AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA

vs.

SAMI OSMAKAC

CRIMINAL COMPLAINT

CASE NUMBER: 8:12-MJ-1008 MAP

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about January 7, 2012, in Hillsborough County, in the Middle District of Florida, defendant(s) did,

    Attempt to Use of a Weapon of Mass Destruction Against Persons and Property in the United States

in violation of Title 18, United States Code, Section(s) 2332a(a)(2)(A), (a)(2)(B), and (a)(2)(D). I further state that I am a(n) Special Agent with Federal Bureau of Investigation, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Signature of Complainant
Christopher B. Johnston, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

January  , 2012     at     Tampa, Florida

MARK A. PIZZO
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Christopher B. Johnston, being duly sworn, hereby depose and state as follows:

### I. Introduction

1. I am employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since October of 2009. Currently, I am assigned to the Joint Terrorism Task Force at the Tampa Field Office, Tampa, Florida. My duties with the FBI include, but are not limited to, the investigation of alleged violations of Federal criminal statutes involving terrorism, extensive document review and analysis, interviews of witnesses and subjects, and the execution of federal arrest warrants and search warrants. In my capacity as a Special Agent, I have received training in search and seizure, the use of confidential human sources, electronic and video surveillance, and investigations involving international and domestic terrorism, violent crimes, and various other crimes. I am also a member of the FBI Evidence Response Team and an administrative member of the FBI Hazardous Materials Response Team. I have received significant training in evidence collection and crime scene processing and have utilized those skills during the execution of several search warrants.

2. The facts set forth in this affidavit are based upon my personal knowledge, knowledge obtained during my participation in this investigation, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through training and experience. I have not included in this

1

affidavit every fact known to me in regard to this investigation, but rather only those facts that are sufficient to establish probable cause.

3. I make this affidavit in support of a criminal complaint charging SAMI OSMAKAC with attempted use of weapons of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2)(A), (a)(2)(B), and (a)(2)(D). As described in detail below. I have probable cause to believe that on or about January 7, 2012, OSMAKAC did knowingly attempt to use a weapon of mass destruction, to wit, a destructive device as described in 18 U.S.C. § 921, without lawful authority against persons and property located within the United States. This affidavit is also submitted in support of an arrest warrant for OSMAKAC.

II. Details of Probable Cause

4. The defendant, SAMI OSMAKAC, is a 25 year-old man who is a naturalized citizen of the United States, born in the former Yugoslavia. The defendant currently lives in Pinellas Park, Florida. The defendant has no known prior felony convictions.

5. On or about September 28, 2011, the FBI, specifically, the Tampa Field Office in Tampa, Florida, received information from a Confidential Human Source (CHS) regarding OSMAKAC. The CHS was known to the FBI prior to this investigation and has provided reliable information in the past. The CHS stated that OSMAKAC and another individual had come into his/her business and asked if the CHS had any flags representing Al Qaeda. OSMAKAC then began working for the CHS as a laborer in his/her business. The CHS has been paid for his/her services during the course of this investigation. The CHS

2

initially refused to use recording devices during his/her meetings with OSMAKAC, although later meetings between the two have been recorded by audio and/or video devices.

6. On or about November 30, 2011, OSMAKAC met with the CHS, and their conversation was recorded by audio and video devices. The CHS and OSMAKAC drove around the Tampa area, discussing a potential violent attack that OSMAKAC wished to execute. During this meeting, OSMAKAC asked the CHS to help him procure firearms and a belt containing explosives for use in the attack. The CHS then indicated to OSMAKAC that s/he knew someone who might be able to provide OSMAKAC with the items he wanted, including firearms and explosive devices. Unbeknownst to OSMAKAC, the individual the CHS was discussing is an FBI undercover employee (UCE).

7. On or about December 19, 2011, OSMAKAC worked at the CHS's store. OSMAKAC and the CHS drove to a nearby storage unit the CHS uses for his/her business. While there, the CHS called the UCE on OSMAKAC's behalf. The CHS placed the call on a cellular phone provided by OSMAKAC. OSMAKAC and the CHS were located within the State of Florida and the UCE was located outside of the State of Florida when this call took place. After the CHS spoke to the UCE, OSMAKAC and the UCE spoke briefly and agreed to meet in the future to discuss "the work." Based on his/her training, experience, and this investigation, the UCE believed "the work" was a coded reference to OSMAKAC's desire to carry out a violent attack in the Tampa Bay area.

