UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:12-CR-45-T-35AEP

SAMI OSMAKAC

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR DISCLOSURE OF
BRADY, GIGLIO, RULE 16, AND JENCKS MATERIAL**

The United States of America hereby responds in opposition to the defendant's Motion for Disclosure of Brady, Giglio, Rule 16, and Jencks Material (Dkt. No. 96). The motion requests a number of different categories of discovery, each of which will be addressed in turn herein.

## FACTUAL BACKGROUND

1. The facts relevant to this case are set forth in detail in the Complaint in this matter. (Dkt. No. 1.) In summary, the FBI received information from a confidential human source (CHS) regarding the defendant on September 28, 2011. On November 30, 2011, the defendant met with the CHS and told him/her about a violent attack that the defendant wished to carry out. The CHS offered to introduce the defendant to someone who might be able to provide Osmakac with firearms and explosive devices. Unbeknownst to Osmakac, the individual the CHS was discussing is an Federal Bureau of Investigation (FBI) undercover employee (UCE).

2. On December 21, 2011, Osmakac met in person with the UCE. During the meeting, Osmakac told the UCE he wished to acquire "one AK at

least," "a couple of Uzis," "ten grenades minimum," and explosives, specifically an explosive "belt" with a multi-directional blast range of approximately 15 yards.

3.  On December 23, 2011, Osmakac met in person with the UCE. During the meeting, Osmakac paid the UCE $500.00 as a down payment for an AK-47, multiple homemade explosive grenades, and an explosive belt. Osmakac also requested that the UCE build explosive devices that could be placed in vehicles and remotely detonated. The UCE agreed to attempt to build one such device.

4.  On January 1, 2012, Osmakac met in person with the UCE. During the meeting, Osmakac stated that he wanted a fully automatic AK-47 and asked the UCE for a pistol as well. Further, Osmakac discussed the location of his attack with the UCE. He stated that he wished to attack the Ybor City area of Tampa on a Thursday night because it is "a big gathering ... night."

5.  On January 7, 2012, Osmakac met in person with the UCE. During the meeting, the UCE gave the following items to Osmakac: six items that were designed to resemble grenades, although the items were not functional explosives; a fully automatic AK-47, although the firearm was not functional; ammunition for the AK-47, although the ammunition was inert; a .45 caliber Colt Mark IV pistol, although the firearm was not functional; ammunition for the pistol, although the ammunition was inert; an item that was purported to be an explosive belt, although the item contained no functional explosives; and an item that was designed to resemble a vehicle-borne improvised explosive device (VBIED), although the item was not a functional explosive.

6.  Also during the course of this meeting, Osmakac directed that the UCE film him using a digital video camera. Osmakac then explained his motives for conducting a violent attack, stating that he wanted "pay back" for wrongs he felt had been done to Muslims.

7.  After the filming was completed, Osmakac told the UCE that he was leaving to park a getaway vehicle near his intended target for the VBIED. Osmakac stated that he had changed his target from the Ybor City area because there were too many police officers in that area. Osmakac indicated that his target was a bar. Osmakac then left the meeting in a silver minivan and drove to a parking lot near the intersection of S. Howard Avenue and W. Swann Avenue in the South Tampa area of Tampa, Florida. Osmakac parked the vehicle, left the parking lot on foot, and hired a taxi to retrieve his personal car from where he left it.

8.  Osmakac then met again with the UCE. The UCE and Osmakac placed the purported VBIED into the trunk of Osmakac's car. The UCE then left the meeting. Osmakac got into his car and was arrested as he was attempting to leave the meeting.

## **LEGAL ARGUMENT**

The defendant's requests for additional discovery appear beginning at paragraph 92 of his motion. (Dkt. No. 96 at 25, ¶ 92.) First, the defendant requests "all records of payment involving the CHS or any source; any promises of preferential treatment, leniency, or immunity, including in civil proceedings; copies of any documents reflecting the rules of engagement and conduct as to

3

the informant or any other informant; [and] the basis for the rejection of taping or video taping by the CHS from the period of September 28 through November 30, 2011 . . . as well as any and all impeachment evidence . . . in this case." (Id.) The defendant requests that these materials be provided sixty days prior to trial. (Id. at 27, ¶ 98.) The pretrial discovery order in this case requires that the government provide such material, which is appropriately classified as Giglio material, ten days prior to trial. (Dkt. No. 18 at 2.) On March 25, 2013, the undersigned consulted with defense counsel in this matter regarding the timing of the above-described disclosures related to the CHS. The parties agreed that such materials will be provided by the government to the defendant at least thirty days prior to the commencement of trial in this matter.

As to the CHS, the defendant further requests "a record of and access to an examination of the CHS's computer or computers for all times relevant." (Dkt. No. 96 at 25, ¶ 92.) No such information exists, and thus there is nothing for the government to provide as to this request.

Next, the defendant requests materials related to Russell Dennison. The defendant states that "there is no interview of Dennison and no report of his actual surveillance during the course of the conspiracy." (Id. at 26, ¶ 95.) In the first instance, the defendant was not charged with conspiracy, which limits the amount of discovery regarding Dennison to which the defendant is entitled. The government conducted a review of all materials gathered during the course of the investigation into the defendant prior to providing discovery in this case and has provided all materials that are relevant to the defendant's charges or which

constitute information which the government is required to disclose pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

In his motion, the defendant points only to a memorandum of an interview with Dennison and reports of surveillance in which Dennison was observed as items that he believes he is entitled to that he has not received. (Dkt. No. 96 at 26, ¶ 25.) The memorandum regarding the interview of Dennison by the FBI will be provided to the defendant in a timely manner. Any surveillance in which Dennison was seen associating with the defendant has previously been provided in discovery on February 17, 2012; February 23, 2012; April 24, 2012; and July 20, 2012, or will be provided in a timely manner. There are no other materials that the government is aware of to which the defendant is entitled, and he has not requested any other specific materials from the government relevant to Dennison.

Finally, the defendant requests any materials related to Dennison as an FBI CHS. Id. No such information exists, and thus there is nothing for the government to provide as to this request.

Further, the defendant requests "any promises made, classification as source, and supporting materials" as to Jasmin Hodzic. (Id. at 27, ¶ 97.) No such information exists, and thus there is nothing for the government to provide as to this request.

Finally, the defendant makes a general request in his motion for "Brady material," id. at 25, ¶ 92, and "all investigative, surveillance, and interview material which references the defendant," id. at 27, ¶ 98. All such material that is

5

not governed by the Government's Classified In Camera, Ex Parte Memorandum of Law and Motion Pursuant to Section 4 of CIPA and Rule 16, see Dkt. No. 44, and the Court's Order regarding that Motion, see Dkt. No. 60, has been provided to the defendant or will be provided as set forth in this response and the United States' Response in Opposition to Defendant's Motion for Disclosure of FISA Information and Other Discovery, Dkt. No. 107, filed contemporaneously with this response.

## CONCLUSION

The government will provide the materials requested by the defendant relevant to the CHS and Dennison as discussed above. As to the remainder of the materials, the government respectfully requests that this Court deny the defendant's motion for the reasons stated above.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

By: *s/ Sara C. Sweeney*
SARA C. SWEENEY
Assistant United States Attorney
USA No. 119
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: sara.sweeney@usdoj.gov

U.S. v. SAMI OSMAKAC	Case No. 8:12-CR-45-T-35AEP

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 29, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

George E. Tragos, Esq.

By: */s/ Sara C. Sweeney*
SARA C. SWEENEY
Assistant United States Attorney
USA No. 119
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-Mail: sara.sweeney@usdoj.gov