UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                             CASE NO.:  8:12-CR-45-T-35AEP

SAMI OSMAKAC

**MOTION FOR PROTECTIVE ORDER
PERTAINING TO THE TESTIMONY OF
UNDERCOVER AGENT AT TRIAL**

The United States of America hereby moves this Court for a protective

order authorizing the government to utilize certain measures to protect the

identity and security of an undercover employee (UCE) of the Federal Bureau of

Investigation (FBI) who will be testifying on behalf of the government during the

trial in this matter.  At trial, the government intends to call the FBI undercover

agent who had direct contact with the defendant during the course of the

investigation at issue in this case.[1]  Further, the government intends to show

video recordings to the jury of meetings between the defendant and the UCE in

---

[1]      The true names of FBI UCEs are classified. The government has moved, *in camera* and *ex parte,* pursuant to the Classified Information Procedures Act (CIPA) Section 4, 18 U.S.C. App. 3 § 4, to delete the true identity of the UCE from discovery. See Dkt. No. 138. In any event, the government will provide defendant with all Giglio and Jencks materials regarding the UCE, if any, 30 days prior to trial as required by the Pretrial Discovery Order (Dkt. No. 18) and the parties' agreement (see Dkt. No. 106 at 4.).

1

which the UCE's face is shown.  The government moves for certain protections for the UCE's identity during his/her trial testimony.

In support of this motion, the government relies on a Declaration prepared by R.J. Holley, Acting Assistant Director of the Counterterrorism Division, Federal Bureau of Investigation, which sets forth information regarding the UCE.  A version of the Declaration containing only the non-classified information relied on by the government is attached as Exhibit 1 to this motion.  The full Declaration, which contains classified information, was filed by the government as Exhibit 1 to the government's Third Classified In Camera, Ex Parte Memorandum of Law and Motion for an Order Pursuant to Section 4 of CIPA and Fed. R. Crim. Pro. 16(d)(1).  See Dkt. No. 138.  The Declaration explains why public disclosure of the UCE's true identity and public disclosure of the UCE's physical image will jeopardize other undercover investigations and the government's undercover investigative procedures, as well as pose a risk of danger to the UCE.[2]

## I.  Factual and Procedural Background

On January 7, 2012, the defendant, Sami Osmakac, was arrested on the basis of a Criminal Complaint charging him with attempting to use a weapon of mass destruction against persons and property within the United States, in

_____

[2]     The undersigned contacted counsel for the defendant regarding the government's reliance on the classified version of the Declaration, and counsel advised that he objected to the government's reliance on the classified version of the Declaration in support of this motion.

2

violation of 18 U.S.C. § 2332a(a)(2).  (Dkt. No. 1.)  The defendant made his initial appearance on January 9, 2012, and was detained pending trial because he was both a flight risk and an ongoing danger to community.  (Dkt. No. 7, Order of Detention.)  On February 2, 2012, the grand jury returned a two-count Indictment charging the defendant with attempting to use a weapon of mass destruction against persons and property within the United States, in violation of 18 U.S.C. § 2332a(a)(2), and with possession of an unregistered machine gun, in violation of 26 U.S.C. § 5861(d).  (Dkt. No. 10.)

The facts relevant to this case are set forth in detail in the Complaint in this matter.  (Dkt. No. 1.)  In summary, the FBI received information from a confidential human source (CHS) regarding the defendant on September 28, 2011.  On November 30, 2011, the defendant met with the CHS and told him/her about a violent attack that the defendant wished to carry out.  The CHS offered to introduce the defendant to someone who might be able to provide Osmakac with firearms and explosive devices.  Unbeknownst to the defendant, the individual the CHS was discussing is a Federal Bureau of Investigation (FBI) undercover employee (UCE).

On December 21, 2011, Osmakac met in person with the UCE.  During the meeting, Osmakac told the UCE he wished to acquire "one AK at least," "a couple of Uzis," "ten grenades minimum," and explosives, specifically an explosive "belt" with a multi-directional blast range of approximately 15 yards.

3

On December 23, 2011, the defendant met in person with the UCE. During the meeting, Osmakac paid the UCE $500.00 as a down payment for an AK-47, multiple homemade explosive grenades, and an explosive belt. Osmakac also requested that the UCE build explosive devices that could be placed in vehicles and remotely detonated.  The UCE agreed to attempt to build one such device.

On January 1, 2012, the defendant met in person with the UCE.  During the meeting, Osmakac stated that he wanted a fully automatic AK-47 and asked the UCE for a pistol as well.  Further, Osmakac discussed the location of his attack with the UCE.  He stated that he wished to attack the Ybor City area of Tampa on a Thursday night because it is "a big gathering ... night."

