UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,

       Plaintiff,

                            Case No. 8:12-CR-45-T-35AEP
-vs-                         13 November 2013
                            Tampa, Florida
                            10:30 a.m.

SAMI OSMAKAC,

       Defendant.
-------------------------------/


TRANSCRIPT OF COMPETENCY HEARING
BEFORE THE HONORABLE ANTHONY E. PORCELLI,
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

For the Government:     SARA C. SWEENEY, ESQUIRE
                        Assistant United States Attorney
                        United States Attorney's Office
                        400 North Tampa Street
                        Suite 3200
                        Tampa, Florida 33602
                        (813) 274-6000


For the Defendant:      GEORGE TRAGOS, ESQUIRE
                        601 Cleveland Street
                        Suite 800
                        SunTrust Bank Building
                        Clearwater, Florida 33755
                        (727) 441-9030


Reported By:            PAUL K. SPANGLER, RPR,
                        Official Court Reporter
                        Certificates of Merit and
                         Proficiency, Notary Public
                        (813) 301-5898


STENOGRAPHICALLY RECORDED
COMPUTER-AIDED TRANSCRIPTION
BY ECLIPSE

INDEX TO WITNESS

Witness                                              Page

DONALD R. TAYLOR
        Direct Examination By Ms. Sweeney          4
        Cross-Examination By Mr. Tragos           11
        Redirect Examination By Ms. Sweeney       23

```
 1   (10:30 a.m.)    P R O C E E D I N G S

 2            THE BAILIFF:  All rise.

 3            (Pause.)

 4            This Honorable Court is now in session, the

 5   Honorable Anthony E. Porcelli presiding.  Be seated, please.

 6            THE COURT:  Thank you.

 7            Good morning.

 8            Call the case.

 9            THE DEPUTY CLERK:  United States versus

10   Sami Osmakac.  Case 8:12-CR-45-T-35AEP.

11            THE COURT:  All right.

12            Counsel, please state your appearance for the

13   record.

14            MS. SWEENEY:  Good morning, Your Honor.

15            Sara Sweeney on behalf of the United States.  With

16   me is Agent Taylor Reed from the FBI.

17            THE COURT:  Good morning to you both.

18            MR. TRAGOS:  George Tragos on behalf the

19   defendant, Your Honor.  Good morning.

20            THE COURT:  Good morning, Mr. Tragos.

21            All right.  This matter is scheduled for a

22   competency hearing.  Is the Government ready to proceed?

23            MS. SWEENEY:  Yes, Your Honor.

24            THE COURT:  All right, let's call your first

25   witness.
```

1          MS. SWEENEY:  The United States calls

2     Dr. Donald Taylor.

3              (Pause.)

4              THE DEPUTY CLERK:  This way.

5              (Pause.)

6              Good morning.

7              Turn and face me.

8              Raise your right hand.

9     Thereupon,

10                    DONALD R. TAYLOR, JR.,

11     a witness, having been duly sworn, testified as follows:

12              THE WITNESS:  Yes.

13              THE DEPUTY CLERK:  Please be seated in the witness

14     stand.

15              (Pause.)

16              Please state your name for the record, and spell

17     your last name.

18              THE WITNESS:  Donald R. Taylor, Jr.  T-A-Y-L-O-R.

19                    DIRECT EXAMINATION

20     BY MS. SWEENEY:

21     Q    Dr. Taylor --

22              THE COURT:  Doctor -- one moment, Ms. Sweeney.

23              MS. SWEENEY:  Sorry, Your Honor.

24              THE COURT:  Dr. Taylor, I'm sure, as you know

25     having done this many of times, is just wait for the

1    question to be asked before you respond to it so we can

2    avoid talking over one another.  We have the court reporter

3    taking everything down.

4              If there's an objection, just wait until I rule on

5    the objection before you respond.

6              There should be some water for you, if you need

7    some water.

8              I do want to thank you before we begin, I know the

9    Court put some time pressure on you to get your report done,

10   which I really appreciate your service, so I want to thank

11   you in advance.

12             THE WITNESS:  Thank you.

13             THE COURT:  You may proceed.

14   BY MS. SWEENEY:

15   Q    Thank you, Your Honor.

16        Dr. Taylor, can you briefly describe your educational

17   and professional background.

