UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.: 8:12-CR-45-T-35AEP

SAMI OSMAKAC

### GOVERNMENT'S SENTENCING MEMO

The United States of America, by A. Lee Bentley, III, United States Attorney for the Middle District of Florida, by and through the undersigned Assistant United States Attorney, respectfully submits this memorandum in support of a sentence of at least 40 years' imprisonment for Sami Osmakac, the defendant herein. This memorandum also addresses Osmakac's objections to the Presentence Investigation Report (PSR).

### BACKGROUND

On June 10, 2014, defendant was found guilty of attempting to use a weapon of mass destruction and possession of an unregistered machine gun after a 10-day jury trial. The evidence presented at trial showed that the defendant sought to use terroristic, violent means to accomplish the release of "Muslim prisoners" by the U.S. government. This goal was a manifestation of the defendant's pre-existing willingness to use violence in support of his extremist beliefs, as shown by his previous attempts to enter Afghanistan and Iraq to attempt to kill American soldiers located in those areas.

The government agrees with the Presentence Report (PSR) that the total offense level is 43, the defendant's Criminal History Category is VI, and the

1

resulting guideline range is life. However, it is anticipated that the defendant will argue there are factors present in this case based upon which the Court could find a variance from the Guidelines is appropriate pursuant to 18 U.S.C. § 3553(a). Should the Court determine a variance from the Guidelines is warranted in this case, the United States asks that the Court sentence the defendant to no less than 40 years' imprisonment. The United States respectfully submits that a sentence of less than 40 years of imprisonment would vary inappropriately from the advisory Guidelines sentence in this case and would not be warranted after taking into account all of the factors in Section 3553(a).

## ARGUMENT

### I. No Less Than Forty Years' Imprisonment Is an Appropriate Sentence in This Matter.

#### a. Nature and Characteristics of the Offenses

The offenses of conviction in this case are related to the defendant's plan to murder hundreds of innocent people in the name of Islamic extremism. The defendant wanted to commit an act of terrorism and to use violence to intimidate the U.S. government into complying with his demands to release Muslim prisoners from incarceration and other confinement. He hoped that his actions would be akin to "a second 9/11." Govt. Trial Ex. 106.2 B at 4.

During his very first meeting with the Federal Bureau of Investigation (FBI) Undercover Employee (UCE), the defendant requested multiple firearms and explosives and affirmed his desire to commit a violent attack. (PSR ¶¶ 10-11; Govt. Trial Ex. 109B at 3-6.) The defendant never expressed any hesitation to murder innocent people and to commit an act of terrorism.

Similarly, the defendant's actions before he met the UCE and the Confidential Human Source (CHS) in this case reaffirm that the intention to commit an act of terrorism was the defendant's alone. The defendant has repeatedly admitted travelling abroad in March 2011 to engage in violent conflict in Afghanistan and Iraq against American soldiers. (PSR ¶ 57.) This itself is a prior criminal offense committed by the defendant, and with the same intent that he had when he attempted to use a weapon of mass destruction to murder innocent people within the United States

The sentence imposed by this Court must fit the crime committed and reflect its seriousness. In this case, defendant believed he was going to kill many innocent people by detonating a car bomb and then take hostages, kill those hostages until his demands were met, and then kill himself in order to attempt to kill the law enforcement officers who would arrest him. He did not know the devices he obtained were inert. The punishment should fit the crime, and should the Court find that a variance from the Guidelines is appropriate, a sentence of 40 years—and no less than 40 years—would be an appropriate sentence for this defendant and the crime he intended to and did commit.

### b. History and Characteristics of the Defendant; Defendant's Future Dangerousness and the Need to Protect the Public

There are no salient characteristics or events in defendant's background that support a reduction in sentence under 18 U.S.C. § 3553(a), and in fact, the defendant's prior behavior indicates that a very serious sentence is warranted. In some respects, the defendant's background is far better than many of the defendants seen by this Court; he had a supportive, intact family, adequate

financial resources, and even attended college for a period of time. (PSR ¶¶ 54, 119, 123.)

