```
 1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3   UNITED STATES OF AMERICA,    Case No.8:12-CR-45-T-35AEP

 4          Plaintiff,

 5   VS.                          Tampa, Florida

 6   SAMI OSMAKAC,                May 30, 2014

 7          Defendant.           9:00 a.m.

 8   _____/

 9
                           VOLUME 4
10           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             BEFORE THE HONORABLE MARY S. SCRIVEN
11              UNITED STATES DISTRICT JUDGE

12   Appearances:           MS. SARA SWEENEY
                            Assistant United States Attorney
13                          401 North Tampa Street
                            Suite 3200
14                          Tampa, FL 33602
                            (813)274-6000
15                          sara_sweeney@usdoj.gov

16                          CLEMENT J. MCGOVERN, ESQUIRE
                            United States Department of Justice
17                          Trial Attorney
                            950 Pennsylvania Avenue, N.W.
18                          Washington, DC  20530
                            (202)305-0535
19                          clement_mcgovern@usdoj.gov

20   For the Defendant:     GEORGE TRAGOS, ESQUIRE
                            PETER TRAGOS, ESQUIRE
21                          Tragos & Sartes, PL
                            601 Cleveland St.
22                          Suite 800
                            Clearwater, FL  33755
23                          (727)441-9030
                            george@greeklaw.com
24                          peter@greeklaw.com

25
```

```
 1

 2   Court Reporter:          CLAUDIA SPANGLER-FRY, RPR, RMR
                              Official Court Reporter
 3                            801 North Florida Avenue
                              7th Floor
 4                            Tampa, FL 33602
                              (813)301-5575
 5                            cookiefry@aol.com

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   WITNESSES:                                    PAGE

 3   SPECIAL AGENT AMIR JONES

 4   Direct Examination Continuing by Ms. Sweeney .........   10

 5   Cross-Examination by Mr. George Tragos ...............   87

 6                         EXHIBITS

 7   Government's Exhibit 3 in Evidence (Ammo Can) ........   21

 8   Government's Exhibits 6-A,B&C in Evidence (.45 caliber

 9   pistol, magazine, and round) .........................   24

10   Government's Exhibit 10 in Evidence (Video camera) .....  33

11   Government's Exhibits 123.2-A&B in Evidence (Video and

12   Transcript) ..........................................   42

13   Government's Exhibit 13 In Evidence (Rental Car Key) ...  53

14   Government's Exhibits 123.3-A&B in Evidence

15   (Video/Transcript) ...................................   54

16   Government's Exhibit 126.3 in Evidence (Video) ........   61

17   Government's Exhibits 125.2-A&B in Evidence (Video and

18   Transcript) ..........................................   61

19   Government's Exhibits 121.2-A&B in Evidence (Video and

20   Transcript) ..........................................   64

21   Government's Exhibits 125.3-A&B in Evidence (Audiotape

22   and Transcript) ......................................   80

23   Government's Exhibit 126.4 in Evidence (Video) ........   80

24   Defendant's Exhibit 1 (Photo of Black Flag) ............ 191

25   Defendant's Exhibit 2 (Photo of Black Flags) ........... 192
```

```
1              P R O C E E D I N G S

2                    May 30, 2014

3                       ******

4          THE COURT:  Good morning.

5          Are there any preliminary issues to address before we

6  proceed?

7          MR. GEORGE TRAGOS:  Yes, Your Honor.

8          Your Honor, I would make a specific Brady request.

9  In the overhears for December 24th and January 7th, there were

10 specific references to equipment malfunctions, tapes that had

11 been erased or recorded over.  And I would request that the

12 defense be provided from the Government all information they

13 have with reference to equipment malfunctions -- and this

14 equipment, by the way, is specifically the recording equipment

15 or the monitoring equipment that was referred to in those

16 transcripts -- equipment malfunctions, as well as any tapes

17 that were recorded over or that were erased.

18         THE COURT:  You want erased tapes or you want

19 circumstances in which tapes were erased disclosed to you?

20         MR. GEORGE TRAGOS:  Correct.  And the records with

21 reference to those erasures.

22         THE COURT:  Counsel.

23         MS. SWEENEY:  Your Honor, I -- as I sit here, I know

24 of no erasures of any kind, but I will inquire specifically

25 and --
```

1              THE COURT:  And you have a specific reference,

2    Mr. Tragos, to a place where it says the tapes were erased or

3    recorded over?

4              MR. GEORGE TRAGOS:  Yes, Your Honor.  Could you hold

5    on for one second?

6              THE COURT:  Yes, sir.

7              (Brief pause.)

8              MR. GEORGE TRAGOS:  Your Honor, on the December 24th,

9    2011 overheard recording where the agents are speaking outside

10   the presence of the Defendant, on page three --

11             THE COURT:  Which three?

12             MR. GEORGE TRAGOS:  Page three.

13             THE COURT:  Of which session?

14             MR. GEORGE TRAGOS:  December 24th.

15             THE COURT:  Oh, in the other one.  Okay.

16             MR. GEORGE TRAGOS:  Right.  This is not the ones --

17   this is not the 85-page one.  This is the ones we had earlier.

18             THE COURT:  Yes, sir.

19             MR. GEORGE TRAGOS:  Okay.  They specifically speak

20   that there was a malfunction of the recording equipment last

21   night on page three.  On --

22             THE COURT:  So these are *Brady* requests based on

23   information you've had sometime now?

24             MR. GEORGE TRAGOS:  Well, Your Honor, if the Court

25   will remember that the -- we filed a motion with regards to the

```
1    overhear conversations that included this information.  The
2    Court just ruled, I guess I got the first day of trial, that
3    I'd be allowed to use this overhear information.  And so, you
4    know, I don't know how the Court wants to interpret that, but I
5    did not know that I could even use this material until the
6    first day of trial.
7                THE COURT:  All right.
8                MR. GEORGE TRAGOS:  So, again, on page three, and
9    then on page 10, "Yeah, so the finch" -- the finch is a
10   recording device -- "may be freaking broken.  You charged it up
11   and everything last night.  That's great.  A 7,000-dollar piece
12   of gear and its F'ing broken."
13               And then page 11.  "Because if it's that important, I
14   mean, could we erase it and try again?  Yeah.  Let's not erase
15   it because it's -- because we don't have recordings of him
16   telling Sami that he gave him $500 in salary if it doesn't come
17   up on the key fob or whatever."
18               And then -- okay.  Okay.  Your Honor, those are the
19   specifics in the transcript that indicate that there was a
20   malfunction or possible erasures, and those are specific.  And
21   I'm asking that if there is any information with reference to
22   any of that, that it be provided to the defense.
23               THE COURT:  Yes, ma'am.
24               MS. SWEENEY:  Your Honor, I will inquire.
25   My recollection is --
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1          MR. GEORGE TRAGOS:  I'm sorry.  Is the courtroom
2     open?
3          THE COURT:  It will be in a minute.
4          MR. GEORGE TRAGOS:  Okay.
5          THE COURT:  Go ahead.
6          MS. SWEENEY:  My recollection is that there were
7     two -- I remember two meetings with the confidential source.
8     He had multiple recording devices, and one of them did not
9     work.  I have a memory of that.  But I'll inquire specifically
10    and get specifics about that.
11         I believe -- I'm not sure but I will inquire, but I
12    believe what the agents are discussing with the erasing is
13    they're discussing that a file that was downloaded from a
14    recorder to the computer didn't work, and they're discussing
15    erasing the file from the computer.
16         But, again, I'll inquire specifically as to what
17    they're talking about and provide that information to Mr.
18    Tragos.
19         THE COURT:  All right.
20         And you'll advise the Court once that has been done?
21         MS. SWEENEY:  Yes, Your Honor, I will.
22         THE COURT:  All right.
23         MR. GEORGE TRAGOS:  Next, Your Honor, with regards to
24    the overhear -- Your Honor, I'd like for his family to be in so
25    they can see the Court's --

```
 1                THE COURT:  That's fine.

 2                MR. GEORGE TRAGOS:  Actually, can we open the --

 3     okay.

 4                (Brief pause.)

 5                THE COURT:  Yes, sir.

 6                MR. GEORGE TRAGOS:  Now, Your Honor, with regards to

 7     the 85 plus pages overhear conversation that was provided at

 8     the beginning of trial to the defense, I believe that's Defense

 9     Exhibit A, I was provided this morning -- they attempted to

10     provide it to me last night, but there were -- there were

11     some -- they're called mechanical, but computer issues with

12     providing it all to me last night.  Apparently, that's the --

13                THE COURT:  Mr. Tragos, what is your issue?

14                MR. GEORGE TRAGOS:  Excuse me?

15                THE COURT:  What is the issue?

16                MR. GEORGE TRAGOS:  The computer issue?

17                THE COURT:  Yes.

18                MR. GEORGE TRAGOS:  Well, the FBI couldn't, for some

19     reason, scan it in color, so I couldn't get the -- called the

20     red line version or whatever you want.  I tried to compare some

21     of it.  They had to send it to me in --

22                THE COURT:  I think the short version because we have

23     a jury waiting.

24                MR. GEORGE TRAGOS:  Well, the short version, I got it

25     this morning.  And I honestly do not have time this morning to
```

| 1 | go through it.  I discovered when I went through it -- some of |
| 2 | it that I got, the piecemeal, some of the pieces I got last |
| 3 | night, that there are additional words.  There are UIs were |
| 4 | there weren't UIs before.  There were additional words where |
| 5 | there weren't UIs.  And, therefore, I'm not prepared to fully |
| 6 | cross-examine the UCE today, and I don't think I will be. |
| 7 | I would request the Court to allow me to start |
| 8 | crossing the UCE and then to stop crossing the UCE at some |
| 9 | point, allow me to finish crossing the UCE on Monday.  The |
| 10 | Government has informed me that there's a possibility that they |
| 11 | might be able to put on some of what we have referred to as |
| 12 | clean-up kind of witnesses. |
| 13 | THE COURT:  I don't have a problem with you breaking |
| 14 | the cross of the UCE.  Anything else? |
| 15 | MR. GEORGE TRAGOS:  No, Your Honor. |
| 16 | THE COURT:  All right. |
| 17 | Let's call in the jury. |
| 18 | (Jury returned to the courtroom.) |
| 19 | Welcome back, ladies and gentlemen. |
| 20 | As you will recall, we were in the examination of |
| 21 | the -- of Special Agent Amir.  We will continue that |
| 22 | examination this morning. |
| 23 | Are there any issues or questions from the jury? |
| 24 | Counsel, you may proceed. |
| 25 | MS. SWEENEY:  Thank you, Your Honor. |

```
 1                    DIRECT EXAMINATION(Continuing)

 2    BY MS. SWEENEY:

 3    Q.   So we will continue with the video from January 7th.

 4              (Tape continuing.)

 5    "UCE:  Yeah.

 6    SO:  [UI]

 7    UCE:  [UI] on your back, and you reach behind you enough to tie

 8    to strap it.

 9    SO:  I don't think my clothes will be able to hide it but

10    UCE:  You dont

11    SO:  My clothes are not that thick.  Theyre white. [UI]

12    UCE:  Hmm?"

13    BY MS. SWEENEY:

14    Q.   At that moment, we just saw the Defendant walk over to

15    what looked like the corner of the room.  What was he doing?

16    A.   He was looking in a mirror.

17              (Tape continuing.)

18    "SO:  [UI] It will be quick?

19    UCE:  Yes, quick.  [UI] space.  I don't want to touch the

20    batteries, take the batteries out.  Take these batteries [UI].

21    Once you slide the batteries in there, they're on...just flip

22    the switch.

23    SO:  [UI]

24    UCE:  Yeah.

25    SO:  Once I put, the, whe- when [UI] put the battery --
```

CLAUDIA SPANGLER—FRY   OFFICIAL U. S. COURT REPORTER

1   UCE:  The battery goes.

2   SO:  One?

3   UCE:  Yeah, just one battery.

4   SO:  And once, one, I cannot mess with it?

5   UCE:  Right.  This is your safety.  Don't put the battery,

6   unless youre ready.

7   SO:  Oh [UI].

8   UCE:  [UI] So, you put, leave that around [UI] trying to get

9   everything, on, and once you probably, you want, want to wear

10  this over the top of that.  Right.  That would be the best way

11  to do it.

12  SO:  [UI]

13  UCE:  [UI] Your arms in and your head through keep that kinda

14  hides it too.

15  SO:  Yeah.

16  UCE:  [UI]

17  SO:  I take off this here, when, when I'm ready.

18  UCE:  Uh huh.

19  SO:  And I'll put a thick jacket, if they see this, try to [UI]

20  a very thick jacket, maybe it'll hide something.

21  UCE:  Okay.  Okay.

22  SO:  [UI]

23  UCE:  'Cause you're, youre, youre thin, thin enough so if, if

24  you have something --

25  SO:  It's a, it's a big jacket.

```
1   UCE:  [UI] then it won't look too bad.

2   SO:  No, I mean as long as long as [UI].

3   UCE:  Right.

4   SO:  After that it doesn't matter.

5   UCE:  [Laughs]

6   SO:  What's missing here?  This will be the heavy part.  I

7   didn't know it was that heavy.  It's twenty pounds?"

8              (Tape stopped.)

9              THE COURT:  Stop the video.  I notice your version is

10  frozen for some reason.

11             MS. SWEENEY:  I can go check, Your Honor.  Just a

12  moment.

13             THE COURT:  And did that screen get smaller?  At

14  first when we first started in the morning, it was larger.  And

15  now it's been made to a smaller screen.  Is there a reason for

16  that?

17             MS. SWEENEY:  Your Honor, the -- when we were

18  initially playing on that screen, there was an error and so I

19  was playing directly from the exhibit copy in Windows Media

20  Player directly, which allows you to do full screen.  It's now

21  in Sanctions, which is the Government's presentation system

22  that we have which is -- so it's the same size as what's on

23  this screen, scaled down to the size of that screen.

24             THE COURT:  And there's no way to use Sanctions in a

25  larger version?  It's hard to see that now in that smaller
```

 1   screen from a distance.

 2           MS. SWEENEY:  There is not.  I could -- I do know the

 3   correspondence between Sanctions and the exhibit copy, so I

 4   could place the exhibit copy in and match them up that way.

 5           THE COURT:  Well, we'll maybe do that at a break.

 6   Let's just go ahead and got these synced and play them.

 7           (Brief Pause.)

 8           (Tape continuing.)

 9   "SO:  It is?

10   UCE:  [UI]

11   SO:  Feels good.

12   UCE:  Doesn't feel too bad, right?

13   SO:  No, it feels good.  Because I'm saying this twenty and

14   this might be too heavy [UI].

15   UCE:  Now, you're right-handed, right?

16   SO:  Yes.

17   UCE:  So this is your right hand.

18   SO:  Yeah.

19   UCE:  Thatll be the hand that you probably be diggin, [UI]...

20   So youll probably be diggin and not with your right hand, uh...

21   SO:  [UI]

22   UCE:  [UI]

23   SO:  I, I can.

24   UCE:  If you got the gun?  Let's, let's see

25   SO:  What I --

```
 1   UCE:  Which is easier.

 2   SO:  What I'm going to do is one of these is gonna go first,

 3   before I do this because this gonna be the shock."

 4            MS. SWEENEY:  Please pause it for a moment.

 5   BY MS. SWEENEY:

 6   Q.   So, Agent, the Defendant just said, "What I'm going to do

 7   is one of these is gonna go first."

 8        What was he referring to when he said that?

 9   A.   He was going to throw in a grenade first.

10   Q.   "Before I do this because this gonna be the shock."  Do

11   you know what he was referring to there?

12   A.   Yes.  Yes, ma'am.

13   Q.   What was he referring to?

14   A.   He's going to throw the grenade.  He was going to get

15   everyone's attention, shock everyone.  And then when he pulls

16   the gun out at that point, everyone will know he's not joking.

17            (Tape continuing.)

18   "UCE:  Okay.

19   SO:  After this, I don't think people want to move too much.

20   UCE:  Right [UI]...so [UI].  Do you think you can remember this

21   now?

22   SO:  This here?

23   UCE:  I'm mean how to put everything on.  Do you remember?

24   SO:  This left arm goes underneath and my head.  This one wear

25   it on both arms and this one, how is this one?  The same?
```

1    UCE:  This one?

2    SO:  Yeah.

3    UCE:  No... the cross goes behind your head and then your arms

4    go through.

5    SO:  I think I'm [UI] and then this one goes left arm and over

6    my neck.

7    UCE:  Right.

8    SO:  Same here.

9    UCE:  That, thats safe.

10   SO:  [UI] safe.  I havent used this in 2 years...it doesn't

11   matter.  Im just gonna, Im just gonna.

12   UCE:  Point

13   SO:  Point.  Allah [God]

14   UCE:  [UI] Just --

15   SO:  Just a little heavy but...

16   UCE:  [UI].

17   SO:  This right here is a little heavy.

18   UCE:  Uh huh.  This doesn't look like anything.  I think if

19   even somebody sees this, theyre not going to think anything of

20   it, but it doesn't look like anything.

21   SO:  Once the big thing is loaded in the car, Insha Allah [God

22   willing], Im driving straight to the place.  Ima try to run

23   away [UI] like behind two buildings at least.

24   UCE:  Okay.

25   SO:  So I can run straight in [UI]

```
 1   UCE:  Okay.

 2   SO:  I think, then I'll go to another place with this on.

 3   UCE:  Yeah.  So you're going to put, you're going to take this

 4   with, with you in your car when we go out, or you want to

 5   leave, or do you want, would you, you could just, you could

 6   want to leave it here or you could leave it there.

 7   SO:  Yeah.  No, no, [noise] I'm going to leave it.  I've got to

 8   go get my car.

 9   UCE:  I mean, I, because we're going to load your car here.

10   SO:  Yeah.

11   UCE:  So, I mean, I think, I think you go drop your car off.

12   SO:  Yeah.

13   UCE:  You can leave it, if you want to leave it here, I'll just

14   leave you the room key and I'm gone, and that's the last.

15   SO:  Im just gonna have to remember how to get back [UI].

16   UCE:  To the room.

17   SO:  [UI] and then whats gonna happen with the car?

18   UCE:  You've got to tell me where you're gonna leave it.

19   SO:  I said Sligh.

20   UCE:  The second place is close by Sligh?

21   SO:  Yeah, it's close by Sligh.

22   UCE:  It's good enough for you?

23   SO:  It's a little walk but I was thinking I could leave these

24   close to the place.

25   UCE:  Leave it around.
```

```
1   SO:   The bush is what I was thinking.

2   UCE:   If --

3   SO:   Now what I'm gonna do is [UI] they catch me with the car

4   after were done [UI].

5   UCE:   [UI]...the rental car thing is inside it.

6   SO:   It is?

7   UCE:   The rental car thing is inside it and it says, uh, I dont

8   even remember, Mike something or something like that.   I think

9   it said Mike something but the rental car thing is inside it.

10   So

11   SO:   Hes [UI] my buddy.   Where is he?

12   UCE:   Yeah.

13   SO:   He's out with friends.

14   UCE:   Yeah, yeah.   [UI] buddy.   Yeah.   Yeah.   Exactly.

15   SO:   As long as --

16   UCE:   [UI]   Its a fake name anyway.

17   SO:   The first thing happens its good.

18   UCE:   A fake name anyway.

19   SO:   Okay.   So, so then Im gonna come get all this stuff, in

20   bags, take them to the rental car, with the rental car drive to

21   the second place after the first one goes. [IA] second place

22   cause the first one has to be quick cause if they track me.

23   UCE:   Right

24   SO:   Ill jump in the car and drive away [IA] I hope the FBI get

25   up next to my car, at least couple of them.
```

1    SO:  For all the following theyve been doing, at least couple

2    of them.  And then I got the second place close to the bushes,

3    observe the place, go to the bags in the bushes.  Get real

4    close to them I drive the car to Sligh; I have to find note and

5    just write a note.

6    UCE:  Sligh?

7    SO:  Yeah.

8    UCE:  You think there somebody will tow it? Because at Sligh.

9    SO:  [IA] gonna happen.

10   UCE:  Not that I [IA].

11   SO:  [IA] You just have to find out.

12   UCE:  [IA].

13   SO:  That means it's better, better [IA].

14   UCE:  No place, there is no place on the street, close by.

15   Where you going?

16   SO:  There's a gas station.  There's a state fairgrounds, but

17   dont wanna look suspicious.

18   UCE:  [IA].

19   SO:  [IA] that's Sligh 'cause it's Masjid [a mosque].

20   UCE:  [IA] saying it's like people dont park on the street, say

21   like, like street parking.

22   SO:  They don't, that's the thing.

23   UCE:  Okay.  Okay.  Okay, okay [IA].

24   SO:  So now listen, everything is smooth, I'm gonna remember

25   first how to get here, from that, where I'm going everything is

```
 1   smooth, if something on the road, I don't come here.

 2   UCE:  Text me. [IA] I gotta give you a phone, its in my car.

 3   SO:  Yes, yes, yes, so what Im gonna text?

 4   UCE:  Uh... just, not the, its too long.

 5   SO:  I'm gonna -- I'm feeling ill, I'm not feeling good

 6   tonight.

 7   UCE:  Okay.

 8   SO:  Yeah.

 9   UCE:  Yes.

10   SO:  Not feeling good tonight.

11   UCE:  Not feeling good.

12   SO:  Not feeling good tonight.  I'm not feeling good either

13   tonight. [IA].

14   UCE:  Yes.

15   UCE:  I'm just gonna [IA].  You know we've been here for

16   problems.

17   SO:  Okay now, hold on now. [IA] gonna have to pull this back

18   once?

19   UCE:  Once you stick it in there.

20   SO:  Yeah.

21   UCE:  Put it back to semi [IA].

22   SO:  And let go.

23   UCE:  Yeah, just pull back [IA].

24   SO:  And then it's ready.

25   UCE:  It's ready, it's ready.  Then, then you're gonna have to
```

```
 1   be careful with this cause you want to keep this up here until
 2   you're ready to shoot.
 3   SO:  [IA].
 4   UCE:  That's it.
 5   SO:  Semi, I start semi, if people come too close Ill go.
 6   UCE:  Then, not gonna' load any magazines till, you know, till
 7   I'm, till I'm gone and --
 8   SO:  [IA]
 9   UCE:  -- everything."
10          (Tape stopped.)
11          MS. SWEENEY:  You want to stop for a second.
12   BY MS. SWEENEY:
13   Q.   Agent, I'm showing you what's been previously marked as
14   Government's Exhibit 3.  What is that?
15   A.   It's the ammo can.
16   Q.   And what's inside of that one?
17   A.   Inside of the ammo can is a 75-round drum magazine and a
18   number of AK-47 bullets.
19   Q.   And can you open it and make sure that it's in --
20   everything is substantially the same condition as it was the
21   last time you saw it on January 7th, 2012.
22   A.   Yes, it is.
23          MS. SWEENEY:  Your Honor, the Government moves
24   Exhibit 3 into evidence.
25          MR. GEORGE TRAGOS:  No objection.
```

```
 1              THE COURT:  It will be received.

 2              (Thereupon, Government's Exhibit 3 was received and

 3    filed in evidence.)

 4    BY MS. SWEENEY:

 5    Q.   Agent, can you pull out the drum magazine and hold that up

 6    so the jury can see it.

 7              MS. SWEENEY:  And then, Your Honor, I'll also show it

 8    to the public.

 9              (Brief Pause.)

10    BY MS. SWEENEY:

11    Q.   In addition to the drum magazine, Agent, how many boxes of

12    ammunition are in the box?

13    A.   There's six boxes of ammunition with 20 rounds in each

14    box.

15    Q.   And what kind of firearm is that ammunition for?

16    A.   It's for an AK-47

17    Q.   And, Agent, is Exhibit 3 what you're showing to the

18    Defendant in the portion of this video that we're about to

19    watch?

20    A.   Yes, it is.

21              (Tape continuing.)

22    "UCE:  These are bullets.  There's twenty in a box so these,

23    this

24    SO:  I think it be [IA], I think we should do it a little more

25    quietly [IA].
```

```
1    UCE:  [IA] twenty --

2    SO:  Yeah.

3    UCE:  -- of each round.  This is hard to load, so I loaded it

4    for you, but not, not till I leave.

5    SO:  [IA]

6    UCE:  Okay.  And this is the same thing.  This is the same

7    thing as that one.

8    SO:  [IA].

9    UCE:  This side up first, then that.

10   SO:  So, this side up first?

11   UCE:  Yeah, this side up first, just like this one is.

12   SO:  Yeah, yeah, yeah.

13   UCE:  [IA].

14   SO:  Yeah.

15   UCE:  [IA].

16   SO:  Yeah.

17   UCE:  And then when it's done, just like before, you pull that.

18   SO:  [IA] pull back.

19   UCE:  Yup, drop it again, it's the other way [UI].  Towards us

20   [UI].

21   SO:  I don't go like this [IA].

22   UCE:  Right, right.

23   UCE:  [IA].

24   SO:  So, it's pretty simple, just this side first, then that.

25   UCE:  Yup.
```

```
1    SO:  Hold it, let go.

2    UCE:  Yup.

3    SO:  I just change this and then like that.

4    UCE:  Yup.

5    SO:  [IA].

6    UCE:  Yup.

7    UCE:  [IA] this is for when you're going to, when you're going

8    to go take your car.  That you asked for.

9    SO:  Uh?

10   UCE:  That you asked for.  Look at you smiling.

11   SO:  Show me exactly [UI].

12   UCE:  Uh?

13   SO:  Ooo...  Allahu akbar [God is great].

14   UCE:  [IA] take everything off?

15   SO:  That's for when I, when I do the big thing.

16   UCE:  Yes.

17   SO:  Take this with me.

18   UCE:  Yes.

19   SO:  In case they follow me.  Let's take this off.  Try to

20   remember how to do it.  Put your arms straight out."

21   BY MS. SWEENEY:

22   Q.   Agent, I just handed you what have been previously marked

23   as Government's Exhibits 6-A, 6-B and 6-C.  What -- let's start

24   with 6-A.  What is that?

25   A.   It's a 1911 .45 caliber pistol.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1  Q.   And did -- is that one of the things you provided to the
 2  Defendant on January 7th of 2012?
 3  A.   Yes, it is.
 4  Q.   Is it, in fact, what you just have shown him inside of the
 5  bag in the video that we're watching?
 6  A.   Yes, it is.
 7  Q.   And what is 6-B?
 8  A.   6-B is a magazine for the 1911 .45 caliber pistol.
 9  Q.   And what is 6-C?
10  A.   6-C is the round that goes to the 1911 45-caliber pistol.
11  Q.   Are all of those items in substantially the same condition
12  as they were the last time you saw them on January 7th?
13  A.   Yes, it is.
14       MS. SWEENEY:  Your Honor, at this time the Government
15  moves into evidence 6-A, 6-B and 6-C.
16       MR. GEORGE TRAGOS:  No objection.
17       THE COURT:  They'll be received.
18       (Thereupon, Government's Exhibits 6-A, 6-B and 6-C
19  were received and filed in evidence.)
20  BY MS. SWEENEY:
21  Q.   Agent, did you -- you showed them to the jury, just the
22  items?
23  A.   Yes, I did.
24       MS. SWEENEY:  Your Honor, I'll show them to the
25  public.
```

```
 1              THE COURT:  Yes, ma'am.
 2              (Brief Pause.)
 3              MS. SWEENEY:  Okay.  So we'll continue with the
 4  video.
 5              (Tape continuing.)
 6  "UCE:  [IA] put your arms straight out, put your arms straight
 7  out. [IA].
 8  SO:  [IA].  I dont think I can get it off.
 9  UCE:  You wanna; you wanna try putting everything on by
10  yourself?
11  SO:  Yeah, yeah, yeah.  Let's try [IA].
12  UCE:  Let's get everything off; let's get this one off, too.
13  SO:  [IA].
14  UCE:  Yeah.
15  SO:  Alhamdulillah [praise be to God]
16  UCE:  Now you wanna just take it.  You got this one, it's gonna
17  be a little bit cause you'll have to, you'll have to [IA].
18  UCE:  [UI] Velcro.
19  SO:  [IA] this a little easier [IA].
20  UCE:  Yeah.
21  SO:  [IA] easy.
22  UCE:  Did you do the Velcro?  Did you do the Velcro?
23  SO:  Insha Allah [God willing]. [IA].  How far this goes?
24  UCE:  [IA] this much room on the other side of that door [UI].
25  You can see.  You can see it?
```

```
 1   SO:  Yeah.

 2   UCE:  [IA].

 3   SO:  Mines gonna be quick inshaAllah [God willing], but nobody

 4   else.

 5   SO:  Those are like the... screws?

 6   UCE:  Yes, yes.

 7   SO:  Alhamdulillah [praise be to God].

 8   UCE:  [IA].

 9   SO:  [IA] education, Alhamdulillah [praise be to God].

10   UCE:  Homemade stuff, you know.

11   SO:  It's the real stuff, homemade is always the best.  Like

12   homemade food.

13   SO:  Alhamdulillah [praise be to God] Insha Allah [God

14   willing].  [IA].  This, you cant find a way

15   UCE:  [IA].  Can you put it in your sleeve?  I'm trying to see

16   if I can get it in your shirt or something so its just kinda

17   extended inside your shirt sleeve.  [UI]

18   SO:  There's room right here though. [IA].

19   UCE:  [IA] when you put this on, it might lock it.

20   SO:  [IA].  Yeah.

21   UCE:  You can put it in one of the pockets, you could put it in

22   the side pockets, so this. [IA].

23   SO:  Yeah.

24   UCE:  [IA] you'll have space.

25   SO:  Alright.  This --
```

```
1    UCE:  [IA]
2    SO:  [IA] this is good.  This is not too low right, this good
3    [IA]
4    UCE:  [IA].
5    SO:  So, wanna make the video, do you wanna do it now? [IA].
6    UCE:  [IA].  That's too tight [IA].
7    SO:  [IA].
8    UCE:  Okay.
9    SO:  How much was this one?
10   UCE:  Uh?
11   SO:  How much was that one?
12   UCE:  That was --
13   SO:  Half of everything, right?
14   UCE:  Uh?
15   SO:  Half of everything.
16   UCE:  That was, that was, that was the, that was the --
17   [IA], you know, people, you know, that youve been in business
18   with for a while.  If I tell you, you can't tell.  [UI]
19   SO:  [IA].
20   UCE:  About 800.  [IA] Fully automatic [IA]
21   SO:  [IA] I think I saw semi-automatic, a fully eight, ninety,
22   five but not metal, at a shooting range.
23   UCE:  Uh?
24   SO:  But, it wasn't metal.
25   UCE:  Okay.
```

```
 1   SO:  This, this heavy, the other thing was way lighter.
 2   UCE:  Uh...
 3   SO:  [IA].  Alhamdulillah [praise be to God]
 4   UCE:  [IA] this I don't wanna touch this one so, you, you can
 5   put it on [IA].
     [Conversation IA].
 7   UCE:  See that black handle right there?
 8   SO:  Push it down.  It will slap.
 9   UCE:  [IA] push it down.
10   UCE:  [IA] this one has a safety and a [IA] cause it's a 1911,
11   it's a forty-five, so with your thumb tip it back with your
12   thumb and push that up.
13   SO:  [IA].
14   UCE:  Yeah. [UI] that's safe.
15   SO:  [UI] and that's not safe.
16   UCE:  That's not safe.  Push it up.
17   UCE:  Try to pull the trigger.  Nothing.
18   SO:  What's this for?
19   UCE:  That, that's that safety also [IA].
20   SO:  I like to hold it so [IA].
21   UCE:  Yeah, right.
22   SO:  [IA].
23   UCE:  Forty-five.
24   SO:  [IA].
25   UCE:  Okay, so put, put, put, push it, push it down.  Now pull
```

1   the trigger and see.

2   UCE:  So now the hammer fell.  Okay.  And now, right now

3   because there's no bullet in it so it didnt --

4   SO:  Yeah [UI].

5   UCE:  [IA].

6   SO:  [IA].

7   UCE:  Yeah.

8   SO:  This automatically [IA].

9   UCE:  No.  You got to push that [UI] put it back.

10  UCE:  But, it's not gonna stay back, so, turn, turn [IA] there

11  you go, push that up.

12  SO:  I dont think I did it.

13  UCE:  You should.  You should.

14  UCE:  [IA] there you go.

15  SO:  And then I load it?

16  UCE:  Yup.

17  SO:  [IA]... different.

18  UCE:  Yup.

19  SO:  Because the Glock 19 didnt have a safety.

20  UCE:  These are your bullets, you need to keep them separate.

21  You can leave everything in the bag [IA].

22  SO:  Yeah [IA].

23  UCE:  When I leave out of here, I think I'm gonna, you want,

24  you wanna', you wanna' borrow my bag, because you need some

25  place [UI] carry it, because you're not gonna go out of here

```
 1   dressed.
 2   SO:  [IA] with my hands like this, right?
 3   UCE:  [IA].
 4   SO:  [IA].
 5   UCE:  Yeah.
 6   SO:  I need one bag, at least.
 7   UCE:  Okay.  I leave you this bag, you dont, you not you
 8   probably won't need this one.
 9   SO:  I need the number.
10   UCE:  What [IA].
11   SO:  The number that I got to call.
12   UCE:  Thats probably the only thing, I gotta show you when I go
13   and set up the bomb Ill show you [IA] the bomb.  I think I have
14   the switch for it.  So I show you all that and uh... thats
15   easy.
16   UCE:  You wanna do your video dressed, with your -- with
17   everything on you?  Or you wanna do your video without?
18   SO:  It cant be too loud, theres a room next to us.
19   [UI] T.V.
20   UCE:  [IA] sound.
21   SO:  [IA].
22   UCE:  Okay.
23   SO:  [IA].
24   UCE:  You want to hear it too on the video [IA] make sure that
25   you can hear it.
```

```
1    SO:  Yeah.  We can do like once, like five seconds test because
2    [UI].  I might not wanna do it like this. [IA].
3    UCE:  Yeah, yeah that's cool.  You wanna sit down and do it?
4    SO:  Yeah.
5    UCE:  Okay, [IA] what if, whatever you think its best, I don't,
6    I don't know.
7    SO:  I had so much stuff to say for the past three days, I have
8    nothing to say now, for real.  Okay lets do this.
9    UCE:  You, you don't wanna wear the stuff, we can take the
10   stuff off, and do it with the stuff off?  You can, so you can
11   just talk.  Cause you think you feel better talking with the
12   stuff off or you think you feel better talking with the stuff
13   on?
14   SO:  Ill keep this on.  This I'll keep. [IA].  Car nowhere --
15   UCE:  Uh?
16   SO:  No driving with the car nowhere.
17   UCE:  No.
18   SO:  Cause you dont want [UI].
19   SO:  I have to put it in the bags. [UI].
20   UCE:  You can put them in the bags later when you come back.
21   SO:  I thinking 'bout, [IA].
22   UCE:  Its gotta be after the car because any time before the
23   car is not good, because it's just gonna be out there if
24   something happens.
25   SO:  [IA] okay.  So I'll leave all this after coming with the
```

1  rental here.  Take this, leave it in the bushes, parking lot at

2  Sligh.  Go back to the bushes do everything and go to the

3  casino.

4  UCE:  Okay.

5  SO:  Leave the keys; leave the car open with the keys in the

6  [IA].

7  UCE:  Leave, leave the keys inside. [IA].

8  SO:  Here?

9  UCE:  Uhm... center, in the center.

10  SO:  Uh?

11  UCE:  In the center [UI] yeah.

12  SO:  [IA].  I went to his store because he was supposed to be

13  there and he told the other ones don't come at all, they said

14  no, no, we gonna come, we gonna come.  So I was in there that

15  morning, I was hoping I would catch some sleep in the back.

16  UCE:  But everybody was there?

17  SO:  Yeah. [IA] The reason why I was there [IA]

18  UCE:  How do you work this thing?

19  SO:  You have a laptop or a computer, [IA] put it inside [IA]

20  battery if it dies.  Like this and not [UI].  Because you just

21  wait till I call.  They don't get [IA] you [IA] you get

22  questioned, if you got a lawyer already.

23  UCE:  Give them time?"

24          (Tape stopped.)

25          MS. SWEENEY:  Okay.  Let's stop for a moment.

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1   BY MS. SWEENEY:

2   Q.   Agent, I'm handing you what's been previously marked as

3   Government's Exhibit 10.  What is that?

4   A.   It's the video camera the Defendant brought on the night

5   he made the martyrdom video.

6   Q.   And is that item in substantially the same condition as it

7   was the last time you saw it on January 7, 2012?

8   A.   Yes, it is.

9           MS. SWEENEY:  Your Honor, the Government moves

10  Exhibit 10 into evidence.

11          THE COURT:  It will be received.

12          MR. GEORGE TRAGOS:  No objection.

13          (Thereupon, Government's Exhibit 10 was received and

14  filed in evidence.)

15  BY MS. SWEENEY:

16  Q.   Agent, so, who brought that that evening?

17  A.   The Defendant brought this camera.

18  Q.   And in the portion of the video that we just started

19  watching and are going to continue watching, what is the

20  Defendant telling you about?

21  A.   He's instructing me on how to use it.

22  Q.   So had you seen it before that evening?

23          THE COURT:  Asked and answered.

24          MS. SWEENEY:  Your Honor, would you like me to show

25  the camera to the public?

