```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3   UNITED STATES OF AMERICA,      Case No.8:12-CR-45-T-35AEP

 4          Plaintiff,

 5    VS.                           Tampa, Florida

 6   SAMI OSMAKAC,                  June 2, 2014

 7          Defendant.             9:00 a.m.

 8   _____/

 9                          VOLUME 5
          REDACTED TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10           BEFORE THE HONORABLE MARY S. SCRIVEN
                UNITED STATES DISTRICT JUDGE
11
     Appearances:            MS. SARA SWEENEY
12                           Assistant United States Attorney
                             401 North Tampa Street
13                           Suite 3200
                             Tampa, FL 33602
14                           (813)274-6000
                             sara_sweeney@usdoj.gov
15
                             CLEMENT J. MCGOVERN, ESQUIRE
16                           United States Department of Justice
                             Trial Attorney
17                           950 Pennsylvania Avenue, N.W.
                             Washington, DC  20530
18                           (202)305-0535
                             clement_mcgovern@usdoj.gov
19
     For the Defendant:      GEORGE TRAGOS, ESQUIRE
20                           PETER TRAGOS, ESQUIRE
                             Tragos & Sartes, PL
21                           601 Cleveland St.
                             Suite 800
22                           Clearwater, FL  33755
                             (727)441-9030
23                           george@greeklaw.com

24

25
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1    Court Reporter:            CLAUDIA SPANGLER-FRY, RPR, RMR
                                 Official Court Reporter
 2                               801 North Florida Avenue
                                 7th Floor
 3                               Tampa, FL 33602
                                 (813)301-5575
 4                               cookiefry@aol.com

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               I N D E X

2

3    WITNESSES:                                    PAGE

4

5    *SPECIAL AGENT AMIR*

6    CROSS-EXAMINATION BY MR. GEORGE TRAGOS ...............   7

7    REDIRECT EXAMINATION BY MS. SWEENEY ..................  70

8

9    *PAUL HAAG*

10   DIRECT EXAMINATION BY MS. SWEENEY .................... 127

11   VOIR DIRE EXAMINATION BY MR. GEORGE TRAGOS ........... 134

12   CROSS-EXAMINATION BY MR. GEORGE TRAGOS ............... 141

13   RECROSS-EXAMINATION BY MR. GEORGE TRAGOS ............. 160

14

15                      EXHIBITS

16

17   Government's Exhibit 164 Identified ......... ........ 129

18   Government's Exhibits 161-A&B, 161.1A&B, 162-A&B,

19   162.1-A&B, 163-A&B and 163.1-A&B Identified .......... 136

20

21

22

23

24

25

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1                      P R O C E E D I N G S

 2                         June 2, 2014

 3                           ******

 4            THE COURT:  Good morning.

 5            Please call the case.

 6            THE CLERK:  In the matter of the United States of

 7   America versus Sami Osmakac, Case Number 8:12-Criminal-45.

 8   This matter is again in session.

 9            THE COURT:  Will counsel state their appearances for

10   the record.

11            MS. SWEENEY:  Good morning, Your Honor, Sara Sweeney

12   on behalf of the United States, and with me is Clement McGovern

13   from the Department of Justice and Jacob Collins from the FBI.

14            THE COURT:  Good morning.

15            For the defense?

16            MR. GEORGE TRAGOS:  George Tragos on behalf of the

17   Defendant along with Peter Tragos, Your Honor.

18            THE COURT:  And the Defendant is present?

19            MR. GEORGE TRAGOS:  Yes, Your Honor.

20            THE COURT:  Are there any preliminary issues to

21   address?

22            MR. GEORGE TRAGOS:  You want to talk about Kohlmann?

23            THE COURT:  From the Government?

24            MS. SWEENEY:  No, not at this time, Your Honor.

25            MR. GEORGE TRAGOS:  One second, Your Honor.
```

```
 1              (Brief pause.)

 2              MR. PETER TRAGOS:  Yes, Your Honor, briefly.  We

 3   would request a Daubert hearing on the black flag and the

 4   videos for Evan Kohlmann that we spoke about on Friday.  The

 5   video that the Government says -- Mr. Kohlmann says mirrors the

 6   Defendant's video, that also was not brought up in the Daubert

 7   hearing and we weren't able to challenge how that is connected

 8   to the Defendant and how Evan Kohlmann knows that or anything

 9   that has to do with that video.

10              THE COURT:  Is Mr. Kohlmann present today?

11              MS. SWEENEY:  He is not, Your Honor.  He was coming

12   in tomorrow.

13              THE COURT:  So he's out of town today?

14              MS. SWEENEY:  And tomorrow -- he's coming in Tuesday

15   evening, correct.  We could ask him if he could move it up and

16   come for it tomorrow.  We'll check and see if that's possible,

17   and if it is, we'll let the Court and Mr. Tragos know.  But

18   those items were included in Mr. Kohlmann's report, so

19   certainly there was an opportunity to challenge them at the

20   previous Daubert hearing.

21              THE COURT:  Well, at the Daubert hearing, the

22   Government was asked what he was going to be called for, and

23   experts often reduce their testimony once a Daubert hearing is

24   scheduled.  We'll address it later.

25              Please recall the jury.
```

```
 1              What is this exhibit I have?

 2              MS. SWEENEY:  Your Honor, after the UC is completed,

 3    the Government intends to call a witness to attempt to lay a

 4    foundation to admit phone calls intercepted between the

 5    Defendant and other individuals.  And I've informed Mr. Tragos

 6    of that slight change.  But that witness is from out of town

 7    and so he could testify just after the UC is done.  He could

 8    then go home.  But in any event, that is a demonstrative

 9    exhibit that explains how phone calls are intercepted.

10              THE COURT:  Any objection to the demonstrative?

11              MR. GEORGE TRAGOS:  No, Your Honor.

12              THE COURT:  All right.

13              MR. GEORGE TRAGOS:  We object to the exhibit or to

14    the witness -- we will object to the exhibit, but we don't

15    object to the witness being called.

16              THE COURT:  All right.

17              (Brief pause.)

18              MR. GEORGE TRAGOS:  And the objection to the exhibit

19    is not for timeliness.

20              (Jury returned to the courtroom.)

21              THE COURT:  Good morning, ladies and gentlemen,

22    welcome back to the trial.  As you recall, we were on the

23    cross-examination of Special Agent Amir by the defense and we

24    will continue in that cross-examination at this time.

25              Mr. Tragos.
```

1            And, sir, I'm reminding you that you are under oath.

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  That mic is really sensitive.  If you

4  want to speak to your client, you need to push the mute button

5  on the bottom of the mic, not bend the mic, but push the mute

6  button.

7            MR. PETER TRAGOS:  Yes, Your Honor.

8                       CROSS-EXAMINATION

9  BY MR. GEORGE TRAGOS:

10  Q.   Agent, what did you review in preparation for your

11  testimony?

12  A.   Videotapes, the tapes of the interaction between myself

13  and the Defendant and transcripts of those interactions.

14  Q.   Did you review any 302s?

15  A.   No, sir.

16  Q.   What is a 302?

17  A.   It's a report written in the course of an investigation.

18  Q.   A report written by an FBI agent, correct?

19  A.   Correct.

20  Q.   And you didn't review any FBI reports?

21  A.   The transcripts I believe were FBI reports.

22  Q.   I'm sorry, the transcripts were FBI reports?

23  A.   I believe so.  They were created by the FBI.  They were

24  reports created by the FBI, right.

25  Q.   The transcripts we've had here in evidence?

```
1    A.    Yes, sir.

2    Q.    Okay.  And did you review any -- what's a source report?

3    A.    A source report is a report written after a meeting with a

4    source.

5    Q.    Like the confidential human source in this case?

6    A.    Yes, sir.

7    Q.    And it would be -- if there was a meeting with a

8    confidential human source, then the agent who had that meeting

9    would write a source report?

10   A.    Yes, sir.

11   Q.    What is a surveillance log?

12   A.    A log of activities pursuant to a surveillance.

13   Q.    And did you review or did you ever see any surveillance

14   logs in this case?

15   A.    To review?

16   Q.    Did you ever see any surveillance logs?

17   A.    No, sir, I didn't receive any surveillance logs.

18   Q.    I didn't ask you if you reviewed any, I asked you if you

19   ever saw any surveillance logs in this case.

20   A.    No, sir, I did not see any surveillance logs in this case.

21   Q.    Now, back on December 23rd, 2011, when you met with the

22   Defendant, and we've reviewed that transcript, correct?

23   A.    Yes, sir.

24   Q.    Did you bring a black flag with you?

25   A.    December 23rd?
```

1   Q.   Yes, sir.

2   A.   Yes, sir.

3   Q.   And did you show that black flag to the Defendant?

4   A.   No, sir.

5   Q.   Did he see the black flag?

6   A.   Yes, sir.

7   Q.   And did you have a discussion about the black flag?

8   A.   Yes, sir.

9   Q.   Did he know what the black flag was for?

10  A.   No, sir.

11  Q.   Did you tell him that you thought the black flag was for

12  making a video?

13  A.   Yes, sir.

14  Q.   And, in fact, is that not the first time that that video

15  was mentioned?

16  A.   Yes, sir.

17  Q.   So you were the first one to mention video, weren't you?

18  A.   Yes, sir.

19  Q.   Did you review any transcripts over the weekend?

20  A.   No, sir.

21  Q.   Do you remember on January 7, 2012?

22  A.   Yes, sir.

23  Q.   You reviewed those transcripts as well, correct?

24  A.   Yes, sir.

25  Q.   On page 11 of Exhibit 121.2, see where he says, "'Cause my

CLAUDIA SPANGLER—FRY   OFFICIAL U. S. COURT REPORTER

1    cousin and brother are ignorant, they are kuffars, infidels,

2    they go to some of those places and sometimes I want to text

3    them where you at."  You see that?

4    A.    Yes, sir.

5    Q.    Now, he was talking about his blood relatives there,

6    correct?

7    A.    I believe so.

8    Q.    Further on you say, "Text, text them what?"  He says,

9    "Where you at, I have a brother from my blood.  Uh-huh.  And a

10   cousin, a blood cousin."  You see that?

11   A.    Yes, sir.

12   Q.    So he is talking about blood relatives, isn't he?

13   A.    Yes, sir.

14   Q.    And "Uh-huh, they're kuffar, infidels, they're jihadiis,

15   pre-Islamic paganism, they go to clubs and stuff.  You just

16   want to make sure they're not there at these places.  Yeah, go

17   ahead.  So I can do that.  Yeah, yeah, yeah, I would do it than

18   just have it with you.  I would say put it -- when you put

19   it -- the vest on, put that in so you know it's gonna try to

20   make sense of this."

21        He asks you if he can call his, I guess, call his blood

22   relatives, correct, so they're not there?

23   A.    Yes, sir.

24   Q.    And you say, yeah, yeah, yeah, you say it's okay.

25   A.    You'd have to play it for me to be able to answer

```
 1   accurately.  From what it says there, yes, sir.  If you can
 2   play the video, I can answer more accurately for you.
 3   Q.   Do you believe that these transcripts are not accurate?
 4   A.   Again, I can't tell you in the context of that
 5   conversation 'cause I'm not listening to it, I'm reading it.
 6        (Brief pause.)
 7   Q.   Now, on December 22nd --
 8            MR. GEORGE TRAGOS:  A moment, Your Honor.
 9            (Brief pause.)
10   BY MR. GEORGE TRAGOS:
11   Q.   On December 22nd, you were in the FBI office meeting with
12   the other agents, correct?
13   A.   Yes, sir.
14   Q.   And you had a meeting, I think it was, what, on the 21st
15   of December, with the Defendant?
16   A.   23rd of December?
17   Q.   Twenty-first.  Did you have one on the 21st?
18   A.   Yes, sir.
19   Q.   Okay.  And did you have one on the 23rd?
20   A.   Yes, sir.
21   Q.   So this is between the 21st and the 23rd.  On the 22nd,
22   you meet with the FBI, other agents, correct?
23   A.   Yes, sir.
24   Q.   Okay.  And I believe you have been told, discovered that,
25   again, inadvertently, by accident, whatever, the tape recorder
```

1    was left on and your conversations were recorded with the

2    agent, weren't they?

3    A.    Yes, sir.

4    Q.    And you have reviewed a transcript of that, haven't you?

5    A.    Yes, sir.

6    Q.    By the way, in the course of your career where -- this is

7    actually the third one in this case, but in the course of your

8    career, how often does that happen?

9    A.    Very rarely.

10   Q.    And how often does it happen to the extent that it

11   happened on December 22nd?

12   A.    Very rarely.

13   Q.    In fact, it's not supposed to happen, is it?

14   A.    No, sir, it's not.

15   Q.    You're not supposed to record your conversations with the

16   agents, are you?

17   A.    No, sir, we are not.

18   Q.    Only your conversation with the Defendant, right?

19   A.    Yes, sir.

20   Q.    During your conversations with the agents, did you discuss

21   with them the fact that you need to pull something out of the

22   Defendant?

23        MS. SWEENEY:  Your Honor, I'm going to object.  I

24   think this is hearsay, irrelevant and improper impeachment.

25        THE COURT:  Overruled.

```
1              THE WITNESS:  I'm not sure what you're talking about,
2    sir.
3              THE COURT:  Well, the question is, did you say that?
4              THE WITNESS:  I don't know.  I'm not sure.
5              THE COURT:  Then say, I don't know, I don't recall.
6    BY MR. GEORGE TRAGOS:
7    Q.   Is that something that could have been said at that
8    hearing -- at that meeting, excuse me?
9    A.   I don't know, I don't recall.
10   Q.   Now, you reviewed that transcript, right?
11   A.   Yes, sir.
12   Q.   Now sometimes there's initials "CTS"; does that mean CHS?
13   Is that an error or typo?
14   A.   I don't know.
15   Q.   Was there a discussion about how the Defendant would get
16   the money from the CHS, the confidential human source, in order
17   to pay you for the guns and explosives?
18              THE COURT:  When you say, "was there a discussion,"
19   do you mean at anytime or in this meeting, this transcript?
20              MR. GEORGE TRAGOS:  This transcript that he
21   participated in.
22              Was there such a discussion?
23              THE WITNESS:  I believe so, yes, sir.
24   BY MR. GEORGE TRAGOS:
25   Q.   And was the discussion that you did not want the money to
```

1   come directly from the confidential human source because it

2   would make a better case if it came from -- at least some of it

3   came from the Defendant, Mr. Osmakac?

4   A.   Did I or did someone; I don't recall if I said that or

5   not.  I can't recall that.

6   Q.   Were you present at such a discussion?

7   A.   Yes, sir.

8          THE COURT:  Mr. Tragos, you can only ask him what he

9   said.  You can't ask him about hearsay.

10          MR. GEORGE TRAGOS:  Can we have a sidebar, Your

11  Honor?

12          THE COURT:  No, sir.

13  BY MR. GEORGE TRAGOS:

14  Q.   Did you participate in such a discussion?

15  A.   No, sir, I did not.

16  Q.   You didn't participate?

17  A.   I did not say that.

18  Q.   I didn't say if you said those words, I asked you if you

19  participated in such a discussion.

20          THE COURT:  Mr. Tragos, and the Court has said that

21  you can't assert statements made by others because that would

22  be hearsay.  You can ask him what he said.

23  BY MR. GEORGE TRAGOS:

24  Q.   Were you part of the planning for how the CHS was going to

25  give the money to Mr. Osmakac and then Mr. Osmakac was going to

1   give it to you?

2   A.   No, sir.

3   Q.   You remember saying these words, page 13 --

4          THE COURT:  One second.  Page 13 of which session?

5          MR. GEORGE TRAGOS:  A of session one.

6          THE COURT:  One second.

7          MR. GEORGE TRAGOS:  Your Honor, does the Court have

8   the final copy?

9          THE COURT:  I do.

10         Which line?

11         MR. GEORGE TRAGOS:  Line 23.  Okay?

12         THE COURT:  One second.

13         (Brief pause.)

14         That's not proper impeachment if that's what it's

15  for.

16  BY MR. GEORGE TRAGOS:

17  Q.   Did you participate in a discussion about who's going to

18  come up with the thousand dollars?

19  A.   Possible, I don't recall.

20  Q.   Would it refresh your recollection to look at the

21  transcript?

22  A.   Yes, sir.

23         MR. GEORGE TRAGOS:  May I, Your Honor?

24         THE COURT:  Yes, you may.

25         (Brief pause.)

```
 1   BY MR. GEORGE TRAGOS:

 2   Q.    Does that refresh your recollection?

 3   A.    Yes, sir.

 4   Q.    Did you participate in that conversation or did you make

 5   those statements?

 6   A.    Could you repeat your question so I can answer correctly?

 7   Q.    Did you say, "Someone has to come up with the thousand

 8   dollars?"

 9   A.    Yes, sir.

10   Q.    And what was that thousand dollars for?

11   A.    For the bomb that your Defendant was asking for.

12   Q.    And did you also -- have you also stated in that meeting

13   that the source was going to pay for the bombs and the

14   explosives?

15   A.    Did I say that?  I don't recall saying that.

16          MR. GEORGE TRAGOS:  May I approach, Your Honor?

17          THE COURT:  To refresh?

18          MR. GEORGE TRAGOS:  Yes.

19          THE COURT:  Which line?

20          MR. GEORGE TRAGOS:  Excuse me?

21          THE COURT:  Which line?

22          MR. GEORGE TRAGOS:  Page 14, line four.

23          THE COURT:  Yes.

24          (Brief pause.)

25
```

1   BY MR. GEORGE TRAGOS:

2   Q.   Does that refresh your recollection?

3   A.   Could you repeat your question?

4   Q.   Did you say that the source was paying for it?

5   A.   I said the source was paying for it, yes, sir.

6   Q.   Who is R.W.?

7   A.   I don't know, sir.

8   Q.   You don't know?  Do you know who Richard Worms is?

9   A.   Yes, sir.

10  Q.   And so, you don't know that Richard Worms is R.W.?

11  A.   When you said R.W., I did not know if Richard Worms were

12  he.  Yes, sir, I know Richard Worms.

13  Q.   And who is Richard Worms?

14  A.   Richard Worms is a supervisor of the squad that was

15  investigating Mr. Osmakac's case.

16  Q.   Okay.  And at times, you'd call him "boss," wouldn't you?

17  A.   It's possible.  I don't recall.

18  Q.   And did he tell you --

19          MS. SWEENEY:  Object, Your Honor, that's hearsay.

20          THE COURT:   Sustained.

21          MR. GEORGE TRAGOS:  Can we have a sidebar?

22          THE COURT:  No, sir.

23  BY MR. GEORGE TRAGOS:

24  Q.   As his supervisor, do you follow his direction?

25  A.   Depends on what you're talking about.

1  Q.   Well, on how things were going to happen in this

2  investigation?

3  A.   Not necessarily, but, yes, sir.  Not necessarily.

4  Q.   Well, can you think of a time in this case where you did

5  not follow his direction?

6  A.   Yes, sir.

7  Q.   When?

8  A.   The supervisor, Mr. Worms, on occasion would provide

9  instruction on when you meet with the Defendant, if you say

10  this, the Defendant will say this, and then if you say this,

11  the Defendant will say that.  That's not possible because you

12  can't anticipate what another person is going to say.  So did I

13  follow his direction when he said things like that, no, I did

14  not.  That's an instance.

15  Q.   Well, he didn't -- did you say the things he wanted you to

16  say?

17  A.   No, sir.

18  Q.   Let me ask you, did he direct you to give a Hollywood

19  ending?

20         MS. SWEENEY:  Object, Your Honor, that's hearsay and

21  counsel deliberately injected it.

22         THE COURT:  Let me see counsel at sidebar.

23         (Thereupon, the following discussion was had at

24  sidebar:)

25         I told you twice if not three times you cannot elicit

1    the statement of someone else.  The supervisor's statements in

2    this case are not the statements of the Government, they're not

3    binding on the Government, they don't constitute admissions by

4    the Government.  It's offered to prove the truth of the matter

5    asserted that he was to create a Hollywood ending and --

6              MS. SWEENEY:  I move to strike the question and ask

7    the jury to be instructed to disregard it.

8              MR. GEORGE TRAGOS:  Those statements are not for the

9    truth of the matter asserted, what they are is the effect on

10   the listener.  I think that his supervisor --

11             MS. SWEENEY:  It's not --

12             MR. GEORGE TRAGOS:  He has said that they talk about

13   these things in prior testimony and they get together to

14   develop a plan.  This is a joint event.  The fact that he was

15   directed to do things and that he did those things I think have

16   an effect on him.  I don't care whether those things are true

17   or not.  The fact that his supervisor tells him certain things,

18   directs him to do certain things and then he goes out and does

19   those things, I think they're certainly an effect on the

20   listener not for the truth of the matter asserted.

21             MS. SWEENEY:  It's not his supervisor.  Richard Worms

22   is not his supervisor 'cause this agent doesn't even work for

23   him.  Number two, Mr. Tragos just asked the agent if he

24   followed Mr. Worms' instructions and the agent said he didn't.

25   So there can't be an effect on the listener if he --

```
 1              THE COURT:  Did he tell the witness in this

 2   conversation to create a Hollywood ending in the transcript?

 3              MS. SWEENEY:  Your Honor, I believe the context is

 4   he's saying the lawyers want a Hollywood ending.  There's no

 5   instruction to the witness to do anything and it --

 6              THE COURT:  Let me see the transcript.

 7              MR. GEORGE TRAGOS:  Can I get mine?

 8              THE COURT:  Yes, sir.

 9              (Brief pause.)

10              MS. SWEENEY:  Your Honor, just to be clear for the

11   record, this is in session two on page three.

12              THE COURT:  Can you speak quietly because we're doing

13   it at sidebar for a reason.

14              MS. SWEENEY:  I apologize.  Would you like me to read

15   this or would you like --

16              THE COURT:  Where is the agent?

17              MS. SWEENEY:  The UC?

18              THE COURT:  Yes.

19              MS. SWEENEY:  I'm not sure, Your Honor.  He doesn't

20   appear to be there at that moment or he's not speaking.

21   Certainly, there's no adoption of that statement by this

22   witness and the effect, I go back --

23              THE COURT:  Can I finish reading it?

24              MS. SWEENEY:  I'm sorry, Your Honor.

25              (Brief pause.)
```

1          THE COURT:  Who is R.W. talking to?  Who is T.R.?

2    Who is the former attorney turned FBI agent?

3          MS. SWEENEY:  Taylor Reid, Your Honor.  He's not the

4    case agent, he was not the case agent, the case agent is Jacob

5    Collins.  Taylor Reid was just another agent on the --

6          MR. GEORGE TRAGOS:  Your Honor, we have been provided

7    Taylor Reid, co-case agent.

8          MS. SWEENEY:  I'm sorry, I didn't know they

9    considered him that.  I apologize.

10         (Brief pause.)