8. On or about December 21, 2011, OSMAKAC met in person with the UCE. The two met alone, and their meeting was recorded by audio and video devices. During the meeting, OSMAKAC told the UCE he wished to acquire "one AK at least," "a couple of Uzis," "ten grenades minimum." and explosives, specifically, an explosive "belt" with a multi-directional blast range of approximately 15 yards. Based on his/her training, experience, and this investigation, the UCE believed "AK" was a reference to an AK-47-style machine gun and "Uzis" was a reference to Uzi submachine guns.

9. OSMAKAC explained, in response to questioning by the UCE, that he wanted the blast of the explosive belt to be circular and not focused in any one direction. OSMAKAC indicated that he was physically able to carry a 25 pound explosive belt. OSMAKAC also requested "long" magazines for the AK-47 and the Uzis. Based on his/her training, experience, and this investigation, the UCE believed that "long magazines" was a reference to high capacity magazines. When discussing the specifications for the explosive belt, the UCE asked OSMAKAC if he was sure "this is what you want," and OSMAKAC affirmed that it was.

10. The UCE told OSMAKAC s/he could sell him one firearm, the AK-47, and multiple magazines but that multiple firearms would be expensive. OSMAKAC stated that the UCE would have to show him how to use everything except the AK-47 because OSMAKAC did not "trust" his internet connection, so he could not use his computer to research how to use the devices. OSMAKAC stated that he could "figure . . . out" how to use the AK-47.

4

11. On or about December 23, 2011. OSMAKAC met in person with the UCE. This meeting was recorded by audio and video devices. During this meeting, OSMAKAC told the UCE that OSMAKAC had access to a warehouse where the UCE could show OSMAKAC how to use the weapons that OSMAKAC had previously asked the UCE to provide. OSMAKAC also provided the UCE a $500.00 down payment on the AK-47, multiple homemade explosive grenades, and an explosive belt.

12. OSMAKAC also asked the UCE if s/he could build explosives that could be placed in three different vehicles and detonated remotely near the location where OSMAKAC would conduct an attack using the other weapons he previously asked for. The UCE advised OSMAKAC that it would be difficult to obtain explosives for three vehicles without arousing the suspicion of law enforcement but that s/he could possibly provide OSMAKAC one set of explosives that could be placed in the trunk of a car. The UCE further explained that the explosive device for the car would be designed so that it could be triggered by using a cellular phone. The UCE later told OSMAKAC the cost would be $2,100.00 without an explosive device that could be placed in the trunk of a car and $2,500.00 with explosives for a car. The UCE told OSMAKAC that it would take him/her some time to obtain everything OSMAKAC was asking for.

13. OSMAKAC told the UCE that he wanted the explosive belt to be built to kill people, stating that the purpose of the explosive belt was "to hold people and in case they want to storm whatever I'm trying to do . . . it's for everybody and the people who want to storm it." OSMAKAC indicated he was not sure he would be able to enter inside the location of

his planned attack, so he directed that the explosive belt should be built to function outdoors in an open space rather than in an enclosed space, although OSMAKAC did state "if the building flew in, it's . . . more terror in their hearts." When asked whether he wanted a low or high intensity explosive, OSMAKAC asked which one would cause more damage. "let's say to police, for instance." When the UCE told OSMAKAC that high intensity explosives would "rip flesh," OSMAKAC expressed his desire to have high intensity explosives in the belt. OSMAKAC asked the UCE to build the belt with marbles as projectiles and agreed when the UCE asked OSMKAC if b.b. gun pellets would be acceptable instead of marbles. The UCE and OSMAKAC agreed to contact each other again in about a week using cellular phones they were to obtain without using their real identification.