On January 7, 2012, Osmakac met in person with the UCE.  During the meeting, the UCE gave the following items to Osmakac: six items that were designed to resemble grenades, although the items were not functional explosives; a fully automatic AK-47, although the firearm was not functional; ammunition for the AK-47, although the ammunition was inert; a .45 caliber Colt Mark IV pistol, although the firearm was not functional; ammunition for the pistol, although the ammunition was inert; an item that was purported to be an explosive belt, although the item contained no functional explosives; and an item that was designed to resemble a vehicle-borne improvised explosive device (VBIED), although the item was not a functional explosive.

Also during the course of this meeting, Osmakac directed that the UCE film him using a digital video camera.  The defendant then explained his motives for conducting a violent attack, stating that he wanted "pay back" for wrongs he felt had been done to Muslims.

After the filming was completed, Osmakac told the UCE that he was leaving to park a getaway vehicle near his intended target for the VBIED.  The defendant stated that he had changed his target from the Ybor City area because there were too many police officers in that area.  Osmakac indicated that his target was a bar.  Osmakac then left the meeting in a silver minivan and drove to a parking lot near the intersection of S. Howard Avenue and W. Swann Avenue in South Tampa.  The defendant parked the vehicle and hired a taxi to retrieve his personal car from where he left it.

Osmakac then met again with the UCE.  The UCE and Osmakac placed the purported VBIED into the trunk of the defendant's car.  The UCE then left the meeting.  Osmakac got into his car and was arrested as he was attempting to leave the meeting.

## II.  Protective Measures Sought

Based upon the need to protect from disclosure the UCE's true identity and physical image, and the need to protect other undercover investigations and the government's undercover investigative procedures, the government respectfully submits that there are certain measures the Court should adopt for

5

the testimony of the UCE at trial.  The proposed security measures are narrowly tailored to assure that the identity and security of the UCE and the integrity of other undercover investigations will not be compromised by the UCE's appearance, without impairing the defendant's confrontation rights under the Sixth Amendment, and without closing the proceedings to the public.

Specifically, the government requests the Court implement the following measures:

1.      The UCE may use the UCE's undercover pseudonym when testifying at trial, without disclosing publicly the true identity of the UCE.

2.      The defense shall be prohibited from asking any questions seeking personal identifying information, such as name and address, from the UCE.

3.      The UCE may testify using a light disguise, such as changing the UCE's facial hair, hairstyle, or dress style.

4.      The UCE shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom.

5.      When the UCE testifies, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom.  The government shall provide a contemporaneous CCTV video or similar broadcast of the UCE's testimony, without the visual image of the UCE, while the UCE is testifying, which shall be made available for public viewing in another location in the courthouse.

6.      The government shall be allowed to digitally obscure the facial image of the UCE on any recorded video footage played over the CCTV feed during court proceedings (no such measures are required for any video shown or offered by the government as an exhibit at trial and viewed by the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team).

7.      All non-official recording devices shall be prohibited from being in the room in which the CCTV feed is shown during the UCE's testimony.

8.      No public disclosure of any audio and/or video recording of the UCE while testifying shall be permitted.

A proposed protective order setting forth the above conditions is attached hereto as Exhibit 2.

### III.  Argument

Federal courts have consistently allowed witnesses to testify under a pseudonym and using other means to protect their identity where a compelling reason is given, as is proposed in the instant case.  Further, a number of courts have allowed undercover agents to testify behind a screen or while otherwise concealed where such concealment is balanced against the defendant's right to a fair and public trial.  The courts have held that protecting an officer's safety and the integrity of other ongoing investigations are compelling interests that can be

7

accommodated by the courts without substantially infringing upon a defendant's Sixth Amendment rights.

**A.    The government's requests regarding protection of the UCE's identity during trial testimony are appropriate and do not impact the defendant's confrontation rights.**

The confrontation clause of the Sixth Amendment provides that the defendant in a criminal trial has the right to confront and cross-examine the government's witnesses who testify against the defendant.  U.S. Const. amend. VI; see Maryland v. Craig, 497 U.S. 836, 846 (1990); Smith v. Illinois, 390 U.S. 129 (1968).  The "elements of confrontation - physical presence, oath, cross-examination, and observation of demeanor by the trier of fact - serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings."  Craig, 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied."  United States v. Falsia, 724 F.2d 1339, 1343 (9th Cir. 1983).