18   A    I graduated from the University of South Florida with a

19   Bachelor's Degree in 1979.

20        I graduated from the University of South Florida

21   College of Medicine with a medical degree in 1984.

22        I completed residency training in psychiatry at the

23   University of Florida in 1988.

24        I completed a fellowship in forensic psychiatry at the

25   University of Florida in 1989.

1      I've been licensed to practice medicine in the State of

2  Florida since 1985.

3      I've been what's known as board certified, which is,

4  uh, a diplomate of the American Board of Psychiatry and

5  Neurology and Psychiatry since 1990, with added

6  qualifications in forensic psychiatry since 1994.

7      Since 1989 I've been in private practice in psychiatry

8  in Tampa.  For the first 20 years or so splitting the

9  practice between adult clinical psychiatry and forensic

10  psychiatry.

11      And since 2008, uh, practicing exclusively forensic

12  psychiatry.

13  Q    And Dr. Taylor, did you conduct an evaluation of the

14  defendant in this case, Mr. Sami Osmakac?

15  A    Yes, I did.

16  Q    What was the purpose of your evaluation of the

17  defendant?

18  A    To render an opinion regarding his competence to stand

19  trial.

20  Q    As part of your evaluation of the defendant, did you

21  conduct an in-person interview with him on October 10th,

22  2013?

23  A    Yes.

24  Q    During the course of that interview did you discuss

25  with the defendant his mental health history and his present

1   symptoms?

2   A     Yes.

3   Q     Did you also review various materials that you note on

4   your report at pages one through two, offer information

5   related to his history and his present symptoms?

6   A     Yes.

7   Q     During the time that you conducted an evaluation of the

8   defendant, in particular focusing on your interview with

9   him, uh, can you please describe what tests or analysis --

10  analyses that you used during that interview.

11  A     It was a one-hour interview which primarily consisted

12  of obtaining a personal history, uh, of him starting with

13  his childhood and growing up, uh, on through the time he was

14  arrested.

15       I asked questions regarding his history of medical

16  problems both before and after his -- he was arrested.

17  Mental health problems both before and after he was

18  arrested.

19       And, uh, I asked him specific questions regarding his

20  understanding of the charges he is facing and the nature of

21  the legal process in which he's involved.

22       And finally I did some, uh, basic tests of his

23  cognitive functioning, such as testing his orientation,

24  memory and ability to perform calculations.

25  Q     And based on all of that, Dr. Taylor, what is your

1     opinion of his current diagnosis?

2     A     His medical diagnoses are hypothyroidism, which is an

3     underactive thyroid, uh, for which he was being treated with

4     a thyroid supplement.

5          He had a history of a, uh, las -- head laceration in

6     childhood.  And he also had a history of fracturing both

7     elbows at age 12.

8          Psychiatric diagnoses were schizoaffective disorder,

9     depressive type, and posttraumatic stress disorder.

10    Q     Okay, so speaking on -- focusing on the psychiatric

11    diagnosis at the moment, uh, the first one, schizoaffective

12    disorder, depressive type, can you describe, uh, what that

13    is.  In layman's terms.

14    A     Schizoaffective disorder is a hybrid diagnosis in

15    between a psychotic disorder and a depressive disorder.

16         Somebody with schizophrenia experiences symptoms of

17    psychosis, but they are not associated with significant mood

18    disturbances such as depression or mania.  And somebody with

19    a pure, uh, depressive disorder, such as major depressive

20    disorder, only has the symptoms of depression, but no

21    symptoms of psychosis.

22         Uh, a schiz -- somebody with schizoaffective disorder

23    has coexisting symptoms of both psychosis and depression at

24    some time during the illness.

25         If the person's mood disturbances or depression, you

1    would call it schizoaffective disorder, depressive type.   If

2    during that time his, uh -- the symptoms were manic, you

3    would call it schizoaffective disorder, bipolar type.

4         But in his case he has had during the course of his

5    illness both symptoms of psychosis and depression which

6    coexisted simultaneously.

7    Q    And at the present time, or at the time that you

8    conducted the -- the in-person interview with the defendant,

9    had either of those issues resolved, either the psychosis or

10   the depressive -- the depression?