It is anticipated that the defendant will raise his mental health under 18 U.S.C. § 3553 in support of a request for a departure. The defendant notes in his objections to the initial PSR that "all of the doctors [that evaluated the defendant] agreed that the defendant did in fact suffer from multiple mental disorders." However, the nature of the defendant's disorder, as evaluated by the two doctors who spent the most time with him, that is, Drs. Johnson and Montalbano, was dysthymic disorder, a form of depression. PSR at ¶ 107. Both doctors rejected the more serious diagnoses of PTSD and psychotic disorders given to the defendant by previous evaluators, who spent far less time with the defendant. Thus, the government does not agree that the defendant's mental health is an adequate basis for a departure, as the defendant does not suffer from conditions that "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." USSG § 5H1.3.

On the other hand, this defendant's willingness to resort to violence to support his extremist ideology is well documented. In addition to his travel abroad with the intent to join violent jihad, as discussed above, the defendant also faces battery charges related to his interaction with a religious protestor in April 2011 (PSR ¶ 48) and further had interactions with members of a mosque in Chicago in May 2011 in which he advocated violence. Finally, the defendant intended a remarkably violent attack in this case, and he expressed glee on multiple occasions that he might be able to carry it out. Further, the defendant suggested

multiple other targets and plans that he wished he could carry out, including with others. *See, e.g.*, Govt. Trial Exs. 106.2 B at 2-3 ("even if it's in a gay night club, better a gay night club 3 or 4 hundred people go in there, [claps], I don't care anymore."); 113.4 B at 2-7 (describing in-depth the defendant's wish that he could coordinate a violent attack with four people to blow up multiple bridges in the Tampa Bay area, leading to the deaths of thousands of people); 118 B at 15 ("[H]onestly, I would love to go for the army people, but their bases are so locked up.") The defendant poses a strong danger to the community, for his easy willingness to engage in violence and his attempts to induce others to engage in terroristic acts with him.

As the Eleventh Circuit has held, "'Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (internal quotation marks omitted) (reversing as substantively unreasonable a sentence of 17 years, 4 months of imprisonment for a conspiracy to provide material support for terrorism, that is, to murder, maim, or kidnap persons outside the U.S.); *see also United States v. Ressam*, 679 F.3d 1069, 1090-91 (9th Cir. 2012) (en banc) (reversing as substantively unreasonable a 22-year sentence of imprisonment for plotting to detonate a massive bomb at Los Angeles International Airport on New Year's Eve 1999);[1] *United States v. Abu Ali*, 528 F.3d 210, 261-69 (4th Cir. 2008) (reversing 30-year sentence imposed for terrorist conspiracy as substantively

---

[1] Ressam was recently resentenced on remand to 37 years' imprisonment. Case No. 2:99-cr-666-JCC-1 (W.D. Wash.).

unreasonable despite defendant's having joined conspiracy at age 22 with no criminal history and despite "letters describing [his] 'general [sic] decent reputation as a young man' and his overall 'good character'"); *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."). Therefore, a serious sentence of imprisonment of at least 40 years is necessary to protect the public from the defendant.

### c. Need to Avoid Unwarranted Sentencing Disparities and Need for Deterrence; Respect for the Law

In cases where defendants have attempted to detonate weapons of mass destruction under similar circumstances, courts have imposed sentences ranging from 23 years to life imprisonment. As noted above, the defendant tried to detonate a massive bomb that he hoped would murder hundreds of innocent people, as well as to use other innocent people as hostages and pawns, followed by his planned murder of law enforcement officers attempting to stop him. His horrific conduct places him in the same category as other terrorists who sought to kill on a large scale.