```
 1              THE COURT:  Yes.

 2              (Brief pause.)

 3              (Tape continuing.)

 4   "UCE:  Give them time?

 5   SO:  After some time, give the video, give it to him, to give

 6   it to that brothers brother, the Bosnian brother, Salah Uddin.

 7   UCE:  The Bosnian.

 8   SO:  I can write down the name.  I'll write down the name he

 9   knows.  The one with the name of your son you tell him.

10   UCE:  If I say the Bosnian brother will he know?

11   SO:  Yeah, you gonna remember that?

12   UCE:  So I can just, I can say the Bosnian brother has [IA] I,

13   I might not remember the name but I can remember the Bosnian

14   brother.

15   SO:  You just tell him [UI] you can tell him the one that your

16   son's name.

17   UCE:  The one with your son's name.

18   SO:  Give to the one with your son's name.  With your son's

19   name, it's the brothers video. [UI] they be like, oh my God,

20   what happened, the psycho he was mistreated in that shower.

21   [Laughs] inshaAllah [God willing]; The only thing is inshaAllah

22   [God willing] the one that followed me, here like, they might

23   give us, if they might give us twenty minutes before they come

24   and see what I'm doing.

25   UCE:  Did they follow you here?
```

```
 1    SO:  Yeah.

 2    UCE:  Okay, so --

 3    SO:  Like you said, we cannot have it ready and put it in the

 4    car, you said we have to do it first then put in the car and

 5    then have it ready.

 6    UCE:  Yeah.

 7    SO:  Because it could, it could go off.

 8    UCE:  If... Yeah.  So what do you wanna do about the rental

 9    car?

10    SO:  Im gonna leave it at Sligh.

11    UCE:  No.  I'm talking about for the first place now, you wanna

12    because when --

13    SO:  Oh, I got to drive it first.

14    UCE:  Do you wanna --

15    SO:  I'll drive it first.

16    UCE:  You wanna do it first?

17    SO:  And then I'll go with my car.

18    UCE:  And then you go catch a cab to go get your car and then

19    meet me back here.  Can you do that?

20    SO:  Yeah, so how long though?

21    UCE:  How long you think it's gonna' take you? I'll come,

22    'cause I'm gonna come straight back here.

23    SO:  It's okay.  It's not [UI]; I might go nowhere.

24    UCE:  What do you mean?

25    SO:  Im just saying driving your car?  Are we driving the
```

1  rental together?  You don't want to [UI] big car.  You don't

2  wanna be on the road with that.  That one is the one thats

3  gonna [UI].

4  UCE:  Right.

5  SO:  [UI].

6  UCE:  Right, right.  Okay.  So you take the rental car and go

7  put that after you put the rental car, then you gonna take a

8  taxi.  You have enough money to take a taxi?

9  SO:  I, I have enough to there, but I might need --

10  UCE:  But you have to gonna get your car.

11  SO:  No, I have enough money, I have enough  money.  I have

12  enough money.  So, I just now have to find out what exactly

13  what exits are when I take the rental, I have to see what exit

14  Im at.  So I find the place.

15  UCE:  Okay.

16  SO:  Its 275 here, right?

17  UCE:  That was 4 we got off of.

18  SO:  I-4?

19  UCE:  Yeah, we got off at 50th street exit off I-4.  And then

20  we went --

21  SO:  Oh, 50th street so that means exit 3.

22  UCE:  [UI].  I don't know the exit number.  I didn't even look,

23  might have been [IA] left exit.  It's the left exit.  It's the

24  two-lane left exit.  It's the first two-lane left exit after

25  one.

1   SO:   Every, every, every other exits on the right and this one

2   is in the left.

3   UCE:   Right, because exit one, exit one was on the right.  So

4   after exit one just stay all the way left and it's gonna be

5   that first exit.  So you go one light, two lights and you're

6   gonna have to make the left turn. And then it's one light, two

7   lights, left turn, you can see it from the highway, from there,

8   you can see it from the highway.

9   SO:   And, let me see.  I'm gonna come back with my car.  I'm ah

10  load this ready.  Because I'm gonna have this and [UI]."

11  BY MS. SWEENEY:

12  Q.   Agent, in the moment that we just watched, the Defendant

13  said, "I'm gonna come back with my car.  I'm ah load this

14  ready.  Because I'm gonna have this," and then it's

15  unintelligible.  What was he referring to when he said that?

16  A.   The pistol.

17        (Tape continuing.)

18  "UCE:   Okay.  When you come back --

19  SO:   If they, if they want to pull me over.  I go to the most

20  crowed place.  I let them follow me a little bit, so they

21  gather round [UI] go to the most crowed place [UI] freeze.

22  UCE:   Okay.

23  SO:   Put that on the news.

24  UCE:   Okay.  So that's now it's just, do the video.

25  SO:   Trust in Allah [God] and do the video.

1   UCE:  Do the video and you go put the rental car and I'll just

2   wait.  I'll wait for you to come back.

3   SO:  InshaAllah [God willing] I dont need to be too excited

4   because I dont want to speak too loud.

5   UCE:  Where do I push to record?

6   SO:  [IA].

7   UCE:  I see the on, I see the on/off, so.

8   SO:  [IA].

9   UCE:  It's up to you, what do you want?

10  SO:  [IA].

11  UCE:  It's up to you if you want to hold it, you can hold it.

12  You could hold whatever you want, you could hold whatever you

13  want to hold.

14  SO:  Yeah.  Ill hold it, I'll hold it inshaAllah [God willing].

15  [UI] kuffar [the infidels] [UI]  You got it?

16  UCE:  No, show me.

17  SO:  [IA].  Okay.  It's ready right now.  [IA] you cant believe

18  everything [UI].

19  UCE:  When you're ready you tell me and I'll hit record.

20  SO:  Okay. [IA] is that close enough?

21  UCE:  Yeah, this is good, I've got everything.

22  SO:  Okay.  Go ahead, we gonna try it first [UI].

23  UCE:  It's recording.

24  SO:  Assalamu alaykum wa rahmatullah [Peace be upon you with

25  Gods mercy] this is brother Abdul Samea [PH], today, inshaAllah

1  [God willing], were gonna revenge the death of our Muslim

2  sisters and brothers overseas and the rape and torture in their

3  prisons like theyre doing to our sisters and brothers.  And

4  this is the only way Allah [God] will be questioning their

5  judgments; Allah [God] [UI] I rather get a bullet, then let our

6  sisters get raped.  For those of you who know me already from

7  my previous videos, there's no need for me to get into any

8  details.  We already know this is part of the good and all I

9  have to say is we will not stop with this.  One point five

10  million and more people died even before the war started.  We

11  will go after every one of them, their kindergartens, their

12  shopping centers, their night clubs, their police stations,

13  their court houses and everything.  Until we have an Islamic

14  state the whole world, that was once Islamic will be the

15  Cilafah [Caliphate] and then until we revenge every Muslim

16  death.  So I'm not gonna say much. [UI] The problem is [IA].

17  That's the only problem right now.

18  SO:  [IA] check it. [IA] can you hear? [IA]

19  UCE:  [IA].

20  SO:  [IA] can you hear what Im saying at least?

21  UCE:  Yeah, I think so [IA].

22  SO:  [IA].

23  UCE:  [IA].

24  SO:  [IA].

25  UCE:  Lets leave it.  You wanna?

```
 1   SO:   [IA]

 2   UCE:  All right.

 3   SO:   [IA] alhamdulillah [praise be to God] [IA] hit the button

 4   [IA].

 5   UCE:  [IA] It's recording.

 6   SO:   Assalamu alaykum wa rahmatullah."

 7             (Tape concluded.)

 8   BY MS. SWEENEY:

 9   Q.   So, Agent, in the -- towards the end of this video, the

10   Defendant, what was he doing when he was speaking for an

11   extended period of time?

12   A.   At the end of the video?

13   Q.   The part --

14             MS. SWEENEY:  Can we switch to the document camera.

15   BY MS. SWEENEY:

16   Q.   I'm showing you Government's Exhibit 123.1-B.

17             THE COURT:  Move the microphone or go back to your

18   spot.

19             MS. SWEENEY:  I'm sorry, Your Honor.  I apologize.

20   BY MS. SWEENEY:

21   Q.   I'm putting up Government's Exhibit 123.1-B, in page 32 of

22   that exhibit.

23        Agent, I'm referring to this portion of the recording

24   where the Defendant begins, "We're going to revenge the death

25   of our Muslim sisters and brothers overseas."  What is --
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    what's happening in this portion?

2    A.    The Defendant is testing the video camera to make sure

3    that it records properly or works accurately.

4    Q.    And in this -- when this happened, did you know what the

5    Defendant was going to say before he said it?

6    A.    No, I did not.

7    Q.    Did you tell him what to say?

8    A.    No, I did not.

9    Q.    Was he reading from anything?

10   A.    No, he was not.

11   Q.    And then on page 33, at the end of this recording, at the

12   end of 123.1-A, you say, "It's recording," and the Defendant

13   says an Arabic phrase.  What is that the beginning of right

14   there?

15   A.    That is the beginning of the martyrdom video that we saw

16   on day one of my testimony.

17   Q.    Agent, I just handed you Government's -- I handed you two

18   exhibits or four exhibits.  But let's first start with

19   Government's Exhibits 123.2-A and B.  What are those?

20   A.    Those are portions of the recordings of my interactions

21   with the Defendant after he did the martyrdom video and the

22   transcript of that recording.

23   Q.    And how do you know that he --

24          MR. GEORGE TRAGOS:  I object.  Could we refer to the

25   -- what he's referring to as the martyrdom video as -- by the

1    exhibit number, because that is an exhibit?

2              THE COURT:  No.  He can answer the way he answered.

3    BY MS. SWEENEY:

4    Q.    How do you know that you reviewed the recording that is on

5    Government's Exhibit 123.2-A?

6    A.    Because I marked it as such after I reviewed it.

7    Q.    And as to -- is that an accurate recording of this portion

8    of your meeting with the Defendant?

9    A.    Yes, it is.

10   Q.    And as to that portion of the meeting, are there any

11   insertions, deletions, changes to that portion of the

12   recording?

13   A.    No, there is not.

14   Q.    Is the transcript an accurate transcript of the meeting?

15   A.    Yes, it is.

16             MS. SWEENEY:  Your Honor, the Government moves into

17   evidence Exhibits 123.2-A and B.

18             MR. GEORGE TRAGOS:  No objection.

19             THE COURT:  They'll be received.

20             (Thereupon, Government's Exhibits 123.2-A and B were

21   received and filed in evidence.)

22             MS. SWEENEY:  And, Your Honor, may we play those for

23   the jury?

24             THE COURT:  Yes.  Can you bring the volume back up

25   again?

```
 1              (Brief Pause.)

 2              MS. SWEENEY:  Your Honor, the volume is up as high as

 3    it will go.

 4              (Tape played.)

 5    "SO:  How long was that?

 6    UCE:  I can't tell how, how much time it was.

 7    SO:  [IA] I can check.

 8    UCE:  You didn't wanna take credit for what you were going to

 9    do?

10    SO:  Uh?

11    UCE:  You didn't wanna take credit for what you were going to

12    do?  Like, say like, you know --

13    SO:  Oh, they, they know.

14    UCE:  Uh?  You didn't want to take credit for it?

15    SO:  I didn't want to take credit for this?

16    UCE:  That's what I'm saying on your, on your video, like say,

17    like, you know, whatever they tell you that this is what

18    happened.  And this is whatever they tell you that the --

19    SO:  They'll know.

20    UCE:  You think?  I don't care, I mean, if you wanna' leave it

21    like that.

22    SO:  They'll know.

23    UCE:  Okay.

24    SO:  They'll know inshaAllah [God willing].

25    UCE:  Okay.
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1   SO:  They'll know because they'll know.  They'll know

2   inshaAllah [God willing].

3   XXXX

4   UCE:  Okay.

5   SO:  Unless somebody where ever they, if they get the videos

6   they gonna [IA] inshaAllah [God willing].

7   UCE:  Cool.

8   SO:  I had way better stuff to say...

9   SO:  Like in jahiliya [pre-Islam paganism] I used to rap.

10  UCE:  Hmm.

11  SO:  I had way better stuff to say and it was flowing better,

12  because I use to record it.

13  SO:  It's not the same.  When you feel like speaking at that

14  moment is the best.

15  UCE:  [IA].  You right.  You right.  Youre right.

16  SO:  [IA].

17  UCE:  [IA].

18  SO:  As long as I have breakfast tomorrow inshaAllah [God

19  willing] in Jannah [Heaven].

20  UCE:  Yes.

21  SO:  [IA] inshaAllah [God willing] be successful inshaAllah

22  [God willing] [UI].

23  UCE:  I don't know.  We'll see.  Mine is uh... everyone has a

24  talent and uh... a calling from Allah [God].

25  SO:  Your talent is beautiful.  Maybe we can use you.  Just

| | |
|---|---|
| 1 | know that there's always one or two brothers that every masjid |
| 2 | [mosque].  Maybe even five, but they dont know who to trust.  I |
| 3 | personally put myself out there because I was trying to incite |
| 4 | everybody [UI] police came and everything trespass me, then the |
| 5 | FBI started following me.  I was, I was in Turkmenistan [UI]. |
| 6 | I went to visit this mosque of this person who's he?  Ah... |
| 7 | thats a historic place." |
| 8 | (Tape stopped.) |
| 9 | THE COURT:  Let's take a break and see if we can |
| 10 | bring the volume up. |
| 11 | MS. SWEENEY:  It's up as high as it will go.  It is |
| 12 | quite quiet at this point, Your Honor. |
| 13 | THE COURT:  All right. |
| 14 | (Brief recess.) |
| 15 | You may continue. |
| 16 | (Tape continuing.) |
| 17 | "SO:  Part of the Ottoman Empire.  They like, what does it |
| 18 | interest you?  I'm like, yeah, I like it when Islam was |
| 19 | dominant over the whole world.  Then they said why did you try |
| 20 | to go to Syria and Turkey?  [UI] many countries around there |
| 21 | [UI].  Only from the Turkish side is apostates, traitors, every |
| 22 | 300 yards they had like a big post.  Watching the border [IA] |
| 23 | shot one [IA] soon as you trespass the line, they shoot. |
| 24 | UCE:  Hmm. |
| 25 | SO:  And that's not even [UI] on the Shia side, cause they have |

1   the oil on the other side of Iraq.

2   UCE:  So why can't you get in?  Why was it a big deal though?

3   Why, why is that such a problem?

4   SO:  You cant get in, you can get in through Syria. [UI] they

5   wouldnt let me in with U.S. passport.  They said no [UI] you

6   have to have a visa [UI] only if you fly.  They like thats

7   sometimes.  [UI] who are you?  We dont like Americans coming

8   here.  Im a Muslim.  Im not American.  They got angry, they

9   started yelling.  I tried three times through Syrian different

10  border.

11  UCE:  Hmm

12  SO:  Twice at the same place and they like [IA] I'm like let me

13  talk to this guy.  One guy [IA] so I mention the name and they

14  say, oh, okay.  Will take you; they take me to the wrong guy.

15  [IA] have you ever been to Syria? [IA] how do you know, how do

16  you know about it.  I told him I [IA] he said if you go to this

17  check point ask for this guy he'll give you [UI]. [IA] they all

18  start yelling [IA].  Every time I got questioned I used to feel

19  so much better.  Before I get there I'm like alhamdulillah

20  [praise be to God]. [UI] Every time I got questioned [UI] I was

21  smiling.  And when I came back, the FBI, in Detroit, they asked

22  me questions your family.  Im like my family are just like you

23  guys, disbelievers.  They are; but I am not trying to be mean

24  [UI]

25  UCE:  Right.

1 SO:  And then, uh, so, what do you mean you disbelieve us?  Did

2 Islam  teach you to respect us?  Pull out my Quran right now,

3 show me where Im supposed to respect you.  Rather I am supposed

4 to hate you because youre disbelievers; I dont harm because

5 youre disbelievers, but I hate you and I'm -- and I'm gonna

6 stay away from you so I dont get corrupted by you.  So you

7 think Im a disbeliever?  Im like  I know if you die right now

8 youll go to hell if you dont accept Islam.

9 UCE:  Sure.

10 SO:  [UI] this, every time they brought up a question, stuff

11 that is in the Quran.

12 UCE:  Uh-u.

13 SO:  Or Hadith [the prophet tradition].

14 UCE:  Uh-u.

15 SO:  I don't remember it right now but Allah [God] would make

16 it come up and I would answer like that.  And I would change

17 the conversation so one of them would like slam the table he

18 told this guy--he told him, probably cause I was dragging him,

19 Alhamdulillah [praise be to God]

20 UCE:  Uh-um.

21 SO:  -- I was dragging to Islamic conversation and changing the

22 subject.

23 SO:  Cant we just concentrate on the, the interrogation?

24 UCE:  [UI].

25 SO:  [UI] Islam is peace.

SO:  Well, actually, I agreed with everything, I even agreed with the airplane but I said [UI] wife overseas and saw everything then [UI] while I was driving back to the airport on the bus [UI] these kuffar [infidels] are responsible for everything [UI] airplane but [UI], in Palestine, in Iraq and in Afghanistan [UI] but you cant even go to the supermarket without getting killed or losing your family.

UCE:  Yeah, yeah.

SO:  I'm like, and I saw the children in front of me, with their families laughing, Im like, man, the children deserve it too, man.  Im like, how, why their children are better ours? Why are they allowed to travel and theyre drinking wine and they celebrate on the airplane watching TV on "la-la-land" [UI] Muslims. [UI] Before I was like, if I happen to be on a plane, I'll say anything besides [UI].  If I happen to be on a plane.. [UI] these kuffar [infidels] they are evil man.  Its all part of [UI]; their kids are pure, theyre [UI] but I love Muslim children more than them.

UCE:  Yeah, yeah.

SO:  I like shocked because [UI] scholars.  He said the toenail of one Muslim is better the big of the biggest sinner Muslim, he is better than the whole world of disbelievers.  They are nothing in the sight of Allah [God].  If dunia [life] was worth something, Allah [God] wouldnt give them a glass... drink of water.

```
1    UCE:  Check the history though, bro, we are, our people ruled
2    this planet once upon a time.
3    SO:  Yeah.  We will again.  It's -- it's guaranteed.  Victory
4    is ours.  We wanna secure victory; we want shahada [martyrdom];
5    we dont wanna die in bed or a car accident.
6    UCE:  [UI] Its getting late.
7         UCE:  It's the one.  I think I'm parked right next to it.
8    The one I'm parked right next to.  So, you take it and you go
9    place it and you're gonna catch a taxi.
10   SO:  To University Mall.
11   UCE:  I'll wait for you.  Ill wait for you.  How long do you
12   think it's gonna take you?
13   SO:  I'll have to see exactly where we are so I dont get lost.
14   I still have the address.
15   UCE:  Okay.  Okay.  I know it's on 4 that you were coming.  You
16   were coming, because we came from 275 to 4 --
17   SO:  275, exit 4, I-4 connection.
18   SO:  [UI conversation] [SC].
19   SO:  [UI] a left under the bridge, do you do a right...straight
20   or left?
21   UCE:  Once you go exit left, you go under the bridge, uh-m, you
22   get that first light when you get off the exit?
23        SO:  Yeah.
24   UCE:  The first light?  The second light...you turn.
25   SO:  So that's Fifty?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1   UCE:  Yeah, that's Fifty.
2   SO:  That's the one that I usually take to Bush. There is a
3   graveyard, do you go by a grave?
4   UCE:  See, I don't come that way.  I don't come all the way
5   down.
6   SO:  Ima, Ima try to find it right now.
7   UCE:  [UI]
8   SO:  I have to go.
9   UCE:  As soon as you turn, as soon as you turn, as soon as you
10  turn...it's right...  As soon as you turn on 50...the light
11  right on 50 -- the first light takes you back on the highway.
12  The second light is where the hotel is.  [UI]
13  SO:  So, I make a left [PH] on 50 on the second light?
14  UCE:  Yeah, yeah...on 50th, the second light on 50th -- once
15  you make a left on to 50, once you make a left on to 50, the
16  second light on 50 brings you right in. You'll see [UI].
17  SO:  [UI] 275, this right here?
18  UCE:  I don't know where its going.  [UI].
19  SO:  I -- I'm, Ill just try to find it [UI].
20  UCE:  Okay.
21  SO:  [UI].
22  UCE:  Yeah, so you have everything?
23  SO:  Whats the address?
24  UCE:  [UI]?
25  SO:  Thats not the room, right?
```

```
1    UCE:   [UI] room numbers.

2    SO:   [UI].

3    UCE:   This is One-Twelve.

4    SO:   One-Twelve, right?

5    UCE:   Yeah.

6    SO:   By the [UI], right?

7    UCE:   [UI].

8    SO:   [UI] make duah [prayer], make duah [prayer].

9    UCE:   Yes.

10   SO:   [UI].  Make duah [prayer] for all [UI] insha Allah [God

11   willing] [UI conversation]."

12           (Tape concluded.)

13   BY MS. SWEENEY:

14   Q.   Agent, just a moment ago the Defendant was looking at

15   something in his hands.  Do you know what he was looking at?

16   A.   I'm sorry.  I wasn't paying attention.

17   Q.   Oh, let me go back just a -- well, he says, yeah -- you

18   say, "Yeah, so you have everything?"  And he says, "What's the

19   address?"  You say something back to him that's unintelligible,

20   and then he says, "That's not the room, right?"  Do you know

21   what he was looking at in his hand, do you recall?

22   A.   I don't.  I'm sorry.

23           MS. SWEENEY:  Let's continue.

24           (Brief pause.)

25   BY MS. SWEENEY:
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1  Q.   Okay.  So, Agent, at the end of the video that we just

2  saw, what is the Defendant going to do?

3  A.   He's going to get into the rental vehicle and drive it and

4  stage it at the location where he's going to explode the car

5  bomb.

6  Q.   And do you -- do you leave the hotel at this time or not?

7  A.   Do I permanently leave the hotel?  I walk out of the room,

8  but I don't leave the hotel area.

9  Q.   Okay.  So you go -- once the Defendant leaves in the van,

10  where are you?

11  A.   I stay at the hotel.

12  Q.   So I've handed you what's been previously marked as

13  Government's Exhibit 13.  What is that?

14  A.   This is the key -- this is the key to the rental vehicle.

15  Q.   Did you give that to the Defendant in the hotel room on

16  January 7th, 2012?

17  A.   Yes, I did.

18  Q.   And did you see him leave with it on January 7th, 2012?

19  A.   Leave with the rental vehicle?  Yes, I did.

20  Q.   And that key?

21  A.   Yes, I did.

22  Q.   And is that key in substantially the same condition that

23  it was the last time that you saw it on January 7, 2012?

24  A.   Yes, it is.

25            MS. SWEENEY:  Your Honor, the Government moves

1    Exhibit 13 into evidence.

2              MR. GEORGE TRAGOS:  No objection.

3              THE COURT:  It will be received.

4              (Thereupon, Government's Exhibit 13 was received and

5    filed in evidence.)

6    BY MS. SWEENEY:

7    Q.   So, Agent, when the Defendant -- does the Defendant return

8    to the hotel?

9    A.   Yes, he does.

10   Q.   About how long was he gone?

11   A.   I don't know.

12   Q.   Where were you when you first saw him upon his return to

13   the hotel?

14   A.   I was in the hotel room.

15   Q.   So you weren't waiting in the parking lot for him?

16   A.   No, I was not.

17   Q.   Can you please take a look at -- I think you have up there

18   Government's Exhibits 123.3-A and B.  Do you see that?

19   A.   Yes.

20   Q.   What are those items?

21   A.   It's a recording of the interaction between myself and the

22   Defendant after he returns to the hotel room after staging the

23   vehicle.

24   Q.   And how do you know that that disc contains that portion

25   of your meeting?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    A.   Because I reviewed it and marked it as such.

 2              THE COURT:  Is there any objection to the

 3    introduction of this exhibit?

 4              MR. GEORGE TRAGOS:  No, Your Honor.

 5              THE COURT:  It will be received.

 6              MS. SWEENEY:  Yes, Your Honor.

 7              (Thereupon, Government's Exhibits 123.3-A and B were

 8    received and filed in evidence.)

 9              MR. GEORGE TRAGOS:  I wonder if we can take a comfort

10    break.

11              THE COURT:  Yes.  We're going to take a comfort break

12    now for 15 minutes until 10:45.

13              (Jury excused.)

14              Court stands in recess for 15 minutes.

15              (Brief recess.)

16              Call the Court back to order, please.  Please recall

17    the jury and open the courtroom.  The courtroom is also being

18    opened.

19              (Jury returned to the courtroom)

20              Counsel, you may proceed.

21              MS. SWEENEY:  Thank you.

22              At this time, we'll play Government's Exhibit 123.3.

23              (Tape played.)

24    "SO:  [IA] Assalamu alaykum [Peace be upon you] [UI] follow me

25    [UI] when I open my door [UI] I unlocked it.
```

```
 1  UCE:   Hmm...

 2  SO:   [UI] barely, couldnt even reach it [UI].

 3  UCE:   Right.

 4  SO:   Because I can't open it with a key I have to put my hand

 5  in there.

 6  UCE:   [IA].

 7  SO:   [IA] it seemed as if somebody has messed with it, like

 8  they took the frame off. I hope that there was nothing in the

 9  frame but...

10  UCE:   Okay.  What are you gonna do [IA] wanna do it, or?

11  SO:   I can stop at a gas station for like five minutes, away

12  [IA].

13  UCE:   If you think it's okay.  If you don't think it's okay I

14  wanna, I'll go with whatever you think because youve been, you

15  the one that you been seen in

16  SO:   [UI] following.

17  UCE:   Yeah, you've been seeing it, you know.  So, you tell me

18  what you wanna' do and [IA].

19  SO:   I dont have your phone number; so you got to text me okay,

20  cause I deleted all the messages.

21  UCE:   Say that again.

22  SO:   From the phone.

23  UCE:   Yes.

24  SO:   Text [UI] okay [UI].

25  UCE:   Okay.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    SO:   [IA].  All the inbox [UI].

2    UCE:  Whatever you say [IA].

3    SO:   [IA] So I can leave this car somewhere.

4    UCE:  [IA].

5    SO:   [IA].  How long do you think [IA] just to make sure, the

6    door, thats not how it was [IA] its never been like that?

7    Somebody messed with it [UI] So [IA] it all depends.  How long

8    you think it'll take to take the new car.

9    UCE:  To find another car?  I don't know.  I mean I don't know.

10   I cant say for sure, I dont know. [IA].

11   SO:   [UI] Lets try.  How long it take to put in?

12   UCE:  To put this stuff in?  We can do it in about, we can do

13   it in about 5 minutes.

14   SO:   [UI] In case they come.

15   UC:   Can you what?

16   SO:   Can we load something in case they come? [UI] cause if

17   they see you --

18   UCE:  Um.

19   SO:   If they see you giving that to me, they gonna put you as a

20   helping terrorists [UI].

21   UCE:  [UI].

22   SO:   [UI].

23   UCE:  How about this.  Take, take the, take the pistol [UI] put

24   the pistol and the magazine in your car.  [UI] Just start

25   loading it.  If somebody comes out, if you think somebody comes
```

```
 1    out and sees you, Im gonna just leave.  Im gonna leave and you
 2    [IA] do whatever [IA].  Im just gonna leave.
 3    SO:  [IA] the big one?
 4    UCE:  Huh?
 5    SO:  Can you load the big one?
 6    UCE:  Youre gonna take the big one into the car now?
 7    SO:  I mean --
 8    UCE:  [IA].
 9    SO:  [IA] I want to take the big one.
10    UCE:  Can you get [IA].
11    SO:  I get the small pistol.
12    UCE:  Huh?
13    SO:  I get the small [IA] I just get the handgun [IA].
14    UCE:  [IA].
15    SO:  [IA]  If youre just going to bolt, [UI] Ill have to run,
16    too, with this
17    UCE:  Youre going to run?
18    SO:  [IA]
19    UCE:  Hm?
20    SO:  [IA]
21    UCE:  [IA] Is your car parked next to mine?
22    SO:  Yeah.
23    UCE:  Right next to it?
24    SO:  Yeah, to the left, cause somebody parked to the right.
25    UCE:  Okay, okay [UI].  Go into your car, put it into your car.
```

```
1    SO:  Not loaded?

2    UCE:  Not loaded [UI].

3    SO:  [UI].

4    UCE:  Its got nothing in it right now.

5    SO:  [UI].

6    UCE:  [UI]  Do you have the magazine?

7    SO:  [UI].

8    UCE:  [UI].

9    SO:  [UI].

10   UCE:  [UI] Yeah, Im going to show you quick. Thats what Im

11   going to do.  Put the gun in your car and then get into my car.

12   SO:  [UI]."

13            (Tape concluded.)

14   BY MS. SWEENEY:

15   Q.   Okay.  Agent, so at the end of this clip, where are you

16   and the Defendant?  What are you all doing?

17   A.   We're going outside.

18   Q.   To do what?

19   A.   I'm going to show him how to arm the car explosives.

20   Q.   And what --

21   A.   We're going to put the car explosive in his vehicle.

22   Q.   Repeat your answer.  Sorry.

23   A.   I'm going to show him how to arm the car explosive, and

24   then we will put the car explosive into his vehicle.

25            MS. SWEENEY:  Ms. Vizza, can we switch to the
```

1  document camera for just a moment?

2  BY MS. SWEENEY:

3  Q.   I'm putting up Government's Exhibit 123.3-B, on page one.

4       Agent, at the beginning of -- when the Defendant came back

5  in the room, it was kind of difficult to hear.  What was he

6  telling you about?

7  A.   That when he went to pick up his vehicle to bring it back

8  to the hotel --

9       MR. GEORGE TRAGOS:  I'm sorry.  Which exhibit was

10  this?

11       MS. SWEENEY:  123.3-B, page one.

12  BY MS. SWEENEY:

13  Q.   Go ahead, Agent.

14  A.   When he went back to get his vehicle, to bring his vehicle

15  back to the hotel so we can load the car bomb into his vehicle,

16  and when he got to his vehicle, his vehicle had been tampered

17  with.  He felt that someone had been in his vehicle after his

18  vehicle had been tampered with, and we were discussing that.

19  Q.   And what was the Defendant's concern about that?

20  A.   That if his vehicle had been tampered with, there might

21  have been a tracking device in his vehicle, and we might not --

22  he didn't know how much time we would have to load the bomb

23  into his vehicle.

24  Q.   Agent, I've just handed you several exhibits.  But first,

25  take a look at the one that's marked 123 -- I'm sorry, no,

1    126.3.  Do you see that one?

2    A.    Yes, I do.

3    Q.    And what is that?

4    A.    This is the video -- or this is the video of myself and

5    the Defendant going outside in the parking lot putting the

6    pistol into his vehicle.

7    Q.    And does that video have sound?

8    A.    No, it does not.

9    Q.    And can you also take a look at Government's Exhibits

10   125.2-A and B.  Is that in front of you?

11   A.    This is the recording of myself and the Defendant outside

12   of the hotel room putting the pistol into his vehicle.

13   Q.    What kind of recording?

14   A.    This is an audio recording.

15   Q.    And on that audio recording, have you previously reviewed

16   it?

17   A.    Yes, I have.

18   Q.    Can you hear very much?

19   A.    There's a lot of ruffling.  It's not very clear, though.

20          MS. SWEENEY:  Your Honor, at this time the Government

21   moves into evidence 125.2-A and B and 126.3.

22          MR. GEORGE TRAGOS:  Can I have a moment, Your Honor?

23          THE COURT:  Yes, sir.

24          (Brief pause.)

25          Any objection?