11         THE COURT:  Who is R.W.?

12         MS. SWEENEY:  Richard Worms, he is the agent in

13   charge of the joint terrorism task force here in Tampa.

14         THE COURT:  Who is C.F.?

15         MS. SWEENEY:  Chris Frank.  He's an agent who worked

16   on this case who had responsibility for things like

17   surveillance and sometimes dealt with the recording process.

18         THE COURT:  Who is J.C.?

19         MS. SWEENEY:  Jacob Collins.

20         THE COURT:  Well, I think if he lays a foundation

21   that the UCE was part of this conversation and the directing

22   supervisor is telling him this is the plan, he can elicit

23   whether that was the plan.  I don't know that this record

24   establishes that the UCE was even part of this discussion

25   between R.W. and T.R., and I think perhaps we should have this

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    discussion outside the presence of the jury to lay a proper

2    foundation as to his memory of whether he was part of this

3    conversation or not.

4            If he confirms that he was part of this conversation,

5    then the statement of the -- the statement of the supervising

6    officer could have an effect on the listener.

7            MR. GEORGE TRAGOS:  One other thing, Your Honor, for

8    the record.  I don't have a copy of the audio on this so I --

9    there's no way for me to tell who was or wasn't there.  So I

10   guess I need a little latitude from the Court on that 'cause

11   you remember, I haven't listened to that.

12           THE COURT:  I don't know what latitude you would want

13   other than to ask him to read this transcript and ask him if he

14   was part of this discussion between R.W. and T.R.

15           MS. SWEENEY:  Your Honor, if we are going to do this

16   outside the presence of the jury, can I make an argument on the

17   record about why even if this did show his state of mind,

18   that's not relevant.

19           THE COURT:  You can make whatever argument you want

20   outside the presence of the jury.

21           MS. SWEENEY:  Thank you.

22           (Thereupon, the sidebar discussion was concluded and

23   the proceedings resumed as follows:)

24           THE COURT:  We're going to have to ask the jury to

25   step out for a moment.  We'll call you back in a few minutes.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1              (Jury excused.)

 2              Counsel, you may inquire of the witness.

 3              What page are we on?

 4              MR. GEORGE TRAGOS:  Page three of session two.  Is

 5    that what the Court asked?

 6              THE COURT:  Yes, sir.

 7              MR. GEORGE TRAGOS:  Okay.

 8    BY MR. GEORGE TRAGOS:

 9    Q.   I believe we established who R.W. was, correct?

10    A.   Yes, sir.

11    Q.   And during the course of your conversations, were you

12    present when R.W. stated that, "They want a Hollywood ending,

13    that's great, but once we start laying out attempted use of a

14    WMD, I don't remember the Title 18 for that one".

15         Do you remember that?

16    A.   Not actually, but it's possible.

17    Q.   Would it refresh your recollection to take a look at it?

18    A.   Yes, sir.

19              MR. GEORGE TRAGOS:  May I approach the witness?

20              THE COURT:  You may.

21              (Brief pause.)

22    BY MR. GEORGE TRAGOS:

23    Q.   I'm going to show you four pages.

24              THE COURT:  Just give him the whole of session two.

25              MR. GEORGE TRAGOS:  Whole of session --
```

```
 1              THE COURT:  Yes, sir.
 2              MR. GEORGE TRAGOS:  May I talk to the agent for a
 3    second?
 4              (Brief pause.)
 5    BY MR. GEORGE TRAGOS:
 6    Q.   I think you'll find where I asked you about on page three.
 7    A.   Yes, I see that.
 8    Q.   Okay.  And then you see that later on on page six, you are
 9    speaking?
10    A.   Yes, sir.
11    Q.   So were you then present when this was said?
12    A.   I'm not sure if I was in the vicinity where that
13    conversation was taking place.  I'm not sure.  I can't say yes
14    or no.  I don't know.
15    Q.   So you don't remember?
16    A.   I don't recall whether I was present when Mr. Worms made
17    this statement.
18    Q.   Would it aid you to listen to the recording?
19    A.   Yes, sir.
20              MR. GEORGE TRAGOS:  Your Honor, again, I'm at a Catch
21    22 here.
22              THE COURT:  Do you have some other inquiry of this
23    witness than this?
24              MR. GEORGE TRAGOS:  For this particular paragraph?
25              THE COURT:  For anything else?
```

```
1              MR. GEORGE TRAGOS:  Yes, I do.

2              THE COURT:  All right.

3              What we'll do is we'll go on to other areas of

4    inquiry.  On a break, we will go into closed session to allow

5    the witness to listen to this part of the audio to see if it

6    refreshes his recollection whether he was present during this

7    conversation.

8              Please recall the jury.

9              MR. GEORGE TRAGOS:  Your Honor, before they come

10   in so I don't have any issues with the Court, I do plan on

11   asking him other situations like this where he was present and

12   I understand if he says he doesn't remember, but I do have

13   other questions like that.  I just would ask the Court if I can

14   be able to ask those questions and see what his answers are.

15             THE COURT:  You said you had a relevancy objection,

16   Ms. Sweeney?

17             MS. SWEENEY:  Yes, Your Honor.  I still go back to

18   the fact that the defense's -- the defense in this case is

19   entrapment and what's relevant to a defense of entrapment is

20   what happens with the Defendant.  So why the Government is

21   doing various things, whether it's couched as motive or as how

22   the Government conducts its investigations is irrelevant.

23   What's relevant is what this agent or any agent or any actor of

24   the Government did when meeting with the Defendant.

25             So Mr. Tragos is trying to argue that there's this
```

```
 1    idea that there's going to be a Hollywood ending in this case,
 2    but what matters is if that was in some way communicated to the
 3    Defendant.  And he certainly can argue -- I think his argument
 4    is that by getting, you know, the martyrdom video, that that is
 5    the Hollywood ending, the martyrdom video itself is the
 6    Hollywood ending.
 7              So he can argue what he believes the Government did
 8    to elicit that martyrdom video with the Defendant.  But as for
 9    what the agents talked about, scenarios that they discussed
10    with each other that may or may not happen, that is not
11    relevant to what actually happens in meetings between the
12    Defendant and Government agents.
13              The state of mind of the Government or of any
14    Government actor is irrelevant.  It's the state of mind of the
15    Defendant that matters.
16              THE COURT:  Mr. Tragos.
17              MR. GEORGE TRAGOS:  Your Honor, two things.  One,
18    entrapment is not an exclusive defense, it is a defense.
19    Secondly --
20              THE COURT:  What other defense is this relevant to?
21              MR. GEORGE TRAGOS:  Your Honor, it's relevant to the
22    fact that these agents concocted -- well, Your Honor, could the
23    witness be excused before I do my argument here?
24              THE COURT:  Well, can you just tell me the name of
25    the defense?
```

```
 1              MR. GEORGE TRAGOS:  Not guilty beyond a reasonable

 2   doubt.  And, Your Honor, the jury can find relevance from the

 3   fact that the Government --

 4              THE COURT:  Let's have the witness step out.  Close

 5   the courtroom, please.

 6              (Witness excused.)

 7              You can reopen the courtroom.

 8              Yes, sir.

 9              MR. GEORGE TRAGOS:  Your Honor, are these -- who are,

10   I guess, the ladies that are sitting in the back here --

11              THE COURT:  I assume they're paralegals of the U. S.

12   Attorney's Office.

13              MS. SWEENEY:  The two ladies are analysts at the FBI.

14              MR. GEORGE TRAGOS:  Okay.

15              MS. SWEENEY:  They're not testifying as far as I

16   know.

17              MR. GEORGE TRAGOS:  I just didn't know who they were.

18              MS. SWEENEY:  Yeah.

19              THE COURT:  Yes, sir.  You don't have to wait for

20   your audience.

21              MR. GEORGE TRAGOS:  Okay.  Your Honor, the defense in

22   many cases pokes holes in the prosecution's case as to the

23   strength of the case and the weakness of the case.  That

24   martyrdom video is the center piece of the U. S. Attorney's

25   Office's case.  If the Court will remember --
```

```
1            THE COURT:  What is the defense; that it is not him;

2   that it is a mistaken video; that it's a contrived video; that

3   it's not Mr. Osmakac on the tape?

4            MR. GEORGE TRAGOS:  No, Your Honor.

5            THE COURT:  So what is the defense called?

6            MR. GEORGE TRAGOS:  The defense -- well, Your Honor,

7   I don't know if it has to have a name.  Beyond a reasonable

8   doubt.  But there's also a defense of entrapment, and I don't

9   want to ignore entrapment in this argument.

10            THE COURT:  Well, there's entrapment, i.e., he would

11   not have done this but for the prodding of the Government or

12   there is not guilty because he didn't do it.

13            MR. GEORGE TRAGOS:  Your Honor, I think that even

14   though he may have done it, if the jury finds that the

15   Government has not proved their case beyond a reasonable doubt,

16   they can still acquit him.

17            THE COURT:  Well, what would be the absence of proof

18   beyond a reasonable doubt other than entrapment where the

19   Defendant is himself on the video?

20            MR. GEORGE TRAGOS:  Your Honor, I would agree with

21   the Court that entrapment does have the appearance of being the

22   strongest defense, but it does not mean that I abandon arguing

23   to this jury that the Government still has not proved their

24   case beyond a reasonable doubt.  But going to entrapment, this

25   video, attacking this video is key to all defenses, including
```

1    entrapment.

2              THE COURT:  What other defense is it key to is my

3    question?

4              MR. GEORGE TRAGOS:  Your Honor, just beyond a

5    reasonable doubt.

6              THE COURT:  Nullification?

7              MR. GEORGE TRAGOS:  Excuse me?

8              THE COURT:  Nullification?

9              MR. GEORGE TRAGOS:  No.

10             THE COURT:  All right.

11             Well, it's a video that the defendant himself appears

12   on and unless there's an argument that he was there

13   involuntarily or an argument that he was entrapped, I'm not

14   sure what other defense it would be relevant to.

15             MR. GEORGE TRAGOS:  And the Court may be correct.

16   But even with those defenses, this is still a relevant

17   statement because it goes to the fact that the -- Your Honor,

18   this witness earlier stated that the first person -- when I

19   asked him, didn't you mention this video first on a later

20   transcript, I believe it was the January 7th transcript, he

21   said, oh, no, the first one to mention it was the Defendant on

22   May -- on December 23rd.  And then today when I brought up

23   December 23rd, who was the first one to mention it; in fact, it

24   was the witness, not the Defendant.

25             So then the witness finally admitted he was the first

1    one to mention the video.  The 23rd is the day after, the day

2    after this statement about a Hollywood ending.  This statement

3    happened December 22nd, the day before he goes and brings that

4    black flag and tells my client it's for a video or it could be

5    for a video.  That is -- our argument is that the Government

6    is, in fact, is, in fact, controlling this, making it a

7    Hollywood video.  The Government, in their case, the very first

8    thing they played was the very last video.  They didn't go

9    chronologically, they didn't build up to the last video.  That

10   last video was the focal point of their direct examination of

11   this witness.

12        THE COURT:  What other questions would you ask of

13   this witness that he may require refreshing by listening to the

14   audio?

15        MR. GEORGE TRAGOS:  I don't know 'cause I don't know

16   what his answers are going to be, if he remembers these things

17   or not 'cause he said he reviewed the transcript already.

18        Your Honor, does the Court want me to go through my

19   entire cross of this witness on this area?  It's a hundred-page

20   transcript.

21        MS. SWEENEY:  May I clarify -- I'm sorry for

22   interrupting.  May I clarify one thing?  The witness reviewed a

23   previous version of this transcript.  No one from the

24   Government has spoken to the witness since he took the stand,

25   so he's not viewed the most recent version of this transcript.

```
 1              THE COURT:  Has he listened to the audio?

 2              MS. SWEENEY:  No, he has not, Your Honor.

 3              The only other thing I would say, Your Honor, with

 4   what Mr. Tragos has just said, I don't believe that he asked

 5   the witness who was the first person to mention a martyrdom

 6   video, it was just the word "video."  I don't think the witness

 7   would agree that he was the first one to mention martyrdom

 8   video.

 9              THE COURT:  Please recall the witness.

10              (Witness returned to the courtroom.)

11              Please recall the jury.

12              We're going to take a break and allow you to listen

13   to the audio of this section of the conversation in order to

14   refresh your recollection.  But right now, we're going to move

15   to other parts of the cross-examination.

16              THE WITNESS:  Yes, Your Honor.

17              (Thereupon, the jury was returned to the courtroom.)

18              THE COURT:  We're going to move on to a different

19   part of the inquiry at this time and we may come back to the

20   other after the break.

21              Counsel, you may proceed.

22              MR. GEORGE TRAGOS:  Thank you, Your Honor.

23   BY MR. GEORGE TRAGOS:

24   Q.   You also, on December 22nd, had some trouble -- some

25   issues because you couldn't get Mr. Osmakac to state a target;
```

```
 1   is that right?
 2   A.   Yes, sir.
 3   Q.   And, in fact, you decided that you had to nail him down to
 4   get a target, didn't you?
 5   A.   Yes, sir.
 6   Q.   And that was important, wasn't it?
 7   A.   Yes, sir.
 8   Q.   Because you wanted to know where this is going to happen?
 9   A.   Yes, sir.
10   Q.   But in your discussions with Mr. Osmakac, I think the word
11   you used was he was in "flux?"
12           THE COURT:  Is that a question?
13           MR. GEORGE TRAGOS:  Yes.
14   BY MR. GEORGE TRAGOS:
15   Q.   Is that right?
16   A.   I don't recall if I used those exact words or not.
17   Q.   You think that would accurately reflect the way you felt
18   that day?
19   A.   I don't recall.
20           MR. GEORGE TRAGOS:  Your Honor, may I approach the
21   witness?  Page five, session three.
22           THE COURT:  To refresh his recollection?
23           MR. GEORGE TRAGOS:  Yes, Your Honor.
24           THE COURT:  Yes, sir.
25
```

1    BY MR. GEORGE TRAGOS:

2    Q.    Line two.

3          Does that refresh your recollection?

4    A.    Yes, sir.

5    Q.    So, in fact, you did use the word he was in "flux"?

6    A.    Yes, sir.

7    Q.    There was also a concern about what you were going to be

8    able to arrest him for, wasn't there?

9    A.    Possibly.  I don't recall.

10   Q.    Well, was he regarded -- do you regard him as an

11   irrational guy?

12   A.    I regard anyone who wants to kill women and children as

13   irrational.

14   Q.    So you did regard him on the 22nd as an irrational guy?

15   A.    Yes, sir.

16   Q.    Did you discuss what the -- what possible targets you were

17   going to try to direct him to?

18   A.    It might have been mentioned.  I don't recall.

19   Q.    Well, do you recall discussing recruiting stations, gay

20   bars, places such as that, night clubs?

21   A.    Are you asking if I said those words or was that in a

22   conversation?

23   Q.    Was that in the discussion?

24   A.    Yes, sir, I believe it was.

25   Q.    Now, you made the statement in that same conversation that

1   we have -- "right now we have money issues."  Remember that?

2   A.    Show me.

3           MR. GEORGE TRAGOS:  May I refresh his recollection?

4           THE COURT:  Do you recall; yes or no?

5           THE WITNESS:  I don't recall.

6           THE COURT:  Yes, you may.  What page?

7           MR. GEORGE TRAGOS:  Page seven, Your Honor.

8           THE COURT:  Session three?

9           MR. GEORGE TRAGOS:  Yes, Your Honor.

10          MS. SWEENEY:  It's session four.

11          MR. GEORGE TRAGOS:  Zero four, sorry, four.

12          THE WITNESS:  Yes, sir.

13  BY MR. GEORGE TRAGOS:

14  Q.    What did you mean by "money issues?"

15  A.    How I was going to get paid.

16  Q.    How what?

17  A.    How I was going to get paid.

18  Q.    How you were going to get paid?

19  A.    Yes, sir.

20  Q.    That was your payment we're worried about?

21  A.    Yes, sir, my payment from the Defendant.

22  Q.    Oh, okay.  I'm sorry, I thought you were talking about how

23  you were going to get your salary.

24  A.    No, sir.

25  Q.    Okay.  So, this was a situation where you were discussing

1  how the Defendant was going to pay you?

2  A.   Yes, sir.

3  Q.   Did you discuss various scenarios about how the payment

4  was going to come from the CHS through the Defendant and then

5  to you?

6  A.   Yes, sir.

7  Q.   And you tried to develop a plan for that, correct?

8  A.   Did I try to develop a plan?

9  Q.   Yes, sir.  Were you part and did you actually speak in the

10  development of a plan?

11  A.   I don't recall.  It's possible.

12          MR. GEORGE TRAGOS:  Your Honor, may I approach?

13          THE COURT:  You may.

14  BY MR. GEORGE TRAGOS:

15  Q.   Would it refresh your recollection to see the transcript?

16  A.   Yes, sir, it would.

17          THE COURT:  Which one?

18          MR. GEORGE TRAGOS:  This is -- I believe we're in --

19  sorry, I didn't keep track of these, Your Honor.  I think this

20  is 15, page five.

21          (Brief pause.)

22  BY MR. GEORGE TRAGOS:

23  Q.   And does that refresh your recollection?

24  A.   Yes, sir, it does.

25  Q.   So you were part of the planning about how the money was

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    going to get from the CHS to Mr. Osmakac and then to you to pay

2    for the explosives?

3    A.    I was part of the planning on how the money was going to

4    get to me from the CHS and to me from the Defendant.

5    Q.    In fact, you were concerned, weren't you, that if the CHS

6    gave the money to Mr. Osmakac, he might not use the money to

7    buy the guns and explosives, but, in fact, he might go off and

8    do something else with it?

9    A.    No, sir.

10   Q.    Page seven of -- we were in 15.

11            THE COURT:  Which line?

12            MR. GEORGE TRAGOS:  I don't have lines on mine.  Do

13   you have lines on yours, Your Honor, I'm sorry?

14            THE COURT:  Where in the page?

15            MR. GEORGE TRAGOS:  It's at the bottom of the page --

16   let me take a look, Your Honor.

17            THE COURT:  Third of the page, top of the page?

18            MR. GEORGE TRAGOS:  Bottom of the page. It starts,

19   "Uh, one thing".

20            THE COURT:  That's not the UCE talking.

21            MR. GEORGE TRAGOS:  Yes.  If the Court looks right

22   below it, it says UCE, "Right," he acknowledges the statement

23   and agreed to it.

24            MS. SWEENEY:  It doesn't go to the question that was

25   just asked.

```
 1              THE COURT:  Is that an objection, improper
 2   impeachment?
 3              MS. SWEENEY:  Yes, Your Honor.
 4              THE COURT:  Sustained.
 5   BY MR. GEORGE TRAGOS:
 6   Q.   Do you agree with the opinion that the source giving the
 7   money to Sami, that Sami might not actually show up in time
 8   'cause there was absolutely no guarantee that would happen?  Do
 9   you agree with that?
10   A.   Yes, sir.
11   Q.   In fact, were you concerned Sami was not even reliable
12   enough to show up?
13   A.   I don't recall.  Did I say that?
14   Q.   But do you recall that discussion?  Were you part of that
15   discussion?
16              THE COURT:  I've already explained, Mr. Tragos, that
17   you can ask this witness what he said and ask him if that was
18   his view, and if not or if you believe he gives an inconsistent
19   answer, you may impeach him, but you may not ask him what other
20   people thought in the context of this discussion.
21              MR. GEORGE TRAGOS:  Your Honor, I have another
22   supervisor statement and then the UCE speaking right after that
23   that I would like to ask him about.
24              THE COURT:  You may ask him what he said.
25              MR. GEORGE TRAGOS:  Would have a direct effect on
```

1    what he would do.

2            MS. SWEENEY:  Your Honor, may we approach sidebar?

3            THE COURT:  No, I've already answered the question.

4    BY MR. GEORGE TRAGOS:

5    Q.   Okay.  You remember making a comment to your boss -- by

6    the way, you remember -- I think you said you don't remember,

7    but did you refer to R.W. as your boss?

8    A.   I don't recall.

9    Q.   And do you remember ever talking to him and saying that

10   what he's saying was not logical?

11   A.   It's possible.

12           MR. GEORGE TRAGOS:  Your Honor, may I approach?  This

13   is page nine.

14           (Brief pause.)

15           THE COURT:  Yes, you may approach to refresh his

16   recollection.

17           (Brief pause.)

18           It's just one line.  Did you tell your boss something

19   he said wasn't logical?

20           THE WITNESS:  Yes, sir.

21   BY MR. GEORGE TRAGOS:

22   Q.   You did refer to him as "boss," right?

23   A.   Yes, sir.

24   Q.   Okay.  Now, what were you talking about that was not

25   logical?

```
 1            MS. SWEENEY:  Your Honor, I object, that calls for
 2   hearsay.
 3            THE COURT:  Sustained.
 4   BY MR. GEORGE TRAGOS:
 5   Q.   Did you know Mr. Osmakac did not have enough money to do
 6   what you wanted him to pay for?
 7   A.   Yes, sir.
 8   Q.   Were you concerned that Mr. Osmakac would only be able to
 9   give you a hundred dollars for the guns and explosives?
10   A.   I was not concerned.
11   Q.   Did you think that he might?
12   A.   Did I think that --
13   Q.   Mr. Osmakac may come up and just give you a hundred
14   dollars for all this?
15   A.   I don't recall.  I don't think that he might.
16            MR. GEORGE TRAGOS:  Okay.  Page 10, Your Honor, about
17   six lines down.
18            THE COURT:  Yes, sir.
19            MR. GEORGE TRAGOS:  May I approach the witness?
20            THE COURT:  You may.
21   BY MR. GEORGE TRAGOS:
22   Q.   So on December 22nd, 2011, did you, in fact, say he might
23   want to give you a hundred dollars?
24   A.   Yes, sir, I did.  That was not your original question.
25   Q.   In fact, wasn't it your intention to contact the
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   Defendant, get back in touch with him, weigh out the details,

2   discuss the devices, lay out a plan, how all that thing lays

3   out, plays out, and we'll have that conversation?  Is that not

4   true that you wanted to do that with the Defendant?

5   A.    Yes, sir.

6   Q.    So you were going to discuss the devices, right?

7   A.    Yes, sir.

8   Q.    You were going to lay out a plan with him?

9   A.    Going to hear his plan.

10  Q.    Well, it says here, "Lay out a plan."  Did you say his

11  plan or just lay out a plan.

12  A.    I said, "Lay out a plan."  I did say we were going to lay

13  out a plan together.

14  Q.    You're saying you said together?

15  A.    I just told you I did not say that we were going to lay

16  out a plan together.

17  Q.    Okay.  Again, this is you talking with the agents, right,

18  other agents?

19  A.    Yes, sir.

20  Q.    Sir, were you part of a discussion that was expressing

21  concern that Mr. Osmakac would take that $500 he was going to

22  get and do something else with it?