14. On or about January 1, 2012, OSMAKAC met in person with the UCE. This meeting was recorded by audio and video devices. During this meeting, OSMAKAC stated that he wanted to carry out his attack "during the night." He stated, "I want to do something, something terrifying, like one day, one night, something's going to happen, then six hours later, something else." He described his attack generally by stating that he wanted to get a hotel room, park the vehicle with the bomb in it at his target, leave the area, detonate the bomb in the car, and then "go get the other stuff from the motel." Based on his/her training, experience, and this investigation, the UCE believed that the "stuff" OSMAKAC was referring to was the AK-47, grenades, and explosive belt that OSMAKAC planned to leave in a hotel room. The UCE asked OSMAKAC if he wanted a semi-automatic or fully-automatic AK-47; OSMAKAC told him/her, "get the fully" and also asked the UCE

to obtain a pistol for him.

15. The UCE and OSMAKAC then discussed the location where OSMAKAC wished to park the vehicle with the explosive device. OSMAKAC stated the location was in Tampa, Florida, and then directed the UCE to Seventh Avenue in the Ybor City area of Tampa. OSMAKAC stated he wanted the items he asked for on Thursday because it is "a big gathering ... night." Later, OSMAKAC pointed out two specific establishments that he described as "real busy." The UCE later identified these two establishments as night clubs in Ybor City, although one of the establishments is currently not open for business. OSMAKAC went on to discuss parking near the locations with the UCE. The UCE stated, "[Y]ou could put it in the parking lot and, and you're not gonna do anything here." OSMAKAC then replied, "No, no, no. I wanna park it here," indicating that he wished to park the car on the street directly in front of businesses he had indicated located there. When discussing whether the area in Ybor City OSMAKAC was showing the UCE would be busy on night the UCE delivered the firearm and explosives. OSMAKAC stated, "If I find out there is nothing, I know other places. . . . I know a lot of places where it gets real crowded."

16. The UCE and OSMAKAC discussed how far OSMAKAC needed to be from the vehicle-borne explosive device to avoid being injured by the blast. The UCE stated that OSMAKAC should be at least 400 yards away. OSMAKAC stated, "that's going to do a lot of damage." The UCE replied, "I mean, that's how far you wanna be, because I'm, just to be safe." OSMAKAC then stated, "No, no, the more, the more the better." He also

7

asked if the car bomb would "take down buildings" and "kill people inside." When the UCE responded in the affirmative, OSMAKAC stated, "that's what I'll do." When discussing the "trunk," OSMAKAC stated, "You know, they saying they like 3 trillion in debt, they like 200 trillion in debt, and after all this money they're spending for homeland security and all this, this is gonna be crushing them, this gonna terrify them."

17. OSMAKAC explained that the place he wanted to target after placing the car bomb was "very close" to where he would detonate the car bomb. He stated that during the second portion of his attack, he wanted to use the explosive belt to "get in somewhere where there's a lot of people" and take hostages. Then, OSMAKAC stated he wants to contact the authorities, specifically, the Federal Bureau of Investigation, "and I want to demand something . . . from the kuffar." (In Arabic, the word kuffar means infidels or disbelievers in Islam.) He continued that after he took hostages, "they better release whoever I demand to release." OSMAKAC told the UCE that he believed that the detonation of the vehicle bomb before he took hostages would indicate to authorities that he was "not joking" and would lead to the release of "some prisoners."

18. When discussing "kuffar backup," OSMAKAC stated, "once I have this . . . they can take me in five million pieces." As he said the word "this," OSMAKAC can be seen on video gesturing to his waist. Based on his/her training, experience, and this investigation, the UCE believed that when OSMAKAC said "this" and gestured to his waist, he was referring to the explosive device attached to a belt or a vest that OSMAKAC had previously asked for. The UCE also believed that OSMAKAC was referring to responding law

enforcement officers when he used the term "kuffar backup." Further, OSMAKAC indicated that he was also considering parking the vehicle with the explosive device in front of the Operations Center of the Hillsborough County Sheriff's Office, located in Ybor City. OSMAKAC asked the UCE, "Will that take down a police station, the Sheriff's building?" After the UCE replied in the affirmative, OSMAKAC discussed where the best place was to park near the Sheriff's Office building.