A criminal defendant has no absolute right to have a jury hear a witness's true name.  This restriction of cross examination for a witness's protection was recognized in the Supreme Court case of Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986), holding that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such

cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

Several circuits have affirmed the district court's discretion to allow a witness's use of a pseudonym and limiting cross examination of a witness regarding identifying information, where the court found that the government's interest in protecting the witness from harm outweighed the defendant's interest in learning or using the identifying information of the witness.  See United States v. Maso, 2007 WL 3121986, *4 (11th Cir. (Fla.) Oct. 26, 2007) ("The district court did not violate [the defendant's] right to confront witnesses by allowing the [cooperating witness] to testify using a pseudonym."); United States v. Alston, 460 F.2d 48, 52 (5th Cir. 1972) ("Thus, while a witness would normally be required to answer all questions regarding his or her background, there are exceptions to that requirement, including that the information is not necessary to 'place the witness in his proper setting.'"); see also Brown v. Kuhlman, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); Siegfriedt v. Fair, 982 F.2d 14, 18 (1st Cir. 1992) (affirming district court's ruling that a witness could use a pseudonym when testifying as the defendant was able to conduct full and effective cross examination.); United States v. Rangel, 534 F.2d 147 (9th Cir. 1976) (holding

9

that where record showed that witness' life had been threatened and witness and family relocated, no error in permitting witness to testify without divulging true name, address and phone number); United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969) (finding that "where there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute.").

Here, permitting the UCE to testify under a pseudonym will not impair the defendant's Sixth Amendment right to confront the witnesses against him.  The declaration submitted in support of this motion shows the government has a compelling interest in protecting the safety of the UCE, the security of other undercover investigations, and the integrity of the government's undercover procedures.  Balanced against this compelling government interest, the use of a pseudonym by the UCE will not prejudice the defendant's confrontation rights. The UCE will be present in the courtroom, so the defendant's ability to confront him/her will not be affected.  Additionally, the jury will be fully able to observe and assess the UCE's appearance and demeanor while testifying. For the same reasons, permitting the UCE to testify in light disguise will not impair the defendant's confrontation rights.  A light disguise, such as facial hair or changing the UCE's hair or dress style should be permitted and will simply serve to minimize the risk that the UCE's true identity will be compromised.

Further, the defendant should be restricted from eliciting questions that would publicly reveal any personal information about the UCE that would disclose the UCE's identity for all of the same reasons set forth above.  Personal information about the UCE is not relevant to the case.  It is the UCE's contacts and communications with the defendant that are relevant.  Public disclosure of personal information about the UCE, such as name and address, will compromise his/her safety and that of his/her family, as well as substantially impacting other investigations.  Cross-examination into completely irrelevant personal information should be prohibited.

**B.     The government's requests regarding the courtroom set up during the UCE's trial testimony are appropriate and do not impact the defendant's right to a public trial.**

The Sixth Amendment guarantees the right to a public trial.  U.S. Const. amend. VI; see also Waller v. Georgia, 467 U.S. 39 (1984).  The right to a public trial assures the defendant receives a fair trial, promotes the integrity of the fact-finding process, preserves public confidence in the criminal justice system, and affords the community an outlet to address crime.  See Waller, 467 U.S. at 46.  However, the Supreme Court has recognized the right to a public trial is not absolute and under certain circumstance the trial court may implement reasonable trial procedures to protect other compelling interests, without violating the Sixth Amendment.  Id. at 45.

11

The Supreme Court in <u>Waller</u> examined under what circumstances criminal proceedings could be closed to the public and gave four factors to determine if a party is justified in closing proceedings:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. 39, 48 (1984).  Although the government is not seeking here to close the proceedings, these factors are instructive in determining the appropriateness of the government's proposal.

"The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and . . . this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom." <u>Ayala v. Speckard</u>, 131 F.3d 62, 72 (2d Cir. 1997). "It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officers." <u>Rodriguez v. Miller</u>, 537 F.3d 102, 110 (2d Cir. 2008).  In <u>Brown v. Artuz</u>, 283 F.3d 492, 501-02 (2d Cir. 2002), the Second Circuit held that protecting an undercover officer's safety satisfied the first prong of the <u>Waller</u> test and was an overriding interest likely to be prejudiced if the courtroom was open to the public during the officer's testimony.  Taken together, these cases make clear that

12

protecting other investigations and ensuring a law enforcement officer's safety are both compelling government interests, in satisfaction of the first Waller factor.

The factual basis in this case for both of these compelling interests are described in detail in the Holley affidavit.  The FBI and the UCE have serious concerns about the disclosure of the UCE's identity, both by name and appearance, and the dire consequences that could result from such disclosure.  See generally Declaration of Holley.  While the government is not aware of any particular individual who might attend the proceedings during the UCE's testimony who would pose a threat, there is "no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity." Ayala, 131 F.3d at 72.  The risk that anyone in the courtroom might reveal the appearance of the UCE to others would create a personal danger to the UCE and would run the risk of jeopardizing ongoing FBI investigations.

As to the second Waller factor, the proposed measures requested by the government to protect the security and safety of the UCEs, and to protect the integrity of other undercover investigations, are no broader than necessary to protect the government's overriding interests.  The government in this case is not seeking the drastic measure of closing the courtroom during the testimony of the UCE.  The government only seeks to protect from disclosure the true identity and image of the UCE.  To accomplish that goal, the government has proposed

13

reasonable procedures that will not interfere with the defendant's Sixth Amendment rights and will allow the public to hear the testimony of the UCE in real time.