11   A    Yes.  At the time of my evaluation, the symptoms of

12   psychosis had resolved through treatment with antipsychotic

13   medication.  By his report, he had last experienced symptoms

14   of psychosis in February 2013.  He continued to have

15   persistence symptoms of depression, including intermittent

16   suicidal thoughts.

17   Q    And based on your analysis and interview with him, do

18   you have a recommendation for the treatment of his current,

19   uh, diagnosis of depression?

20   A    It's my opinion that a trial of antidepressant

21   medication in addition to the antipsychotic medication he's

22   taking, uh, would be indicated, that he would probably

23   benefit from that.

24   Q    Okay.

25        And then your other psychiatric diagnosis in your

1    report is listed as posttraumatic stress disorder, which I'm

2    going to abbreviate as PTSD, and what is that and what

3    effects or symptoms has that caused the defendant?

4    A    Posttraumatic stress disorder is a type of anxiety

5    disorder in which somebody is having persistent symptoms

6    either of anxiety or arousal based on events that happened,

7    uh, in the past.

8         That diagnosis was primarily made in review of the

9    evaluation of Dr. McClain in which he told her that he

10   sometimes experienced, uh, nightmares and flashbacks related

11   to his childhood in Kosovo.  So that was the primary basis

12   for the diagnosis.

13        At the time that I evaluated him, he was not

14   experiencing any active symptoms of posttraumatic stress

15   disorder.

16   Q    Okay, so, Dr. Taylor, based on the entirety of your

17   analysis, is it your opinion that the defendant understands

18   the nature and consequences of the proceedings against him?

19   A    Yes, in my opinion he does.

20   Q    And what do you base that opinion on?

21   A    Based on his response to the questions that I put to

22   him regarding the adversary nature of the process and his

23   understanding of most of the relevant legal terms and the

24   participants in the process.

25   Q    Based on, uh, your analysis on everything that you did,

1   do you believe that the -- is it your opinion that the

2   defendant is able to assist in his own defense?

3   A    Yes.  In my opinion he's capable of consulting with

4   counsel with a reasonable degree of rational understanding.

5   Q    And finally, based on everything that you did, is it

6   your opinion that the defendant is competent to stand trial

7   based on all the factors that we've just discussed?

8   A    Yes.

9        MS. SWEENEY:  I don't have anything further,

10  Your Honor.

11       THE COURT:  All right.

12       Cross-examination? (10:42 a.m.)

13                    CROSS-EXAMINATION

14  BY MR. TRAGOS:

15  Q    Dr. Taylor, the prosecutor asked you a couple questions

16  and about your opinion about his ability to consult with

17  counsel, understand the charges against him, those kinds of

18  things, do you remember those questions?

19  A    Yes.

20  Q    I just want to clarify for the record, are you saying

21  that -- is your opinion based on a reasonable degree of

22  medical certainty?

23  A    Yes.

24  Q    Now, you in your report, uh, speak about medication

25  that he is currently on, correct?

1   A    Yes, he's taking medication both for the medical

2   problem of hypothyroidism and he's taking antipsychotic

3   medication for his mental condition.  At the time that I saw

4   him he was.

5   Q    What was the antipsychotic medication he was taking?

6   A    Risperdal.

7   Q    And does Risperdal also have a antidepressive effect as

8   well?

9   A    It -- it has been used to augment the, uh -- augment

10  treatment with antidepressant medication, but it's not a

11  antidepressant medication in and of itself.

12  Q    Right, but it does augment it, antidepressant

13  medication?

14  A    It -- it can be used in that capacity.

15  Q    And the -- your examination, was it necessary for him

16  to get off his medication in order for you to truly examine

17  him?

18  A    No.

19  Q    Okay.

20       So when you did an examination, you examined him under

21  the influence of the medication he was taking, this

22  Risperdal?

23  A    Well, I wouldn't phrase it as under the influence.

24  When I examined him he was, uh, being prescribed medication

25  and in my opinion he had -- he was achieving therapeutic

1    benefit from it.

2    Q    So he was taking the medication?

3    A    Yes, that was my understanding.

4    Q    Okay.

5         Do you know if he had stopped taking the medication,

6    would that make any difference, uh, in the examination you

7    were doing?

8    A    If he had stopped taking the medication at the time I

9    saw him, no, it would not have had any effect on my opinion.