Three defendants in similar circumstances have been sentenced to life imprisonment: the "Times Square bomber" Faisal Shahzad,[2] the "Christmas Day

---

[2]   *See United States v. Shahzad*, 1:10-CR-00541-MGC (S.D.N.Y. 2010), a case where a 30-year-old defendant was convicted of violating § 2332(a) and other terrorism-related statutes for attempting to detonate a car bomb at Times Square in New York

6

bomber" Umar Farouk Abdulmutallab,[3] and Khalid Aldawsari.[4] Although thedefendant did not construct the bomb that he sought to detonate, his intent was the same as Shahzad, Abdulmutallab, and Aldawsari—namely, to kill innocent people in a violent attempt to support his extremist ideals. Although he never trained at a terrorist training camp, he subscribed to the same violent ideology and acted according to a similar desire to murder. Indeed, defendant remained steadfast in his desire to kill despite the UCE's multiple inquiries regarding whether he really wanted to go forward with committing the attack. It was the defendant that formulated the plan for the attack and eagerly attempted to carry it out.

A somewhat similarly situated defendant, Mohamed Mohamud, was recently sentenced to 30 years' imprisonment. *United States v. Mohamud*, 3:10-CR-475-KI (D. Ore. Sept. 6, 2014). Mohamud was found guilty after a jury trial of

---

City. Shahzad was a naturalized United States citizen who had received explosives training from terrorists affiliated with the Tehrik-e-Taliban, a militant extremist group in Pakistan. Upon his return to the United States, Shahzad acquired the necessary components to construct his bomb and researched his target. At his first appearance after his indictment, Shahzad pled guilty to a ten-count indictment.

[3] *See United States v. Abdulmutallab*, 2:10-CR-20005 (E.D. Mich. 2010), a case in which a 23-year-old defendant attempted to detonate a bomb hidden in his underwear while on board a flight bound for Detroit, Michigan, on December 25, 2009. Had the bomb successfully detonated, all 289 passengers and crew aboard the airplane would have been killed. At the time of his arrest, Abdulmutallab was a 23-year-old Nigerian national who had previously trained in Yemen at a terrorist training camp run by al Qaeda in the Arabian Peninsula, and had been tasked to commit the attack by Anwar al-Aulaqi. On the second day of trial, Abdulmutallab pled guilty to an eight-count indictment.

[4] *See United States v. Aldawsari*, 5:11-CR-00015 (N.D. Tex. 2011), a case where a defendant was convicted of violating § 2332(a). At the time of his arrest, defendant Aldawsari was a 20-year-old Saudi national with a student visa living in the United States. Law enforcement became aware of defendant after learning that he ordered chemicals from a North Carolina chemical company. An investigation soon revealed that the defendant was trying to obtain other chemicals to use on an undetermined target for an attack in the name of violent jihad. In addition, he possessed instructions, plans, and tools that could be used to combine the chemicals. In June 2012, Aldawsari was convicted after a trial.

attempting to use a weapon of mass destruction related to his plot to detonate a parked car bomb (that unbeknownst to him was inert) at a Christmas tree lighting ceremony in Portland, Oregon. Despite the similarities between Mohamud and Osmakac, Osmakac deserves a higher sentence than Mohamud due to Osmakac's prior travel overseas to engage in violent conflict with American soldiers, ready and willing engagement in an act of terrorism that involved the planned murder of many innocent people, his attempts to induce others to join in his violent acts, and his formulations of many plans by which to carry out violent terrorist attacks.