```
 1              MR. GEORGE TRAGOS:  No, Your Honor.

 2              THE COURT:  They'll be received.

 3          (Thereupon, Government's Exhibits 125.2-A and B and

 4   126.3 were received and filed in evidence.)

 5              MS. SWEENEY:  At this time we will play 126.3.

 6          (Tape Played.)

 7   "SO:  I'm gonna throw this number away.  Throw it over the

 8   bushes uh.

 9   UCE:  Okay.

10   SO:  You gonna' go open the trunk?

11   UCE:  Yeah.

12   [No conversation]

13   SO:  [UI] what is this?

14   UCE:  Put the wood in first, just put the wood in first [IA].

15   [No Conversation]

16   SO:  [UI].

17   UCE:  [UI].

18   [Conversation IA]

19   SO:  [UI] sleep, thats why.  Insha Allah [God willing] [UI]

20   UCE:  [UI].

21   SO:  [UI].

22   UCE:  [UI].

23   SO:  [UI].

24   UCE:  [UI] lights on [UI].

25   SO:  [UI].
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1   UCE:   [UI].

 2   SO:   [UI] make duah [prayer] [UI].

 3   UCE:   [UI].

 4   SO:   [UI].

 5   UCE:   [UI].

 6   SO:   [UI].

 7   UCE:   Let me go, let, let me [IA]."

 8          (Tape concluded.)

 9   BY MS. SWEENEY:

10   Q.   Okay.  So, Agent, what we're seeing on the screen in

11   126.3, who did we just see?

12   A.   That was the Defendant.

13   Q.   And what car did he get into?

14   A.   That was the passenger side of his vehicle.

15   Q.   And what is he doing in the car?

16   A.   At this point he was placing the pistol inside of his

17   vehicle.  He was loading it first, because when I gave him the

18   pistol, I made sure it was unloaded when he was with me.  I

19   told him that he could load it once he got to his vehicle.  So

20   when he got to his vehicle, he loaded the vehicle and --

21   Q.   And did he go where -- I'm sorry.  Go ahead.

22   A.   He loaded his vehicle and placed it.

23   Q.   Do you know where he placed it in his car?  Did you see?

24   A.   No, I did not.

25   Q.   At this point, are you also now in your car?
```

1    A.    I came out -- first, when he was loading the -- the

2    pistol, he was having difficulty with it, loading the pistol.

3    I helped him with that.  He got it loaded.  I went into my

4    vehicle and then he walked around to the passenger side of my

5    vehicle and got in.

6    Q.    And so just to be clear, is your vehicle the vehicle that

7    is the black truck that is parked next to the Defendant's car

8    right now?

9    A.    Yes, it is.

10         (Brief pause.)

11   Q.    Okay.  And at the end of that clip, where does the

12   Defendant go?

13   A.    He gets into my vehicle.

14   Q.    Agent, I also handed you a moment ago 121 -- Government's

15   Exhibits 121.2-A and B.  Do you see that in front of you?

16   A.    Yes, ma'am, I do.

17   Q.    And what is that?

18   A.    It is the recording of me showing the Defendant how to arm

19   the car bomb while sitting inside of my vehicle.

20   Q.    And is -- how do you know that disc is -- is that portion

21   of your meeting with the Defendant?

22   A.    Because I reviewed it and marked it as such.

23   Q.    And is that disc an accurate recording of this portion of

24   your meeting with the Defendant?

25   A.    Yes, sir.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Q.   Are there any additions, deletions or alterations from

2    this portion of the meeting?

3    A.   No, there's not.

4    Q.   And is the transcript an accurate transcript of the

5    recording?

6    A.   Yes, it is.

7         MS. SWEENEY:  Your Honor, at this time, the

8    Government moves into evidence 121.2-A and B.

9         THE COURT:  They'll be received.

10        (Thereupon, Government's Exhibits 121.2-A and B were

11   received and filed in evidence.)

12   BY MS. SWEENEY:

13   Q.   Now, Agent, at the beginning of this portion of the

14   transcript or the clip that we're just going to watch, the

15   Defendant says to you, "I threw my phone."  At the time when

16   this meeting happened, did you see the Defendant throw his

17   phone?

18   A.   I did not see it.

19   Q.   In reviewing this portion of the video, did you see him do

20   it?

21   A.   Yes, I did.

22   Q.   And when does it happen?

23   A.   Right before he gets into my vehicle, you can see when the

24   door is open, you can see him flick the phone or have a

25   throwing motion, excuse me.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1              (Tape played.)
 2    "SO:  I threw my phone.
 3    UCE:  Hum?
 4    SO:  I threw my phone.
 5    UCE:  You threw it?
 6    SO:  Yeah.
 7    UCE:  Okay, so, you got this is the one that I have just
 8    bought.  You want this one?  That's your old phone or that's
 9    the one -- the new one?
10    SO:  The old phone.
11    UCE:  You have the new one?
12    SO:  I have the new phone in there.
13    UCE:  Okay.
14    SO:  You want to go get it?
15    UCE:  No, I, I can write -- I'll write the number down for you.
16    SO:  Okay.
17    UCE:  I'm gonna, I'm gonna show you the timer first.  To do the
18    timer to set itself and [UI].
19    SO:  There's a timer for it?
20    UCE:  What, this is the trigger.
21    SO:  Oh, okay.
22    UCE:  This, that's the, that's the trigger.  Uhm, there's a
23    fifteen minutes.
24         SO:  Yeah
25    UCE:  With the safe before you putyou gotta putso we couldas
```

```
 1   might as well get everything set up now."
 2   BY MS. SWEENEY:
 3   Q.   So, Agent, in this portion of the video, what are you and
 4   the Defendant manipulating?
 5   A.   The orange box that you see on the table there  and the
 6   blasting cap, the wires and those batteries that you had seen
 7   earlier.
 8             MS. SWEENEY:  Your Honor, for the record, the agent
 9   is referring to Government's Exhibits 1-D, 10 and 1-F.
10             THE COURT:  So noted.
11             (Tape continuing.)
12   "SO:  Yeah.
13   UCE:  With the safe before you put -- you gotta put-so we
14   could-as might as well get everything set up now.  So-
15   SO:  What does the fifteen minutes do?
16   UCE:  Fifteen minutes means it won't fire for that whole
17   fifteen minutes in case somebody accidently calls the phone.
18   SO:  Oh, okay, yeah.
19   UCE:  Cause you don't really want it, so somebody accidently
20   calls the phone while you're in the car or something, you know.
21   SO:  So I should turn it on when I'm there?
22   UCE:  No!  No.  We're gonna do it set fifteen minutes.
23   SO:  But, what if --
24   UCE:  How long you think, it's gonna take you longer to get
25   there?
```

```
 1   SO:  Maybe.

 2   UCE:  When are you gonna' go?

 3   SO:  Right now.  It was pretty busy when I was there.

 4   UCE:  The road was busy?

 5   SO:  The places were busy.  The places not the roads.

 6   UCE:  Oh, okay.

 7   SO:  I can park kinda far away, cause it's, I didn't wanna' get

 8   too close.

 9   UCE:  Okay.

10   SO:  So, whatever, I --

11   UCE:  Okay.

12   SO:  Should run.

13   UCE:  It should be good.

14   SO:  Insha Allah [God willing], they [UI] Follow me there.

15   UCE:  Fifteen minutes?  Okay, so Uh, let's see.  See, see.

16   SO:  Yeah.

17   UCE:  Uhm So, go ahead cause I don't wanna' touch stuff.

18   SO:  Okay.

19   UCE:  You get the battery [pause] and, and this, this, this is

20   the blasting cap.

21   SO:  Okay.

22   UCE:  We gotta we're gonna' tape this, I dont know, I brought

23   the tape to the room.  I'm gonna' have to go back to the room.

24   SO:  Yeah [UI].

25   UCE:  I have to run back to the room real quick and get the
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    tape.

2    SO:   Okay, Insha Allah [God willing].   Alhamdu lillah [Praise

3    be to God].

4    UCE:   Okay.   So you got everything?

5    SO:   So, you need two?

6    UCE:   Yeah.

7    SO:   That woman, she keeps going to the office and back.

8    UCE:   She -- she's the one that works there--

9    SO:   I think so.

10   UCE:   She works the front desk.

11   SO:   She left, she's leaving.

12   UCE:   Okay.

13   SO:   Shes re-parking [UI].

14   UCE:   Uhm, just make sure the part --the heads are right.

15   The --

16   SO:   Like this?

17   UCE:   That one goes on the skinny one and the skinny one goes

18   on the fat one there.   Is it right?

19   SO:   Yeah.

20   UCE:   Okay.

21   SO:   I don't wanna mess this up.

22   SO:   Push it down?

23   UCE:   Push -- push it all the way in and push it down.

24   UCE:   Okay.   Uhm.   The same thing with that one.   Put -- put

25   the back in first, it's easier to put the back in first.

1    SO:  [UI].

2    UCE:  Yeah.

3    SO:  Are you sure?

4    UCE:  Yeah.  Im pretty sure.  Put the back in.  Push down the

5    front after you push the back in.  No, no, no, I mean, put --

6    SO:  Let me --

7    UCE:  Put --

8    SO:  Let me try.

9    UCE:  Put.

10   SO:  Yeah, let me just try.  Ill do what I did in [UI] My left

11   hand is bad.

12   SO:  Subhan Allah [Glory to God] It's falling out I can't keep

13   it in my --

14   UCE:  Go ahead.  Put it on your lap.

15   SO:  Nah.

16   UCE:  It's not going.

17   SO:  Uh-uh.

18   UCE:  Let -- let me -- let me help.

19   SO:  I don't want you --

20   UCE:  I'm not touching.  Wait up, wait up, you know what, I

21   think I got I got this here, got some gloves.  I was supposed

22   to put these on before I touched all the stuff in uh, inside

23   the room.

24   SO:  Did you wipe it yet?

25   UCE:  Hum?

```
 1   SO:  You wiped everything?

 2   UCE:  Yeah.

 3   SO:  Okay.

 4   UCE:  Yeah.

 5   SO:  Tha -- that's like the one main road to get away over

 6   there, where it's gonna' happen, that's one way.  So, I gotta'

 7   think.  There's more roads, but I just gotta think exactly how.

 8   SO:  Without getting, without getting suspicious.

 9   UCE:  Umm.

10   UCE:  Let's see.

11   UCE:  [IA].  Okay, so it's now plugged into the thing.

12   UCE:  But, you see that green light?

13   SO:  Yeah.

14   UCE:  That green light is on, the phone has to be on.  I have

15   written some instructions in there, you know.  So, it's turn

16   everything off, right?

17   SO:  Yeah.

18   UCE:  Turn the phone on, the batterys in, turn the phone on.

19   SO:  Yeah.

20   SO:  I like hearing the sound, how it goes on.  Alhamdu lillah

21   [Praise be to God].  You want me to keep this?

22   UCE:  Uh, yeah, you keep that.

23   SO:  Yeah, I'll keep it.

24   UCE:  Umm, so now, what we gonna' do is the this here.

25   SO:  Yeah.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    UCE:  Want to, want to tape this to those.  We're gonna' get

2    those put them in your trunk and tape this to it, and once we

3    tape this to it, when, when we tape this in there, this plugs

4    into.

5    SO:  Yeah.

6    UCE:  Thats what this plugs into.  This plugs into.

7    SO:  Yeah.

8    UCE:  So, what we do, once we get this, we put it.

9    SO:  It doesn't matter which side?

10   UCE:  No.

11   SO:  Or they have to match?

12   UCE:  No, it doesn't matter, just plugs in.

13   SO:  Yeah.

14   UCE:  It doesn't matter.  Turn that.

15   SO:  Yeah.

16   UCE:  All the way to fifteen, gives you the most amount of time

17   [UI]

18   SO:  Let's not talk next to my car when we do it.

19   UCE:  Okay.

20   SO:  Cause I think it might be tapped.

21   UCE:  This, this is the last time we'll talk about this

22   SO:  Okay.

23   UCE:  But turn, we're gonna' turn this all the way.

24   SO:  Okay.

25   UCE:  So, it gives you the most amount of time.  Then just, you
```

1  know.

2  SO:  I think fifteen minutes good.

3  UCE:  Okay.  Okay.

4  SO:  Should be able to make it in fifteen.

5  UCE:  Okay.

6  SO:  Its like seven minutes away, insha Allah [God willing].

7  UCE:  And this is the phone number.

8  SO:  That's the only where --

9  UCE:  Yeah.

10  SO:  Place you have it?

11  UCE:  Yeah.  That's the phone number.

12  SO:  You want to go get my phone?

13  UCE:  You have to call.  Hum?

14  SO:  You want me --

15  UCE:  You wanna --

16  SO:  Or you gonna' give me this one?  The one that you have.

17  The small one, didn't you say you had another one?

18  UCE:  Let me do this.  Let me keep I'll keep my phone, I'll

19  just write it, okay.

20  UCE:  You have to lose this card.  Cause this is my business

21  card.

22  SO:  Nah, don't do it.  Let me just get the phone.

23  UCE:  Okay.

24  UCE:  You run it through, get the tape.

25  SO:  [UI].  Huh?

```
1   UCE:  You run it through, get the tape.

2   UCE:  Okay, that's the room key.

3   UCE:  So, you keep the room key.

4   UCE:  You got the number, you put it in your phone?

5   SO:  No.  I can dial it now, right?

6   UCE:  Yeah, you can dial it now.

7   SO:  Let me just save this in the speed dial.

8   UCE:  Everything is safe.  Yeah, you can do it, Put it on speed

9   dial.

10  SO:  I really don't want to go just yet.

11  VR:  Metro PCS:  Hello, hello, hello.  Wireless for all.

12  SO:  Okay, one, eight, three.  Should I put, one, eight, three,

13  yeah, just in case.

14  SO:  Save it?

15  UCE:  Yeah.

16  SO:  Yeah, just in case, so I don't delete it.  Uh.

17  SO:  Haqq [Truth].  You think they can trace this?

18  UCE:  They shouldn't.

19  SO:  After?

20  UCE:  Afterwards?

21  SO:  And they see like what line was called.

22  UCE:  I I would say afterwards, destroy it.  It doesn't matter

23  though, cause --

24  SO:  Cause I want to use it for one thing.

25  UCE:  It doesn't matter.
```

```
 1   SO:  Cause my cousin and brother are ignorant, theyre kafir
 2   [infidels], they go to some of those places sometimes.  I want
 3   to text them where you at.
 4   UCE:  Text -- text them what?
 5   SO:  Where you at.  I have a brother from my blood.
 6   UCE:  Uh-huh.
 7   SO:  And uh, cousin, a blood cousin.
 8   UCE:  Uh-huh.
 9   SO:  Theyre kafir [infidels], theyre jahiliya [pre-Islamic
10   paganism], they go to clubs and stuff.
11   UCE:  You just want to make sure theyre not there?
12   SO:  At those places.
13   UCE:  What, go ahead.
14   SO:  So, I can do that?
15   UCE:  Yes, yeah, yeah.  I would do it, then, just have it with
16   you.  I would say put it, when you put the vest on, put that
17   in.  So, you know it's gonna'
18   SO:  I can just take the battery and throw it off the highway.
19   UCE:  Yeah, you can do that, too.
20   SO:  Yeah, Ill do this.
21   UCE:  After you make the call, yes?
22   SO:  But, I'm saying, can they trace the numbers?
23   UCE:  They shouldn't.  They don't know nobody should know about
24   this stuff, cause we just go this telephone.
25   SO:  No, after it happens.  Like, cause it... I don't want them
```

```
 1  to think that.
 2  UCE:  No.
 3  SO:  My brother, my cousin had something to do with it.
 4  UCE:  No.
 5  SO:  If I call them [UI].
 6  UCE:  I don't think so.  I don't think so.  Cause I don't see
 7  how.
 8  SO:  Okay.
 9  UCE:  Wouldnt connect.
10  SO:  Okay.
11  UCE:  I mean, does itI--I don't see how it would connect.
12  SO:  Nah.  I just be like where you at?
13  UCE:  I dont see--  Okay.
14  SO:  Alhamdu lillah [Praise be to God].
15  UCE:  Okay.
16  SO:  Im gonna do that actually, [UI] unlock right here and
17  here.
18  UCE:  Okay.
19  SO:  I'm gonna put the numbers and throw them away.
20  SO:  Im gonna do the number [UI] at Starbucks parking lot.
21  UCE:  Say -- say it again.
22  SO:  I'll go to Starbuck parking lot and from there call, it's
23  close by.
24  UCE:  Okay.
25  SO:  And then after that --
```

```
1   SO:   I know my brother's is probably watched, just because he

2   calls me.

3   SO:   The thing is, all I can do is try if they don't reply, you

4   know what I mean?

5   UCE:   Yeah.

6   SO:   Theyre not suppose to be in to begin with.

7   UCE:   You, you know, I didn't even think of that.

8   SO:   They never usually go to where I'm going.  That's why I'm

9   going there.  You know what I mean?

10  UCE:   But, uh --

11  SO:   They've been to ones we left.  When I used to be Kafir [an

12  infidel] too, in jahiliya [the pre-Islamic paganism era].

13  UCE:   Im, uh, I just think theyre --

14  UCE:   These people there I know about.  Cause I know somebody,

15  I know somebody that, that

16  SO:   There's many clubs.

17  UCE:   The clubs.  Which -- which club?  I just want to make

18  sure it's not somebody -- somebody I know.

19  SO:   It's like an Irish Pub place.

20  UCE:   Is it a -- is a bar or club?

21  SO:   Bar slash like music all that.

22  UCE:   Do you know the name of it, let me just, I--I can call, I

23  call one of the [UI] I just make sure I tell them not to be

24  there.  Make sure I -- I ask this, I'll ask where you are at

25  and where you at -- where they at to make sure they not.
```

```
1    SO:  I don't know what the place is called.  But, ask where
2    they at, like Yeah, just ask where they at.
3    UCE:  Okay.
4    SO:  Like, what, what's they area?
5    UCE:  Okay.
6    SO:  Just ask the area.
7    UCE:  Okay, okay
8    UCE:  Do you know what the area's called?
9    SO:  Hyde Park.
10   UCE:  Okay.
11   SO:  Hyde Park area.  You know somebody there, too?
12   UCE:  Man, it's just some friends that I --
13   SO:  We gotta' do this fast in the trunk.
14   UCE:  Okay.
15   SO:  If they come, you can just leave.
16   UCE:  Yeah.  You -- you have space in your trunk, it's clear?
17   Take all -- open your trunk, lets take a look what it looks
18   like.
19   SO:  Okay.  Let me just add this number.
20   SO:  Let's imagine I go out and they come surround me and if,
21   if it's a drone attack, with like, you know they can take x-ray
22   pictures.
23   UCE:  Here?
24   SO:  Drones can take x-ray pictures and if I'm on the road and
25   they come like surround me before I can get to the people.  I
```

1    hit up twenty or thirty of them, that's good, too, kuffar

2    [infidels].

3    UCE:  Uh-huh.

4    SO:  They'll know not to go after the Muslims.  Alhamdu lillah

5    [Praise be to God].  Yeah.  Hang in there, I'm gonna' throw

6    this number away.  Throw it over the bushes, huh?

7    UCE:  Okay.

8    SO:  You gonna' go open the trunk?

9    UCE:  Yeah.

10   SO:  Is that for me?

11   SO:  Hum?

12   UCE:  Let me go.  Let -- let me go."

13             (Tape concluded.)

14   BY MS. SWEENEY:

15   Q.   Agent, so after the end of the video that we just watched,

16   what do you and the Defendant do?

17   A.   We get out of my vehicle.  He opens the trunk of his

18   vehicle, I open the tailgate of my pickup truck.  We take the

19   bomb out of my pickup truck and we put it into the trunk of his

20   vehicle.

21   Q.   I actually want to pull up briefly Government's Exhibit 1,

22   which is a picture of a part of the car bomb.  The two orange

23   buckets that we see there, what's in the canvas sacks that

24   surrounded the orange buckets?

25   A.   It's a bag full of nails and screws and nuts and bolts and

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    things like that, just projectiles that could be used as scrap

2    metal.

3    Q.    And how heavy is what we see there with the wooden frame

4    with the two buckets in it?

5    A.    It is very heavy.

6    Q.    Okay.  So in looking at the exhibits in front of you,

7    let's start with Government's Exhibits 125.3-A and B.  What are

8    those?

9    A.    It's the recording of myself and the Defendant putting the

10   bomb into the trunk of his Honda and arming it.

11   Q.    And is that -- is that an audio recording, a video

12   recording or both?

13   A.    This is just an audio recording.

14   Q.    And, again, can you hear very much on the audio recording?

15   A.    It's difficult.

16   Q.    And then looking at Government's Exhibit 126.4, what is

17   that?

18   A.    This is just a video recording of the same thing, myself

19   and the Defendant putting the bomb into the trunk of his

20   vehicle.

21          MS. SWEENEY:  Your Honor, at this time, the

22   Government moves into evidence Exhibits 125.3-A and B and

23   126.4.

24          THE COURT:  They'll be received.

25          (Thereupon, Government's Exhibits 125.3-A and B and

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1    126.4 were received and filed in evidence.)

 2              MR. GEORGE TRAGOS:  One second, Your Honor.

 3              (Brief pause.)

 4              No objection.

 5              THE COURT:  Counsel, you may proceed.

 6              MS. SWEENEY:  Yes, Your Honor.  I'm just waiting for

 7    the un-blurred version to be pulled.  It's 1-D43.4.

 8              THE COURT:  Which exhibit are you playing?

 9              MS. SWEENEY:  I'm sorry.  I understand the confusion.

10    I apologize, Your Honor.  I'm playing Government's Exhibit

11    126.4.

12              THE COURT:  Which is the video only?

13              MR. GEORGE TRAGOS:  Video only.

14              (Brief Pause.)

15              (Video played, no sounds.)

16    BY MS. SWEENEY:

17    Q.   So, Agent, at this point, what are you and the Defendant

18    doing in the video that we see playing?

19    A.   Right now we're in the back of my pickup truck and we're

20    pulling out the car explosive, the bomb.  It's very heavy, so

21    we take it apart first.  We pull the buckets out of the

22    platform, put the platform into his vehicle first and then we

23    put the buckets back into the platform.

24    Q.   So right now what object is the Defendant holding?

25    A.   That is the Defendant putting the platform into his
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    vehicle.

2    Q.    What is the Defendant carrying into his car now?

3    A.    That is one of the buckets.

4    Q.    And what are you carrying to the Defendant's car now?

5    A.    The other bucket.

6    Q.    What are you putting into the Defendant's trunk at this

7    point?

8    A.    I don't think I was putting anything into his trunk.

9    Q.    Oh, okay.  What are the two of you doing right now, then?

10   A.    Right now we're about to start arming the bomb.

11   Q.    And what do you do that with?

12   A.    With the orange container.  That's us walking after we get

13   the orange container at that point because we didn't have it

14   with us.

15           MR. GEORGE TRAGOS:   Objection.  There's not a

16   question pending.

17   BY MS. SWEENEY:

18   Q.    Agent, what object was in your hand just a moment ago?

19   A.    That's the orange container.  We just brought it out of my

20   vehicle.  I think that's it.

21   Q.    So at this point, you're closing the Defendant's trunk.

22   When you did that, was the bomb fully connected?

23   A.    Yes, ma'am.  When the Defendant was bent over, that's when

24   he was connecting everything up.  I stood up by him, just

25   making sure that he did it correctly, and he did do it

```
 1   correctly after he connected it up.  We stood back.  We said
 2   our goodbyes right there, closed his trunk, and I got into my
 3   vehicle and drove off.
 4   Q.   So what had the Defendant told you about where he was
 5   going to go when he left in his car that evening?
 6   A.   An Irish pub.
 7   Q.   Agent, I'm going to hand you -- Agent, I'm going to share
 8   a mic with you since there's a couple of these.
 9   I'm showing you Government's Exhibits 161-A and B.  Have you
10   reviewed the recording on 161-A?
11   A.   Yes, I have.
12   Q.   Were you part of the conversation that is captured on
13   Government's Exhibit 161-A?
14   A.   No, I was not.
15   Q.   Can you identify any of the speakers on 161-A?
16            MR. GEORGE TRAGOS:  Objection.
17            THE COURT:  Overruled.
18            THE WITNESS:  Yes, I could.
19   BY MS. SWEENEY:
20   Q.   And who could you identify?
21            MR. GEORGE TRAGOS:  Objection.
22            THE COURT:  What's the basis?  One word?
23            MR. GEORGE TRAGOS:  Predicate.
24            THE COURT:  Sustained.
25   BY MS. SWEENEY:
```

1  Q.   Agent, of the individuals that were on this recording, had
2  you ever spoken to any of them previously?
3  A.   Yes, I had.
4  Q.   And approximately how many times?
5  A.   More than one.  A number of times.
6  Q.   And for how long of a period of time?
7  A.   For extended periods of time.
8  Q.   So can you identify one of the voices on Government's
9  Exhibit 161-A?
10  A.   Yes, I could.
11  Q.   And who can you identify?
12        MR. GEORGE TRAGOS:  Objection.  Can we go to sidebar,
13  Your Honor?
14        THE COURT:  Is it the same objection?  Yes or no?
15        MR. GEORGE TRAGOS:  Yes.
16        THE COURT:  Overruled.
17        THE WITNESS:  I identified the Defendant's voice on
18  the recording.
19  BY MS. SWEENEY:
20  Q.   And is the transcript that is 161-B, does it accurately
21  identify when the Defendant is speaking on 161-A?
22  A.   Yes, it does.
23  Q.   I'm also showing you Government's Exhibit 161.1-A and B.
24  Is this a portion of the same recording that is Government's
25  Exhibit 161-A?

```
1    A.    Can I take a look at 161-A again?

2    Q.    Sure.

3    A.    Yes, it is.

4    Q.    And you can tell that from having reviewed the two

5    transcripts next to each other?

6    A.    Yes, I did.

7    Q.    Okay.  And so the same question on Government's Exhibit

8    161-B, could you identify one of the individuals speaking on

9    that recording?

10   A.    Yes, I could.

11   Q.    And who was it?

12   A.    The Defendant.

13   Q.    Let me show you Government's Exhibit 162-A and B.  Is

14   this -- did you review this recording?

15   A.    Yes, I did.

16   Q.    Are you a participant in this recording?

17   A.    No, I'm not.

18   Q.    Can you identify one of the voices on this recording?

19   A.    Yes, I could.

20   Q.    Can you identify it based on the same foundation as what

21   you described for Government's Exhibit 161?

22   A.    Yes.

23   Q.    So who can you identify speaking on Government's Exhibit

24   162-A?

25   A.    The Defendant.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   Q.   Does the transcript in Government's Exhibit 162-B

2   accurately identify when the Defendant is speaking?

3   A.   Yes, it does.

4   Q.   Is Government's Exhibit 162.1-A and B, is that a portion

5   of the recording at 162-A and B?

6   A.   Yes, it is.

7   Q.   Again, did you listen to 162.1 and identify the

8   Defendant's voice on it?

9   A.   Yes, I did.

10  Q.   And does the transcript at 162.1-B accurately identify

11  when the Defendant is speaking?

12  A.   Yes, it does.

13  Q.   And finally, Government's Exhibit 163-A and B, does 163-A

14  contain a conversation that you were not a part of?

15  A.   Yes, it does.

16  Q.   Can you, nonetheless, identify the voice of one of the

17  participants of that recording?

18  A.   Yes, I can.

19  Q.   And who is that?

20  A.   The Defendant's.

21  Q.   And does the transcript at Government's Exhibit 163-B

22  accurately identify when the Defendant is speaking?

23  A.   Yes, it does.

24  Q.   I'm also going to show you finally Government's Exhibit

25  163.1-A and B.   Is this a portion of the recording in

1   Government's Exhibit 163?

2   A.   Yes, it is.

3   Q.   And again, did you identify the Defendant's voice on

4   Exhibit 163.1-A?

5   A.   Yes, I did.

6   Q.   And does the transcript at 163.1-B accurately identify

7   when the Defendant is speaking?

8   A.   Yes, it does.

9           MS. SWEENEY:  Your Honor, may I have just a moment?

10          THE COURT:  Yes, you may.

11          (Brief pause.)

12          MS. SWEENEY:  Thank you, Your Honor.  At this time, I

13  have no further questions.

14          THE COURT:  One second.

15          (Brief Pause.)

16          You did not intend to introduce these through the

17  witness, only to identify them, is that correct?

18          MS. SWEENEY:  That is correct, Your Honor.

19          THE COURT:  All right.

20          Counsel, you may proceed.  Are you ready, Mr. Tragos?

21          MR. GEORGE TRAGOS:  Your Honor, I have some matters I

22  would like to preserve for the record before I start my

23  cross-examination.

24          THE COURT:  Can we preserve them for the record

25  during the break?

```
 1              MR. GEORGE TRAGOS:  We can if the Court states that
 2    they will be preserved.
 3              THE COURT:  Yes, sir.
 4              During cross-examination, sometimes the parties talk
 5    really fast, and there's a temptation to talk over one another
 6    anticipating the questions and the responses.  I am reminding
 7    you not to do that.  The Court Reporter can't take two people
 8    talking at the same time.
 9              Counsel, you may proceed.
10              MR. GEORGE TRAGOS:  May it please the Court.
11                        CROSS-EXAMINATION
12    BY MR. GEORGE TRAGOS:
13    Q.   Good morning, Agent.
14    A.   Good morning, sir.
15    Q.   Agent, when you began your testimony, you spoke about your
16    education, and that you gave an accounting degree?
17    A.   Yes, sir.
18    Q.   Is that a bachelor's?
19    A.   Yes, sir.
20    Q.   Okay.  And when you were in college, did you play any
21    sports?
22    A.   No, sir.
23    Q.   Okay.  Agent, how tall are you?
24    A.   Six feet, two inches.
25    Q.   And how much do you weigh?
```

```
 1   A.    Approximately 240 pounds.

 2   Q.    Okay.  You spoke about your training when the prosecutor

 3   was asking you and you -- special agents, I guess there's an

 4   initial training period, correct?

 5   A.    Yes, sir.

 6   Q.    And where is that initial training?

 7   A.    In Quantico, Virginia, sir.

 8   Q.    And how long is that training for?

 9   A.    Approximately four to 16 weeks.

10   Q.    Approximately four to 16 weeks?

11   A.    Approximately.  It was 17 years ago, sir.

12   Q.    Okay.  Were you taught interview techniques?

13   A.    Yes.

14   Q.    Investigative techniques?

15   A.    Yes, sir.

16   Q.    Was there any training with regards to undercover

17   operations at that time?

18   A.    No, sir.

19   Q.    Now, you spoke to the -- when you were asked by the

20   prosecutor, you said your first assignment was in

21   counterterrorism; is that correct?

22   A.    Yes, sir.  It was the National Security Division is what

23   it was called at the time, the counterterrorism section of that

24   division.

25   Q.    And, again, that was approximately 17 years ago?
```

1    A.    Yes, sir.

2    Q.    Okay.  And you were there for one and a half years?

3    A.    Yes, sir.

4    Q.    At the time, was that division's primary purpose following

5    foreign nationals and things such as that?

6    A.    I don't know what the division's primary purpose was, sir.

7    Q.    Okay.  Well, is that the kind of thing you did?

8    A.    No, sir.

9    Q.    What kind of things did you do when you were there?

10   A.    I worked the particular -- I worked particular cases

11   involving counterterrorism back in those days.

12   Q.    But, again, you did not -- you were not undercover then;

13   is that right?

14   A.    That is correct, sir.

15   Q.    Okay.  And then you became, I believe you told the

16   prosecutor, certified for undercover work?