23  A.    No, sir.

24          MR. GEORGE TRAGOS:  Page three, Your Honor, of 16.

25          About the last third of the page, Your Honor.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1              Can I go into that with him?

2              THE COURT:  Without objection, yes.

3   BY MR. GEORGE TRAGOS:

4   Q.   Sir, let me -- remember this statement by R.W., the

5   supervisor; "It gives him -- it's more of a chance of him

6   taking that 500 bucks he gets tomorrow," and then your

7   statement, "Yes, sir, yes, sir, yes, sir."  Then R.W., "And

8   doing something else with it.  I don't like that."  Your

9   answer, "That's exactly," then it's unintelligible.  And then

10  Agent Collins here says, "Well then, also it creates a

11  situation that we also don't want where he has to actually go

12  and get the money from the source."

13             THE COURT:  Mr. Tragos, that goes beyond your

14  impeachment.

15  BY MR. GEORGE TRAGOS:

16  Q.   So do you recall those statements and your statements?

17  A.   Yes, sir.

18  Q.   So now you do remember a concern that he might do

19  something else with the $500?

20  A.   You asked if I had a concern.  I did not have a concern.

21             THE COURT:  No, he asked you whether you were part of

22  a discussion about a concern.  Does that refresh your

23  recollection that you were part of such a discussion?

24             THE WITNESS:  Yes, Your Honor.

25
```

```
 1   BY MR. GEORGE TRAGOS:
 2   Q.   Well, you knew the money was coming directly from the
 3   source, correct?
 4   A.   Yes, sir.
 5   Q.   And you hesitate.  Is there a question in your mind that
 6   the money was coming directly from the source?
 7   A.   No, sir.
 8   Q.   Let me ask you, have you ever been involved in undercover
 9   recordings where the recordings click on and off or don't
10   record the entire session?
11   A.   Two different questions.
12   Q.   Okay.  Let's start with the recorder clicking on and off.
13   A.   Yes, sir.
14   Q.   And have you also been involved in recordings that --
15   where the entire recording is not -- the entire conversation is
16   not recorded?
17   A.   Once the recorder is turned on, no, sir.
18   Q.   But there are times where it's turned off by itself?
19   A.   If the battery dies, the recording will turn off.  Other
20   than that, I haven't had that type of malfunction before.
21           MR. GEORGE TRAGOS:  Your Honor, at this time, I'm
22   finished with the December 22nd transcript.
23           THE COURT:  All right.
24           MR. GEORGE TRAGOS:  Does the Court wish me to
25   continue?
```

1          THE COURT:  Yes, sir.

2          MR. GEORGE TRAGOS:  All right.

3     BY MR. GEORGE TRAGOS:

4     Q.   Now, sir, let's go to January 7, 2012.  And this would be

5     the second -- you had two meetings with him that day, right,

6     you leave and come back, two tapes?

7     A.   When he left?

8     Q.   Right.

9     A.   And went to get his vehicle?

10    Q.   Right.

11    A.   Then he came back.

12    Q.   Okay.  And when he came back is when he -- I believe that

13    you -- in the video, we saw him saying a prayer.  That was his

14    fifth prayer of the day, correct?

15    A.   When we first got to the hotel is when he said his prayer.

16    Q.   The first time?

17    A.   The first time when we first got to the hotel is when he

18    first said his prayer.

19    Q.   Okay.  When is it that you showed him how to use

20    everything?  Was that the first time or the second time?

21    A.   The first time is -- when we first got to the hotel is

22    when I showed him how to use everything.  After I showed him

23    how to use everything, he left to go get his vehicle so we

24    could put the bomb in his vehicle.  He came back with his

25    vehicle and we put the bomb in his vehicle.

1    Q.   And the video, was that the first time or the second time?

2    A.   What is your question, sir?

3    Q.   Is the video, was that the first meeting or the second

4    meeting?

5    A.   There was a video of both.

6    Q.   Well, no, I'm sorry.  I'm talking about the one you refer

7    to as the martyrdom video; was that taken at the first or the

8    second?

9    A.   When he first arrived.

10   Q.   And the showing him how to use -- in fact, you had to show

11   him how to use the AK47, I think, two or three times, didn't

12   you?

13   A.   It's possible.

14   Q.   And then, I know earlier -- by the way, you told us that

15   you were kind of faking it about types of explosives, things

16   like that.  You remember that?

17   A.   I remember what I said, yes, sir.

18   Q.   On the bomb itself, when you showed him how to use the

19   bomb, was that the first visit or the second visit?

20   A.   Which bomb are you talking about, sir, the grenades, the

21   explosive vest or the bomb in his vehicle?

22   Q.   You consider the grenades the bombs, I guess?

23   A.   Yes, sir, grenades are bombs.

24   Q.   Okay.  And then I guess -- let's talk about the bomb in

25   the vehicle.  When did you show him how to do those; was that

1   the first visit or the second visit?

2   A.    The second, when he returned.

3   Q.    And that's the one where you're down -- I guess the video

4   is being taken through a window, I think; is that correct?

5   A.    When I showed him how to do it, we were inside of my

6   vehicle.

7   Q.    Okay.

8   A.    There's a video of that.

9   Q.    Okay.  Let's be clear.  There was a video of him with no

10  audio that was shot through a window, correct?

11  A.    Yes, sir.

12  Q.    And what were you doing in that video?

13  A.    There were two videos that were shot through a window that

14  we looked at.  There was one when we first came out of the

15  hotel room and he was putting the pistol in his vehicle.

16  There's a second one that was shot through a window when we

17  went to the back of my vehicle and put it into the trunk of his

18  vehicle.

19  Q.    When you put it in the trunk of his vehicle, how did you

20  do that?  Just physically tell us how it happened.

21  A.    We carried the bomb out of the trunk of my vehicle and put

22  it into the trunk of his vehicle.

23  Q.    Well, there is a wooden thing here, Exhibit Number 10.

24  Exhibit Number 10, where was that; was that in your vehicle or

25  his vehicle?

1   A.    It was in both vehicles at one point or another.

2   Q.    Where did it start?

3   A.    In my vehicle.

4   Q.    Okay.  And were the two, I guess, pails in your vehicle?

5   A.    Yes, it was.

6   Q.    Were the two pails and the wooden thing in your vehicle?

7   A.    Yes, it was.

8   Q.    Exhibit 10.  And when you carried them out of your

9   vehicle, did you take Exhibit 10 and the two buckets together

10  or separately?

11  A.    Separately.

12  Q.    Who carried what; do you remember?

13  A.    Yes, sir, I do.

14  Q.    Who carried what?

15  A.    The Defendant carried the platform, the base for it, and

16  one of the buckets, and I carried one of the buckets.

17  Q.    How heavy were they?

18  A.    Fairly heavy.

19  Q.    You put them in the Defendant's car?

20  A.    He put one in his vehicle, and I put one in his vehicle,

21  and he put the base in his vehicle.

22  Q.    Then you hooked them up?

23  A.    He hooked them up because I had shown him how it was

24  supposed to be hooked up when we were inside of my car.

25  Q.    Was that right before you moved them to his car?

```
1    A.   Yes, sir.
2    Q.   All right.
3         And when you hooked them up, there's a -- an orange case
4    here.  Is that 10 or 1-D?  Okay.
5              MS. SWEENEY:  It is 1-D, Your Honor.
6              MR. GEORGE TRAGOS:  It is?
7              MS. SWEENEY:  Yes.
8    BY MR. GEORGE TRAGOS:
9    Q.   Okay.  1-D is this orange case and this orange case was
10   something that went with the bomb, correct?
11   A.   Yes, sir.
12   Q.   And what was this orange case?
13   A.   That was the timer and detonation device for the bomb.
14   Q.   And this had to be hooked up to the bomb, correct?
15   A.   Yes, sir.
16   Q.   And you showed the Defendant how to do that?
17   A.   Yes, sir.
18   Q.   Showed him in the back of your car?
19   A.   No, we were inside of my vehicle, yes, sir.
20   Q.   Inside your vehicle?
21   A.   Yes, sir.
22   Q.   And then you -- did he have any explanation about -- when
23   you went back to his vehicle and hooked it up, did you have to
24   help him at all?
25   A.   Yes, sir.  I told him what he was doing while he was doing
```

1  it when he was having difficulty.

2  Q.   He was making a mistake when he was hooking it up?

3  A.   He was having difficulty.  I would tell him that goes in

4  there or something to that effect.

5  Q.   Okay.  Now, why wasn't that recorded?

6  A.   I believe it was recorded, sir.

7  Q.   Excuse me?

8  A.   I believe it was recorded.

9  Q.   Audio recorded?

10  A.   There was an audio recording, also, sir.

11  Q.   There was?

12  A.   Yes, sir.

13  Q.   But we didn't hear that, did we?

14  A.   No, we didn't.

15  Q.   Where was the microphone?

16  A.   For the audio recording?

17  Q.   Yes.

18  A.   It was on my person.

19  Q.   And were there any other video cameras other than the one

20  coming through the window?

21  A.   No, sir.

22  Q.   In the video, again, after he came back, did you show him

23  how to make the AK47 fully automatic?

24  A.   No, sir, I did not show him how to make it fully

25  automatic.

1   Q.   Didn't you show him how to switch the switches to fully

2   automatic?

3   A.   The weapon was already fully automatic.   That doesn't make

4   it fully automatic.

5   Q.   You didn't show him the switch?

6   A.   Yes, sir.

7   Q.   Don't you have to do something with the switch so it fires

8   in a fully automatic mode?

9   A.   Yes, sir.   Your question was did I show him how to make it

10  fully automatic.   But I told you the weapon was already fully

11  automatic.

12  Q.   So, no matter -- so right now, that weapon, if I went and

13  pulled the trigger, let's say it was loaded and it worked, it

14  would be fully automatic?

15  A.   Depends on what the selector switch is on?

16  Q.   That's what I'm -- so it has to have the right selector

17  switch to be fully automatic to operate in a fully automatic

18  manner?

19  A.   Yes, sir.   The selector switch has to be on in the right

20  position.

21  Q.   Did you show him that position?

22  A.   Yes, sir.

23  Q.   Now, there were three magazines, correct?

24  A.   There were four magazines altogether, sir.

25  Q.   Four altogether.   What; three and then one in the weapon?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1  A.   Three magazines, three banana magazines and one barrel

2  magazine.

3  Q.   And you showed him how to put the vest on?

4  A.   Yes, sir.

5  Q.   How did he do on that?  Did he do real well or did you

6  have to show him more than once?

7  A.   Did well enough, sir.

8  Q.   Excuse me?

9  A.   He did well enough, sir.

10  Q.   I'm sorry?

11  A.   He did well enough, sir.

12  Q.   Okay.  I'm not talking about well enough.  Did you have to

13  show him multiple times?

14  A.   I showed him more than one time.

15  Q.   Did you tell him which hand he had to use to get the

16  magazines out?

17  A.   Yes, sir.

18  Q.   By the way, did he have any trouble with one of his hands?

19  A.   I don't recall, sir.

20  Q.   Which hand did you tell him to use to get the magazines

21  out?

22  A.   I believe he used his left hand to pull the magazine out

23  of the magazine pouch to put it into the weapon 'cause he was

24  right handed.

25  Q.   When he told you he was going to carry 25 pounds, right,

1    in prior conversations, he could carry 25 pounds?

2    A.   Yes, sir.

3    Q.   Do you think that was a lot?

4    A.   I didn't think of it, sir.

5    Q.   You didn't think one way or the other whether 25 pounds

6    was too much or too little?

7    A.   No, sir, I did not.

8    Q.   Now, during the course of your conversation, and prior to

9    making the video, in fact, you -- Mr. Osmakac asked you, "So

10   you want to make the video; do you want to do it now?"  Didn't

11   he ask you that?

12   A.   Yes, sir.

13   Q.   And you asked him a lot of questions about the video, too,

14   didn't you?

15   A.   I asked him questions about the video, yes, sir.

16   Q.   You asked him whether he wanted to be dressed with

17   everything on it or without that on, right?

18   A.   Yes, sir.

19   Q.   And you asked him -- told him you want to make sure that

20   he could be heard on the video, right?

21   A.   I don't recall.  Did I say that?  I don't recall saying

22   that.

23   Q.   Well, he was worried -- let's say, he was worried about

24   somebody hearing him in the next room.  Remember that?

25   A.   Yes, sir.

1  Q.   But you told him that it's not -- it wasn't too loud, that

2  we can make sure that he can be heard, right?

3  A.   Yes, sir.

4  Q.   So you did talk about the volume of the video, didn't you,

5  to make sure he could be heard?

6  A.   The volume of the TV set.  If the TV set was too loud, he

7  wouldn't be able to be heard.  So that was what we were

8  discussing at that particular point.

9  Q.   When you say "Hear it," we're talking about the TV?

10  A.   Make sure he's heard over the TV set.

11         MR. GEORGE TRAGOS:  May I approach the witness, Your

12  Honor?  Page 34 --

13         THE COURT:  Of which exhibit?

14         MR. GEORGE TRAGOS:  Exhibit 123.

15         THE COURT:  You may.

16  BY MR. GEORGE TRAGOS:

17  Q.   Did you read the next page?

18  A.   I did not.

19     (Brief pause.)

20     Yes, sir.

21  Q.   So you wanted to make sure that he could be heard on the

22  video, correct?

23  A.   Yes, sir.

24         THE COURT:  We're going to break there for the

25  morning, maybe a little bit longer than 15 minutes.  So let's

1    call it 20, and if we are more delayed than that, I'll let

2    Mr. Stokes know that we're more delayed than that.

3              (Jury excused from the courtroom.)

4              Let's clear the courtroom.

5              (Brief pause.)

6              You may excuse the UCE.  He's going to go to chambers

7    to the SCIF to listen to the audio of session two.

8              MR. GEORGE TRAGOS:  Can he have a copy of the

9    transcript as well, Your Honor?

10             THE COURT:  Yes, you may give him the Court copy.

11             MR. GEORGE TRAGOS:  Right, the Court's got a copy up

12   there somewhere.

13             THE COURT:  I mean the official exhibit copy.

14             MR. GEORGE TRAGOS:  I don't have it.

15             THE COURT:  Do we have it, Ms. Vizza?  It's the

16   version that was given this morning.  Is that the only copy is

17   the one I have?  Has this been filed of record or is this just

18   randomly submitted?

19             MS. SWEENEY:  We provided it to you this morning,

20   Your Honor, as the -- anticipating that it would be the Court

21   exhibit related to this.  Your Honor, we do have an extra one

22   here that's the same as what you, I and defense counsel have

23   that we can provide.

24             THE COURT:  Well, I need a copy to work with in the

25   courtroom.  Give that to the UCE.  Actually, keep the one made

| | |
|---|---|
| 1 | so we can keep the Court exhibits in the room and let me use |
| 2 | the Court exhibit. |
| 3 | (Brief pause.) |
| 4 | The audio is T'd up to session two.  I just need to |
| 5 | listen to the entire session and then counsel will be able to |
| 6 | inquire of you with regard to that session and the question as |
| 7 | I understand it is, were you part of that discussion having to |
| 8 | do with the Hollywood ending, and so you need to listen to it |
| 9 | so you can refresh your recollection as to that. |
| 10 | MR. GEORGE TRAGOS:  Your Honor, if we could, what I |
| 11 | would like is to question him out of the presence of the jury |
| 12 | about that because, obviously, I don't want to be sandbagged |
| 13 | 'cause I'm not listening to the tape, so I want to ask him some |
| 14 | questions out of the presence of the jury 'cause I don't know |
| 15 | what his answers are going to be. |
| 16 | THE COURT:  Well, you never know what his answers are |
| 17 | going to be in a criminal trial. |
| 18 | MR. GEORGE TRAGOS:  If I had the tape, Your Honor, I |
| 19 | would be a little better informed. |
| 20 | THE COURT:  All right. |
| 21 | Let me just get this piece done first, take the UCE |
| 22 | to the SCIF, Mr. Forsgren is there, and there will be no audio |
| 23 | recording of him.  He's just going to be handed the headphones, |
| 24 | and he'll be allowed to listen to the transcript.  All right. |
| 25 | (Witness excused.) |

1           Please don't take any recording device in that room.

2           (Brief pause.)

3           Yes, sir.

4           MR. GEORGE TRAGOS:  Your Honor, just about 11:30,

5   Peter Tragos will need to step out of the courtroom to have a

6   telephonic hearing.  I wanted to inform the Court of that.

7           THE COURT:  Anything else?

8           MS. SWEENEY:  No, Your Honor, not from the

9   Government.

10          MR. GEORGE TRAGOS:  No, Your Honor.

11          THE COURT:  Will you get through the questions that

12  you wanted other than this one, Mr. Tragos?

13          MR. GEORGE TRAGOS:  Except -- well, except for the

14  ones the Court sustained, the objections of the Government.

15          THE COURT:  All right.

16          One of the jurors inquired of Mr. Stokes why some of

17  the lawyers are being able to use the transcript to show to the

18  witness and others weren't.  It's not my intention to respond

19  to that inquiry unless someone believes it needs to be

20  responded to.

21          MS. SWEENEY:  I don't understand what the juror is

22  referring to.

23          THE COURT:  What I think the juror is likely

24  referring to is during the examination on direct of the

25  Government's witness, the Government played the entirety of the

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    transcript and then in the Government's attempted examination

2    of the witness, because you didn't want to have to stop and

3    start the tape and start and stop the tape, you wanted to go

4    back and start walking back through the transcript, and I told

5    you you weren't going to introduce the transcript twice.

6            And then on cross, the defense is entitled to inquire

7    as to certain things and he's showing the transcripts, both to

8    the jury and to the witness, to either refresh his recollection

9    or to impeach him or to inquire and she may be confused as to

10   the difference.

11           MS. SWEENEY:  I did, during direct, Your Honor,

12   sometimes put the transcripts up on the ELMO.

13           THE COURT:  I think that's her point, after you saw I

14   wasn't going to let you just play the whole thing and then go

15   back, you started more carefully coordinating the playing of

16   the transcript with your assistant and so you were able to stop

17   at portions and you were able to show it.

18           So that's why I don't think there's any issue with

19   respect to it and I don't always respond to all jury questions.

20   But I don't like to just ignore them necessarily unless

21   someone -- in case someone objects to that.

22           MS. SWEENEY:  I don't.  No objection to not

23   responding to the question.

24           THE COURT:  Any objection from the defense?

25           MR. GEORGE TRAGOS:  No objection.

```
 1              THE COURT:  All right.
 2              We will take the break.  I'm going to go to chambers.
 3    I'll be back.  When did we let the jury out -- 10:36.  I told
 4    them 20 minutes, so 10:56.
 5              Court is in recess.
 6              (Brief recess.)
 7              You can reopen the courtroom.
 8              You want to inquire of the witness, Mr. Tragos?
 9              MR. GEORGE TRAGOS:  Yes, Your Honor.
10              THE COURT:  Yes, sir.
11              MR. GEORGE TRAGOS:  Yes?
12              THE COURT:  Oh, yes, go ahead.
13    BY MR. GEORGE TRAGOS:
14    Q.   Agent, did you have a chance to listen to the audio
15    recording?
16    A.   Yes, sir.
17    Q.   Okay.  Did that help you in determining whether or not you
18    were there or not?
19    A.   Yes, sir.
20    Q.   And were you present?
21    A.   I was present.
22              MR. GEORGE TRAGOS:  Okay.  At this point, Your Honor
23    --
24              THE COURT:  Ask him whether he overheard the
25    conversations.  I don't know that that gets you to where you're
```

1    going.

2    BY MR. GEORGE TRAGOS:

3    Q.   All right.

4         Did you hear the conversation?

5    A.   Yes, I did.

6    Q.   And was --

7              MR. GEORGE TRAGOS:  I need its session.

8              THE COURT:  Two.

9              MR. GEORGE TRAGOS:  Two.

10             THE COURT:  You can bring the jury back in.  You can

11   inquire the rest in the jury's presence.

12             MR. GEORGE TRAGOS:  Again, I have a list to -- I

13   don't want to be sandbagged.

14             THE COURT:  You have the transcript.  He acknowledges

15   he was there and present for the hearing of this discussion.

16             MR. GEORGE TRAGOS:  Okay.

17             THE COURT:  Yes, Ms. Sweeney.

18             MS. SWEENEY:  Your Honor, thank you.  Do you overrule

19   the Government's relevancy objection?

20             THE COURT:  Yes, I overrule the Government's

21   relevancy objection.

22             You may recall the jury.

23             And you should reask those questions in the presence

24   of the jury so that they understand the context of this

25   inquiry.

```
 1                  MR. GEORGE TRAGOS:  The Court said I should?

 2                  THE COURT:  Yes.

 3                  (Jury returned to the courtroom.)

 4                  Counsel, you may proceed.

 5      BY MR. GEORGE TRAGOS:

 6      Q.   Agent, when we were talking about the December 22nd, 2011

 7      inadvertent recording of your meeting with the other agents;

 8      you remember that?

 9      A.   Yes, sir.

10      Q.   And I specifically asked you if you remember your

11      supervisor, R.W., saying, "They want this Hollywood ending,

12      that's great, but plus we start laying out attempted use of a

13      WMD, I don't remember the Title 18 code for that one."

14           You remember me asking you about that Hollywood ending?

15      A.   Yes, sir.

16      Q.   Now, have you had a chance to review the actual audio of

17      this transcript?

18      A.   Yes, sir.

19      Q.   Were you present for the Hollywood ending comment?

20      A.   Yes, I was.

21      Q.   Okay.  And did you hear it?

22      A.   I did hear it.

23      Q.   Now, let's go back to January 7th, 2012, and this is the

24      second meeting when he comes back, what we were talking about

25      over the break.  Your remember that?
```

```
1    A.   Yes, sir.

2    Q.   Okay.  And at that meeting, you were also concerned that

3    Mr. Osmakac may not even have enough money to pay for the taxi.

4    Remember that?

5    A.   Yes, sir.

6    Q.   Okay.  What was that taxi for?

7    A.   The taxi that would get him from where he staged the

8    rental vehicle that he would return after staging the vehicle

9    with his vehicle with the bomb in it, where he staged that

10   rental vehicle that he would take to go get his vehicle to

11   bring back to the hotel.  I don't know if that was clear.

12   Q.   You knew his financial situation, so you were concerned

13   about whether he even had enough money to pay for that taxi,

14   right?

15   A.   Yes, sir.

16             MR. GEORGE TRAGOS:  Excuse me a moment.

17             (Brief pause.)

18   BY MR. GEORGE TRAGOS:

19   Q.   Now, he was about to leave --

20             THE COURT:  One second, one second.

21             (Brief pause.)