19. The UCE and OSMAKAC also discussed other ideas that OSMAKAC had for conducting attacks. OSMAKAC discussed two specific other ideas he had. First, he stated, "Honestly, I would love to go for the Army people, but their bases are so locked up, I have to do something else." Second, he discussed a plan to "take down the bridges" across the Tampa Bay area in simultaneous attacks with multiple people, stating "this will crush the whole economy . . . this would crush everything, man, they would have no more food coming in. They would, nobody would have work." OSMAKAC told the UCE that this plan wouldn't work by stating, "I mean, I made many plans, but there's not enough people. I even wasted like my energy debating and talking and trying [to] inspire them."

20. When the UCE asked OSMAKAC when he would be ready "to go," OSMAKAC stated, "I've been ready, man. Whenever we can get this done, I'm ready." The UCE later stated to OSMAKAC that because nothing had been delivered yet, OSMAKAC could still change his mind. OSMAKAC immediately shook his head in the negative and stated, "We all have to die, so why not die the Islamic way?" Later, the UCE told OSMAKAC, "you haven't lived half your life yet, bro. . . . you don't want to have kids, take a wife, have

9

children?" OSMAKAC replied that Allah allows people to have children in Jannah. Jannah means paradise in Arabic.

21. During the course of the meeting on January 1, 2012, OSMAKAC indicated on multiple occasions that he did not want to meet with the UCE again until the UCE was ready to deliver the firearms and explosives OSMAKAC requested. OSMAKAC asked the UCE if s/he had gotten a cell phone in a fake name; the UCE replied in the affirmative. OSMAKAC first requested that the UCE get another cellular phone in a fake name and then accepted when the UCE subsequently offered to let OSMAKAC take the phone s/he had. The UCE agreed to get another cellular phone in a fake name for him/herself. The two determined that in the future they would communicate by text message using the cellular phones in fake names and by messages left at the CHS's business. The purpose of these communications would be to decide on a date for delivery of the firearms and explosives OSMAKAC wished to use in his attack.

22. On or about January 7, 2012, OSMAKAC and the UCE agreed via text messages and a handwritten note to meet at a hotel in Tampa. OSMAKAC went to the CHS's business, and OSMAKAC and the CHS drove separately, first to a park and then to a shopping mall parking lot. OSMAKAC parked his vehicle, described as green 1994 Honda Accord, VIN Number 1HGCD5639RA177526, Florida license plate number A747YF, in the shopping mall parking lot. OSMAKAC then got into the CHS's car, where OSMAKAC related his belief that he was being followed by law enforcement and asked the CHS to drive him to the hotel where the UCE was waiting. The CHS drove OSMAKAC to the agreed-upon

hotel, dropped him off near the parking lot of the hotel, and then left the area.

23. OSMAKAC met the UCE in the parking lot of the hotel. OSMAKAC then got into the UCE's vehicle, and the two drove around the Tampa area. During the drive, OSMAKAC and the UCE stopped briefly and looked at an item in the truck bed of the UCE's vehicle that was designed to resemble a vehicle-born improvised explosive device (VBIED) weighing over 100 pounds, although the item was not a functional explosive, nor did it contain any explosive material, unbeknownst to OSMAKAC. Then, after getting back in the UCE's vehicle, OSMAKAC requested that the UCE film a video explaining OSMAKAC's motives for a violent attack. OSMAKAC informed the UCE that he had a video camera in his bag that they could use when they returned to the hotel.

24. OSMAKAC and the UCE then returned to the hotel room. After a brief time, the UCE began showing OSMAKAC the items s/he brought, which included all of the items OSMAKAC had requested in previous meetings, specifically, a fully automatic AK-47, ammunition and magazines for the AK-47, a pistol, ammunition and a magazine for the pistol, grenades, and an explosive belt. The UCE first delivered to OSMAKAC six items that were designed to resemble grenades, although the items were not functional explosives, unbeknownst to OSMAKAC. The UCE next delivered to OSMAKAC a fully automatic AK-47, although the firearm was not functional, unbeknownst to OSMAKAC. The UCE also delivered ammunition for the AK-47, which was inert, again, unbeknownst to OSMAKAC.