Specifically, when the UCE testifies, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team should be present in the courtroom.  The government will provide a contemporaneous CCTV video or similar broadcast of the courtroom proceeding, without the visual image of the UCE, while the UCE is testifying, which shall be made available for public viewing in another location in the courthouse.  The recorded video footage played over the CCTV to the public will have the facial images of the UCE blurred or pixilated, although no such measures will be used for any video shown or offered by the government as an exhibit at trial and viewed by the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team.   The purpose of this proposed set up is to again protect the UCE's image and identity from being revealed to the public.

The transcript of the UCE's testimony will be available for review by the public or press, but there will be no public disclosure of the audio or video evidence presented to the jury.  See United States v. Trofimoff, No. 8:00-CR-197-T-24EAJ, 2001 WL 1644230 at *3 (M.D. Fla. June 12, 2001) (Blurring the image of the undercover officer was "a narrow remedy carefully tailored to protect the effectiveness of the undercover agent while allowing the

14

media access to the full substance of the video tape." ).  Thus, although the public will not be in the same courtroom, the public will have full access to the trial proceeding, except for the UCE's facial image.

The declaration submitted in support of this motion details the government's "extremely substantial" interests here in protecting the UCE's safety and maintaining the continued effectiveness of ongoing undercover investigations. See Ayala, 131 F.3d at 72.  Thus, the Court would be justified in concluding that these interests "would be seriously prejudiced by requiring the officer to testify in an open courtroom." Id.

While the requested procedure of shielding from public view the facial images of the UCE from the public while he/she testifies, the defendant himself would suffer no such deprivation, as he would be able to observe the UCE throughout the testimony.   This procedure will not deprive the defendant of the ability to confront the UCE when he/she testifies against him, nor will it deprive the defendant or the jury of the ability to evaluate the UCE's demeanor.  In addition, the transcript of the UCE's testimony would be made available to the public in its entirety after the testimony is concluded.  As a result, on balance, the deprivation to the public pales in comparison to the government's interest in concealing the UCE's identity from the public during his/her continued work as an undercover employee.

15

For all of the reasons set forth above, prohibiting the public dissemination of any reproductions of the UCE's oral testimony and visual images will not impair any Sixth Amendment rights.  Federal judicial policy prohibits the taking of in-court photographs or videotape of criminal trials, in any event.  See Local Rule 4.11(a)(2).  Here a written transcript of the UCE's testimony will be available to the public.  Only the visual images of the UCE on the witness stand will be obscured from the public.  Thus, all the measures proposed by the government are narrowly tailored to protect the important and substantial government interests at issue.

As to the last Waller factor, the government proposes that the Court make the following findings based on the law above and the information presented in the Holley declaration: 1) The reasonable measures proposed by the government are necessary to protect from disclosure of the true identity of the UCE at trial; 2) Disclosure of the UCE's true identity would jeopardize ongoing undercover investigations and the government's undercover investigative procedures; and 3) The UCE faces a real and substantial risk of danger to him/herself and his/her family if the UCE's true identity were to be disclosed.

## IV.  Consultation with Opposing Counsel

Counsel of record for defendant was contacted and advised the government that he objects to protective measure number 5 but does not object to protective measures 1 through 4 and 6 through 8.

### V.  Conclusion

For all the foregoing reasons, the government respectfully requests that the Court grant the government's motion for a protective order and adopt the government's proposed protective measures to assure the security and safety of the UCE, other undercover investigations, and the government's undercover investigative procedures.

Respectfully submitted,

A. LEE BENTLEY, III
Acting United States Attorney


By:    *s/Sara C. Sweeney*
SARA C. SWEENEY
Assistant United States Attorney
United States Attorney No. 0000119
400 North Tampa Street, Suite 3200
Tampa, Florida  33602
Telephone:  (813) 274-6000
Facsimile:  (813) 274-6178
E-mail:  sara.sweeney@usdoj.gov

U.S. v. SAMI OSMAKAC                    Case No. 8:12-CR-45-T-35AEP

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2013, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice

of electronic filing to the following:

George E. Tragos, Esq.


By:     *s/Sara C. Sweeney*
        SARA C. SWEENEY
        Assistant United States Attorney
        United States Attorney No. 0000119
        400 North Tampa Street, Suite 3200
        Tampa, Florida  33602
        Telephone:  (813) 274-6000
        Facsimile:  (813) 274-6178
        E-mail:  sara.sweeney@usdoj.gov

\\USAFLMSFILE21\Users\_Criminal Cases\O\OSMAKAC, Sami_2011R00291_SCS\p_motion for protective order UC trial testimony.wpd