10   Q    Okay.

11        So whether or not he's competent to stand trial, your

12   examination was -- it wouldn't have made any difference

13   whether he was on or off the Risperdal?

14   A    Well, my evaluation was based on what his, uh, clinical

15   presentation was and what his mental status was, so

16   regardless of whether it was in a medicated or non-medicated

17   state, uh, he presented in a manner in which he was not, uh,

18   impaired by symptoms of mental illness to the point that he

19   was incompetent to stand trial.

20   Q    Okay, I'm not sure that answered my question.  Let me

21   maybe try to phrase it.

22        When you examined him, he was on a medication.  And

23   that medication was a psychiatric-type medication, correct?

24   A    Yes.

25   Q    Uh, and the reason he's taking the medication is

1   because he had some psychiatric issues that the medication

2   was treating?

3   A    Yes.

4   Q    And -- so my question is:  Since he was taking the

5   medication, if you had done an examination with him off that

6   medication, not having the effects of that medication, could

7   that have made a difference in whether or not you found him

8   competent to stand trial?

9   A    It would depend on his response to being off the

10  mediation.  Some people when they stop taking the

11  medication, uh, their condition continues to be stable for a

12  period of weeks or months or sometimes years.  Sometimes

13  after a period of weeks or months they decompensate, and at

14  that point their competence to stand trial could become

15  impaired.

16       So you're asking me to speculate how he would have been

17  had he not been taking the medication at the time.  All I

18  can, uh, give an opinion about with certainty is what his

19  mental state was at the time I saw him.

20  Q    Okay.

21       All right.  At the very end of your last answer you

22  said that going off the medication could -- I'm not saying

23  it would, I'm not saying you could predict it, but medically

24  speaking it could impact him so that he would become

25  incompetent to stand trial?

1    A     Yes.

2    Q     Okay.

3          Now, you, uh -- but -- going further on that, but you

4    did not feel it was necessary to examine him off the

5    medication in order to make your current diagnosis?

6    A     No.

7    Q     Okay.

8          So you're comfortable then in making this diagnosis

9    while he's on and under the influence of that medication --

10   or you didn't like the words "under the influence."  Uh,

11   while he's having the therapeutic effects of that

12   medication?

13   A     Yes, I was comfortable making the diagnosis that I made

14   based on the, uh, history of symptoms that had been reported

15   by himself and others.

16   Q     Okay.

17   A     And based on his mental state at the time I saw him, I

18   was comfortable in rendering the opinion that he was

19   competent to stand trial.

20   Q     Okay.

21         Now, in your report you use the phrase on page six "his

22   insight in judgment were impaired."  Bottom of page six.

23         What did you mean by that?

24   A     That primarily refers to the person's degree of

25   awareness, uh, that symptoms they've experienced are due to

1   mental health problems.  And most specifically that refers

2   to his belief that, uh, when the -- he stopped experiencing

3   the hallucinations in February of 2013, rather than

4   realizing that those were hallucinations that were part of

5   psychotic illness which resulted to the treatment with

6   through medication, at the time I saw him he still believed

7   that up until that time the devil had been talking to him

8   and simply stopped talking to him at that time.  So he did

9   not have an adequate appreciation that it was the medication

10  that had made the difference and caused the hallucinations

11  to stop.

12  Q    So when you examined him, he just felt that -- at that

13  time the devil had stopped talking to him?

14  A    Yes, he knew he was no longer hearing the voices and,

15  uh, his belief was that the devil had stopped talking to

16  him.

17  Q    Basically the devil had made a choice?

18  A    Pardon me?

19  Q    The devil had made a choice just to stop talking to

20  him?

21  A    Essentially.

22  Q    Okay.

23       (Pause.)

24       Now, you, uh, had doctor -- the benefit of

25  Dr. McClain's report, correct?

1   A    Yes, from the two occasions that -- or at least two

2   occasions that she saw him.

3   Q    All right.

4        Now, you in your psychiatric diagnosis, uh, and the way

5   you wrote your diagnosis, you're familiar with the approach

6   of using Axis I, II, III, IV and V?

7   A    Yes.

8   Q    And that comes from the DSM, correct?

9   A    That comes from the editions up through the DSM-IV and

10  its revisions.