There are a series of other cases involving similar conduct to what the defendant was convicted of here that were resolved through guilty pleas and that resulted in sentences ranging from 23 to 35 years.[5] The government submits that

---

[5] *See United States v. Nafis*, 1:12-CR-00720 (E.D.N.Y. 2012) (sentencing a 21-year-old Bangladeshi national, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at the Federal Reserve Bank of New York for the express purpose of causing economic damage, to 30 years' imprisonment after pleading guilty); *United States v. Khalifi*, 1:12-CR-00037-JCC (E.D. Va. 2012) (sentencing a 28-year-old Moroccan national, who attempted to conduct a suicide attack on the U.S. Capitol using a suicide bomb vest and automatic weapon (that unbeknownst to him were inert), to 30 years' imprisonment after pleading guilty); *United States v. Hassoun*, 1:10-CR-00773 (N.D. Ill. 2010) (sentencing a 22-year-old Lebanese legal permanent resident, who attempted to detonate a backpack bomb (that unbeknownst to him was inert) that he had deposited in a trash can outside of a sports bar located in the vicinity of Wrigley Field, to 23 years' imprisonment after pleading guilty); *United States v. Martinez*, 1:10-CR-00798-JFM (D. Md. 2010) (sentencing a 21-year-old defendant, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a military recruiting center and expressly stated that he did not want to kill civilians, to 25 years' imprisonment after pleading guilty pursuant); *United States v. Finton*, 3:10-CR-30215-DRH (S.D. Ill. 2010) (sentencing a 29-year-old convicted felon with a history of bipolar personality disorder, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a federal building and expressed concerns about targeting civilians, to 28 years' imprisonment after pleading guilty); *United States v. Smadi*, 3:09-CR-00294-M (N.D. Tex. 2009) (sentencing a 19-year-old Jordanian national with a history of schizophrenia and abuse as a child, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at an office building with the intent to inflict economic and commercial damage on the

the defendants in those cases should not be considered to be similarly situated to defendant. In those cases, the defendants accepted responsibility and pled guilty, unlike the defendant here, who has never accepted responsibility or expressed any remorse or concern for his intended victims.[6]

A significant sentence is also needed to deter others from committing similar acts of planned violence and to promote respect for the law. For the other people who disagree with the policies of the United States and would consider using violence to express those views as the defendant did, the sentence imposed should be lengthy enough to deter those individuals.

## II.     Defendant's Objections to the PSR Guidelines Calculation

### a.  Guidelines Calculation Pursuant to USSG § 2K1.4

The calculation of the Guidelines in the PSR is correct. The defendant objects to the calculation pursuant to USSG § 2K1.4 on two bases. First, he contends that the correct base offense level is 20, pursuant to USSG § 2K1.4(a)(2). The appropriate base offense level is 24, pursuant to § 2K1.4(a)(1)(B), as the defendant's offense "involved the destruction or attempted destruction . . . of a place a public use." Pursuant to USSG §2K1.4, Application

---

United States, to 24 years' imprisonment following his guilty plea); *United States v. Shareef*, 1:06-CR-00919 (N.D. Ill. 2006) (sentencing a 22-year-old defendant, who attempted to purchase from a UCE a handgun and four grenades (that unbeknownst to him were inert) that he intended to detonate at a local shopping center, to 35 years' imprisonment following his guilty plea).

[6]     There are also a significant number of cases that involve arguably similar terrorism-related conduct but not charges of violating 18 U.S.C. § 2332a(a). These cases are distinguishable and not instructive in informing the Court regarding appropriate, comparable sentences under 18 U.S.C. § 3553(a)(6). To the extent the defendant seeks to rely on such cases in his sentencing argument, the government will advise the Court of the distinguishing details of those cases at the sentencing hearing or in a separate supplemental filing prior to sentencing.

Note 1, "place of public use" is defined at 18 U.S.C. § 2332f(6), as "those parts of any building, land, street, waterway, or other location that are accessible or open to members of the public, whether continuously, periodically, or occasionally, and encompasses any commercial, business, cultural, historical, educational, religious, governmental, entertainment, recreational, or similar place that is so accessible or open to the public; . . . ." The defendant here sought to use a car bomb at a commercial establishment and to destroy that target. *See* Govt. Trial Exs. 111 B at 9 ("if the buildings go in it's, it's more terror in their hearts."); 118 B at 76 (SO: So, that stuff will take down buildings, the car? How far?; UCE: Oh, uh. The one you put, the one you put it in front of?; SO: Yeah.; UCE: Is going to go down. The one you put it in front of is going to go down. . . . SO: Yeah. And, people inside they gonna get it? UCE: Oh yeah, they're done with it. Yeah, no body inside is gonna make it."). Thus, the higher base offense level is applicable.