17   A.    Yes, sir.

18   Q.    And what do you do to be certified for undercover work?

19   A.    You go through a certification course, sir.

20   Q.    Okay.  And where is that course?

21   A.    That organization at the time was held at Quantico,

22   Virginia.

23   Q.    It's not there anymore?

24   A.    It had moved around.  It goes to different venues.  And

25   the last one that was held was held at Quantico, Virginia.

```
 1    Q.   Okay.  And how long is that course?
 2    A.   It's a two-week course, sir.
 3    Q.   Okay.  And is part of the training in that course teaching
 4    you how to, I guess, speak like the people you're investigating
 5    and what to say so you don't tip them off?
 6    A.   Not to speak like.  I mean, I don't understand what you
 7    mean by speak like the people that you're investigating.
 8    Q.   Well, one of the things that you said when the prosecutor
 9    was asking you about certain things on here, you said, I said
10    things that way because if I said them another way, he might
11    think I'm law enforcement.
12    A.   Yes, sir.
13    Q.   Do you remember that testimony?
14    A.   Yes, sir.
15    Q.   Okay.  Is that part of the training in this, I guess,
16    two-week certification course?
17    A.   To be able to disguise your identity so that you're not
18    discovered to be law enforcement, sir?
19    Q.   Yes.
20    A.   Is that what you're asking?
21    Q.   Yes.
22    A.   Yes, it is.
23    Q.   Okay.  And are you also taught the elements of crimes?
24    A.   At that particular course?
25    Q.   Or in your regular training.
```

```
1    A.    In my regular training, yes, sir.
2    Q.    Okay.  Now, you then after -- I guess you said after your
3    undercover certification course you went to the cyber division;
4    is that right?
5    A.    I did not say that, sir.
6    Q.    Oh, I'm sorry.  Did you serve time in the cyber division?
7    A.    Yes, I did.
8    Q.    How long were you there?
9    A.    Approximately three years or so.
10   Q.    And where is that division?
11             MS. SWEENEY:  I object, Your Honor.
12             MR. GEORGE TRAGOS:  All right.
13             THE COURT:  Sustained.
14   BY MR. GEORGE TRAGOS:
15   Q.    Okay.  Was that before or after your undercover
16   certification?
17   A.    That was after my undercover certification.
18   Q.    Once you got certified, how long was it before you went
19   undercover.
20   A.    I did undercover work prior to being certified.
21   Q.    Oh.  So you can be an undercover agent before you're
22   certified as an undercover agent?
23   A.    Yes, sir.
24   Q.    Okay.
25   A.    You can work undercover cases, yes, sir.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    Q.    All right.
 2          But did you go undercover?
 3    A.    I worked in an undercover capacity.  I don't understand
 4    what you mean by go undercover.
 5    Q.    Where you disguised your identity to people you're
 6    investigating.
 7    A.    I worked in an undercover capacity, yes, sir.
 8    Q.    Okay.  And after you became certified, did you continue to
 9    work in an undercover capacity?
10    A.    At times, yes, sir.
11    Q.    Okay.  And now you are again in -- working in
12    counterterrorism, correct?
13    A.    Yes, sir.
14    Q.    Okay.  Are you familiar with the National Counterterrorism
15    Center?
16    A.    I've heard of it, sir, but I don't understand what you
17    mean by familiar with it.  I've never been there.
18    Q.    But it is part of the FBI program; is it not?
19    A.    I've heard of it.  I've heard of it.
20    Q.    But you've never been there?
21    A.    No, sir.  I can't speak to it because I'm not educated on
22    it and I don't know a whole lot about it, but I have heard of
23    it.
24    Q.    Are you familiar with the National Joint Terrorism Task
25    Force?
```

```
 1   A.   I've heard of the Joint Terrorism Task Force because at
 2   different divisions, every division has a Joint Terrorism Task
 3   Force.  The divisions that I have been assigned to have had
 4   squads that have Joint Terrorism Task Forces.  But a National
 5   Terrorism Task Force, is that what you're asking, sir?
 6   Q.   Yes.
 7   A.   I don't -- I can't speak to that because I'm not familiar
 8   with it.
 9   Q.   Well, have you ever been part of a Joint Terrorism Task
10   Force?
11   A.   No, I haven't.  I've never been on that Joint Terrorism
12   Task Force.
13   Q.   Are you familiar with terrorism fly teams?
14   A.   No, I'm not familiar with terrorism fly teams.
15   Q.   Are you familiar with the Terrorism Explosives Device
16   Analytical Center?
17   A.   No, I'm not.
18   Q.   Are you familiar with the Terrorist Financing Operations
19   Section?
20   A.   I have heard of it, but I am not familiar with that.  I
21   can't speak to it.
22   Q.   And that's part of the FBI, too, as well; is it not?
23   A.   If you say so.
24   Q.   You don't know?
25   A.   I couldn't tell you.  I'm not familiar with it.  I wish I
```

1    was more familiar with it, I could answer your question.

2    Q.   Would it refresh -- well, would it refresh your memory to

3    look at an FBI terrorism computer printout listing those as

4    inside operations?

5    A.   I'm sure it wouldn't refresh my memory because, again,

6    too, it's not something that I'm familiar with.  I don't work

7    with that.

8    Q.   So you've never worked with any of those?

9    A.   No, I haven't.

10        (Brief pause.)

11   Q.   Are you familiar with -- within the counterterrorism

12   division of the FBI the phrase, "fusion cell?"

13   A.   I am familiar with that phrase.  Yes, sir.

14   Q.   And have you been involved in those?

15   A.   No, I have not.

16   Q.   Are you familiar with the FBI taking an approach where

17   they combine FBI assets with intelligence community tactical

18   analysis strategic intelligence, all generated from the fusion

19   cells?

20   A.   No, sir.  I can't tell you that I am.

21   Q.   Are you familiar with James J. Forest and Russell Howard

22   and their book, *Weapons of Mass Destruction and Terrorism*, from

23   the Terrorism Center at West Point?

24   A.   No, I am not.

25   Q.   You haven't read that book?

```
1    A.    No, sir, I have not.

2    Q.    Have you ever been to a three-day counterterrorism course

3    at the Combating Counterterrorism Center?

4    A.    No, sir, I have not.

5    Q.    Ever studied the socioeconomic religious aspects of

6    terrorism ideology?

7    A.    No, sir, I have not.

8    Q.    Are you familiar with the counterterrorism -- excuse me.

9    Are you familiar with the Federal Bureau of Investigation

10   Counterterrorism Analytical Lexicon?

11   A.    No, sir, I am not.

12   Q.    Do you know how the FBI defines an operative?

13   A.    No, sir, I do not.

14   Q.    Do you know how the FBI defines an attack operative?

15   A.    No, sir, I do not.

16   Q.    Do you know how the FBI defines a support operative?

17   A.    No, sir, I do not.

18   Q.    I believe you stated that right now you are full-time

19   undercover.

20   A.    Yes, sir.

21   Q.    And you work 35 undercover cases and five national

22   security cases?

23   A.    Yes, sir.

24   Q.    The five national security cases you have worked, have

25   they all been involving Muslim or Islamic religions?
```

```
 1    A.   Yes, sir, they have.
 2    Q.   And are you or do you have a background as Islamic or
 3    Muslim?
 4              THE COURT:  Can you ask one question at a time?
 5    BY MR. GEORGE TRAGOS:
 6    Q.   Okay.  Are you or -- are you currently Islamic or Muslim?
 7    A.   I am not.
 8    Q.   Have you been in your past?
 9    A.   No, I have not.
10    Q.   Do you have a family history of being Islamic or Muslim?
11    A.   No, I do not.
12    Q.   Now, I notice that in the -- when we were listening here
13    that you seemed to speak in a foreign language; is that
14    correct?
15    A.   I don't believe I spoke in a foreign language.
16    Q.   You didn't speak about Allah or praise God?  You didn't
17    say anything like that in any foreign language.
18    A.   I used foreign words.  I used Arabic words.
19    Q.   You did use Arabic words?
20    A.   I did use Arabic words.
21    Q.   You recognize that that is a foreign language?
22    A.   Yes, sir.
23    Q.   Okay.  And where did you learn those words?
24    A.   Through the course of my experience with Islamic people
25    and working Islamic cases.
```

```
1    Q.    So you didn't study it?

2    A.    No, sir, I didn't study Arabic.

3    Q.    Did you study the Muslim or Islamic traditions?  Have you

4    studied those?

5    A.    I'm aware of some of them.  I don't know studied -- I

6    didn't go to a formal training for it or some formal school for

7    it, but I'm aware of it.

8    Q.    Are you aware that they -- in a strict adherence that they

9    would pray five times a day?

10   A.    Yes, sir.  I'm aware of that.

11   Q.    And on this video in the motel room, you particularly

12   noted that the Defendant was praying.  Do you remember that?

13   A.    Yes, sir, I do.

14   Q.    And do you know whether or not that was just part of the

15   regular regiment of five times a day or not?

16   A.    Yes, sir.  I believe it was.

17   Q.    So it had nothing to do with the bombing, correct?

18   A.    No, sir.  It had nothing to do with the bombing.

19   Q.    Now, in the beginning of this case, you were shown a

20   video, and you stated that that video was a martyrdom video.

21   Do you remember that?

22   A.    Yes, sir, I did.

23   Q.    Okay.  And in that video, you have the Defendant being

24   photographed by you, correct?

25   A.    Yes, sir.  I was running the video camera.
```

```
 1   Q.   Okay.  He was holding a pistol.  Do you remember that?
 2   A.   Yes, sir, he was.
 3            MR. TRAGOS:  May I approach, Your Honor?
 4            THE COURT:  Yes.
 5            THE WITNESS:  The pistol is here, sir.
 6   BY MR. GEORGE TRAGOS:
 7   Q.   Oh.  Let me show you Government's Exhibit 6-A.  And we may
 8   not be able to demonstrate this.  I notice that on the video,
 9   6-A appears to be -- actually, the slide is actually back on
10   it.  Do you remember that?
11   A.   Yes, sir.
12   Q.   That's not the way it is there right now, right?
13   A.   No, sir.
14   Q.   And although I was going to ask you to demonstrate it, I
15   notice that there is a safety wire in the pistol, correct?
16   A.   Yes, sir.
17   Q.   So you actually could not cock it back and show us how it
18   appeared in the video, right, without taking the safety wire
19   off?
20   A.   I don't know.  I could try if you would like me to try.
21   Q.   Yes, I would.
22            MS. SWEENEY:  Can I -- for the record, I object if
23   he's asking the agent to take the safety device out of it.
24            MR. GEORGE TRAGOS:  I'm not.
25            MS. SWEENEY:  Okay.
```

```
 1              MR. GEORGE TRAGOS:  I asked him if he could do it,
 2   and he said yeah.
 3              MS. SWEENEY:  Okay.
 4   BY MR. GEORGE TRAGOS:
 5   Q.   Were you able to do it?
 6   A.   Yes, sir.
 7   Q.   Okay.  Good.  And the safety device is still in?
 8   A.   Yes, sir.
 9   Q.   Okay.
10   A.   I don't think you would like it left this way, though,
11   because it would --
12   Q.   That's all right.  Can you just hold it up.  We're going
13   to put it back.  Okay.  And can you hold it like from the
14   handle?  Don't point it at anybody.  Okay.
15        Now, in that position, there's -- you can tell that there
16   are no bullets in the weapon, correct?
17   A.   Yes, sir.
18   Q.   And wasn't that one of the reasons why you had him hold it
19   in that position?
20   A.   Why I had the weapon in this position when I gave it to
21   him?
22   Q.   Yes.
23   A.   No, not really.  No.
24   Q.   Is that the way you gave it to him?
25   A.   Yes, sir.
```

```
 1    Q.    But didn't you make sure it was unloaded when you --
 2    A.    I made sure the weapon was unloaded.  I'm sorry.
 3    Q.    Did you make sure that it was unloaded?
 4    A.    Yes, sir.  I did make sure the weapon was unloaded.
 5    Q.    Okay.  Can you put that back in the regular position,
 6    please.
 7          Also, I believe that you told the prosecutor in response
 8    to questions that it was the Defendant who staged the items in
 9    the video, right?
10    A.    For the martyrdom video?
11    Q.    Yes.
12    A.    Yes, sir.
13    Q.    Now, you told us about air surveillance and automobile
14    surveillance, correct?
15    A.    Yes, sir.
16    Q.    All right.
17          And you knew that there was air surveillance and
18    automobile surveillance of the Defendant, correct?
19    A.    Yes, sir.
20    Q.    Okay.  And you knew -- well, when did you first become
21    involved in this investigation?  When was it first that
22    somebody said to you, hey, Agent, we want you to go down to
23    Tampa and do something here?
24    A.    It was in November.  I don't know exact -- an date in
25    November.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   Q.   Okay.  Well, if you know the date, I --
 2   A.   I don't know the exact date, but I know it was the month
 3   of November.
 4            THE COURT:  What year?
 5            THE WITNESS:  2011.
 6   BY MR. GEORGE TRAGOS:
 7   Q.   Okay.  And who told you?  Maybe not a name, but if you can
 8   give us a position in the agency.  Was there a supervisor who
 9   told you this or --
10   A.   I had been in contact with the case agents working the
11   case.  My supervisors were aware of the case.
12   Q.   I'm sorry.  Before November?
13   A.   Before November, had I -- before November, had I been in
14   contact with the case agents working the case?  It was in
15   November that the case agents -- I had known the case agents
16   were working this investigation.  I had known that there was a
17   possibility that -- that they would have liked to have an
18   undercover operation in this investigation.
19   My supervisors were aware of it.  I had spoken to the
20   supervisors in their division about -- about this case.  They
21   had an undercover proposal prior to myself being assigned to
22   it.  I wasn't initially going to be assigned to the undercover
23   operation.  It might have been someone else, it might have been
24   me.  At that point that wasn't clear.  It was just the fact
25   that they had a -- they wanted to have an undercover operation
```

1   in their investigation.  Situations occurred, and I was called

2   and asked to be the undercover, and that was in November.

3   Q.   Okay.

4               THE COURT:  All right.

5               Let's stop there for the lunch break.  The jury is

6   reminded not to talk about the case during the break, and we'll

7   release you until 1:30.  Thank you for your attention.

8               (Jury excused.)

9               There are some matters you wanted to preserve for the

10  record, Mr. Tragos?

11              MR. GEORGE TRAGOS:  Yes, Your Honor.

12              At this point, Your Honor, just --

13              THE COURT:  Do we need the UCE here for this purpose?

14              MR. GEORGE TRAGOS:  I don't believe so, no.

15              THE COURT:  All right.

16              We'll close the courtroom for a second.  Let the

17  witness take his break, and then we'll reopen the courtroom for

18  this portion of the proceedings.

19              (Brief pause.)

20              The Courtroom can be reopened.  Yes, sir.

21              MR. GEORGE TRAGOS:  Okay.  Your Honor, we would at

22  this time, in case we haven't received it all, make a *Jencks*

23  request with regards to this witness.

24              MS. SWEENEY:  The defense has received all *Jencks*

25  that I am aware of for this witness, Your Honor.

```
 1              THE COURT:  All right.

 2              I note that the Government did not file anything this

 3    morning in the way of legal authority, so it rests on what it

 4    has submitted to this point on that question?

 5              MS. SWEENEY:  Okay.  Your Honor, I don't -- I think

 6    that what we've handed over is the *Jencks* -- any potential

 7    *Jencks* for this witness.  So we're not arguing that it is or

 8    isn't *Jencks*.  The defense has it and we're not arguing that

 9    he's not entitled to it at this point.

10              THE COURT:  All right.

11              Counsel.

12              MR. GEORGE TRAGOS:  We would renew our motions, Your

13    Honor, for the CIPA and FISA information with regards --

14    especially regarding this witness and various aspects of the

15    investigation so that we could cross-examine him on those

16    items.

17              We would request the Court provide us with the items

18    that have been provided to the Court in camera under seal that

19    we have not received.

20              THE COURT:  In particular based upon his testimony

21    by -- to this point in the case, do you have any additional

22    argument to make or are you just making the argument you were

23    making before?

24              MR. GEORGE TRAGOS:  Well, I'm making that argument

25    plus, Your Honor, I believe that the Government at this point
```

| | |
|---|---|
| 1 | has revealed or opened the door to surveillance issues, I |
| 2 | believe that they have opened the door to the credibility of |
| 3 | this witness.  I'm not allowed to ask certain things, but they |
| 4 | certainly bolstered his credibility with questions about his |
| 5 | background, et cetera, and I would I think at some point -- |
| 6 | THE COURT:  What in particular do you want to ask the |
| 7 | witness that you feel you cannot ask based upon what you now |
| 8 | believe the Government has opened the door to allow you to ask? |
| 9 | MR. GEORGE TRAGOS:  I believe that I should be able |
| 10 | to ask him specifically about his training and experience. |
| 11 | THE COURT:  In what fields or areas? |
| 12 | MR. GEORGE TRAGOS:  Counterterrorism, specifically |
| 13 | those items -- whatever training and experience he used and |
| 14 | benefited from that allowed him to do the work he does in this |
| 15 | case.  How he was trained, I am particularly curious about |
| 16 | training about individuals, any particular religions, cultural |
| 17 | training, training with regards to how to interview, how to |
| 18 | make particular kinds of cases, what training he had in that |
| 19 | area, basically, and his experience, the past undercover |
| 20 | operations he has done. |
| 21 | The Government was able to place before the jury that |
| 22 | he's done 30 undercovers and five national security |
| 23 | undercovers.  The Court, I know, has some transcripts that the |
| 24 | Court reviewed.  I don't know anything about those transcripts. |
| 25 | I just know the Court reviewed some transcripts with regards to |

1    his prior testimony.

2              If that testimony related to his prior undercover

3    work, then I would like to see those so that I could read those

4    and perhaps use those as part of my cross-examination.

5              But I believe his credibility is important.  I

6    believe it was bolstered by the Government, and I think I

7    should be entitled to that information.

8              THE COURT:  And additionally what else?

9              MR. GEORGE TRAGOS:  Well, Your Honor, I don't know

10   what the Government has submitted to the Court so I can't be

11   any broader than that.

12             THE COURT:  All right.

13             MR. GEORGE TRAGOS:  Excuse me one second.

14             (Brief Pause.)

15             Additionally, Your Honor, the Court has ordered that

16   I could not ask about particular recording equipment, how it

17   was used or not used, why it was used or not used and some

18   details about it.  I think that what I have raised with the

19   Court and what I have raised before on the *Brady* motion should

20   allow me to ask some questions about that.

21             THE COURT:  What exactly?

22             MR. GEORGE TRAGOS:  Well, Your Honor, I'd like to

23   know -- I don't know how far the Court is going to let me go

24   when I'm doing my cross.  So I think what I'm going to, if I

25   could, is wait until I do my cross and I get to those points,

1    see if in the Government now objects to what I'm going to ask.

2            In reading the documents, I find that named in the

3    transcripts are certain types of items, and so I plan on asking

4    him about those things that are named in the transcripts.

5            THE COURT:  All right.

6            Anything else?

7            MR. GEORGE TRAGOS:  No, Your Honor.

8            THE COURT:  Counsel.

9            MS. SWEENEY:  So, Your Honor, according to my notes,

10   Mr. Tragos said he had wanted to ask about training regarding

11   individuals.  I'm not sure which individuals those are.  He

12   also said --

13           THE COURT:  One second.  Mr. Tragos might want to

14   listen to your response.  And you can have a seat, sir.

15           MS. SWEENEY:  I'm not sure which individuals he's

16   referring to there.  Then he said cultural.  I believe he just

17   asked the witness about if he had had training regarding, you

18   know, cultural socioeconomic factors of terrorism, if he had

19   any training regarding --

20           THE COURT:  So is the Government's response you don't

21   object?

22           MS. SWEENEY:  Well, Your Honor, not to the extent

23   that it's been done thus far.  And I think Your Honor has

24   actually already ruled on this.  You gave Mr. Tragos the

25   latitude to say -- if there was something that he wanted to ask

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    the agent about, did you behave in this way because of your

2    training, did you interact with the Defendant in this way

3    because of your training, I believe Your Honor has already

4    given the latitude for those questions to be asked.  If there's

5    something specific that Mr. Tragos believes happened because of

6    training or as the result of --

7              THE COURT:  What do you object to?

8              MS. SWEENEY:  I object to opening the door in general

9    to his training for the reasons that we've already -- his

10   undercover training, for the reasons that we've already

11   discussed on the record.

12             THE COURT:  Well, you discussed his training.  You

13   raised the question of his training after some substantial

14   argument that his training was beyond the limit of proper

15   inquiry.  You asked about where he was trained.  You asked

16   about his training particularly with regard to undercover

17   training.  You took him all the way through the temporal

18   relationship of his training.  And now what you are suggesting

19   is that Mr. Tragos can't ask him what exactly?

20             MS. SWEENEY:  What Mr. Tragos can't ask him is, as

21   Your Honor knows, we've presented some specific training that

22   happens -- that is classified and remains classified, and Your

23   Honor granted protection for that.

24             I didn't ask the agent anything about his training

25   except for the fact that he was trained and when he was

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    trained, you know, basically just that he has training from the

2    FBI just to establish that he is, in fact, a special agent.

3            As to the past, Mr. Tragos also mentioned the past

4    UCE operations and that I brought out that he had done 35

5    total, 30 of which were not national security and five of which

6    were.  That was the specific question that Mr. Tragos said he

7    wanted to ask the agent.  The Government objected.  Your Honor

8    ordered that that information be disclosed to Mr. Tragos, so I

9    brought it out merely because it was already coming in based on

10   what Mr. Tragos had said he wanted to ask.

11           As to the prior testimony, Your Honor's reviewed it

12   and has already made a determination that it's not relevant to

13   the facts of this case.

14           And then finally with respect to recording equipment,

15   I don't feel like -- I don't know what the topic is there.  The

16   recording equipment was used.  It made recordings that exist

17   that were played.  If Mr. Tragos wants to ask, you know,

18   questions about the recordings, that's one thing.  But about

19   other devices that could have been used or what specific device

20   was used here, I don't -- I don't see how that's relevant, not

21   to mention, which it is, law enforcement sensitive and in some

22   instances it may be classified.

23           But what I know is that it's law enforcement

24   sensitive as we briefed to this Court.

25           I'm not sure there was anything brought out on direct

1    that was bolstering, either.  You know, it was simply asking

2    the agent questions that Mr. Tragos had already indicated that

3    he would ask the agent.  So we just asked him on direct.

4             THE COURT:  Let me see counsel at sidebar.

5             (Thereupon, the following discussion was had at

6    sidebar:)

7             There was also in certain pieces of the Government's

8    materials a reference to the types of surveillance, including

9    key fob and finch, which I assume is also a type of

10   surveillance.  And those have been produced now in the

11   unredacted version of this latest production.  Was that an

12   inadvertent disclosure or is that --

13            MS. SWEENEY:  The redacted one?

14            THE COURT:  Yes.

15            MS. SWEENEY:  That was inadvertent, Your Honor.

16   Certainly the key fob reference was inadvertent.

17            THE COURT:  Well, Mr. Tragos raised it this morning

18   so presumably the version he had had was unredacted.

19            MS. SWEENEY:  Okay.

20            THE COURT:  And so -- beg your pardon?

21            MR. MCGOVERN:  I've seen the reference to the key fob

22   in some of the transcripts.  So it is inadvertent but it's

23   another --

24            THE COURT:  And so are you suggesting now that that

25   has effectively been unclassified and is fodder for a fair

```
 1    discussion or --

 2             MS. SWEENEY:  Okay.  Your Honor, the FBI's position

 3    would typically be that that's spillage of -- it's not -- the

 4    nature of the concealment of the recording device is not

 5    classified.  It's just law enforcement sensitive.  So -- so,

 6    no.  Am I correct in that, Mr. McGovern?

 7             MR. MCGOVERN:  Just because it leaks out doesn't mean

 8    it's unclassified.  It would --

 9             MS. SWEENEY:  No, no, no.  Is the nature of

10    concealment of the recording device classified or law

11    enforcement sensitive?  My understanding is it's law

12    enforcement sensitive.

13             MR. MCGOVERN:  And I believe the FBI considers it

14    classified.

15             MS. SWEENEY:  May we ask the agent to step up for a

16    moment, Your Honor, just to clarify this issue?  I think he

17    knows.

18             THE COURT:  Well, if it's classified, we shouldn't

19    even be talking about it on open mic.  So I don't understand

20    where we are now.

21             MS. SWEENEY:  My understanding is that's not

22    classified.

23             THE COURT:  Mr. Collins, can you step up for a

24    moment.

25             (Brief pause.)
```

1              What is the status of the use of key fobs and

2    something called finch in regard to classification?  Is it

3    classified or is it law enforcement sensitive?  What does the

4    FBI consider it to be?

5              THE AGENT:  I believe law enforcement sensitive.

6              MS. SWEENEY:  That's what I understood, Your Honor.

7              THE COURT:  And so now that it has been revealed in

8    certain of the transcripts, including those that were produced

9    to the defense this morning, is there any reason they can't

10   inquire with regard to it?

11             MS. SWEENEY:  Your Honor, obviously we would vastly

12   prefer that it not be inquired into.  I'm not sure how the fact

13   that it's a key fob is relevant.  I think Mr. Tragos could get

14   everything that he wanted by just saying it's something you

15   hold in your hand or can put in your pocket.

16             So it would be the Government's request that the

17   particular nature of the item as to exactly what it is, that

18   that not be revealed, even though it's been inadvertently

19   revealed in some of the transcripts.

20             THE COURT:  Well, it's also been revealed in open

21   courtroom already and so there are reporters here so they know

22   now.

23             MS. SWEENEY:  Oh.  Did you say key fob this morning?

24             THE COURT:  He did.

25             MS. SWEENEY:  I'm sorry.  I didn't hear that.  Well,

```
 1   we ask that there be no additional emphasis drawn on that.
 2              THE AGENT:  The transcript has that in it.
 3              MR. GEORGE TRAGOS:  The overhears, and I believe that
 4   key fob is actually in the transcript somewhere, but I know
 5   it's the overhear.  And I know that finch is there because he
 6   talked about finch and, you know, it's -- it's there.
 7              THE AGENT:  I believe --
 8              THE COURT:  Can you speak into the microphone.
 9              THE AGENT:  Yes, Your Honor.  I believe you're
10   speaking about the December 24th, 2011 overhear.  Is that
11   correct?
12              MR. GEORGE TRAGOS:  You might be right.  I'm not -- I
13   can't -- I don't have it in front of me, so I --
14              THE COURT:  Do you intend to inquire about it?
15              MR. GEORGE TRAGOS:  Yes.
16              THE COURT:  What is it relevant to?
17              MR. GEORGE TRAGOS:  It's relevant to -- especially
18   the finch, about the fact that we believe that there is a
19   conversation there.
20              THE COURT:  You believe that there's what?
21              MR. GEORGE TRAGOS:  It's in a conversation that there
22   was a malfunction that was not recorded.  And we want to talk
23   to him about that, and we want to talk to him about what he
24   knew about the malfunctioning equipment, about the -- you know,
25   where we have trouble hearing some of this stuff, why are we
```

1    having trouble hearing it, where is the -- you know, where is

2    that located, why he --

3              THE COURT:  And that's relative to what?

4              MR. GEORGE TRAGOS:  It's relevant to questioning the

5    authenticity of the -- the jury does not have to find that the

6    Court -- it is the audio recording.  The transcript is an aid

7    to them.  And I want the jury to -- I want to have questions in

8    the jury's mind about why certain things are able to be heard

9    on the transcript and certain things can't be heard on these

10   transcripts.

11             And I want to bring that into question for the jury

12   when they review these because some of these tapes were played,

13   and I couldn't hear a word.  The transcripts were all up there

14   rolling along, but I certainly couldn't hear a word.  And why

15   is it that when they go out to do this thing out in the parking

16   lot, why couldn't they have a key fob, why couldn't they have

17   the finch, why couldn't they be out there recording it instead

18   of us just viewing it and having the agent tell us what --

19             MS. SWEENEY:  We did record it.  There was an audio

20   recording and it was admitted.  I understand entirely the point

21   that you're making.  All I'm asking -- all the Government is

22   asking is that we just don't use the words "key fob."

23             I think everything that you're talking about to be

24   inquired about like about how small is the item, can it be held

25   in your hand, can it be put in your pocket, can it be -- you

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    know, do you wear it inside your clothing, do you have it

2    outside your clothing, I think everything that you want to ask

3    about can be inquired about without using that term.  And

4    that's all the Government is seeking here.

5              MR. GEORGE TRAGOS:  I don't know if all of the

6    recording devices that were on his person were key fobs.  Is

7    there a difference?  And we talked about some of the type of

8    wires, body wires on the transcript, as well.  So I don't know

9    if we have different devices.  Is it in your pocket?  I don't

10   know if we're talking about different things.

11             Secondly, I don't like -- and, of course, I will

12   always do what the Court tells me to do.  But limiting my

13   cross-examination, things happen during cross-examination when

14   I'm asking witnesses questions.  These are relevant items.  I

15   have -- I have totally cooperated with the security aspects of

16   this case.  There have been other mistakes, other things have

17   happened in this case, and I have totally cooperated.  There

18   are other mistakes, and I've been totally cooperative.

19   But we're in trial and this stuff is out.  And I just can't

20   unring the bell on this stuff.

21             THE COURT:  You mean other areas?

22             MR. GEORGE TRAGOS:  Not that I can think of.  I'll

23   approach sidebar if I think of another area.

24             THE COURT:  Thank you.

25             THE AGENT:  Your Honor, may I add one thing?

```
 1                    THE COURT:  Yes, sir.
 2                    THE AGENT:  The term -- as Ms. Sweeney said, the term
 3       "key fob" is what we are particularly -- that term in
 4       association with the recording device is what we are
 5       particularly concerned about.
 6                    THE COURT:  But you now know that the media has heard
 7       that term.
 8                    THE AGENT:  Yes, because Mr. Tragos brought it up
 9       this morning.  I understand.  We would ask that we not
10       continue.
11                    MR. GEORGE TRAGOS:  And I understand, I brought it up
12       because the Court asked me for specifics.
13                    THE COURT:  Well, you didn't bring it up because of
14       specifics.
15                    MR. GEORGE TRAGOS:  You asked me specifically, what
16       are you talking about, when I said that there are some
17       malfunctions.  And then you said -- so I had to go to that
18       transcript and read the Court portions of the December 24th
19       transcript.  And that's -- it was included in that portion that
20       I read.
21                    (Thereupon, the sidebar discussion was concluded and
22       the proceedings resumed as follows:)
23                    THE COURT:  Well, the Court has entered an order that
24       limits the defense's ability to inquire as to the witness'
25       identity, and to inquire as to the witness' training.  The
```

1    defense asked a number of questions about the witness' training

2    because the Government asked questions about the witness'

3    training, and the Government did not object to those questions

4    during the course of the examination, including questions about

5    the witness' Islamic background, his training in Arabic, his

6    family background and training in Islam.  And none of these

7    questions drew objections.

8           I don't know what additional questions the defense

9    might want to ask that the Government would not oppose.  And so

10   I don't know that there's anything we can do but allow the

11   defense to ask questions the defense wishes to ask and have the

12   Government object to the inquiry and then -- if it's

13   appropriate, or not object if the Government has no objection,

14   and the Court will rule accordingly.

15          I can't control the cross without knowing what it's

16   going to be, and I can't know the Government's objection until

17   it asserts one.  I would have expected an earlier objection.  I

18   also would not have expected the Government to inquire as to

19   the witness' training.

20          So as to training, there has to be some effective

21   cross-examination of this witness.  Without his identity being

22   known, the defense is limited.  But having now given at least

23   the Government's view of what's pertinent about his training,

24   the defense should be free to inquire.  And if there's

25   something of a sensitive nature about that training, then we

1    can hear it on objection.

2           Now, what the defense cannot ask is targeting

3    questions, what is the internal protocol of the FBI or whatever

4    entity he's trained by concerning how to embark an

5    investigation and who to consider in connection with an

6    investigation.  But his training more broadly about how he is

7    trained to be an undercover, he can ask.  And to the extent

8    that anything draws a classified objection or a law enforcement

9    sensitive objection, the Government can just stand and assert

10   that the information is objectionable because it's protected.

11   The Court will hold sidebar and I'll address the specific

12   concern at that time.

13          Yes, sir.

14          MR. GEORGE TRAGOS:  Just so the record is clear,

15   going beyond what the Court just said, the other things I

16   raised, the CIPA, FISA and the disclosures that the Government

17   has made, our request for those disclosures as well as the

18   prior testimony of this witness, is the Court continuing to --

19   the same rulings on those?

20          THE COURT:  That is correct.  And with respect to the

21   question on surveillance, the defense would be directed not to

22   further emphasize the one item that we discussed at sidebar by

23   a specific question.  But the Government has agreed,

24   apparently, to inquire whether -- to inquiries concerning

25   whether small devices are available or wires are available and

1    so forth, and to inquire why certain events were or weren't

2    recorded, and to inquire whether in the UCE's mind the

3    audiotapes could have been clearer or were obscured by some

4    conduct of the UCE or some failure of the Government's

5    recording instruments.

6            But because of the protection the Court has afforded

7    for law enforcement sensitive information, the actual

8    instruments that we discussed at sidebar should not any further

9    be disclosed in the context of the trial.

10            And I will instruct the witness to that effect, as

11   well, because I think he was present when that was raised and

12   he may be confused now whether it's in or out from an

13   admissibility standpoint.  And when he comes back in, we'll try

14   to remember and, if I forget, someone remind me to give him

15   that instruction.

16            But the CIPA, FISA and the prior transcripts remain

17   unavailable to the defense in connection with the case.

18            Anything else before we break for lunch, from the

19   Government or the defense?

20            MS. SWEENEY:  No, Your Honor.

21            THE COURT:  How much longer do you think you'll go

22   with this witness before you'll need to stay your cross and

23   turn to other witnesses?

24            MR. GEORGE TRAGOS:  I'm sure I've got at least a

25   couple hours, maybe more, before.

1      MS. SWEENEY:  Your Honor, I did have some other kind

2  of small fill-in sort of witnesses come to the Court.  I think

3  they're probably here now.  In case Mr. Tragos wanted to break,

4  you know, and there was still time left and if the Court wanted

5  another witness to come in in the middle of the undercover's

6  cross-examination, I mean, they can be available or we can just

7  say we're going to stop when Mr. Tragos is ready to stop.

8  Whatever your preference will be.

9      THE COURT:  Well, a couple hours takes us to 3:30.

10  That's time to take in -- now, I hope they're not just fill-in

11  witnesses because they're filling in time.  I assume they're

12  relevant to the case.  That's time for us to take in those

13  witnesses.  I don't want to waste an hour.  If Mr. Tragos goes

14  longer than 3:30, we just won't get to them.  But I think we

15  should have witnesses available if you're saying two hours.

16      MR. GEORGE TRAGOS:  I just want to make sure that

17  whatever witness is called, that that witness is direct and

18  crossed and done with so that on Monday I can start my cross

19  again.  I don't want to have to --

20      THE COURT:  Well, I can't predict all of that.  It

21  really depends on how far you get and the inquiry on which your

22  cross might be.  What we're going to do is we're going to take

23  full days till 4:30.  And wherever we are at 4:30 is where we

24  are at 4:30, and we'll pick up again at 9:00 on Monday.