22             I would again advise counsel that those microphones

23   are sensitive, especially to people who have headsets, so

24   anything you say can be overheard over the headsets and also

25   heard by the Court and also simultaneously recorded.  It's
```

1   imperative that you mute your mic before you talk at counsel

2   table.

3           Counsel, you may continue.

4   BY MR. GEORGE TRAGOS:

5   Q.   Now, Mr. Osmakac was getting ready to leave and you talked

6   to him about, okay, when you come back, but then you actually

7   stop him and remind him that he wants to make a video before he

8   leaves.  Do you remember that?

9   A.   Yes, sir.

10  Q.   So he's ready to walk out the door and you stop and say,

11  hey, don't forget making the video, right, or words to that

12  effect?

13  A.   No, sir.

14  Q.   Okay.  What do you say?

15  A.   I don't recall my exact words, but I did not say that.

16  Q.   Did you tell him, "Okay, it's now, just let's do the

17  video?"

18  A.   Yes, sir.

19  Q.   And then once you say that, he stops leaving, comes back

20  and you do the video?

21  A.   Yes, sir.

22  Q.   You're the one behind the camera, correct?

23  A.   Yes, sir.

24  Q.   But he doesn't do everything on the video you want, does

25  he?

```
1    A.    I had no expectations, sir.

2    Q.    Well, you tell him that -- you ask him about what he

3    wears, you ask him about what he's going to say, but there's

4    something else that you want on that video and he tells you

5    he's not going to do it.  Do you remember that?

6    A.    I had no expectations, sir.

7    Q.    Did you ask him, "Don't you want to take credit for what

8    you're going to do?"

9    A.    Yes, sir, I did ask that.

10   Q.    And he goes, "Huh?"

11   A.    Yes, sir.

12          (Brief pause.)

13          THE COURT:  Do you have a question pending?

14          MR. GEORGE TRAGOS:  No, Your Honor, I'm trying to

15   find the page in the actual exhibit.  The page numbers are

16   different.

17   BY MR. GEORGE TRAGOS:

18   Q.    Do you remember these questions and answers?

19          "You didn't want to take credit for what you -- "You

20   didn't want to take credit for what you're going to do?"

21          MR. OSMAKAC: "Huh"?

22          UCE: "You didn't want to take credit for what you're going

23   to do, like, say like, you know."

24          MR. OSMAKAC: "Oh, they -- they know."

25          UCE: "You didn't went to take credit for it?"
```

```
1   A.    Yes, sir, I remember that.

2   Q.    Excuse me?

3   A.    I said, yes, sir, I remember that.

4   Q.    Okay.  What were you talking about him doing that he

5   didn't do?

6   A.    Say his name while he was making the martyrdom video.

7   Q.    And you tried to get him to do that, but he wouldn't do

8   that, would he?

9   A.    I did not try to get him to do that.  I asked him if he

10  didn't want to do that.

11  Q.    You asked him four times, didn't you?

12  A.    I did not tell him to do it, I asked him.

13  Q.    Did you ask him four times?

14  A.    I didn't count the number of times I asked him.

15  Q.    But it was multiple times, right?

16  A.    Yes, sir.

17  Q.    And he didn't do it, did he?

18  A.    No, sir, he didn't.

19  Q.    Now, he also told you that previously he had been in

20  Detroit, correct?

21  A.    Yes, sir.

22  Q.    And he had been stopped by the FBI in Detroit?

23  A.    Yes, sir.

24  Q.    And questioned by the FBI in Detroit?

25  A.    Yes, sir.
```

1   Q.   And released by the FBI in Detroit?

2   A.   Yes, sir.

3   Q.   Do you know how long ago that was?

4   A.   No, sir.

5   Q.   Let's talk about Exhibit 1-D, the orange box.

6        Now, tell us again what is this?

7             THE COURT:  Asked and answered.  You have another

8   question?

9   BY MR. GEORGE TRAGOS:

10  Q.   Yes.

11       Did you give him instructions on how to do this?

12  A.   Yes, sir.

13  Q.   In fact, was he not so incompetent that you actually had

14  to type the instructions and put them on top of the orange box?

15  A.   No, sir.

16  Q.   No, sir?

17  A.   He was not -- the instructions are not there because he

18  was incompetent if that was your question.  That's not why the

19  instructions are up there.

20  Q.   Oh, why were they there?

21  A.   So that when I'm instructing him I don't forget myself.

22  Q.   Oh.  Now these are the instructions, right?

23  A.   Yes, sir.

24  Q.   Step one, turn on phone.  That's probably one you would

25  have forgot to do, right, so that's why we have it on here?

```
1    A.    Is that a question?

2    Q.    Yes.

3    A.    No.

4    Q.    You wouldn't have forgotten to turn on the phone?

5    A.    I would think -- I would hope I wouldn't.

6    Q.    Turn timer to time needed?

7    A.    Yes, sir.

8    Q.    What is that?  Explain what that instruction does.

9    A.    There's a dial.  You turn that dial to 15 minutes.

10   Q.    So that's the timer?

11   A.    Yes.

12   Q.    Step three, move toggle switch to A, parentheses, arm, end

13   parentheses.  If light is on, do not hook up blasting cap and

14   start over at step one.  Is this the toggle switch?

15   A.    Yes, sir.

16   Q.    And where was the light?

17   A.    I can't see it from there.

18   Q.    You can't see it?

19   A.    No, sir.

20         MR. GEORGE TRAGOS:  May I approach the witness, Your

21   Honor?

22         THE COURT:  Yes.

23         THE WITNESS:  It would be the bulb right there.

24   BY MR. GEORGE TRAGOS:

25   Q.    Right here?
```

```
 1    A.    Yes, sir.
 2    Q.    Okay.  Hook up blasting cap to plugs on outside of box.
 3    When timer gets to zero, the light will come on and the device
 4    is armed.
 5         Let me ask you.  So you put this to 15 minutes, when the
 6    15 minutes goes around and gets back to the off spot, that's
 7    when the device is armed?
 8    A.    If you've done all those other steps, to include putting
 9    the battery in, yes, sir.
10    Q.    Okay.  And once this is armed, does it explode?
11    A.    No, sir.
12    Q.    So some other step has to happen?
13    A.    Yes, sir.
14    Q.    Okay.  Call cell phone (813)546-3104.
15    A.    Yes, sir.
16    Q.    Is that the number for this cell phone?
17    A.    Yes, sir.
18    Q.    Okay.  So is the theory when you call this cell phone the
19    bomb will explode?
20    A.    After completing all those steps, yes, sir.
21    Q.    Once it's armed?
22    A.    After you complete all those steps, yes, sir.
23    Q.    Well, don't you have to complete those steps for it to be
24    armed?
25    A.    I don't understand your question.  After you complete all
```

1   of those steps that are written there, and you call the cell

2   phone, the bomb will explode, yes, sir.

3   Q.   Well, steps one through four arm the bomb, correct?

4   A.   Yes, sir.

5   Q.   So once the bomb is armed, you have completed one through

6   four?

7   A.   Yes, sir.

8   Q.   Otherwise, it can't be armed, correct?

9   A.   Yes, sir.

10  Q.   And once it's armed, you can call the number and the bomb

11  explodes?

12  A.   In theory, yes, sir.

13  Q.   And if you call -- if you don't call this number, the bomb

14  doesn't explode?

15  A.   Yes, sir.

16  Q.   Who put this together?

17  A.   Someone from the FBI.

18          MR. GEORGE TRAGOS:   One minute to review my notes and

19  I'll be close to finishing.

20          THE COURT:   Yes, sir.

21  BY MR. GEORGE TRAGOS:

22  Q.   On December 6th, 2011 --

23  A.   Yes.

24  Q.   -- was there a meeting scheduled?

25  A.   I don't recall, sir.

```
1   Q.   You don't remember if there was or wasn't?

2   A.   I don't recall.

3   Q.   Do you remember December 5th?

4   A.   Yes, sir.

5   Q.   Was there a meeting scheduled December 5th?

6   A.   There wasn't a meeting scheduled, there was a potential

7   meeting that could happen on that date.  There's a difference

8   in what you are asking.

9   Q.   I'm sorry, go ahead and finish.

10  A.   There's a difference in what you're asking.  There was not

11  a meeting scheduled.  That was one of the dates that we had

12  laid out.  We had laid out different dates that we could

13  possibly meet on.  December the 5th was a Thursday.  That was

14  the date the Defendant felt was a busy day where he could

15  commit his act on December 5th, or Saturday would be another

16  date that's a busy day.

17       So what we had discussed on December 1st was that one of

18  those two days would be -- either I would try to do it on

19  December 5th, but if I couldn't do it on December 5th, that it

20  would have to be done like December 7th, which is what ended up

21  happening.

22  Q.   Agent, are you sure about those dates?

23  A.   Thursday?

24  Q.   Those dates you gave us, December 1st, December 5th, you

25  sure about these dates?
```

```
1    A.    I'm sorry, January.  I apologize.

2    Q.    Okay.  Now, let's go back to my question.

3    A.    Yes, sir.

4    Q.    Was there a meeting scheduled on December 5th?

5    A.    Oh, yes, sir, yes, sir, I apologize.

6    Q.    Was there a meeting scheduled on December 6th?

7    A.    I don't recall.

8    Q.    There could have been, you just don't remember?

9    A.    I don't recall.

10   Q.    Were you here December 6th?

11   A.    Again, I don't recall.

12   Q.    When you met with the CHS the very first time or spoke to

13   him, was that before the telephone call that was recorded?

14            THE COURT:  Can you ask one or the other question?

15   You said when you met with him or spoke to him.  Which do you

16   mean?

17   BY MR. GEORGE TRAGOS:

18   Q.    Okay.  When is the first time you had any contact with the

19   confidential human source?

20   A.    Prior to December 5th.  I don't recall the exact date.

21   Q.    And was it face to face or was it a phone call?

22   A.    A face-to-face meeting.

23            MR. GEORGE TRAGOS:  Okay.  One moment, Your Honor.

24            (Brief pause.)

25            That's all the questions I have, Your Honor.
```

```
 1                 THE COURT:  Anything from the Government?

 2                 MS. SWEENEY:  Yes, Your Honor.

 3                 THE COURT:  Pull the microphone down, Ms. Sweeney.

 4                 MS. SWEENEY:  Thank you, Your Honor.

 5                          REDIRECT EXAMINATION

 6    BY MS. SWEENEY:

 7    Q.   Agent, I'm going to start with what has been previously

 8    admitted as Government's Exhibit 108-B.  This is the transcript

 9    of your December 19th phone call with the Defendant and the

10    CHS.

11         In this document on page three, the Defendant tells you,

12    "Yeah, I'm looking for some work, inshallah."

13         After this conversation, did the two of you ever speak

14    about work again?

15    A.   No, ma'am.

16    Q.   On page four, the Defendant also tells you, "So we can

17    talk about the work and how much you guys want to pay me.  You

18    know what's going on, inshallah."

19         Did the two of you ever speak again about your paying the

20    Defendant anything?

21    A.   No, ma'am.

22    Q.   So why do you say that the two of you were speaking in

23    code when you had this conversation?

24                 MR. GEORGE TRAGOS:  Objection, asked and answered.

25                 THE COURT:  Sustained.
```

1   BY MS. SWEENEY:

2   Q.   On the December 21st, 2011 meeting, where did -- in what

3   different places did your conversations with the Defendant take

4   place on that date?

5   A.   On December 21st?

6   Q.   On December 21st.

7   A.   All our conversations occurred inside the vehicle.

8   Q.   Was there a time when you got outside the vehicle during

9   that meeting?

10  A.   Yes.

11  Q.   And why did you get outside the vehicle during that

12  meeting?

13  A.   For two reasons.  The first time we stepped outside of the

14  vehicle, I patted the Defendant down to see if he had any

15  weapons.  The second time -- we got back in the vehicle after

16  that.  The second time we got outside of the vehicle was the

17  Defendant was concerned that I had my cell phone in the vehicle

18  and wasn't comfortable speaking with my cell phone in the

19  vehicle.  So we got outside of the vehicle and had our

20  conversation outside of the vehicle.

21  Q.   So when you got out of the vehicle, did you take your cell

22  phone with you?

23  A.   No, I did not.

24  Q.   Is that why no code was necessary during the December 21st

25  meeting?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   A.   Yes, it is.

2   Q.   When you got back into the car, what happened then?

3   A.   The Defendant turned the radio on very loud to mask our

4   conversation and we continued to talk till I dropped him off.

5            THE COURT:  What are you looking for, Ms. Sweeney?

6            MS. SWEENEY:  Government's 109-B.

7            THE COURT:  Is that it, Mr. Tragos?

8            MR. GEORGE TRAGOS:  No, it isn't.

9            MS. SWEENEY:  Your Honor, I believe I can put it up

10  on the Government's computer.  If we could switch to that, I

11  can try that.

12           THE COURT:  I have the Court's copy if you want it.

13           MS. SWEENEY:  I'll try the computer.  If that doesn't

14  work, thank you, Your Honor.

15  BY MS. SWEENEY:

16  Q.   Okay, Agent, I've put on the screen Government's Exhibit

17  109-B, and I've gone to page 10 of that exhibit.  On this

18  portion, you tell the Defendant, "I'll talk to the brother."

19       Who are you referring to there?

20  A.   I'm referring to the CHS, ma'am.

21  Q.   And what does the Defendant instruct you in return?

22  A.   Do not talk to him on the phone for this.

23  Q.   Mr. Tragos asked you about the Defendant being under

24  surveillance.  What is your understanding of why the Defendant

25  was under surveillance?

1          MR. GEORGE TRAGOS:  Objection, his understanding is

2     irrelevant.

3          THE COURT:  Sustained.

4     BY MS. SWEENEY:

5     Q.   Agent, I'm going to put up Government's Exhibit 118-B,

6     which is the transcript from the recording on January 1st of

7     2012.  And I'm pulling up page 16.  Mr. Tragos asked you about

8     this conversation where the Defendant says, "Yesterday, I was

9     seven, seven years old.  I remember everything I did since I

10    was seven."  And he asked you if the Defendant had told you he

11    didn't feel any older than seven or eight.

12         What was the context of this conversation?

13         MR. GEORGE TRAGOS:  Objection, it speaks for itself.

14         THE COURT:  Overruled.

15    BY MS. SWEENEY:

16    Q.   Agent, I'm sorry, go ahead.

17    A.   The reason we got into the conversation was because the

18    Defendant was talking about he was ready at that point to do

19    this act and die because it didn't matter, he doesn't feel any

20    different now than he did years ago, and didn't think that he

21    would feel any different than he does now years from now.  That

22    was the context of saying that "I remember yesterday like I was

23    seven, I don't feel any different now," so it's to say where he

24    is at this point in his life, that he didn't think that in the

25    future going forward that he wouldn't feel any different than

| | |
|---|---|
| 1 | either that he does at that particular point.  He hadn't |
| 2 | changed in that amount of time, so he doesn't think he would |
| 3 | change in a future amount of time equivalent to that. |
| 4 | Q.   During your interactions with the Defendant, did you feel |
| 5 | that he exhibited the mentality of a seven or eight year old? |
| 6 |           MR. GEORGE TRAGOS:  Objection. |
| 7 |           THE COURT:  Sustained. |
| 8 |           With regard to the objection to what the witness' |
| 9 | understanding was or why the Defendant was under surveillance, |
| 10 | the Court sustained the relevancy objection.  It wasn't really |
| 11 | irrelevant, it just lacked predicate or foundation for his |
| 12 | understanding. |
| 13 | BY MS. SWEENEY: |
| 14 | Q.   Agent, during the course of this investigation, did you |
| 15 | come to learn why the Defendant was under surveillance? |
| 16 |           MR. GEORGE TRAGOS:  Objection, it's been asked and |
| 17 | answered. |
| 18 |           THE COURT:  Overruled. |
| 19 |           THE WITNESS:  Yes, I did. |
| 20 | BY MS. SWEENEY: |
| 21 | Q.   And why was that? |
| 22 |           THE COURT:  Well, you need to ask what his basis was, |
| 23 | who he learned it from. |
| 24 | BY MS. SWEENEY: |
| 25 | Q.   Who did you learn that from, Agent? |

1    A.    From the agents investigating the case.

2    Q.    And why did you understand the Defendant to be under

3    surveillance?

4              MR. GEORGE TRAGOS:  Objection.

5              THE COURT:  Sustained.

6              MS. SWEENEY:  Ms. Vizza, can we switch to the

7    document camera?  It's easier for this.

8    BY MS. SWEENEY:

9    Q.    Agent, I'm putting up Government's Exhibit 121.1-B.  Do

10   you recall which portion of your meeting with the Defendant

11   that this was, looking at the transcript?

12   A.    Yes, I do.

13   Q.    And what was it?

14   A.    That's when I first picked the Defendant up on

15   January 7th.

16   Q.    During the course of this meeting, were there topics of

17   conversation that came up more than one time?

18   A.    Yes, there were.

19   Q.    Do you recall any of them?

20   A.    We talked about --

21             MR. GEORGE TRAGOS:  Objection, Your Honor, calls for

22   a narrative and relevance and beyond the scope of cross.

23             THE COURT:  Overruled.

24             THE WITNESS:  We talked about targets that the

25   Defendant wanted to hit.  We talked about the Defendant being

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    under surveillance.  We talked about ways to overcome the issue

2    of the surveillance that the Defendant was under.

3    BY MS. SWEENEY:

4    Q.   So Agent, I'm just going to show you on page six, you say

5    to the Defendant, "Hey, you just want to wait, just forget --

6    just forget it for now and wait a little while and just see

7    things cool back down again, when things cool back down again.

8    Just wait awhile."

9         What are you saying to the Defendant there?

10             MR. GEORGE TRAGOS:  Objection, speaks for itself.

11             THE COURT:  Overruled.

12             THE WITNESS:  The Defendant --

13             THE COURT:  The question is, what were you saying?

14             THE WITNESS:  I was saying to the Defendant because

15   that he felt there was so much surveillance on him and things

16   were difficult at that point, there was a likelihood that

17   people were watching him, we can wait, let things cool down,

18   and then we can proceed again at a later date.  He could

19   contact me when he thinks things are better and we can proceed

20   at that point.

21   BY MS. SWEENEY:

22   Q.   Agent, do you recall, over the course of this portion of

23   this meeting, making an offer similar to that several times?

24             MR. GEORGE TRAGOS:  Objection, asks for a conclusion.

25             THE COURT:  Overruled.

1           THE WITNESS:  Yes, I do.

2    BY MS. SWEENEY:

3    Q.   So what were you -- we just looked at this on page six.

4    I'm going to show you page 10, at the top.  You say, "I'll do

5    this.  You wanna just -- I can -- just let me just take you

6    back and then give you some time and you can give -- call me

7    and let me know."

8           Is that another instance on which you're telling the

9    Defendant he can wait?

10          MR. GEORGE TRAGOS:  Objection, leading.

11          THE COURT:  Sustained.

12   BY MS. SWEENEY:

13   Q.   Agent, in that portion I just read, what are you saying

14   there?

15          MR. GEORGE TRAGOS:  Objection, speaks for itself.

16          THE COURT:  Overruled.

17          THE WITNESS:  I was telling the Defendant that,

18   again, we can let this thing go for now and when he feels

19   better, when things calm down, when he didn't think there's

20   surveillance on him, he could contact me at a later date and we

21   can discuss it then.

22   BY MS. SWEENEY:

23   Q.   Does the Defendant take you up on your offer?

24   A.   No, he doesn't.

25   Q.   In the same transcript on the bottom of the page 12, you

1   say, "I think -- just kind of think best, best, best way to do

2   it now is just wait," and now on the top of page 13, "Wait till

3   you feel better, wait till you think things are better, and

4   then you let me know then."

5       What do you mean?  What are you saying there?

6   A.   Again, telling the Defendant again that because he feels

7   that things are so bad that there's surveillance on him, and he

8   wasn't comfortable, that we can just wait, you know, when

9   things cool down, when he feels better about it, to let me know

10  at that point, and we can get back together and we can proceed

11  from there.

12  Q.   Again, did the Defendant take you up on that offer?

13  A.   No, he didn't.

14  Q.   On page 15 of the transcript, you say, "Just wait, let's

15  just wait 'cause when I do it, I give everything at one time."

16  And then he says, "Yeah."  And you say, "I'll give everything

17  at one time."  And he says, "Yeah, that's what I want to do."

18      What are you doing?  What are you saying in this portion?

19  A.   Because of the fact that there was no way that I can give

20  him parts of the items that he wanted me to provide to him and

21  let him go with that and then come back at a later date and

22  give him the rest of it, what I told him was that whenever I

23  give him the things, I would have to give him everything at one

24  time because there was no way that the FBI would allow any of

25  those items outside of their control.

1    So what I was telling him is that when I do give him the

2    items, I'll give him everything at one time, that I will have

3    to wait for that because that's just the way I like to do

4    things.

5    Q.   And what does the Defendant say that he wants to do as a

6    result of that?

7    A.   That's what he wants to do, also.  He wants to get

8    everything at one time because he wants to do everything at one

9    time.

10   Q.   On page 18 of the transcript, you say, "I'm just saying

11   things -- things are hot right now.  Why don't we just go."

12       What are you saying there?

13   A.   Because the Defendant kept saying how his vehicle wasn't

14   good and was -- kept trying to get me to get another -- a

15   secondary vehicle, which I didn't think was going to be

16   possible to use as an explosive, to put the explosive in, and

17   he felt his vehicle was compromised.  I was telling him let's

18   just wait, you know, when things calm down, when he feels

19   better, we can proceed at that time.

20   Q.   Also on the bottom of page 18, you say, "So just -- just

21   give it some time, give it some time so that we know we can get

22   away clean.  I don't want to take any chances."

23       What are you saying there?

24   A.   'Cause it would be dangerous for me, also, if he's being

25   surveilled, there's a possibility that he can get caught, and

1    if he gets caught, there's a possibility of we're together, and

2    he's being surveilled, that I could possibly get caught, also,

3    so let's just wait.

4    Q.   On page 20 of the transcript, you say, "Just kind of

5    nervous now, is how you think somebody is following us, I'd

6    rather we just kind of wait."  And the Defendant replies, "No,

7    I think we lost them.  I don't think, like honestly, I don't

8    think this opportunity is going to come much 'cause we don't

9    lose them many times."

10        What are you saying there?

11   A.   I told the Defendant that I was concerned because he said

12   he had surveillance on him, I was concerned that there's a

13   possibility that we can get caught doing this, that this might

14   not be a good time, that we should wait.  And the Defendant

15   didn't want to wait, he felt that at that point that the

16   surveillance had been lost, we had lost the surveillance, that

17   it was all clear, that we can proceed forward.

18   Q.   On page 23, you say, "Man, don't worry about that, don't

19   worry about that.  If you're not --" then you continue, "If you

20   didn't think you were going to do this thing today, you're not

21   prepared if you didn't think you were going to do it today."

22   And the Defendant says, "No, I thought I was going to do it

23   today."

24        What are you discussing there?

25   A.   The first part when I said don't worry about it is the