25. The UCE delivered to OSMAKAC what was purported to be an explosive belt, although the item contained no functional explosives, unbeknownst to OSMAKAC. The UCE demonstrated that the belt was designed to be worn around the waist and over the shoulders. The UCE delivered to OSMAKAC a pistol, specifically, a .45 caliber Colt Mark IV, although the firearm was not functional, unbeknownst to OSMAKAC. The UCE also delivered ammunition for the pistol, which was inert, again, unbeknownst to OSMAKAC.

26. OSMAKAC took the AK-47, held it for a period of time, and inserted an empty magazine. Later, OSMAKAC put on the explosive belt, a vest holding extra magazines for the AK-47, and a satchel holding six grenades, all the while holding the AK-47 in his hands. OSMAKAC then removed all of these items and put them in the hotel room.

27. OSMAKAC then directed the UCE to film OSMAKAC using a digital video camera. OSMAKAC first directed the UCE to film OSMAKAC in a brief test video to check for sound and visual quality. OSMAKAC then directed the UCE to film a video in which OSMAKAC explained his motives for conducting a violent attack. During the video, OSMAKAC is seen sitting cross-legged on the floor of the hotel room, with the pistol in his hand and the AK-47 displayed behind him. The video lasted approximately 8 minutes. In the video, OSMAKAC stated his belief that Muslims' "blood" was more valuable than that of people who do not believe in Islam. He also stated that he wanted "pay back" for wrongs he felt were done to Muslims.

28. OSMAKAC then left the hotel without any of the items the UCE delivered to him and took a silver minivan, which was provided by the UCE at OSMAKAC's request. Before he left, OSMAKAC stated that he intended to park the minivan near his intended target for the VBIED to use as a getaway vehicle. OSMAKAC told the UCE that he changed his target from the Ybor City area because there were too many police officers in that area. OSMAKAC indicated that his target was an Irish bar, whose name he could not remember but he described it as playing music all night. OSMAKAC drove to the intersection of S. Howard Avenue and W. Swann Avenue in the South Tampa area of Tampa, Florida. OSMAKAC parked the silver minivan in a parking lot for a number of businesses, including a Starbucks. Your affiant is aware that there is at least one business that can be described as an Irish bar within a number of blocks from where OSMAKAC parked the silver minivan. OSMAKAC then left the area on foot and hired a taxi a number of blocks away.

29. OSMAKAC took the taxi to the shopping mall parking lot where he left his green Honda Accord. OSMAKAC then drove the vehicle back to the hotel where he again met with the UCE in the hotel room. OSMAKAC put the pistol in the waistband of his pants. OSMAKAC and the UCE then went to the parking lot of the hotel. OSMAKAC sat in the passenger seat of his vehicle. loaded a magazine into the pistol. and then put it in the glove compartment of the vehicle.

30. OSMAKAC's green Honda Accord was parked next to the UCE's vehicle. OSMAKAC got into the passenger seat of the UCE's vehicle. The UCE showed OSMAKAC how to "arm" and detonate the item that OSMAKAC believed was a VBIED. The VBIED was constructed with a cellular phone trigger, as the UCE and OSMAKAC had previously discussed. The UCE then gave OSMAKAC the key to the hotel room. The two transferred the item that OSMAKAC believed was a VBIED to the trunk of OSMAKAC's vehicle. OSMAKAC then armed the VBIED by connecting the detonating device to what he believed was the detonating cord and set the detonating device.

31. The UCE got into his/her vehicle and drove away from the hotel. OSMAKAC then got into his vehicle, started the car, and placed it into reverse. He was then arrested. His vehicle was impounded after his arrest.

## III. CONCLUSION

32. Based upon the above information, probable cause exists to believe that the defendant, Sami Osmakac, committed a violation of Title 18, United States Code, Section 2332a(a)(2)(A), (a)(2)(B), and (a)(2)(D) on or about January 7, 2012, in that OSMAKAC did knowingly attempt to use a weapon of mass destruction, to wit, a destructive device as described in 18 U.S.C. § 921, without lawful authority against persons and property located within the United States. In consideration of the foregoing, your affiant respectfully requests that this court issue a warrant authorizing the arrest of the defendant.

Further affiant sayeth naught.

_____
Christopher B. Johnston, Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me
this __8__ day of January 2012

_____
MARK A. PIZZO
United States Magistrate Judge

15