11  Q    Okay.

12       And you're familiar with that book?

13  A    Yes, I am.

14  Q    Okay.

15       Now, she, uh -- Axis I is the primary psychiatric

16  disorder of the psychological disorders, correct?

17  A    Correct.

18  Q    She has major depression recurrent.  And I'm just

19  trying to juxtaposition that wording with schizoaffective

20  disorder, depressive type.  Are those consistent diagnoses?

21  A    They're very similar.  She made separate Axis I

22  diagnoses of major depression, recurrent, and a psychotic

23  disorder not otherwise specified.  So rather than, uh,

24  separating them out into two diagnoses, uh, I merged them

25  into the one diagnosis of schizoaffective disorder.  It's

1    different ways of saying essentially the same thing.

2    Q    Okay, that's what I'm saying, basically you're

3    consistent?

4    A    Yes, we -- we were both of the opinion that he had both

5    a psychotic disorder and a depressive disorder.

6    Q    All right.

7         The, uh -- so you did find that he did have some real,

8    uh, psychiatric disorders?

9    A    Yes.

10   Q    And, uh, was it your opinion that, uh, he was because

11   of these psychiatric disorders, uh, more susceptible to

12   suggestion than not?

13        Than a normal person would be?

14   A    Not necessarily.  During the time that he was

15   experiencing symptoms of psychosis, which by definition

16   means that there is some loss of contact with reality, it

17   would probably be easier, uh, to convince him of something,

18   uh -- that something existed or not existed than, uh, at

19   other times.

20        But when the condition is in remission, it doesn't

21   necessarily make him any more or less suggestive than

22   anybody else.

23   Q    Well, let's -- let me ask you about that again.  We are

24   talking about being on or off the medication.  Does being

25   off the medication, does the possibility exist he's off the

```
1    medication -- well -- I'm trying to figure out, you worded
2    it just -- your last answer, and you said he is more
3    susceptible to suggestion.  Is that the way you worded it?
4    A    I said he potentially could be during an acute
5    psychotic episode when he's experiencing active symptoms of
6    psychosis.
7    Q    And he would be more likely to experience those things
8    off the medication, the Risperdal, correct?
9    A    Yes, he would be at higher risk for those symptoms to
10   recur or -- or -- or he would have been at higher risk for
11   those symptoms to continue had he not been prescribed the
12   medication.
13   Q    Okay.
14        So this type of mental illness, if untreated, makes you
15   more likely to be subject to suggestion?
16   A    Yes, and -- and in that it makes it more likely that
17   you would experience recurrent symptoms of psychosis.
18        (Pause.)
19   Q    Now, the defendant also gave some family history,
20   correct?
21   A    Yes.
22   Q    Okay.
23        And you took that into account in making your
24   diagnosis?
25   A    Yes.
```

1   Q    All right.

2        (Pause.)

3        When you asked him the questions about, uh, current

4   affairs, what were the purposes for asking those questions?

5   A    Can you -- can you be more specific regarding current

6   affairs.

7   Q    Well, uh, who the governor is, the governor of Florida?

8   A    Uh, those are tests of somebody's, uh, fund of

9   knowledge, uh, just general information.  That's all part of

10  a, uh, examination of cognitive functioning.

11  Q    And he was not able to answer some of those questions,

12  right?

13  A    Correct.

14  Q    Which ones was he not able to answer?

15  A    Well, for instance, he knew the capital of Florida, but

16  he could not name the governor.  And he said he did not know

17  the nation's capital, but he correctly named the past two

18  presidents.

19  Q    So you had some correct, some incorrect answers on

20  that?

21  A    Yes.

22       In terms of his orientation, he was fully oriented with

23  the exception that he was one day off on the date.

24  Q    You say that he would benefit from additional -- the

25  addition of antidepressant medication, correct?

1    A    Yes, in my opinion he would.

2    Q    What would -- what kind of antidepressive medication?

3    A    Well, there are -- the most commonly prescribed are

4    some of the more recent medications, either the serotonin

5    specific reuptake inhibitor such as Prozac, Zoloft, Paxil,

6    or there's medications that, uh, react with other

7    neurotransmitters, such as Effexor, uh, or Wellbutrin, so

8    really any -- any of those category could potentially be

9    helpful.