The defendant also objects to the application of USSG § 2K1.4(c)(1) and the subsequent cross reference to the attempted murder Guideline. USSG § 2K1.4(c)(1) instructs that if "the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than determined above." Here, as noted and demonstrated throughout this memo, the defendant's goal was to kill hundreds of innocent people. Thus, USSG § 2A2.1 (Attempted Murder) applies.

Pursuant to that Guideline, the appropriate base offense level is 33, as the object of the offense would have constituted first degree murder pursuant to 18

U.S.C. § 1111 because the defendant's plan was to commit "willful, deliberate, malicious, and premeditated" killings. *See* USSG § 2A2.1 App. Note 1 (defining "first degree murder"); *see also United States v. Mock*, 523 F.3d 1299, 1303-04 (11th Cir. 2008) (holding that the government must prove the applicability of this Guideline by a preponderance of the evidence and that the Court should make explicit findings of fact regarding the defendant's intent); *United States v. Aldawsari*, 740 F.3d 1015, 1020-21 (5th Cir. Jan. 23, 2014) (relying on the defendant's own statements to find that defendant intended to cause death).

### b. Application of the Terrorism Enhancement Pursuant to USSG § 3A1.4

The defendant objects to the application of USSG § 3A1.4 (Terrorism) to his sentence. The Guideline applies to any felony that involved or was intended to promote a federal crime of terrorism, as that term is defined in 18 U.S.C. § 2332b(g)(5). USSG § 3A1.4(a) and App. Note 1. A federal crime of terrorism is an offense that (1) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and (2) is one of a number of enumerated offenses, including 18 U.S.C. § 2332a, one of the offenses with which the defendant was charged. 18 U.S.C. § 2332b(g)(5); *see also Jayyousi*, 657 F.3d at 1115 (upholding the application of the enhancement where the defendants spoke "expressly about their desire to impose Sharia, toppling existing governments in the process"); *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir.2004) ( "[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered. . . . He planned to demand the release of Muslim

11

prisoners and changes in the government's foreign policy after the bombings.");

*United States v. Awan*, 607 F.3d 306, 316–17 (2d Cir. 2010) (finding that government only had to demonstrate that defendant's offenses were intended to promote a federal crime of terrorism, whatever his reasons for committing them).

Here, the defendant, by his own admission, intended to influence or affect the conduct of government by intimidation or coercion, and/or intended to retaliate against government conduct. The following are examples of the defendant's admissions. First, on December 19, 2011, the defendant had the following recorded conversation with the CHS:

SO: You said you knew Sheikh 'Abd-al-Rahman?

CHS: What?

SO: He wrote a letter you know that?

CHS: I honestly, I don't…

SO: You know what it said, he says: where are you? Don't you know this obligation for you to complete this whole nation of Islam? like every time they somebody visits me and make me bend over and put their hand in my privates and make me cough they know I'm blind because I have nothing... that you will be answered, questioned by Allah, and you know what Affia Siddiqui said? You know what she said man? She said you guys are Arabs, Pakistani, American, Indians... she said but you're not Muslims, and my brothers, my brothers are the prophet peace be upon him and the prophet followers may God be pleased with them. And she's right, if I don't do nothing, I'm not a Muslim, I'm not her brother, but that's just two people, you can go down the list, I'm a demand, I'm a demand God's willing, I'll be, if I can get a camera small one with me be like, this gonna happen every 30 minutes (UI) cause when I have this I know why they don't dare to come close. This gonna happen every 30 minutes (UI) clack…release my sisters and my brother from Guantanamo, every US Prison, every European prison, from Belmauchin (PH), in London, it's like the Guantanamo of here, of England and everywhere and sold to the Islamic (UI) Afghanistan (UI) I'll be like, I'll give you three days to do all that if