25      MR. GEORGE TRAGOS:  So the Court knows, we are ahead

1   of schedule.  I think both the prosecutor and I believe we are.

2   Thursday -- and this is a scheduling matter -- but Thursday, I

3   would request the Court allow me to put my doctors on.  We

4   think we'll be at that point on Thursday.  But if we're not,

5   I'd still like to be able to put my psychologist and

6   psychiatrist on.  They're expensive and we don't have a lot of

7   money.

8           MS. SWEENEY:  I discussed it with Mr. Tragos this

9   morning.  And I don't object, Your Honor.  I hope that the

10  Government's case will be done by then.  But if it's not, given

11  those circumstances, I don't object if we pause in the

12  Government's case at that point and put on his witnesses.

13          THE COURT:  All right.

14          That's fine.  And we have to take that break on

15  Thursday for a half an hour for the attorney, unless he's been

16  able to clear his calendar.

17          MR. GEORGE TRAGOS:  Oh, okay.

18          THE COURT:  But it's just a break.  Anything further?

19          MR. GEORGE TRAGOS:  No.

20          MS. SWEENEY:  No, Your Honor.

21          THE COURT:  See you back at 1:30.

22          (Thereupon, a luncheon recess was taken.)

23          I read over the break the excerpts from the

24  additional three sessions that were indicated to be wholly

25  irrelevant in any part to this case.  And my review suggests

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

 1   otherwise.

 2            I would bring the Government's attention to I.D. 204,

 3   through -- well, they all say 204, so I'm not sure what this

 4   is.  I'll just tab them and you can look at them and tell me if

 5   you agree or disagree.

 6            And then the last one, I'm not sure what this is.

 7   Apparently, someone was arrested and someone was interviewed.

 8   And it's not entirely clear to me whether this is the -- it

 9   mentions the word "Sami."  So I don't know if it was the

10   Defendant or someone else with the same name.  But I'll just

11   let you all look at it and you can tell me.

12            On the pink tabs -- I'm sorry.  Ms. Vizza, would you

13   pass that over.  Take a look and let me know on a break.

14            Anything else before we proceed?

15            MR. GEORGE TRAGOS:  Your Honor, have those been

16   marked as a Court's exhibit?

17            THE COURT:  They have not been marked.  They were

18   just handed to me this morning, handed to Ms. Vizza this

19   morning as further refinement, and the three sessions, the

20   Government contended were recorded, but had nothing at all to

21   do, just the UCE talking about going to lunch.  And that's not

22   really accurate.

23            MS. SWEENEY:  Your Honor, these are -- all three of

24   these at this point have been declassified.  So we can

25   certainly just hand them -- in this version, with the

1    redactions that you saw, we can just hand these to Mr. Tragos

2    right now, if you would like us -- we'll do that.  We'll give

3    them to Mr. Tragos.

4             THE COURT:  Well, I want to know first whether I am

5    mistaken about their reference to the case, because it was

6    represented to me that they didn't have anything to do with the

7    case, but they appeared to.

8             MS. SWEENEY:  The reference to a firearm by N.E.,

9    that's the first one that you marked, Your Honor.  N.E. is Nora

10   Ellington.  She was an -- or she is an FBI analyst who works at

11   headquarters.  There's not -- I don't think that we can hear

12   enough around that.

13            THE COURT:  That's not the reference.  That's just

14   the beginning of where the discussion starts.

15            MS. SWEENEY:  I'm sorry.

16            THE COURT:  And if you follow the UCE intermittently

17   in there, he's talking, it appears, about getting this thing

18   wrapped up and we don't want to give them the case unless we

19   have all the points in place.  But you have to read between the

20   lines of the other people talking about apparently a Gasparilla

21   race or something.

22            But in the end, it appears to wrap up with the UCE

23   and an N.N. discussing the status of the investigation, whether

24   all the loose ends have been tied up, not those words, but

25   words to that effect.

```
1            MS. SWEENEY:  Okay.  Your Honor, we'll review this
2    and discuss it on the next break.
3            THE COURT:  That's fine.
4            MR. GEORGE TRAGOS:  Your Honor, I would request that
5    they be marked as a Court's exhibit, and I would again request
6    for a copy of the audio.
7            THE COURT:  All right.
8            They will be marked as a Court's exhibit.  And the
9    motion for the audio is denied.  The Court has reviewed the
10   audio, and there are parts of the audio that appear to contain
11   classified information.  Now, the enhanced version appears to
12   be in places the things that are on the Court's copy, things
13   that I think are redacted.  Am I correct about that?
14           THE AGENT:  Yes, Your Honor.
15           THE COURT:  But the Government's contention is even
16   beyond what has been redacted, it still believes there is
17   classified information on the audio?
18           THE AGENT:  Yes, Your Honor.
19           THE COURT:  All right.
20           Anything else before we bring back the jury?
21           MR. GEORGE TRAGOS:  No, Your Honor.  And the audio is
22   going to be made an exhibit, as well?
23           THE COURT:  Yes.
24           (Brief Pause.)
25           Well, I don't know about the audio being made an
```

```
1    exhibit.  Can we make an exhibit of a classified document?

2              MR. GEORGE TRAGOS:  I think you can make it in a

3    classified way.

4              MS. SWEENEY:  I think that's correct, Your Honor.

5              THE COURT:  All right.

6              (Jury returned to the courtroom.)

7              Welcome back, ladies and gentlemen.  As you know,

8    we're on the cross-examination of Special Agent Amir.

9              Counsel, you may proceed.

10             MR. GEORGE TRAGOS:  Thank you, Your Honor.  May it

11   please the Court.

12   BY MR. GEORGE TRAGOS:

13   Q.   Agent Amir, you went to regular, I guess, undercover

14   school for regular criminal investigations.  Is there a

15   separate undercover school for national security undercover?

16   A.   No, sir.

17   Q.   All right.

18        So did you receive any specialized training for national

19   security cases?

20   A.   For undercover work?

21   Q.   Well, let's just go generally, for national security

22   cases.

23   A.   No, sir.

24   Q.   Okay.  And how about for undercover work in national

25   security cases?
```

```
 1   A.    Yes, sir.
 2   Q.    Okay.  And was this a set curriculum?  In other words, it
 3   wasn't just designed for you, but they have a regular
 4   curriculum for this?
 5   A.    No, sir.
 6   Q.    Oh, it was one designed for you?
 7   A.    There's one designed for individuals involved in the type
 8   of work that I did or that I do.
 9   Q.    Okay.  Let me try to rephrase it, then.
10         All the individuals that do the type of work that you do
11   go through the same specialized undercover training?
12   A.    It's case dependent, so there's not -- it's case
13   dependent.  It's -- the fact that I've been involved in certain
14   types of undercover work, I've received training specific to
15   that type of work.  So it's case specific.
16         So when you say individual involved in national security
17   investigations, no.  The answer would be no.  Case specific to
18   what I do, yes, or case specific to the types of cases that I
19   have worked, yes.
20   Q.    Did you receive this training individually or as a group?
21   A.    Individually.
22   Q.    And who is it that trained you?
23              MS. SWEENEY:  I object, Your Honor, for under --
24   because it's protected.
25              THE COURT:  Sustained.
```

```
 1   BY MR. GEORGE TRAGOS:
 2   Q.   Did you receive any additional training specific to this
 3   case?
 4   A.   Specific to this particular case or this type of case?
 5   Q.   Well, let's go with this type of case.
 6   A.   Yes.
 7   Q.   And did you receive any additional training on this
 8   specific case?
 9   A.   No.
10   Q.   Now, I think you earlier testified that your five previous
11   national security undercover cases involved Muslim or
12   Islamic-related activity, correct?
13   A.   Yes, sir.
14   Q.   Before you entered into those five cases, did you receive
15   any specialized training?
16   A.   Again, for those types of cases or for those specific --
17   Q.   Those types of cases.
18   A.   Yes, I did.
19   Q.   Okay.  And was any of that training specific to Muslims or
20   Islamic beliefs?
21   A.   Yes.
22   Q.   And I asked you earlier about socio or economic training,
23   and I think you said that you had not received any but, in
24   fact, wouldn't you consider training that is geared toward
25   Muslims or Islamic individuals that that is training that is
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    geared specifically to that socio class?

2    A.    When you say Muslims or Islamic individuals --

3    Q.    Yes.

4    A.    Not Muslims or Islamic individuals as a general, but

5    specifically to radical Islamic -- individuals who are involved

6    in radical Islamic or Islamic extremists, that's the type of

7    training that --

8    Q.    Okay.  So you got specialized training with regards to

9    radical Islamic or extremist Muslim characteristics?

10   A.    Yes, sir.

11   Q.    Okay.  And that training, again, also involved culturally?

12   A.    It's hard to say because I don't understand what you mean,

13   culturally.

14   Q.    Well, how they lived, acted, grew up, those kinds of

15   things.

16   A.    No, not really.  No.  It was more in -- it was more in

17   things specific to that particular belief system, that

18   extremist belief system.  So it's not how they lived, grew up,

19   it's not that.

20   Q.    Okay.  How about the way they think, how about that?

21   A.    That's -- yes, that would be accurate.

22   Q.    So you were trained in the way they think?

23   A.    Yes, sir.

24   Q.    And were you trained in the way that they respond to you

25   as to how you act and how you speak?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    A.    Yes, sir.

2    Q.    And was the purpose of this training for you to -- let me

3    step back.

4          Were you also trained in what the elements are for

5    criminal offenses?  You know what I mean by elements?

6    A.    Please explain.

7    Q.    Okay.  The elements are those things that are required in

8    order to have a prosecution, those specific things, kind of

9    like a fill-in-the-blank.  Before you can arrest somebody and

10   prosecute them, they have to do this, this and this.  Are you

11   trained in that?

12   A.    In criminal violations, yes, sir.

13   Q.    Okay.  And in this case, we have two types of criminal

14   violations.  One is the AK-47, the automatic AK-47.

15   A.    Yes, sir.

16   Q.    Are you familiar with what is necessary in order to

17   prosecute somebody for possessing that?

18   A.    Yes, sir.

19   Q.    And the other crime we have here is a weapons of mass

20   destruction.

21   A.    Yes, sir.

22   Q.    And are you familiar with how people are -- what is

23   required or what is necessary in order for someone to be

24   prosecuted under that statute?

25   A.    Yes, sir.
```

1   Q.   Okay.  During the course of this investigation, were you

2   careful to make sure that you established all of the necessary

3   requirements for prosecuting those violations?

4   A.   Not the way -- if a yes or no answer is required, the

5   answer would be no.

6   Q.   Okay.  No.  Okay.

7        During the course of this case, did you have an

8   opportunity to meet the confidential human source?

9   A.   Yes, sir.

10  Q.   And what is a confidential human source?

11  A.   An individual who provides information and/or assistance

12  to the Government.

13  Q.   And the confidential human sources have various incentives

14  for cooperating with the Government, correct?

15  A.   Yes, sir.

16  Q.   And that's also part of your training; is it not?

17            THE COURT:  Mr. Tragos, one second.  Ms. Vizza.

18            (Brief Pause.)

19            You may continue.  Thank you.

20            MR. GEORGE TRAGOS:  Thank you, Your Honor.

21  BY MR. GEORGE TRAGOS:

22  Q.   That is also part of your training, is it not, the

23  incentives that are received by confidential human sources?

24  A.   What -- I don't understand what your question is.

25  Q.   Well, are you trained by policy and by the bureau on how

1   to deal with, handle, take care of, benefit, confidential human

2   sources?

3   A.    Develop, handle, yes, sir.

4   Q.    And when we say the confidential human sources have

5   various incentives to cooperate, do you know what I'm talking

6   about?

7   A.    Yes, sir, I believe so.

8   Q.    And what is your experience for what incentives or how

9   people are benefited from being confidential human sources?

10  A.    There are a number of different ways where confidential

11  human sources benefit.  Some agree to assist the Government

12  because they feel a duty to.  Some agree to assist the

13  Government because they're in legal difficulty and it would be

14  a way to get them out of legal difficulty.  Some agree to

15  assist the Government because they will give financially --

16  they'll get financial benefit from it.  So it's one of those

17  three ways is reasons why individuals become confidential human

18  sources.

19  Q.    Now, in this case, there's a confidential human source,

20  correct?

21  A.    Yes, sir.

22  Q.    And when did you first meet the confidential human source?

23  A.    It was in November.

24  Q.    Now, just as a frame of reference, you identified Exhibit

25  108-B, which is a transcript of a telephone call on

```
 1   December 19th, 2011?
 2   A.   Yes, sir.
 3   Q.   Do you remember that?
 4   A.   Yes, sir.
 5   Q.   Did you meet the confidential human source before that?
 6   A.   Yes, sir.
 7   Q.   Tell me the circumstances of you meeting the confidential
 8   human source.
 9   A.   I was introduced to the source by the case agents who were
10   investigating the violation.
11   Q.   Who are those case agents?
12   A.   One of them is Mr. Collins.
13   Q.   Mr. Collins, is that the individual sitting next to the
14   prosecutor?
15   A.   Yes, sir.
16   Q.   And is there another one?
17   A.   Yes, sir.
18   Q.   And what was the other one's name?
19   A.   Mr. Taylor?  Is it Taylor?  I'm not sure.  I'm sorry.
20   Q.   Okay.  Where did they introduce you to the confidential
21   human source?
22   A.   We met at a park, I believe it was.
23   Q.   And during the course of this investigation, how many
24   times did you meet or speak with the confidential human source?
25   A.   A number of times.  I don't know exactly how many.
```

```
1   Q.   Okay.  On December 19th, 2011, that telephone call with
2   the confidential human source was recorded, correct?
3   A.   Yes, sir.
4   Q.   Okay.  Prior to that, had you ever recorded any other
5   conversations you had with the confidential human source?
6   A.   No, sir.
7   Q.   Prior to that, how many times had you spoken to or met
8   the confidential -- prior to December 19th, 2011, had you met
9   or spoken to the confidential human source?
10  A.   I'm not sure.  A few times, I'm not sure exactly the
11  number.  I'm not sure of the number.
12  Q.   More than five?
13  A.   No, sir, not more than five.
14  Q.   Okay.  And I think you said the first time you met was
15  approximately October of 2011?
16  A.   The first time I met with the confidential human source?
17  Q.   Yes, sir.
18  A.   No, sir.  I didn't say October.
19  Q.   November?
20  A.   I said November.
21  Q.   November?
22  A.   Yes, sir.
23  Q.   But you don't remember when in November?
24  A.   It was the end of November, I believe.
25  Q.   Do you keep a record of your meetings and what you do?
```

1    A.    No, sir.

2    Q.    You don't make notes or anything like that?

3    A.    No, sir.

4    Q.    Does anybody make notes for you?

5    A.    I don't know.  I don't know if they make notes.  I don't

6    make notes.

7    Q.    So you don't know if anybody keeps any records of anything

8    that you do?

9    A.    The meetings that we had, the recording meetings that I

10   had with the Defendant, there are records of those.  As far as

11   meetings with the CHS and things of that nature, I couldn't

12   tell you if they kept notes of those because it's not my

13   division.  I wasn't the case agent in it.  I was an undercover.

14   I was not the case agent in it.

15   Q.    So the case agent keeps records of that?

16   A.    Again, I don't know that.  You would have to ask the case

17   agent that.

18   Q.    Well, let me ask you.  You are trained and you have the

19   ability with your training to be a case agent?

20   A.    Yes, sir, I do.

21   Q.    As the case agent, do you not know whether or not it's the

22   policy of the FBI to -- for the case agent to keep notes of

23   those types of meetings?

24   A.    You know, I don't know.  I know what my practices were and

25   individuals that trained me because as far as policy-wise, I

1    don't know if there's a policy on that.

2    Q.   Well, how were you trained?

3    A.   Again, depending on the types of contracts that you have,

4    when you meet with your CHS, you usually record that.  You have

5    a recording of what -- when you meet with your CHS and what

6    transpires during that meeting with your CHS.  Usually you

7    record that.  And that's how I was trained.  As far as policy

8    on that, I couldn't tell you what the policy is on that.

9            THE COURT:  When you say record, do you mean with an

10   audio recording or record as in writing down?

11           THE WITNESS:  I write it down, document it.

12   BY MR. GEORGE TRAGOS:

13   Q.   And on the five times or less that you met with the CHS

14   before December 19th, 2011, was the -- was Agent Collins always

15   with you?

16   A.   Yes, I believe so.

17   Q.   How about Taylor?

18   A.   I don't know.  I don't remember.

19   Q.   When you met with the CHS in November --

20   A.   Yes.

21   Q.   -- again, without telling us what he said, was your

22   purpose for meeting with him the -- about the individual named

23   Sami Osmakac, or the Defendant?

24   A.   No.

25   Q.   You did not meet with him for that purpose?

```
 1   A.    No.   The purpose that I met with the CHS --
 2            THE COURT:   That's the only question that's pending.
 3   BY MR. GEORGE TRAGOS:
 4   Q.    What was the purpose of you meeting the CHS?
 5   A.    The purpose I met with the CHS was to develop our story on
 6   how we knew each other.
 7   Q.    Say that again.
 8   A.    To develop a story on how we knew each other, our
 9   relationship, what our relationship is to each other.
10   Q.    To develop a story?
11   A.    Yes.
12   Q.    Okay.  And so you didn't know at that time that that
13   involved Sami Osmakac or the Defendant?
14   A.    At that time, yes, it did.  The purpose was when I did
15   eventually meet Mr. Osmakac was if Mr. Osmakac asked him what
16   our relationship was that he would have a story to tell Mr.
17   Osmakac.
18   Q.    All right.
19       So, then, the overall purpose of the first meeting did
20   involve the investigation involving Sami Osmakac?
21   A.    Okay.  Yes.  I see what you're saying.  Yes, sir.  I see
22   what you're saying.
23   Q.    You say -- earlier you testified that you were brought
24   down here because I guess a case agent requests an undercover
25   person, correct?
```

```
1    A.    Yes.

2    Q.    Okay.  In this case, who made the request for you to come

3    down here and become an undercover agent?

4    A.    I don't know who actually made the request.  It was

5    someone from the division.

6    Q.    Okay.

7             THE COURT:  From what division?

8             THE WITNESS:  From the Tampa Division of the FBI.

9    BY MR. GEORGE TRAGOS:

10   Q.    In the other meetings you had with the CHS before

11   December 19th, you said one meeting was -- the purpose was to

12   -- the initial meeting was to discuss what your cover story was

13   going to be, right?

14   A.    Yes.

15   Q.    How you met?

16   A.    Yes, sir.

17   Q.    What was the purpose for the other four meetings before

18   December 19th?

19   A.    I did not say there were four meetings before December

20   19th.  You said that.

21   Q.    Okay.  Sorry.  You said it was less than five?

22   A.    Yes, sir.

23   Q.    All right.

24        What was the purpose for the other meetings?

25   A.    I think it was one meeting and a phone call -- some phone
```

1    calls 'cause I left -- I left the area shortly after that

2    meeting.

3    Q.   After -- I'm sorry.

4    A.   Go ahead.

5    Q.   Go ahead.  Finish.

6    A.   It was a plan for an introduction of myself to Mr.

7    Osmakac, to the Defendant.  After that plan, the only other

8    time I saw the CHS was -- you know what?  I don't even know if

9    I saw the CHS again after that.  I didn't see him again.  I

10   talked -- I spoke to him on the telephone, but I don't think I

11   saw him again.

12   Q.   Okay.  How many times did you speak to him on the

13   telephone?

14   A.   I don't know.  It might have been like prior to receiving

15   the phone call on the 19th, sometime prior to that, maybe once

16   or twice prior to receiving the phone call on the 19th to tell

17   me that the phone call -- to expect the phone call on the 19th.

18   I'm not sure, but -- it was 2011, so I'm not a hundred percent

19   sure on exactly when it was.

20   Q.   Was this phone call recorded?

21   A.   I don't think so.

22   Q.   Were you local when you talked to him or were you out of

23   town?

24   A.   I was out of town.

25   Q.   And was anyone else on that phone call?

```
 1   A.   I don't think so.

 2   Q.   Okay.  So the case agent wasn't on the call?

 3   A.   I don't think so.  I don't think so.

 4   Q.   After December 19th, what contact did you have with the

 5   confidential human source?

 6   A.   I had some face -- might have had a few face-to-face

 7   contacts, maybe some telephonic contacts.

 8   Q.   And what was the purpose of you meeting face to face with

 9   him?

10   A.   Something dealing with -- something dealing with the

11   investigation on Mr. Osmakac.  I couldn't tell you exactly what

12   the --

13   Q.   Because you kept no notes or records, right?

14   A.   Yes, sir, I did not.

15   Q.   And do you remember the last time you saw the confidential

16   human source?

17   A.   Yes, sir, on January the 1st of 2012.

18   Q.   After that date, you never saw him again?

19   A.   Yes, sir.

20   Q.   Excuse me?  I'm sorry?

21   A.   Yes, sir.

22   Q.   Yes, you never saw him?

23   A.   Yes, sir.  I never saw him again after that day.

24   Q.   Or spoke to him?

25   A.   Or spoke to him.
```

1   Q.   Now, the -- when the prosecutor was speaking to you and

2   you answered that you had some information that you gained

3   about surveillance from these briefings, we talked about these

4   briefings.   What do you mean by "these briefings"?

5   A.   If you can tell me exactly what you're talking about, I

6   could probably answer that better.

7   Q.   Before you went in to make -- before you had this phone

8   call on December 19th --

9   A.   Yes, sir.

10  Q.   -- was there a meeting, something to plan about what was

11  going to happen on that phone call, what we wanted to happen,

12  what we wanted to accomplish, some kind of group meeting like

13  that?

14  A.   Not that I was part of.

15  Q.   So when you made the call on December 19th, 2011, you had

16  no other information, no other planning other than you met the

17  CHS and talked about your cover story and you may have talked

18  to the CHS once on the phone?

19  A.   When I received the call on December 19th?

20  Q.   Yes.

21  A.   When I received the call on December 19th, there was no

22  planning.   I had gotten -- made no plans with anyone.   I had

23  departed that area after our failed meet on December the 5th.

24  Q.   Now, let's talk about the December 5th meeting that didn't

25  happen.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   A.   Yes, sir.
 2   Q.   Who told you about that meeting?  Who told you to be
 3   there?
 4   A.   I knew to be there because we were involved in an
 5   investigation.  No one told me to be there.  I was involved in
 6   an investigation.  I was at the Tampa Division.  There was a
 7   planned meeting where the Defendant was supposed to show up to
 8   meet with me.  So your question is difficult to answer because
 9   no one told me to be there.  I knew to be there.
10   Q.   Well, how did you know to be there?
11   A.   Because I was in the meetings to set up the meet.
12   Q.   So there was a meeting to set all this up?  You did meet
13   with the agents to set this up?
14   A.   On December the 5th?
15   Q.   Before December 5th.
16   A.   For the meeting between myself and the Defendant on
17   December the 5th, there was an operations plan.  There was a
18   meeting for that operation, that December the 5th operation.
19   For January -- for December the 12th, no, I was back home.
20   Q.   Are you talking about December the 19th?
21   A.   December the 19th, excuse me, I was back home on December
22   the 19th.
23   Q.   All right.
24        Then let's go back to December the 5th.
25   A.   Yes, sir.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   Q.    There was an operational meeting?

2   A.    Yes, sir.

3   Q.    And at that operational meeting, were there discussions

4   about what was going to happen when you met Mr. Osmakac?

5   A.    Yes, sir.

6   Q.    And at that meeting, you were told -- let me backtrack.

7   Before that meeting on December 5th --

8   A.    Yes, sir.

9   Q.    -- did you -- when did you come into the Tampa area?

10  A.    I'm not sure exactly whether it was prior to that meeting,

11  a day or two prior to that meeting, maybe longer than that.

12  I'm not sure.

13  Q.    When you came to Tampa, did you know that a meeting had

14  been set up for December 5th?

15  A.    Sometime after my arrival in Tampa, did I know that there

16  was a meeting set up for December the 5th?

17  Q.    Before you came to Tampa, did you know?

18  A.    That's difficult.  I don't think so.  I don't think I knew

19  of the date of the meeting.

20  Q.    So you just came into Tampa on the off chance that you

21  might meet with Mr. Osmakac?

22  A.    I came to the Tampa area because I knew there was a

23  meeting going to be planned for me to meet with the Defendant.

24  Was there a date set -- a set date and time for that yet?  At

25  that point, I don't think there was.  I think there was a plan

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    for that to happen.

2    Q.   So you came into town not knowing if there had been a

3    meeting even set up?

4    A.   I came into town knowing that a meeting was going to be

5    set up.  I came to town not knowing the exact date and time

6    when that meeting would be set up.

7    Q.   So you come to Tampa and you're told that -- somebody

8    tells you, I presume, that there's a December 5th meeting,

9    right?

10   A.   I come to Tampa after the December the 5th meeting is

11   established and, yes, I know there's a meeting being held

12   December the 5th.

13   Q.   You knew that once you got to Tampa or before?

14   A.   I knew that once I got to Tampa.

15   Q.   And who told you that?

16   A.   I'm not sure exactly who I got the information from, but

17   it was someone from the Tampa Division, either the case agent

18   or somebody at that division.

19   Q.   Not the CHS?

20   A.   Not the CHS.  I did not hear that from the CHS.

21   Q.   Did they tell you how the December 5th meeting was set up?

22   A.   I don't want to be inaccurate.  I'm not sure exactly.

23   What I believe -- what I believe is that the December the 5th

24   meeting was set up through the CHS.

25   Q.   Tell me what happened on December 5th.

1    A.    On December the 5th, I arrived at the Sligh Mosque.  I

2    waited in the parking lot for the Defendant to show up.  He

3    didn't show up.  After waiting a significant -- what I consider

4    a decent enough time, I learned that he wasn't going to show

5    up, then I left the area.

6    Q.    Was the CHS with you?

7    A.    While I was waiting for the Defendant?  No, he wasn't.

8    Q.    Did you see the CHS at all on December 5th?

9    A.    I did not see the CHS.  I believe I saw the CHS's vehicle.

10   I mean, just going off of memory, I believe I saw his vehicle

11   there, but I never -- I never saw the CHS or spoke to the CHS

12   on that date at that location.

13   Q.    Do you know if you were being surveilled when you were at

14   the Mosque?

15   A.    Yes, sir.  I do know I was being surveilled when I was at

16   the Mosque.

17   Q.    There were FBI agents around?

18   A.    Yes, sir, there were.

19   Q.    Do you know if you were being videotaped?

20   A.    I don't know if I was being videotaped or not.

21   Q.    Did you have a recording device on you?

22   A.    Yes, I did.

23   Q.    And where did you have the recording device?

24   A.    It was inside the vehicle that I was in.

25   Q.    Is that the same vehicle we have seen up here a couple of

```
 1   times?
 2   A.   Yes, sir, it is.
 3              THE COURT:  Let's -- I'm sorry.  We need to close the
 4   courtroom.  I need to have a sidebar with the witness.
 5              Close the courtroom please.
 6              (Brief Pause.)
 7              Sir, may I see you at sidebar.  One second.  Let him
 8   close the door.
 9              (Brief Pause.)
10              (At which time the following sidebar discussion was
11   held:)
12              After the break, we discussed the fact of the
13   existence of the key fob which was inadvertently disclosed on
14   some of the transcripts.  And you may recall that Mr. Tragos
15   mentioned it during his discussion before the Court today.  And
16   so we have agreed that even though it did come out, it would
17   not be emphasized anymore.  So the Court is directing you not
18   to mention that type of surveillance.  If you feel like now
19   it's open or able to be discussed, it is not, so you're not to
20   mention the key fob.
21              What about the finch?  I don't even know what that
22   is.
23              MR. GEORGE TRAGOS:  I think the witness isn't to say
24   key fob.  I'm allowed to ask him if it was small or those
25   things, but not the word "key fob."
```

```
 1              THE WITNESS:  Okay.  Yes, ma'am.  Thank you.
 2              (Thereupon, the sidebar conference was concluded.)
 3              THE COURT:  You can reopen the Courtroom.
 4              Counsel, you may continue.
 5              (Brief Pause.)
 6              Mr. Tragos, you may continue.
 7              MR. GEORGE TRAGOS:  Okay, Your Honor.
 8    BY MR. GEORGE TRAGOS:
 9    Q.   Okay.  There was a -- was it a video and an audio
10    recording device in your vehicle?
11    A.   Yes, there was.
12    Q.   And was it turned on?
13    A.   I believe so.  Yes, sir.
14    Q.   And did you ever view that audio or video?
15    A.   I did not.
16    Q.   The agents that were around you, do you know if they had
17    any audio or video recording devices?
18    A.   I don't believe they did.
19    Q.   Now, you say you think you saw the CHS's vehicle drive by?
20    A.   I believe so.
21    Q.   Okay.  Now, when this didn't happen on the 5th, when was
22    the next time you were scheduled to meet the Defendant?
23    A.   After the conversation on December the 19th, the next
24    time.
25    Q.   So there was no scheduled meeting for like the 6th of
```

```
 1    December?

 2    A.    No, sir.

 3    Q.    Did you speak to the CHS after December 5th when the

 4    Defendant didn't show up about the Defendant not showing up on

 5    December 5th?

 6    A.    I believe so.

 7    Q.    Was that by phone or a personal meeting?

 8    A.    I don't recall.

 9              THE COURT:  You don't recall whether you met with the

10    CHS on the 5th?

11              THE WITNESS:  I don't recall if the conversation that

12    we had was by phone or by face-to-face contact.

13              THE COURT:  But do you recall that you had a

14    conversation?

15              THE WITNESS:  I believe so.  I believe so.  I don't

16    know that I had a conversation with him or that the case agents

17    told me about their conversation with him.  So it's not clear,

18    but I know I had learned that the Defendant didn't show up and

19    why he didn't show up.

20    BY MR. GEORGE TRAGOS:

21    Q.    So now let's go to December 19th.

22    A.    Yes, sir.

23    Q.    By the way, what was the cover story that you had

24    developed with the CHS about who you were?

25    A.    I was a merchant.
```

```
1    Q.   A merchant.  And did you sell merchandise to the CHS?

2    A.   No, I did not.

3    Q.   Did the CHS have a store?

4    A.   Yes, he does.

5    Q.   And do you know what kind of a store it is?

6    A.   A store that sells merchandise.

7    Q.   But what kind of merchandise?

8    A.   Flags, trinkets, some food items, things of that nature.

9    Q.   In fact, you've been to the CHS's store, haven't you?

10   A.   Yes, sir.

11   Q.   How many times have you been there?

12   A.   I was there twice.

13   Q.   The December 19th, 2011 call, do you know how that call

14   was arranged?

15   A.   I do not know how that call was arranged.

16   Q.   Were you -- did you know to expect the call?

17   A.   Yes, sir.  I knew to expect the call.

18   Q.   And how did you know to expect the call?

19   A.   Again, too, I'm not clear on whether it was the case

20   agents that contacted me and told me that the CHS was going to

21   be calling me or it was the CHS that contacted me and told me

22   that he'd be calling me again with the Defendant.

23   Q.   Prior to that call on the 19th -- well, let me backtrack.

24        Between December 5th, 2011 --

25   A.   Yes, sir.
```

```
 1    Q.   -- and December 19th, 2011 --
 2    A.   Yes, sir.
 3    Q.   -- did you have any conversations with any of the Tampa
 4    Division FBI agents?
 5    A.   Between December 5th and December 19th?
 6    Q.   Yes.
 7    A.   Yes, I did.
 8    Q.   And on those calls, was there operational discussions?
 9    A.   Yes, sir.
10    Q.   And were there operational discussions about what would
11    happen on the December 19th call?
12    A.   No, sir.
13    Q.   Did the CHS on December -- before December 19th, discuss
14    with you what was going to be discussed on the December 19th
15    call?
16    A.   No, sir, he did not.
17    Q.   So you have no idea what was going to be discussed on the
18    December 19th call?
19    A.   That is correct, sir.
20    Q.   Now, let me show you --
21         MR. GEORGE TRAGOS:  May I approach, Your Honor?
22         THE COURT:  Yes.  You have general leave to approach
23    as necessary.
24    BY MR. GEORGE TRAGOS:
25    Q.   Let me show you the transcript of the phone call from
```

```
 1   108-B.
 2        Now, you've testified you remember this phone call,
 3   correct?
 4   A.   Yes, sir, I do.
 5   Q.   And we heard the phone call, didn't we?
 6   A.   Yes, sir.
 7   Q.   And you compared the transcript, right?
 8   A.   Yes, sir, I did.
 9   Q.   Okay.  And at the beginning of the phone call, the phone
10   rings, you say "hello", correct?
11   A.   Uh-huh.  (Indicating affirmatively.)
12   Q.   And I know I'm going to mispronounce this --
13            THE COURT:  I'm sorry.  You have to answer yes or no.
14            THE WITNESS:  Yes.
15   BY MR. GEORGE TRAGOS:
16   Q.   And the -- I know I'm going to mispronounce this, but the
17   CHS says, "Assalamu alaykum," which means peace be upon you,
18   correct?
19   A.   Yes, sir.
20   Q.   And then you say, "Waalaykum," which means and upon you?
21   A.   Yes, sir.
22   Q.   And then this -- we've established that's a foreign
23   language, correct?
24   A.   Yes, sir.
25   Q.   And this you've learned from your investigations in the
```

1    past?

2    A.   Yes, sir.

3    Q.   On the first page of the transcript, it's all you and the

4    CHS talking, right?

5    A.   Yes, sir.

6    Q.   Is there anybody else on the phone at this time?

7    A.   No, sir.

8    Q.   And then on page two of that transcript, we say -- the CHS

9    says to you, "okay, um."