```
 1    Defendant was worried about me, that --
 2              MR. GEORGE TRAGOS:  Objection, speculation.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  The Defendant was worried about me and,
 5    you know, but my issues would be with the stuff, he didn't want
 6    me to have to take the stuff back and all that stuff.  And so I
 7    tried to ease his mind on that, don't worry about that, don't
 8    worry about me, and if he's not ready to do it today, there's
 9    no reason for us to go forward anyway.
10              So if he's not ready to do it today, if he wasn't
11    ready to go forward today, that he wasn't ready, we didn't have
12    to do it at that point, that we could wait till he was ready
13    and then he can contact, make that point where we could go
14    forward at that point.
15    BY MS. SWEENEY:
16    Q.   How did he respond to that?
17    A.   That he's been ready to do it, that he was ready to do it
18    today, he's ready to do it at that point, that he wanted to go
19    forward.
20    Q.   Then finally on page 25 of the transcript, you say, "Don't
21    worry about me, don't worry about me.  If you want to just --
22    we can just -- we can wait, we can wait till," and the
23    Defendant replies, "Actually, like honestly, I feel good, man."
24         What are you saying there?
25    A.   Again, just to ease his worries, don't worry about my
```

1   situation, that it's okay with me if we don't do it at that

2   particular time, we can wait till he feels better about it.

3   Q.   And at the end of this portion of the meeting, what was

4   the Defendant's decision about whether to go forward or not?

5   A.   He wanted to go forward.

6   Q.   Okay.  Agent, I'm going to show you Government's Exhibit

7   111-B.  I'm going to show you page 18 of that transcript.  The

8   Defendant says, "I know one brother that had the contact, he's

9   a good brother, but I haven't contacted him yet.  He told me a

10  while back whenever I can find."

11       Is the Defendant talking about the CHS there?

12  A.   No, he's not.

13           MR. GEORGE TRAGOS:  Objection, no basis or predicate

14  for that.

15           THE COURT:  Overruled.

16  BY MS. SWEENEY:

17  Q.   Agent, and then he says, "'Cause I was looking -- matter

18  of fact, what might put me on their list is I went downtown

19  South St. Pete and I talked to some drug dealers."

20       Do you understand what the Defendant is referring to when

21  he says that?

22  A.   Yes, I do.

23  Q.   What is he referring to?

24  A.   The Defendant had stated that he had went down to South

25  St. Pete and talked to some drug dealers about buying some

```
 1  weapons.
 2           MR. GEORGE TRAGOS:  Objection, no basis from going
 3  beyond that.
 4           THE COURT:  Overruled.
 5  BY MS. SWEENEY:
 6  Q.   He was looking for some what, Agent?
 7  A.   To buy some guns from some drug dealers in South St. Pete.
 8  Q.   And do you understand why the Defendant in the same
 9  passage is telling you about one brother and the trip to St.
10  Pete?
11  A.   That that brother is the one --
12           THE COURT:  The question is do you understand?
13           THE WITNESS:  Yes, I do.
14           THE COURT:  And what is the basis for that
15  understanding?
16           THE WITNESS:  That in the context of that
17  conversation, that there was a brother who had contact --
18           MR. GEORGE TRAGOS:  Objection.
19           THE COURT:  What is your basis?  Did he tell you what
20  he was discussing?
21           THE WITNESS:  Yeah, we continued to talk about that
22  and I mean it clarified itself in the conversation.
23           THE COURT:  You may continue.
24  BY MS. SWEENEY:
25  Q.   On page 20 of the transcript, the Defendant says, "I'm
```

1   gonna contact the one brother that I told you about," and he

2   then goes on on page 21 to say, "And if he's down -- he used to

3   be down in the day" -- I'm sorry -- "He used to be down back in

4   the day, so if he's down, he gonna use his own credit card

5   'cause he want to make the big hijrah, too."

6          So, Agent, with that, is that the further conversation you

7   were just referring to?

8   A.   Yes, it is.

9   Q.   And is it based on that that you understand --

10          THE COURT:  Ms. Sweeney, you can't ask a leading

11   question.

12   BY MS. SWEENEY:

13   Q.   Agent, on the portion that we were just speaking about

14   back on page 18 where the Defendant says -- talks about this

15   brother and talks about St. Pete, do you understand the

16   connection between those two topics?

17   A.   Yes, I do.

18   Q.   And what do you understand that connection to be?

19          MR. GEORGE TRAGOS:  Objection.

20          THE COURT:  Let me see counsel at sidebar.

21          (Thereupon, the following discussion was had at

22   sidebar:)

23          MR. GEORGE TRAGOS:  Your Honor, what she read to him,

24   there's no logical connection to give him the basis.  There's

25   no basis for him saying this guy is a drug dealer which I still

```
 1   haven't seen.
 2            THE COURT:  Well, the Defendant said there were drug
 3   dealers.
 4            MR. GEORGE TRAGOS:  No, he did not.
 5            MS. SWEENEY:  Yes, he did.
 6            MR. GEORGE TRAGOS:  Excuse me -- he went to get guns.
 7   The statement that he went to get guns, he never says he went
 8   to get guns.  This witness has been able to testify that he
 9   went down to see these drug dealers to buy guns as opposed to
10   drugs, but he's able to say that, there's no explanation for
11   that.  The statement that she just read doesn't explain that.
12   I don't know how he can testify to all these things.
13            THE COURT:  The witness said that he heard this
14   Defendant's statements that he went down to South St. Pete to
15   buy some bodies, I believe is what he said, and that the
16   Defendant himself said he's a Muslim and so the law enforcement
17   officers knew he wasn't there to buy any drugs and from that
18   the witness contends he believes that the Defendant was talking
19   about weapons.  And he's free to draw that inference and
20   explain that inference and you are free on cross-examination,
21   to challenge it, but that's what the witness is prepared to
22   say, Mr. Tragos.  Overruled.
23            MR. GEORGE TRAGOS:  What's the next question?
24            (Thereupon, the sidebar conference was concluded.)
25
```

1  BY MS. SWEENEY:

2  Q.   Agent, still on Government's Exhibit 111—B, on page 18,

3  the Defendant talks about the brother that he's going to

4  contact and then he transitions into speaking about South St.

5  Pete.

6       Do you understand the connection between those two topics?

7  A.   Yes, I do.

8  Q.   What is the connection between these two topics?

9           MR. GEORGE TRAGOS:  Objection, predicate.

10          THE COURT:  Overruled.

11          THE WITNESS:  That this brother that he had contact

12 with informed him of this area in South St. Pete where he can

13 go and get guns from these drug dealers.  He went down there to

14 do that and that's what put the FBI on him.

15 BY MS. SWEENEY:

16 Q.   I just want to be clear, Agent.  At the bottom of page 18,

17 the Defendant says, "I caught him filming us from behind me.

18 He was working in the business next to me.  There was an

19 informant, so I went to another place.  And I think the other

20 place had bodies, but they could only get one."

21      Are you familiar with the term "bodies" in this context?

22 A.   Yes, I am.

23 Q.   And how, without telling me what it is, how are you

24 familiar with it?

25 A.   From my experiences working drug—related cases and working

1   gang-related cases.

2   Q.   What does the word "bodies" mean in this context?

3   A.   A gun that's been used in murders or homicides.

4   Q.   And the Defendant says they could only get one.  What do

5   you understand that to mean?

6   A.   The Defendant was looking for more than one gun at that

7   point, so when he went there, they could only get one gun for

8   him.

9           MR. GEORGE TRAGOS:  What page was that?

10           MS. SWEENEY:  That was page 19.

11           MR. GEORGE TRAGOS:  Of 111?

12           MS. SWEENEY:  Of 111.

13   BY MS. SWEENEY:

14   Q.   On the bottom of page 20, the Defendant says, "And I'm

15   going to contact the one brother that I told you about."

16       Who do you understand him to be referring to there?

17   A.   The brother that he mentioned in the prior occasion, the

18   contact.

19   Q.   The brother that we just talked about?

20   A.   Correct.

21   Q.   And he goes on to say, "And if he's down, he used to be

22   down back in the day, so if he's down, he's gonna use his own

23   credit card 'cause he wanna make the big hijrah, too."

24       What do you understand the Defendant to be speaking about

25   there?

1  A.   That he would get that other brother to partake in this

2  act with us.  He would use his credit card 'cause that brother

3  has a credit card 'cause that brother also wanted to be a

4  martyr, do a suicide bombing.

5        MR. GEORGE TRAGOS:  Objection, your Honor, is he

6  interpreting the word "hijrah?"

7        THE COURT:  Yes, sir.

8        MR. GEORGE TRAGOS:  I object for him to be able to do

9  that beyond the transcript.

10        THE COURT:  Overruled.

11  BY MS. SWEENEY:

12  Q.   Government's Exhibit 118-B, which is your meeting with the

13  Defendant on January 1st of --

14        THE COURT:  How much longer do you have with this

15  witness?

16        MS. SWEENEY:  Probably at least half an hour, Your

17  Honor, 20 minutes.

18        THE COURT:  You have 15 more minutes with this

19  witness.

20        MS. SWEENEY:  Thank you, Your Honor.

21  BY MS. SWEENEY:

22  Q.   On Exhibit 118, on page 35, the Defendant says, "I talked

23  to one brother.  I haven't seen him in a long time.  Right at

24  first when I told this brother, I mean, I don't have this kind

25  of money nor is it easy to do.  I told brother just that is it

1    possible, like would somebody be able to drive into the

2    Pentagon with an 18 wheeler."

3          Is the Defendant talking about the CHS here?

4              MR. GEORGE TRAGOS:  Objection, basis for his

5    knowledge.

6              THE COURT:  Would you like to lay the predicate

7    first?  Sustained as to foundation.

8    BY MS. SWEENEY:

9    Q.   Agent, do you know who the brother -- do you know if the

10   Defendant here is speaking about the CHS or not?

11   A.   Yes.

12   Q.   And without telling us whether he is or isn't, what

13   part -- what makes you know that?

14   A.   Because he said it was a brother that he used to speak

15   with or be in contact with a long time ago.  The Defendant is

16   not -- the CHS was not a long time ago acquaintance of his.

17   Q.   To your knowledge, on this date, January 1st, when had the

18   Defendant last seen the CHS?

19   A.   Fairly recently, December 1st, on that day -- on that same

20   day.

21   Q.   And Agent, you said December, did you mean December?

22   A.   I'm sorry, January 1st.

23   Q.   Okay.

24   A.   That same day.

25   Q.   Is the Defendant speaking about the CHS in this passage?

1    A.   No, he's not.

2    Q.   Finally, I want to show you on Government's Exhibit

3    121.1-B, on page eight, the Defendant refers to "The brother

4    that's supposed -- was supposed to record me, that

5    {unintelligible} is quiet, nobody ever there, they only come

6    for Juma and they leave.  They stayed all day so I had to

7    bounce."

8         So do you know if the Defendant is speaking about when he

9    says "the brother," is he speaking about the CHS or someone

10   else?

11             THE COURT:  Do you know, first?  Yes or no, do you

12   know or you do not know or if you know?

13             THE WITNESS:  I don't know.

14   BY MS. SWEENEY:

15   Q.   Agent, I want to ask you about some of the things that

16   Mr. Tragos asked you about.  He specifically referenced that

17   you had made a statement that you can tell Sara she got her

18   martyrdom video.  Do you recall that?

19   A.   Yes.

20   Q.   What was the context of that statement?  What did you mean

21   by that statement?

22   A.   Prior to -- prior to the December -- excuse me -- prior to

23   January 7th, when we met on January 7th, prior to the meeting

24   where the Defendant recorded the martyrdom video after the

25   meeting on January 1st, we had discussed what the Defendant was

1    going to do.

2            MR. GEORGE TRAGOS:  Objection as to the "we," Your

3    Honor.

4            THE COURT:  Sustained.

5    BY MS. SWEENEY:

6    Q.   Who were you referring to?

7    A.   The individuals involved in the investigation; the

8    prosecutor, Ms. Sweeney, the case agents.  We had discussed the

9    fact that the Defendant wanted to make a video, so Ms. Sweeney

10   said that if he wants to make a video, by all means --

11           MR. GEORGE TRAGOS:  Objection, hearsay.

12           THE WITNESS:  I was there when she said it.

13           THE COURT:  Overruled as to hearsay.

14           MR. GEORGE TRAGOS:  Objection as irrelevant.

15           THE COURT:  Sustained as to relevance.

16           MS. SWEENEY:  Your Honor, may we have a sidebar?

17           THE COURT:  Yes, ma'am.

18           (Thereupon, the following discussion was had at

19   sidebar:)

20           MS. SWEENEY:  Your Honor, Mr. Tragos brought this up

21   in his cross to impeach the witness and to poke holes, as he

22   said, in the Government's investigation.  I believe the agent

23   should be allowed to explain the context of his statement.

24   It's not offered for the truth of the matter.

25           THE COURT:  That's why I overruled the hearsay

| | |
|---|---|
| 1 | objection.  What's the relevance of it? |
| 2 | MS. SWEENEY:  To respond to what Mr. Tragos' |
| 3 | insinuation was in cross, that it was somehow illegitimate for |
| 4 | the agent to say, "You can tell Sara she got her martyrdom |
| 5 | video," he followed by, "Was it a present for Sara;" those |
| 6 | kinds of questions.  And I think the agent should be allowed to |
| 7 | explain what the context of the conversation was so that the |
| 8 | jury is not left with the false impression of that |
| 9 | conversation. |
| 10 | THE COURT:  Yes, sir. |
| 11 | MR. GEORGE TRAGOS:  Your Honor, I was repeatedly |
| 12 | objected to and sustained by the Court.  And I tried to get |
| 13 | into what statements the Defendant witness made and the |
| 14 | surrounding context of that statement. |
| 15 | THE COURT:  Not as to that statement, Mr. Tragos. |
| 16 | You inquired of the witness whether Ms. Sweeney said it or |
| 17 | whether he said that Ms. Sweeney got her martyrdom video, and |
| 18 | you asked whether it was a gift and he said, "No, it wasn't a |
| 19 | gift."  I don't recall that you were stymied in that inquiry. |
| 20 | MR. GEORGE TRAGOS:  I asked him what he said.  That's |
| 21 | all I did.  I did not get into what Ms. Sweeney said.  I |
| 22 | repeatedly was not allowed to get into what other people said. |
| 23 | For instance, when I asked him about there's one statement |
| 24 | where he disagreed with the R.W., and he made the statement, |
| 25 | his statement came in.  Then I asked him was that in response |

1    to what, objection, and the Court sustained the objection.  The

2    fact that he made the statement, that's it, but if he's able to

3    go back and find out what Ms. Sweeney said and anybody else

4    said about it to explain it, how am I supposed to cross-examine

5    and get a cross-examination if he's allowed to just come up

6    with these explanations from other people of why it was said?

7                THE COURT:  Ms. Sweeney.

8                MS. SWEENEY:  Your Honor, when Mr. Tragos was allowed

9    to ask him about this statement, "What did you mean by that;" I

10   wouldn't have objected to that, the follow-up question of what

11   did you mean by that, but to have this statement floating out

12   there without no context, it's simply false.

13               Well, it could leave a mistaken impression with the

14   jury about what the witness meant when he said that.  And I

15   don't think that's fair to the Government and I think the agent

16   should be able to explain what the context of that statement

17   was that Mr. Tragos has injected into this through

18   cross-examination.

19               THE COURT:  Well, if you go into it any deeper than

20   asking what you've already asked, which is, I guess, the

21   current question -- hold on -- you have asked whether there

22   were discussions among people concerning this video and he said

23   there was a discussion of Ms. Sweeney who said if he wants to

24   make a video, then by all means, and that's where the objection

25   was inserted.  If you ask him anything more than that, his

1   impression was did you do this video as a gift for Ms. Sweeney,

2   or did you do it as a gift for the investigation, and from his

3   perspective, if you go into what everybody else said, then the

4   Court will allow recross by the defense on that issue.

5        MS. SWEENEY:  Your Honor, what everybody else said?

6        THE COURT:  That's right.  If you ask him whether he

7   did it as a gift to Ms. Sweeney, he can say yes or no, but you

8   can't ask what other people said because if you ask those

9   questions, I'll allow the defense to recross on what the

10  discussions were leading up to that decision.

11       MS. SWEENEY:  All right.

12       MR. GEORGE TRAGOS:  Are you going to go further into

13  it?

14       MS. SWEENEY:  I'll just tell him, you know, to answer

15  as much as he can without saying what anyone else told him,

16  what he meant when he said it.

17       THE COURT:  Well, I don't know how he does that other

18  than to ask him a very direct question, was this a gift for Ms.

19  Sweeney, was this designed to benefit Ms. Sweeney.  You can ask

20  him that question, but you can't ask him what the general

21  narrative was because, as I understand it, his narrative is

22  going to include a discussion about those other agents.

23       MS. SWEENEY:  I think his narrative -- well,

24  obviously, I don't know exactly, but I think it would be --

25       THE COURT:  You can ask him was this a gift for Ms.

1    Sweeney, was this intended to benefit Ms. Sweeney.  That's all

2    you can ask him, unless you want to ask him what everybody said

3    in which case the defense will be allowed to recross.

4              MS. SWEENEY:  And, Your Honor, may I have until

5    12:30?  Fifteen more minutes?

6              THE COURT:  No, no, no.

7              (Thereupon, the sidebar discussion was concluded and

8    the proceedings resumed as follows:)

9    BY MS. SWEENEY:

10   Q.   Agent, on cross-examination, when asking you about the

11   statement we were just discussing, Mr. Tragos asked you was it

12   a gift for Ms. Sweeney.  Was the martyrdom video a gift for Ms.

13   Sweeney and was it --

14   A.   No, it was not.

15   Q.   Was it a gift in any sense of the word in your mind?

16   A.   No, it was not.

17   Q.   Mr. Tragos also asked you about a conversation that you

18   had with Rich Worms at the FBI, the conversation that you

19   heard, and he asked you about Mr. Worms' statement about a

20   Hollywood ending.  In your mind, is what happened here a

21   Hollywood ending?

22   A.   No, it wasn't.

23   Q.   Is Mr. Worms your direct supervisor?

24   A.   No, he's not.

25   Q.   Is he your supervisor at all?

```
 1    A.    No, he's not.
 2    Q.    And when he said that -- when he said "Hollywood ending,"
 3    did that have any impact on anything else that you did in the
 4    course of this investigation?
 5    A.    No, it did not.
 6    Q.    When you meet with the Defendant in this case or really in
 7    any case, in the end, who makes the decision about what you're
 8    going to say and do?
 9              THE COURT:  Well, ask one question or the other.
10    BY MS. SWEENEY:
11    Q.    In the context of this investigation, when you meet with
12    the Defendant, who decided what you were going to say and do?
13    A.    The Defendant.
14    Q.    Explain that.
15    A.    It's unnatural for you to try to drive a conversation
16    because if you're having a conversation with someone, if they
17    wanted to speak about one thing and you keep pushing it towards
18    something else, that's an unnatural conversation and people are
19    wary of that and people are uncomfortable with that.  So people
20    don't usually speak to you for a very long period of time if
21    you try to steer a conversation away from what it is that
22    they're trying to speak about.
23         So that's an unnatural conversation and you know not to do
24    that.  When you interact with someone in an undercover
25    capacity, you're not there -- you're there to hear them out.
```

```
 1            MR. GEORGE TRAGOS:  Object, Your Honor, beyond the

 2   scope of the question.

 3            THE COURT:  Sustained.

 4   BY MS. SWEENEY:

 5   Q.   Agent, at any point, did you instruct Mr. Osmakac that he

 6   had to film a martyrdom video?

 7   A.   No, I did not.

 8   Q.   Who brought the camera to your meeting on January 7?

 9            MR. GEORGE TRAGOS:  Objection, asked and answered.

10            THE COURT:  Asked and answered.  Sustained.

11   BY MS. SWEENEY:

12   Q.   Did you know what he was going to say?

13            THE COURT:  That's been asked and answered, Ms.

14   Sweeney.

15   BY MS. SWEENEY:

16   Q.   Mr. Tragos asked you about your experience with recording

17   devices and if in your experience during investigations they

18   often captured conversations between agents that maybe they

19   weren't intended to.  You said that was not common in your

20   experience.  Were you responsible for running the recording

21   devices in this case?

22   A.   No, I was not.

23   Q.   Mr. Tragos ask -- also asked you about a discussion in

24   which you were -- you and various FBI agents were discussing

25   scenarios of how the Defendant might be asked to pay money
```

1    related to this investigation.  What actually happened?  What

2    happened in terms of the Defendant giving you money?

3    A.   The Defendant gave me $500 of his salary.

4    Q.   And what did you ask in order to -- what happened in order

5    for him to do that?

6    A.   He worked --

7            MR. GEORGE TRAGOS:  Objection, Your Honor, the

8    predicate is the basis for his knowledge.

9    BY MS. SWEENEY:

10   Q.   Agent -- I mean, I'm sorry, I withdraw that question.

11       Agent, I mean from your perspective, what was -- what did

12   you do during the course of your meeting that resulted in the

13   Defendant giving you money?

14   A.   I told the Defendant that I needed a down payment to

15   purchase -- to get -- to start getting the materials that he

16   needed for the guns and for the bombs.  To start acquiring

17   those things that I needed money.

18   Q.   I'm also going to show you again Government's Exhibit

19   118-B, which is the transcript from your meeting with the

20   Defendant on January 1st, 2012.

21       In it, the Defendant says, "I didn't get my salary, he

22   gotta pay me about 1200 already.  So you can go get it from

23   him.  I was trying to get it, but somebody came in."

24       Who is the Defendant referring to when he says "he?"

25   A.   The CHS.

```
 1   Q.   And so he's indicating that --
 2            THE COURT:  Ms. Sweeney, you can't ask a leading
 3   question and your 15 minutes is up.
 4            MS. SWEENEY:  May I have just a moment, Your Honor.
 5            THE COURT:  Yes, ma'am.
 6   BY MS. SWEENEY:
 7   Q.   Mr. Tragos asked you -- just one more area, Your Honor,
 8   thank you.
 9        Mr. Tragos asked you about a concern that the Defendant
10   might do something else with money if he were given money.
11   Agent, did you share that concern or not?
12   A.   I did share a concern.
13   Q.   What was your concern that the Defendant might do if given
14   money?
15   A.   The Defendant had already tried to purchase guns on his
16   own.  If given money by the Government or through the CHS or
17   any other how, the Defendant might take it upon himself to go
18   and get the guns from somewhere else if he wasn't satisfied
19   with me providing him the guns and the explosives in a timely
20   manner.
21            MS. SWEENEY:  Thank you, Your Honor, nothing further.
22            THE COURT:  That concludes the examination of this
23   witness.
24            Is he likely to be recalled at all by the defense?
25            MR. GEORGE TRAGOS:  No, Your Honor.
```

```
 1              THE COURT:  All right.