10   Q    And he, uh -- a person that's on these antidepressants,

11   different people have different reactions to those, correct?

12   A    Yes.

13   Q    And in some cases those antidepressants could have such

14   an effect as maybe -- may affect his ability to comprehend

15   what's going on in a trial?

16   A    No, it shouldn't.

17   Q    You don't think antidepressants can do that?

18   A    Not in a therapeutic dose.  If he were to somehow get a

19   toxic dose, it could.  But -- but generally when somebody's

20   prescribed the more modern antidepressants, most people get

21   better, some people don't get any better, a few people get

22   worse in terms of it -- it actually has an adverse effect on

23   their mood, but it doesn't really affect their ability to --

24   to think or comprehend.  It's the illness itself that if it

25   becomes severe enough can affect their ability to think or

1    comprehend.

2    Q    Why do you think he currently is exhibiting, uh, the

3    depressive diagnosis?

4    A    Well, I think he has a familial, uh, tendency towards

5    experiencing symptoms of depression, and I think it has, uh,

6    almost certainly been exacerbated by his incarceration and,

7    uh, his appreciation of the gravity of his legal situation.

8         (Pause.)(10:55 a.m.)

9    Q    Now, the defendant told you that he -- he denied any

10   history of mental health problems or treatment until 2010?

11   A    Yes.

12        (Pause.)

13             MR. TRAGOS:  Just a moment, Your Honor.

14             THE COURT:  You may.

15             (Pause.)

16   BY MR. TRAGOS:

17   Q    Do you know when he started taking the Risperdal?

18        By the way, that's R-I-S-P-E-R-D-A-L.

19   A    Based on his report, and I believe the report by

20   Dr. Goldsmith, it was, uh, sometime around December 2012.

21   Q    You didn't review, I guess -- well, so -- so at that

22   point did he continue to have the hallucinations?

23   A    Yes, based on his history and -- and that provided by

24   Dr. Goldsmith and Dr. McClain he, uh, continued to

25   experience them until February 2013.

1  Q    So he'd been on the Risperdal a year, and during that

2  year he continued to have the hallucinations?

3  A    Two months.

4  Q    Okay, I'm sorry, maybe I got the date -- when did you

5  say it started, taking the Risperdal?

6  A    Around December 2012.

7  Q    Okay.

8  A    And -- and that was, uh -- regarding what we were

9  talking about earlier in terms of being on medication or not

10 off medication.

11      The other point to make is sometimes even when somebody

12 is medicated, they can still experience symptoms of

13 psychosis until they actually have a positive response to

14 the medication, and it often takes a month or two months or,

15 uh -- or sometimes even longer.

16          MR. TRAGOS:  That's all the questions I have,

17 Your Honor.

18          THE COURT:  All right, thank you.

19          Any redirect?

20          MS. SWEENEY:  Just one area, Your Honor.

21          THE COURT:  All right.

22                    REDIRECT EXAMINATION

23 BY MS. SWEENEY:

24 Q    Dr. Taylor, uh, Mr. Tragos asked you about the DSM Axis

25 system, uh, and he noted that some of the other reports

1   regarding this defendant included that -- the Axis layout in

2   them.  Why did you not include that in your report?

3   A    Well, at the time Dr. -- both Dr. McClain and

4   Dr. Goldsmith saw him in February and March 2013, the most

5   recent version was the Fourth Edition of the Diagnostic and

6   Statistical Manual of Mental Disorders, uh, known an

7   DSM-IV TR.

8       In May of 2013 the American Psychiatric Association

9   published, uh, the DSM-V, the Fifth Edition, which did away

10  with the five-Axis system and essentially, uh, laid out a

11  classification system in which you simple make diagnoses and

12  you don't separate them into I, II, III, IV and V.

13            MS. SWEENEY:  Thank you.

14            That's it, Your Honor.

15            THE COURT:  All right.

16            May Dr. Taylor be excused?

17            MS. SWEENEY:  Yes, Your Honor.

18            MR. TRAGOS:  Yes, Your Honor.

19            THE COURT:  Doctor Taylor, we appreciate your

20  time.  Thank you.  You may be excused.

21            (Witness excused).