not this gonna happen I be like, every hour until I hear that you agree, every 30 minutes I'll take, I'll film it (UI) and I smile God's willing, and I smile... that's where you're at, yesterday you're at, I shouldn't talk to these people, if you wanna go to hell fire, go you've never read the Quran but you wanna tell me, like the guy I know Arabic, that's when ...

Govt. Trial Ex. 106.2 B at 9.

Next, on January 1, 2012, the defendant explained to the CHS:

SO: That's good. Cause I want to do something. Something terrifying. Like one day, one night, something going to happen. Then six hours later somewhere else.

UCE: Oh, okay. So—

SO: The thing with the vest—

UCE: --uh...huh...—

SO: I wanna' use that to get in somewhere, where's there's a lot of people, and I wanna' demand something, so, insha'Allah [God willing].

UCE: You going to demand something?

SO: Yeah, from kuffar [the infidels].

UCE: Okay.

SO: 'Cause if, if they get hit up one day before—

UCE: U-hum—

SO: . . . or, or half a day before, and then I take hostages they better release em'. They better release whoever I demand to release. If they, if they know you're serious, [claps] if they know that you killed kuffar [infidels], they gonna' have to meet your demands.

UCE: Yeah, that's . . .

SO: So, it's out there. But, Allah [God] can make everything happen, and the intention, and the trying, that's all that matters. Allah [God] wills it, it's gonna' happen.

. . .

UCE: Yeah, I'm . . . I think if you gonna do the, if you gonna do the car thing, why do the other thing?

SO: Cause I wanna demand some prisoners to be released. If I can get a hundred people—

UCE: Umm—

SO: . . . after, after people already been killed. They know I'm not joking. They better release or they all gonna die. If I can get that on camera, kuffar [infidels] have cameras, I'll shoot one be like film it.
UCE: Right.

SO: Film it and put this out there. I call the F.B.I. myself [laughs], I'll call 911, I be like connect me to the F.B.I., I'm the guy. Listen, what you think, you st-you stupid or something.

Govt. Trial Ex. 118 B at 5-6, 37.

The defendant further expressed his intentions in his martyrdom video that

he filmed on the night of his arrest, that is, January 7, 2012:

SO: This is brother Abdul Sami' [PH]. This video is to all the Muslim youth and to all the Muslims worldwide. This is a call to the truth. It is the call to help and aid in the party of Allah [God], and help the Ummah [nation] and bring back honor to the din [faith] of Allah [God]. And pay him back for every sister that has been raped and every brother that has been tortured and raped and every [UI] Muslim death in Chechnya and Bosnia and Kosovo and Afghanistan and Pakistan and Somalia and Iraq and Yemen and elsewhere. And this is payback for [UI] Sheikh [religious leader] Osama Bin Laden, Rahimahu Allah [May God have mercy upon him] and [UI] Sheikh [religious leader] Anwar Awlaqi and his son, Rahimahu Allah [May God have mercy upon him].
. . .
Our civilians and our women and our children are forbidden to be killed. And when you cross that forbidden line, then likewise we will do that unto you. Eye for an eye, tooth for a tooth, woman for a woman, child for a child. I know Imam Shafir [PH] Rahimahu Allah [May God have mercy upon him], said, the [UI] the toenail of one Muslim, of the biggest sinning fasid [immoral] Muslim on the earth, is better than all of the nonbelievers put together. Because that's the toenail of a believer. So we will avenge all of them.

14

Govt. Trial Ex. 124 B at 1. Thus, there is ample evidence to support the application of the terrorism enhancement to the defendant.