10             MR. GEORGE TRAGOS:  Can I have the screen up.

11   BY MR. GEORGE TRAGOS:

12   Q.   You have the transcript there.  Can you see that, as well?

13   A.   Yes, sir.

14   Q.   Okay.  "Okay, um, I need to, um, get to the business

15   again.  I'm sorry, the last time I wasn't in town."

16             THE COURT:  I'm sorry.  Can you pick that microphone

17   up and put it on those books?  Not that one.

18   BY MR. GEORGE TRAGOS:

19   Q.   Okay.  "I'm sorry.  The last time I wasn't in town."

20        Do you see that?

21   A.   Yes, sir.

22   Q.   What was he referring to by the last time he wasn't in

23   town?

24   A.   Referring to the December the 5th meeting.

25   Q.   Okay.  "And if you can help me a little bit, I've got, uh,

1    a brother Abdul, um, he wants to -- to work in the same area.

2    He wants probably -- he needs some help so we can put him in

3    the business so he can, uh, make some money.  It sucks these

4    days for everybody."

5        Do you see that?

6    A.   I see that.

7    Q.   Now, earlier you testified that this conversation is about

8    Sami Osmakac buying guns, right?

9    A.   Yes, sir.

10   Q.   So that's how he's going to make money?

11   A.   No, sir.  We were speaking in code.  It was just so --

12   because we're all speaking on the telephone.  He didn't want

13   to -- he -- Mr. Osmakac didn't trust the telephone.  It would

14   have been foolish for the CHS in front of Mr. Osmakac to say,

15   guns, I want to buy guns, I want to buy guns to go shoot and

16   kill people.  That would not have been something that Mr.

17   Osmakac would have been -- would have said in that particular

18   instance because Mr. Osmakac was there.

19   Q.   Didn't you just tell us that you had no idea what you were

20   going to talk about on December 19th?

21   A.   I did say that.

22   Q.   So now you're saying you know about a code you're using?

23   A.   I say if someone calls you and starts speaking in code,

24   right away you understand that there's a reason that they're

25   speaking in code.  Would I break that code?  Why would I break

1    that code?

2    Q.   So just by hearing this right here, you know he's talking

3    in code?

4    A.   Yes, sir.

5    Q.   Okay.  And then later on the CHS says, "You can talk to

6    him, yeah, yeah, I mean, I have no problem.  I need to -- he

7    has a car.  He can just know -- take some flags and braces and,

8    you know, go up to the store, by some store and make -- my

9    store and make some money."  Code again, right?

10   A.   Yes, sir.

11   Q.   Okay.  Now, you know the CHS -- his store sells flags,

12   right?

13   A.   Yes, sir.

14   Q.   And then on page three, the --

15            MS. SWEENEY:  Your Honor, I'm sorry.  I'm going to

16   object to the use of the highlighting on the transcript.

17   BY MR. GEORGE TRAGOS:

18   Q.   Is this funny, Agent?  Do you think this is funny?

19   A.   I think what Ms. -- the interaction that you just had with

20   the prosecutor, I thought that was interesting.

21   Q.   Then Mr. Osmakac gets on the phone on page three, correct?

22   Is that correct?

23   A.   I'm looking for what you're saying.  Is that page three?

24   Yes, sir.

25   Q.   Before this, he was not on the phone, was he?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   A.    No, sir.

 2   Q.    And the CHS gave him the phone?

 3   A.    Yes, sir.

 4   Q.    So the CHS -- so Mr. Osmakac couldn't hear what you were

 5   saying, right?

 6   A.    I gather not.  I don't -- I wasn't with the CHS and Mr.

 7   Osmakac, so I couldn't tell you that.

 8   Q.    So then he says, "Yeah, I'm looking for some work, God

 9   willing."  Do you see that?

10   A.    Yes, sir.

11   Q.    But that's code, too, right?

12   A.    Yes, sir.

13   Q.    This is page four of the transcript.  Mr. Osmakac is

14   speaking.  "So we can talk about the work and how much you guys

15   want to pay me, you know what's going on, God willing."  Code,

16   right?

17   A.    Yes, sir.

18   Q.    So Mr. Osmakac doesn't need a job, right?

19   A.    I don't know whether Mr. Osmakac needed a job or not, sir.

20   Q.    Well, you must know because he's speaking in code that he

21   doesn't need a job because he's telling you he needs a job and

22   it doesn't mean he needs a job?

23   A.    I know I wasn't supposed to be providing Mr. Osmakac a

24   job, so I can tell you.  So I don't know whether or not Mr.

25   Osmakac needed a job or not.
```

1    Q.   Okay.  Now, on page four, Mr. Osmakac gives the phone --

2    in fact, you tell him to give the phone to the confidential

3    human source, right?

4    A.   Yes, sir.

5    Q.   And that's what CHS stands for, right, confidential human

6    source?

7    A.   Yes, sir.

8    Q.   And what does UCE stand for?  That's you, right?

9    A.   Yes, sir.  Undercover employee.

10   Q.   Speaking of employee, the confidential human source, did

11   he get paid by the FBI?

12   A.   You'd have to ask someone else.  I didn't pay him.

13   Q.   I'm not asking whether you paid him.  Do you know whether

14   he got paid or not?

15   A.   I don't know that.  You'll have to ask somebody who did.

16   Ask the case agent.

17   Q.   You never had conversations --

18   A.   I did not -- no.  I did not run the confidential human

19   source.

20   Q.   And you never heard anything about him getting paid,

21   right?

22   A.   I did not run the confidential human source.

23   Q.   That's not my question.

24        MS. SWEENEY:  Your Honor, I object.  The question

25   called for hearsay.

```
1              THE COURT:  Overruled.
2    BY MR. GEORGE TRAGOS:
3    Q.   Did you hear at anytime that he got paid?
4    A.   I believe I might have.  Yes, sir.
5    Q.   Oh.
6              THE COURT:  Mr. Tragos, do you have --
7              MR. GEORGE TRAGOS:  Yes.  I apologize, Your Honor.
8    BY MR. GEORGE TRAGOS:
9    Q.   And now he gives the phone back -- Mr. Osmakac gives the
10   phone back to the confidential human source, correct?
11   A.   Yes, sir.
12   Q.   And then at the bottom it says, "Well, I know, I am so
13   sorry.  We met there after that and I can explain to you
14   exactly what happened on that day.  But honestly" -- by the
15   way, what day is he talking about there?
16   A.   December 5th.
17   Q.   "I feel so bad for the brother.  He is by himself now.
18   He's depending on himself.  I'm going to give him one more
19   shot.  Um.  You don't have to waste your time, honestly.  Um.
20   I have to be there.  I'll have to be there.  But, um, you know,
21   I straighten it up with you.  I told you what happened that
22   night so he's -- he -- he wants to make a living, too."
23   Talking about code there?
24   A.   Yes, sir.
25   Q.   So wants to make a living means give me a bomb?
```

```
1    A.    I don't know if it means give me a bomb, sir.
2    Q.    Where's the code words?  I want to understand the code,
3    too.
4    A.    I couldn't -- I couldn't point out a code word to you,
5    sir.  I can tell you that in that conversation that I was not
6    getting Mr. Osmakac a job.
7              THE COURT:  Well, what does the conversation mean in
8    code?
9              THE WITNESS:  We are discussing the fact -- all that
10   I knew that I was supposed to by Mr. Osmakac is I was the guy
11   looking for guns.
12             THE COURT:  No.  My question is that conversation
13   translated in code, or out of code into English?
14             THE WITNESS:  The only way I could translate that
15   conversation is that in this particular instance that he
16   wants -- Mr. Osmakac wants to meet with me again to discuss
17   whatever it was that we didn't discuss on December the 5th.
18   That's how I understood that -- that's what I understood that
19   to mean.  He wants to meet again to discuss whatever we failed
20   to discuss on December the 5th.  That was the gist of that
21   entire conversation.
22   BY MR. GEORGE TRAGOS:
23   Q.    Not once in this conversation does Mr. Osmakac refer to
24   December 5th, does he?
25   A.    No, sir.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Q.   Only the CHS talks about December 5th, right?

2    A.   I believe later on in that conversation, Mr. Osmakac says

3    that when I meet you in person, I can explain what happened.

4    Q.   I'm asking you, anywhere in this conversation does Mr.

5    Osmakac make any reference to not meeting you on December 5th?

6    A.   Does he say the date, December the 5th?  No, sir.

7    Q.   How about the last time?  Just like we heard what the CHS

8    said, I'm sorry about the last time, did Mr. Osmakac ever say

9    anything like that?

10   A.   I think at the end -- I think at the end of that

11   conversation -- at the end of that conversation or the end of

12   that conversation, there's something -- there's something

13   referenced in that.  If you look at the end of the

14   conversation, the interaction between myself and Mr. Osmakac, I

15   think you might see that.

16   Q.   The jury will have the transcript.  They'll be able to see

17   your code, too, right?

18   A.   Are you asking me a question?

19   Q.   Yes.  Will they be able to see your code in this?

20   A.   I don't know.

21   Q.   Prior to December 19th, 2011, how many times did the CHS

22   meet with Sami Osmakac?

23   A.   I don't know.

24   Q.   How many times did the CHS talk to Sami Osmakac?

25   A.   Again, I don't know.

```
1    Q.   After December 9th, did you have any operational meetings
2    or operational phone calls with any agents from the Tampa
3    Division?
4    A.   Yes, I did.
5    Q.   Who did you -- did you meet with them physically or did
6    you have phone calls?
7    A.   I believe probably both.
8    Q.   And at those meetings, the operational meetings --
9    A.   Yes, sir.
10   Q.   -- is there a plan for what's going to happen next as the
11   case developed?
12   A.   Yes, sir.
13   Q.   Is that developed by the agents talking with each other,
14   kind of a give and take, throwing around ideas and then finally
15   coming up with an agreement?
16   A.   Yes, sir.
17   Q.   Who is in charge at those meetings?
18   A.   I don't know who's in charge of the meetings.  It's a
19   gathering of individuals.
20   Q.   I mean, is there one person and if there's a conflict, his
21   word is law and this is the way you're going to do it?
22   A.   I suppose there should be, yes.
23   Q.   Okay.  At these meetings for this case, who was that
24   person?
25   A.   I don't know.  I can't answer that question because I
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    don't know.

2    Q.    All right.

3          Do you listen to what's being said at these meetings?

4    A.    Yes, sir, I do.

5    Q.    And does everything said in these meetings, do you

6    consider everything that's said in these meetings?

7    A.    Do I personally consider them or --

8    Q.    Yes.  Do you consider what people are saying at these

9    meetings?

10   A.    Yes, sir.

11   Q.    And when you develop how you're going to conduct

12   yourself --

13   A.    Yes, sir.

14   Q.    -- when you are with the target of your investigation --

15   in this case, by the way, the target of your investigation was

16   Sami Osmakac, correct?

17   A.    Yes, sir.

18   Q.    And when you decide how you're going to act with Mr.

19   Osmakac and that, you take into consideration what the agents

20   are telling you, don't you?

21   A.    Yes, sir.

22   Q.    When was the next time that you met with Sami Osmakac?

23   A.    After the first time that I met him?

24   Q.    After the first meeting, correct.

25   A.    The first meeting was on December the 21st.  The next time

```
 1  after that was December the 23rd.
 2  Q.   I believe the first -- right.  The first meeting was the
 3  21st.  Did you meet with him on that first meeting on the 21st?
 4  I sorry.  I may have misspoke.
 5       You have a phone call on the 19th, right?
 6  A.   Yes, sir.
 7  Q.   And you had a meeting on the 21st?
 8  A.   Yes, sir.
 9  Q.   On the 19th phone call, did you set the date for a meeting
10  on the 21st?
11  A.   No, sir.
12  Q.   How did you know about a meeting on December 21st?
13  A.   I set up a meeting between myself and Mr. Osmakac through
14  the CHS.
15  Q.   Okay.  So the CHS set it up?
16  A.   Yes, sir.
17  Q.   And did you talk to the CHS directly or were you told this
18  by the case agent?
19  A.   I'm not sure.  One of those ways is the way it occurred.
20  I'm not sure which one.
21  Q.   Was there a face-to-face meeting?
22  A.   With the Defendant?  Yes.  It was a face-to-face meeting.
23  Q.   And this meeting took place on the 21st of December 2011,
24  correct?
25  A.   Yes, sir.
```

```
1    Q.   And did you -- when did you come in town for that?
2    A.   I'm not sure.  A day prior, maybe, maybe the same day.
3    I'm not sure.
4    Q.   Was this recorded?
5    A.   The meeting between myself and the Defendant?  Yes, it
6    was.
7    Q.   And where was the recorder?
8    A.   In the vehicle.
9    Q.   In the vehicle?
10   A.   Yes, sir.
11   Q.   Okay.  Was this vehicle a vehicle you brought with you or
12   was it one already all set up for you?
13   A.   It was a vehicle that was here.
14   Q.   Okay.  This is the same vehicle you used throughout this
15   process, correct?
16   A.   Yes, sir.
17   Q.   Do you remember this meeting?
18   A.   Yes, sir.
19   Q.   Were you told the location?
20   A.   Yes, sir.
21   Q.   And where that was location?
22   A.   We were to meet at the parking lot of Sligh Mosque.
23   Q.   And who told you that?
24   A.   Between the case agents?  More than likely, I would gather
25   the case agents.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   Q.   And did you -- when you arrived there, did you see Mr.

2   Osmakac?

3   A.   No, sir.

4   Q.   He hadn't come yet?

5   A.   No, sir.

6   Q.   How long before he got there?

7   A.   I'm not sure.

8   Q.   How did he get there?

9   A.   He came in the vehicle of the CHS.  The CHS was driving.

10  Q.   So the CHS drove him to the meeting?

11  A.   Yes, sir.

12  Q.   And when he got out of the car, had you -- and according

13  to your story, you had met the CHS before, right?

14  A.   Yes, sir.

15  Q.   That's your cover story?

16  A.   Yes, sir.

17  Q.   And the CHS, when he got there, did he say anything to

18  you?

19  A.   Hello.

20  Q.   He did?

21  A.   I'm guessing.

22  Q.   You don't remember?

23  A.   He pulled up -- his vehicle pulled up next to mine.  The

24  Defendant got out and got into my vehicle.

25  Q.   You don't remember any greetings between you and the CHS?

```
 1    A.    There might have been.

 2              MR. TRAGOS:  May I speak to the prosecutor for a

 3    second, Your Honor?

 4              THE COURT:  Yes, sir.

 5              (Brief Pause.)

 6    BY MR. GEORGE TRAGOS:

 7    Q.    Agent, let me -- first of all, do you remember when you

 8    turned on the recording device?

 9    A.    I remember turning on the recording device.

10    Q.    And was that device on when you were driving the vehicle?

11    A.    Possibly.

12    Q.    Would a record of the -- of that audio help you remember?

13    A.    Yes, sir, it would.

14              (Brief pause.)

15              THE COURT:  Which transcript are you handing him?

16              MR. GEORGE TRAGOS:  Your Honor, it's not in evidence.

17    It's just to refresh his recollection.

18              THE COURT:  All right.

19    BY MR. GEORGE TRAGOS:

20    Q.    Does that refresh your recollection?

21    A.    Yes, sir.

22    Q.    So the audio was on when you were driving?

23    A.    Yes, sir.

24    Q.    And so when you pulled into the Mosque, the video and

25    audio were already running?
```

```
 1   A.    Yes, sir.

 2   Q.    Now, let me show you 109-B.

 3         That is the transcript, correct, that you already

 4   identified?

 5   A.    Yes, sir.

 6   Q.    And you already said this is a transcript of your meeting,

 7   correct?

 8   A.    Yes, sir.

 9   Q.    Is there any voice on there other than Mr. Osmakac and

10   yours?

11   A.    Not on this transcript, no, sir.

12   Q.    Do you think there's another transcript?

13   A.    The one that you just showed me was different than this

14   one, wasn't it?

15   Q.    Okay.  I'll let you compare and you'll understand.

16   A.    Okay.

17             (Brief Pause.)

18   Q.    Does that make it clear to you?

19   A.    Yes, sir.

20   Q.    You did check these transcripts, right, and compare them

21   to the audio?

22   A.    I didn't check the one that you have here.  I checked this

23   transcript.

24   Q.    And the one that I showed you only has the part about the

25   navigation on it, correct?
```

1    A.    It has -- that's the -- that's what -- it has more than

2    this one.

3    Q.    Okay.  Otherwise --

4              THE COURT:  I'm sorry.  The record is not going to

5    mean anything when the parties say this one and that one.  It

6    needs to be identified by a number even if it's not admitted.

7    BY MR. GEORGE TRAGOS:

8    Q.    108 --

9              THE COURT:  I'm sorry.  So to the witness, which one

10   did you not review?

11             THE WITNESS:  I don't know the number on it.  The one

12   that defense counsel has is the one -- I did not review that

13   one.  The one that I reviewed is the one sitting in front of me

14   because it has my markings on it.

15             THE COURT:  Which exhibit number is in front of you?

16             THE WITNESS:  It's 109-B.

17             THE COURT:  And what is the number of the one you

18   showed him?

19             MR. GEORGE TRAGOS:  Your Honor, it is a broader

20   transcript, not one that's in evidence.

21             MS. SWEENEY:  Your Honor, may we approach sidebar

22   briefly?

23             THE COURT:  No.

24   BY MR. GEORGE TRAGOS:

25   Q.    So on the transcript -- you have 108?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   A.    Yes, sir.
 2   Q.    The confidential human source does not appear, correct?
 3   A.    No, sir.  109-B?
 4   Q.    Yes.
 5   A.    Yes, sir.
 6   Q.    And 109-B you did check with the audio?
 7   A.    Yes, sir, I did.
 8   Q.    Okay.  You remember the confidential human source being on
 9   the audio you checked?
10   A.    On 109-B?
11   Q.    Yes.
12   A.    He was on there later -- later part of the transcript, he
13   was.
14   Q.    The later part but not in the beginning?
15   A.    Not in the very beginning, no.
16   Q.    The confidential human source pulls up next to you?
17   A.    Yes.
18   Q.    And then the -- Mr. Osmakac gets out of the car.  Which
19   side of your car did he pull up to?
20   A.    I can't recall exactly.
21   Q.    Well, didn't Mr. Osmakac have to walk around the
22   confidential human source's car to get into your car?
23   A.    I can't recall exactly.  I could tell you that he got out
24   of the passenger's side of Mr. -- of the CHS's vehicle and got
25   into the passenger's side of my vehicle.  I can tell you that
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1  because he wasn't driving that vehicle.

2  Q.   So Mr. Osmakac gets out of the passenger's side of the

3  confidential human source's vehicle?

4  A.   Yes, sir.

5  Q.   And gets into your vehicle?

6  A.   Yes, sir.

7  Q.   Now, on page five of the transcript, you tell Mr. Osmakac,

8  "Something that's expensive.  If you guys have the money, if

9  you, if you, uh."  Then Mr. Osmakac says, "He said he'll take

10 care of it.  That's all he told me."  Who's the he there?

11 A.   I believe Mr. Osmakac, the Defendant, was referring to the

12 CHS.

13 Q.   So he's telling you that the confidential human source

14 said he would take care of it, that's all he told me.  Are they

15 talking about paying for what you're selling?

16 A.   Yes, sir.

17 Q.   Are they talking in code there?

18 A.   They weren't talking about flags, sir.

19 Q.   Were they talking in code?

20 A.   We had spoken about explosives and guns that the Defendant

21 wanted at that -- during that conversation, so it was very

22 clear what we're talking about.

23 Q.   They weren't talking in code, were they?

24 A.   Again, we already expressed that he wanted --

25          THE COURT:  That's a yes or no question.  Are they

```
 1   talking in code?
 2              THE WITNESS:  No.
 3   BY MR. GEORGE TRAGOS:
 4   Q.    Then you say, "I'll have to try -- I'll have to try and do
 5   something that's, um, some high explosives, some really high
 6   explosive stuff.  That's not easy to get stuff like that, you
 7   know.  It costs you to get it, people to get it.  Have you --
 8   do somebody that's in the business, you know?  Yeah."  Then you
 9   say, "Lot of stuff.  It's kind of controlled."
10        You're not talking in code there, are you?
11   A.    We're talking about explosives.
12   Q.    Explosives?
13   A.    Yes, sir.  I said explosives a few times in there.
14   Q.    Then if you'll look here, "I don't know nothing about
15   price.  He said he was gonna take care of everything."  Do you
16   see that?
17   A.    Yes, sir, I do.
18   Q.    And again, we're speaking about the CHS, aren't we?
19   A.    I believe so, yes, sir.
20              (Brief pause.)
21   BY MR. GEORGE TRAGOS:
22   Q.    Page 10 of the transcript.  "Okay, okay, we'll work it
23   out.  I'm talk to -- I'll talk to the brother."  That's you
24   talking, right?
25   A.    Yes, sir.
```

1    Q.    And who are you talking about there?

2    A.    The CHS, I believe.

3    Q.    Now, you testified that on December 19th, the last -- the

4    meeting we've just been talking about --

5    A.    That's not the meeting we're talking about, sir.

6    Q.    Excuse me.  That wasn't the 19th?

7          THE COURT:  Twenty-first.

8    BY MR. GEORGE TRAGOS:

9    Q.    I'm sorry, the 21st, December 21st.  You testified that

10   you didn't ask him for his plan or to explain everything

11   because you want to avoid being revealed as law enforcement; is

12   that right?

13   A.    Yes, sir.

14   Q.    When was the next meeting that you had after

15   December 21st, right, after December 21st?

16   A.    December the 23rd.

17   Q.    And did you have an operational meeting before that?

18   A.    Yes, sir.

19   Q.    Where was the operational meeting?

20   A.    At the field office.

21   Q.    Do you know when it was.

22   A.    No, sir, I couldn't tell you.

23   Q.    And during that operational meeting, did you talk about

24   what the plan was going to be?

25   A.    Yes, sir.

```
1    Q.   Did you get together with other agents again?

2    A.   Yes, sir.

3    Q.   Did you take into account everything they said?

4    A.   Yes, sir.

5    Q.   How was the meeting arranged for December 23rd?

6    A.   Through the CHS.

7    Q.   And how did that -- did you talk to the CHS?

8    A.   I couldn't tell you whether it was me or someone that was

9    part of that investigative team, but someone spoke to the CHS,

10   set up the meeting, and I knew where to go.

11   Q.   Did you take that same car?

12   A.   Yes, sir, I did.

13   Q.   Where did you go?

14   A.   I went to the CHS's store.

15   Q.   And were you wearing any recording devices?

16   A.   I had recording devices with me.

17   Q.   It wasn't on your body?

18   A.   I had recording devices with me.

19   Q.   Was it on your body?

20   A.   I didn't have one on my body.

21   Q.   Okay.  Did you carry it in?

22   A.   Yes, I did.

23   Q.   Okay.  And was there a camera?

24   A.   Yes, there was.

25   Q.   And was -- is there a video of this meeting?
```

```
 1   A.    Yes, there was.

 2   Q.    So you went to the store.  You walked in?

 3   A.    Yes, sir.

 4   Q.    About what time?

 5   A.    Late morning.

 6   Q.    And what was your purpose for going there?  Was it to meet

 7   Sami Osmakac?

 8   A.    Yes, sir.

 9   Q.    All right.

10         Whose store was it?

11   A.    It was the CHS's store.

12   Q.    Who was in there?

13   A.    The CHS, Mr. Osmakac, the Defendant.

14   Q.    Anybody else?

15   A.    Yes, sir.

16   Q.    Who else?

17   A.    People that were either working or shopping at the store.

18   I don't know who those individuals were.

19   Q.    Any agents?

20   A.    No, sir.

21   Q.    Before you went into this, I would think that for your own

22   safety, you probably did some -- got some background on Mr.

23   Osmakac, didn't you?

24   A.    Yes, sir.

25   Q.    And did you determine when you did that background how
```

1  long Mr. Osmakac had been under surveillance?

2  A.    Yes, sir.

3  Q.    How long had he been under surveillance?

4  A.    For quite awhile.

5  Q.    A year?

6  A.    I'm not sure, sir.  I know it's quite awhile.

7  Q.    And by surveillance, he's being watched by the FBI, right?

8  A.    Yes, sir.

9  Q.    And I want to make sure we're not -- we're not saying a

10  matter of weeks or months, but much longer than that, right?

11  A.    It depends upon what -- the answer depends on what you're

12  asking.  After the Defendant -- after your client went and

13  tried to purchase guns from drug dealers, at that point, there

14  was a physical surveillance on him.  At that point, I know that

15  there was a physical surveillance on him.

16          MR. GEORGE TRAGOS:  Approach the bench, Your Honor?

17          THE COURT:  Can you just answer the question.  Had he

18  been watched for more than a couple of weeks by any type of

19  surveillance before the 23rd?

20          THE WITNESS:  Yes.

21          MR. GEORGE TRAGOS:  Your Honor, can we approach

22  sidebar?

23          THE COURT:  Yes.

24          (Thereupon, the following discussion was had at

25  sidebar:)

1          MR. GEORGE TRAGOS:  I'd like to move for a mistrial

2    based on the unresponsive answer that the witness -- I asked

3    him how long he had been under surveillance.  His answer was,

4    well, after he had been trying to buy the guns from drug

5    dealers.  So that's totally unresponsive to the question.  And

6    that's actually not even true because he knows he was under

7    surveillance even before that.  But, Your Honor, I think that's

8    such an outrageous statement that it cannot be cured, and I

9    would move for a mistrial.

10         MS. SWEENEY:  Your Honor, Mr. Tragos has been asking

11   the agent about how long Mr. Osmakac was under investigation

12   and what kinds of surveillance he was under.  I think the agent

13   was just answering what he knew about when that started.

14         THE COURT:  The motion for a mistrial is denied.  As

15   I recall it on the audio and video transcript we've already

16   seen, Mr. Osmakac mentions going to try to buy guns from drug

17   dealers.  So I don't know how the agent's mentioning that he

18   was under surveillance after having done that so taints the

19   proceedings as to render a mistrial.

20              (Thereupon, the sidebar conference was concluded.)

21              We're going to go ahead and take the afternoon break.

22   It sounds like a little bit longer than 15 minutes.  But plan

23   to be back within 15 minutes.  It may be a little bit later

24   than that.

25              (Jury excused.)

```
 1              Does anybody have the view that this motion needs to
 2    be heard at sidebar or just outside the presence of the jury?
 3              MR. GEORGE TRAGOS:  I'm sorry, Your Honor?
 4              THE COURT:  Does anybody have the view that this
 5    motion needs to be heard at sidebar or just outside the
 6    presence of the jury?
 7              MR. GEORGE TRAGOS:  Well, I think, Your Honor, that
 8    probably the witness should -- needs to be excused.
 9              THE COURT:  All right.
10              We'll need to close the courtroom for at least a few
11    moments to excuse the witness.
12              (Witness excused.)
13              And the parties are all right with opening the
14    courtroom during this proceeding?
15              MR. GEORGE TRAGOS:  Yes, Your Honor.
16              MS. SWEENEY:  Yes, Your Honor.
17              THE COURT:  Please reopen the courtroom.
18              Yes, sir.
19              MR. GEORGE TRAGOS:  Okay.  Your Honor, I might be
20    wrong, but I don't think that this has come before the jury
21    that he went to buy guns from drug dealers.
22              THE COURT:  It did.  He testified -- he stated this
23    on one of the recordings we listened to that he was down in
24    some part of south St. Pete to try to buy guns or -- and the
25    FBI started watching him and they saw what he was doing and
```

1    they trailed him.  That's my memory of what was said.

2              MR. GEORGE TRAGOS:  Excuse me.

3              MS. SWEENEY:  I'm trying to locate it, Your Honor.

4    It is in here.

5              THE COURT:  In any event --

6              MR. GEORGE TRAGOS:  While she's looking, this answer

7    was a deliberate attempt to circumvent this case.

8              THE COURT:  No, it wasn't, Mr. Tragos.

9              MR. GEORGE TRAGOS:  Your Honor --

10             THE COURT:  The witness answered the question you

11   asked, how long had he been under surveillance.  And then you

12   said, well, let's just be clear.  It's been more than just a

13   few days or so.  And then the witness says, well, it depends on

14   what type of surveillance you mean; direct surveillance?  If

15   it's direct surveillance, that physical surveillance began when

16   the witness testified the Defendant tried to buy guns from drug

17   dealers.

18             MR. GEORGE TRAGOS:  Okay.  Your Honor, he had been

19   under surveillance obviously before that because this man had

20   come down here before that.  That's why he came down.  He had

21   already been under surveillance.  He shot this in there, this

22   was in the middle of surveillance because he had already been

23   under surveillance for months before --

24             THE COURT:  The motion for mistrial on that ground is

25   denied.  I don't believe this was a deliberate attempt to

1   conceal the length of the surveillance, if that is your

2   contention.

3           Did you find that part of the transcript?

4           MS. SWEENEY:  I did, Your Honor.  It's Government's

5   Exhibit 111-B, page 18.  Do you have that one, the trial

6   exhibit?

7           THE COURT:  One second.  Let me find it.

8           MR. GEORGE TRAGOS:  I don't have the trial exhibit.

9           MS. SWEENEY:  I'll just put it on the screen.  Your

10  Honor, I'll put my version on the screen.  As a matter --

11          THE COURT:  One second.

12          MS. SWEENEY:  I'm sorry.

13          (Brief Pause.)

14          THE COURT:  Go ahead.

15          MS. SWEENEY:  I think there's actually another

16  reference, as well, Your Honor.  I'm asking the agent to look

17  for it.  But on 111-B on the bottom of page 18, the Defendant

18  says, "'Cause I was looking.  Matter of fact what might have --

19  what might put me on their list is I went downtown south St.

20  Pete and I talked to some drug dealers.  And an infidel came.

21  I caught him filming us from behind me.  He was working in the

22  business next to me.  There was an informant, so I went to

23  another place.  And I think the other place had bodies but they

24  could only get one.  The place before somebody I think took my

25  tag or something."

```
 1              Do you want me to continue?
 2              THE COURT:  No.
 3              Anything else, Mr. Tragos?
 4              MR. GEORGE TRAGOS:  No, Your Honor.  That doesn't say
 5    buy guns from drug dealers.
 6              THE COURT:  All right.
 7              The motion for a mistrial is denied.  Are you
 8    requesting any special instruction to the jury on account of
 9    the testimony involving surveillance?
10              MR. GEORGE TRAGOS:  Yes, Your Honor.
11              THE COURT:  What is the instruction you request?
12              MR. GEORGE TRAGOS:  To disregard the witness' last
13    answer.
14              THE COURT:  Well, the last answer was in answer to
15    the Court's question.  It was yes.  It was the next to the last
16    answer.  So do you want me to repeat it and tell them to
17    disregard it or do you want me to --
18              MR. GEORGE TRAGOS:  If the Court has it there, could
19    the Court repeat the question, too, that I asked him?
20              THE COURT:  The question was:  "And I want to make
21    sure we're not saying a matter of weeks or months but longer
22    than that, right?"
23              "Answer:  Depends on -- the answer depends on what
24    you're asking.  After the Defendant -- after your client went
25    and tried I think to purchase guns from drug dealers, at that
```

```
 1    point, there was a physical surveillance on him, at that point,
 2    and there was a physical surveillance."
 3              MR. GEORGE TRAGOS:  All right.
 4              And the Court asked him --
 5              THE COURT:  And the Court's question was:  "Can you
 6    just answer the question.  Had it been watched for more than a
 7    couple of weeks by any type of surveillance before the 23rd.
 8              "Answer:  Yes."
 9              MR. GEORGE TRAGOS:  Okay.  I'd ask that the Court
10    have the jury disregard the witness' next to last answer, I
11    guess.
12              THE COURT:  And they're disregarding it because why?
13              MR. GEORGE TRAGOS:  Because it's not responsive to
14    the question.
15              THE COURT:  Ms. Sweeney?
16              MS. SWEENEY:  Okay.  Your Honor, I think the witness
17    is answering the question as best he could as to when he was
18    aware the physical surveillance of the Defendant started.  I
19    mean, this agent -- all I can say is this agent didn't conduct
20    physical surveillance of the Defendant, so I don't -- I don't
21    necessarily know that he knows anymore than what he answered.
22              THE COURT:  Well, the line of questioning is:  "And
23    before you went into this, I would think for your own safety,
24    you probably did some background on Mr. Osmakac, didn't you?
25              "Yes, sir.
```

1              "And did you determine when you did that background

2    how long he had been under surveillance?

3              "Yes, sir.

4              "How long had he been under surveillance?

5              "For quite awhile.

6              "Year?

7              "I'm not sure, sir.  I know it's quite awhile."

8              "And by surveillance, he's being watched by the FBI,

9    right?

10              "Yes, sir."

11              "And I want to make sure" -- and then this is when he

12    gets into this question about a matter of weeks.  So I don't

13    find the witness' answer to be nonresponsive and I don't see

14    anything wrong with the question.  And unless someone tells me

15    that the question was without basis, then I don't see anything

16    wrong with the answer.

17              We are in recess until 3:20.

18              (Brief recess.)

19              All right.

20              Are we ready to proceed?

21              MR. GEORGE TRAGOS:  Yeah.

22              THE COURT:  Please recall the jury.

23              THE BAILIFF:  Your Honor, do you want the courtroom

24    open?