 2              If we would at this time clear the courtroom,

 3    we'll -- well, let me keep you here for a second.  I'm going to

 4    release this jury at this time for lunch for an hour and a

 5    half, so that will put us back here at 2:30 -- I mean

 6    2:00 o'clock.  Basically, if you'll be prepared to be back on

 7    the jury stand at 2:00 o'clock.  Thank you.

 8              (Jury excused from the courtroom.)

 9              The courtroom should be closed to allow the UCE to be

10    excused.

11              (Brief pause.)

12              Sir, you're released to be excused from the case.

13    Your services will not be required any longer in this

14    proceeding.

15              THE WITNESS:  Thank you, Your Honor.

16              (Witness excused.)

17              THE COURT:  All right.

18              What is the lineup for the afternoon?

19              MS. SWEENEY:  Your Honor, the Government will call

20    Special Agent Paul Haag to the stand.  He will testify

21    regarding the capture, the interception of three phone calls

22    that Your Honor had previously ruled could be admitted as

23    404(b) if a proper predicate and foundation were laid and after

24    that, we will begin playing the CHS recordings.

25              THE COURT:  And there was no objection to the
```

1    witness, but there's an objection to this demonstrative?

2              Mr. Tragos, you want to be heard on it?

3              MR. GEORGE TRAGOS:  Yes, Your Honor.  Until I hear

4    the witness just -- I don't know that that is correct.  I'm not

5    objecting to the timeliness I was given it.  I won't object at

6    this time until I hear the witness to find out if he can

7    properly identify this and I don't know what he's going to say.

8              THE COURT:  Counsel.

9              MS. SWEENEY:  Your Honor, the witness provided me

10   with this slide and it describes the mechanism by which the

11   call interception in this case worked.  And it's just meant to

12   provide a visual to explain that process and certainly

13   Mr. Tragos can cross-examine the witness if he thinks any of

14   this is incorrect or doesn't match the witness' testimony.

15             THE COURT:  Well, I think what you need to do is get

16   the testimony on the record unobjected to or subject to the

17   objection, and then if the exhibit turns out to be accurate and

18   there's no objection to it, you can show it to him and say does

19   this adequately or actually reflect what you're discussing

20   because until we know what the witness is going to say, I don't

21   know whether the demonstrative is accurate either.

22             MS. SWEENEY:  The point, I think, Your Honor, is for

23   the jury to be able to see the demonstrative as the witness is

24   offering the explanation.  So perhaps I could approach him and

25   say, based on your understanding of this process, is this

1    exhibit correct and --

2              THE COURT:  Only he's going to say yes to this since

3    he gave you the exhibit.  The question is, does the defense

4    agree that the exhibit literally reflects what the witness is

5    saying?  I have no way to know that.

6              MS. SWEENEY:  And certainly they could challenge it

7    through cross-examination -- just as with any exhibit they

8    could challenge it through cross-examination.

9              THE COURT:  Well, with any exhibit before the exhibit

10   is displayed, the Defendant has an opportunity to voir dire on

11   it, so if you are trying to use it as a demonstrative, it's

12   being presented to the jury before we've determined its

13   validity, so...

14             MS. SWEENEY:  I think the witness is here, Your

15   Honor, and Mr. McGovern makes a good point.  If Mr. Tragos

16   would like to briefly speak to the witness over lunch to

17   confirm the validity of the slide, I would be willing to do

18   that, too, or I can have the witness testify and then place

19   this up.  I think it helps with understanding the testimony as

20   it's coming in.

21             THE COURT:  Mr. Tragos.

22             MR. GEORGE TRAGOS:  Your Honor, I just want to have a

23   record and if I do that, there will be no record of his

24   testimony and then my objection, I think, is important to

25   establish a record in this case.  I don't really see the

1    complexity here 'cause this is not unusual that a witness would

2    come in and say, well, how did you do it.  Well, I did it to

3    hear the telephone company's switch, whatever that is, career

4    provisioning function, whatever that is, carrier provisioning

5    function, whatever that is, cell data channel goes to the

6    engineering resource facility.

7            You can lay all this out orally, and if it comports

8    with the exhibit, then it comports with the exhibit.  If it

9    doesn't comport with the exhibit, then we have a problem.

10           THE COURT:  I can't allow the introduction of the

11   demonstrative exhibit into evidence until there's been some

12   basis for the content of it.  So you can assert your basis for

13   the content of it and then re-walk him through it.  The defense

14   will not be heard to say this is cumulative or duplicative if

15   she does it twice since it's necessary for the foundational

16   basis to be laid before she shows the jury the demonstrative.

17           Anything else?

18           MS. SWEENEY:  Your Honor, at some point today, I was

19   hoping to be heard regarding a 404(b) witness, but the

20   Government would like to propose, he's in Chicago, so he would

21   fly in this evening to be available for testimony tomorrow.

22   I'm sorry -- he would fly in tomorrow to be available for

23   testimony on Wednesday.  The witness is someone who the

24   Defendant interacted with in Chicago in May, May through June

25   of 2011.

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
1           During that time, the Defendant approached this
2  individual, and first of all, told him the individual had said
3  in front of a congregation at a Mosque that if -- that
4  essentially that Osama Bin Laden being killed was justified
5  based upon what Osama Bin Laden had done and Osama Bin Laden,
6  I checked, was killed on May 2nd of 2011, so it was just prior
7  to this conversation.  And the Defendant then approached him
8  and said that he was a kuffar and that he was essentially a
9  trader.
10          Then they had a second interaction in which the
11 Defendant told him that the United States is a place of war and
12 that essentially then the Defendant can kill people in the
13 place of war, can take whatever he wants from any other houses
14 because America is a place of war.
15          These concepts and these ideas line up with the
16 Defendant's intent in committing this act and they obviously
17 predate the Government's involvement with the Defendant.  So
18 they are very probative evidence of his intent in committing
19 these acts, and so the Government would ask for them to be
20 admitted as 404(b) on that basis.
21          THE COURT:  Counsel.
22          MR. GEORGE TRAGOS:  Your Honor, and I believe the
23 prosecutor did say, at least the 302s I have, I have two of
24 them, one is dated July 29th, 2011, the other is dated
25 August 10th, 2011.  I'm not sure if those are the actual dates
```

1    that these things happened.  Does the prosecutor know what date

2    these things actually happened?

3          MS. SWEENEY:  Your Honor, the 302s are obviously the

4    FBI statement that the witness says May, June, July, 2011.  He

5    didn't recall the exact date either in the present time.  I

6    don't know, I can't recall if he gave an exact date in the 302.

7          MR. GEORGE TRAGOS:  I do see a June 24th, 2011 date

8    that's on one of the 302s.  But regardless of that, Your Honor,

9    the fact that you have an argument with a man and you disagree

10   with a man so that the man is allowed to come and testify as to

11   404(b), he did not say I'm going to go bomb the United States.

12   He did not say I'm coming down to Tampa to bomb a night club.

13   He didn't say any of those things.  He said, which would be in

14   some's belief consistent, that a -- they were under Sharia law,

15   that someone that is a non-believer, that a jihad is shedding

16   of blood, you know, those are things where he's expounding a

17   religious belief, but he did not say a word about bombing

18   anything.  He did not say a word about going and getting AK47s,

19   he did not say a word about coming down to Tampa to do anything

20   or to even do a similar act, and apparently this was in

21   Chicago, a similar act in Chicago.  This is a discussion at a

22   Mosque.  So I don't see how it can be similar fact.

23          Your Honor, has the Court seen these --

24          THE COURT:  I have not.

25          MR. GEORGE TRAGOS:  -- 302s?

```
 1                    THE COURT:  May I see them?

 2                    MR. GEORGE TRAGOS:  Does the prosecutor have clean

 3        copies?

 4                    MS. SWEENEY:  I do not.

 5                    MR. GEORGE TRAGOS:  Mine are all marked up.

 6                    THE COURT:  May I see yours?  I need to see one

 7        version.

 8                    (Brief pause.)

 9                    MR. GEORGE TRAGOS:  Your Honor, I'll --

10                    (Brief pause.)

11                    THE COURT:  The courtroom can be reopened.

12                    MR. GEORGE TRAGOS:  We changing things around during

13        lunch?

14                    THE COURT:  We're taking the screen down, everything

15        else is going to stay the same.  We need the overnight to

16        rearrange the other aspects of the courtroom if that's even

17        possible.

18                    (Brief pause.)

19                    I don't see anything in the 302 about Osama Bin

20        Laden.  Where is that part of it?

21                    MR. GEORGE TRAGOS:  It's in there.

22                    THE COURT:  Which one?

23                    MS. SWEENEY:  Your Honor, I'm sorry, I don't appear

24        to have a copy of that 302 in my folder, so I can't direct you

25        to it without looking at it.  I'm sorry.
```

1            THE COURT:  One second.  I see it.

2            So you contend this witness would establish what

3    under the permissible uses of 404(b) evidence?

4            MS. SWEENEY:  I'm sorry, I didn't understand your

5    question.

6            THE COURT:  You contend the witness would establish

7    what under the permissible uses of 404(b) evidence?

8            MS. SWEENEY:  The Defendant's intent, Your Honor,

9    that he had the same intent at that time as he did at this

10   time.  So essentially, it is that the Defendant's intention and

11   his beliefs that things like Osama Bin Laden and things like

12   the fact that he believes America is a land of war allows for

13   violent activities.  That that same intent was present in the

14   actions he was committing here.

15           Your Honor, also, I mean the -- the other difficulty

16   is is that it is still the Government's case in chief, but it

17   does appear that entrapment is the main defense here.  Once

18   entrapment is raised, the Government typically has more leeway

19   to introduce someone's predilection, essentially, their

20   predisposition to commit an act, and the Eleventh Circuit case

21   law says that once you get into the land of predisposition,

22   then it -- you can use evidence such as this precisely because

23   it does show the Defendant's propensity to commit an act like

24   this.

25           So I do think there's a little less concern in this

| | |
|---|---|
| 1 | case about propensity evidence because the Defendant is raising |
| 2 | entrapment and propensity evidence is then allowed.  We |
| 3 | typically would wait until our rebuttal case to have this |
| 4 | witness testify, but he's unavailable next week, which is why |
| 5 | we're seeking to have him testify this week, under both 404(b) |
| 6 | and because entrapment has essentially already been raised. |
| 7 | THE COURT:  Counsel. |
| 8 | MR. GEORGE TRAGOS:  Your Honor, more I could say. |
| 9 | The Court's read the transcript.  That transcript just expounds |
| 10 | his religious and political beliefs.  It does not say that he |
| 11 | is or is not going to do anything.  And it does not say that he |
| 12 | is going to come down to Tampa to do anything. |
| 13 | (Brief pause.) |
| 14 | THE COURT:  All right. |
| 15 | I'll take it under advisement.  I assume that you |
| 16 | concede, Mr. Tragos, that you have put the issue of the |
| 17 | entrapment defense in issue in the case already in your |
| 18 | cross-examination of the agent such that it would not be |
| 19 | premature in this case for the Government to respond with this |
| 20 | witness? |
| 21 | MR. GEORGE TRAGOS:  Yes. |
| 22 | THE COURT:  All right. |
| 23 | I will take up the matter whether this is proper |
| 24 | 404(b) or whether it is, even if relevant under 404(b), so |
| 25 | prejudicial that its prejudice outweighs its probative value |

```
 1    with respect to this issue of intent, motive and planning

 2    and/or to overcome the notion that the Government somehow

 3    placed the propensity to commit this crime into the mind of

 4    Mr. Osmakac by its actions.

 5              Anything else we expect -- I'm sorry -- what is the

 6    lineup for this afternoon?

 7              MS. SWEENEY:  Mr. Haag, Special Agent Haag with this

 8    demonstrative, and then we will begin playing the CHS

 9    transcripts.

10              THE COURT:  Are those all audio?

11              MS. SWEENEY:  They are all audio, Your Honor.

12              THE COURT:  And you realize this jury will be

13    post-lunch?

14              MS. SWEENEY:  Your Honor, I do, I do.

15              THE COURT:  All right.

16              And there's five hours of it?

17              MS. SWEENEY:  I think that's approximately correct.

18    I don't think we'll finish it today, Your Honor, I think it

19    will continue through till tomorrow, probably through half a

20    day tomorrow.

21              THE COURT:  And it's all relevant and pertinent?

22              MS. SWEENEY:  Yes, Your Honor, it's all about -- the

23    defense has selected some clips of it.  The majority of it is

24    stuff that the Government has marked and it's all about the

25    Defendant's discussions regarding what he's going to do, what
```

```
 1    he was going to do here.

 2               THE COURT:  All right.

 3               Anything from the defense with respect to that

 4    lineup?

 5               MR. GEORGE TRAGOS:  No, Your Honor.

 6               THE COURT:  And this interception witness is

 7    necessary because the defense challenges the authenticity of

 8    these transcripts?  Why are we calling this person?

 9               MR. GEORGE TRAGOS:  Your Honor, there's three phone

10    calls that have not yet been introduced into evidence, the ones

11    we previously discussed where Mr. Osmakac and Mr. Dennison

12    discuss Inspire Magazine and the black flag.  And the --

13               THE COURT:  The Courtroom is open.  Did you intend

14    that?

15               MR. GEORGE TRAGOS:  Yes.

16               MS. SWEENEY:  Yes.

17               THE COURT:  All right.

18               MS. SWEENEY:  And this witness discusses how those

19    phone calls were intercepted, how the FBI got those phone

20    calls, essentially.

21               MR. GEORGE TRAGOS:  Those are the ones I'm objecting

22    to.  I'm not -- there's two sets of phone calls we're talking

23    about here.  One, we got the CHS, one is Richard Dennison.  I

24    think she's speaking about Richard Dennison; right -- I mean,

25    Russell Dennison?
```

1          MS. SWEENEY:  Right, I'm only speaking about the

2     calls that were previously -- can be admitted as 404(b) if a

3     proper foundation is laid.  I can -- so basically, essentially,

4     it's the one where the Defendant and Russell Dennison, first

5     they discuss an issue of Inspire, then they discuss a second

6     issue of Inspire.

7          Then there's a call in which they're discussing a

8     YouTube video and the Defendant says something to the effect of

9     he's mad at the commenters on the YouTube video and he says,

10    "They think it's funny until a black flag comes over their

11    heads and their heads fly off."

12         This witness doesn't know anything about the content

13    of these calls or who's speaking on them, he only knows how the

14    FBI received them.  The UC authenticated Mr. Osmakac's voice,

15    another witness will authenticate Mr. Dennison's voice, and

16    then Mr. Kohlmann will explain the content of the calls such

17    that they're relevant to this matter.

18         THE COURT:  So going back to my question, this

19    witness' explanation of how the FBI came into possession of

20    these intercepted phone calls is relevant or in dispute why?

21         MS. SWEENEY:  I can't answer that, Your Honor.

22         THE COURT:  Mr. Tragos.

23         MR. GEORGE TRAGOS:  Your Honor, we do object because,

24    one, I don't know how they got these.  These are Russell

25    Dennison.  He was not an agent of law enforcement speaking to

```
 1    the Defendant, allegedly speaking to the Defendant, Sami
 2    Osmakac.  So, both sides of this conversation, neither one of
 3    them are law enforcement.  Neither one of them are confidential
 4    sources.  This is just some call out of the blue that somebody
 5    says they taped.  I don't know how they got it.  I don't
 6    know -- I know I've seen now an exhibit, theoretically, of how
 7    they got it, but I can't agree to a call that doesn't have any
 8    basis at all from law enforcement or anything and neither one
 9    of the speakers are law enforcement.  I don't know if this is a
10    complete tape.  I don't know anything about this.
11              THE COURT:  All right.
12              Stand in recess until 2:00 o'clock.
13              (Thereupon, a luncheon recess was taken.)
14              Let's close the Courtroom for a second, please.
15              I have this document in front of me.  I have recently
16    heard in regard to this the reference to Mr. Dennison as the
17    person whose conversations are being disclosed as part of this.
18    And in that context, I went back and reviewed the certain
19    motions filed by the Government in this case asserting law
20    enforcement's sensitivity, and certain information as being
21    improper for disclosure and I'm having a difficult time
22    reconciling the Government's position with its filings.  And I
23    just need to know whether this is something that needs to be
24    clarified on the record, off the record, classified, law
25    enforcement sensitive.  I just don't understand where this
```

1   falls in that analysis.

2           MS. SWEENEY:  Your Honor, I believe I understand what

3   you're asking.  I cannot clarify it in an unclassified setting.

4   I can only clarify it in a classified setting.

5           THE COURT:  Well then, I think we need to go into a

6   classified session because I have to have some understanding.

7   The defense has no way to raise these issues or raise these

8   challenges without knowing what has been classified.  So as to

9   be consistent on this record, I need to have an understanding

10  of it so we will go into classified session with the

11  Government, Mr. McGovern, Mr. Collins and Mr. Forsgren, I guess

12  is the appropriate group; is that right?

13          MS. SWEENEY:  Yes, Your Honor.

14          THE COURT:  I'll see you in chambers.

15          (Thereupon, a classified hearing was had and not

16  included in this transcript.)

17          MR. GEORGE TRAGOS:  Can I go to sidebar so I can

18  maybe have some instruction on this if I need some, or I don't

19  know what the outcome was to the Court's question.

20          THE COURT:  The outcome is nothing has changed so you

21  won't need any instruction.  If you do before it gets deep into

22  it, I'll call you at sidebar.  Okay.

23          MR. GEORGE TRAGOS:  Yes, Your Honor.

24          (Jury returned to the courtroom.)

25          THE COURT:  All right.

1          Welcome back, ladies and gentlemen.  I'm sorry for

2    the extenuated -- I mean, the extended delay in the

3    circumstances, it was unavoidable.

4          You will see the courtroom has changed around a

5    little bit.  The person who testified previously was not

6    someone who could be seen by the general public, so now the

7    screen is gone, so we're ready to proceed at this time with the

8    calling of the Government's next witness.

9          MS. SWEENEY:  Your Honor, at this time, the

10   Government calls Special Agent Paul Haag to the stand.

11         THE COURT:  Please come forward, sir, to be sworn.

12   Thereupon,

13                          PAUL HAAG,

14   after having been duly sworn to tell the truth, the whole truth

15   and nothing but the truth, under penalty of perjury, was

16   examined and testified as follows:

17         THE WITNESS:  I do.

18         THE CLERK:  Please be seated.  Please state your name

19   and spell your last for the record.

20         THE WITNESS:  Paul Haag, H-A-A-G.

21         THE CLERK:  Thank you.

22         THE COURT:  Sir, you're under oath.  You must give

23   truthful answers to any questions that are asked.  If you give

24   false answers, you face penalties of perjury, false statement

25   and obstruction.

```
 1              Do you understand that?
 2              THE WITNESS:  Yes, ma'am.
 3              THE COURT:  Also, sir, I need you to wait until
 4  counsel completes her question before you start your answer so
 5  you're not talking over her.  And if you see opposing counsel
 6  stand to object, wait until I rule on the objection before you
 7  give your answer.
 8              Do you understand that?
 9              THE WITNESS:  Yes, ma'am.
10              THE COURT:  Counsel, you may proceed.
11              MS. SWEENEY:  Thank you, Your Honor.
12                          DIRECT EXAMINATION
13  BY MS. SWEENEY:
14  Q.    Special Agent Haag, who do you work for?
15  A.    I work for the FBI.
16  Q.    And what is your current position with the FBI?
17  A.    I'm a Supervisory Special Agent.
18  Q.    And in what group?
19  A.    It's called the TTA Operations and Development Unit.
20  Q.    And what does TTA stand for?
21  A.    Technically Trained Agent.
22  Q.    And what are your current job duties?
23  A.    I am one of the regional coordinators for the TTA Program.
24  I manage and supervise the northern half of the country.
25  Q.    And prior to being with the TTA Operations and Development
```

1   Unit, were you also with the FBI?

2   A.    Yes, I was.

3   Q.    And what did you do then?

4   A.    Prior to my current unit, I was with the

5   Telecommunications Intercept and Collection Technology Unit.

6   Q.    Is there an acronym for that one as well?

7   A.    Yes, it's called TICT 2.

8   Q.    TICT 2?

9   A.    Yes.

10  Q.    Spell that for us.

11  A.    T-I-C-T 2.

12  Q.    And prior to that, were you also with the FBI?

13  A.    I was.

14  Q.    And what were you doing then?

15  A.    I was a Special Agent in Norfolk, Virgina.

16  Q.    And what kind of cases did you work?

17  A.    I initially worked white collar cases, cyber crime, civil

18  rights and then I was a technically trained agent for five

19  years.

20  Q.    And how long total have you been with the FBI?

21  A.    Fourteen years.

22  Q.    How do you become certified as a technically trained

23  agent?

24  A.    There's a series of approximately seven classes that you

25  have to attend and pass the classes and a final certification

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    course.

2    Q.   And do you have experience with the FBI's process by which

3    it collects telephone calls, specifically, wireless telephone

4    calls?

5    A.   I do.

6    Q.   What's your experience with that?

7    A.   As a technically trained agent in Norfolk, I was

8    responsible for effecting the collections as well as I was a

9    supervisor in TICT 2.  I worked with the groups that managed

10   those systems.

11             MS. SWEENEY:  Okay.  Your Honor, may I have general

12   permission with all witnesses to approach?

13             THE COURT:  Yes, ma'am.

14             MS. SWEENEY:  Okay.  Thank you.

15   BY MS. SWEENEY:

16   Q.   Agent, I've handed you what's been marked as Government's

17   Exhibit 164.  Are you going to refer to that during your

18   testimony?

19   A.   Yes.

20   Q.   Can you describe the general process by which the FBI

21   would collect telephone calls?