22            All right, any other witnesses?

23            MS. SWEENEY:  No, Your Honor.

24            THE COURT:  All right.

25            Any witnesses, Mr. Tragos?

 1              MR. TRAGOS:  No, Your Honor.

 2              THE COURT:  All right, Mr. Tragos, do you want to

 3    present argument?

 4              MR. TRAGOS:  Yes, Your Honor.

 5              Your Honor, I believe that the Court is unable to

 6    draw a conclusive decision from the testimony of the

 7    witness.  That the witness, uh, finds that, uh, he has --

 8              (Pause.)

 9              Use the witness's wordings here, his insight and

10    judgment were impaired.  The fact that he is impaired in

11    any way, especially insight and judgment, certainly affects

12    my ability to communicate with him, his ability to help me

13    and to understand what's going on in the trial.

14              The fact that we have a situation where the devil

15    just happened to stop talking to him and that's what he

16    believes and that's why he's not having hallucinations

17    anymore certainly again brings into question his competency.

18              The fact that this medication if -- if we again

19    are to believe Dr. Taylor, if this medication is what's

20    keeping him competent, uh, and being off that medication

21    would make him incompetent, I think that, uh, that again

22    raises doubts about his competency to stand trial.

23              The fact that he's so --

24              THE COURT:  Why?

25              MR. TRAGOS:  Because, Your Honor, someone who can,

1    uh, stop taking medication is incompetent, we can't tell

2    whether or not that medication would ebb and flow, or that

3    medication would keep him there.

4           He says that sometimes that therapeutic effect may

5    or may not be going, uh -- going on at a particular time,

6    uh, the fact that he is still believing today, even under

7    the therapeutic medication, the devil stopped talking do

8    him, shows that it's not having all the desired effect.

9           The, uh -- the fact that he is so massively

10   depressed at this point that they're going to put him on

11   antidepressants.  We don't know right now what effect those

12   antidepressants are going to have on his ability to

13   communicate with his lawyer, understand what is going on,

14   and to understand, uh, what is happening in the trial.

15          That's what I'm raising with the Court.

16          THE COURT:  All right, thank you, Mr. Tragos.

17          Any response?

18          MS. SWEENEY:  Your Honor, I'll just say at this

19   point four different doctors have found the defendant to be

20   competent.  Dr. Goldsmith, Dr. McClain, Dr. Taylor, and

21   Mr. Tragos has informed me that the psychiatrist that he

22   retained did not produce a written report but also found the

23   defendant to be competent based on a recent evaluation.

24          Given all that, I just don't think there's any

25   doubt that the defendant's competent, and what Mr. Tragos is

1    arguing about is if things change in the future, uh, and

2    that's just not relevant to the consideration now.

3              Thank you.

4              THE COURT:  All right.

5              I'll take it under advisement.  My intent is to

6    get out a written order here in the very near future.

7              Mr. Tragos, I appreciate your argument, and

8    certainly I think you've highlighted maybe a -- for purposes

9    of your case more important things for the future parts of

10   this case, uh, more so than the competency hearing, but I do

11   appreciate your argument.

12             All right, anything else as to this matter?

13             MS. SWEENEY:  No.  Thank you, Your Honor.

14             THE COURT:  Mr. Tragos?

15             MR. TRAGOS:  No, Your Honor.

16             THE COURT:  All right, we'll be in recess.  Thank

17   you.

18             THE BAILIFF:  All rise.

19             (Thereupon, the hearing was concluded at

20   11:05 a.m.)

21

22

23

24

25

STATE OF FLORIDA          )

COUNTY OF HILLSBOROUGH    )

          I, PAUL K. SPANGLER, Official Court Reporter for

the United States District Court, Middle District, Tampa

Division,

          DO HEREBY CERTIFY, that I was authorized to and

did, through use of Computer Aided Transcription, report

in shorthand the proceedings and evidence in the

above-styled cause, as stated in the caption hereto, and

that the foregoing pages numbered 1 to 28, inclusive,

constitute a true and correct transcription of my

shorthand report of said proceedings and evidence.

          IN WITNESS WHEREOF I have hereunto set my hand

in the City of Tampa, County of Hillsborough, State of

Florida, this 17th day of February, 2014.


          S/PAUL K. SPANGLER
          _____
          PAUL K. SPANGLER, Official Court Reporter