### III.     Defendant's Factual Objections to the PSR

The defendant raises a number of factual objections to the PSR. First, the defendant objects to the inclusion in paragraph 7 of the PSR of the CHS's statement that the defendant was asking for flags representing Al Qaeda. Further, the defendant also objects to the information from the CHS in paragraph 8 of the PSR.

Although there was no testimony on these points offered at trial, and the CHS will not be testifying at sentencing, the Court may consider "any information, (including hearsay), regardless of its admissibility at trial, in determining whether factors exist that would enhance a defendant's sentence, provided that the evidence has sufficient indicia of reliability, the court makes explicit findings of fact as to credibility, and the defendant has an opportunity to rebut the evidence." *United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir. 2010); USSG § 6A1.3. This information was provided by the CHS to the FBI, and there are sufficient indications of its reliability to enable the Court to rely upon these statements.

As to the information in paragraph 7, the CHS's information is corroborated in part by the circumstances of this case, as well as by a call made by the defendant in December of 2010, in which the defendant states, "Until the black flags come on top of everybody's head and the head flies off, we will see what the joke." Govt. Trial Ex. 163.1 B; *see also United States v. Kikumura*, 918 F.2d 1084, 1103-04 (3d Cir. 1990) (holding that offense conduct at issue may be

15

considered as corroboration of hearsay testimony, particularly where the defendant "points to nothing in the record that casts doubt upon the believability of the informant's [hearsay statements]."), *overruled on other grounds, United States v. Fisher*, 502 F.3d 293, (3d Cir. 2007) (overruling *Kikumura*'s higher burden of proof related to hearsay statements that are relied on for sentencing enhancements).

Further, as to the information at issue in paragraph 8, the government did present portions of a recording made during this meeting between the defendant and the CHS at trial. *See* Govt. Trial Exs. 101.2 A & B, 101.3 A & B, 101.4 A & B, 101.5 A & B, 101.6 A & B, and 101.7 A & B. These recordings, as well as the course of events following, specifically, the defendant's introduction to and interaction with the UCE substantially corroborate the CHS's hearsay statements to the FBI.

As to the defendant's objection to PSR paragraph 9, regarding the meaning of the word "work" in the context of this conversation, this statement is the FBI undercover employee's (UCE) belief regarding what the defendant was discussing. The UCE testified to this belief and his bases for it at trial in this matter, including his law enforcement investigative experience and the fact that he and the defendant never again discussed anything relating to work or a job. The standard at sentencing is preponderance of the evidence, and the government has clearly shown to that standard that the word work in this conversation was a coded reference for the defendant's desire to carry out a violent attack.

As to the defendant's objection to PSR paragraph 12, the CHS did provide the defendant with $500 as payment for the defendant's work in the CHS's business. Thus, the statement the defendant requests would only be accurate if it also indicated that the CHS provided the $500 to Osmakac as his salary. This is corroborated by the fact that the defendant and the CHS discussed the defendant's salary in other circumstances, Govt. Trial Ex. 115.3 B at 5, and the defendant told the UCE that the CHS owed him [the defendant] about $1200 for salary, Govt. Trial Ex. 118 B at 12.

## CONCLUSION

The government respectfully requests that this Court sentence the defendant to at least forty years' imprisonment.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

By: *s/Sara C. Sweeney*
SARA C. SWEENEY
Assistant United States Attorney
United States Attorney No. 0000119
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6178
E-mail: sara.sweeney@usdoj.gov

U.S. v. Osmakac                                    Case No. 8:12-CR-45-T-35AEP

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

George E. Tragos, Esq.

          By:    */s/ Sara C. Sweeney*
                  SARA C. SWEENEY
                  Assistant United States Attorney
                  USA No. 119
                  400 North Tampa Street, Suite 3200
                  Tampa, Florida 33602
                  Telephone:   (813) 274-6000
                  Facsimile:   (813) 274-6178
                  E-Mail: sara.sweeney@usdoj.gov