25              THE COURT:  Yes.  You can bring them in.  That's

```
 1    fine.
 2              (Jury returned to the courtroom.)
 3              Counsel, you may continue.
 4              MR. GEORGE TRAGOS:  Thank you, Your Honor.
 5    BY MR. GEORGE TRAGOS:
 6    Q.   Agent, on December 23rd, 2011, you again met with the
 7    Defendant, Sami Osmakac, correct?
 8    A.   Yes, sir.
 9    Q.   Prior to that, did you have another meeting with local
10    agents to strategize?  I think you have been calling them
11    operational meetings.
12    A.   Yes, sir.  You called them operational meetings, so go
13    ahead.
14    Q.   I thought you said they were operational meetings.
15    A.   You said it first.
16    Q.   What would you like to call them?
17    A.   Whatever you'd like to call it.
18    Q.   All right.
19         What are they called officially?
20    A.   Meetings.
21    Q.   Okay.  Meetings.  Did you have any meetings --
22    A.   Yes, sir.
23    Q.   -- with other agents --
24    A.   Yes, sir.
25    Q.   -- where you planned on how you were going to conduct the
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   next meeting with Mr. Osmakac?
 2   A.    Yes, sir.
 3   Q.    And that meeting was set up for December 23rd, 2011,
 4   correct?
 5   A.    Yes, sir.
 6   Q.    And how was that set up?
 7   A.    Through the CHS.
 8   Q.    Did you speak to the CHS before December 23rd, 2011, in
 9   any manner other than what you've already told us?
10   A.    It's possible.
11   Q.    Okay.  And what was the location?
12   A.    I said it's possible.  I'm not sure.
13   Q.    I'm sorry.  What was the location of the meeting?
14   A.    It was inside of my vehicle.
15   Q.    And where did you meet with the Defendant?
16   A.    I met him at the CHS's store.
17   Q.    Now, when you went into the store, did you have any
18   conversation with the CHS?
19   A.    Yes, sir.
20   Q.    What was your conversation with him?
21   A.    About goods that I had for sale.
22   Q.    And what kind of goods?
23   A.    Flags and other trinkets.
24   Q.    Legitimate things?
25   A.    Yes, sir.
```

1   Q.   I mean, he wasn't selling explosives or grenades out of

2   his store, was he?

3   A.   No, sir, he was not.  No.

4   Q.   Okay.  And you were the person that supplies stores with

5   legitimate goods, that was your cover?

6   A.   Yes, sir.

7   Q.   All right.

8        And about how long did you talk to the CHS before you

9   started talking to Mr. Osmakac?

10  A.   A few minutes.

11  Q.   Was Mr. Osmakac always present when you were talking to

12  the CHS?

13  A.   I don't know.  I couldn't tell you.  I wasn't watching Mr.

14  Osmakac.

15  Q.   Well, when did you first see him?

16  A.   When I walked in the store, he was there.

17  Q.   Okay.  And where was he while you were in the store?

18  A.   In the background.

19  Q.   When did he become someone that you focused on?

20  A.   I didn't focus on him in the store.  My focus was on the

21  CHS because that's who my interaction was with in the store.

22  Q.   Okay.  At some point, you left the store, didn't you?

23  A.   Yes, sir.

24  Q.   How did that happen?

25  A.   I concluded my transaction with the CHS.  I went to my

1    vehicle and I pulled up around, and the Defendant got into my

2    vehicle.

3    Q.   Did you see the Defendant leave the store?

4    A.   I saw him get into my vehicle.  He had to leave the store

5    to get into my vehicle.

6    Q.   I know that.  But did you actually see him leave the

7    store?

8    A.   Did I see him open the door?  Yes.  The front door to the

9    store, I pulled up right next to it.  He opened the front door

10   to the store, walked out the front door and directly into my

11   vehicle.

12   Q.   While you were in the store, did you have any contact with

13   Sami Osmakac?

14   A.   He was in the background.  I'm not sure.  I didn't direct

15   any conversation to Mr. Osmakac.  He was in the background.

16   Q.   So you had no conversation with him?

17   A.   No.  He was in the background.

18   Q.   Then when you pulled in front, all of a sudden he comes

19   out and gets in your car?

20   A.   Yes, sir.

21   Q.   And all of this, as far as you know, was arranged by the

22   CHS?

23   A.   Yes, sir.

24   Q.   Does Mr. Osmakac refer to the CHS as "brother"?

25   A.   Yes, sir.

1   Q.   Now, in your testimony earlier, you spoke about asking Mr.

2   Osmakac about whether he wanted a semiautomatic or a fully

3   automatic weapon, correct?

4   A.   Yes, sir.

5   Q.   And in this conversation on the 23rd of December, he

6   didn't answer you, did he?

7   A.   I'm not sure.  I'm not looking at it, but I don't think

8   so.  We discussed it again further.

9   Q.   You brought it up at a later time, didn't you?

10  A.   Yes, sir.

11  Q.   Because you wanted a decision from him.

12  A.   Yes, sir.

13  Q.   And you also talked to him about a vest.

14  A.   Yes, sir.

15  Q.   And did you bring the vest up?

16  A.   The Defendant did.

17  Q.   And what kind of a vest are we talking about?

18  A.   An explosives vest, a suicide vest.

19  Q.   That's the kind of vest that you were talking about that

20  day?

21  A.   Yes, sir.

22  Q.   Let me show you page three of Exhibit 111-B.

23  See where it says there, "Yeah.  Normally a clip gets us 25.

24  The thing is, most likely it's going to be me alone.  I don't

25  know how much time I'll have to reload it."

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1          Your answer, "Uh, yeah.  If I can see if I can get you a
 2   vest that's got magazines."
 3          That's a different kind of vest, isn't it?
 4   A.    Yes, sir.
 5   Q.    Let me show you Exhibit Number 4.  Do you see that, sir?
 6   A.    Yes, sir.
 7   Q.    Now, is that the kind of vest we're talking about?
 8   A.    In that particular instance, yes, sir.
 9   Q.    Again, I'm not talking -- we'll get to later
10   conversations.
11   A.    Yes, sir.
12   Q.    But I'm talking this conversation, that's what we're
13   talking about?
14   A.    In that particular instance and in that conversation,
15   that's what we're talking about.  Yes, sir.
16   Q.    Now, you also talked about some explosive devices in this
17   conversation, correct?
18   A.    Yes, sir.
19   Q.    And you tell him a price of $10,000, don't you?  Do you
20   remember that?
21   A.    If you show me where you're talking about, sir, I'll
22   answer you.
23   Q.    You don't remember?  You need to be refreshed?
24   A.    Show me where you're talking about.  Yes, sir.
25             (Brief pause.)
```

```
 1   BY MR. GEORGE TRAGOS:

 2   Q.   Page two, that same transcript.  Do you see that, sir?

 3   A.   Yes, sir.

 4   Q.   Does that refresh your recollection?

 5   A.   Yes, sir.

 6   Q.   But he tells you, do you know what an IED is?

 7   A.   Yes, sir.

 8   Q.   What's an IED?

 9   A.   An improvised explosive device.

10   Q.   And he tells you he wants an IED for like $5?

11   A.   That's not what he said, sir.

12   Q.   What did he say?

13   A.   If you can read his statement there.

14   Q.   Well --

15   A.   Show me his statement.  I can read to you exactly what he

16   said.

17   Q.   Well, do you have -- from your memory, do you know what he

18   said?

19   A.   From my memory, he said something about in Afghanistan or

20   overseas that they make IEDs for like $5.

21   Q.   So he was --

22   A.   Something to that effect.

23   Q.   Was that part of the negotiations?  In other words, was he

24   trying to get your price down?

25   A.   I don't know.  I don't -- I don't know.
```

```
 1              MS. SWEENEY:  Objection, Your Honor.  It's
 2   speculation.
 3              THE COURT:  Overruled as to speculation.
 4              THE WITNESS:  Do I think he was negotiating?  I don't
 5   know.  I don't know if he was negotiating or not.
 6   BY MR. GEORGE TRAGOS:
 7   Q.   Well, was he talking in code?
 8   A.   No, sir.
 9   Q.   Okay.
10   A.   He made a statement.
11   Q.   And then you talked to him about detonating devices,
12   didn't you?
13   A.   Where are you talking about, sir?
14   Q.   In that same conversation, did you speak about detonating
15   devices?
16   A.   I don't know.  Possibly.  You'd have to show me where
17   you're talking about.
18   Q.   "It depends.  I can do a cell phone, cell phone.  Yeah.
19   It has a trigger."
20              THE COURT:  What page are you on, for the record?
21              MR. GEORGE TRAGOS:  Page five, Your Honor.
22   BY MR. GEORGE TRAGOS:
23   Q.   Do you see that?
24   A.   Which -- could you point to the line that you're talking
25   about, sir?
```

1    Q.   Do you see that?

2    A.   Yes, sir.

3    Q.   So did you talk to him about the cell phone as a

4    detonating device?

5    A.   Yes, sir.  As a trigger.

6    Q.   As a trigger?

7    A.   That's not a detonating device.  A detonating device and a

8    trigger are two different things, right, sir?

9    Q.   Okay.  What's the difference so I'll know?

10   A.   A detonating device makes the thing explode.  A trigger is

11   what you flip to make the detonating device activate.

12   Q.   And in this case, you were telling him that you could do a

13   cell phone?

14   A.   Yes, sir.

15   Q.   In that same transcript, page five, Mr. Osmakac was

16   talking to you.  And he says, "As for the connection that's

17   going to pay, I'm going to try to meet him today and tell him,

18   see, what he's going to get when he's going to get the

19   withdrawal."

20        Do you see that?

21   A.   Yes, sir.

22   Q.   He's talking to you about the CHS there, isn't he?

23   A.   He tried -- he tried to mask what he's talking about

24   because at that point, if he was talking about the CHS, he

25   would have said the brother or made it a little bit more clear.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   But he didn't make it very clear in that particular
 2   conversation, in that particular instance.
 3   Q.   In your entire time with him in all the meetings you ever
 4   had with him, did he ever tell you anybody else was going to
 5   pay for this other than the CHS?
 6   A.   Fast forward?  No, sir.
 7   Q.   Fast forward?
 8   A.   No, sir.
 9   Q.   Always the CHS?
10   A.   Yes, sir.  The CHS and himself from the monies that he
11   earned.  He said that quite a few times, the monies that he
12   earned.
13   Q.   Who was he working for?
14   A.   He was working for the CHS.
15   Q.   So who was paying him?
16   A.   His salary, the money that he earned from working with the
17   CHS?
18   Q.   The CHS was giving him a salary, right?
19   A.   Yes, sir.
20   Q.   And the FBI was giving the CHS money, right?
21   A.   Yes, sir.
22   Q.   Thank you.
23        Page five, as well.  "And the black flag," do you see
24   that?
25   A.   Yes, sir.  On the bottom?
```

```
1   Q.    Yes.
2   A.    Where the Defendant says, "And the black flag"?
3   Q.    Yes.
4   A.    Yes, sir.
5   Q.    Did you sell black flags?  Was that part of like your
6   cover?
7   A.    I brought a black flag into the store with me and I showed
8   it to the CHS that day.
9   Q.    And what color was it?  I know this will be a redundant
10  question, but what color was it?
11  A.    It was black.
12  Q.    Solid?
13  A.    Yes, sir.
14  Q.    And anything else on it?
15  A.    No, sir.
16  Q.    No fringe, no -- nothing else on it?
17  A.    It was a black flag, sir.
18  Q.    This will be Defense Exhibit 1.  I ask you to take a look
19  at Defense Exhibit 1.
20  A.    Yes, sir.
21  Q.    What is that?
22  A.    That appears to be a black flag, sir.
23  Q.    Any fringe on it, writing or anything?
24  A.    Not that I can see.
25  Q.    Okay.  It's a solid black flag?
```

```
 1   A.   From this photograph, yes, sir.
 2   Q.   Okay.
 3           MR. GEORGE TRAGOS:  At this time, Your Honor, the
 4   defense would move Exhibit 1 into evidence.
 5           MS. SWEENEY:  No objection, Your Honor.
 6           THE COURT:  It will be received.
 7           (Thereupon, Defense Exhibit 1 was received and filed
 8   in evidence.)
 9   BY MR. GEORGE TRAGOS:
10   Q.   Is this similar to the flag that he was talking about in
11   the transcript?
12   A.   Similar.
13           MR. GEORGE TRAGOS:  Mark this as Defense Exhibit 2.
14   BY MR. GEORGE TRAGOS:
15   Q.   I'd ask you to take a look at Defense Exhibit 2.
16   A.   Yes, sir.
17   Q.   Do those, as well, appear to be black flags similar in
18   nature to the ones that you were selling, supposedly, and were
19   mentioned in the transcript?
20   A.   From this picture, it appears.  I couldn't say definitely.
21   It appears.  Yes, sir, it appears to be.
22           MR. TRAGOS:  Your Honor, we move Defense Exhibit 2
23   into evidence.
24           MS. SWEENEY:  No objection.
25           THE COURT:  It will be received.
```

1        (Thereupon, Defense Exhibit 2 was received and filed in

2   evidence.)

3   BY MR. GEORGE TRAGOS:

4   Q.    In your travels around Tampa, did you ever happen to go

5   down Highway 60?

6            MR. GEORGE TRAGOS:   Could we lower these lights for

7   just a second.

8            (Brief Pause.)

9            Thank you.

10  BY MR. GEORGE TRAGOS:

11  Q.    Did you happen to go by Highway 60?   There's a taco stand

12  there that has all these black flags on it.   Did you ever

13  happen to go by and see that?

14  A.    No, sir, I didn't.

15  Q.    Now, on this date, you also spoke to the Defendant about

16  whether he wanted high intensity or low intensity explosives?

17  A.    Yes.

18  Q.    Did the Defendant know what you were talking about?

19  A.    No, sir.

20  Q.    You had to explain it to him, didn't you?

21  A.    Yes, sir.

22  Q.    You had to explain the difference?

23  A.    Say that one more time.

24  Q.    You had to explain the difference?

25  A.    Yes, sir.

1   Q.   And the unique characteristics between low explosives and

2   high explosives?

3   A.   I was just making all that stuff up.  I did not know, but

4   yes, sir.

5   Q.   You were making it up as you were going along?

6   A.   Yes.  I'm not a munitions expert.

7   Q.   We saw you instruct him on how to make a bomb, how to put

8   a bomb together, how to assemble it, how to do all that stuff.

9   Were you making that up as you went along?

10  A.   Yes, sir.  I had someone show me how to put that stuff

11  together prior to meeting with the Defendant.  And when I met

12  with the Defendant, I just showed him what they -- what I was

13  showed.  But as far as the conversation between high explosives

14  and all of that, that was -- I was just making that stuff up as

15  I was going along.

16  Q.   Page nine of the transcript.  "So no tears, it rips, you

17  know.  Where low intensity pushes so it goes slower, so it

18  pushes, it knocks things down without breaking things up most

19  of the times."

20       Do you see that, sir?

21  A.   Yes, sir.

22  Q.   You made that up?

23  A.   Yes, sir.  My point was trying to identify what his target

24  was.

25  Q.   And the Defendant didn't go, you're a liar, that's not the

1    way it works, did he?

2    A.   No, sir.

3    Q.   He sat there and just listened to every word you said,

4    didn't he?

5    A.   Yes, sir.

6    Q.   Page 12 of that transcript.  "Yeah.  I'll talk to the guy,

7    God willing.  I'm not something that will make -- put you

8    under -- it is.  When he says, "I'll talk to the guy", who's he

9    referring to there?

10   A.   I'm not sure where we're at in that conversation.  Can --

11   can you just kind have -- can we see a little bit more so I

12   can -- I can actually try to figure out where we are in that

13   conversation?

14   Q.   Up or down, where would you like to go?

15   A.   See, I'm not sure where we're at in that conversation

16   where you're talking about.

17   Q.   Did he ever talk about any other guy other than the CHS

18   when he was talking to you?

19   A.   Yes, he has.

20   Q.   That he was involved with?

21   A.   Yes, sir.

22   Q.   That was going to give him any money?

23   A.   No, sir, not about money.  That particular vantage point

24   didn't say anything about money, though.

25   Q.   When you were meeting with the agents around

```
1    December 24th, which would be the day after this
2    December 23rd -- by the way, after you have these meetings with
3    the Defendant, would you then have like a follow-up meeting
4    with the agents?
5    A.   Yes, sir.
6    Q.   And would there be discussion there about what happened,
7    what the next step was going to be?
8    A.   Yes, sir.
9    Q.   Was there a concern at this meeting that you were only
10   going to be able to arrest Mr. Osmakac for an AK-47 charge and
11   not explosives?
12           MS. SWEENEY:  Your Honor, I object.  I think the
13   question calls for hearsay.
14           THE COURT:  One second.
15           (Brief pause.)
16           Sustained.
17   BY MR. GEORGE TRAGOS:
18   Q.   Were you part of a discussion where a concern -- where
19   there was a concern and that you were actually part of the
20   discussion about whether this would just be a gun charge or we
21   need to make it more of an explosives charge?
22           MS. SWEENEY:  Same objection, Your Honor.
23           THE COURT:  Same ruling.
24   BY MR. GEORGE TRAGOS:
25   Q.   Are you aware of any equipment malfunctions during the
```

1  course of the investigation?

2  A.    Yes, sir.

3  Q.    And what malfunctions are you aware of?

4  A.    The recorder in the back of my vehicle did not function.

5  Q.    When was that?

6  A.    On December the -- excuse me, on January the 7th, 2012.

7  Q.    Are you aware of any other malfunctions on December 24th,

8  2011?  You're not aware of any malfunctions that occurred on

9  December 23rd?

10  A.    I'm not sure.  There might have been.  I'm not sure.

11  Q.    Are you aware of any malfunctions that occurred in the

12  tape recordings where a part of the tape recordings were

13  erased?

14  A.    No, I'm not.

15  Q.    You're not sure?

16  A.    I'm not sure.

17  Q.    Are you aware of any situations during this investigation

18  where the wrong dates were placed on transcripts and

19  recordings?

20  A.    Again, I'm not sure.  I'm not --

21  Q.    Who would be sure of these things?

22  A.    Whoever was involved, the people that were investigating

23  the case.  My part was very limited.  I was undercover, brought

24  in from somewhere else.  It was not my case.  It was not my

25  investigation.

```
 1   Q.   Are you talking about the case agents would know?

 2   A.   I believe they should know.

 3   Q.   What's a finch?

 4            MS. SWEENEY:  Your Honor, I object.  I think that

 5   it's protected.

 6            THE COURT:  Sustained.

 7            MR. GEORGE TRAGOS:  Your Honor, may we have a

 8   sidebar?  The other word -- that word was never --

 9            THE COURT:  No.  Sustained.

10   BY MR. GEORGE TRAGOS:

11   Q.   Are you wear of a 7,000-dollar piece of gear that broke

12   during this investigation?

13   A.   I'm -- again, I'm not sure.  I'm not.  I'm not aware of

14   that.

15   Q.   Are you aware of an eraser -- an erase on a tape where the

16   confidential human source is giving Sami $500?

17            MS. SWEENEY:  Asked and answered, Your Honor.

18            THE COURT:  Sustained.

19   BY MR. GEORGE TRAGOS:

20   Q.   How many meetings did you have with the Defendant on

21   December 23rd, 2011?

22   A.   One meeting.

23   Q.   And that's the one that was recorded that we saw the

24   recording, right?

25   A.   Yes, sir.
```

1   Q.    No other meetings?

2   A.    No other meetings.

3   Q.    When was the next time that you met with the Defendant?

4   A.    January the 1st.

5   Q.    And how was that arranged?

6   A.    Through the CHS.

7   Q.    And the date, the time, the place, all that, the CHS?

8   A.    Yes, sir.

9   Q.    Again, when you came in town, you had your meeting, right,

10  with the agents?

11  A.    Yes.

12  Q.    And then you drove where to have the meeting with Mr.

13  Osmakac?

14  A.    To the CHS's store.

15  Q.    By the way, in your meetings with Mr. Osmakac, you had one

16  telephone call where the CHS placed the call, correct?

17  A.    I don't know.

18  Q.    I thought you told me that on December 19th, that there

19  was a phone call and the CHS called you and --

20  A.    Yes, sir.

21  Q.    All right.

22        So you had a phone call that the CHS plays, that's the

23  first time you --

24            THE COURT:  I'm sorry.  Mr. Tragos, you all need to

25  wait until the questions are completed until any response is

1    given so that you're not talking over each other and there's

2    not a break in the question and a partial answer.  So start

3    over from the beginning with the question.

4    BY MR. GEORGE TRAGOS:

5    Q.    The first contact with Sami Osmakac, December 19th,

6    telephone call placed by CHS, correct?

7    A.    Yes, sir.

8    Q.    Before that --

9             THE COURT:  Go to the microphone, please.

10   BY MR. GEORGE TRAGOS:

11   Q.    Before that, you met -- before that, you were supposed to

12   meet with him on December 5th, arranged by the CHS, but that

13   didn't happen, correct?

14   A.    Yes, sir.

15   Q.    After December 19th, you had a meeting on December 21st

16   with Sami Osmakac, and the CHS drove him there?

17   A.    Yes, sir.

18   Q.    And then on December 23rd, you have a meeting with Sami

19   Osmakac, and you meet at the store, the CHS's store?

20   A.    Yes, sir.

21   Q.    And without any conversation with Sami Osmakac, you pull

22   up to the store and he gets in your car?

23   A.    Yes, sir.  I didn't just pull up to the store, though.  I

24   went inside on that first date.

25   Q.    Right.  But I thought you said you pulled around and he

1    came out?

2    A.    Yes, sir.

3    Q.    So you pull around the store and Sami Osmakac comes out?

4    A.    Yes, sir.

5    Q.    You didn't tell him to come out?

6    A.    No, sir.

7    Q.    You didn't talk to him and say, hey, you coming out?

8    A.    No, sir.

9    Q.    He didn't tell you, hey, I'm coming out?

10              THE COURT:  Yes or no.

11              THE WITNESS:  No, sir.

12   BY MR. GEORGE TRAGOS:

13   Q.    The only person you remember talking to is the CHS?

14   A.    Yes, sir.

15   Q.    And now we're on January 1st, 2012.  Another meeting

16   arranged by the CHS, and the meeting starts out at the CHS's

17   store again, correct?

18   A.    Yes, sir.

19   Q.    And do you go in the store?

20   A.    I'm not sure if I went into the store this time.  I might

21   have.  I think I did.  Yes, sir, I went into the store.

22   Q.    And who did you talk to?

23   A.    More than likely the CHS.

24   Q.    Do you remember talking to Mr. Osmakac?

25   A.    No, sir, I don't.

```
 1   Q.    And then do you go outside and get back in your car again?
 2   A.    Yes, sir.
 3   Q.    Pull around again?
 4   A.    Yes, sir.
 5   Q.    And then Mr. Osmakac appears, correct?
 6   A.    Yes, sir.
 7   Q.    And gets in your car?
 8   A.    Yes, sir.
 9   Q.    And we saw that there was a tape and a transcript of this,
10   correct?
11   A.    Yes, sir.
12   Q.    During the entire course of this investigation, are you
13   ever aware that -- was the plan that Mr. Osmakac was not
14   supposed to get the money from the confidential source wherein
15   he would have a chance to walk away and not pay for the
16   explosives?
17   A.    I'm not exactly sure what you're asking me, sir.  Could
18   you clarify?
19   Q.    Sure.  Were you or were the -- was the FBI concerned so
20   that your actions resulted from this concern?
21             MS. SWEENEY:  Your Honor, I object.  I think that
22   question -- there's no predicate.
23             THE COURT:  Well, we don't have the question yet.
24   Let's wait until we have the question.
25   BY MR. GEORGE TRAGOS:
```

```
 1   Q.   During the course of this investigation, was it your

 2   intent to be sure that the money received by Sami Osmakac from

 3   the confidential human source went back to the FBI as opposed

 4   to Mr. Osmakac being able to walk off with it?

 5   A.   I'm not sure.  I'm not sure.

 6           THE COURT:  I don't understand.  You're not sure that

 7   that was ever your concern?

 8           THE WITNESS:  The way he phrased the question.

 9           THE COURT:  Was it ever your concern?

10           THE WITNESS:  Was it my concern?

11           THE COURT:  Yes.

12           THE WITNESS:  No.  No.

13   BY MR. GEORGE TRAGOS:

14   Q.   Were you ever directed to act in such a way so that didn't

15   happen?

16   A.   I'm not sure.  Honestly, I'm not sure.

17   Q.   Did Mr. Osmakac complain to you because the CHS was not

18   paying his salary?

19   A.   Mr. Osmakac informed me -- I don't know if he was

20   complaining, but he informed me that the CHS owed him some

21   monies for work that he had done.

22   Q.   But he had not paid him, correct?

23   A.   That hadn't been paid to him yet.

24   Q.   Did Mr. Osmakac ever express to you that sometimes he

25   feels like he's seven or eight years old?
```

1  A.   The Defendant stated that he remembers when he was seven

2  and eight years old.

3  Q.   Did he tell you he didn't feel any older than that?

4  A.   Yes, sir.  He did say that.

5  Q.   Now, on this January 1st, 2011 date, you told him that you

6  were going to explain to him how everything worked, right?

7  A.   Yes, sir, I did.

8  Q.   He didn't know how anything worked, did he?

9  A.   Yes, sir.

10 Q.   In fact, even though he told you that years before he had

11 shot an AK-47, he didn't even remember how to do it, did he?

12 A.   He's not sure -- yes, sir.  Yes, sir.

13 Q.   In fact, you asked him, do I need to show you or do you

14 remember, and he said, no, I don't.

15 A.   Yes, sir.  You're absolutely right.  Yes, sir.

16 Q.   And you told him you'd be happy to show him how everything

17 worked?

18 A.   Yes, sir.

19 Q.   You even helped him decide what kind of switch to use,

20 didn't you?

21 A.   Yes, sir.  I sure did.

22 Q.   Whether to use the flip switch trigger, right?

23 A.   Yes, sir.

24 Q.   Now, you told the prosecutor that you never discussed

25 doing a video with Mr. Osmakac, that that was his idea to do

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   that -- to do it there at the end, right?
 2   A.   Yes, sir, I did.
 3   Q.   Page 38 of Exhibit 118-B, the January 1st transcript.
 4   Okay.  Mr. Osmakac says, "Hey, like, like, he put it down this
 5   much.  He's like, yo, I spit in your face, you infidel.  Why
 6   the hell you follow me?  He's -- I'm not following you.  He's
 7   like, you filthy infidel.  You will see so."
 8        Then you say, "If you -- that's stuff you should have a
 9   video."
10        Mr. Osmakac:  "I know."
11        Then you say, "Video that stuff.  That's good stuff."
12        And he asks you, "Video it?"
13        And you say, "That's what I'm saying.  If you video it,
14   that was -- you don't think that would have been good, huh?"
15   A.   Yes, sir.
16   Q.   January 1st you told him that he should be videoing that
17   stuff, didn't you?
18   A.   What stuff are you talking about, sir?
19   Q.   The stuff about him screaming and yelling at infidels.
20   A.   Yes, sir.
21   Q.   He didn't bring up that video, you brought it up first,
22   didn't you?
23   A.   The martyrdom video or that stuff?
24   Q.   On January 1st -- in this investigation, who's the first
25   one that said he should video something; you or him?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    A.   He did.

2    Q.   I just showed you on January 1st where you said it.

3    A.   That was January 1st.

4    Q.   When was the video, the martyrdom video?

5    A.   The martyrdom video was January 7th.

6    Q.   So which came first, this video or the martyrdom video?

7    A.   Prior to that conversation --

8    Q.   He said he was going to do a video?

9    A.   He said there would be a video.  Yes, sir, he sure did.

10   Q.   When?

11   A.   It was on -- it was either the day of the black flag.  It

12   would be on the 21st.

13   Q.   On the 21st, you're saying he said he was going to do a

14   martyrdom video?

15   A.   Excuse me.  That's the 23rd.  I apologize.

16   Q.   The 23rd he said he was going to do a martyrdom video?

17   A.   Yes, sir.  He said there would be a video.

18   Q.   Who bought the Metro PCS phone?

19   A.   I did.

20   Q.   Did you tell him it doesn't matter, that he should make up

21   a name, make up a date of birth, make up an address?

22   A.   Yes, sir, I sure did.

23   Q.   Did he tell you that he's on the FBI list?

24   A.   Yes, sir, he did.

25   Q.   And that he's on the watch list?

```
 1  A.   Yes, sir, he did.
 2  Q.   And the whole time he's with you, did he not believe he
 3  was also under surveillance?
 4  A.   Yes, sir.
 5  Q.   Page 74 of that same transcript --
 6            THE COURT:  Which same transcript?
 7            MR. GEORGE TRAGOS:  That's 118-B.
 8  BY MR. GEORGE TRAGOS:
 9  Q.   Mr. Osmakac:  "So what did you want to do?  You want to
10  see it for another car or not?  He'll take care of the money if
11  it's not too much, couple of thousand.  Do you think you can
12  get it for a couple of thousand?"
13       When he says he'll take care of the money, who's he
14  talking about?
15  A.   The CHS.
16  Q.   By the way, payments that go to a confidential human
17  source is money?
18  A.   Yes, sir.
19  Q.   Does that have to be approved initially by the --
20  requested by the case agent?
21  A.   Yes, sir, it does.
22  Q.   Page 80 of the 118 transcript.
23       "So if you park back where it's next to my car, he said
24  he'll take care of it all.  He said whatever you have to get."
25       Your answer:  "Okay."
```

1        Mr. Osmakac:  "He'll take care of it.  Okay.  Because he

2   knows he doesn't -- the people that are looking.  Okay.  So he

3   doesn't want to give even to me that much at once.  Okay."

4        Who's he talking about there?

5   A.   The CHS.

6   Q.   But the CHS doesn't want to give him all that money, does

7   he?

8   A.   All at once, yes, sir.  That's what he said.

9           MR. GEORGE TRAGOS:  Your Honor, does the Court want

10  me to continue because now would be a -- I've got a bit.

11          THE COURT:  Yes, sir.

12          MR. GEORGE TRAGOS:  Okay.

13  BY MR. GEORGE TRAGOS:

14  Q.   Between January 1st and January 7th, did you meet with the

15  agents and have the meeting and talk about strategy?

16  A.   Yes, sir.

17  Q.   And did you determine that January 7 was going to be the

18  day?

19  A.   Yes, sir.

20  Q.   And that was going to be the day everything was going to

21  happen, arrests, everything was going to go down?

22  A.   Yes, sir.

23  Q.   When did you make that determination?

24  A.   Determined that January 7 would be the day that I would

25  deliver the goods to him.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Q.   Okay.  When was that determination made?

2    A.   Sometime after January 1st.

3    Q.   And how was it communicated to Mr. Osmakac that

4    January 7th would be the day you'd be delivering the goods?

5    A.   As we had discussed on January the 1st, I would drop the

6    note off to the CHS's store, give Mr. -- text Mr. Osmakac it's

7    good.  Mr. Osmakac would go to the store, pick up the note and

8    meet me at the location that the note said to meet me at at the

9    time that the note said to meet me at.

10   Q.   So you gave the note to the CHS?

11   A.   Yes, sir.

12   Q.   And when was that?

13   A.   On January 7th.

14   Q.   I thought you said the last time you had contact with the

15   CHS was January 1st?

16   A.   Yes, sir.

17   Q.   Isn't that what you said?

18   A.   Yes, sir, you're right.

19   Q.   So what's the truth?

20   A.   I dropped the note off on January the 7th.

21   Q.   So you saw the CHS on January 7th, too?

22   A.   Yes, sir, I sure did.

23   Q.   Okay.  And did you have a conversation with the CHS?

24   A.   No, sir.

25   Q.   You didn't tell him that the 7th was the date?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1  A.   I might have.  I might have.  I dropped the note off on

 2  that date.  I made sure that the CHS knew what the note was

 3  for.

 4  Q.   And then we have the meeting, correct?

 5  A.   Yes, sir.

 6  Q.   When did you meet the Defendant on that -- on the 7th of

 7  January?

 8  A.   When?

 9  Q.   Yes.

10  A.   That evening.

11  Q.   What time?

12  A.   It was after 7:00, after 7:00 p.m.  I couldn't tell you an

13  exact time.  I don't remember that.  It was after 7:00 p.m.,

14  though.

15  Q.   Was Mr. Osmakac supposed to get a room in a hotel or

16  motel?

17  A.   Was he supposed to get a room?

18  Q.   Yes.

19  A.   I don't think he was supposed to get a room.  I hadn't

20  planned for him to get a room.

21  Q.   Page six of Exhibit 121.1.

22           (Brief pause.)

23  BY MR. GEORGE TRAGOS:

24  Q.   Page six of 121.1-B.

25           Mr. Osmakac:  "If we go to the car, it has to be quick.
```

```
1    But the thing is the brother, he didn't have much money.  He
2    said to give you the rest for me to get a room."
3         Do you see that?
4    A.   I see that.  Yes, sir.
5    Q.   So was Mr. Osmakac supposed to get a room?
6    A.   Again, my answer stays the same.  I hadn't planned for him
7    to get a room.  His conversation with the CHS about that, I'm
8    not aware of that.  I wasn't aware of that.
9    Q.   Brother is the CHS?
10   A.   Yes, sir.
11   Q.   Okay.  Page seven of 121.1-B.
12        "I don't have no accounts.  They going to need like a big
13   deposit or something, huh?  No.  They want about 70 buck a
14   night.  Depends on what kind of inn it is.  Yeah.  Motel 6 used
15   to get 60 a night.  I have like 34, and he gave me.  I got a --
16   I got a room where I got to show you how to use the stuff."
17        Do you see that?
18   A.   I do see that.  Yes, sir.
19   Q.   So you still don't know whether he was going to get a
20   room?
21   A.   No, sir.  I had a room.  I had a room where I was going to
22   show him how to use the stuff at.  Him getting a room, that's
23   something that him and the CHS might have discussed, nothing to
24   do with me.  I had a room to show him how to use the stuff.
25   That was what I was talking about.
```

```
1   Q.   He tells you -- I'm sorry.  Go ahead.

2   A.   No.  I was done.

3   Q.   And he tells you that he has a total of $34?

4   A.   Yes, sir.

5   Q.   Did Mr. Osmakac tell you that he hadn't had any sleep?

6   A.   He did.

7            (Brief pause.)

8            THE COURT:  Do you have anymore questions?

9            MR. GEORGE TRAGOS:  Yes.

10           THE COURT:  Ask them, please.

11           MR. GEORGE TRAGOS:  I am, Your Honor.

12  BY MR. GEORGE TRAGOS:

13  Q.   Now, you told us before -- and you brought up the

14  transcript, that you had a -- you gave him a chance to get out

15  of this, right?