22   A.   Yes.  Once a Court order is received by the technically

23   trained agents, the agents would then review the order, make

24   sure that they have the correct phone number and all the

25   pertinent information related to the Court order.

```
1          They will then send it to the telecommunications provider,
2     for example, to Verizon or AT&T, whatever, they'd send that
3     Court order with what is authorized, and the telephone company
4     would then provision their switch to effect the order as it is
5     directed.
6     Q.   When you refer to a telephone company switch, what are you
7     talking about?
8     A.   Depending on the telephone company, they have different
9     offices and their systems are set up differently.  They have
10    different regions or areas where there are switches where when
11    you make a telephone call, the telephone call goes to that
12    switch and out to whomever you're calling or when somebody
13    calls you, it hits that switch and then comes to your
14    telephone.
15    Q.   And when the telephone company sets up an intercept
16    switch, how does that data get from the telephone company to
17    the FBI?
18    A.   So after they set up the order in their system and it
19    directs -- their computers basically direct that telephone call
20    to not only go between the person you're intercepting and the
21    person they're calling or who was calling them, but it also
22    sends that information to the FBI and sends it on two separate
23    channels they're called.
24         The first is called the call data channel, which if you
25    look at your phone bill, it's similar information.  It's the
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   date and time of the call, who you're calling or who has called

2   you and the duration of the telephone call, and there's also

3   some other information that goes along with that.

4   Q.   You said there were two channels, so you just -- what's

5   the second one?

6   A.   The second one is called the call content channel.  That's

7   actually the voice part of the telephone call.

8   Q.   As to the -- do those -- why are those two channels split

9   up?

10  A.   They're split for a few reasons.  Sometimes -- there's a

11  lot of times where we have a -- what's called a pen register

12  order on a telephone which is only that call data.  The order

13  is to receive that information.  So we have a lot of those that

14  occur and very few where we actually get the call content.

15       Because of that nature, we actually have all the call data

16  go to our engineering research facility at Quantico where my

17  office is located.  All that information comes into Quantico

18  first from the telephone companies and then it's sent out to

19  field offices via a private network.

20  Q.   And where does the -- when you do have a Court order for

21  content, where does the call content channel go?

22  A.   So call content, the actual voice part goes directly from

23  that telephone switch to the field office that is actually

24  doing the collection.

25  Q.   And then how are they -- well, are they -- is the call

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   data and the call content ever matched back up, and if so, how

2   does that happen?

3   A.   Yes.  In the field office, there's a system.  In this

4   particular case, the system is called the Red Wolf, and the Red

5   Wolf system takes the call data and call content, marries them

6   together and allows the agent to review those as one combined

7   piece of data.

8   Q.   How quickly does that process happen?  If a call occurs,

9   how fast is the data transmitted and how fast does it marry

10  back up?

11  A.   Typically within seconds, three to five seconds.

12          MS. SWEENEY:  Your Honor, at this time, I would ask

13  to display to the jury Government's Exhibit 164.

14          MR. GEORGE TRAGOS:  Your Honor, we would object to

15  that.  Can we have a sidebar, Your Honor?

16          THE COURT:  Yes.

17          (Thereupon, the following discussion was had at

18  sidebar:)

19          MR. GEORGE TRAGOS:  Did I miss the carrier

20  provision --

21          THE COURT:  Speak up.

22          MR. GEORGE TRAGOS:  Did I miss the carrier

23  provisioning section.  I don't believe he testified to that.

24          MS. SWEENEY:  You're right, I will ask that.  I

25  neglected to ask him about that.

1          MR. GEORGE TRAGOS:  And the target's cell and if he's

2     done this with cell phones.

3          MS. SWEENEY:  Okay.

4          MR. GEORGE TRAGOS:  The main thing, I didn't hear

5     about any carrier provisions.

6          (Thereupon, the sidebar conference concluded.)

7          THE COURT:  The objection is sustained without

8     prejudice.

9          Counsel, you may continue to attempt to clarify.

10          MS. SWEENEY:  Thank you.

11    BY MS. SWEENEY:

12    Q.   Agent, in looking at Government's Exhibit 164, there's a

13    portion of it that says carrier provisioning function.  What

14    does that mean?

15    A.   That simply indicates that once we send the order to the

16    telephone company, they're the ones that actually effect the

17    intercept.  We don't go into their systems and make the

18    changes.  It's a representative of their company that actually

19    goes in and programs their system to send that information to

20    us.

21    Q.   And the process that you just described, is it -- is it

22    functioning with respect to cellular telephone calls?

23    A.   Yes, it is.

24    Q.   And I'm sorry, one last question based on the exhibit, but

25    what does CALEA, C-A-L-E-A; what does that refer to?

```
 1   A.   It's stands for Communications Assistance for Law
 2   Enforcement Act.
 3   Q.   And what does it essentially allow for?
 4   A.   This is the law that was passed in the mid '90s, I believe
 5   it was the mid '90s, that instructed the carriers, the
 6   telephone carriers to assist law enforcement with lawfully
 7   authorized intercepts.
 8           MS. SWEENEY:  Your Honor, at this time, the
 9   Government moves exhibit -- I don't move it into evidence, I
10   request permission to show 164 to the jury.
11           MR. GEORGE TRAGOS:  May I voir dire?
12           THE COURT:  Yes, sir.
13                     VOIR DIRE EXAMINATION
14   BY MR. GEORGE TRAGOS:
15   Q.   On Exhibit 164, I think you have a copy in front of you
16   there.
17   A.   Yes.
18   Q.   Okay.  You say that starts with an order?
19   A.   Yes.
20   Q.   You have a copy of that order?
21   A.   I do not.  In this particular instance?
22   Q.   Yes.
23   A.   No, I do not.
24   Q.   Now the -- this exhibit doesn't reflect, I guess, the
25   order, correct?
```

1  A.   It does not show the order.  The order is what would be

2  provided to the carrier.

3        MR. GEORGE TRAGOS:  Okay.  Your Honor, we would

4  request a copy of the order.

5        THE COURT:  Motion is denied.

6        Any objection to the publishing of the exhibit?

7        MR. GEORGE TRAGOS:  No objection.

8  BY MS. SWEENEY:

9  Q.   Okay, Agent, so is this a copy of what you have in front

10  of you as well?

11  A.   Yes, it is.

12        THE COURT:  Just for the record, this is a

13  demonstrative exhibit, it will not be available for you take

14  back to the jury room because it is not being introduced in

15  evidence, but just showing you demonstratively what the witness

16  is talking about.

17  BY MS. SWEENEY:

18  Q.   So, starting with Carrier Provisioning Function, can you

19  just explain what that is indicating with respect to the

20  telephone company switch?

21  A.   Yes.  That just indicates once we send the order to the

22  carrier, they're the ones that actually provision or set up

23  their system to send the information to the FBI.

24  Q.   And then as to -- so if a call starts on a cell phone and

25  it goes into the switch, does it -- if there's an intercept on

1    it, does it continue on to the party it's intended for.

2    A.    It does.

3    Q.    Okay.  And what else happens to it in the -- inside the

4    telephone company switch?

5    A.    So now at the same time, instead of just going to the

6    other party, the call is also routed to the FBI along with the

7    data associated with that call.

8    Q.    Agent, I just placed a number of exhibits in front of you.

9    Let's -- I will just talk about all of them generally,

10   initially.  So it's Government's Exhibits 161-A and B, 161.1-A

11   and B, 162-A and B, 162.1-A and B, 163-A & B, and 163.1-A and

12   B.

13        Have you previously reviewed each of those exhibits?

14   A.    I have.

15   Q.    And how do you know that you've reviewed them?

16   A.    I initialed on both the disc and the transcript that I had

17   reviewed them.

18   Q.    So as to the specific -- well, are those all phone calls

19   or portions of phone calls?

20   A.    They are.

21   Q.    And as to those phone calls, did you -- well, let's talk

22   about how those -- did those calls progress through the process

23   that you've just described before being intercepted,

24   essentially?

25   A.    Yes.

1    Q.   So did you determine that there was, in fact, a Court

2    order allowing for the interception of those calls?

3    A.   I did.  I reviewed a Court order and compared the

4    telephone number of the order to the data associated with the

5    intercepts of these calls.

6    Q.   And did the order also include the date range in which

7    those calls appear?

8    A.   It did.

9    Q.   So, let's start specifically with Government's Exhibits --

10   the ones starting 161 and 161.1.  From what date -- well, first

11   of all, is 161.1 a portion of the call that appears in 161?

12   A.   It is.

13   Q.   And on what date was that call intercepted?

14   A.   January 18th, 2011.

15   Q.   And according to your review, was that call intercepted

16   through the process that is described on the demonstrative

17   exhibit, Government's 164?

18   A.   Yes, it is intercepted by the telephone company and the

19   FBI collected that call.

20   Q.   On Government's Exhibit 162 and 162.1, is 162.1 a portion

21   of 162?

22   A.   It is.

23   Q.   And was that -- what's the date on that call?

24   A.   That call is January 19th, 2011.

25   Q.   And according to your review of those calls, were they

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    intercepted -- was that call -- I'm sorry -- was it intercepted

2    pursuant to the system that you've described previously?

3    A.    It was.

4    Q.    And finally, 163.  Is 163.1 a portion of the call at 163?

5    A.    It is.

6    Q.    And was that call -- what's the date on that call?

7    A.    December 15th, 2010.

8    Q.    And was that call intercepted pursuant to the process that

9    you've testified to?

10   A.    It was.

11   Q.    And as to each of the calls that you've just described,

12   was the -- is the date that is on them the date that came

13   through the FBI's call data channel?

14   A.    Yes, it was.

15          MR. GEORGE TRAGOS:  Objection, predicate.

16          THE COURT:  Overruled.

17   BY MS. SWEENEY:

18   Q.    Agent, did you review the call data that was received

19   related to these calls?

20   A.    I did.

21          MR. GEORGE TRAGOS:  Objection, hearsay.

22          THE COURT:  Overruled.

23   BY MS. SWEENEY:

24   Q.    And finally, Agent, did you review the content of the

25   calls that was received and compare them to the content on the

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   discs that are in those exhibits?

 2   A.   I did.

 3   Q.   And are they the same?

 4   A.   They are.

 5           MS. SWEENEY:  Your Honor, may I have a moment?

 6           THE COURT:  You may.

 7           MS. SWEENEY:  Thank you, Your Honor.  I have nothing

 8   further.

 9           THE COURT:  Let me see counsel at sidebar.

10           (Thereupon, a sealed sidebar discussion was had and

11   not included in this transcript.)

12                     CROSS-EXAMINATION

13   BY MR. GEORGE TRAGOS:

14   Q.   It is Agent Haag, right; you are an agent?

15   A.   Correct.

16   Q.   All right.

17        Agent, this Carrier Provisioning Function --

18   A.   Yes.

19   Q.   -- that's the phone company?

20   A.   Yes.

21   Q.   And you go to the phone company, as I understand it, and

22   you tell them you want them to, for lack of a better word, tap

23   into a phone call between two people?

24   A.   We serve them with the order.

25   Q.   Right, that tells them that, right?
```

1    A.    Yes.

2    Q.    And in this case, we have the other third party and a

3    target cell phone?

4    A.    That's correct.

5    Q.    That is what happened in this case?

6    A.    Yes.

7    Q.    So one of these lines was a land line?

8    A.    I do not know.

9    Q.    Okay.  You just told the prosecutor that you checked this

10   to verify that this data was correct.  You don't know where the

11   data came from, whether it was a land line or a cell phone?

12   A.    The telephone number itself would not indicate that to me,

13   whether it was a land line or a cell phone.  I know that the

14   Court order was for a cellular phone.  The example there, for

15   the other party, it could be a cell phone, it could be a land

16   line.  That's just an example that the other party -- it could

17   be either way, could be a cell phone or land line.

18   Q.    So the order only tells you about one recipient, in this

19   case, a cell phone?

20   A.    The order was for the cell phone.  Everybody else it does

21   not matter whether it's a cell phone or a land line.

22   Q.    So you were allowed to tap into all calls from whatever

23   source into that cell phone?

24   A.    I'm allowed to -- we intercept or collect the information

25   the telephone company provides us on who has called that cell

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   phone or who that cell phone is calling.

2   Q.   Right.   What I'm saying is that if it wasn't -- you didn't

3   have an order for a -- two particular cell phones or two

4   particular people to call each other and that's the one you

5   intercept?

6   A.   No.   The order is only for one particular telephone

7   number, correct.

8   Q.   And the -- so when we're talking about, in this particular

9   case, target cell phone, that was the target of the order?

10  A.   Correct.

11  Q.   And then when we're talking about other party, we really

12  don't know who that other party is?

13  A.   Not at time of interception necessarily.

14  Q.   Okay.   And so there could be multiple calls into that

15  target cell phone from third parties?

16  A.   Yes.   Over the duration of the order, it could be many,

17  yes.

18  Q.   And you were allowed, according to the order, over the

19  duration of the order, to listen in on phone calls between the

20  target cell phone and any other third party?

21  A.   Correct.

22  Q.   And in this case, how many recordings or how many

23  interceptions did you make during the course of the order?

24           MS. SWEENEY:   I object, Your Honor.   I think the

25  information is protected.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1              THE COURT:  Sustained.
 2   BY MR. GEORGE TRAGOS:
 3   Q.   Well, let me ask you this.  In this case you brought us or
 4   you testified to about three of them, correct?
 5   A.   Correct.
 6   Q.   Were there more than three?
 7   A.   I'm not aware of that.
 8   Q.   Okay.  You did not check that or you're just not aware of
 9   it?
10   A.   I was not -- I'm not aware.  I did not check how many
11   there were, I just checked these three to verify that the
12   copies that were made were the same as the original.
13   Q.   All right.
14        Let's just talk about these three then.  When you did
15   these three, did you actually go back and check the data, the
16   original data -- actually, we have two places, right?  We have
17   the engineering research facility and we have the FBI office,
18   correct?
19   A.   It doesn't actually get stored at the Engineering Research
20   Facility, it actually gets transmitted through the Engineering
21   Research Facility and is collected actually at the field office
22   itself.
23   Q.   By field office in this case, would we be talking about
24   Tampa?
25   A.   In this case, it was actually collected in Miami.
```

```
1    Q.   Miami?

2    A.   Yes.

3    Q.   Okay.  And did you actually go check the data at the Miami

4    field office and compare it to the data on these transcripts?

5    A.   They actually sent the information to the Tampa field

6    office and I reviewed it at the Tampa field office.

7    Q.   Who sent the original data?

8    A.   The ELSHUR {sic} technicians is what they're called.

9    Q.   So the data is stored in Miami when this happens, right?

10   A.   In this particular instance, yes.

11   Q.   That happened within seconds of the phone call, right?

12   A.   Yes.

13   Q.   But when you did your comparisons -- when did you do those

14   by the way?

15   A.   Yesterday.

16   Q.   When you did your comparisons yesterday, that information

17   was sent up from Miami to Tampa?

18   A.   Yes.

19   Q.   So you never went to Miami, the original collection point,

20   and compared it?

21   A.   I didn't need to.

22   Q.   Okay.

23            THE COURT:  Well, the answer is yes or no.  Did you

24   do it?

25            THE WITNESS:  No, I did not go to Miami.
```

1  BY MR. GEORGE TRAGOS:

2  Q.   Okay.  Now, what does Miami -- or when this is saved, you

3  told us that on the data -- cell data channel, when that is

4  saved, that is like time of the call, duration of the call, the

5  kind of things you see on your phone bill?

6  A.   The call data, yes.

7  Q.   Okay.  And that doesn't come across -- does that come

8  across in English words or does that come across as some kind

9  of a data code?

10  A.   When I review it, the way I've seen it is numbers.

11  Q.   But does it come across that way?  I mean, is it stored

12  that way?

13  A.   I'm not sure about the signaling itself.  I'm not sure

14  exactly what -- if it's in a particular type of code or not.

15  When I review it as an end user would, it would be in, for

16  example, a telephone number and then a time and date and things

17  like that.

18  Q.   Something has to transfer into we'll call it English,

19  right?

20  A.   I'm not sure if it does that.  I'm not sure if it comes

21  across that way from the phone company or not.  I do not know.

22  Q.   Have you ever seen the original data the way it looks

23  while it's in the phone company computer before they make it

24  into a bill?

25  A.   No.

```
1    Q.   All right.

2         So what you see is some computer's interpretation of the

3    original data, I guess?

4    A.   That would be correct.

5    Q.   Okay.  And you never went behind that interpretation to

6    see if it was correct?

7    A.   I did not.

8    Q.   Okay.  Now, for your testimony today, what did you review?

9    A.   I reviewed original recordings that the FBI made and

10   compared them to the discs and the transcripts that were

11   provided as the copies.

12   Q.   Who gave you those?

13   A.   The FBI field office and the AUSA.

14   Q.   In Tampa?

15   A.   Yes.

16   Q.   You remember the name of any of these people?

17   A.   Of who provided me the discs?

18   Q.   And the transcript?

19   A.   The exhibits themselves; the AUSA did.

20   Q.   Ms. Sweeney?

21   A.   Yes.

22   Q.   How about the agent back here, Mr. Collins, did he do

23   anything for you?

24   A.   He may have provided the original disc.

25   Q.   That disc actually -- where is the original of these
```

```
 1   conversations?  Did it flow directly from the telephone company
 2   switch to the Tampa FBI office?
 3   A.   No, it went through my -- the data or the --
 4   Q.   The data, right.  In other words, the voice?
 5   A.   The voice went to Miami, went from the telephone company
 6   to the Miami field office.
 7   Q.   Okay.  And do you know how the voice disc got from Miami
 8   to you personally, from Miami to Tampa?
 9   A.   No.
10   Q.   So all you know is you were handed a disc in Tampa and
11   were told that it came from Miami; did they tell you that?
12   A.   Yes, I received it and it was in a -- what's called an
13   evidence envelope.
14   Q.   From Tampa?
15   A.   Yes.
16   Q.   Okay.  Now, you mentioned the word "Red Wolf".
17   A.   Yes.
18   Q.   What is Red Wolf?
19   A.   That's just our collection system.  It's basically a
20   series of servers and computers that collect the information
21   that's provided by the telephone companies and that's where the
22   call content and the call data channels are combined.
23   Q.   Do you -- before yesterday, had you had any involvement in
24   this case?
25   A.   Yes.
```

```
 1   Q.   What was your involvement before yesterday?
 2   A.   Back during the event, I came down and was prepared to
 3   assist technically.
 4   Q.   Technically with these particular intercepts?
 5   A.   No.
 6   Q.   With something else?
 7   A.   Yes.
 8   Q.   So these particular intercepts, prior to yesterday, were
 9   you aware of them?
10   A.   No.
11   Q.   Now what is your current title?
12   A.   Supervisory Special Agent.
13   Q.   Supervising Special Agent for?
14   A.   TTA Operation and Development Unit.
15   Q.   And where are you located now?
16   A.   Quantico, Virginia.
17   Q.   Okay.  And what was your job back in December, 2010?
18   A.   I was a supervisory special agent in the
19   Telecommunications Intercept and Collection Technology Unit.
20   Q.   Where?
21   A.   Quantico, Virginia.
22   Q.   Were you at the Engineering Research Facility?
23   A.   I was.
24   Q.   Okay.  And did you have anything to do -- again, this may
25   be a redundant question, let me make sure I get everything
```

1  covered.   Did you have anything to do with the collection of

2  these three calls?

3  A.    I did not.

4  Q.    When you listened to the transcript, did you compare the

5  transcript to the audio?

6  A.    I listened to the original recording, I reviewed the

7  transcript at that time, then I listened to the copy and

8  reviewed the transcript at that time.

9  Q.    Okay.   And again, the only way you know they're the

10  original recordings is because in Tampa you received these

11  discs and they told you that's what they were?

12  A.    They are marked as original discs, and they're in an

13  evidence envelope that indicated the same.

14  Q.    Were they -- when you collect the data of the voice at the

15  FBI office, in this case, it was Miami, correct?

16  A.    Correct.

17  Q.    Do they collect it on a disc or collect it on a server?

18  A.    It's recorded to a disc at that time.

19  Q.    At that moment or on a server and then copied to a disc?

20  A.    I believe it's contemporaneous or it's a very short time

21  window when it's all actually saved to the disc.

22  Q.    Short time, time is important.   Is it originally -- does

23  it originally go on a server and then copied to a disc?

24  A.    I'm not sure.   I'm not sure if it goes -- there might be a

25  buffer within the server.   I'm not a hundred percent sure

1    technically how that operates, but the original recording --

2    the disc becomes what's considered the original recording.

3    Q.    I know what you may consider it, but I'm trying to find

4    out, originally when this happens, when it comes in to the

5    field office, does it go to the server or is it recorded on a

6    disc?

7    A.    It has to process through the server before it can be

8    recorded to the disc.

9    Q.    Okay.  Did you at anytime compare what's on the server to

10   the disc?

11   A.    It's not saved on the server.

12   Q.    So they -- once it happens, they delete it?

13   A.    I don't believe it actually is -- I'm not a hundred

14   percent sure, but I don't believe it is saved on the server.

15   Q.    Do they delete it?

16   A.    If it's not saved, I don't know if it's deleted.  I don't

17   know.

18   Q.    You don't know what happens?

19   A.    I'm not sure.

20   Q.    Okay.

21         Now, you say that this is transmitted from the Engineering

22   Research Facility to the field office over a private network,

23   correct?

24   A.    Yes, the data is, yes.

25   Q.    Okay.  Tell me what a private network -- what are you

1    speaking about there?

2    A.    It's a system of interconnections between the field

3    office's and the Engineering Research Facility's computer

4    network, private computer network.

5    Q.    All right.

6          And it's sent across that network in whatever computer

7    gobbledy-gook it's sent across the network?

8    A.    Correct.

9    Q.    And you say it's like within a couple seconds?

10   A.    Yes.

11   Q.    So does the Miami field office get the phone call before

12   the data gets there from the Engineering Research Facility?

13   A.    I'm not sure.

14   Q.    Well, how do you know it's only a couple seconds if you

15   don't know who gets it first?

16   A.    That's how the system works.  It marries them up within

17   seconds.  How the computer -- whether it sees one first before

18   the other, I don't know.

19   Q.    Did you ever time them?

20   A.    In this particular case or in general?

21   Q.    In general.  Have you ever timed between when one comes

22   there and the other?

23   A.    No, but as a technically trained agent, that's not

24   something I would do.  That's something the engineers manage.

25   Q.    Okay.  So basically, you've been told that's what happens?

1    A.   Yes.  In my training, yes, and my experience in working

2    with these, I know that they get married up and they instructed

3    us how it happens.

4    Q.   But you, yourself, don't know who goes first or how long

5    it takes.  You've been told that by others?

6    A.   Correct.

7    Q.   In this case, where was the telephone company switch?

8    A.   I do not know.

9    Q.   Where was the Carrier Provisioning Function performed?

10   A.   I'm not sure.

11   Q.   Where was the target cell?

12   A.   I would not know that either.

13   Q.   Where was the other party?

14   A.   I'm unsure of that.

15   Q.   On the right-hand side, we know where the Engineering and

16   Research Facility was, it's Quantico?

17   A.   Correct.

18   Q.   And then we know FBI office, that's Miami?

19   A.   Correct.

20   Q.   Why didn't this material be -- why wasn't it -- the call

21   content channel, why wasn't that sent to Tampa versus Miami?

22   A.   In this instance, it's actually a regional collection

23   facility, and so at the time, any collections of this nature

24   would have been through Miami.

25   Q.   Now what's a sack?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    A.    A SAC?

 2    Q.    SAC; what does SAC stand for?

 3    A.    Special Agent in Charge; is that what you are referring

 4    to?

 5    Q.    Yes.

 6    A.    Okay.  We call them SAC, we don't call them sack.

 7    Q.    All right.

 8          SAC.  You don't like calling them sack.

 9    A.    They don't like that.

10    Q.    So the Special Agent in Charge -- Florida's divided into

11    various divisions with Special Agents in Charge, correct?

12    A.    Correct.

13    Q.    And the Miami Special Agent in Charge is not responsible

14    for Tampa, is he?

15    A.    No.

16    Q.    In fact, Tampa has their own Special Agent in Charge?

17    A.    They do.

18    Q.    Okay.  And there is a division between the Miami Special

19    Agent in Charge and the Tampa Special Agent in Charge as far as

20    the geography of Florida?

21    A.    Yes.

22    Q.    And what they investigate and don't investigate, correct?

23    A.    Yes.

24          MR. GEORGE TRAGOS:  Excuse me, Your Honor.  That's

25    all the questions I have, Your Honor.
```

```
 1              THE COURT:  Any objection to the introduction of the
 2   transcripts?
 3              MR. GEORGE TRAGOS:  Yes, Your Honor.  I don't think
 4   they've moved them in evidence, actually.
 5              MS. SWEENEY:  Your Honor, I did not.  May we speak at
 6   sidebar, briefly?
 7              THE COURT:  No.  You have a motion?
 8              MS. SWEENEY:  Your Honor, I move the transcripts into
 9   evidence.  I move 161.1-A and B, 162.1-A and B and 163.1-A and
10   B into evidence.
11              THE COURT:  All right.
12              Agent, the intercept of the call channel data and the
13   call content data you say is married up with where?
14              THE WITNESS:  At the field office.
15              THE COURT:  This is the Miami field office?
16              THE WITNESS:  Yes, ma'am.
17              THE COURT:  And the server that is on is at that
18   field office?
19              THE WITNESS:  Where it was originally married up,
20   yes.
21              THE COURT:  And it is instantaneously placed on a
22   disc?
23              THE WITNESS:  I'm not sure if it's instantaneously
24   or if there's a short buffer.  I do not know the specifics on
25   that.  But the original disc is what is -- we consider
```

1    evidence.