16  A.   On multiple occasions.  Yes, sir.

17  Q.   Okay.  And he was telling you that his car wasn't good and

18  it's not going to be good.  And you said, "Well, maybe we

19  should do it another day."

20       Do you remember that?

21  A.   Yes, sir.

22  Q.   But right after you say that, instead of just leaving it

23  alone, you ask him, "Can't you get another car," right?

24  A.   Yes, sir.

25  Q.   Is that some type of investigative technique, tell him,
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   look, you can get out of this, but can't you get another car?

2   Is that the way you do it?

3   A.   Is that the full content of that conversation?

4   Q.   Well, let's take a look at it.

5   A.   Yes, sir.  Let's do that.

6   Q.   Can you see it?

7   A.   Yes, sir.

8   Q.   I think you can get another car?

9   A.   Yes, sir.

10  Q.   "No, can't get another car.  I don't have a credit card or

11  else I'd go rent one in my own name."

12          THE COURT:  Mr. Tragos, you're going to need to use

13  the microphone.

14  BY MR. GEORGE TRAGOS:

15  Q.   All right.

16          Do you see that?

17  A.   Yes, sir.

18  Q.   Did I take it out of context?

19  A.   You did, but what came first, though, sir?

20  Q.   You don't know?  You want to know the page before?

21  A.   Yes, sir.

22  Q.   Did that change the context?

23  A.   No.  I was waiting for you -- I thought you were going to

24  tell me where I told him you can get out of this.

25  Q.   Oh, earlier you can, but then you tell him to get another

```
 1   car.
 2   A.   Where did I tell him he can get out of this is what I was
 3   asking?
 4   Q.   "Okay.  I don't want to take the stuff back, but I have
 5   to, well", do you see that?
 6   A.   Yes, sir.
 7   Q.   You were telling him you could take the stuff back, right,
 8   whatever the stuff is?
 9   A.   Yes, sir.
10   Q.   What is the stuff?
11   A.   The gun, the explosives, the car bomb that your client was
12   going to use in his terrorist attack.
13   Q.   And then the next page you tell him, can't you get another
14   car, right?
15   A.   Was it the next page?
16   Q.   Yes.
17   A.   Or was it two pages after that?
18   Q.   The next page.
19   A.   Okay.  Yes, sir.
20   Q.   Page 27 of the 121.1 transcript.  "God willing, everything
21   is successful today, even the brothers say he had good
22   feelings."
23        Who is he talking about when he says, "even the brothers
24   say"?
25   A.   I believe the CHS.
```

1    Q.   You had another one of these meetings on January 7th,

2    didn't you, with the other agents?

3    A.   Yes, sir.

4    Q.   And during the course of that meeting, you determined that

5    although the Defendant thought he was under surveillance and

6    saw cars and people, it wasn't the FBI, right?

7    A.   I determined that?

8    Q.   Yes, sir.

9    A.   I don't know.

10   Q.   Well, did that -- were you told that at the meeting?

11            MS. SWEENEY:   Object, Your Honor.   That calls for

12   hearsay.

13            THE COURT:   Sustained.

14   BY MR. GEORGE TRAGOS:

15   Q.   Did you agree or acknowledge that at the meeting that it

16   wasn't the FBI?

17   A.   Sure.   Yes.   Did I -- I don't know.   I don't know.

18            THE COURT:   You answered three different ways, I

19   guess, or twice, sure, yes, I don't know.   Which is it?

20            THE WITNESS:   I don't know.

21   BY MR. GEORGE TRAGOS:

22   Q.   Did you make the comment on January 7th that this thing

23   was getting ugly?

24   A.   Yes, sir.

25   Q.   And that Mr. Osmakac was changing things?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    A.    Yes, sir.

2    Q.    That he wanted to do different things now?

3    A.    Yes, sir.

4    Q.    That he was unorganized?

5    A.    Yes, sir.

6    Q.    That he was wishy-washy?

7    A.    I said those words.  Yes, sir.

8    Q.    Did you search Mr. Osmakac's bag that day?

9    A.    The bag with food in it?

10   Q.    Yes.

11   A.    No, sir.

12   Q.    The bag he had with him.

13   A.    He had a bag with food in it.  I didn't search the bag

14   with food in it.

15   Q.    Could you see what was in it?

16   A.    I could see that it was a plastic bag.  Yes, sir.

17   Q.    Did you see there was salad in it?

18   A.    Yes, sir.

19   Q.    A bottle of water?

20   A.    Yes, sir.

21   Q.    This is what you call the martyrdom video?

22   A.    Yes, sir.

23   Q.    Do you remember making this statement about it?  "You

24   could tell Sara that she got her what do you call it video,

25   this suicide video"?
```

```
 1         Do you remember telling that to the other agents?
 2  A.    Yes, sir, I sure do.
 3  Q.    Who is this Sara you were talking about?
 4  A.    The prosecutor.
 5  Q.    Had you all talked about making sure that she got her
 6  video?
 7         MS. SWEENEY:  Your Honor, I object.  It calls for
 8  hearsay.
 9         THE COURT:  Overruled.
10         THE WITNESS:  No, sir.
11  BY MR. GEORGE TRAGOS:
12  Q.    Then how did you know you can tell Sara we got her suicide
13  video?
14  A.    Because your question is did we discuss making sure that
15  she had her -- got her video.
16  Q.    Did you discuss the fact that she was going to get a
17  suicide video?
18  A.    Did we discuss the fact that the Defendant wanted to make
19  a suicide video?  Yes, sir.
20  Q.    And was it a gift to Sara?
21  A.    No, sir.  It was not a gift to Sara.
22  Q.    Now, there was a mistake that occurred, in fact, because
23  the tape recorder at this meeting between where you said
24  wishy-washy, unorganized, ugly, the tape was accidentally left
25  on during that FBI meeting, wasn't it?
```

```
1    A.   Yes, sir.

2    Q.   And so that we actually have a tape of what you said at

3    one of these meetings, don't we?

4    A.   Yes, sir, you do.

5    Q.   But we don't have a tape of the other ones, do we?

6    A.   No, sir, you don't.

7    Q.   You complained because he was changing the target, right?

8    A.   Yes, sir.

9    Q.   Where was this meeting that was taped?

10   A.   It was at the hotel.

11   Q.   In one of the rooms?

12   A.   Yes, sir.

13   Q.   Was it the room you were in with the Defendant?

14   A.   No, sir.  It was an adjoining room, I believe.  It might

15   have been an adjoining room, it might have been a room

16   upstairs.  I'm not sure.  It was in one of the rooms at that

17   same hotel.

18   Q.   And who was it you were telling these things to, what

19   agents?

20   A.   The agents that were surveilling the meeting that we were

21   having at the hotel.

22   Q.   Do you know who it was?

23   A.   I don't know them.

24        THE COURT:  I assume you have some more time to go

25   with this witness?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1            MR. GEORGE TRAGOS:  Yes.

2            THE COURT:  All right.

3            We will break at this time and resume on Monday at

4   9:00 o'clock.  As I indicated to the jury, we are going to go

5   four days a week, Monday through Thursday of next week.  So if

6   you need to make some plans for personal things, Friday will be

7   a good day because we will not have trial on Friday.

8            Again, you'll be off for a couple of days, and I know

9   you're intrigued by all of these things.  Please do not look at

10  anything online, in the newspaper.  Don't discuss anything

11  among yourselves.  Don't allow anyone to discuss with you

12  anything having to do with this case.  That is so imperative

13  for the proper trial of this case and the integrity of these

14  proceedings.

15           Again, thank you for your attention, your

16  professionalism, your promptness.  We are trying to be as

17  efficient with your time as possible.  We will see on you

18  Monday at 9:00 o'clock.

19           (Jury excused.)

20           Mr. Millian, were you able to work out your schedule

21  on Thursday or you still don't know yet?

22           JUROR MILLIAN:  Still don't know yet.

23           THE COURT:  All right.

24           Thank you.

25           (Jury excused.)
```

```
1              The courtroom needs to be closed.  I assume the

2    witness wishes to leave at this time?

3              THE WITNESS:  Yes, ma'am.

4              THE COURT:  Thank you, sir.  We'll see you back here

5    at 9:00 o'clock on Monday.

6              THE WITNESS:  Yes, ma'am.

7              (Witness excused.)

8              THE COURT:  Matters for the Court to address before

9    we break for the weekend.

10             MS. SWEENEY:  Your Honor, you wanted to discuss these

11   other three sessions.

12             THE COURT:  And what have you determined concerning

13   the other three sessions?

14             MS. SWEENEY:  Okay.  Your Honor, the -- it does

15   appear that in all of them, someone is at least mentioning the

16   Defendant.  Our thought was that the UCE wasn't -- he is

17   around, but he's not part of these conversations.

18             So starting with the first and second pink tab that

19   you have, he's -- you can -- he is there, you see his name

20   appear, but he's in the background.  He doesn't appear to be

21   part of the conversation about the Defendant at that moment.

22   But in any event, as I stated before, we have no objection.  I

23   will hand these to Mr. Tragos in any event after Court is over

24   today.

25             Then on your third pink tab, again, the undercover is
```

```
 1    there, but in the background.  You can see towards the bottom
 2    of the page, says undercover, IA voices in background.  So he's
 3    not part of the conversation about the case at that moment.
 4            And then finally on the last pink tab, it appears
 5    that what happens is that he was actually out for lunch and
 6    then comes back in at the end.  But that is -- the rest of it
 7    is about -- someone's discussing the Defendant's -- his -- oh,
 8    I'm sorry, they're discussing his -- an interview of him that
 9    occurred previously after an incident that -- the incident that
10    he had with the street preacher that Your Honor is aware of.
11            THE COURT:  And I assume that this interview, if it
12    was recorded, has been given to the defense?
13            MS. SWEENEY:  I think it was not recorded.
14            THE COURT:  Well, which is it?  It was or wasn't?
15            MS. SWEENEY:  I'm sorry.  We were misunderstanding --
16    the agent was misunderstanding the word "recorded".  It's not
17    audio or video recorded.  There is a report of that interview
18    that has been provided to the defense.
19            THE COURT:  So there was no audio or visual recording
20    of the interview with Mr. Osmakac concerning the prior incident
21    on the street?
22            MS. SWEENEY:  No, Your Honor.
23            THE COURT:  And the recording -- the written record
24    of the report was given to the defense already?
25            MS. SWEENEY:  Yes, Your Honor.
```

```
 1              (Brief pause.)

 2              THE COURT:  What is SVTC?

 3              MS. SWEENEY:  It's essentially a teleconference, Your

 4    Honor.  It's -- I cannot remember exactly what -- the S stands

 5    for secret.  It's a secret teleconference.  The system that it

 6    used can handle top secret information.  I can't remember

 7    exactly what it stands for.  I guess the VTC stands for video

 8    teleconference.

 9              THE COURT:  All right.

10              Well, if you're going to give it to the defense, they

11    can make whatever they want to make of it.

12              MS. SWEENEY:  Yes, Your Honor.

13              Your Honor, I just also wanted -- there was one other

14    thing Mr. Tragos mentioned on the record before trial started,

15    and I was going back through my notes and I just wanted it to

16    be clear for the record.  There was some data that he requested

17    from the Government's psychologist, Dr. Montalbano, prior to

18    the jury being sworn.  And we did provide that the first day of

19    trial, the first day of jury selection.  I just wanted the

20    record to be clear that we had done that.

21              THE COURT:  All right.

22              Anything from the defense?

23              MR. GEORGE TRAGOS:  No, Your Honor.  I think I'm --

24              THE COURT:  Mr. Tragos, can you just go back to your

25    seat where you belong and stay there during proceedings.  Thank
```

1    you.

2            Now, there's a microphone right there, all handy and

3    everything.  What is that you want to tell me?

4            MR. GEORGE TRAGOS:  I'm getting *Brady* information

5    this weekend.

6            MS. SWEENEY:  Your Honor, as to the *Brady* that Mr. --

7    or the information that Mr. Tragos requested this morning, I

8    told him I will write a letter to him and provide it to him

9    electronically over the weekend so that he has it.

10           THE COURT:  What information is this, so the record

11   is clear?

12           MS. SWEENEY:  Yes, Your Honor.  Earlier today,

13   Mr. Tragos made an official request for information relating to

14   any failures of recording devices or any erasures of

15   recordings.  And I said on the record earlier what my knowledge

16   at this time is of those things, and we're investigating and

17   making sure that there's nothing else and we'll -- I'll provide

18   Mr. Tragos a letter.

19           THE COURT:  And by weekend, you mean what day?

20           MR. GEORGE TRAGOS:  I don't -- as long as it's before

21   5:00 o'clock on Sunday, I'm fine.

22           MS. SWEENEY:  I will endeavor -- it will be before

23   5:00 o'clock on Sunday.  I will endeavor to get it to Mr.

24   Tragos as early as possible on Sunday, Your Honor.

25           MR. GEORGE TRAGOS:  Your Honor, can I ask a question

1    because I must have misinterpreted something?

2             We had one word up there that I wasn't going to

3    mention.  And then I -- there was a second word I did mention,

4    an objection, the Court sustained it, which was not the same

5    word as the word I was told not to mention.  Are those two the

6    same thing?  Is that what it is?

7             THE COURT:  No.  But my understanding was both of

8    those words were deemed to be police sensitive, law enforcement

9    sensitive information.  And that's why even though no

10   affirmative final response was made at sidebar to the word that

11   you asked about, I had been previously advised that both of

12   those words were law enforcement sensitive.

13            Am I right or wrong about that, Ms. Sweeney?

14            MR. GEORGE TRAGOS:  Because I think I can Google that

15   one word and I'd come up with it.

16            THE COURT:  Am I right or wrong about that?

17            MS. SWEENEY:  You are correct, Your Honor.

18            THE COURT:  All right.

19            You can Google both words and come up with it.  The

20   question is whether the Government is willing to acknowledge

21   its use in the context of this investigation.  And so that's

22   the reason for the Court's sustaining the objection.

23            MR. GEORGE TRAGOS:  Okay.  I just wanted the Court to

24   know I didn't deliberately say that word.  That wasn't the

25   other word mentioned.

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1              THE COURT:  I understand.

 2              Anything else before we break?

 3              MS. SWEENEY:  No.  Thank you, Your Honor.

 4              THE COURT:  You're anticipating that the defense

 5    cross of the UCE will be completed at what time on Monday?

 6              MR. GEORGE TRAGOS:  Your Honor, I have a little more

 7    in transcripts.  The majority of it is going to probably come

 8    from this stuff that I haven't had a chance to see yet, so it

 9    would be really hard for me to estimate.  I'm sure -- my guess

10    is by noon I'll be done.

11              THE COURT:  Will it be before noon?

12              MR. GEORGE TRAGOS:  It's possible, but I can't tell

13    the Court.

14              THE COURT:  So then who would be the next witness?

15              MS. SWEENEY:  Your Honor, at that point, I believe

16    that the Government -- we will read the stipulation of the

17    parties, that will take a minute, and then we will --

18    Mr. Tragos and I have agreed that we will play the CHS

19    recordings without a witness on the stand.  And he and I are

20    going to work out the exact language that -- basically the

21    intention of the proposal for the Court is I will say something

22    like, this is a recording from January 1st between the

23    Defendant and the CHS.  The -- we're playing portions of that

24    recording that the -- either the Government or the defense has

25    requested be played.
```

```
1              That's because we're agreeing that the recordings are
2    authentic, essentially.  And so then we will play those in a
3    kind of date order.  I anticipate that there's
4    about probably -- at this time, I think it's about five or six
5    hours of those recordings that either me or the defense wants
6    to play, so I think that would be next.
7              Then there will be a few of the -- as Mr. Tragos
8    called them, the clean-up witnesses.  They are necessary to the
9    Government's case.  They relate where various pieces of
10   evidence were found in the end, essentially, the physical
11   evidence, kind of where it was found.  And then finally --
12   well, we have Mr. Kohlmann, and then we also have the --
13             THE COURT:  So what's Mr. Kohlmann coming to say now
14   in light of the limitations of his testimony, the introduction
15   of the videos with parenthetical interpretations of words
16   already included?  What is he coming to say?
17             MS. SWEENEY:  Well, Your Honor, there's a couple of
18   things.  The first is that in -- and I can't remember which
19   one, in one of the recordings that we just listened to, the
20   Defendant references two Muslim brothers from Germany who have
21   traveled to Afghanistan.  And then in his martyrdom video he --
22   well, essentially, these two brothers are -- they're involved
23   in active jihad.
24             One of them released a video on the Internet in
25   German, and it's -- there are subtitles on the bottom in
```

1    English.

2         Mr. Kohlmann knows about that video, knows to which

3    two brothers the Defendant is referring.  And then in the

4    Defendant's German part of the martyrdom video, he does two

5    things; one, he mirrors the language that the other guy uses in

6    his kind of jihad video that's posted on the Internet; and,

7    two, the Defendant specifically calls out to them.  He says,

8    you know, Abu Adam and Abu Ibrahim, essentially, you are my

9    brothers.  We're -- the idea is we're engaged in the same

10   thing.  I can read the exact language, if you'd like.  I'd like

11   Mr. Kohlmann to be able to explain that to the jury.

12        Second, in one of the CHS's recordings, the Defendant

13   plays two Anwar al-Awlaki videos for the CHS.  You can hear it

14   clearly in the background.  And we have clips of -- small clips

15   of that.  But then I'd like Mr. Kohlmann to be able to say,

16   these are the videos that the Defendant is showing the CHS

17   which, again, that's where Mr. Awlaki is essentially

18   encouraging terrorist acts against America.

19        Third, the Defendant on at least one occasion in the

20   UC recordings and perhaps elsewhere in the CHS recordings,

21   makes references to other individuals that have committed or

22   attempted to commit violent attacks.  Specifically in the UC

23   recording, he mentions -- I can't remember the gentleman's

24   actual name, but the underwear bomber, the gentleman who was on

25   a plane going to Chicago that had a device in his underwear

1    that did not detonate.

2         He also mentions on at least one point to the CHS

3    Nidal Hasan.  I'd like Mr. Kohlmann to be able to explain who

4    those people are so that the jury can understand what the

5    Defendant is referencing in these conversations.

6         Finally, there are a few places in the materials that

7    are currently here where the Defendant uses the word "hijrah"

8    not as its proper meaning.  So the translation that's in the

9    transcript is the English translation of the Arabic word,

10   "hijrah".  But that's not how the Defendant is using the word.

11        And it's Mr. Kohlmann's experience from his database

12   and from reviewing these materials that the meaning of that

13   word among certain groups of people, particularly people who

14   espouse extremist Muslim ideology, that they mean that word to

15   mean martyrdom.  And that's -- in a nutshell, that's what

16   Mr. Kohlmann will be testifying to.

17        THE COURT:  Counsel?

18        MR. PETER TRAGOS:  We would object to all of the

19   extraneous evidence about the people that the Defendant

20   mentions as, A, they're irrelevant; B, they're trying to

21   destroy the Defendant's character.  There's nothing to say that

22   the Defendant worked with any of these people or these people

23   gave any support to any of the charges against the Defendant.

24        The definition of the word is already chosen by the

25   Government when they defined them.  And if the Government wants

1   to argue that the Defendant had other definitions for them,

2   they're in context already for the jury to hear and the jury to

3   read.  And the Government is the one that typed out the

4   transcripts in the first place for the jury to read, and now

5   they can pick and choose what definitions they want to change.

6         And it would just be speculation for Mr. Kohlmann to

7   say that Mr. Osmakac meant hijrah in this way in this sentence

8   and in this way in another sentence.  And who's to say we

9   couldn't call an expert to say he means all sorts of different

10  words in this way in this sentence and in this way in another

11  sentence.

12        He doesn't hold himself out to be fluent in Arabic or

13  an expert in Islam.  So if they wanted to get an actual

14  translator to translate the word instead of Mr. Kohlmann, who

15  just reads what the Defendant says and enters the province of

16  the jury to say what they should think the Defendant means when

17  he says this, when they have their own brains to listen and to

18  read those words, and any other mention of the individuals that

19  the Defendant mentions throughout the martyrdom video and any

20  beliefs that he aligns himself with he says in the martyrdom

21  video and he says throughout the entire transcript.

22        I don't know why we need Evan Kohlmann to come give a

23  historical background of those people, which we don't even know

24  if the Defendant knows about that historical background, just

25  that he's read these certain things that he repeats which then,

1    again, are already before the jury and not the extraneous

2    information that Evan Kohlmann is going to bring in.

3              THE COURT:  Ms. Sweeney?

4              MS. SWEENEY:  Okay.  Your Honor, just to read --

5    particularly as to the two German brothers, let me read what

6    the Defendant says about them.

7              "My beloved brothers in Afghanistan, Abu Adam and Abu

8    Ibrahim, you are my brothers.  We're going to annihilate them.

9    We're going to hunt them down.  We're going to mutilate them

10   piece by piece everywhere they go."  And then he lists a few

11   locations -- I'll just read it.  "In the subway, Asban,

12   everywhere.  They won't have any peace until they pay us back

13   for what they have done."

14             To me, the -- there's no way the jury will know who

15   Abu Adam and Abu Ibrahim are.  But the Defendant is clearly

16   calling out to them and saying that he -- what he's doing is

17   akin to what they're doing, essentially hunting down people --

18             THE COURT:  Have those individuals done that or are

19   those individuals people who espouse views that Mr. Osmakac is

20   espousing in the video?

21             MS. SWEENEY:  They are known to be in Afghanistan

22   participating in active fighting with the Mujahideen.  They are

23   both --

24             THE COURT:  What is the evidence of that?

25             MS. SWEENEY:  They are on the -- they are on a

1    specific list.  May I have just one moment, Your Honor?  I'll

2    retrieve Mr. Kohlmann's report.  I think it might say.  Do you

3    know?  Okay.

4              (Brief Pause.)

5              I'm sorry, Your Honor.  I don't have Mr. Kohlmann's

6    report in here right now.  And they're on -- I'll have to --

7              MR. GEORGE TRAGOS:  We have a copy.  Would you like

8    to share our copy?

9              MS. SWEENEY:  Yes.  Do you mind?

10             THE COURT:  They're on some sort of watch list

11   associated with terrorist activity?

12             MS. SWEENEY:  Your Honor, I am not recalling at the

13   moment.  I've seen a State Department web page about them that

14   they are -- I cannot remember.

15             MR. GEORGE TRAGOS:  We're pulling it.  Which one of

16   Kohlmann's reports?  Is it one or two?

17             MS. SWEENEY:  Number one.  Thank you.  I'm sorry,

18   Your Honor.

19             (Brief pause.)

20             According to documents -- in Mr. Kohlmann's report

21   on -- his first report on page 30 reads, "According to

22   documents filed by the German Government with the United

23   Nations Security Council, Yassin Chouka, alias Abu Ibrahim, is

24   strongly suspected of having been a member since 2008 of the

25   Islamic Movement of Uzbekistan whose purposes or activity --

1        THE COURT:  You're talking -- softer doesn't mean
2    talking slowly.
3        MS. SWEENEY:  I apologize, Your Honor -- "whose
4    purposes or activities are inter alia directed at committing
5    murder and manslaughter.  The investigating Judge at the German
6    Federal Court of Justice has issued a warrant for the arrest of
7    Yassin Chouka, dated 5 October 2010, based on the strong
8    suspicion of membership in a terrorist organization abroad.
9    After a phase of increasing radicalization, Yassin Chouka, and
10   his brother, Mounir Chouka, decided to participate in the
11   activities in support of Al-Qaeda and associated entities.
12       At some unspecified date, probably in April 2007,
13   they left Germany for Yemen and thereafter joined the IMU,
14   which is the Islamic Movement of Uzbekistan, integrating
15   themselves permanently into its structures.
16       Yassin and Mounir Chouka put themselves in the
17   service of the organization as multipliers, disseminating the
18   organization's messages over the Internet and thereby inter
19   alia recruiting new members or supporters."
20       And then it goes on to discuss the video that Mounir
21   Chouka, who is known as Abu Adam, released on the Internet in
22   November and December 2011.
23       MR. PETER TRAGOS:  What page is that?
24       MS. SWEENEY:  Page 30 of Mr. Kohlmann's report.
25       THE COURT:  And this video of Abu Adam is one of the

1    videos that has been determined to have been something Mr.

2    Osmakac reviewed based upon some forensic analysis of his

3    computer systems?

4            MS. SWEENEY:  There's two ways -- it was initially

5    first determined by Mr. Kohlmann that he had reviewed it, not

6    based on any forensic analysis, but based on the fact that the

7    Defendant mirrors very closely language that Abu Adam uses in

8    his video in the martyrdom video.  And he calls out to them

9    specifically.

10           As a result of that, the further forensic analysis

11   was conducted on Mr. Osmakac's hard drive by the FBI, and an

12   image, a still image from the video was located in what is

13   called unallocated space.  Essentially, it doesn't exist in a

14   saved file or anything like that on the computer, but it is on

15   the computer, indicating that someone used that computer to

16   watch that video.

17           Also, in the January 1st meeting with the undercover,

18   Mr. Osmakac says there was some Muslim Arabs, they made hijrah

19   from Germany to Afghanistan.  One of the two brothers -- one of

20   them just released a statement just a couple of days ago.  And

21   that's just after the German video had come out with English

22   subtitles on it, according to Mr. Kohlmann.

23           (Brief pause.)

24           THE COURT:  I've already ruled that Mr. Kohlmann can

25   tell us what big hijrah is in the parlance of terrorist cells.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

He purports to understand the use of that terminology in the

context of his work and his expertise in this field.

        With regard to Abu Adam, whatever his real name is,

it would seem that the Defendant's having referenced him would

bring him into relevancy in the case.  And if there's a video

that he has made with English subtitles that Mr. Kohlmann can

tell us is what is mirrored in Mr. Osmakac's own video, I think

that that is pertinent.

        And if Mr. Adam is saying what similar things that

Mr. Osmakac is saying, the jury can draw inferences and

understandings from the consistency of those videos or those

statements.

        And if there is extrinsic evidence, as I indicated in

my order, if there's some proof that Mr. Osmakac actually

viewed the video and that apparently is going to be this

forensic evidence that it was on his unallocated space, then I

think Mr. Kohlmann should be able to draw the connection

between those two.

        Now, whether Mr. Kohlmann is going to also be able to

testify that these people were under suspicion somewhere and a

Judge has issued a warrant and they may be or they are

speculated to be and so forth, to me, that's hearsay.  It is

prejudicial.  It is not probative of anything.  And it's

further not any proof that Mr. Osmakac would have known about

their notoriety in that regard.

```
1              And so the breadth of his testimony, I think, would
2     be more narrow than just getting up and talking about all the
3     terrorists in the world whose names he's ever mentioned and all
4     the things that they are suspected of being engaged in.
5              Again, we have to tie Mr. Osmakac's knowledge of
6     their conduct to them, as well.  The other brother -- is Ismael
7     or Emmanuel?
8              MS. SWEENEY:  Ibrahim.
9              THE COURT:  Ibrahim.  What is the evidence of his
10    knowledge about his behavior?
11             MS. SWEENEY:  Okay.  Your Honor, the Defendant
12    references specifically when he's speaking to the UCE that one
13    of the two brothers released a statement.
14             THE COURT:  And you said that statement, though, was
15    of whom?
16             MS. SWEENEY:  Abu Adam.  The Defendant clearly knows
17    who Abu Ibrahim is because he says his name in his martyrdom
18    video.
19             And may I respond just briefly to a point that you
20    just made, Your Honor?
21             THE COURT:  Yes.
22             MS. SWEENEY:  You said that it's not clear that the
23    Defendant is aware of what Abu Adam and Abu Ibrahim are
24    suspected of having done.  But in -- no.  I'm sorry.  I leave
25    that, Your Honor.  I understand.
```

```
 1              THE COURT:  All right.

 2              So there's nothing that we know about that the

 3    Defendant has seen of Abu Ibrahim?

 4              MS. SWEENEY:  That is correct, Your Honor.  I don't

 5    know of any video or anything like that that he's watched of

 6    Abu Ibrahim.

 7              THE COURT:  All right.

 8              So hijrah is in.  Abu Adam and the parallels to his

 9    video and the Defendant's martyrdom video will be allowed.  And

10    I'm assuming there's going to be someone to testify about the

11    still image being on the computer.  There will be a stipulation

12    to that effect.  Yes, sir?

13              MR. PETER TRAGOS:  What about the accuracy of the

14    transcription throughout the Abu Adam video and the fact that

15    Sami says --

16              THE COURT:  Turn your microphone around.

17              MR. PETER TRAGOS:  And the fact that Sami says one of

18    the two brothers made a video, doesn't even know which one,

19    sort of speculating that he was correct in picking Abu Adam as

20    opposed to the other guy since he didn't know.

21              THE COURT:  Yes.  We're going to allow the Government

22    to offer evidence that a couple of days before he says that

23    there was, in fact, a video of one of the brothers, and that

24    was Abu Adam and this is what it said.  And if it parallels, as

25    the Government suggests, so closely to what the Defendant says
```

```
1   in his video, then it would not seem to be much speculation to
2   say that he is being sort of a copycat martyrdom preparer.
3         MR. PETER TRAGOS:  So if the video didn't come out in
4   a few days, then that would make it irrelevant because the
5   Defendant wasn't talking about -- if Mr. Kohlmann thinks the
6   video came out weeks before.  I believe during the Daubert
7   hearing, Mr. Kohlmann said the video came out weeks before, not
8   days before.  I could be thinking about another individual he
9   was talking about, but I thought that was this video.
10        MS. SWEENEY:  Your Honor, my understanding -- and
11  obviously, this is all --
12        THE COURT:  Well, let me just ask this question.
13  How -- I guess the two of you have looked at the video?
14        MS. SWEENEY:  Yes.  I've seen it.
15        THE COURT:  Yes?
16        MR. PETER TRAGOS:  I've seen parts of it.  I've not
17  watched the whole thing beginning to end.  I didn't notice it
18  nearing --
19        THE COURT:  Does it track the language of Mr.
20  Osmakac's video?
21        MR. PETER TRAGOS:  I'm not sure.
22        MS. SWEENEY:  Okay.  The first track that
23  Mr. Kohlmann notices is the part where the Defendant says,
24  "we're going to annihilate them, we're going to hunt them down,
25  we're going to mutilate them," that's in the Defendant's
```

1   martyrdom video.  In the -- I'll have to come back to that one,

2   Your Honor.  I'm sorry.

3            THE COURT:  Well, I need to let my marshals go.  They

4   can't leave the building until we clear, and we're supposed to

5   be out before 5:00, and it is three minutes after 5:00.

6            Is it in his report what the two parallels are

7   supposed to be?

8            MS. SWEENEY:  Yes, Your Honor.  It's on page -- it's

9   on page 30 of the report.  And I left out one other topic that

10  Mr. Kohlmann is going to testify to entirely, which is to the

11  Defendant's two calls on Inspire Magazine and to his reference

12  to the black flag in one of the calls.  I apologize, Your

13  Honor.

14           THE COURT:  All right.

15           Well, I will take a look at the transcripts.  I think

16  it was -- I'm sorry, of the report, and make a decision.  But

17  we're not going to have Mr. Kohlmann sit on the stand and read

18  his treatise on everything he knows about terrorism because I

19  don't believe, based upon the evidence that we've seen so far,

20  that it's largely pertinent to this trial.

21           I think he has a view about the universe based upon

22  his research and experience that may be important and relevant,

23  may help the Government -- seriously help the Government with

24  its investigations.  But then to translate that over into a

25  trial is a different matter entirely.

```
1              MR. GEORGE TRAGOS:  Can I say something?
2              THE COURT:  Are you arguing on the motion having to
3    do with Mr. Kohlmann?
4              MR. PETER TRAGOS:  I will say it.
5              THE COURT:  Yes, sir.
6              MR. PETER TRAGOS:  I don't believe -- actually, I'm
7    positive Mr. Kohlmann did not testify at all the Daubert
8    hearings about a black flag because we were ready with pictures
9    to talk to him about it and it never came out, so we didn't
10   even get a chance to question his ability to testify about the
11   black flag, if there was anything scientific about it.
12             THE COURT:  We may -- I recall that the black flag
13   sort of got left out of the discussion after I went back to try
14   to do the order because I think that there was a confusion
15   about whether it was even present on some aspect of what we
16   were looking at.  But then we went back and looked at the
17   material.  We found that it was, in fact, in it, and so he
18   never talked about it because of the Government's -- I think it
19   was the Government's concession.
20             But in any event, if necessary, we may have to hold a
21   short Daubert hearing on that aspect of his testimony in
22   advance of it.  But you all will have to remind me to do that
23   better than you reminding me to ask the UCE about the
24   testimony.
25             MS. SWEENEY:  Sorry, Your Honor.
```

1              THE COURT:   I will see you all at 9:00 o'clock on

2      Monday.   Do we have any expected interruptions next week other

3      than possibly Mr. Kohlmann?

4              See you at 9:00 Monday.

5              (Thereupon the proceedings concluded.)

6                          ******

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1

2                          CERTIFICATE

3

4    STATE OF FLORIDA            )

5    COUNTY OF HILLSBOROUGH      )

6

7          I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

8    the United States District Court, Middle District, Tampa

9    Division,

10         DO HEREBY CERTIFY, that I was authorized to and

11   did, through use of Computer Aided Transcription, report

12   in shorthand the proceedings and evidence in the

13   above-styled cause, as stated in the caption hereto, and

14   that the foregoing pages numbered 1 to 241, inclusive,

15   constitute a true and correct transcription of my

16   shorthand report of said proceedings and evidence.

17         IN WITNESS WHEREOF I have hereunto set my hand

18   in the City of Tampa, County of Hillsborough, State of

19   Florida, this 15th day of June, 2015.

20

21          /s/CLAUDIA SPANGLER-FRY
           _____
22          CLAUDIA SPANGLER-FRY, Official Court Reporter

23

24

25