2              THE COURT:  Well, that's what you consider evidence,

3    but the server had the information on it at some point?

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  And at some point, the information was

6    downloaded to a disc?

7              THE WITNESS:  Correct.

8              THE COURT:  And then it was deleted from the server?

9              THE WITNESS:  I don't know if it's a buffer type of

10   thing or if it's stored there and then deleted.  I'm not sure

11   of that.

12             THE COURT:  When you say "buffer type of thing," what

13   do you mean?

14             THE WITNESS:  Buffer is like a temporary storage.

15   It's almost like a bucket.  So information would come in, it

16   would be temporarily stored in this bucket and then put into

17   the disc.

18             THE COURT:  You're the FBI, right?

19             THE WITNESS:  Yes, ma'am.

20             THE COURT:  And you know that when something is put

21   someplace, it was someplace?

22             THE WITNESS:  Yes.

23             THE COURT:  So it either is still there or it is

24   removed.

25             THE WITNESS:  It would be removed from the server,

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1   yes.

2          THE COURT:  When was it --

3          THE WITNESS:  If it was temporarily there, it would

4   have been removed.

5          THE COURT:  When was it deleted?

6          THE WITNESS:  I do not know.

7          THE COURT:  By whom was it deleted?

8          THE WITNESS:  I do not know.

9          THE COURT:  Do you know how long it stays there?

10          THE WITNESS:  I do not know.

11          THE COURT:  Do you know when the disc was created

12   that you looked at to verify the content of these

13   conversations?

14          THE WITNESS:  I do not specifically know, ma'am.

15          THE COURT:  Do you know who created the disc?

16          THE WITNESS:  The computer creates the disc.

17          THE COURT:  It just creates it and spits it out onto

18   the floor or someone has to say, please create a disc?

19          THE WITNESS:  Before we start the intercept, before

20   we start the collection of the intercept, we prepare the system

21   with a new disc.  The disc is placed into the system and all

22   recordings from that collection are placed on to that disc.

23   When the disc gets full, the disc gets removed by either the

24   agent or by an electronic surveillance technician who then puts

25   it into evidence.

```
 1              THE COURT:  This disc is target phone specific?

 2              THE WITNESS:  Yes, ma'am.  There's one for each

 3   collection.  For each Court order, there is a disc.  It's

 4   marked with that information.

 5              THE COURT:  And someone in the field office directs

 6   the disc to be created?

 7              THE WITNESS:  To be -- you mean finalized or

 8   initially created?

 9              THE COURT:  Finalized?

10              THE WITNESS:  Yes.

11              THE COURT:  So they can be mailed to Tampa and given

12   to you?

13              THE WITNESS:  Yes.  Well, it would have been -- at

14   the time when the collection was completed, it would have

15   been -- or the disc was full, it would have been put into

16   evidence at that time.

17              THE COURT:  Then who culls the information from the

18   disc to make it into a disc relevant to this case?  Like if he

19   ordered pizza or the target sent out for Chinese, I assume

20   that's not on the disc?

21              THE WITNESS:  I'm sorry, can you say that one more

22   time.

23              THE COURT:  If the target did something completely

24   irrelevant to the case, like ordered out for Chinese, is that

25   going to be on the disc?
```

```
 1              THE WITNESS:  In this instance, it would be, yes,
 2   ma'am.
 3              THE COURT:  And so that's the 161, for example?
 4              THE WITNESS:  These are just calls off that disc.
 5   this is not the disc in its entirety.
 6              THE COURT:  So there's the calls, then there's the
 7   portions of the calls, and then somewhere else in the world
 8   there's the big disk?
 9              THE WITNESS:  Correct.
10              THE COURT:  Did you review the big disk or just the
11   two little discs?
12              THE WITNESS:  I reviewed a disc that was created from
13   the big disk.
14              THE COURT:  Two discs created from the big disk or
15   one?
16              THE WITNESS:  One disc that had these three calls on
17   it, ma'am.
18              THE COURT:  Who created that disc?
19              THE WITNESS:  I do not know.
20              THE COURT:  That wasn't created by the computer?
21              THE WITNESS:  No, that was created off the larger
22   disk.
23              THE COURT:  By a human being?
24              THE WITNESS:  Yes.
25              THE COURT:  You don't know who did that?
```

```
 1              THE WITNESS:  I do not.

 2              THE COURT:  You don't know when they did it?

 3              THE WITNESS:  I do not.

 4              THE COURT:  Any followup from the Government or the

 5    defense of this witness before we take a sidebar?

 6              MS. SWEENEY:  No, Your Honor.

 7              MR. GEORGE TRAGOS:  Yes, Your Honor.

 8              THE COURT:  Yes, sir.

 9                        RECROSS-EXAMINATION

10    BY MR. GEORGE TRAGOS:

11    Q.    To be clear, there was a big disk?

12    A.    Yes.

13    Q.    That has who knows how many calls on it?

14    A.    Correct.

15    Q.    Somewhere?

16    A.    Yes.

17    Q.    The three calls that you looked at?

18    A.    Yes.

19    Q.    You did not take those three calls off the big disk?

20    A.    I did not.

21    Q.    When you saw the discs, they already had been removed from

22    the big disk?

23    A.    Yes.

24    Q.    And so you don't know how many calls are on the big disk?

25    A.    I do not.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   Q.   You don't know what's on the big disk?

 2   A.   No, not specifically.

 3             MR. GEORGE TRAGOS:  Okay.

 4             THE COURT:  All right.

 5             We're going to ask the jury to step out at this time.

 6             (Jury excused from the courtroom.)

 7             THE COURT:  And the witness may step out.

 8             (Witness excused.)

 9             Let me hear your objection.

10             MR. GEORGE TRAGOS:  Well, Your Honor, the objections

11   are multi-folded.  First, these transcripts, no one has

12   identified any voices on the transcripts, so we don't know if

13   the Defendant is on the transcript, if Russell Dennison is on

14   the transcript or if President Bush is on the transcript.  We

15   don't know.  Therefore, I think the Government has to at least

16   identify the voices on the transcript and make the transcript

17   relevant to this case.

18             Secondly, I don't think they have established a

19   proper predicate for these items.

20             THE COURT:  Well, let me stop you there.  Is the

21   Government prepared, through this witness, to have the voices

22   identified?

23             MS. SWEENEY:  Your Honor, the UC Agent identified the

24   Defendant's voice on these and it was at the very end of his

25   testimony, so the Defendant's voice has been identified on
```

| | |
|---|---|
| 1 | these.  We certainly can call a witness to identify Russell |
| 2 | Dennison's voice. |
| 3 | THE COURT:  The Defendant did so by saying I listened |
| 4 | to these and in my view, based upon my observation of the |
| 5 | Defendant's voice, this is his voice. |
| 6 | MS. SWEENEY:  You're talking about the UC, Your |
| 7 | Honor? |
| 8 | THE COURT:  Yes. |
| 9 | MS. SWEENEY:  Yes, Your Honor. |
| 10 | THE COURT:  Yes, sir. |
| 11 | MR. GEORGE TRAGOS:  Okay.  You want me to continue? |
| 12 | THE COURT:  Yes, sir. |
| 13 | MR. GEORGE TRAGOS:  Yeah.  Russell Dennison, we don't |
| 14 | have a -- this was made -- at least one of them I got December, |
| 15 | 2010, January, 2011.  I don't believe the predicate from the |
| 16 | Bureau has been properly established that can show that this is |
| 17 | actually an accurate recording of the conversation. |
| 18 | There is -- this man had no involvement in the |
| 19 | intercept.  The man had no involvement -- he was up at the |
| 20 | engineering -- let me get my exhibit. |
| 21 | He was up at the Engineering Research Facility, and |
| 22 | had no involvement.  He was -- the only thing he knows about |
| 23 | these calls was he received a disc from somebody -- actually |
| 24 | from Ms. Sweeney.  That's as much as he knows.  And he doesn't |
| 25 | know if there were other calls. |

1        The defense obviously is severely hampered here

2   because we haven't heard the entire disc.  We haven't heard

3   the -- how many calls are intercepted, what context these calls

4   were in, none of that because it was all -- been judged to be

5   classified.

6        So our argument is hampered 'cause there could have

7   been 40 calls to Russell Dennison.  They could have been calls

8   that said, hey, this is just a big joke, and let's ha, ha, ha,

9   about it 'cause we're back in 2011, 2012.  So for them -- '10

10  and '12, excuse me, '10 and '11, 2010 and 2011.

11       So for the Government to be able to establish that

12  these three calls are the total representations of the

13  conversations between Dennison and the Defendant, they need, at

14  least, to present proof directly showing that these are the

15  calls, these are the totality of the calls and these are

16  everything that is relevant to what is going on in these calls

17  and explaining these calls.

18       I haven't seen -- and again, I've asked for, but I

19  haven't seen anything surrounding these calls or any other

20  intercepts between Dennison and Osmakac and I don't even know

21  if there are any other intercepts between Dennison and Osmakac.

22       But I would like to know what my client was saying

23  around this period of time because then this is, again, I

24  believe, coming in as 404(b) which is what the Government moved

25  for initially on this, and 404(b) should be more reliable than

```
 1   this and a predicate should be laid better than this to get

 2   these in.

 3              THE COURT:  Counsel.

 4              MS. SWEENEY:  I'll just start at the end, Your Honor.

 5   I mean, certainly the Government is aware of our discovery

 6   obligations and we've complied with them.  Counsel is

 7   complaining because he doesn't know -- the Government's not

 8   seeking to put in through this witness all the calls between

 9   Mr. Dennison and the Defendant that we have.  We would never do

10   that.  We always only put in the ones that were relevant to our

11   case.

12              THE COURT:  The problem isn't that the Government

13   isn't putting in all the calls, the problem is that this

14   witness isn't competent to testify that the calls you are

15   introducing are complete, that is, that there is no material

16   deletion, addition or alteration to the portions of the

17   recording.

18              As I understand his testimony, you handed him a disc

19   and a transcript which are subsets of a larger disk and said,

20   can you compare the information on disc A to the transcript of

21   disc A, and he says, like anyone in this room could say, yes,

22   this is an accurate transcription of what you handed me, Ms.

23   Sweeney.  But he cannot say this is an accurate compilation of

24   the information pulled from the server onto the disk from which

25   this information was drawn.
```

1        MS. SWEENEY:  This is what I understood him to say,

2   Your Honor.  There exists -- a phone number is a target of --

3        THE COURT:  I heard his testimony and his testimony

4   was quite clearly that he has not listened to the full disk and

5   he hasn't listened to even the full section of the server to

6   know that the disc you gave him is a complete download of these

7   conversations.  He would have no way to do that.

8        MS. SWEENEY:  Of the specific conversations, Your

9   Honor, they -- the files begin and end with a conversation.  So

10  he essentially -- let's say that there were 20 intercepted

11  calls on the big disk as we were referring -- as you and the

12  witness are referring to it, the big disk.  Three of those

13  calls were pulled off, copied directly onto another disc.

14       THE COURT:  So says whom?

15       MS. SWEENEY:  Well, Your Honor, we can have --

16       THE COURT:  So says whom, Ms. Sweeney?

17       MS. SWEENEY:  I don't know, Your Honor.

18       THE COURT:  All right.

19       And we don't know.  And it could be somebody

20  completely competent, completely trustworthy at the FBI who can

21  tell me that, Judge, on March the 15th, before this trial, I

22  pulled the disk and I pulled conversation number 13 and I

23  copied it in its entirety to this disc and I can tell you,

24  Judge, that everything with regard to conversation 13 presents

25  on this disc and that this transcript is an accurate

1    transcription of this disc.  But this witness cannot do that.

2              What you have done is given him what someone told you

3    was a complete copy and told him to verify that A equals A

4    which is not hard to do.

5              MS. SWEENEY:  Yes, Your Honor.  We will call another

6    witness.

7              THE COURT:  All right.

8              We have some courtroom furniture movement to do over

9    the evening in order to put the courtroom back to its normal

10   state.  Our systems people had hoped that in the order of

11   things we would finish on a Thursday, they would be able to do

12   that on a Friday and then we'd all be back together because the

13   trial is moving at a faster clip than that.

14             We didn't have that break we expected, so they can

15   work this evening pretty hard and they can work in the morning

16   pretty early, but they don't want to guarantee me it will be

17   done before 10:00.  And I don't want them here till 10:00

18   o'clock tonight, so I am going to tell the jury to come at

19   10:00 tomorrow morning so that we can have the courtroom back.

20             I had thought we'd just leave it this way, but then I

21   remembered that the public can't observe the witnesses because

22   the witnesses' backs are to the gallery, so we need to put the

23   courtroom back in its normal public state.

24             And so, we will break.  I'm going to call the jury

25   back in now, we'll break for the evening, and then we will

```
1    resume in the morning at 10:00, giving our people as much time

2    as they can.

3          If you all would take your materials off of your

4    desks and your boxes, push them out of the way, either back to

5    the area where you normally are, that's where you're going to

6    be, that would help facilitate this transition more quickly.

7          Are there any other issues that I need to address

8    before I release the jury?  From the Government?

9          MS. SWEENEY:  No, Your Honor.

10          THE COURT:  From the defense?

11          That's a no?

12          Please recall the jury.

13          I'm sorry, there's one issue.  Ms. Vizza reminds me

14    that the media has asked for the transcripts of the overhears.

15    There are many different versions.  We need to call them

16    something specific so the record is clear.  The most complete

17    comprehensive set I think is the one we got this morning.  Is

18    that accurate?

19          MS. SWEENEY:  Yes, Your Honor.  I tagged it as

20    Government's Exhibit 170, although it has not been entered into

21    evidence and the Government would object to it being released.

22          THE COURT:  Yes, sir.

23          MR. GEORGE TRAGOS:  We have no objection to it being

24    released.  We just talking about that one or are we talking

25    about the other two as well?
```

1          THE COURT:  We're talking about that -- if you mean

2     Government's Exhibit 170, which I think is the compilation of

3     overhears in the SCIF, plus the three that were added later

4     yesterday, now part of the same composite exhibit; is that

5     right?

6          MS. SWEENEY:  Yes.

7          THE COURT:  These are not the ones that were part of

8     the discussion pretrial?

9          MS. SWEENEY:  That's correct.

10          MR. GEORGE TRAGOS:  Okay.  So we're just talking

11     about the ones once the trial started overhears?

12          THE COURT:  That's correct.

13          MR. GEORGE TRAGOS:  We have no objection, Your Honor,

14     to the one that was given by the Government today because I

15     believe that is the most accurate and complete one.

16          THE COURT:  And what's the nature of the Government's

17     objection?

18          MS. SWEENEY:  Your Honor, it's -- again, it's in the

19     nature of discovery.  It's not -- it has not been entered into

20     the Court record and therefore it's not public.  And that the

21     only very, very small portions of it were referenced by

22     Mr. Tragos in his exam, and none of them were entered into

23     evidence or even shown to the jury, so for that reason, there's

24     no basis to release it to the public.

25          THE COURT:  The Court will sustain the objection.

```
 1              Please recall the jury.

 2              (Jury returned to the courtroom.)

 3              Ladies and gentlemen of the jury, there's good news I

 4   guess to some degree.  We're going to release you all early

 5   today at 4:00, like right now.  We're going to release you to

 6   go home and we're also going to start an hour later tomorrow at

 7   10:00 rather than at 9:00.  The reason is that we have to

 8   reorient the courtroom.

 9              When you come back in tomorrow if all goes as

10   planned, the courtroom will be reconfigured the way that it

11   normally is with the witness stand across from you and the

12   witness observable by the Court and the public in general.

13              In order to facilitate that transition, we need a

14   little bit more time for our systems people to make that switch

15   over.

16              You have heard quite a bit about this case.  There

17   have been media reports about the case.  It continues to be

18   imperative that you avoid at all costs any consideration of

19   anything about this case outside this courtroom and that you

20   not discuss this matter with anyone or anything having to do

21   with the case with anyone, including among yourselves, until

22   the case has been fully presented to you with instructions on

23   the law.

24              You all have been immensely patient with us.  We are

25   trying as best we can to be as efficient with your time as
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    possible.  And so we're going to excuse you for today asking
2    you to be back to be seated by 10:00 tomorrow.  Again, thank
3    you for your consideration.  We'll see you in the morning.
4              (Jury excused.)
5              Anything more that we need to address the parties to
6    before we recess?
7              MS. SWEENEY:  Your Honor, did you have a chance to
8    rule or consider the 404(b) proposal on the gentleman from
9    Chicago?
10             THE COURT:  I began that review, but I can't give you
11   an answer to that off the cuff.  If you want to bring your
12   witness here to be timely presented, you need to order him to
13   be here and then if he can't testify because the Court declines
14   to allow it, then so be it, but I'm not going to be rushed in
15   that ruling because it's significant.
16             Did anyone want to present anything further on that
17   issue from the Government or the defense?
18             MS. SWEENEY:  No, Your Honor.
19             MR. GEORGE TRAGOS:  Could the -- I was wondering if
20   the Government could give the Court clean copies of those 302s?
21             MS. SWEENEY:  Yes.
22             THE COURT:  Yes.
23             MR. GEORGE TRAGOS:  What the Court is looking at, I
24   was wondering if I could retrieve mine if the Court is going to
25   have it overnight?
```

```
 1              MS. SWEENEY:  I will provide clean copies, Your
 2    Honor.
 3              THE COURT:  Anything else from the defense?
 4              MR. GEORGE TRAGOS:  No, Your Honor.  Is this table
 5    going to be gone?  Is that the way it works?
 6              THE COURT:  No, that table and the table behind it
 7    will remain, right, Ms. Vizza?
 8              THE CLERK:  That's correct.
 9              THE COURT:  Yes.  So your materials can sort of stay
10    put.
11              MR. GEORGE TRAGOS:  We'll clean the table off just to
12    make sure.
13              THE COURT:  So tomorrow, this new person will appear
14    to attempt to authenticate these exhibits?
15              MS. SWEENEY:  It may be Wednesday, Your Honor, but if
16    we continue to seek to admit them, we'll bring a new witness.
17              THE COURT:  All right.
18              So if not, then what will we have tomorrow, the
19    playing of the ones we know to not have objection?
20              MS. SWEENEY:  Exactly, Your Honor.  They're not
21    telephone intercepts, they're the recordings between the
22    Defendant and the CHS when they were meeting.  So we'll play
23    portions of those that the parties have requested played, and
24    we may also have minor -- what I call more minor witnesses who
25    will testify as to where various pieces of evidence were kind
```

1    of found in the end, that sort of thing.

2            MR. GEORGE TRAGOS:  We do have one dispute on the CHS

3    recordings that we haven't been able to resolve that the Court

4    is going to have to resolve.

5            THE COURT:  What is it?

6            MR. GEORGE TRAGOS:  We requested a portion to be

7    played.  They object to that portion being played.

8            THE COURT:  May I see it?

9            (Brief pause.)

10           Anything other than this?

11           MR. GEORGE TRAGOS:  That's the only one we have in

12   dispute.

13           THE COURT:  And then we think that tomorrow will be

14   taken up entirely by the recordings and the short witnesses?

15           MS. SWEENEY:  I think it may be taken up entirely by

16   the recordings, Your Honor.  We'll have short witnesses on

17   standby in case it goes faster than anticipated or anything

18   like that, but I believe that it may take the entire day to

19   play the CHS recordings or the portions of them.  I mean,

20   there's hours and hours of them, but the parties have narrowed

21   down to smaller portions of them.

22           THE COURT:  All right.

23           Let's have a closed courtroom on this inquiry.

24           (Thereupon, an in camera hearing was held and not

25   included in this transcript.)

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1              Are we on the record or are you all just clowning
 2    around?
 3              MR. GEORGE TRAGOS:  We're clowning around, Your
 4    Honor.
 5              THE COURT:  All right.
 6              Well, we're in a proceeding, Mr. Tragos.
 7              You should also let the defense know, Ms. Sweeney,
 8    this evening whether you intend to call a witness to attempt
 9    the introduction of these additional materials that were at
10    issue with Agent Haag's testimony today and who that witness
11    would be and what his or her role is at the FBI.
12              MR. GEORGE TRAGOS:  If I could request *Jencks* as
13    well.
14              THE COURT:  Anything else before we recess for the
15    evening?
16              MS. SWEENEY:  No, Your Honor, thank you.
17              THE COURT:  Court's in recess.
18              (Thereupon, the proceedings concluded.)
19                        *******
20
21
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF HILLSBOROUGH    )

 5

 6        I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

 7   the United States District Court, Middle District, Tampa

 8   Division,

 9        DO HEREBY CERTIFY, that I was authorized to and

10   did, through use of Computer Aided Transcription, report

11   in shorthand the proceedings and evidence in the

12   above-styled cause, as stated in the caption hereto, and

13   that the foregoing pages numbered 1 to 160, inclusive,

14   constitute a true and correct transcription of my

15   shorthand report of said proceedings and evidence.

16        IN WITNESS WHEREOF I have hereunto set my hand

17   in the City of Tampa, County of Hillsborough, State of

18   Florida, this 15th day of June, 2015.

19

20        /s/CLAUDIA SPANGLER-FRY
          _____
21        CLAUDIA SPANGLER-FRY, Official Court Reporter

22

23

24

25
```