1            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
2                  TAMPA DIVISION

3  UNITED STATES OF AMERICA,      Case No.8:12-CR-45-T-35AEP

4            Plaintiff,

5   VS.                           Tampa, Florida

6  SAMI OSMAKAC,                  June 4, 2014

7            Defendant.           8:30 a.m.

8  _____/

9                         VOLUME 7
               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10            BEFORE THE HONORABLE MARY S. SCRIVEN
                 UNITED STATES DISTRICT JUDGE
11
   Appearances:            MS. SARA SWEENEY
12                         Assistant United States Attorney
                           401 North Tampa Street
13                         Suite 3200
                           Tampa, FL 33602
14                         (813)274-6000
                           sara_sweeney@usdoj.gov
15
                           CLEMENT J. MCGOVERN, ESQUIRE
16                         United States Department of Justice
                           Trial Attorney
17                         950 Pennsylvania Avenue, N.W.
                           Washington, DC  20530
18                         (202)305-0535
                           clement_mcgovern@usdoj.gov
19
   For the Defendant:      GEORGE TRAGOS, ESQUIRE
20                         PETER TRAGOS, ESQUIRE
                           Tragos & Sartes, PL
21                         601 Cleveland St.
                           Suite 800
22                         Clearwater, FL  33755
                           (727)441-9030
23                         george@greeklaw.com

24

25

             CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

| | |
|---|---|
| 1 | Court Reporter: |
| 2 | |
| 3 | |
| 4 | |
| 5 | |

Court Reporter:          CLAUDIA SPANGLER-FRY, RPR, RMR
                         Official Court Reporter
                         801 North Florida Avenue
                         7th Floor
                         Tampa, FL 33602
                         (813)301-5575
                         cookiefry@aol.com

```
 1                    I N D E X
 2   WITNESSES:                                    PAGE
 3   EVAN F. KOHLMANN
 4   Proffer Direct Examination by Mr. McGovern ...........   28
 5   Proffer Cross-Examination by Mr. Peter Tragos ........   42
 6   Direct Examination by Mr. McGovern ...................  116
 7   Cross-Examination by Mr. Peter Tragos ................  176
 8   Redirect Examination by Mr. McGovern .................  191
 9   PAUL HAAG
10   Direct Examination by Ms. Sweeney ....................   65
11   Voir Dire Examination by Mr. George Tragos ...........   70
12   Cross-Examination by Mr. George Tragos ...............  108
13   ASHRAF ELESSAWAY
14   Proffer Direct Examination by Ms. Sweeney ............   94
15   Direct Examination by Ms. Sweeney ....................  112
16   Cross-Examination by Mr. George Tragos ...............  115
17   KEITH ARNDT
18   Direct Examination by Ms. Sweeney ....................  199
19   Voir Dire Examination by Mr. George Tragos ...........  203
20   Cross-Examination by Mr. George Tragos ...............  209
21   Redirect Examination by Ms. Sweeney ..................  213
22   JEFFEY ALLEN FULLER
23   Direct Examination by Ms. Sweeney ....................  215
24   Cross-Examination by Mr. George Tragos ...............  219
25
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1              I N D E X

2     EXHIBITS:                                    PAGE

3     Government's Exhibits 161.1-A&B, 162.1-A&B and

4     163.1-A&B  (Magnito Optical Disk Data)..............   111

5     Government's Exhibit 160-A in Evidence (Excerpt of

6     Winter 2010 Issue of Inspire) ......................   149

7     Government's Exhibit 160-B in Evidence (Excerpt of Fall

8     2010 Issue of Inspire.) ...........................    158

9     Government's Exhibits 50-B, 14 and 19-A in Evidence

10    (Picture of Hotel Rooom, Handwritten Note, Metro PCS

11    Cellular phone with phone number) ..................   197

12    Government's Exhibit 17-A (Kyocera cell phone, ID only)  202

13    Government's Exhibit 17-B in Evidence (Data from

14    Metro PCS Cellular Phone Showing Text Messages) .....   204

15    Government's Exhibit 18-A (Samsung Cell phone, ID only)  195

16    Government's Exhibit 18-B in Evidence (Cellebrite Data

17    from Samsung Cellular Phone Showing Contacts) .......   206

18    Government's Exhibit 18-C in Evidence (Data from

19    Samsung Cellular Phone Showing Auto Erase In box) ...   207

20    Government's Exhibit 19-A (Metro PCS cell phone ID only)  208

21    Government's Exhibit 19-C in Evidence (Data from

22    Metro PCS Cellular Phone Showing Contacts) .........    209

23    Government's Exhibit 51 in Evidence (Picture of

24    Rental Van) .......................................     218

25

```
 1                    P R O C E E D I N G S

 2                        June 4, 2014

 3                          ******

 4            THE COURT:  Good morning.

 5            Please call the case.

 6            THE CLERK:  In the matter of United States of America

 7  versus Sami Osmakac, Case Number 8:12-Criminal-45.  This matter

 8  is again in session.

 9            THE COURT:  All right.

10            There was a request for additional Daubert analysis

11  of Mr. Kohlmann; is that right.

12            MR. PETER TRAGOS:  Yes, Your Honor.

13            THE COURT:  Is he present?

14            MR. MCGOVERN:  Yes, Your Honor.  Good morning, Your

15  Honor, Mr. Kohlmann is present.

16            THE COURT:  Please have him come forward.

17            MR. MCGOVERN:  May I inquire, Your Honor, before the

18  witness is brought in?

19            THE COURT:  Yes, sir.

20            MR. MCGOVERN:  If the defense could specifically

21  state on the record the issues that they would like to address,

22  I might be able to tailor that.

23            THE COURT:  My understanding was his knowledge

24  concerning the black flag and any testimony he intends to offer

25  with respect to that; is that right?  Is there something else?
```

1           MR. PETER TRAGOS:  Yes, Your Honor, also the video,

2    multiple videos, I guess, that the Government is planning onto

3    playing, and the background information of the people they

4    intend to put before the jury anything above what the Defendant

5    has actually mentioned in the transcript.

6           THE COURT:  I didn't hear any witness who was going

7    to authenticate any video having been on Mr. Osmakac's computer

8    other than Peggy, and I can't remember her last name, who was

9    going to testify concerning the jpeg image of Abdul Abraham or

10   Abdul Abrim, one or the other.

11          Is there anyone else who is here to authenticate any

12   video forensic analysis of a computer of Mr. Osmakac's for

13   which there would be a foundational basis for Mr. Kohlmann's

14   testimony?

15          MR. MCGOVERN:  Your Honor, upon reflection --

16          THE COURT:  On your feet, Mr. McGovern, please.

17          Yes, sir.

18          MR. MCGOVERN:  I'm sorry.

19          Your Honor, upon reflection after reviewing the

20   Court's order in Daubert and examining our case in chief, the

21   Government has decided not to call any forensic analysis from

22   the FBI to authenticate the jpeg or admit any computer evidence

23   at this time in our case in chief.

24          The videos to which the Defendant -- defense refers,

25   I believe, are in -- of some point in time, Your Honor, when

1  the Defendant was meeting with the CHS.  The Defendant played a

2  video from Awlaki which was recorded on the Government's

3  recording, and a transcript of that was prepared and has been

4  admitted into evidence.

5        We would call Evan Kohlmann to describe what that

6  video is, who is speaking, what the content of that video is.

7        THE COURT:  Which exhibit is that?

8        Did I hear Ms. Sweeney say the document is not in

9  evidence?

10        MR. MCGOVERN:  Yes, you did, Your Honor.

11  Specifically, the transcript is Government's Exhibit 114.4-B.

12  The audio CD is Government's Exhibit 114.4-A.

13        THE COURT:  And so through whom do you intend now to

14  seek to introduce this exhibit?

15        MR. MCGOVERN:  Your Honor, this Exhibit 114.1-A, 2-A

16  and 3-A were all part of the same stipulation between the

17  defense and the Government regarding CHS transcripts, most of

18  which were played and admitted into evidence yesterday.

19        THE COURT:  And the Awlaki video is on one of those,

20  114.4-B?

21        MR. MCGOVERN:  No, Your Honor.  114.4-B is a

22  transcript of a recording that was picked up by the

23  interception of that conversation through the CHS.

24        THE COURT:  In the background of that is the audio

25  playing?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1            MR. MCGOVERN:  Yes.

2            THE COURT:  Has someone transcribed the audio?

3            MR. MCGOVERN:  Yes.

4            THE COURT:  And the defense has agreed to admission

5    of the audio in the background of the conversation of the CHS

6    and the Defendant?  That's part of the stipulation?

7            MR. PETER TRAGOS:  Judge, we object in a similar

8    fashion to -- this is not -- this transcript is not a

9    conversation between the CHS and the Defendant which is what

10   was stipulated to, is the tapes of their recordings because the

11   CHS's testimony was coming in to explain the Defendant's

12   responses.  This would just be hearsay of somebody else that

13   wasn't even there or it might be our contention, also, that

14   this was just played as background so that they couldn't be

15   picked up if there was a recording device and --

16           THE COURT:  Well, this is a bunch of ifs.  We now

17   know the transcripts, we have them.  What happened; did

18   Mr. Osmakac say, listen, CHS, I want to let you hear the Shaykh

19   Awlaki, listen to what he's telling us and then he proceeds to

20   play it or is it just like the NPR audio that just plays over

21   it in an effort to drown out the sound, and do we know who,

22   among the two of them, turned it on?

23           MR. MCGOVERN:  Your Honor, the transcript bears out

24   and indicates that the Defendant wanted the CHS to listen to

25   this particular --

```
 1              THE COURT:  Show me the page and line of the audio.

 2              MR. MCGOVERN:  114.1, Your Honor.

 3              THE COURT:  114.1 at what page?  114.1-B, it's a one

 4  page --

 5              MR. MCGOVERN:  Yes, it's 114.1-B, it's one page.

 6              THE COURT:  And so where is the audio transcribed?

 7              MR. MCGOVERN:  The audio is transcribed in 114.4-B, a

 8  continuation of that same recording.

 9              THE COURT:  So show me where on 114.1-B the Defendant

10  asks the CHS to listen to the tape.

11              MR. MCGOVERN:  114.1-B, the third line down

12  indicating the Defendant, SO: "You should go in as a guest.  I

13  can show you some websites and then you can make like -- oh,

14  that means guest, you -- like I don't use it.  Do you know what

15  I mean?"

16              The CHS: "Hold on a second."

17              THE DEFENDANT:  "And then you can read while I clean

18  up.  You have a customer."  And then the recording begins with

19  the Awlaki video.

20              THE COURT:  On what page; 114.4-B?

21              MR. MCGOVERN:  Yes.

22              THE COURT:  And do we know whether this is the CHS

23  listening to this or whether this is Mr. Osmakac listening to

24  this?

25              MR. MCGOVERN:  This is the CHS listening to the
```

| | |
|---|---|
| 1 | laptop that is playing the video. |
| 2 | THE COURT:  And is it the CHS's laptop? |
| 3 | MR. MCGOVERN:  I'm sorry? |
| 4 | THE COURT:  Is it the CHS's laptop? |
| 5 | MR. MCGOVERN:  Yes, Your Honor. |
| 6 | THE COURT:  And where's Mr. Osmakac during the |
| 7 | playing? |
| 8 | MR. MCGOVERN:  The transcript indicates that he was |
| 9 | going to pick up and clean up around the CHS's store while the |
| 10 | video played. |
| 11 | THE COURT:  Counsel. |
| 12 | Mr. Tragos. |
| 13 | MR. PETER TRAGOS:  Yes, Your Honor, a couple things. |
| 14 | Right before the Defendant says, "You should go in as guest, I |
| 15 | can show you how," the CHS says, "No, I want to put 20 minutes, |
| 16 | let it relax and then we'll take care of it."  That's sounds to |
| 17 | me like just as much as Mr. Osmakac saying you can go on this |
| 18 | website, the CHS wants to watch this video maybe, but there's |
| 19 | nobody -- the Government hasn't called anybody to explain these |
| 20 | statements.  They also haven't called anybody to say that they |
| 21 | were actually listening while this was playing in the |
| 22 | background. |
| 23 | And the Defendant says, "You can read while I clean |
| 24 | everything up," in addition to, "I'll show you a website," not |
| 25 | I will play a video for you to watch because I agree with |

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    everything this guy says in the video.

2            THE COURT:  On page two of four, it says, CHS and SO

3    are talking at the same time as al-Awlaki.  What are they

4    saying?

5            MR. MCGOVERN:  Your Honor, I have to pull that

6    transcript up.

7            (Brief pause.)

8            Sorry, Your Honor, which document were you referring

9    to?

10           THE COURT:  114.4-B on page two of four, during the

11   playing of the audio by apparently the CHS, the notes of the

12   Government indicate CHS and SO are talking at the same time as

13   al-Awlaki.  And what are they saying?

14           MR. MCGOVERN:  Your Honor, if it hasn't been

15   transcribed, then I'm not able to tell you that.

16           THE COURT:  So there is no other transcript that

17   would be a transcript of what they're saying?

18           MR. MCGOVERN:  Not to my knowledge, Your Honor, no,

19   other than the following pages on page three.  You can see that

20   they're trying to pick up parts of the conversations, but it's

21   unintelligible.  Part of it says the CHS and the SO are

22   whispering.  It's very hard to hear what to saying with the

23   broadcast of the Awlaki speech.  The Awlaki voice is too loud.

24   It does indicate the two voices of those two individuals are

25   being picked up while the video is being played.

```
1          THE COURT:  Well, the Defendant is in the background
2    taking care of customers it sounds like, and then he's telling
3    somebody, "That is a good gift for your children," I assume, in
4    reference to something they are trying to purchase.
5          MR. MCGOVERN:  Yes, Your Honor, and that would be
6    consistent with what the Defendant said in 114.1-B, that and
7    then "You can read while I clean up everything."
8          THE COURT:  Well, this is -- there's no indication
9    here that the Defendant adopted this Awlaki video.  It looks
10   like the CHS played this of his own accord.  And it appears
11   apparently that he played it on his own computer, not the
12   Defendant's.  So, I'm not sure how this becomes an adopted
13   statement of the Defendant because we also don't know where the
14   Defendant was during most of the playing of it from this video
15   or this transcript.
16         MR. MCGOVERN:  Your Honor, clearly in 114.1, it is
17   the Defendant that is instructing the CHS to go in as a guest,
18   log into the website and listen to this particular lecture.
19         (Brief pause.)
20         THE COURT:  You indicated that the defense had
21   stipulated to the admission of this document.  I don't hear
22   that to be the case.
23         MR. MCGOVERN:  Well, Your Honor, that would be news
24   to the Government.  The agreement was that the CHS tapes,
25   generally all those recordings were going to be admitted.  And
```

```
1    then they selected -- the Government selected the recordings

2    that they were going to use and the defense selected the

3    recordings they were going to use.

4            THE COURT:  And you all shared them and no one

5    objected?

6            MR. MCGOVERN:  If there's an objection to this

7    particular part of the recording, then that would be news to

8    us.

9            THE COURT:  Counsel.

10           MR. PETER TRAGOS:  Yes, Judge.  The clips were

11   stipulated to between the CHS and the Defendant, but as the

12   Government had objections to some of our clips, some of which

13   were kept out and the one about, "I'm going to control him" was

14   let in by the Court, we have an objection to this part, the

15   Awlaki hearsay, relevance and predicate to -- that the

16   Defendant even knew he picked this video as he may have

17   directed him to a website, and the CHS could have picked

18   whatever video he wanted to listen to.  The Defendant directed

19   him to read on the website.

20           So we don't have a problem with 114.1-B coming in and

21   the discussions between the CHS and Mr. Osmakac.  We just have

22   a problem with the transcript -- the videos coming in that may

23   have been playing in the background.  None of the other videos

24   or radio recordings that were playing while the UCE and the

25   Defendant were in the car were transcribed and entered in
```

1    evidence either.

2              THE COURT:  Were they transcribed, all these other

3    NPR videos and background preacher videos and music videos and

4    audios that were being played in the car; were any of those

5    transcribed?

6              MR. MCGOVERN:  No, Your Honor, not to my knowledge.

7              THE COURT:  Why not?

8              MR. MCGOVERN:  I'm not able to answer that question,

9    Your Honor.

10             THE COURT:  Well, ask somebody who is.

11             MR. MCGOVERN:  Your Honor, for the purposes of

12   preparing the case in chief, you know, transcribing, the

13   overhears of the Christmas songs and NPR video were not deemed

14   to be useful for the Court or the jury.  You know, they clearly

15   can hear that on the audio as played, but it's more of a

16   distraction.  The focus is on what the two parties are

17   communicating about.  I would add, Your Honor, if I can --

18             THE COURT:  Where in the larger transcript does this

19   fall?

20             MR. MCGOVERN:  Where in the martyr transcript?

21             THE COURT:  Larger transcript, 114-B?

22             MR. MCGOVERN:  Is the placing of the audio?

23             THE COURT:  Yes, sir.

24             MR. MCGOVERN:  While that's being pulled out, Your

25   Honor, I would just add for the Court to consider that this is

1   not the first time that this particular video which is called

2   Martyr of Dawah is referenced by the Defendant.  He has spoken

3   about this particular video and spoken about Awlaki throughout

4   his conversations with the UCE, specifically, Your Honor,

5   Government's Exhibit 118, page 45.

6           THE COURT:  What is the answer to my other question?

7           MR. MCGOVERN:  I'm sorry, page 53.

8           MR. GEORGE TRAGOS:  I missed the argument.  What does

9   that represent?

10          THE COURT:  I'm listening.

11          MR. MCGOVERN:  Yes, Your Honor.  This is an example

12  of a reference to the Martyr of Dawa individual where the

13  Defendant talks about the paragraph starting "'Cause that's why

14  America loves to go to war with people", and a reference to

15  Umar Farouk Abdulmutallab.  You know, that information comes

16  from the Awlaki video and Evan Kohlmann will be able to relate

17  that particular statement to the video.

18          THE COURT:  When you're saying that is a reference to

19  the video, you mean that is a quote from the video?

20          MR. MCGOVERN:  Your Honor, I don't know if it's a

21  direct quote, but the context of that statement has been linked

22  to the Martyr of Dawa by Anwar al-Awlaki.

23          THE COURT:  What part of that?

24          MR. MCGOVERN:  Umar Farouk Abdulmutallab, the brother

25  that comes from Yemen, the Somalia brother.

```
 1              THE COURT:  You mean his name is mentioned in the
 2    audio?  I don't understand what you are saying.
 3              MR. MCGOVERN:  A continuation of --
 4              THE COURT:  Go back to where we were, please.  So you
 5    mean by a link to the video that this person's name, Umar
 6    Farouk Abdulmutallab is mentioned in the al-Awlaki video?
 7              MR. MCGOVERN:  Yes, Your Honor, that is my
 8    understanding.  Also, if we --
 9              THE COURT:  The only place in the world his name is
10    mentioned?
11              MR. MCGOVERN:  No, Your Honor, of course not.
12              THE COURT:  So how does that link him to the video?
13              MR. MCGOVERN:  If we could continue down on the
14    conversation.
15              THE COURT:  All right.
16              MR. MCGOVERN:  For the record, Mutallab is also known
17    as the Christmas tree -- Christmas Day bomber.  The reference
18    that this Defendant attempted to blow up a plane on Christmas
19    Day, but his equipment malfunctioned.  And when it says
20    $40 billion wasted, all Homeland Security garbage, you know,
21    that connection is directly from the Awlaki video.
22              THE COURT:  Show me where it is in the Awlaki video
23    transcript.
24              MR. MCGOVERN:  Pull that up, the fifth line down,
25    Your Honor.  Again, it talks about his brother, Umar Farouk
```

```
 1   Abdulmutallab has succeeded in breaking through the security
 2   system that has cost the U. S. Government alone over
 3   $30 billion since 911.
 4            The import of this conversation and what Evan
 5   Kohlmann would testify to is similarities between the reference
 6   to the individual, his attempt to conduct a terrorist act and
 7   the failure of that act, but that it wasn't a failure because
 8   it cost the United States Government billions of dollars in
 9   reacting to it by upgrading their security.
10            (Brief pause.)
11            If I may, Your Honor?
12            THE COURT:  No, sir, one second.
13            (Brief pause.)
14            What does it mean when it says clip one, start file 2
15   at 20125 and then clip one in file two at 20150?
16            MR. MCGOVERN:  Your Honor, the clips were prepared
17   from individual interceptions, so within one interception there
18   might be multiple clips that were marked as relevant either for
19   the defense or for the Government.
20            Within the clip, the Government and the defense
21   attempted to even further narrow down that which would be
22   played for the jury in Court.  While the complete transcript
23   would go to the jury, if there were notes about starting and
24   stopping, that was to aid the Government in knowing when to
25   start and when to stop a particular recording.
```

1          THE COURT:  The video -- I'm sorry, the audio

2    transcript says that the confidential human source and the

3    Defendant are talking about -- well, first of all, the clip,

4    the way you have it played -- have it set up to just play the

5    intro of this conversation, "You should go on some website," et

6    cetera, then deletes all the intervening discussion which

7    shows, it appears, the confidential human source and an

8    unidentified female talking and doing other things.

9          Mr. Osmakac is off the scene, it appears, entirely,

10   and then the transcript says the sound of what could be a talk

11   show on an Arabic channel, the speakers are discussing the

12   achievements and activities of al-Awlaki, his killing and the

13   relationship of Yemen with the United States.  And then there's

14   a talk show host, apparently speaking in English, and then some

15   participant speaking in Arabic, and then the speaker on the

16   program speaks more about al-Awlaki, the jihad and Islam, and

17   so forth, and then the recorded message of al-Awlaki is played.

18          So, is this a TV show that -- or a radio show that

19   the confidential human source has turned to or is this a

20   website he's gone on at the behest of the Defendant?

21          MR. MCGOVERN:  Your Honor, this is a website he's

22   gone at the behest of the Defendant.  Furthermore, Your Honor,

23   the Government believes that Evan Kohlmann will testify that

24   what is listed in the transcript, the persons who wrote the

25   transcripts from the recordings wrote down it appeared to be a

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   talk show, but Evan Kohlmann would testify that this is

 2   al-Awlaki speaking on the video that he made entitled Martyr of

 3   Dawa.

 4              THE COURT:  Well, that doesn't mean that the video

 5   wasn't played on the talk show.

 6              MR. MCGOVERN:  Your Honor, I believe that Evan

 7   Kohlmann has listened to that and that would be his testimony.

 8              THE COURT:  Well, I'm looking at your transcript.  Is

 9   it inaccurate?  Your transcript says the talk show was on in

10   the background and the talk show host made an introduction in

11   English and then there was an overplay of the al-Awlaki video

12   or there's a transcription of it.  So, was there a TV show on

13   or wasn't there a TV show on in the room at the time?

14              MR. MCGOVERN:  Your Honor, it would not be a TV show.

15   And my understanding, and I believe this would be Evan

16   Kohlmann's testimony --

17              THE COURT:  So the al-Awlaki video is introduced by a

18   talk show host in English?

19              MR. MCGOVERN:  Yes, Your Honor.  He would be able to

20   testify that -- how the website works in terms of going to the

21   website, selecting a video and al-Awlaki being introduced.

22              THE COURT:  Is he going to present that in evidence

23   in this case?

24              MR. MCGOVERN:  Your Honor, we do have a copy of the

25   original and parts of that we would ask to be played as it
```

```
 1    mirrors the transcript of --

 2              THE COURT:  The original what?

 3              MR. MCGOVERN:  The original video of Awlaki.  The

 4    original video entitled Martyr of Dawa.

 5              I would just add, Your Honor, that on Government's

 6    Exhibit 121.1, page six, that the Defendant acknowledges

 7    listening to a lecture by Anwar al-Awlaki.  And I would add,

 8    Your Honor, that in the martyrdom video that the Defendant

 9    references Anwar al-Awlaki.  In fact, he's doing this to avenge

10    Anwar al-Awlaki's death.  Anwar al-Awlaki is a principal figure

11    in the Defendant's life.  It clearly is something that

12    motivates him.

13              THE COURT:  Is this his only lecture?

14              MR. MCGOVERN:  Oh, no, Your Honor.  It's the only

15    lecture that the Government can tie -- that we have proof that

16    he listened to and the only one we're bringing up consistent

17    with the Court's Daubert ruling without going to the, you know,

18    bypassing the computer evidence.

19              THE COURT:  Can you play this segment beginning on

20    clip one, start file two at 20125 which is 49 of the big

21    transcript going through and up to parts of the al-Awlaki video

22    and I'll tell you where I've had enough starting at page 49 of

23    the big transcript so I can see this entire exchange in

24    context.

25              MS. SWEENEY:  Your Honor, I need just a moment to
```

```
 1    calculate that.  I'm sorry.
 2             THE COURT:  This is Exhibit 114-B, the full
 3    transcript being played from page 49 through the point of the
 4    Court's direction of completion.
 5             (Brief pause.)
 6             The big transcript has not been admitted in evidence;
 7    just the pieces or has the big one also been introduced?
 8             MR. GEORGE TRAGOS:  The pieces haven't either.
 9             MR. MCGOVERN:  No, it has not been, Your Honor.
10             THE COURT:  All right.
11             Let me hear it.
12             Where is the transcript?
13             MS. SWEENEY:  Your Honor, I'm sorry, I'm still not
14    sure if we're there.  May I just unplug from the sound for a
15    moment until I get to the correct portion?
16             THE COURT:  That's fine.
17             MS. SWEENEY:  Okay.  Your Honor, we're on page 48 of
18    the transcript, about halfway down where the CHS has said,
19    "It's stuck, take the plug, take the power," so this is
20    slightly before where the Court wanted to begin, but we're
21    within 30 seconds to a minute of what the Court would like to
22    hear.  So I'm just going to play from there.
23             THE COURT:  Where are we?
24             MS. SWEENEY:  I'm sorry, page 48 of 114-B, about
25    halfway down the page.  The CHS has just said, "It's stuck,
```

1      take the plug, take the power."

2                  THE COURT:  I don't see that on this page.

3                  MS. SWEENEY:  Your Honor, may I consult --

4                  THE COURT:  That's on page 49 of my transcript.

5                  MS. SWEENEY:  I'm sorry, Your Honor, it somehow

6      appears the Government's copy is slightly different than that

7      copy that you and defense have.  We will work with the ones

8      that you and the defense have, but yes, you're correct, 49 of

9      your copy.

10                 THE COURT:  There's a transcript?

11                 MR. MCGOVERN:  No transcript, Your Honor.

12                 THE COURT:  All right.

13                 (Tape played for the Court.)

14                 Can you fast forward to 217?

15                 MR. MCGOVERN:  I'm sorry, Your Honor?

16                 THE COURT:  Can you fast forward to 217.

17                 (Tape continuing.)

18                 How much longer is the transcript on this video?

19                 MR. MCGOVERN:  I'm sorry, Your Honor?

20                 THE COURT:  I don't hear that, I don't see that.

21     Where is he speaking?

22                 MR. MCGOVERN:  Apparently that follows what's on the

23     transcript.  That's not -- was not transcribed, that portion?

24                 THE COURT:  Why wasn't it transcribed?

25                 MR. MCGOVERN:  Your Honor, I can't answer that.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1              THE COURT:  So it's not even an accurate
2    transcription of what's on there?  No?
3              MR. MCGOVERN:  Your Honor, I can't explain why
4    certain parts of it were transcribed and certain parts were not
5    transcribed.
6              THE COURT:  Well, who can?
7              MR. MCGOVERN:  Your Honor, I don't have an
8    explanation as to why that part was not transcribed.
9              THE COURT:  Well, I don't either which calls into
10   question the validity of this 114-B transcript.  I don't know
11   why it's not complete.  We know it's not complete and we know
12   the Government's picking and choosing what it wants to
13   transcribe and submit to the Court as a compilation of what's
14   said in the background.  If the Government wants to play the
15   background, it has to transcribe the background accurately.
16   And it hasn't done that.
17             So the document is not admissible as something that
18   the Defendant ascribed to.  If you want Mr. Kohlmann to talk
19   about the people the Defendant has identified by name and
20   explain who those people are, in some general terms, that do
21   not include accusations against them but include facts, then
22   the Court will consider it in his Daubert hearing, but he's not
23   going to say the Defendant turned this computer on and listened
24   to it.  I don't know where the Defendant is.  I don't even know
25   how much time transpires.  I don't know what this program is.
```

```
1              The Government hasn't even sought to identify -- the
2    Government had the confidential human source in its control.
3    At some point, it could have asked him what this was, could
4    have called him to testify to tell us what it is and they
5    didn't do that either.
6              So, I just can't, in the context of the invalidity of
7    this evidence, allow it to be introduced.
8              MR. MCGOVERN:  Your Honor, what the recording does
9    pick up, you know, I would ask that the Court permit us to play
10   that part.
11             THE COURT:  I don't know what it picks up.  I know
12   what you say it picks up and when we tested it, you were wrong.
13             MR. MCGOVERN:  And Evan Kohlmann has listened to the
14   entire recording and he would testify as to --
15             THE COURT:  I don't know what Evan Kohlmann looked
16   at.  I don't know what he listen to.  The defense can't cross
17   him on it 'cause the defense doesn't have it.
18             MR. MCGOVERN:  Your Honor, the recording --
19             THE COURT:  I've ruled.
20             Call your witness if you want to Daubert him on this
21   black flag business.
22             MR. MCGOVERN:  The Government calls Evan Kohlmann.
23             Before the witness is brought in, Your Honor, is that
24   the extent of the Defendant's request at this time?
25             MR. PETER TRAGOS:  Just one second, please.
```

```
 1              THE COURT:  It's as to the black flag and as to any

 2    information he has about some Shaykh that can be attributed to

 3    the Defendant that's not from either 114-B, and that can't be

 4    authenticated by the Government as coming from his computer or

 5    his mouth, and I'm told there's nothing from a forensic

 6    standpoint the Government intends to introduce.  So if there's

 7    a name from the Defendant's mouth or statement from the

 8    Defendant that this witness is prepared to testify about, those

 9    are the categories the Court is aware of.

10              Any others, Mr. Tragos?

11              MR. PETER TRAGOS:  There's one more, Your Honor, that

12    we may not have mentioned before, it's a definition of the word

13    "takfiri."

14              THE COURT:  Yes, that did not come up in the --

15              MR. PETER TRAGOS:  Transcripts.

16              THE COURT:  Well, it didn't come up in the Daubert

17    hearing or a source of the transcripts.  Are you going to have

18    him define takfiri?

19              MR. MCGOVERN:  No, Your Honor.

20              THE COURT:  All right.

21              MR. PETER TRAGOS:  Just to be clear, 'cause there's

22    different definitions of those words, so he's not going to

23    define anything about takfiri?

24              THE COURT:  That's my understanding.

25              MR. PETER TRAGOS:  Thank you, Your Honor.
```

```
 1              MR. MCGOVERN:  In an abundance of caution, Your

 2    Honor, and I would notify the Court that the Government also

 3    intends to have -- ask Evan Kohlmann about the two German

 4    brothers that the Court knows about and that we have discussed

 5    before.  Evan Kohlmann would be able to identify the paragraphs

 6    spoken about the German brothers by the Defendant --

 7              THE COURT:  Are they in his report?

 8              MR. MCGOVERN:  I'm sorry?

 9              THE COURT:  Are the -- are those people referenced in

10    Mr. Kohlmann's report?

11              MR. MCGOVERN:  Yes, Your Honor.  Page 30 of the

12    report, Your Honor.

13              THE COURT:  Was that mentioned at the first Daubert

14    hearing?

15              MR. MCGOVERN:  Yes, Your Honor.

16              THE COURT:  All right.

17              MR. PETER TRAGOS:  I don't believe it was, Your

18    Honor.

19              (Brief pause.)

20              THE COURT:  Please call your witness.

21    Thereupon,

22                        EVAN F. KOHLMANN,

23    after having been duly sworn to tell the truth, the whole truth

24    and nothing but the truth, was examined and testified as

25    follows:
```

```
 1              THE WITNESS:  Yes, I do.
 2              THE CLERK:  Please be seated in the witness stand.
 3              Please state your full name and spell your last name
 4    for the record.
 5              THE WITNESS:  Yes, my name is Evan F. Kohlmann,
 6    K-O-H-L-M-A-N-N.
 7              THE COURT:  Mr. Kohlmann, you're under oath, you must
 8    give truthful answers to any questions asked.  If you give
 9    false answers, you face penalties of perjury, false statement
10    and obstruction.
11              Do you understand that?
12              THE WITNESS:  Yes, Your Honor, thank you.
13              THE COURT:  The Government has shown you the Court's
14    prior order that constrains your testimony; is that right?
15              THE WITNESS:  Yes, Your Honor.
16              THE COURT:  There is some inquiry that you further
17    constrain your testimony or to determine your qualification to
18    offer certain opinions and so we need to have a short hearing
19    with respect to that.
20              Counsel, you may proceed.
21              MR. MCGOVERN:  Your Honor does the Court adopt the
22    previous testimony in the other Daubert hearing to incorporate
23    that in this hearing?
24              THE COURT:  Yes.
25              MR. MCGOVERN:  Thank you.
```

```
 1                    PROFFER DIRECT EXAMINATION
 2   BY MR. MCGOVERN:
 3   Q.   Mr. Kohlmann, I'd like to start with the term "black
 4   flag."  Are you familiar with that term?
 5   A.   Yes.
 6   Q.   And in your experience and expertise, what does that refer
 7   to?
 8   A.   There is a hadith which is part of the Sunnah of Islam,
 9   part of the belief system of Islam that talks about black flags
10   from Khorasan.  Khorasan is a synonym for Afghanistan.  And the
11   hadith relates a story whereby there will be an army of Muslims
12   that will arise in Khorasan, in Afghanistan and that will lead
13   the way to liberate the Islamic empire carrying black flags.
14        As a result, a number of Islamic political movements,
15   particularly armed political movements, have adopted this ria,
16   this banner as their symbol of or their symbol because of the
17   fact that it represents the idea of an army, an Islamic army
18   marching to take control of the Islamic world, again, under the
19   black flags, under the ria, the banners.
20   Q.   Sir, how are you familiar with that?
21   A.   It's a well known hadith within the belief system of
22   Islam.  I've come across it ever since I first started studying
23   Islam at Georgetown University.
24   Q.   During the time that you've collected videos, you told us
25   you do research and collect videos, do research, you know, have
```

1    you ever read or done research concerning the issue of black

2    flags and what they're about, what they stand for?

3    A.   Yes.  The first time I did research on this subject, it

4    was I think the year 2000.

5    Q.   Are there any groups that associate themselves with the

6    flag?

7    A.   Yes.  There are a number of armed Islamic movements that

8    associate themselves with that particular flag.  The groups

9    that would associate themselves with that flag would include

10   everything from groups like Jabhatal-Nusra, Al-Qaeda in

11   Afghanistan, the Taliban and Jabhatal-Nusra in Syria.

12   Q.   Sir, did you review the discovery in this case?

13   A.   Yes, I have.

14   Q.   In Government's Exhibit 111, page six, there's a reference

15   to a shahada flag.  Are you familiar with that term?

16   A.   Yes.

17           THE COURT:  Who makes reference to it, for the

18   record?

19           MR. MCGOVERN:  I'm sorry, Your Honor?

20           THE COURT:  Who makes reference to it?

21           MR. MCGOVERN:  It's the Defendant making reference to

22   it?

23           THE COURT:  All right.

24   BY MR. MCGOVERN:

25   Q.   I'll direct your attention to the screen in front of you,

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    page six of Government's Exhibit 111.

2    A.    Yes.

3    Q.    In the middle of it, SO, indicating the Defendant, "You

4    have the la ilahillallah, no "gob-a-gob" flags, right, the one

5    with the white letters."

6          Do you know what he is referring to?

7    A.    Yes.

8    Q.    What is he referring to?

9    A.    Well, ilahillallah is the Shahada, it's the testimony of

10   Islam.  This is the Shahada flag, the black one with the white

11   letters is the Ria flag.  It's the black banners with the

12   Shahada written on it.  It's the exact same banner or flag that

13   I've just described.

14   Q.    The manner in which black flags are used and associated

15   with the groups you mentioned, are there different types of

16   flags, black flags meaning some with lettering, some without or

17   others with --

18   A.    Yeah, I mean, I've seen videos in which you have some

19   individuals simply carrying a blank black flag.  Some carry a

20   flag with the Shahada written on it, but usually it's one

21   connotation or the other.  Specifically, it's a black flag,

22   either plain black flag or a black flag with the Shahada

23   ilahillallah written on it.

24   Q.    What is the most commonplace that one might see that flag?

25   A.    Again, the flag is used by a variety of Islamic political

1   movements, although because of the connotation of what the

2   black flag means, it tends to be used more specifically by

3   armed Islamic movements or by movements that are promoting the

4   use of violence or weapons.

5   Q.   More specifically, have you had occasion in your

6   experience to view radical Islamic videos?

7   A.   Yes.

8   Q.   Have you had experience in viewing martyrdom videos?

9   A.   Yes.

10  Q.   Have you ever seen the Shahada flag in those videos?

11  A.   Quite frequently, yes.

12  Q.   Sir, the first time you testified before the Court, you

13  spoke about the Inspire Magazine.

14  A.   Yes.

15  Q.   How are you familiar with Inspire Magazine?

16  A.   I'm familiar with Inspire Magazine because of the fact

17  that I personally downloaded it and accessed the magazine from

18  the official release points of the creators of the magazine,

19  Al-Qaeda in the Arabian Peninsula.  I have reviewed all copies

20  of Inspire Magazine that have been published to date.  I have

21  directly contacted the editors of Inspire Magazine.  I have

22  discussed Inspire Magazine with other experts.

23       I have written about Inspire Magazine, and I have

24  testified about Inspire Magazine, both in Federal Court as well

25  as before Congress.

1    Q.   Who publishes Inspire Magazine?

2    A.   Inspire Magazine is an official publication of Al-Qaeda in

3    the Arabian Peninsula, HUAP.

4    Q.   How is the magazine distributed.

5    A.   The magazine is distributed by being posted online via

6    several different web forums that are run on behalf of

7    Al-Qaeda.  Those particular web forums have sections in which

8    only authenticated couriers from terrorist organizations can

9    post messages.

10        So in those sections is where you would find the latest

11   video from Al-Qaeda or in some cases the latest copy of Inspire

12   Magazine as it's posted directly by the organization.  When

13   it's first posted, it is often in encrypted format, and you

14   have to unencrypt it and the unencrypted password is contained

15   with the release.

16   Q.   So you told us that you reviewed the discovery in this

17   case.  Specifically, have you had an opportunity to review

18   Government's Exhibits 161-A, 161-B, 162-A and 162-B, otherwise

19   identified as calls between the Defendant and an individual

20   identified as Russell Dennison?

21   A.   Yes, I have reviewed those.

22   Q.   In those calls, is the Inspire Magazine referenced?

23   A.   There does appear to be references to Inspire Magazine,

24   yes.

25   Q.   In those calls, there's a reference to number two and

| | |
|---|---|
| 1 | number four.  Do you have an understanding of what is meant by |
| 2 | that? |
| 3 | A.   Yes.  I believe the reference is to Inspire Magazine, |
| 4 | issue number two, which was released in October of 2010, and |
| 5 | refers to Inspire Magazine, number four, which was released in |
| 6 | January of 2011. |
| 7 | Q.   And the specific article that the two individuals in the |
| 8 | conversation talk about, are you familiar with that article? |
| 9 | A.   I believe actually there's two articles that are |
| 10 | referenced, but I'm familiar with both of them, yes. |
| 11 | Q.   Have you read them? |
| 12 | A.   Yes. |
| 13 | Q.   And just going back to the distribution of the magazine, |
| 14 | once it's released, how quickly is it available to the general |
| 15 | public? |
| 16 | A.   Usually within a few hours.  There have been a couple of |
| 17 | instances where unknown parties attempted to disrupt the |
| 18 | distribution of the magazine, but typically speaking, even if |
| 19 | there's a disruption, it wouldn't last more than a few days. |
| 20 |           MR. MCGOVERN:  May I have a moment, Your Honor? |
| 21 |           For the record, Your Honor, the defense and the |
| 22 | Government have spoken.  For purposes of this Daubert hearing, |
| 23 | the Government is not being asked to go through foundations for |
| 24 | the term "hijrah" that would be discussed by Evan Kohlmann, the |
| 25 | website identified as unjustmedia.com. |

```
 1   BY MR. MCGOVERN:
 2   Q.   Are you familiar with the person identified as Aafia
 3   Siddiqui.
 4   A.   Aafia Siddiqui.
 5   Q.   Would you please spell that correctly for the record?
 6   A.   Of course, Aafia, A-A-F-I-A, Siddiqui is S-I-D-D-I-Q-U-I.
 7   Q.   How are you familiar with the person identified as Aafia
 8   Siddiqui?
 9   A.   I'm familiar with Dr. Aafia Siddiqui because of the fact
10   that I've conducted original research on her case.  I've
11   reviewed Court documents filed in her case.  I have conducted
12   outside research on individuals who knew her or were familiar
13   with her, and I researched her background and her history and
14   her family, both in the Boston area as well as back in
15   Pakistan.
16   Q.   You referenced her case.  What does that mean?
17   A.   Dr. Aafia Siddiqui was charged and, in fact, convicted of
18   a variety of offenses relating to an incident that occurred in
19   I believe a U. S. base in Afghanistan several years ago.
20   Q.   In your review of the discovery in this case, do you
21   recall the Defendant speaking about Aafia Siddiqui?
22   A.   I do, yes.
23   Q.   On how many occasions?
24   A.   I can recall one occasion, but there may have been more.
25   Q.   Is it your understanding that the Defendant's -- strike
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    that.

2         In the manner in which Aafia Siddiqui is referenced by the

3    Defendant in the discovery, is that accurate?

4              THE COURT:  I don't understand that question.

5              MR. MCGOVERN:  Very well, Your Honor, I'll rephrase

6    that.

7    BY MR. MCGOVERN:

8    Q.   In the discovery, the Defendant, when speaking about Aafia

9    Siddiqui, describes her as someone who has been raped and

10   otherwise abused; is that accurate?

11   A.   No, it's not accurate.

12             THE COURT:  What's the foundational basis for your

13   knowledge?

14             THE WITNESS:  Your Honor, I've read statements of

15   those who were responsible for organizing the custody of Aafia

16   Siddiqui.  Her trial has already taken place, so there's been

17   open testimony about her treatment.  As far as all the evidence

18   that I can see, there is no evidence to back up her claim that

19   she was tortured while in U. S. custody.

20             THE COURT:  Have you done anything to independently

21   verify the testimony of those individuals?

22             THE WITNESS:  No, Your Honor, it's not possible.

23             THE COURT:  Has there been a Court ruling on the

24   truth or falsity of her accusations?

25             THE WITNESS:  Well, she was convicted, Your Honor.  I

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1  don't believe those accusations were treated as credible by the

2  jury.

3          THE COURT:  But was there a trial on whether or not

4  she was raped or abused while in prison?

5          THE WITNESS:  I'm not familiar with one, Your Honor.

6          THE COURT:  So how would there have been a

7  determination by a jury as to that fact?

8          THE WITNESS:  Your Honor, I'm just speaking in the

9  context of her case.  But I only know the information that's

10  publicly available.

11          MR. MCGOVERN:  With your permission, Your Honor, the

12  Government will not ask Evan Kohlmann during the trial whether

13  or not the Defendant's statements are accurate.

14          THE COURT:  So why are you asking him now at the

15  Daubert hearing?

16          MR. MCGOVERN:  It was an oversight, Your Honor.

17          THE COURT:  All right.

18          MR. MCGOVERN:  May I have a moment?

19          THE COURT:  Please.

20          (Brief pause.)

21  BY MR. MCGOVERN:

22  Q.   Mr. Kohlmann, in the discovery, there's a reference by the

23  Defendant to two German brothers.  Do you recall that?

24  A.   Yes.

25  Q.   Can you identify them?

```
 1    A.    Yes.   There are two brothers, they go by the Choukas or
 2    nicknames, Abu Ibrahim and --
 3    Q.    Let's take one at a time and please spell them.
 4    A.    Sure, of course.  Abu Ibrahim is A-B-U  I-B-R-A-H-I-M.
 5    Abu Ibrahim's real name is Yassin Chouka, Y-A-S-S-I-N
 6    C-H-O-U-K-A.   The other brother is Abu Adam, A-B-U  A-D-A-M.
 7    And his real name is Mounir Chouka, M-O-U-N-I-R  C-H-O-U-K-A.
 8    Q.    Are you familiar with those two individuals?
 9            THE COURT:   I'm sorry, his name is spelled M-O-N-I-R
10    in parts of your report and M-O-U-N-I-R.  Which is it?
11            THE WITNESS:   I'm sorry, it's spelled, Your Honor,
12    M-O-U-N-I-R or M-U-N-I-R?
13            THE COURT:   It's spelled M-O-N-I-R in reference to
14    documents that you quote, and then it's spelled M-O-U-N-I-R in
15    your written report.
16            THE WITNESS:   Your Honor.  The name has two alternate
17    spellings.
18            THE COURT:   All right.
19    BY MR. MCGOVERN:
20    Q.    How are you familiar with these individuals?
21    A.    Both of these individuals have been designated by the
22    United Nations as suspected terrorists and they've also
23    currently --
24            MR. PETER TRAGOS:   Object to the suspected nature of
25    anything they're doing, Your Honor.
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1          THE COURT:  I'll let him tell me what his

2   understanding is.  Whether he'll testify to it is a different

3   story.

4          THE WITNESS:  The German Government provided the

5   United Nations with evidence that these two individuals were

6   involved in terrorist activities inside of Germany.  Subsequent

7   to their departure from Germany, they went to Yemen, where they

8   met up with Anwar al-Awlaki.

9          Following their meeting with Anwar al-Awlaki, they

10   traveled on to the Afghan Pakistani border where they joined a

11   group known as the German Taliban mujahideen.  This was a

12   sub-unit of another group known as the Islamic Movement of

13   Uzbekistan which is an ally of Al-Qaeda.

14          When these two brothers -- while these two brothers

15   were in Afghanistan, were being publicly sought by the German

16   Government, they began releasing videos, both through Al-Qaeda

17   as well as through the IMU in which they explained what they

18   were doing in Afghanistan, what the German Taliban Mujahideen

19   was and what their goals were.

20   BY MR. MCGOVERN:

21   Q.   Why were they in Afghanistan?

22   A.   They announced that the reason they had come to

23   Afghanistan was to participate in a jihad against infidels, to

24   fight against U. S. backed forces and their allies and to

25   encourage other individuals, particularly those living in the

1   west, to follow in their footsteps and either travel to a front

2   line and participate in armed combat or else to wage jihad back

3   at home.

4   Q.   How do you know that?

5   A.   Because they explicitly stated this in the videos and the

6   audio messages that they released.

7   Q.   Approximately how many videos or audios have they

8   released?

9   A.   I'm familiar with at least four different recordings

10  featuring the brothers, at least one of the brothers.

11  Q.   Over a period of how long?

12  A.   Approximately two years.

13  Q.   In your view of the discovery, were there references to

14  the German brothers in the transcripts?

15  A.   I believe so, yes.

16          THE COURT:  And what were the references?

17          THE WITNESS:  Your Honor, there was specific

18  references to two brothers from Germany who had migrated to

19  Afghanistan to join the Mujahideen.  That description really

20  only fits two individuals who were publicly known who are

21  Yassin and Mounir Chouka.  The Defendant also discussed the

22  specific speech that Mounir Chouka have given and began

23  actually citing parts of the speech specifically.

24          THE COURT:  Is there any reference in the discovery

25  that you are aware of that discloses the Defendant's knowledge

1    of any of the other facts that you cited concerning those

2    individuals, like to German -- the Germans placing them on a

3    suspect or terror list or they're going to different places to

4    cause jihad?

5          THE WITNESS:  Your Honor, the Defendant describes

6    these individuals as they are recovering the bodies of fallen

7    fighters who have been killed in the drone strike in Waziristan

8    and they're collecting the pieces and he appears to cite the

9    exact language that they use when they suggest that the West

10   should be annihilated and that attacks should be launched

11   against western targets including sabotage --

12         THE COURT:  That wasn't my question.  My question

13   was, is there any reference in the discovery that you have read

14   that shows that the Defendant was aware of the -- of Germany

15   placing these individuals on some terror list?

16         THE WITNESS:  I can't recall that, Your Honor.  I

17   don't recall specific references to that, Your Honor.

18   BY MR. MCGOVERN:

19   Q.   I'd like to direct your attention to Government's Exhibit

20   118-B, pages 15 and 16.

21        Sir, in this transcript, the Defendant makes reference to,

22   at the bottom of the page, "To the planes fly, to the planes in

23   the sky, they," and following on, continuing on page 16, "Fly

24   above the throne of Allah or below the throne of Allah."

25        Are you familiar with that reference?

1    A.    Yes.

2    Q.    How are you familiar with that reference?

3    A.    This is a direct, almost a direct quotation from the video

4    that I previously referenced featuring Mounir Chouka in which

5    Mounir Chouka describes how a Shaykh described exactly this,

6    about whether drones flying above the throne of Allah or below

7    the throne of Allah and whether or not that's significant.

8    Q.    In your experience and expertise, have you ever seen that

9    quote attributed to anyone else?

10   A.    No, I have never seen this in any other piece of

11   propaganda.

12   Q.    I'd like to direct your attention to Government's Exhibit

13   118-B, page 41.  118-B, page 41.

14        Looking at that page, starts with the Defendant talking at

15   the top, where it starts "kuffar."  Do you recognize that?

16   A.    Yes, I do.

17   Q.    What is the Defendant talking about?

18   A.    The Defendant appears to be referring to those Muslim

19   brothers from Germany and Afghanistan, i.e., Mounir and Yassin

20   Chouka and he appears to be quoting directly from the video,

21   "On to Success", which is the video I referenced earlier about,

22   "not one drop of mercy for them," that's a direct quote, and

23   then this subsequent line when they talk about the drone

24   attacks and gathering the pieces.

25        The numbers are not exactly correct, but the other details

1  are basically spot directly from On to Success.

2  Q.   In the paragraph in the middle where the Defendant starts

3  so --

4        THE COURT:  I'm sorry.  If this was all discussed in

5  the first Daubert hearing, why are we discussing it again?

6        MR. MCGOVERN:  Your Honor, I'm just trying to be as

7  complete as possible for the defense.

8        THE COURT:  Let me hear the cross.

9        MR. PETER TRAGOS:  In its entirety, Your Honor, or

10  just the German brothers?

11        THE COURT:  Well, I don't know what entirety means.

12  The only thing we've discussed so far is the German brothers.

13        MR. PETER TRAGOS:  And the black flag.

14        THE COURT:  And the black flag.

15        MR. PETER TRAGOS:  Yes, Your Honor.

16                    PROFFER CROSS-EXAMINATION

17  BY MR. PETER TRAGOS:

18  Q.   Mr. Kohlmann, you've reviewed all the transcripts in this

19  case, correct?

20  A.   I believe so.  I've reviewed all the transcripts that were

21  provided to me.  I don't know if there were transcripts that

22  were not provided to me.

23  Q.   When did you do that?

24  A.   Over the space of approximately two or three months.  I

25  don't remember exactly.  Within the last year, but I don't

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    remember exactly when.

2    Q.   So you don't remember a date-ish that you got the

3    transcripts from the Government?

4    A.   Not offhand.  I'm sure I have that written down somewhere,

5    but I couldn't remember that offhand.

6    Q.   Do you know if they have been revised since you read them?

7    A.   I believe one of them may have been revised, but I'm not a

8    hundred percent sure of exactly what was revised in them.

9    Q.   Did you receive revised transcripts from the Government or

10   final transcripts from the Government?

11   A.   No, I have not.

12   Q.   Okay.

13          THE COURT:  Well, how do you know it was revised?

14          THE WITNESS:  I saw one transcript, Your Honor,

15   that -- in the last 24 hours that had slight differences from

16   the version that I saw, but I haven't gotten fully revised

17   transcripts that were sent to me.

18   BY MR. PETER TRAGOS:

19   Q.   Do you remember in the transcripts --

20          THE COURT:  I'm sorry.  It says, "Did you receive

21   revised transcripts from the Government?"  And you say, "No, I

22   have not."

23          THE WITNESS:  Maybe I should clarify, Your Honor.

24   I've seen one piece of the one transcript, but I have not

25   gotten the full collection of finalized transcripts.  That was

1    never provided to me.

2              THE COURT:  Which transcript did you see a piece of

3    that had been modified?

4              THE WITNESS:  I believe it's this one.

5              THE COURT:  This one being 118-B?

6              THE WITNESS:  That's correct, yes.

7              THE COURT:  In the last 24 hours, you saw a different

8    version of it than the first version you saw?

9              THE WITNESS:  Uh, I believe that instead of saying

10   "PH," instead of saying PH for phonetic, it said "Rahimullah,"

11   which means "May Allah have mercy on him," and I believe there

12   was also one small change to -- I had noticed that Abu Adam was

13   written wrong, so I suggested that they change the spelling,

14   and I believe the spelling was changed.

15             THE COURT:  Counsel.

16   BY MR. PETER TRAGOS:

17   Q.   On one of the transcripts, do you remember the first time

18   and you may not remember this was the first time, but the first

19   time that the black flag was actually mentioned?

20   A.   I couldn't recall off the top of my head, no, I'm sorry.

21             MR. PETER TRAGOS:  Your Honor, can I show him

22   Government's Exhibit 111-B?

23             THE COURT:  Yes.

24   BY MR. PETER TRAGOS:

25   Q.   Page six.  I'm sorry, page five, the bottom, bottom of the

1    page.  Mr. Osmakac says, "The black flag," and then the next

2    page, you remember this part of the transcript?

3    A.    Yes.

4    Q.    Okay.  And is that Mr. Osmakac asking what is it for?

5    A.    That is, yes.

6    Q.    So all the things that you testified about what the black

7    flag is and what it means, Mr. Osmakac never actually explains

8    all that, does he?

9    A.    I don't believe so.  No, not that I saw in the transcript,

10   no.

11   Q.    Okay.  So you don't know what he knows about the black

12   flag?

13   A.    No.  I do know something because in a later reference -- I

14   don't know how he learned it, but in a later reference, he

15   talks about the Ria flag being the predicator for chopping

16   people's heads off.

17   Q.    But he doesn't know what this black flag means, does he,

18   right here?

19   A.    No, he says, "black flag."  In the later reference, he

20   says, "The black flags will come and then people's heads will

21   start getting chopped off."

22   Q.    Why do you think he's asking what it's for?

23   A.    I don't know.  I don't know what the sequence is.  I'm

24   just saying I do know that in a later conversation or in

25   another conversation, he clearly references the idea of black

| | |
|---|---|
| 1 | flags being a predicator for violence.  But I don't know what |
| 2 | the order is and I couldn't just -- I only know what I see. |
| 3 | Q.   And you don't know where in the transcript he says that? |
| 4 | A.   I reviewed it yesterday, but I couldn't tell you the exact |
| 5 | page number offhand. |
| 6 | Q.   And it's not in your report? |
| 7 | A.   I don't recall whether -- I don't think it's my report, |
| 8 | no. |
| 9 | Q.   Okay.  The black flag with white letters on it; there was |
| 10 | no black flag with white letters on it in this case, was there? |
| 11 | A.   I'm not familiar with one, no. |
| 12 | Q.   Okay.  You reviewed the -- did you review the physical |
| 13 | evidence in this case? |
| 14 | A.   Not all of it, no. |
| 15 | Q.   You get pictures of any of it? |
| 16 | A.   I don't recall getting photos of physical evidence, no. |
| 17 | Q.   Did you get a picture of the black flag that we're talking |
| 18 | about? |
| 19 | A.   I've seen the video in which there's a black flag in it. |
| 20 | Q.   You haven't actually seen the black flag except from the |
| 21 | video? |
| 22 | A.   I don't believe so, no. |
| 23 | MR. PETER TRAGOS:  I believe, also, Your Honor, |
| 24 | Inspire Magazine was inquired about. |
| 25 | THE COURT:  Yes, sir. |

```
 1   BY MR. PETER TRAGOS:
 2   Q.   You testified about the authenticated courier and
 3   encryption; is that correct?
 4   A.   That's correct.
 5   Q.   How do you know about that stuff?
 6   A.   Because of the fact that Al-Qaeda leaders have
 7   specifically explained -- that senior Al-Qaeda leaders have
 8   specifically explained and endorsed the system, including Ayman
 9   Al-Zawahiri, including other senior -- but there's no question
10   about it.  It's a very well established system in which these
11   individuals have online couriers, they release the information.
12   The information is also --
13            THE COURT:  You already answered the question.
14            THE WITNESS:  Sorry, Your Honor.
15            THE COURT:  Please spell the name of the individual
16   you just mentioned.  Spell the name of the individual you just
17   mentioned.
18            THE WITNESS:  Which individual; sorry?
19            THE COURT:  You just mentioned him, I don't know his
20   name.  Someone who came up with this encryption process.
21            THE WITNESS:  Oh, excuse me, Your Honor, sorry, it's
22   Ayman Al-Zawahiri, A-Y-M-A-N  A-L-Z-A-W-A-H-I-R-I.  Although I
23   should clarify, Your Honor, he didn't come up with the system,
24   he just endorsed it.  He said this is legitimate.
25
```

1    BY MR. PETER TRAGOS:

2    Q.    Have you ever been through that, going through the

3    encryption, or unencrypting the documents?

4    A.    Yeah, I unencrypt everything.

5    Q.    No, I'm sorry, the Inspire Magazines?

6    A.    I unencript everything.

7    Q.    Okay.  So you've actually done it?

8    A.    They provide you the unencryption password.  The only

9    reason there's an unencryption password is to prevent people

10   who are, quote, unquote, not supposed to read it from getting

11   it.

12        But if you have access to an Al-Qaeda messaging forum, all

13   right, if you have -- it's a password protected system, then

14   presumably you're supposed to have access to it.  So they give

15   you the unencryption password.  There's no sophistication

16   involved in it.  They give you the file, they give you the

17   password and you just extract it.

18   Q.    Do you know how many people subscribe to these websites

19   with the passwords in the Inspire Magazine?

20   A.    I can give you an approximate number.  On a given day,

21   usually several hundred people access these forums.  It can be

22   challenging sometimes to get logins and passwords, but several

23   of the people that operate these forums have made it their

24   mission to once the propaganda is posted on there, to then

25   repost it in other locations where people who don't have logins

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   and passwords or know about encryption or things like that can

2   easily get access to it.

3   Q.   Of the several hundred, do you know how many, about, are

4   law enforcement or people such as yourself that work for

5   Governments?

6   A.   A very small number.

7   Q.   Okay.  Is it possible to just get one article of an

8   Inspire Magazine on the website?

9   A.   Only if someone actually physically retyped the whole

10  article out by hand, because it's not possible to extract pages

11  or copy content out.  There's file protections on Inspire

12  Magazine that prevent you from being able to easily copy and

13  paste.

14       You have to actually retype the whole thing out by hand.

15  So if someone actually took it and retyped it all out by hand,

16  it's possible.  And there's certain people that may have done

17  that, but it's a challenge.

18  Q.   But it wouldn't look like the article would in the

19  magazine?

20  A.   Well, it entirely depends on how someone presents it.

21  Q.   So it is possible to get an article that looks like you

22  just pulled one article out of the magazine?

23  A.   Yeah, I mean, you can excerpt if -- you have to retype it.

24  Again, it depends how it's presented whether or not it's

25  clearly part of Inspire or not.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Q.   I was asking if it looked like a WORD document, if they

2    typed it or if they made it look like an actual article from

3    the Inspire Magazine, with the pictures and the page numbers

4    and everything on it?

5    A.   You're asking if people have done that?

6    Q.   If it's possible to get an article like that, just a

7    singular article as opposed to the entire issue of the

8    magazine?

9    A.   It's possible, but it's a challenge.

10   Q.   Okay.  Back to the black flag really quick.  Did you watch

11   the martyrdom video in this case?

12   A.   Yes, I did.

13   Q.   Was there a black flag in it?

14   A.   I believe there was in the background.

15   Q.   Okay.  And did you see any white letters on that black

16   flag?

17   A.   Not that I can recall.  No.

18   Q.   Okay.  Next we'll talk about the German brothers.

19        Have you ever met either of these brothers?

20   A.   Mounir and Yassin Chouka, no.

21   Q.   You ever interviewed them?

22   A.   No.

23   Q.   Have you ever spoken to them?

24   A.   No.

25   Q.   Do you know if they quote other Muslim leaders or

1    extremists in their videos?

2    A.    Do they quote them; yes, they do.

3    Q.    Do they quote the Quran ever?

4    A.    Certainly.

5    Q.    Okay.  How do you know -- if they started making videos

6    after they traveled here and there, how do you know about those

7    travels?

8    A.    Because of the fact that those travels have been

9    publicized by the German Government in official Court

10   documents.

11   Q.    So they're accused of doing those travels?

12   A.    No, there's objective evidence that they traveled there.

13   There's passport records and stuff like that.  There's exit

14   records.  They know where they went, it's not a mystery.

15   Q.    It's been proven that they've made the travels and the

16   jihad and things that you said they did?

17   A.    They're dead.  They were killed in Afghanistan.  They're

18   dead.

19   Q.    I didn't ask if they were dead.  Is there proof of every

20   one of those moves that you mentioned, they moved from here to

21   there?

22   A.    Yeah.

23   Q.    Have you seen and reviewed the physical proof?

24   A.    Yeah.  I mean, again, there's been United Nations

25   documents filed, there's German Court documents filed.  There's

| | |
|---|---|
| 1 | no question about that these individuals traveled to Yemen and |
| 2 | then traveled on to Afghanistan and died there. |
| 3 | Q.   You know there could be Court documents filed that are not |
| 4 | confirmed or proven, correct? |
| 5 | A.   Again, it's one thing to make an accusation that someone |
| 6 | is a member of an organization, but proving that someone |
| 7 | actually traveled somewhere, there are objective travel |
| 8 | records, there are passport records, there are -- |
| 9 | THE COURT:  Mr. Kohlmann, you're not going to be |
| 10 | allowed to testify who would travel where unless you have their |
| 11 | passports and you have a document establishing authenticity of |
| 12 | those passports.  Those are accusations.  I haven't seen those |
| 13 | Government records.  They're not in evidence.  So all we know |
| 14 | is that you know that they're these two brothers, you know that |
| 15 | one of them has made a video, you know that in that video |
| 16 | Mounir Chamere -- or Chouka -- |
| 17 | THE WITNESS:  Chouka, yeah, yes, Your Honor. |
| 18 | THE COURT:  -- has made certain statements that you |
| 19 | believe are almost identical to statements that Mr. Osmakac has |
| 20 | made.  And you can discuss the similarities between his video |
| 21 | and Mr. Osmakac's video in the course of this trial. |
| 22 | But the notion that these people have done things or |
| 23 | been places or killed people or died in Afghanistan, in the |
| 24 | absence of evidence on this record, you're not going to be |
| 25 | allowed to testify to that because it's all based upon evidence |

```
 1    that this Court is not aware of.
 2              THE WITNESS:  But Your Honor, I believe their deaths
 3    were announced by the group that they fight with in
 4    Afghanistan.
 5              THE COURT:  And that would be abject hearsay.
 6              THE WITNESS:  Okay.
 7              THE COURT:  Anything else?
 8              MR. PETER TRAGOS:  Yes.  One last question, Your
 9    Honor.
10    BY MR. PETER TRAGOS:
11    Q.   The two articles -- how many articles did the Defendant
12    have in this case or did he reference, I'm sorry?
13    A.   You mean from Inspire Magazine?
14    Q.   Yes.
15    A.   Oh, sorry, two.
16    Q.   Okay.  Do you know how he got those two articles?
17    A.   I can only surmise from having read what he described with
18    Mr. Dennison in the audio recording.
19    Q.   So you don't know how he got those two articles?
20    A.   I know one way he got it, but I don't know all the ways he
21    got it.
22              MR. PETER TRAGOS:  Okay.  I have nothing further,
23    Your Honor.
24              THE COURT:  All right.
25              This witness will be allowed to testify about what
```

1    black flag means in the context of the statements of the

2    Defendant.  And he'll be allowed to talk about the similarities

3    between the Defendant's references to Mounir Chouka's video and

4    this Defendant's video in reference to the Defendant having

5    referenced Abu Ibrahim and Abu Adam and he'll be able to tell

6    us what their two names are and he'll be able to tell us that

7    those individuals are associated with one another, that's who

8    he understands the German brothers to be.  And he'll be allowed

9    to go through the similarities between Mounir Chouka's video

10   and the Defendant's video in order to show the Defendant is

11   connecting himself with Mounir Choucka.

12           I don't know yet whether the discussions between Mr.

13   Dennison and the Defendant will be coming into evidence 'cause

14   I don't know where we stand with Mr. Haag or his substitute.

15           Where are we with that?

16           MS. SWEENEY:  Your Honor, Mr. Haag is present and he

17   will be the first witness that the Government calls this

18   morning once the jury is here.

19           THE COURT:  And he has now reviewed the original

20   source material and can testify that this is subject to being

21   introduced as some sort of authentic document of the FBI from

22   the recordings through the process he previously described?

23           MS. SWEENEY:  Yes, Your Honor.  I mean, there are

24   some -- the disk.  The disk that the phone call originally

25   writes to, the big disk that you and he referred to when you

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

| | |
|---|---|
| 1 | were speaking with each other, that disk, it can no longer be |
| 2 | played from directly.  The FBI doesn't use the system that |
| 3 | played from that disk any more.  And I'm just saying what I |
| 4 | believe Mr. Haag will testify or Agent Haag will testify to. |
| 5 | That disk can be hooked into a computer in Miami, |
| 6 | that can pull information off it.  So you have to -- in order |
| 7 | to listen to the call, you have to pull it off of the big disk |
| 8 | and on to a little disc.  But Agent Haag did that himself.  He |
| 9 | used the big disk, produced a small disc with these calls on |
| 10 | them and reviewed those and they match what's in the |
| 11 | Government's Exhibit. |
| 12 | THE COURT:  All right. |
| 13 | And so if there can be some connection between Mr. |
| 14 | Osmakac and Mr. Dennison and those transcripts and they come |
| 15 | into evidence, then the witness can testify as to the Inspire |
| 16 | Magazine. |
| 17 | Now with regard to that magazine, how many articles |
| 18 | are referenced in the conversations? |
| 19 | MR. MCGOVERN:  Two, Your Honor. |
| 20 | THE COURT:  Two specific articles? |
| 21 | MR. MCGOVERN:  Yes, Your Honor. |
| 22 | THE COURT:  And the witness knows which articles |
| 23 | those are? |
| 24 | MR. MCGOVERN:  Yes, Your Honor. |
| 25 | THE COURT:  And he can testify then about those two |

```
 1    articles and no others.
 2              MR. PETER TRAGOS:  What about Inspire, generally,
 3    Your Honor?
 4              THE COURT:  He can mention Inspire as what it is,
 5    explain to the jury what the magazine does, and then he can
 6    explain what the articles that the Defendant saw are in
 7    reference to.
 8              MR. PETER TRAGOS:  Including their encryption and
 9    connection to Al-Qaeda and leaders that say how they're put
10    out?
11              THE COURT:  No.
12              MR. PETER TRAGOS:  Thank you, Your Honor.
13              MR. MCGOVERN:  Your Honor, will the Government --
14    will the Government be able to generally identify Inspire and
15    the purpose of the magazine or what it proposes to do, or the
16    general content of it?  You know, even when we talked about
17    this months ago in front of Your Honor, Your Honor was --
18              THE COURT:  I said yes, he'll be able to explain what
19    Inspire Magazine is.  It is a -- what would you say if somebody
20    asked you what is Inspire Magazine?
21              THE WITNESS:  Your Honor, Inspire Magazine is the
22    official English language magazine of Al-Qaeda in the Arabian
23    Peninsula.  It was first published in 2010.  The purpose of
24    Inspire Magazine is to help individuals radicalize themselves
25    who are living in western countries and who speak English.
```

```
 1              THE COURT:  Yes.  He'll be allowed to say that.
 2    Anything else?
 3              MR. MCGOVERN:  Yes, Your Honor.  The defense asked me
 4    to review Aafia Siddiqui with the witness.  Would the
 5    Government be able to present some testimony regarding Aafia
 6    Siddiqui?
 7              THE COURT:  Let me hear what he has to say about
 8    Siddiqui.
 9              THE WITNESS:  Dr. Aafia Siddiqui was working with --
10    alongside with Al-Qaeda and had been convicted of doing such,
11    as providing material support to Al-Qaeda and other terrorist
12    organizations.
13              THE COURT:  Anything else he intends to say about it?
14    Is that a woman or a man?
15              THE WITNESS:  It's a woman, Your Honor.
16              MR. PETER TRAGOS:  Your Honor, I believe you already
17    ruled on -- that's the one that was raped or not raped and
18    that's the same.
19              THE COURT:  Well, the question was, did he know
20    whether she had been abused in prison and he could not tell us
21    whether she had or had not been abused in prison because that
22    was never tried.  But the fact of who she is and the fact that
23    she has been convicted, if those are facts of which this
24    witness is aware, he can tell us who she is.
25              MR. PETER TRAGOS:  Is that -- what about the fact
```

```
1    that that's nowhere on the transcript that the Defendant was --

2    the only way the Defendant talks about her, I believe

3    Mr. Kohlmann said it's only mentioned one time that she was

4    raped and abused.  That's all the Defendant ever says about

5    this individual.

6              MR. MCGOVERN:  I'm sorry, for the record, there are

7    references to an Aafia Siddiqui on several occasions by the

8    Defendant.

9              MR. PETER TRAGOS:  Can we do this outside the

10   presence of the witness then, Your Honor?

11             THE COURT:  Well, the witness is an expert so he can

12   talk about hearsay or not talk about hearsay.

13             Where are the references?

14             Well, let me ask the witness.  What references have

15   you seen of her in the transcripts?

16             THE WITNESS:  I've seen at least one that was cited

17   by the defense, but, Your Honor, I've seen her name come up a

18   couple of times.  I didn't realize that was significant.  It

19   wasn't included in my report.  Certainly, I'm prepared to

20   testify about it, but I couldn't tell you offhand all the

21   different instances where it's come up.

22             THE COURT:  So you haven't previously disclosed since

23   you are going to be talking about Siddiqui in an expert report

24   in accordance with the Government's disclosure requirements?

25             THE WITNESS:  In this case, Your Honor, no, I don't
```

1    believe I have.

2              THE COURT:  So no.

3              MR. MCGOVERN:  Your Honor, at the original Daubert

4    hearing, the Government asked the Court for Evan Kohlmann to be

5    able to testify to general terms, references and individuals

6    that are identified in the transcripts.

7              THE COURT:  But as identified in the reports that he

8    had disclosed, not just identified in the world.  He has an

9    obligation to tell the defense who he intends to testify about.

10   That's the purpose of the report.

11             MR. MCGOVERN:  Your Honor, you know, that particular

12   matter, reference to Aafia Siddiqui, is not being testified to

13   as an expert.  He's not giving an opinion, he's more of a fact

14   witness regarding Aafia Siddiqui.

15             THE COURT:  Well, he's not going to be called as a

16   fact witness.  He can be called as an expert 'cause then he's

17   introducing hearsay and unless you have the sealed Court file

18   in order to introduce it as a self-authenticating document,

19   then it doesn't come in.  The only way it comes in is through

20   an expert who can testify to hearsay.

21             MR. MCGOVERN:  Thank you.

22             THE COURT:  The answer has been given.  We'll

23   constrain ourselves accordingly.  I need to get my jury on.

24             Anything else we have to talk about?

25             MR. PETER TRAGOS:  Yes, Your Honor, I just have a

| | |
|---|---|
| 1 | couple of objections to Mr. Kohlmann's testimony, not in the |
| 2 | Daubert sense, but just in other rules of evidence. |
| 3 | THE COURT:  All right. |
| 4 | The witness can step out. |
| 5 | THE WITNESS:  Thank you, Your Honor. |
| 6 | (Witness excused.) |
| 7 | MR. MCGOVERN:  Your Honor, I don't believe that the |
| 8 | Government is finished informing the Court about the items |
| 9 | which Evan Kohlmann may testify. |
| 10 | THE COURT:  I think you are. |
| 11 | Yes, sir. |
| 12 | MR. PETER TRAGOS:  First, on the unjustmedia.com, |
| 13 | there's no reason to have an expert on that as in the |
| 14 | transcripts the Defendant defines exactly what he thinks |
| 15 | unjustmedia.com is.  So, it would be, A, cumulative, B, doesn't |
| 16 | assist the jury. |
| 17 | THE COURT:  Overruled. |
| 18 | MR. PETER TRAGOS:  Second, on all of the -- well, |
| 19 | specifically, on the Anwar al-Awlaki and the German brothers, |
| 20 | but more specifically on Anwar al-Awlaki, the Defendant states |
| 21 | everything that he agrees with about Anwar al-Awlaki, so we |
| 22 | think that the evidence would be cumulative. |
| 23 | We also don't think it's relevant, the background |
| 24 | information and the extensive database that Evan Kohlmann has |
| 25 | on Anwar al-Awlaki.  So we would at least request a limiting |

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    instruction to the witness on what he can go into about the

2    vast life of Anwar al-Awlaki and everything he did and all the

3    videos that he posted.

4         And we think that putting the Defendant in agreement

5    with everything Anwar al-Awlaki says is more prejudicial than

6    probative because all of the videos and all of the teachings of

7    Anwar al-Awlaki prove nothing in this case, but they would be

8    very prejudicial.

9         THE COURT:  I think that we have agreed that he can

10   testify that the Defendant's -- well, we haven't agreed, the

11   Court had ruled that he can testify that the Defendant's

12   martyrdom video, to what degree it does, mirrors speeches given

13   by Mr. Al-Awlaki to whom he refers in other places.  Beyond

14   that, I'm not sure what the Government intends to try to

15   introduce about Mr. Al-Awlaki.

16        MR. MCGOVERN:  Your Honor, just referencing the

17   unjustmedia.com website, the Government would just ask Evan

18   Kohlmann to give a brief description of the website.  And there

19   are two specific references that the Defendant makes; one on

20   Government's Exhibit 118-B, page 11, referring to a communique

21   from the Taliban which are posted, Al-Qaeda War Updates Daily

22   News.

23        THE COURT:  Are you talking about the unjustmedia

24   website still?

25        MR. MCGOVERN:  Yes, Your Honor.
```

```
 1              THE COURT:  I've already overruled the objection to
 2    that.
 3              MR. MCGOVERN:  Just so that the Government comports
 4    completely with the Court's order, Your Honor, the Government
 5    would seek to play the original recording, the audio recording
 6    of the CHS listening to the Martyr of Dawa video.  This is
 7    something that was stipulated to by the defense.
 8              THE COURT:  I've already ruled on that issue.
 9              MR. MCGOVERN:  I'm just asking for my own
10    understanding whether or not if it's correct that the
11    Government can play that consistent with its stipulation and
12    have the witness identify the speaker.
13              THE COURT:  No.
14              MR. MCGOVERN:  Thank you, Your Honor.
15              THE COURT:  Other than to say that -- what does the
16    Government understand Mr. Kohlmann is going to say about
17    al-Awlaki, specifically?
18              MR. MCGOVERN:  Your Honor, the Government would
19    propose to have Evan Kohlmann briefly identify the individual.
20              THE COURT:  Show me in his report where he talks
21    about him.
22              MR. MCGOVERN:  It's being pulled up, Your Honor.  The
23    Government would propose to have Evan Kohlmann identify Anwar
24    al-Awlaki, indicate that he has released videos and indicate
25    that he was killed in a drone strike.  He's referenced on page
```

```
 1    13 of the report.

 2              THE COURT:  Counsel.

 3              MR. PETER TRAGOS:  Yes, Your Honor.  First thing we

 4    would point out is the number of suspected that assisted in

 5    this or initially came under suspicion due to this.  I also

 6    don't see how this death by drones is relevant.  And

 7    Mr. Kohlmann says that the Defendant is quite clearly a strong

 8    admirer and points to the transcript where the Defendant says,

 9    "A lot of people love him.  He's the best speaking English,"

10    which I think is connecting quite a few dots.

11              And I don't think that an extensive background that's

12    in Mr. Kohlmann's report would be appropriate before the jury

13    for the reasons that I've already stated.  He says he's a

14    Muslim extremist, that the Defendant listened to his video or

15    read his speeches.  I think that would be a description of

16    al-Awlaki, but I don't understand why his life and death and

17    suspected actions are relevant for this jury.

18              THE COURT:  Well, Mr. McGovern didn't say anything

19    about his suspected actions in his last statement to me.  He

20    can tell the Court that he is a Muslim extremist and that he

21    released numerous videos expressing his extreme views and that

22    to the extent he can establish it, that the so-called martyrdom

23    video of the Defendant tracks some of the language from one of

24    those individuals.  He cannot testify that he was killed in a

25    drone strike.
```

```
 1              MR. MCGOVERN:  The fact that he is no longer alive,
 2    would that be appropriate, Your Honor.
 3              THE COURT:  No.  What is it relevant to?
 4              Anything else before we call this jury?
 5              MR. PETER TRAGOS:  Not from the defense, Your Honor.
 6              MR. MCGOVERN:  No, Your Honor, thank you.
 7              THE COURT:  Please recall the jury.
 8              (Jury returned to the courtroom.)
 9              Welcome back, ladies and gentlemen.  We will continue
10    with the presentation of the Government's case in chief.
11              Counsel, please call your next witness.
12              MS. SWEENEY:  Thank you, Your Honor.
13              The Government recalls Special Agent Paul Haag to the
14    stand.
15              THE COURT:  Please come forward sir and take the
16    witness stand.
17              You may have a seat.  The Court reminds you, sir,
18    that you remain under oath.
19              Do you understand that?
20              THE WITNESS:  Yes.
21              THE COURT:  You can pull that microphone slightly
22    over forward so you are speaking clearly into it.
23              Counsel.
24              MS. SWEENEY:  Thank you, Your Honor.
25                         DIRECT EXAMINATION
```

CLAUDIA SPANGLER—FRY  OFFICIAL U. S. COURT REPORTER

1    BY MS. SWEENEY:

2    Q.    Special Agent Haag, since you were last here, did you

3    locate the Magnito Optical disk that we were discussing last

4    time?

5    A.    I did.

6    Q.    Before we jump into what you did with it, can you please

7    explain what a Magnito Optical disk is?

8    A.    Yes.  It's similar to a CD, but it's actually encased in a

9    hard plastic case.  It helps protect it.  It's a write once,

10   read many times disk, similar to a CDR.  You burn to it one

11   time.  You can't remove what was burned on to it.  You can read

12   it many times after that.

13   Q.    So you said write once and you can read multiple times, so

14   the write part, what do you mean when you say "write once?"

15   A.    When a file is created and it's written to the disk,

16   that's what I mean by written.  The computer actually transfers

17   the data on to that disk.

18   Q.    In the context of the -- of what we --

19           THE COURT:  Can you please have a seat, Mr. Tragos?

20           MR. PETER TRAGOS:  Sorry, Your Honor.

21   BY MS. SWEENEY:

22   Q.    In the context of what we were discussing the last time,

23   the collection of telephone calls, what is the role of the

24   Magnito Optical disk?

25   A.    As soon as the call is completed, the contents of the call

1   are actually transferred to that disk as soon as the call is

2   completed.

3   Q.   And so, did you locate the Magnito Optical disk that has

4   the phone calls that we were discussing last time on it?

5   A.   I did.

6   Q.   And could you -- can you listen to that disk on any

7   computer in the world?

8   A.   No.

9   Q.   Okay.  What can you listen to it on?

10  A.   It takes a specialized drive first of all, but then to

11  also review it or even to see what the contents are, you have

12  to have the software that the calls were originally stored in,

13  the Red Wolf System, it's a Red Wolf piece of software so that

14  you can review it.

15  Q.   And does the FBI still use the Red Wolf System today?

16  A.   No, we do not.

17  Q.   So where was the -- where is the nearest Red Wolf enabled

18  computer to Tampa?

19  A.   The stand-alone computer I went to is in Miami.

20  Q.   So you took the Magnito Optical disk with these calls on

21  it to Miami?

22  A.   I did.

23  Q.   Can you listen to the calls that we're talking about

24  directly from the Magnito Optical disk using that specialized

25  computer in Miami?

1   A.    Not with the software that was available to me.

2   Q.    So what did you have to do?

3   A.    I put the disk into the computer, went to the piece of

4   software where you can view the contents of the disk, it

5   creates -- it shows you a table of all the files on the disk.

6   I selected the three files that we have -- we are discussing,

7   and then burned them individually, each to a disc, a CD in a

8   wave format that can be played in any computer.

9   Q.    I'm sorry, Agent.  So you did that yourself?

10  A.    I did.

11  Q.    Agent, I've handed you a number of Government's exhibits.

12  Let's start with Government's Exhibits 161-A and B.

13          THE COURT:  Well, let me ask a question first.  You

14  said you can write once, read many times, you cannot burn --

15  I'm sorry -- you cannot remove what was burned on to it.  When

16  you say that, you mean you cannot delete it?

17          THE WITNESS:  Yes.

18          THE COURT:  But you can record on to another disc

19  that which is on this Magnito disk?

20          THE WITNESS:  Yes, yes, ma'am.

21          THE COURT:  That is what you did?

22          THE WITNESS:  Yes.  You can copy from it, you can't

23  erase the file that was burned to that disk originally.  But

24  you can make copies of that disk, yes.

25          THE COURT:  All right.

```
 1              Counsel.
 2   BY MS. SWEENEY:
 3   Q.    So Agent, I've handed you Government's Exhibits 161-A and
 4   B.   Is that one of the calls that you obtained from the Magnito
 5   Optical disk?
 6   A.    These are copies of those calls that I reviewed.
 7   Q.    I'm sorry, that's correct.  So they're copies.  So what
 8   did you do with those copies to insure they matched what was on
 9   the Magnito Optical disk?
10   A.    So the copies that I made from the Magnito Optical disk I
11   compared -- I listened to those calls and I compared them to
12   the contents of these discs.
13   Q.    And did those match?
14   A.    They did.
15   Q.    Were there any alterations, deletions, changes to what you
16   pulled off the Magnito Optical disk and what's in Government's
17   Exhibit 161-A?
18   A.    No.
19   Q.    Then as to Government's Exhibits 161.1-A and B, is that
20   just a portion of the call that we were just discussing, just a
21   portion of Government's Exhibit 161?
22   A.    Yes.
23   Q.    Government's Exhibits 162-A and B, is what we just
24   discussed with respect to 161 true with respect to 162 as well?
25   A.    Yes.
```

1    Q.   So you compared the data that you got off the Magnito

2    Optical disk with respect to 162 -- to sorry -- with respect to

3    that call to what's in Government's Exhibit 162-A, and they

4    matched?

5    A.   Yes.  I listened to the calls.  I didn't actually look --

6    review the data, I listened to the calls and I listened to one

7    and then I listened to the other.

8    Q.   And from what you could tell, were there any additions,

9    alterations, deletions, changes to the call from the Magnito

10   Optical disk to what's on the Government's Exhibit?

11   A.   No.

12   Q.   And is the same thing true with Government's Exhibits

13   162.1-A and B?  Is that just a portion of what appears in 162-A

14   and B?

15   A.   Yes.

16   Q.   And finally, Government's Exhibit 163-A, the disc.  Did

17   you compare the recording that's on that disc to the recording

18   that you obtained of that same call from the Magnito Optical

19   disk?

20   A.   I did.

21   Q.   And what did you find?

22   A.   The audio was the same.

23   Q.   Were there any additions, alterations, changes, deletions

24   from what was on the Magnito Optical disk to what's on the

25   Government's exhibit?

```
1   A.   No.
2   Q.   And is 163.1-A and B, does that represent just a portion
3   of the call that's at 163?
4   A.   It does.
5          MS. SWEENEY:  Your Honor, I have no further
6   questions.
7          THE COURT:  Counsel, would you like to voir dire as
8   to the authenticity of this record?
9          MR. GEORGE TRAGOS:  Yes, Your Honor.
10          THE COURT:  Are you moving them into evidence?
11          MS. SWEENEY:  Yes, Your Honor.  It still remains for
12   a witness to identify one of the voices on the call, but
13   besides that, yes, the Government's moving -- it's moving
14   161.1-A and B, 162.1-A and B and 163.1-A and B into evidence.
15          THE COURT:  As to authenticity?
16          MS. SWEENEY:  Yes, Your Honor.
17          THE COURT:  Counsel.
18                    VOIR DIRE EXAMINATION
19   BY MR. GEORGE TRAGOS:
20   Q.   Do you recognize any of the voices on this?
21   A.   I do.
22   Q.   You do?
23   A.   Yes.
24   Q.   And how do you do that?
25   A.   Based on other recordings that I have seen and heard.
```

1    Q.    And someone told you the name of the person that was on

2    there?

3    A.    From the video, I've seen one of the individuals, and I've

4    been told the name of that person, yes.

5    Q.    Okay.  And the name of that one individual?

6    A.    Sami Osmakac.

7    Q.    And the other voice on there, could you recognize that

8    one?

9    A.    I have not seen that person specifically --

10   Q.    Okay.

11   A.    -- prior.

12   Q.    So the only one you can identify is Mr. Osmakac?

13   A.    Yes.

14   Q.    And there are other voices on this, correct?

15   A.    Yes.

16   Q.    Let's start with, I guess, when you left here the other

17   day, were you -- did you have instructions to -- about what to

18   do and what you had to do or needed to do?

19   A.    I was requested to review the Magnito Optical disk and

20   listen to that to see if that was the same as these, yes.

21   Q.    Okay.  All right.

22         Where was the Magnito Optical disk located?

23   A.    In evidence storage in the Tampa Field Office of the FBI.

24   Q.    And how do you know that that is the correct Magnito

25   Optical disk?

1  A.   It is labeled with the file number and the date ranges of

2  when the call was -- calls were collected.

3  Q.   So you're relying on the label?

4  A.   Yes.

5  Q.   And then you -- did you know instantly that you needed a

6  Red Wolf System?

7  A.   Based on the disk, I knew that it was Red Wolf, yes.

8  Q.   Okay.  And did that disk, the optical -- the Magnito

9  Optical disk, did it contain more than the voices or the calls

10 that have been identified as 161 and 162 and 163?

11 A.   Yes.

12 Q.   And did it include all of the calls authorized by the

13 particular Court order you spoke about?

14 A.   Yes.

15 Q.   Were there any other calls pursuant to that Court order on

16 any other disks?

17 A.   Not that I'm aware of, no.

18 Q.   So you think this is all of it?

19 A.   Yes.

20 Q.   Beginning to end?

21 A.   Sorry?

22 Q.   Beginning to end of the Court order --

23 A.   Yes.

24 Q.   -- time period?

25      Then you took that disk and you went down to Miami?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    A.    I did yesterday, yes.
 2    Q.    Okay.  And you found some computer in Miami that could
 3    still play the disk?
 4    A.    Yes.
 5    Q.    That was the closest one that could still play that disk?
 6    A.    Yes.
 7    Q.    Was like a laptop, a desktop?
 8    A.    It was a desktop computer, a stand-alone desktop computer.
 9    Q.    Was it designed to keep that Red Wolf software there so
10    that people could play the old disks?
11    A.    Yes.
12    Q.    That was the reason for why it was still saved?
13    A.    Yes.  That's my understanding as to why it was still
14    saved.
15    Q.    And you're familiar with Red Wolf?
16    A.    Yes.
17    Q.    Now I think you said you're from Quantico?
18    A.    Yes.
19    Q.    You use Red Wolf up in Quantico?
20    A.    Not anymore, we do not.
21    Q.    When did you stop using Red Wolf?
22    A.    It's been transitioned away over the last two to three
23    years into an updated system.
24    Q.    And what's the name of the new system?
25    A.    Red Tiger.
```

1    Q.    Red Tiger?  Okay.  And so you go down to Miami, Red Wolf,

2    you put it into the computer, right?

3    A.    Yes.

4    Q.    And then did you listen to the entire disk?

5    A.    I did not.  In that computer, you can't actually -- or you

6    can't actually listen to the files on the disk using that

7    software.  That software is designed to make a copy of the

8    selected files or sessions or telephone calls, whatever you

9    want to call them, and burn them to a CD or DVD.

10   Q.    So you didn't actually listen to Exhibits 161 and 162 and

11   163 off of the Magnito Optical disk where they were originally

12   copied?

13   A.    It's not possible within that system.  I was able to

14   make -- select those files that were on the Magnito Optical

15   disk and burn them to a CD to listen to them on that CD.

16   Q.    I understand it's not possible, that's why I'm asking you

17   these questions.  You did not do that, did you?  You didn't

18   listen to them directly off the Magnito Optical disk?

19   A.    No.

20   Q.    And when you made copies, did you make copies of only -- I

21   guess there's a way of identifying the calls?

22   A.    Yes, just as the pen register data, it gives you date and

23   time that the call occurred and the telephone numbers

24   associated with it.

25   Q.    And who gave you that information?

1   A.   Of which calls that they were --

2   Q.   Right, the pen register information you're talking about?

3   A.   I received that from these particular files.  And there's

4   an email, I believe, from the case agent specifying which they

5   wanted me to listen to.

6   Q.   So someone told you to listen to -- I guess there's some

7   kind of code on the Magnito -- is there a short form of --

8   A.   MO.

9   Q.   MO?

10  A.   Yes.

11  Q.   So someone told you, go to the MO and put in this code and

12  retrieve this information?

13  A.   Well, to look for that date and time of the telephone

14  call, yes.

15  Q.   Okay.  And so you went down there, you put in, I guess,

16  the date and time; is that right?

17  A.   Once you put the disk in, it populates a table that shows

18  you all the calls, all the instances that were on the disk.  So

19  it's all by date and time.  I selected those date and times and

20  individually burned those two discs.

21  Q.   So of the whole list, you pulled out, I guess, you had

22  three dates and times?

23  A.   Correct.

24  Q.   And then when you selected those three, the computer then,

25  through its software, burns a copy of that call from the OD to

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1    a disc?
 2    A.    From the MO to a disc.
 3    Q.    MO?
 4    A.    MO.
 5    Q.    MO?
 6    A.    Yes.
 7    Q.    I'm sorry, go ahead.
 8    A.    It converts it into a wave format that can be played on
 9    any computer as opposed to the original format which is a VOX,
10    I believe.
11    Q.    So now you have three discs that have the -- this phone
12    call on them?
13    A.    Yes.
14    Q.    And anyone could take those three discs and listen to the
15    call?
16    A.    If they had a computer that could listen to a wave file,
17    yes.
18    Q.    And did you bring those three discs with you?
19    A.    I brought them back to Tampa, yes.
20    Q.    Where are they now?
21    A.    I don't have them.  I believe the AUSA has them.
22    Q.    When you went down to Miami, did you take the transcripts
23    with you?
24    A.    I took these with me, yes.
25    Q.    And did you then listen to those three discs and compare
```

1    them to the transcripts.

2    A.    I did.

3    Q.    And you found that the entirety of the call from beginning

4    to end were on those transcripts?

5    A.    They're reasonably accurate is how I would describe them,

6    yes.

7    Q.    What does reasonably accurate mean?

8    A.    Well, I also listened to the discs, the copies of the

9    discs, but a transcript is the -- there's some parts that are

10   marked unintelligible which some words I may have been able to

11   get out that the transcript might not have described.

12   Q.    So did you listen to them with headphones?

13   A.    Yes.

14   Q.    What kind of headphones?

15   A.    Bose.

16   Q.    Are these the -- I guess the special headphones the FBI

17   has to listen to these things?

18   A.    No, these are my own headphones I use for various things.

19   Q.    Do you -- because I guess of the stuff you do, you try to

20   get very good headphones?

21   A.    It's helpful to have good headphones that work well, yes.

22   Q.    So when you listened to the discs, you heard things on

23   there that weren't in the transcripts?

24   A.    I heard in spots where it was marked either UI or

25   unintelligible, there were some portions of words or some words

1   that I think I made out, yes.

2   Q.   Did you write that in anywhere to make it more accurate,

3   the transcript?

4   A.   I did not.

5   Q.   Did you inform anyone that you had been able to hear

6   things that the transcript said were unintelligible?

7   A.   I did not.

8   Q.   So after you -- just out of curiosity -- did you have

9   discs before of these three calls?  You did, didn't you?

10  A.   I did.

11  Q.   Did you compare the quality of those discs to the

12  qualities of the ones you made?

13  A.   The quality as in terms of --

14  Q.   Being able to hear things?

15  A.   They appeared to be the same to me.  They're both wave

16  files.  I didn't discern any difference between those.

17  Q.   Did you compare them?  Did you make any comparisons?

18  A.   Meaning the ones that are here in the files?

19  Q.   Right, versus the ones you made?

20  A.   I did listen to both of them, yes.

21  Q.   And did you use your special earphones when you listened

22  to them the first time?

23  A.   Yes.

24  Q.   Did you hear words that time that weren't in the

25  transcript?

```
 1    A.    Yes.

 2    Q.    Did you tell anyone that you heard those words?

 3    A.    I did not.

 4    Q.    So the first time you were here, you knew that there were

 5    missing words in that transcript?

 6    A.    I think the more you listen to something, the more

 7    familiar you get with the conversations, and it's easier to

 8    hear additional words.

 9          THE COURT:  That's not the question.  When you were

10    here before, did you know that there were words that were not

11    on the transcripts that were audible, in fact?

12          THE WITNESS:  I'm not sure if I knew that or not.

13    BY MR. GEORGE TRAGOS:

14    Q.    But you know that now?

15    A.    Yes.

16    Q.    Now, after you did your listening and comparisons in

17    Miami, what did you do?

18    A.    I drove back.

19    Q.    Okay.  And brought the three discs you made back with you?

20    A.    Yes.

21    Q.    And you brought the MO with you?

22    A.    Yes.

23          MR. GEORGE TRAGOS:  Your Honor, can we have a

24    sidebar?

25          THE COURT:  Yes, sir.
```

```
 1              Do you have the written-over version with your
 2   handwritten notes of what you could hear that couldn't be
 3   heard?
 4              THE WITNESS:  I didn't make any notes, ma'am.
 5              THE COURT:  All right.
 6              (Thereupon, the following discussion was had at
 7   sidebar:)
 8              MR. GEORGE TRAGOS:  Your Honor, first, I would like a
 9   copy of the discs that were used for comparisons.  Secondly, I
10   would object to the authenticity in that apparently words are
11   missing from these transcripts that the agent was able to hear
12   although he didn't tell anybody.  And thirdly, I don't know
13   when Mr. Kohlmann is going to testify, but before Mr. Kohlmann
14   testifies, I guess we're going to do the voices 'cause
15   obviously, before Mr. Kohlmann testifies, these need to be in
16   evidence because there's a lot of what Mr. Kohlmann bases his
17   testimony on.
18              MS. SWEENEY:  Your Honor, I intend not and cannot
19   permit the discs that Mr. Haag made from the MO.  It has data
20   on it.  It's protected.  I could make a copy of the audio
21   that's on that disc and provide it to Mr. Tragos, although I
22   believe that goes far, far beyond what is required for
23   authenticity of these recordings.
24              If Mr. Tragos wants to make an argument to the jury
25   that the recording somehow -- that the recordings themselves
```

```
 1    somehow are inaccurate, he can certainly do that.

 2               THE COURT:  But you're not going to play the

 3    recordings?

 4               MS. SWEENEY:  Of the calls?

 5               THE COURT:  Of the entire -- of the entire discs?

 6               MS. SWEENEY:  No, Your Honor, just portions because

 7    Your Honor ordered that only portions could only be used, so

 8    I'm only playing portions.  I'm saying I can't give him the

 9    discs that Mr. Haag made from the MO's because they have

10    protected information on them.  What I could do is remove the

11    audio from those onto a disc, but I don't believe that

12    that's -- I don't believe that should have to be done before

13    the authenticity, before it's determined that the Government's

14    met its burden with respect to the authenticity of these discs.

15               And then as to the transcripts, Your Honor, frankly,

16    the way that -- the way that the case law sets this out is, the

17    Government sets forth a reasonably accurate transcript, which I

18    believe we've met our burden to do.  If Mr. Tragos believes

19    it's inaccurate, it's then his burden to come forward to the

20    jury with a different transcript.

21               THE COURT:  He can't do that if he can't get the

22    audio.

23               MS. SWEENEY:  No, no, Your Honor, he has the audio,

24    he's had the audio for two years.  The agent testified there

25    was no discernible difference in quality between what he just
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

 1 | listened to and what's on the Government's exhibits.  So,
 2 | presumably, he has no special ability to make additional words
 3 | on these transcripts, although I will, after this is over,
 4 | consult with him as to what he heard and provide that to Mr.
 5 | Tragos.
 6 |        But as to the transcript itself, it's just far beyond
 7 | the typical burden of accuracy that every word that someone
 8 | hears would be added to a transcript.  If Mr. Tragos -- if he
 9 | believes the transcripts are inaccurate, he can present his own
10 | version to the jury.
11 |        THE COURT:  Counsel, have you listened to the
12 | transcripts?  Are you able to make out words that were
13 | inaudible that --
14 |        MR. GEORGE TRAGOS:  I don't think so.  I think when
15 | we listened to it, I mean, we've heard it that way, he has
16 | maybe better equipment, I don't know, but we have -- we've
17 | listened to them, yes, we did.
18 |        MS. SWEENEY:  It's no better equipment than what the
19 | FBI used in first making these transcripts, I mean, that those
20 | headphones were fairly standard at the FBI.
21 |        THE COURT:  Well, apparently not because we now know
22 | that the FBI doesn't use Bose headphones because once you gave
23 | me Bose headphones and your own agent listened with Bose
24 | headphones, he could hear things that the Government never
25 | wrote on other transcripts.

1          The Government does have some responsibility to make

2     the transcripts accurate.

3          MS. SWEENEY:  We have done our best to do that.

4          THE COURT:  No, you haven't done your best because

5     your agent, who was sent to Miami with a Bose headphone, could

6     hear words you couldn't hear, at least so he contends.

7          MS. SWEENEY:  Different people hear different things.

8     Obviously, sometimes, you know, when we were in the process of

9     preparing this case, I would sometimes hear things that were

10    different than what other people heard and at some point, you

11    just have to stand -- you have to pick the best option.  And if

12    Mr. Tragos or the Defendant contend that anything the

13    Government put in is inaccurate, it's his burden to put that

14    forth to the jury.  The transcripts can't be perfect as every

15    person in the world hears them.  That's not possible.

16         THE COURT:  All right.

17              (Thereupon, the sidebar discussion was concluded and

18    the proceedings resumed as follows:)

19         We'll take the morning recess at this time.

20         (Jury excused.)

21         Do you have the transcript in front of you, sir?

22         THE WITNESS:  I do.

23         THE COURT:  Can you -- which exhibit is it, I'm

24    sorry, 161?

25         MR. GEORGE TRAGOS:  161 through 163, Your Honor.

```
1              THE COURT:  Can you provide the Court with some
2    examples of places that you recall you could make out words
3    that were not indicated to be audible on the transcript?
4              THE WITNESS:  For example, in 163 --
5              THE COURT:  Hold on.  163 --
6              THE WITNESS:  Point 1-A.
7              THE COURT:  Yes, sir.
8              THE WITNESS:  The third line where it says "UI and
9    then yet, question mark."
10             THE COURT:  Yes.
11             MR. GEORGE TRAGOS:  I think that may be a
12   misapplication.  Wouldn't it be 1-B?
13             THE WITNESS:  1-B, I'm sorry, 163.1B.
14             THE COURT:  Oh, 163.1-A is the audio and 163.1-B is
15   the transcript.
16             MR. GEORGE TRAGOS:  Right.
17             THE WITNESS:  My error.  But I don't recall the exact
18   words there, but if I remember correctly, that's one of the
19   spots where there were additional words, I heard bits and
20   pieces of, you know, intelligible words, but then I couldn't
21   understand the whole entire sentence, but there were words
22   within that that were intelligible to me.
23             THE COURT:  Anything else?
24             THE WITNESS:  I'd have to listen to all of them
25   again, ma'am, to get that.  That wasn't my role to necessarily
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

| | |
|---|---|
| 1 | compare the audio -- to compare the transcript to the audio. |
| 2 | My role was to actually listen to the audio and make sure that |
| 3 | it was correct as compared to the original. |
| 4 | If I may, I'll go through the rest and see if there's |
| 5 | any other areas that was unintelligible that I can recall.  The |
| 6 | conversations that were actually transcribed, those words were |
| 7 | correct based on my listen to it. |
| 8 | Another example I think would be under 161.1-B on the |
| 9 | first page. |
| 10 | THE COURT:  Well, 161-B -- |
| 11 | THE WITNESS:  161.1-B on the first page. |
| 12 | THE COURT:  One second.  Yes, sir. |
| 13 | THE WITNESS:  About two thirds of the way down as SO |
| 14 | is the one speaking, it says, "UI, by the Shaykh, UI, I just |
| 15 | read it. I walked in.  I'm like, UI, yo." |
| 16 | If I recall, there were some words in there that I |
| 17 | was able to understand. |
| 18 | THE COURT:  But you don't, sitting here now, know |
| 19 | what those words were? |
| 20 | THE WITNESS:  No, ma'am. |
| 21 | THE COURT:  Do you know whether you were able to |
| 22 | understand them on the disc you burned from the MO as well as |
| 23 | the disc you obtained from the Government or were you only able |
| 24 | to understand it from the disc you burned? |
| 25 | THE WITNESS:  I've listened to it so many times, I |

1    don't think there was a difference.  I think it's based on the

2    number of times listening to it, not on the quality of the

3    disc.  They're the same file, they're both in wave format, but

4    I don't believe it's based on the quality of the disc itself or

5    the contents of the disc, it's based on my, you know, multiple

6    iterations of listening to that same file.

7              THE COURT:  So sitting here now, you can't tell us

8    whether you understood words that were not on the transcript

9    before you went to Miami?

10             THE WITNESS:  I'm not sure.  There may have been some

11   words that I didn't understand before I went to Miami, yes,

12   that is possible.

13             THE COURT:  Well --

14             THE WITNESS:  I've listened to both of them since

15   returning, you know, from Miami to now.

16             THE COURT:  And these words that you say you can now

17   discern, you can discern them from the Government's original

18   disc that it gave you?

19             THE WITNESS:  Yes.

20             THE COURT:  And Ms. Sweeney, is that the disc you

21   gave the defense?

22             MS. SWEENEY:  Your Honor, I did not give the defense

23   a disc, I gave them a thumb drive that had all of the files on

24   it.  So it's the same file, again, as what's on the

25   Government's Exhibit.  I can also just make the Government's

1    Exhibit disc, which is what Agent Haag has been listening to,

2    available to the defense.  But the file, it should be the same

3    across every platform that it's on.  They have a copy of the

4    file on a thumb drive.

5         THE COURT:  And so, what is the defense's challenge

6    or request?

7         MR. GEORGE TRAGOS:  I request a copy of the -- well,

8    the Court order denied my request for the entire disk, but for

9    the three phone calls that he copied from the original MO, I

10   request a copy of those three discs.  And Your Honor, I would

11   also secondly, but we haven't gotten to this yet, challenge the

12   introduction of the transcript since it's within the

13   Government's knowledge that the transcript is not totally

14   accurate.  And therefore, I would challenge its introduction

15   until the Government at least provides the transcript that they

16   believe is as accurate as it can be.  That's what I'm

17   requesting at this point.

18        THE COURT:  Do you have any legal authority to that

19   effect?

20        MR. GEORGE TRAGOS:  Which fact are you talking about?

21        THE COURT:  To the effect that if the Government has

22   reason to believe that its transcript is inaccurate or

23   incomplete to the best of its ability to make to complete, it

24   cannot introduce that portion of it that is an accurate

25   transcription of what it purports to transcribe.

```
 1            MR. GEORGE TRAGOS:  Only, Your Honor, the Court's, I

 2   guess, responsibility under the -- for evidence that what is

 3   introduced and placed before the jury is an accurate

 4   representation.  I understand that if the Government doesn't

 5   know that words -- but if it's within the Government's

 6   knowledge, I think that's a different situation.

 7            Now with regards to the three discs that were used or

 8   copied here, I believe that I would be entitled to make those

 9   comparisons from those discs.

10            THE COURT:  The original discs pulled from the MO?

11            MR. GEORGE TRAGOS:  Correct.

12            THE COURT:  All right.

13            Let me see the Government in chambers and we will

14   take a recess.

15            (Brief pause.)

16            MR. GEORGE TRAGOS:  Till when, Your Honor, I'm sorry?

17            THE COURT:  Let's say 15 minutes.  All right.

18            (Thereupon, a classified hearing was held in chambers

19   and not filed in this transcript.)

20            (Court resumed at 1:10 p.m.)

21            On consideration of the examination of the witness in

22   this case -- well, the Court's original concern had to do with

23   the witness being able to attest that the provisions of 18 USC,

24   2517 and 18 were employed with respect to the introduction of

25   the MO -- what does MO stand for, Ms. Sweeney?
```

1          MS. SWEENEY:  Magnito Optical disk.

2          THE COURT:  -- Magnito Optical disk.  On closed

3  session, the Court has been advised that the Government does

4  not believe that those provisions apply in the circumstances of

5  this case.  And based upon its advice to the Court and the

6  Court's review of the source of it, the Court concurs that the

7  Government was not required to follow those procedures

8  principally by operation of 50 USC, 1801, et sec.

9          The Court also has reviewed again the report of

10  Mr. Kohlmann, and he does reference Ms. Siddiqui in his report

11  contrary to the Government's representation to the Court when

12  asked, so I don't want the ruling to be wrong and be asserted

13  as a challenge, but the Government's advice to the Court was

14  wrong I think at page nine of the report.  He references her

15  conviction in the Southern District of New York into 2010.  And

16  so, he, Mr. Kohlmann, will be allowed to testify to that fact

17  as to who this individual is.

18          I think the Court's remaining restrictions on

19  Mr. Kohlmann are clear.  If someone needs clarification, please

20  ask.

21          MR. MCGOVERN:  None from the Government, Your Honor.

22          MR. PETER TRAGOS:  Can you just clarify what

23  Mr. Kohlmann can testify to?

24          THE COURT:  Because you don't know or because you

25  just want me to talk?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1          MR. PETER TRAGOS:  Because I'm not sure 'cause you

2     said he could testify to who she is and her conviction; is that

3     'cause he obviously has extensive background on her that the

4     Defendant never mentions?

5          THE COURT:  Well, who she is meaning, she is, this is

6     her name and that this individual was convicted in the Southern

7     District of New York on XYZ charge.  The Court has been clear

8     that he cannot testify whether in his mind her assertions of

9     her abuse in prison, if those -- if that's where the Defendant

10    got it from, are accurate or inaccurate because those facts, as

11    best I can tell, were not on trial in the case at issue.  At

12    least if they were, there's no evidence of it on this record.

13         MR. PETER TRAGOS:  We would object to the charges

14    being able to be said in front of the jury as there is no

15    evidence Mr. Osmakac even knew of those charges that she was

16    convicted of.

17         THE COURT:  All right.

18         Your objection is overruled.

19         Anything else with respect to either Mr. Haag or

20    Mr. Kohlmann from the Government or the defense?

21         MS. SWEENEY:  Your Honor, not with respect to either

22    of those witnesses.  I did want to mention the witness from

23    Chicago is here.  I have -- Agent Collins has checked with him

24    and he can come back tomorrow morning.  I know that we've had

25    the jury waiting for a long time, so he can come back tomorrow

| | |
|---|---|
| 1 | if that would be preferable to doing a preliminary examination |
| 2 | of him today. |
| 3 | THE COURT:  When are you expecting him to testify? |
| 4 | MS. SWEENEY:  Your Honor, we anticipated perhaps |
| 5 | calling him today pending the preliminary examination I believe |
| 6 | that the Court and defense counsel wanted to be sure that he |
| 7 | would testify only to what he himself experienced.  That was |
| 8 | the issue, that he had related a number of things that other |
| 9 | people had told him and there was some question. |
| 10 | THE COURT:  The issue, but my question, in what order |
| 11 | do you expect to call him? |
| 12 | MS. SWEENEY:  Your Honor, after -- once we conclude |
| 13 | with Mr. Haag, we would probably call Mr. Kohlmann at that |
| 14 | point. |
| 15 | THE COURT:  And then how long do you expect him to |
| 16 | last? |
| 17 | MS. SWEENEY:  An hour. |
| 18 | THE COURT:  Then? |
| 19 | MS. SWEENEY:  And then perhaps Mr. Elessaway who is |
| 20 | the witness from Chicago. |
| 21 | THE COURT:  Well, let's just call him now, |
| 22 | Mr. Elessaway, so that we hear what he has to say and then the |
| 23 | defense can be prepared to address it and then we'll go back to |
| 24 | Mr. Haag. |
| 25 | Sir, please come forward to be sworn. |

```
 1   Thereupon,

 2                       ASHRAF ELESSAWAY,

 3   after having been duly sworn to tell the truth, the whole truth

 4   and nothing but the truth, under penalty of perjury, was

 5   examined and testified as follows:

 6              THE WITNESS:  I do.

 7              THE CLERK:  Please be seated.

 8              THE COURT:  I just heard someone's telephone ring.

 9   Would you please check to make sure you have your portable

10   devices turned off.

11              Sir, you're under oath.  You must give truthful

12   answers to the questions asked.  If you give false answers, you

13   face penalties of perjury, false statement and obstruction of

14   justice.

15              Do you understand that?

16              THE WITNESS:  Yes, I do.

17              THE COURT:  Wait until counsel completes their

18   question before you start your answer so you're not talking

19   over them.  If you see counsel stand to object, wait until I

20   rule on the objection before you begin your answer.

21              Do you understand that?

22              THE WITNESS:  Yes, Your Honor.

23              THE COURT:  State your name for the record.

24              THE WITNESS:  Ashraf Elessaway.

25              THE COURT:  Spell your name.
```

```
 1              THE WITNESS:  A-S-H-R-A-F, last name

 2   E-L-E-S-S-A-W-A-Y.

 3              THE COURT:  Sir, have you had any contact with any of

 4   the parties in this case since yesterday?

 5              THE WITNESS:  No.

 6              THE COURT:  No one has called you?

 7              THE WITNESS:  No.

 8              THE COURT:  The Government has not spoken to you?

 9              THE WITNESS:  I mean talking about the case, no.

10              THE COURT:  All right.

11              They just told you to come to Court?

12              THE WITNESS:  Yes.

13              THE COURT:  Who was that?

14              THE WITNESS:  The agents from the FBI.

15              THE COURT:  Which agents from the FBI?

16              THE WITNESS:  Mr. Doug Simon.

17              THE COURT:  What did he tell you exactly?

18              THE WITNESS:  That he escorted me here all the way

19   from Chicago.

20              THE COURT:  He came to Chicago to get you?

21              THE WITNESS:  No, he is from Chicago.

22              THE COURT:  Oh, he's from Chicago, and he came down

23   with you?

24              THE WITNESS:  Yes.

25              THE COURT:  All right.
```

```
 1              Counsel.
 2              MS. SWEENEY:  Your Honor, just to be perfectly clear,
 3    I also said hello -- I stepped into the conference room and
 4    said hello to the witness and told him the Court had instructed
 5    that we could not speak, so I just said hello and then left.
 6              THE COURT:  All right.
 7                      PROFFER DIRECT EXAMINATION
 8    BY MS. SWEENEY:
 9    Q.   Mr. Elessaway, do you attend a mosque?
10    A.   I do.
11    Q.   And where is it?
12    A.   In Naperville, Illinois.
13              THE COURT:  I'm sorry.  Can you speak directly into
14    that microphone?
15              THE WITNESS:  Naperville, Illinois.
16    BY MS. SWEENEY:
17    Q.   Do you see anyone in this Courtroom that you have seen at
18    that mosque before?
19    A.   Me?
20    Q.   Yes.
21    A.   That gentleman here.
22    Q.   So you're indicating the gentleman in the white jacket?
23    A.   That's true.
24    Q.   And do you know who that person is?
25    A.   I do.
```

```
1    Q.    Who is that?

2    A.    He gave me different names when I met him in the

3    Naperville.

4    Q.    What name did he give you?

5    A.    Abdallah, Abd-al-Rahman; different names.

6    Q.    Did you come to learn his true name?

7    A.    That is true.

8    Q.    And what is it?

9    A.    I cannot recollect the name to be honest with you.

10   Q.    And was there a time at your mosque that you had a

11   personal face-to-face interaction with the gentleman sitting at

12   the defense table?

13   A.    I did.

14   Q.    And what -- so how many were there?  How many times did

15   you interact with him face to face?

16   A.    Directly were two times.

17   Q.    So can you start by describing the first face-to-face

18   interaction and approximately when it was?

19   A.    It was -- I don't exactly remember the exact dates, but it

20   was on a Friday night, after an event that we have in the

21   mosque.  And him and another person came to me and they

22   confronted me in a very tough way and he said --

23             THE COURT:  One second.  I only want to know what the

24   Defendant said.  I don't want to know what the other person

25   said.
```

```
 1              THE WITNESS:  Yeah, that's what he said.  He said,
 2   "How dare you talk about our Shaykh."  And I said, "I don't
 3   know what you're talking about."  He said, "Shaykh Osama Bin
 4   Laden."  I said, "What did I say?"  He said, "You said that he
 5   deserved what he has done -- has been done to him after he was
 6   killed."  So I corrected him and I told him "I did not say
 7   that.  What I said is if he did what he did, then he deserved
 8   to be, you know, punished.  And if he didn't, then, you know,
 9   God will take care of him as a martyr."  And he said, "No,
10   you're supporting the Government, the U. S. Government against
11   him, and you're trying to get -- I mean, you're supporting him
12   and supporting the Government against him and you are
13   supporting the Government.  You should apologize."  And he
14   started to confronting me more and more with loud voice.
15   That's where people got in the middle between both of us.
16   BY MS. SWEENEY:
17   Q.   And sir, do you remember approximately what year this
18   interaction took place in?
19   A.   2011, I believe.
20   Q.   And can you remember an approximate month?
21   A.   Either June or July.
22   Q.   You said that the Defendant was saying that you had said
23   something about Osama Bin Laden.  In what context had the
24   Defendant heard you say something about Osama Bin Laden?
25   A.   It was the Friday sermon.
```

1    Q.   And you were giving that sermon on this day?

2    A.   I was giving that sermon.

3    Q.   Are you an Iman?

4    A.   I lead the prayers there, yes.

5    Q.   And so what was your position in the mosque at that time?

6             THE COURT:  I don't need to know all of that for

7    purposes of this examination, I just need to know what he heard

8    the Defendant say.

9             MS. SWEENEY:  Yes, Your Honor.

10   BY MS. SWEENEY:

11   Q.   Okay.  So, sir, was there anything else from the first

12   interaction that you had with the Defendant that he said?

13   A.   That was the first interaction.

14   Q.   So then now tell us about this second interaction.

15   A.   It happened a week after that, after the Friday prayer,

16   afternoon, and I was walking outside the mosque and him and

17   that other person were there.  And, I mean, I was just saying

18   shalom or hello to them.  They refused to answer back.  And

19   they said, "We're not going to shake your hand because you are

20   a kuffar or infidel," and they said the word in Arabic and

21   they -- both of them --

22             THE COURT:  I just want to know what the Defendant

23   said.

24             THE WITNESS:  I mean, he was the leading person.  The

25   other guy was next to him all the time.  So he was saying, "You

1    are a kuffar, we were allowed to kill you.  We are -- your

2    women and your money is halal for us, which is allowed for us."

3            And two other individuals came from the board members

4    of the mosque and he stood behind me or beside me.  He told

5    them as well, "You are kuffar, you're supporting him against us

6    as Muslims and, you know, we're going to kill all of you.

7    You're kuffar, you know, this is our duty to do this to you."

8    BY MS. SWEENEY:

9    Q.    Did the Defendant give any reason why he thought he was

10   allowed to kill you?

11   A.    Because we are supporting the Government, the U. S.

12   against Osama Bin Laden.

13   Q.    Was there any other discussion that you -- oh, I'm sorry,

14   that second interaction, you said it was a week later?

15   A.    It was almost a week later, yes, it's a Friday, yes.

16   Q.    The next Friday?

17   A.    The next Friday.

18   Q.    Okay.  And is there anything else during that interaction

19   that you recall the Defendant saying or doing?

20   A.    He quoted a verse from the Quran that I can't remember the

21   exact verse, but it says that we're allowed to fight and this

22   is the land of war or the harp and we're allowed to fight and,

23   you know, destroy things.  There's no peace.  And I quoted him

24   back another verse saying that, you know, that we are not

25   obliged or people are not obliged, there's no obligation or no

```
 1   force in following their religion, and he said, "Your
 2   interpretation is the American interpretation of the Quran."
 3   So that was during that day.
 4   Q.   How did the interaction -- how did this interaction with
 5   the Defendant end?
 6   A.   So again, people got in the middle and separated us and
 7   they, you know, we left from there.
 8   Q.   Okay.  Is there any other interaction or conversation that
 9   you remember having personally with the Defendant?
10   A.   Personally, I mean, not directly, not directly.
11            MS. SWEENEY:  Okay, Your Honor, that is the
12   conclusion then of what the Government would present from this
13   witness.
14            THE COURT:  Any cross?
15            MR. GEORGE TRAGOS:  No cross, but argument, Your
16   Honor.
17            THE COURT:  All right.
18            You can step down, sir, and out of the courtroom.
19   We'll call you back when you're to testify if you are to
20   testify.
21            THE WITNESS:  Thank you.
22            (Witness excused.)
23            MR. GEORGE TRAGOS:  Your Honor, I believe that his
24   testimony is --
25            THE COURT:  I heard his testimony.  What's your
```

1   argument?

2           MR. GEORGE TRAGOS:  That it is not either 404(b) or

3   predisposition testimony.  His statements are different than I

4   think we anticipated them to be.  The reason he was speaking to

5   this witness was because he supported the Government against

6   Osama Bin Laden.  I don't believe that shows a predisposition

7   to bombing and shooting an AK-47 or any of the facts in this

8   case.  I ask the Court to reconsider its prior ruling on that.

9           THE COURT:  And what about his second statement that

10  you are a kuffar and we're allowed to kill you, your women and

11  your children because you are kuffar?

12          MR. GEORGE TRAGOS:  Your Honor, he was -- I believe

13  what he said was that was in relation to him quoting a verse

14  out of the Quran, and that he disagreed with it and he quoted

15  another verse out of the Quran.  But again, I don't see how

16  that translates into him using weapons of mass destruction and

17  an AK-47 here in Tampa.

18          THE COURT:  Counsel.

19          MS. SWEENEY:  Your Honor, I think the witness'

20  testimony was consistent with what was in the 302s and it shows

21  essentially the Defendant's state of mind and his intent and

22  that that intent and that state of mind were in place before

23  the Government began interacting with the Defendant.

24          This idea that America is a land of war that the

25  Defendant said to this witness, that is absolutely consistent

1    with what the Defendant expresses throughout the videos and

2    audio recordings that have been presented to the jury in this

3    case.

4              His support for Osama Bin Laden is in the martyrdom

5    video as well as other places.  And the idea that if someone is

6    kuffar, it's okay to kill them, that fits directly in with what

7    the Defendant was intending to do here.  So I thought the

8    witness' statement was very clearly both 404(b) and

9    predisposition.

10             THE COURT:  As to the second interaction, I think

11   that it is proper for the Government to elicit on the record of

12   this case.  As to the first interaction, the disagreement

13   concerning the prayer leader's belief about whether Osama Bin

14   Laden was or wasn't properly dealt with and the Defendant's

15   disagreement with that doesn't speak to the propensity to

16   commit the offenses alleged in this case.

17             And to the extent that they relate to motive, the

18   Defendant, through his martyrdom video, has already expressed

19   his motive, and I don't think that there's any benefit to the

20   introduction of that portion, because in the abstract, it's

21   people of similar religious beliefs expressing their separate

22   views on a very hot button topic at the time.

23             But as it relates to the second interaction, it

24   reestablishes the Defendant's reference to kuffar and his right

25   to kill the infidel and to create havoc in response to his

1   beliefs and such.  And to the extent that the Defendant here is

2   contending that he was induced to do this and that he wasn't

3   already predisposed to this behavior before he encountered law

4   enforcement in this case and the confidential human source and

5   the UCE, that would tend to undermine that assertion.  So the

6   Court will allow him to explain that second interaction.

7          MS. SWEENEY:  Your Honor, the witness did testify

8   that during -- I'm sorry -- during the second interaction, that

9   he felt -- I can't remember if he felt or the Defendant said

10  that some of the impetus for the interaction was supporting the

11  Government against Osama Bin Laden.  Should I instruct the

12  witness not to state that portion of their disagreement?

13          (Brief pause.)

14          THE COURT:  He did say that and I think you can

15  elicit that as part of his motive.

16          MS. SWEENEY:  Okay.

17          THE COURT:  And predisposition.

18          MS. SWEENEY:  As to the second incident only?

19          THE COURT:  As to the second incident only.

20          MS. SWEENEY:  All right.

21          Thank you, Your Honor.

22          THE COURT:  Yes, sir?

23          MR. GEORGE TRAGOS:  Your Honor, can we go to the

24  witness Haag for a minute?  That's the one that the Court had

25  an in camera hearing on.

```
1              THE COURT:  Yes, sir.

2              MR. GEORGE TRAGOS:  I'm trying to understand the

3   Court's ruling 'cause obviously I wasn't present for the

4   argument.  Is the Court saying that the Court is going to

5   recognize the Magnito Optical drive as authentic, that there's

6   no need for me to cross-examine anymore on the authenticity of

7   that or the copies?

8              THE COURT:  I think you can cross-examine on the

9   authenticity of that and the copies, but insofar as the Court's

10  concern was any indication that compliance with 18 USC 2517 and

11  18 is concerned, that concern has been assuaged by the Court.

12  If there's something else you think you need to draw out for

13  consideration of the weight to be given in order for its

14  admissibility, you can inquire.

15             MR. GEORGE TRAGOS:  All right.

16             Then I do have a few more questions for Haag.

17             One other thing while the jury is out.  If -- at the

18  conclusion of his testimony, is the Court believing that it's

19  going to allow these two Dennison transcripts in, because one

20  thing I'm willing to do, if the Court allows that, is stipulate

21  with the Government on one of their witnesses.

22             They have one witness to authenticate Russell

23  Dennison's voice, and I'm willing to stipulate that that

24  witness would testify that that was Russell Dennison's voice.

25             THE COURT:  Yes, it would be the Court's intention to
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    then allow the introduction of the two clips that we know about

 2    having to do with the Defendant and Mr. Dennison and so --

 3              MR. GEORGE TRAGOS:  Three actually.

 4              THE COURT:  Three.  And as it relates to that then,

 5    if the Government would not object to that stipulation to avoid

 6    that witness --

 7              MS. SWEENEY:  No, we would not object.

 8              THE COURT:  That's fine.  And the Defendant has been

 9    conferred with with regard to that, Mr. Tragos?

10              MR. GEORGE TRAGOS:  No.

11              THE COURT:  All right.

12              Well, that's important.

13              MR. GEORGE TRAGOS:  I thought that was my decision.

14    I'll confer, Your Honor.

15              THE COURT:  Your decision until I get an appeal,

16    Mr. Tragos.

17              MR. GEORGE TRAGOS:  Okay.  I conferred with my

18    client, Your Honor, he agrees there's no need to bring that

19    witness in to verify that's Mr. Dennison's voice.

20              THE COURT:  Mr. Osmakac, you have heard your lawyer

21    indicate that you would stipulate that the voice on those clips

22    would be your voice and that of Mr. Dennison?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Is there any need to call the

25    Government's witness to identify the voice at this time?
```

```
 1              THE DEFENDANT:  No.

 2              THE COURT:  Is anyone threatening you to get you to

 3    make that agreement?

 4              THE DEFENDANT:  No.

 5              THE COURT:  Has anyone promised you anything in

 6    exchange for that agreement?

 7              THE DEFENDANT:  No.

 8              THE COURT:  All right.

 9              MR. GEORGE TRAGOS:  Your Honor, we will, however,

10    make sure all our other objections are preserved with the

11    exception of the voice.

12              THE COURT:  Yes.

13              MR. GEORGE TRAGOS:  I'm not waiving anything else.

14              THE COURT:  Yes.

15              MR. GEORGE TRAGOS:  Okay.

16              THE COURT:  Oh, and insofar as the original copy

17    Mr. Haag drew from the MO once he put it in the Red Wolf

18    process, the Court has also found on the basis of

19    representations made in the closed session that it would affect

20    the interest of national security to allow the defense to have

21    any other version than that the defense already has.  There

22    could be a circumstance in which the defense could listen to

23    the audio-only version in the Court's chambers, but that audio

24    version would essentially be the same version as the

25    wave-length version that the defense already has and I'm told
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    has had for a couple of years.

2            So there's no greater presentation of that audio than

3    that that the defense already has that would not impinge the

4    interest that the Court has addressed in closed session with

5    the Government.

6            MR. GEORGE TRAGOS:  I think probably the Court did

7    address this in closed session so I'll raise it now for the

8    Court to rule on, but the Magnito Optical drive Mr. Haag used

9    or Agent Haag used was given to him to somebody with some

10   written notes on it.  We believe that the proper chain of

11   custody and what he used was hearsay.  So that's an objection

12   we would like to preserve that that Magnito Optical disk has

13   not been properly identified with proper chain of custody as in

14   fact the correct one for this case.

15           THE COURT:  And what do you think that chain of

16   custody would be?

17           MR. GEORGE TRAGOS:  Well, I would think that somebody

18   preserved it or recorded it on that Magnito Optical disk.

19           THE COURT:  His testimony was that the Magnito

20   Optical disk essentially does it on its own, that once the

21   request has been made and the procedures have been put in place

22   by that circular system he described at length on yesterday,

23   that the system itself captures the information.  And then once

24   the call finishes, it writes the call to the disk tod once the

25   order closes, the disk is closed and that becomes the MO.  And

```
 1   there is no person who does anything further than that.  That
 2   was his testimony.
 3           Now whether it then is the item that is put into the
 4   possession of the FBI, that is a chain of custody issue which
 5   you can explore with him when he comes back to testify.
 6           MR. GEORGE TRAGOS:  Okay.
 7           Again, his testimony was that's the way it's supposed
 8   to work as opposed to the way it did work.
 9           THE COURT:  And you can inquire of him if you think
10   there is something left to ask.
11           MR. GEORGE TRAGOS:  Okay.
12           THE COURT:  Please recall the jury.
13           (Jury returned to the courtroom.)
14           Tell me we're not missing a witness
15           MS. SWEENEY:  No, Your Honor, he's out there.  We
16   were just wondering, do you want him to come and sit in the
17   stand?
18           THE COURT:  He can come ahead now.
19           (Jury in.)
20           I told you I would jinks myself if I started
21   predicting our schedule.  I apologize for the extended delay
22   you all have had outside the courtroom.  Sometimes we have to
23   hear matters outside your presence to get them resolved.  We've
24   gotten that done.  And we will at this time proceed.
25           Let me also say that sometimes there will be matters
```

1    that have to be heard outside the presence of the jury and

2    rulings made by the Court.  The Court really is not at liberty

3    to explain its rulings beyond what you hear in the courtroom.

4              In some cases, on TV and other places, you've seen an

5    opportunity for jurors to ask questions of their own.  That is

6    typically not permitted in the course of a trial.  And it will

7    not be permitted in the course of this trial.  You just have to

8    accept the evidence as it comes in with the rulings of the

9    Court.  And if there's an explanation needed for something you

10   don't understand that the Court can convey to you, it will

11   endeavor to do so as circumstances permit.

12             Counsel, please call your witness.

13             Mr. Haag, you can retake the stand.

14                  CROSS-EXAMINATION (Continuing)

15   BY MR. GEORGE TRAGOS:

16   Q.   Agent Haag, the Magnito Optical disk, you told us

17   yesterday or day before, but you told us in your previous

18   testimony that you believed that these disks were made

19   automatically by part of the process; is that right?

20   A.   Yes.

21   Q.   Okay.  And this particular one in this particular case,

22   did you physically verify that's how this disk was made?

23   A.   Yes, that's how the system works, yes.

24   Q.   But did you do it, did you verify on this disk?

25   A.   I don't have any way to verify that that's how it was

1    made.

2    Q.   Okay.  And the person that could verify that is, I guess,

3    someone that was working there day that?  Is that the way it

4    works?

5    A.   I'm trying to think who -- give me a minute, let me think

6    of who that might be.  It would probably be the -- I can only

7    speculate as far as -- you're asking whether -- could you

8    rephrase the question and restate the question, please?

9    Q.   I'm not looking for an individual name.  I'm just saying

10   that the person that could verify that this MO is the MO that

11   was automatically made or created on the day of the recordings,

12   there is somebody that can do that?

13   A.   Yes.

14   Q.   Okay.  But you're not able to do that?

15   A.   No.

16   Q.   And the one you were handed -- wait, I know you said that

17   they can record once?

18   A.   Yes.

19   Q.   Right?  Can you put a second Magnito disk in there and

20   have a second recording?

21   A.   At the same time?

22   Q.   No, different time?

23   A.   I'm not sure.

24   Q.   Okay.  The one that you received in Tampa, you believe

25   that was actually recorded in Miami, correct?

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    A.    Yes.

2    Q.    And -- but you are not -- do you know of your own personal

3    knowledge how that disc came from Miami to Tampa?

4    A.    Based on the chain of custody signatures on the envelope.

5    Q.    Just from seeing it, seeing signatures, right?

6    A.    And there's a line on there that shows the Fed Ex number

7    where it was sent from Miami to Tampa.

8    Q.    But you, yourself, weren't involved in that process?

9    A.    I was not.

10   Q.    And what you're learning came off of a document, correct?

11   A.    Yes.

12            MR. GEORGE TRAGOS:  That's all the questions I have,

13   Your Honor.

14            THE COURT:  Any redirect on that point?

15            MS. SWEENEY:  No, Your Honor.

16            THE COURT:  All right, sir.  You may step down.

17            You may leave that there.  Thank you.

18            (Witness excused.)

19            Ms. Sweeney.

20            MS. SWEENEY:  Your Honor, the Government moves

21   Exhibits 161.1-A and B -- I'm sorry -- 161.1-A and B, 162.1-A

22   and B, 163.1-A and B into evidence.

23            THE COURT:  Any objection?

24            MR. GEORGE TRAGOS:  Yes, Your Honor.  We preserve our

25   previously made objections.

```
 1            THE COURT:  All right.

 2            Those objections are overruled.  The Court determines

 3   that the proper chain of custody has been established for this

 4   document through this witness such that it can be admitted.

 5   And there is additionally the stipulation that the voice on the

 6   video is that of Mr. Dennison and the Defendant's, such that no

 7   witness will be called to verify those voices.

 8            Counsel.

 9            (Thereupon, Government's Exhibits 161.1-A and B,

10   162.1-A and B and 163.1-A and B were received and filed in

11   evidence.)

12            MS. SWEENEY:  Thank you, Your Honor.  And just to be

13   clear for the record, the second voice, the gentleman's name is

14   Russell Dennison.

15            Your Honor, at this time, the Government will call

16   Mr. Ashraf Elessaway to the stand.

17            THE COURT:  Please come forward, sir, and take the

18   witness stand.

19            This witness has previously been sworn.

20            Mr. Elessaway, you need to speak clearly into the

21   microphone.  Wait until counsel completes her question, even if

22   you think you know what it is, before you start talking so

23   you're not talking over her.  If you see opposing counsel stand

24   to object, wait until I rule on the objection before you begin

25   your answer.
```

```
 1              Do you understand that?
 2              THE WITNESS:  Yes.
 3              THE COURT:  Counsel.
 4              MS. SWEENEY:  Thank you, Your Honor.
 5                    DIRECT EXAMINATION
 6   BY MS. SWEENEY:
 7   Q.   Sir, what's your name?
 8   A.   Ashraf Elessaway.
 9   Q.   And do you -- I'm sorry, excuse me.
10        Do you attend a mosque?
11   A.   Yes, I do.
12   Q.   And where is that mosque located?
13   A.   Naperville, Illinois.
14   Q.   Do you see anyone in the courtroom today that you have
15   seen at your mosque before?
16   A.   Yes.  This gentleman in the white shirt.
17   Q.   And what name do you know or how -- did that person ever
18   tell you his name?
19   A.   He told me several names; one is Abdullah and one is
20   Abd-al-Rahman.
21   Q.   And did you ever have any personal face-to-face
22   interactions with the Defendant at your mosque?
23   A.   Yes, I did.
24   Q.   I'm going to direct your attention to the second of those
25   interactions.  We're going to talk about the second one.  So
```

1  about approximately when did your second interaction at the

2  mosque with the Defendant take place?

3  A.   It was June or July of 2011.

4  Q.   And how did that interaction begin?

5  A.   It began when -- after the Friday prayer, I was walking

6  outside to the patio behind the mosque and I saw him and

7  another person.  So I was trying to say salaam or hi, you know,

8  and he refused to do that.  And he said, "I will not offer

9  peace or make salaam to a person that is an infidel or kuffar."

10 Q.   And did the Defendant tell you during this interaction why

11 he believed you were a kuffar?

12 A.   Because we are supporting, and in his words, "We're

13 supporting the American Government against Osama Bin Laden."

14 Q.   What else did the Defendant tell you during this

15 interaction?

16 A.   He told me that he has the right to kill me and other

17 board members, and that our money and our wives or women are

18 allowed for -- hilam for them, allowed for them.

19 Q.   When you say "board members," what are you referring to?

20 A.   So the board members of the Islamic Center of Naperville.

21 They were accompanying me at that time.

22 Q.   I'm sorry, you said the something center of Naperville.

23 A.   The Islamic Center of Naperville.  That's the mosque.

24 Q.   And the board members serve in a leadership function at

25 the mosque?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    A.    That's correct.

2    Q.    Okay.  So when the Defendant said -- he said your women

3    and your money were hiram or allowed; what did that mean?

4    A.    It's hilam, not hiram.  Hilam means they are -- they have

5    the right to them without, you know, without any reason, just

6    they can take them.

7    Q.    And did the Defendant say anything else to you during this

8    interaction?

9    A.    He mentioned a verse of the Quran that justifies a fight

10   or killing people.  And I countered that -- by saying that it

11   is a verse from the Quran that he could not force people to --

12   for hilam, and his words back to me is -- or were, "This is the

13   American translation of the Quran, and this is what you're

14   trying to do."

15   Q.    And how did this interaction with the Defendant end?

16   A.    So, you know, people got in the middle between us and they

17   separated, you know, the parties, you know, me and the other

18   board members and him and the other person that was with him.

19   Q.    And between him and the other person who was with him, who

20   was doing most of the talking during the interaction?

21   A.    He was doing most of the talking.

22            MS. SWEENEY:  I have nothing further, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. GEORGE TRAGOS:

25   Q.    During this second interaction -- let me ask you, have you

1   ever been to Kosov0?

2   A.   I'm sorry?

3   Q.   Have you ever been to Kosovo?

4   A.   No.

5   Q.   During this second interaction, did you -- was this after

6   prayers?

7   A.   That's correct.

8   Q.   Did he participate in prayers?

9   A.   I don't know.  He was in the crowd behind me.  I don't

10  know how many -- there are like 200, 300 people.

11  Q.   Okay.  So you don't know if he even participated in the

12  prayers or not?

13  A.   Definitely not.

14  Q.   You don't know?

15  A.   Well, you know, definitely, I don't know, I mean, because

16  there are 200 people.  I cannot remember every one of them.

17           MR. GEORGE TRAGOS:  That's all the questions I have.

18           THE COURT:  Thank you, sir, you may step down.

19           (Witness excused.)

20           Please call your next witness.

21           MS. SWEENEY:  The Government calls Evan Kohlmann.

22           THE COURT:  Please come forward, sir, and take the

23  witness stand.

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  State your name for the record.

```
 1              THE WITNESS:  My name is Evan F. Kohlmann,
 2    K-O-H-L-M-A-N-N.
 3              THE COURT:  Mr. Kohlmann has also been sworn.
 4              Mr. Kohlmann, I need you to speak slowly.  It's your
 5    tendency to speak quickly.  If you use a word whose spelling is
 6    unusual, please spell the word.  Wait until counsel completes
 7    his question before you give your answer.  Answer only what is
 8    asked.  And if you see counsel stand to object, wait until I
 9    rule on the objection.
10              Do you understand that?
11              THE WITNESS:  Yes, Your Honor.
12              THE COURT:  Counsel.
13              MR. MCGOVERN:  Thank you, Your Honor.
14                    DIRECT EXAMINATION
15    BY MR. MCGOVERN:
16    Q.   Mr. Kohlmann, I'd like to go a little bit into your
17    background.
18    A.   Of course.
19    Q.   Would you please state and spell your name for the jury.
20    A.   Yes.  My name is Evan F. Kohlmann, E-V-A-N
21    K-O-H-L-M-A-N-N.
22    Q.   Sir, did you attend college?
23    A.   I did.
24    Q.   What school did you attend?
25    A.   I attended the Edmund A. Walsh School of Foreign Service
```

1   at Georgetown University, E-D-M-U-N-D  W-A-L-S-H.

2   Q.   Would you describe the Walsh School of Foreign Service for

3   us?

4   A.   Yes.  The SFS, the School of Foreign Services is dedicated

5   to teaching students foreign policy, conflict management,

6   conflict resolution at an international scale.

7   Q.   Sir, what was your undergraduate degree in?

8   A.   My undergraduate degree was in international politics with

9   a focus in international security studies.

10  Q.   Are you familiar with the Center for Muslim Christian

11  Understanding?

12  A.   Yes.

13  Q.   Would you tell us what that is?

14  A.   Within the School of Foreign Service, there are a number

15  of separate sub schools that teach specific aspects of various

16  different aspects of foreign policy.  One of those schools is

17  the Center that Prince Al Waleed Bintalal, A-L  W-A-L-E-E-D

18  B-I-N-T-A-L-A-L, the Prince Al Waleed Binalal Center for Muslim

19  Christian Understanding, which was established to help promote

20  good relations between Muslims and non Muslims.

21  Q.   Was your term at Georgetown University a four year degree?

22  A.   It was, yes.

23  Q.   Were there writing requirements during that time, sir?

24  A.   For my program, yes, there was.

25  Q.   Was there a capstone thesis that you had to engage in?

1  A.    Actually, I had two theses.  My capstone thesis was for my

2  CMCU degree in Islam and Muslim Christian understanding.

3  Q.    What was your other thesis in?

4  A.    My other thesis was a honors thesis in international

5  politics.  The topic of my thesis was the Legacy of the Arab

6  Afghans, a case study, which examined the Soviet Afghan war of

7  the 1980s, foreign fighters who had participated in that

8  conflict, where they had gone afterwards and what they had done

9  there.

10 Q.    Sir, are you familiar with the Center for Contemporary

11 Arab Studies?

12 A.    Yes.

13 Q.    What is that?

14 A.    That's another sub school under the School of Foreign

15 Service at Georgetown University.  The Center for Contemporary

16 Arab studies, or CCAS, is dedicated, as opposed to Islamic

17 studies, is dedicated to studying the Arab world.

18 Q.    Did you participate in that program?

19 A.    Yes.  I took numerous classes in the program as well as I

20 was also an undergraduate teaching assistant for a senior

21 professor in that program.

22 Q.    Who was the senior professor?

23 A.    Dr. Mamoun Fandy, F-A-N-D-Y.

24 Q.    What type of work did you do for Dr. Fandy?

25 A.    I helped conduct research on dissident groups in North

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Africa and the Arabian Gulf region.

2    Q.    Any groups in particular, sir?

3    A.    Yes.  Several groups that were either part of or

4    associated with Osama Bin Laden and Al-Qaeda.

5    Q.    Sir, while at Georgetown, did you receive any awards?

6    A.    Yes, I did.

7    Q.    What awards did you receive?

8    A.    I graduated magna cum laude and I received honors in

9    international politics for producing an approved honors thesis.

10   Q.    Sir, upon completion of your time at Georgetown

11   University, did you attend another school?

12   A.    Yes, I did.

13   Q.    Where did you attend?

14   A.    I attended the University of Pennsylvania Law School in

15   Philadelphia, Pennsylvania.

16   Q.    What were the dates of your attendance?

17   A.    I attended the University of Pennsylvania Law School from

18   September of 2001 until May of 2004.

19   Q.    And did you graduate, sir?

20   A.    I did.

21   Q.    Do you have a law degree?

22   A.    I do.

23   Q.    You took classes at the law school.  Did you take any

24   classes related to terrorism?

25   A.    I did.

1    Q.    What classes did you take there?

2    A.    I took classes both within the law school itself on legal

3    and investigative loopholes in cyber terrorism.  I also did

4    work on the death penalty, the issue of the death penalty as

5    applied to a variety of different terrorism cases.  Separately

6    from law school, I also took classes in Islam -- in Afghanistan

7    and Islamism, excuse me, in the graduate School of Arts and

8    Sciences at the University of Pennsylvania.

9    Q.    Were your classes at that particular school in addition to

10   or a part of your work at the law school?

11   A.    They were both.  Some were in addition to, some were part

12   of my actual degree.

13   Q.    Sir, in this program, did you write any papers?

14   A.    Yes, I did.

15   Q.    Would you tell us what you wrote?

16   A.    Sure.  Within the law school itself within my law school

17   program, I authored a number of seminar papers and papers from

18   my classes in law school on the subject of, again, the legal

19   and investigative loopholes in cyber terrorism law, in the

20   death penalty as applied to terrorism cases, and again, outside

21   of the law school, I also did writing in my class in

22   Afghanistan Islamism, comparing two different Afghan warlords

23   and understanding through a compare and contrast methodology,

24   the similarities and differences between them.

25   Q.    Sir, are you familiar with the Investigative Project?

```
 1   A.    Yes.

 2   Q.    What is the Investigative Project?

 3   A.    The Investigative Project is a counterterrorism think tank

 4   and watch dog group that was established in 1995 by a former

 5   CNN journalist.

 6   Q.    What is a think tank?

 7   A.    A think tank is an organization responsible for producing

 8   research.  The research can go to a variety of different end

 9   users or end clients, anything from Government agencies,

10   academics, media, anyone with a very focused interest in

11   specific aspects of social policy or foreign policy in

12   particular.

13   Q.    Were you employed there?

14   A.    I was, yes.

15   Q.    How long were you employed there?

16   A.    I was employed there from approximately February of 1998,

17   when I began as an intern, until December of 2003, at which

18   time I was a senior analyst.

19   Q.    Sir, did the years of your employment at the Investigative

20   Project overlap your time at Georgetown?

21   A.    And law school both, yes.

22   Q.    How many hours a week did you work for the Investigative

23   Project while you were in law school and at Georgetown?

24   A.    At Georgetown, it started at approximately 15 hours a

25   week, but quickly escalated to about 30 or 35.  While I was in
```

1    law school, for the majority of my law school term, I took

2    classes during the first three days of the week and then the

3    rest of the week I spent down in Washington, DC, working at the

4    think tank.

5    Q.    What was the focus of your work at the Investigative

6    Project?

7    A.    The focus of my work was studying the financial,

8    communication and recruitment networks as well as the

9    infrastructure of a variety of international terrorist

10   organizations, with a focus on organizations which I had a

11   background in studying, namely groups like Al-Qaeda as well as

12   other groups like Hamas and Hezbollah.

13   Q.    Did you develop a specialty?

14   A.    Yes.  My focus was particularly on Al-Qaeda, its

15   communications, its financing, its hierarchy.

16   Q.    Where did you get your resources to engage in your job?

17   A.    In order to perform these services, I did a number of

18   different things.  The focus of my research is open source

19   research, meaning materials that are available publicly if you

20   know where to find them.  So this could include everything from

21   going and actually --

22              THE COURT:  Where did you get the funding?

23              THE WITNESS:  Excuse me, Your Honor?

24              THE COURT:  Where did you get the funding for your

25   work?  That's the question.

1          THE WITNESS:  What was the -- oh, sorry.  The funding

2    for my work was provided by the Investigative Project.

3    BY MR. MCGOVERN:

4    Q.   Did you complete your answers as to the sources of your

5    information?

6    A.   No, sir.  So, the sources of my information, I primarily

7    relied on open sources, i.e, non classified open sources,

8    material that is public, but can be difficult to get at.  A

9    primary source, the most valuable open source of information

10   would be going and actually interviewing people in the field or

11   witnessing an event in person.

12         Now, while that can be challenging in the realm of

13   international terrorism, I have actually gone out and I've

14   interviewed individuals and I did, when I was at the

15   Investigative Project, I did original research in that forum.

16         In addition to that, there's something called secondary

17   research.  Secondary research would be a videotape or a

18   communique or a magazine produced by a terrorist organization

19   or an extremist group.  It isn't the same thing as actually

20   being able to interview someone or being able to see something

21   live, but if it's produced by a group and it's creditable, then

22   it is an authentic source of information and it can be relied

23   upon.

24         In the realm of studying terrorist organizations,

25   secondary sources are the most frequent sources and the most

1    reliable sources that we often come across.  That is because

2    terrorist organizations and extremist groups produce a variety

3    of propaganda and other documents which we can collect.

4        So, as a result, I made it my mission to collect every

5    single secondary source I could get my hands on.  So I have a

6    giant database of every single communique, every single

7    magazine, every single website, every single public interview

8    that was ever done with the groups that I was interested in.

9        Then following that, there are tertiary sources, third

10   party sources.  These are sources we try to stay away from

11   because of the fact it's difficult to verify the information in

12   there.

13       So a tertiary source would be a newspaper article, a

14   magazine article.  These sources can be valuable for contextual

15   purposes.  They can be valuable for establishing general facts.

16   But they are, generally speaking, you have to avoid using them

17   too heavily because of the fact that it's been filtered through

18   a third party.

19   Q.   Sir, would you give us an example of a tertiary resource?

20   A.   Sure.  Newspaper articles is really a very good source of

21   that or even a report written by another academic.  It's

22   certainly valuable to read.  It's good for contextual purposes,

23   but any factual information there would probably be -- have to

24   be verified.

25   Q.   Could you give us an example of a secondary source?

```
 1    A.    Yes.  A magazine or a communique or a video recording or
 2    audio recording authentically produced by a credible
 3    international terrorism organization, an extremist group,
 4    something where it is coming from an original source.
 5    Q.    And what would be an example of a primary source?
 6              THE COURT:  Counsel, he just went through all this
 7    list.
 8              MR. MCGOVERN:  Yes, Your Honor.  I'll move on.
 9    BY MR. MCGOVERN:
10    Q.    Sir, while you were at the Investigative Project, did you
11    interact with any United States Government agencies?
12    A.    Yes, I did.
13    Q.    Did you interact with the Executive Branch of the United
14    States Government?
15    A.    Yes, I did.
16    Q.    What was your interaction with the Executive Branch of the
17    United States Government?
18    A.    While at the Investigative Project, I provided briefings
19    to both individuals from law enforcement, from the FBI, as well
20    as I also provided briefings at the National Security Council
21    of the White House, to Richard Clark who, at the time, was the
22    White House counterterrorism czar, as well as his aides.
23    Q.    Sir, did you ever interact with the Congress?
24    A.    I did.
25    Q.    Would you describe that for us?
```

1    A.    Both while I was at the Investigative Project and

2    separately, while -- after I left the Investigative Project, I

3    have coauthored or authored congressional testimonies before a

4    variety of congressional subcommittees on such subjects as

5    terrorist financing, terrorist communications, the hierarchy of

6    Al-Qaeda, and et cetera.

7    Q.    Sir are you familiar with the 911 Commission?

8    A.    Yes.

9    Q.    What is that?

10   A.    The Bipartisan Congressional 911 Commission was created

11   after the September 11th 2001 terrorist attacks on the United

12   States to establish a time-line of how the events occurred and

13   establish a factual background as to how the events occurred.

14   Q.    Did you interact with that commission?

15   A.    I did.

16   Q.    What was your interaction?

17   A.    I provided briefings to a variety of different

18   commissioners responsible for helping to draft the final

19   report.  As a result, the materials that I provided to them

20   were used in the final report, including my book, *Al Qaeda's*

21   *Jihad in Europe*, which is footnoted in the final commission

22   report.

23   Q.    What year did you publish that book?

24   A.    The book was published in 2004, first in the United

25   Kingdom and then later the same year it was published here in

1    the United States by Paul Greg McMillan.

2    Q.    Who was the intended audience for that book?

3    A.    The publisher is an academic publisher, so presumably the

4    audience is primarily an academic audience, individuals with

5    very, very specific interests in what I was writing about.

6    Q.    Does the title accurately describe the content of the book

7    or is there another general understanding that you can give us

8    about that book?

9    A.    The content of the book is focused on terrorist networks

10   that exist in Europe following the Soviet Afghan war of the

11   1980s, how those networks coalesced around the conflict in

12   Bosnia and Herzegovina and how those individuals attempted to

13   use that conflict as an engine to move forward their movement

14   on a global scale.

15   Q.    Sir, after you left the Investigative Project, were you

16   employed?

17   A.    Yes.

18   Q.    Where were you employed?

19   A.    I was self employed.  I started my own consulting business

20   in late 2003, early 2004.  Within a short span of time, I had

21   begun doing work on behalf of a variety of private clients,

22   including both for profit companies, commercial entities, law

23   firms, as well as NBC News.  I have since 2004, and I am

24   currently an NBC News terrorism analyst responsible for

25   providing both on-air analysis about ongoing matters relating

1    to terrorism, as well as I'm also responsible for providing NBC

2    with original copies of video recordings, audio recordings and

3    other media and statements that are released by terrorist

4    organizations.

5    Q.   Are you familiar with Flashpoint Partners?

6    A.   Yes.

7    Q.   What is that?

8    A.   Flashpoint Partners is the company that grew out of my

9    initial consulting business.  Flashpoint began in 2010

10   formally.  Flashpoint is focused on providing both software

11   services as well as consulting services to a variety of

12   clients, both in the public and private sphere, with regards to

13   communications on the internet, particularly dark web

14   communications.  In other words, illicit communications among

15   illicit actors on the Internet.

16   Q.   In your work at Flashpoint Partners, do you collect

17   information?

18   A.   Yes.

19   Q.   What type of information?

20   A.   I'm responsible for collecting as much credible

21   information as possible about the activities of terrorist

22   organizations, both in the physical realm as well as in the

23   online realm, but focusing mainly on sources that are on the

24   Internet.

25   Q.   Can you quantify the amount of resources that you have

1  collected?

2  A.   Yes.  Currently, we have a database where all of this data

3  is stored.  The database is approximately six and a half

4  terabytes in size.  A terabyte is a thousand gigabytes and a

5  gigabyte is a thousand megabytes.  A single megabyte can store

6  hundreds and hundreds of pages of written materials.

7       Now obviously, some of this material is video recordings

8  or audio recordings which take up more space on a hard drive.

9  But nonetheless, conservatively, you're talking about thousands

10 upon thousands of individual documents in a variety of

11 different languages, so much so, that the only way to

12 effectively search through it is by having our own Google style

13 search engine for us to be able to pull out relevant hits.

14 Q.   Sir, what is the purpose of collecting all this

15 information?

16 A.   The purpose of collecting all this information was that I

17 felt the greatest weakness in terms of the study of

18 international terrorist organizations was a lack of original

19 information, credible, original information, evidence on which

20 to base arguments and to which to base papers and other

21 materials.  I felt a lot of the scholarly activity in this

22 field was focused on hyperbole and not on facts.

23       The purpose of producing this is so that not only we, but

24 others in the field, including other academics, including

25 policy makers, law enforcement had the opportunity to see the

1    material unvarnished, can see the original material unvarnished

2    and have access to it without necessarily being inside of a

3    terrorist group.

4    Q.    Are you aware of whether or not there are other

5    organizations that do the same type of work as Flashpoint

6    Partners?

7    A.    There are a few organizations that do various different

8    aspects of what we do, yes.

9    Q.    Do they maintain databases of information?

10   A.    Yeah, they do.

11   Q.    Were you ever able to compare your database to other

12   organizations' databases?

13   A.    On occasion.  I wouldn't say every single time, but on

14   occasion, yes.

15   Q.    Sir, in your experience, have you ever had the opportunity

16   to interview someone who was known as a terrorist?

17   A.    Yes.

18   Q.    Who have you been able to interview?

19   A.    In 2002, I interviewed a number of individuals outside of

20   the United States, including Abu Hamza al-Masri, A-B-U

21   H-U-M-Z-A  A-L  M-A-S-R-I.  Abu Hamza has been convicted of

22   terrorism charges, both in the United Kingdom as well as here

23   in the United States.  Abu Hamza ran a mosque in the United

24   Kingdom known for recruiting a variety of individuals to carry

25   out terrorist attacks, associated with such individuals as

| | |
|---|---|
| 1 | Richard Reed, the so-called shoe bomber. |
| 2 | THE COURT:  The question was, who have you |
| 3 | interviewed and that's all. |
| 4 | THE WITNESS:  Yes, Your Honor. |
| 5 | I've also interviewed Omar Bakri Muhammad, O-M-A-R |
| 6 | B-A-K-R-I Muhammad, and Muhajiroun is M-U-H-A-J-I-R-O-U-N, |
| 7 | which is an extremist movement in the U.K.  I've also |
| 8 | interviewed individuals such as Saad Fiquih, S-A-A-D |
| 9 | F-I-Q-U-I-H.  Saad Fiquih is a designated foreign -- a |
| 10 | specially designated foreign terrorist by the State Department. |
| 11 | I've also interviewed Mohammed Massari, M-O-H-A-M-M-E-D |
| 12 | M-A-S-S-A-R-I, another individual who was designated by the |
| 13 | United States Government as a terrorist, as well as a variety |
| 14 | of other individuals. |
| 15 | BY MR. MCGOVERN: |
| 16 | Q.   Sir, have you ever provided expert testimony in a |
| 17 | terrorism case before? |
| 18 | A.   Yes. |
| 19 | Q.   Approximately how many times? |
| 20 | A.   I believe this is number 31. |
| 21 | Q.   Which Courts have you been determined to be an expert in |
| 22 | terrorism? |
| 23 | A.   Well, I should say, 31 in the United States. |
| 24 | MR. PETER TRAGOS:  Object, Your Honor. |
| 25 | THE COURT:  Overruled. |

```
1            THE WITNESS:  I should say 31 in the United States.
2    I've been qualified also 10 times outside of Federal Court.  In
3    foreign countries, I've testified in the Old Bailey in London.
4    I've testified in a variety of other Crown Courts in London.
5    I've testified before the Commonwealth Court of New South Wales
6    in Sydney, Australia.  I've testified before the Central
7    Criminal Court in Denmark, in Copenhagen.  I've testified
8    before the Supreme Court of Bosnia, Herzegovnia in Sarajevo,
9    Bosnia, as well as I've also testified in Glasgow, Scotland.
10   BY MR. MCGOVERN:
11   Q.   Sir, have you ever provided services to Governments other
12   than the United States Government?
13   A.   Yes, I have.
14   Q.   Which Governments, sir?
15            THE COURT:  Which services first?
16   BY MR. MCGOVERN:
17   Q.   Which services have you provided to other Governments
18   other than the United States Government?
19   A.   I've provided services, including analysis of seized hard
20   drives and seized digital materials in terrorism cases.  I have
21   provided original copies of communiques and video recordings
22   released by terrorist organizations.  I have assisted in --
23   I've assisted in deciphering conversations by suspected
24   terrorists, covert recorded conversations.  I've assisted in
25   actually reviewing physical evidence seized from locations --
```

1  well, around Europe and around the world.  And I've provided

2  expert testimony.

3          MR. MCGOVERN:  May I have a moment, Your Honor?

4          THE COURT:  Yes.

5          (Brief pause.)

6          MR. MCGOVERN:  Your Honor, that would conclude the

7  Government's questions regarding the expertise of the witness.

8          THE COURT:  He didn't come back and tell you the

9  names of those Governments after the services.  Did you want

10  him to?

11          MR. MCGOVERN:  I'm sorry, Your Honor?

12          THE COURT:  He did not give the names of the

13  countries after the Court required him to give the services

14  first.  Did you want him to?

15          MR. MCGOVERN:  My apologies.

16  BY MR. MCGOVERN:

17  Q.   Mr. Kohlmann, would you answer the question about what

18  countries you provided services to?

19  A.   Certainly.  I provided services to the Government of

20  Australia, the Government of the United Kingdom, the Government

21  of Bosnia, Herzegovina, the Government of Denmark, the

22  Government of Switzerland, the Government of Norway, the

23  Government of Spain, and I believe -- and the Government of

24  Azerbaijan, and the Government of Saudi Arabia and the

25  Government of Jordan, and I believe that's it.

```
1    Q.    Are you paid for your services?

2    A.    Most of the time, yes.

3    Q.    Are you paid when you're an expert in the United States in

4    a Federal Court?

5    A.    Typically speaking, yes.

6              MR. MCGOVERN:  Thank you.

7              I have nothing further as far as the expertise goes.

8              THE COURT:  Counsel, would you like to voir dire this

9    witness?

10             MR. PETER TRAGOS:  No, Your Honor.  We'll save it for

11   cross.

12             THE COURT:  All right.

13             MR. MCGOVERN:  Your Honor, if I may, the Government

14   would move this Court to --

15             MR. GEORGE TRAGOS:  Objection.

16             MR. MCGOVERN:  Sorry, you object, I'm sorry.

17             MR. PETER TRAGOS:  Object to the designation, Your

18   Honor.

19             THE COURT:  I haven't heard what it is.  You want to

20   do it at sidebar?

21             MR. PETER TRAGOS:  Yes, Your Honor.

22             THE COURT:  All right.

23             (Thereupon, the following discussion was had at

24   sidebar:)

25             You would like to designate him as to what areas?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1          MR. MCGOVERN:  An expert in the meaning, relevance

2    and importance of various statements, individuals and

3    references the Defendant made during the course of the

4    investigation, as well as general radical Islamic terrorism.

5          MR. PETER TRAGOS:  I was under the impression that

6    the Court didn't designate experts in front of the jury.

7          THE COURT:  Well, this Court does.  I was under the

8    impression that other Courts don't necessarily.  I've never

9    heard of that other than in the one instance indicated.  I

10   guess Judge Whittemore, I guess, or Judge Merryday did it, one

11   of them.  That was your experience?

12         MR. PETER TRAGOS:  I thought there was a new rule,

13   now that I haven't seen a Judge designate somebody an expert

14   since I've been a lawyer, which isn't very long, but I have not

15   seen that.

16         THE COURT:  What's the rule?

17         MR. PETER TRAGOS:  I don't know what the rule number

18   is.  Are you going to say he's an expert in these areas?

19         THE COURT:  I'm going to say he is designated as an

20   expert to testify in the following areas, whatever they are,

21   that the Court approves, unless somebody points me to a rule

22   that says the Court cannot do that.

23         MR. PETER TRAGOS:  I don't have the rule book.  We do

24   object.

25         MR. MCGOVERN:  I'm sorry?

```
 1              MR. PETER TRAGOS:  We do object.  We don't have the
 2   rule number.
 3              THE COURT:  I tell you what we'll do.  We'll just
 4   launch into a determination of what his testimony is going to
 5   be, and at the conclusion of the case, the Court will say or at
 6   the conclusion of his testimony, I will advise that he was
 7   called as an expert witness in these areas, but he is
 8   designated to testify as to the areas the Court already
 9   articulated outside the presence of the jury at the Daubert
10   hearing before and as concluded this afternoon and no others.
11   And I don't know what this means, general terrorism, as part of
12   your last -- as part of your designation.
13              MR. MCGOVERN:  So that he's an expert and he will be
14   able to testify regarding Al-Qaeda, if he's asked the question,
15   what it is, you know, general terms, general organizations.
16              THE COURT:  Well, I thought we had come to some
17   specific understanding of the words he was going to describe.
18              MR. MCGOVERN:  Oh, yes.
19              THE COURT:  And that is all he's going to do?
20              MR. MCGOVERN:  Yes, all he's going to do.
21              THE COURT:  And Al-Qaeda wasn't one of them.
22              MR. MCGOVERN:  It was.
23              THE COURT:  It was not.
24              MR. MCGOVERN:  Okay.
25              THE COURT:  All right.
```

```
 1              MR. PETER TRAGOS:  I know at the Daubert hearing he
 2    was able to testify to the definitions.  I don't think he's
 3    been given any expertise or anything about why in front of the
 4    jury he would be able to define Arabic words.
 5              THE COURT:  Well, we've already been through that at
 6    the Daubert hearing.
 7              (Thereupon the sidebar conference concluded.)
 8              Counsel, you may proceed to inquire of this witness.
 9              MR. MCGOVERN:  Thank you, Your Honor.
10    BY MR. MCGOVERN:
11    Q.   Mr. Kohlmann, in your experience over the years, have you
12    come across the term or reference to the term "black flag?"
13    A.   Yes.
14    Q.   How are you familiar with the term "black flag?"
15    A.   I'm familiar with it from the original reference from a
16    hadith.  A hadith is a story that is qualified within the
17    religion of Islam as part of the actual belief system.  And
18    there is a hadith or a story about an army arising from
19    Horizon.  Horizon is the ancient name for Afghanistan.  And the
20    hadith says that an army will rise from there and will come
21    forth from Afghanistan carrying black flags, carrying black
22    banners, and that they will liberate the Islamic world and that
23    that will hail the coming of the new savior.
24         This allegory, this hadith has been adapted by a variety
25    of different organizations that believe that armed resistance
```

1   is a way to establish an Islamic empire.  And so in

2   contemporary sense, there are a variety of different groups

3   that use this flag or use black flags to signify their

4   allegiance or their belief in this story.

5   Q.   Are there different types of black flags?

6   A.   Yes, they are.

7   Q.   In your experience, what are the different types?

8   A.   I have seen groups use both a plain black flag with

9   nothing written on it.  I have also seen people use flags that

10  are black and that have the shahada written on it.  The shahada

11  is the Arabic testimonial of faith, if you're a Muslim,

12  ilahillallah.  It's written under Arabic, so you can either

13  have the plain black flag or you can have a black flag with the

14  shahada written on it.

15  Q.   Is the context of the use of the black flag always

16  consistent or can it be different?

17  A.   Usually, it's associated with Islamic political movements.

18  Occasionally, it's associated with ones that are not

19  necessarily armed, but more likely than not it's affiliated

20  with groups that have an armed connotation because of the

21  meaning of the hadith, an army arising from Afghanistan.

22  Q.   If I may Your Honor.

23       Mr. Kohlmann, I'd like to direct your attention to

24  Government's Exhibit 111, page six.  Do you see Exhibit 111-B,

25  page six in front of you?

```
 1   A.   Yes, I do.

 2   Q.   The fourth line from the bottom, starting with the

 3   designation, "SO" for Defendant, would you read that for us,

 4   sir?

 5   A.   Yes.  "You have ilahillallah flags, right, the black with

 6   the white letters?  You do?"

 7   Q.   Can you describe the black flag as being referenced there

 8   by the Defendant?

 9   A.   Yes.  Ilahillallah is the shahada.  So this is the black

10   flag, this is the ria flag, this is the black flag with the

11   shahada, the Arabic testimonial of faith written on the front

12   of it.

13             MR. MCGOVERN:  Thank you.

14             I'd like to have clip -- Government's Exhibit

15   163.1-A, which is a clip of a phone call between the Defendant

16   and Russell Dennison, played for the Court, Your Honor, and the

17   accompanying transcript is 163.1-B, marked for identification.

18             (Tape played.)

19   SO:   Salam 'alaykum [peace be upon you]

20   RD:   Wa 'alaykum assalam [And peace be upon

21   you]. what's going on?

22   SO:   (UI) yet?  (UI).

23   RD:   Oh yeah.

24   SO:   What's up with you?

25   RD:   I don't, I've seen that video man, these people
```

1    are stupid man.

2    RD:   This guy is trying to make videos of all the

3    Muslims, like, making moves or something, you know.

4    SO:   Oh there's some guy Alex or some kind of

5    name.  He commented on all my videos and some

6    kuffar [infidel].  He's like, he's like, forget the, uh, in

7    between (UI) I want to watch the vagina.

8    RD:   Yeah I see…the other people, they're atheists

9    man.

10   SO:   Yeah.

11   RD:   You know how it is with these people man,

12   they retarded, they think everything is a joke man.

13   SO:   Yeah.  Until the black flags come on top of

14   everybody's head and the head flies off, we will see

15   what the joke.

16   RD:   I know right.  I talked to that sister on the

17   phone man.

18   SO:   The one from, that you talked to a couple of

19   days ago?

20   RD:   Yeah, she, um, she wants to get a divorce from

21   her husband man, you know what I mean?

22           (Tape stopped.)

23           MR. MCGOVERN:  And for the record, Your Honor, the

24   Government and the defense have stipulated that the designation

25   "SO" in that transcript is the Defendant, Sami Osmakac, and

1    "RD" is referring to Russell Dennison.

2    BY MR. MCGOVERN:

3    Q.   Sir, during that conversation that we just listened to and

4    read the transcript as it scrolled down, the Defendant, Sami

5    Osmakac, is listed as saying, "Yeah, period, until the black

6    flags come onto top of everybody's head and the heads fly off,

7    we will see what the joke."

8         Do you remember that?

9    A.   Yes, I do.

10   Q.   Sir, can you till us what significance, if any, the use of

11   the term "black flag" in that statement is?

12   A.   I believe this statement is a reference to the idea of the

13   army of the black flags coming out of Afghanistan establishing

14   Islamic rule and establishing Sharia law.

15            MR. PETER TRAGOS:  Object to speculation.

16            THE COURT:  Overruled.

17            THE WITNESS:  Anyone who was in violation of certain

18   Sharia principles or who is a trader to Islam, under certain

19   jurisprudence, would have their heads chopped off.  So this

20   seems to be the connotation here when the Islamic calafate is

21   reestablished, when the army of the black flags comes and when

22   Sharia is established.

23   BY MR. MCGOVERN:

24   Q.   Thank you.

25        Sir, are you familiar with Inspire Magazine?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1  A.    Yes.

2  Q.    What is Inspire Magazine, generally?

3  A.    Inspire Magazine is an English language magazine, the

4  official English language magazine of Al-Qaeda in the Arabian

5  Peninsula or Al-Qaeda in Yemen.  It was first published in

6  2010.  The purpose of Inspire Magazine is to assist individuals

7  living in the west who speak English in terms of radicalizing

8  themselves and training themselves to become jihadists.

9  Q.    How is this magazine released?

10  A.    It is released -- it is originally released by a series of

11  online messaging boards that are run on behalf of Al-Qaeda.

12  The magazine is posted on there in encrypted format and the

13  encryption password is posted and then others are expected to

14  download this magazine unencrypted and then help disseminate it

15  to others at large.

16  Q.    Over the years, have you acquired this magazine?

17  A.    Yes.  I have every single copy of Inspire Magazine.

18        MR. MCGOVERN:  Your Honor, at this time, the

19  Government would ask that Government Exhibit Number 161.1-A,

20  described as a clip of a phone call between Russell Dennison

21  and Sami Osmakac on January 18th, 2011, with the accompanying

22  transcript marked as Government's Exhibit 161.1-B, be played.

23        (Tape played.)

24  RD:    Assalamu 'Alaykum [Peace be upon you]

25  SO:    Wa 'alaykum assalam [And peace be upon

1  you].

2  RD:   What's up?

3  SO:   Alhamdulillah [Praise be to God].   Hey, you on

4  the computer?

5  RD:   Yeah.

6  SO:   Go on the page that I always go, you know

7  what I'm talking about?

8  RD:   Yeah.   Alright.

9  SO:   Ok.   What do you see, the second?   Not the

10  one with big letters, the one in smaller letters, you see

11  the ruling?

12  RD:   Yeah yeah I know about that.

13  SO:   You read that?

14  RD:   I didn't read it yet but…

15  SO:   Oh you better read it, it's by the sheik.

16  RD:   It just got released yesterday, I got the whole

17  thing.

18  SO:   (UI) by the sheik, (UI), I just read it, I just

19  logged in, I'm like (UI) yo, it's what I've been talking

20  about, it's what I've been thinking

21  RD:   Yeah well I mean, that's actually….

22  SO:   I been saying it's halal [permissible]

23  RD:   Yeah I know.   I didn't finish reading it, I didn't

24  finish, listen, we don't have to convince anybody of

25  anything cuz trust me.   Nobody…nobody studies their

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   deen [religion] whatsoever.  You know what I mean?
 2   SO:    Yep.
 3   RD:    It's like….it's like, um, say you're in college and
 4   you try to go down to like the elementary school,
 5   they're not going to understand what you're saying.
 6   No I didn't read the whole article but I have the whole
 7   thing.  You know what it's from right?
 8   SO:    Yeah.
 9   RD:    Yeah it's from the…I got the whole thing, it just
10   came out last night.  I got it.
11   SO:    Yeah.
12   RD:    But, um, this one's number 4.  This is the 4th
13   one.  What's it called, yo, listen, go to my blog and
14   read the top article I put out last night.
15   SO:    Mmmmm…..eh…..
16   RD:    (UI) man, when you read that, you're going to
17   be like, oohh, you're going to be like (UI), a very
18   beautiful article.
19   SO:    It's (UI) you know what?
20   RD:    Yeah, you know what….you know how to find
21   it.
22   SO:    Yeah I haven't been on there for awhile
23   though.  I'll find it, Insha' Allah [God willing]
24   RD:    Alright look, I just put up a article last night I put
25   it up and it's actually from the number 2.  Now I read it
```

| | |
|---|---|
| 1 | awhile ago and I was like, yo, this is like the best |
| 2 | article.  Because last night I was thinking, oohh, I got |
| 3 | to put this up.  So it makes….it's kind of long but |
| 4 | listen, man, forget everything else and go and read |
| 5 | that article right now. |
| 6 | SO:   I will, Insha' Allah [God willing], right now. |
| 7 | RD:   Cuz that brother is with the Sheik. |
| 8 | SO:   I'll read it, Insha' Allah [God willing]. |
| 9 | RD:   So check that out and get at me.  What's going |
| 10 | on tomorrow? |
| 11 | SO:   I don't know yet. |
| 12 | RD:   Alright, well look…. |
| 13 | SO:   I go to work, I guess, at 4:30. |
| 14 | RD:   Alright, well no doubt, maybe if you want to go |
| 15 | out tomorrow night for an hour, whatever, just give me |
| 16 | a call alright? |
| 17 | SO:   Ok, Insha' Allah [God willing]. |
| 18 | (Tape concluded.) |
| 19 | BY MR. MCGOVERN: |
| 20 | Q.   Sir, are you familiar with the discovery in this case? |
| 21 | A.   Yes. |
| 22 | Q.   Have you reviewed all the discovery in this case? |
| 23 | A.   Everything that was provided to me, yes. |
| 24 | Q.   Previously, you've had an opportunity to listen to this |
| 25 | recording and the transcripts that accompany it; is that right? |

1   A.    Yes.

2   Q.    Given your understanding of the discovery in this case and

3   your experience, are you able to determine what Russell

4   Dennison and Sami Osmakac are discussing during this

5   conversation?

6   A.    I believe I am.

7   Q.    Sir, why do you believe that you are able to determine

8   that?

9   A.    Based on, number one, the dates -- specific dates they're

10  discussing, number two, the specific content of the items

11  they're discussing, and number three, the reference to Mr.

12  Dennison's blog and a specific item that was posted on his blog

13  in January of 2011 that was related to what they were looking

14  at.

15  Q.    Sir, based on your experience, what is it that they were

16  looking at or talking about?

17  A.    It appears that they're talking about the release of

18  Inspire Magazine, number four, which was released on

19  January 16th 2011, two days before this conversation took

20  place.  They also reference Inspire Magazine, number two, which

21  was released in mid October of 2010, about three months before

22  this conversation took place.

23  Q.    Sir, how do you know that the Inspire Magazine was

24  released two days before this conversation?

25  A.    Because of the fact that I personally downloaded it and

CLAUDIA SPANGLER—FRY   OFFICIAL U. S. COURT REPORTER

1  acquired it the moment it was released online.

2  Q.   Sir, during this conversation, there's a reference to,

3  quote, not the big letters, the smaller letters.  Do you have

4  an understanding of what that was?

5  A.   Yes.  After examining the cover of Inspire Magazine,

6  number four, and looking at the titling on that cover of the

7  magazine, I believe I was able to identify the specific article

8  that was being referenced by Mr. Osmakac and by Mr. Dennison.

9          MR. MCGOVERN:  May I have a moment, Your Honor?

10          THE COURT:  Yes, sir.

11          (Brief pause.)

12          MR. MCGOVERN:  Your Honor, if I might, the Government

13  is going to move to have Exhibit 160-A marked for

14  identification, however, I understand that the defense would

15  like to speak sidebar regarding that.

16          THE COURT:  Yes, sir.

17          (Thereupon, the following discussion was had at

18  sidebar:)

19          MR. PETER TRAGOS:  Judge, we'll be objecting to the

20  covers because Mr. Kohlmann has made this statement that it's

21  possible to just get the articles and listen to it.  The

22  transcript talks about specific articles in the Inspire

23  Magazine.  Dennison says he has the entire magazine, but Sami

24  Osmakac says he read a specific article and he's going to go

25  ahead to Dennison's blog to read the specific article that

1    Dennison posted, not the entire magazine.

2            MR. MCGOVERN:  The contents of the conversation

3    between the two individuals, Your Honor, is that, have you seen

4    the magazine, not the big letters, the small letters.  That's

5    the specific article that they're referring to.  And

6    Mr. Kohlmann will be able to identify this as the Inspire

7    Magazine that was released January 16th 2011.

8            THE COURT:  May I see the --

9            Mr. Kohlmann, the question was, during the

10   conversation, there's a reference to, quote, not the big

11   letters, the small letters.

12           Do you have an understanding of what that was?  Can

13   you tell me if you have an understanding of what that is?

14           THE WITNESS:  I believe I do, Your Honor.

15           THE COURT:  What is that understanding?

16           THE WITNESS:  I believe it's a reference to a

17   particular article or sermon by Shaykh Anwar al-Awlaki which

18   was headlined onto that Inspire Magazine, the cover.

19           THE COURT:  What is the reference to big letters and

20   small letters?

21           THE WITNESS:  The subtitle.  There's a subtitle, I

22   believe, underneath it.

23           THE COURT:  Underneath what?

24           THE WITNESS:  The main title, Your Honor.  There's a

25   subtitle of articles written in smaller letters.

```
 1              THE COURT:  So the big letters would be where?
 2              THE WITNESS:  I believe the big letters are referring
 3    to Inspire Magazine at the top, and the main subtitle are
 4    underneath it in smaller letters.  It's specifically referenced
 5    in the conversation, Your Honor, the article by the Shaykh.
 6    And there's only one person who goes or would be referred to
 7    that whose article is written in small letters on the cover of
 8    the magazine.
 9              THE COURT:  Okay.  Overruled.
10              (Thereupon, the sidebar conference concluded.)
11              MR. MCGOVERN:  Your Honor, 160-A has been marked for
12    identification.  The Government would move it in evidence?
13              THE COURT:  Be received.
14              (Thereupon, Government's Exhibit 160-A was received
15    and filed in evidence.)
16    BY MR. MCGOVERN:
17    Q.   Would you display 160-A for the witness?
18         Mr. Kohlmann, do you see what's on the screen in front of
19    you?
20    A.   Yes.
21    Q.   Have you ever seen that before?
22    A.   Yes.
23    Q.   What is that?
24    A.   This is the cover of Inspire Magazine, issue number four,
25    released onto January 16th 2011.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    Q.    In the conversation between Russell Dennison and Sami

2    Osmakac, they talked about an article.  Were you ever able to

3    determine what article they were referring to?

4    A.    I believe I do, yes.

5    Q.    How are you able to determine that?

6    A.    Based on the fact that there was a specific reference to

7    the Shaykh, which in the context of the conversation taking

8    place, appeared to be a reference to Shaykh Anwar al-Awlaki and

9    also the description of the small lettering underneath the big

10   lettering.  And in this case, the small lettering underneath

11   the big lettering, it reads, "Is it halal to dispossess the

12   wealth and disbelievers in America and other western countries.

13   Shaykh Anwar al-Awlaki explains the Islamic ruling."

14         Based on the description, I believe this is the text that

15   they were referring to.

16   Q.    Sir, are you familiar with the specific article that's

17   referenced in small letters to the bottom right-hand side of

18   that article or the front cover of the magazine?

19   A.    Yes.

20   Q.    What is that article about?

21   A.    This is an article by Shaykh Anwar al-Awlaki which argues

22   that Muslims living in western countries have the right, the

23   religious right to steal money or take money without cause from

24   non Muslims as a way to raise money for the Islamic causes.

25         In other words, if you want to support jihad, it's

1    perfectly permissible in the view of Shaykh Anwar al-Awlaki to

2    steal money from Americans and other westerners in order to

3    fund that jihad or other Islamic causes.

4    Q.    Sir, I'd like to direct your attention to Government

5    Exhibit Number 162.1-A, an audio recording, and 162.1-B, that's

6    .1-B, which is a transcript accompanying that recording.  The

7    recording is described as a telephone call between Russell

8    Dennison and Sami Osmakac on the following day, January 19th of

9    2011.

10        Would you please play the call.

11            (Tape played.)

12   SO:   OK I wasn't sure, I had to pay some, I had to

13   fix my car at the (UI) from work.

14   RD:   Oh yeah.

15   SO:   It wouldn't start.  So I bought some oil, gas

16   where the spark plugs are.  It broke the spark plugs

17   the…the wires for spark plugs some other stuff and I

18   have to get the whole done, like a hundred bucks.

19   RD:   Hmm. That's what you do if stuff happens, you

20   know.

21   SO:   Yeah.  I mean it's been giving me problems for

22   a while dude.  I used to think it was the starter.  I used

23   to complain cause he used to be like yo, I got the

24   starter fixed, so many times but then he told me it's

25   not the starter.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
1    RD:    Mmm.

2    SO:    Alhamdulillah [Praise be to God].  Yeah I read

3    that thing yesterday man.

4    RD:    What do you think?

5    SO:    It's on the, it's on the check right.

6    RD:    Yeah.

7    SO:    Yeah I read it.  That was beautiful man.

8    RD:    I told you man, I was like subhanallah [glory to

9    God] man.

10   SO:    Subhanallah [Glory to God] they told you that

11   you just put your trust in Allah [God].  He's out again,

12   you see.  Allah [God] just wants to test them, man.

13   He's out again, you see.  He ended up there, they

14   ended up getting, you know, and then he ended up.

15   RD:    Yeah, yeah, yeah I know.

16   SO:    You know, and then again (UI) if Allah [God]

17   has something decreed for you, it'll happen.  You just

18   put your trust in Allah [God] and do your efforts.  Just

19   like that man.

20   RD:    Yeah because uhm yeah man yo.  As soon as I

21   read it someone emailed me on my YouTube like oh

22   thank you so much you know like.  Like I just read that

23   and like aww they're like man you know.

24   SO:    Yeah that was some good stuff.

25   RD:    Cause that stuff affects people man.  I knew
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   when I put it up, because all of a sudden it was like a

2   miracle from Allah [God].  Like all of sudden, like all of

3   a sudden that like popped in my head like that article.

4   I was like yo.

5   SO:   Alhamdulillah [Praise be to God]. Alhamdulillah

6   [Praise be to God].

7   RD:   Yeah man so it took me forever to fix it to get it

8   ready, but yeah, man, I was like, man.  Like after I

9   read it, I was like, what?  I was like uh this gonna

10  make people go crazy.

11  SO:   That stuff was beautiful, Allahu akbar [God is

12  great].

13  RD:   I know, that's like the kind of stuff you gotta

14  read over and over like every day, you know like this

15  is how it is man.

16  SO:   Yeah, it is, that's how it is.

17  RD:   Imagine that bro, imagine that brother's reward

18  for his patience.

19  SO:   Yeah.  Insha'Allah [God willing].  Insha'Allah

20  [God willing].  He be very patient till the end.

21  RD:   I man it's like, I tell myself whenever I get down

22  or I feel like I'm stressed or I can't figure something

23  out.  I'm like yo, it's just this world that we live in man.

24  It's just, it's just one big test you know.

25  SO:   Yeah, that's true.  Big test man.  If we do

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   something ahead of what Allah [God] had decreed

 2   that would change his plan.  That's never going to

 3   happen.

 4   RD:   Exactly, exactly.  You have to really think about

 5   it like, is it able, like, am I able to do my own thing.

 6   Like is it possible for me to like, for me to do what I

 7   feel like doing.  I guess that's not even the best way to

 8   word it.  I think it's like this like, is it possible for you

 9   to

10   do anything that it wasn't written for you to do.

11   SO:   Exactly.

12   RD:   I mean, do you have any choice in the matter.

13   I mean any choice to go against what is already

14   decreed for you.

15   SO:   No.

16   RD:   Absolutely, it's impossible.

17   SO:   Exactly cause if you do then that means not

18   everything is ruled by Allah's plan and that's

19   impossible because everything is decreed by Allah

20   [God].

21   RD:   I know.

22   SO:   Everything goes according to his plan,

23   smoothly.

24   RD:   So when you think like that, when you really

25   think like that and you believe that, how could you
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1   really stress anything?

 2   SO:    Yep.

 3   RD:    But you have to constantly remind yourself of

 4   this, cause you don't wake up thinking this stuff, you

 5   don't go to bed thinking it cause you don't see

 6   anything that reminds you of it.

 7   SO:    Exactly.

 8   RD:    That's why you have stick to these statements.

 9   You know you have to.

10   SO:    Exactly.

11   RD:    Without 'em, go crazy.

12   SO:    Exactly man, subhanallah [glory to God].

13   RD:    That's why I wrote, that's why I felt that article

14   was really beautiful and I was like this is, I was like, I

15   was thinking I was like you know this is a real

16   inspiration for anybody.  No matter what you're going

17   through, no matter what level you're on.  Plus another

18   thing articles like that do is.

19   SO:    Can reach anyone.

20   RD:    Yo, the articles like that, another thing that they

21   do is, they show people who don't really know the

22   truth, it shows them what the truth is.

23   SO:    Huh.

24   RD:    Because when you read that its undeniable.

25   SO:    (UI) Insha'Allah [God willing].  If not, I come
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

| | |
|---|---|
| 1 | back here. |
| 2 | RD:   Nah, did you hear what I said? |
| 3 | SO:   Yeah what was the last part? |
| 4 | RD:   No another thing is that articles like that, what it |
| 5 | does is that people who don't know the truth or |
| 6 | against the truth or they just confused.   When you |
| 7 | read something like that, it, it, you it, it wakes them |
| 8 | up. |
| 9 | SO:   Yeah, yeah. |
| 10 | RD:   Like oh, you know like its undeniable you |
| 11 | know. |
| 12 | SO:   Yeah. |
| 13 | RD:   Forget about like the knowledge you think you |
| 14 | have it's about like, what you follow you know.   Your |
| 15 | struggle. |
| 16 | SO:   Yep.  Yeah you read the thing. |
| 17 | RD:   Yeah by the Sheik? |
| 18 | SO:   Yeah.  It was beautiful. |
| 19 | RD:   Yeah I read it.  But it wasn't anything that really |
| 20 | affected me it's like it's kind of like stuff that I kind of |
| 21 | already figured, you know.  It wasn't like oh like it |
| 22 | didn't even really, honestly man it didn't even really |
| 23 | increase my Iman [faith] or anything it was just like |
| 24 | information. |
| 25 | SO:   No it (UI) Iman [faith] [UI] kuffar [infidels]. |

```
 1   RD:   Alright well look just get on me later man.

 2   Don't even, I'm even tired of talking on the phone

 3   man, seriously these people man they just, they're so

 4   annoying man.  They need to get a life man.

 5   SO:   Ok Insha'Allah [God willing].

 6   RD:   You know what I mean, they want to know

 7   something they can come and talk to you.  You know

 8   what I mean.  Trying to invade your privacy and all

 9   that other stuff, you know what I mean.

10   SO:   Yeah.

11   RD:   Look if you want to get off for an hour then you

12   come pick me up.

13   SO:   Yeah I'm tired I just want to go pay him the

14   money.

15   RD:   Alright, just give me a call tomorrow,

16   Insha'Allah [God willing] Ok.

17            (Tape concluded.)

18   BY MR. MCGOVERN:

19   Q.   Sir, one final thing on these calls.  You initially

20   referred to -- made reference to Inspire Magazine, number two.

21   A.   That's correct.

22   Q.   What specific article, if you were able to tell, were they

23   talking about in Inspire Magazine, number two?

24   A.   They were discussing the biography of a Saudi Al-Qaeda

25   operative named Al-Ghamdi, A-L  G-H-A-M-D-I.  This was
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    subsequently posted on Mr. Dennison's blog, exactly the timing

2    he described.  The biography describes how this Saudi Al-Qaeda

3    operative went to Afghanistan and to fight against U. S.

4    forces, was captured, was sent to Guantanamo Bay, was held as

5    an enemy combatant in Guantanamo Bay for several years, then

6    was returned back to Saudi Arabia and then jumped back over to

7    Yemen and rejoined Al-Qaeda in the Arabian Peninsula.

8         So it was meant to be an inspirational story about the

9    life of an Al-Qaeda operative and how he had stuck with it

10   through all ends.

11             MR. MCGOVERN:  With your permission, Your Honor, the

12   Government would move to mark Government's Exhibit 160-B into

13   evidence and move it into evidence.  This is a copy of the

14   article just referenced by Mr. Kohlmann and it has been shown

15   to the defense.

16             THE COURT:  Be received without objection.

17             MR. PETER TRAGOS:  No objection, Your Honor.

18             (Thereupon, Government's Exhibit 160-B was

19   received and filed in evidence.)

20   BY MR. MCGOVERN:

21   Q.   Sir, in your experience, are you familiar with the term

22   "hijrah?"

23   A.   Yes, sir.

24   Q.   How is that spelled?

25   A.   It's spelled a number of different ways, but generally it

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   is spelled H-I-J-R-A-H.

2   Q.    How are you familiar with the term "hijrah?"

3   A.    It's an essential term within the context of Islam and

4   it's also a term that is used in a similar but not the same

5   context by contemporary violent extremists.

6   Q.    What is the literal definition of the term "hijrah?"

7   A.    Hijrah is an Arabic word which literally means pilgrimage

8   or journey.  It means to take a pilgrimage or journey.

9   Q.    And is this the only definition of the term?

10   A.    No.  Although the traditional definition of a hijrah

11   refers to making a religious journey, a religious pilgrimage

12   such as the pilgrimage to Mecca, the hajj, hijrah, hashijrah

13   also taken on another context.

14        Hijrah has also taken on the context in a particular sect

15   of Muslims, Salafis, S-A-L-A-F-I-S.  It's taken on the meaning

16   also of journeying abroad to participate in Islamic society,

17   including participating in fighting on a front line for Islamic

18   causes.

19   Q.    Sir, when you're reviewing an article or a lecture or

20   wherever this term might be used, how do you determine which

21   definition the author intended?

22   A.    It's entirely in the context.

23   Q.    Sir, I'm directing your attention to Government's Exhibit

24   111, page 21, which is a conversation between the Defendant and

25   the undercover employee.

1    Sir, do you see the exhibit in front of you?

2    A.    Yes.

3    Q.    The second line down starting with the indication of "SO"

4    for Sami Osmakac, "And if he's down, he used to be down back in

5    the day, so if he's down, he's gonna use his credit card.

6    'Cause he want to make "big hijrah."  And in parentheses,

7    migration, close parentheses.

8        Given your understanding of the discovery in this case and

9    that specific reference, are you able to determine to context

10   of the word "big hijrah" and how it's being used in this

11   manner?

12   A.    I believe I can.

13   Q.    How can you tell us the difference, sir?

14   A.    I, in the context of the conversation, it's quite clear

15   that there's no discussion about a pilgrimage to mecca, there's

16   no discussion about traveling to Saudi Arabia.  In the context

17   of this conversation, it appears the "big hijrah" refers to the

18   journey to the after life, the journey to paradise.  In other

19   words, making the big journey.

20   Q.    I'd like to direct your attention to Government's Exhibit

21   118, page 26.  Sir, do you -- can you see Government's Exhibit

22   118-B, page 26, in front of you?

23   A.    Yes, I can.

24   Q.    At the top of the page, the undercover employee is

25   speaking, "You hold it, you flip the switch.  Once you put the

1    battery in it, period, it's going to be ready."

2        THE DEFENDANT:  "That's then, period."

3        THE UNDERCOVER EMPLOYEE:   "Once you put the battery in,

4    it's going to be ready."

5        THE DEFENDANT:  "Yeah."

6        The undercover employee says, "Flip the switch."

7        And Sami Osmakac responds, "Hijrah, inshallah."

8        The manner in which the term "hijrah" is being used in

9    this instance, are you able to determine its meaning?

10   A.   I believe so, yes.

11   Q.   How are you able to determine its meaning?

12   A.   Well, once again, there's no discussion of taking a trip

13   to Saudi Arabia to go on the hajj, there's no discussion of

14   mecca, there's no discussion of visiting a religious site.  In

15   this context, it does appear that this is talking about the

16   "big hijrah," in other words, journeying to paradise, going to

17   the after life.

18   Q.   When you say "journey to paradise," do you mean death?

19   A.   Death, yes.  In Islam, if you are martyred to the cause of

20   it, the Islamic cause, you are supposedly immediately given

21   entrance to paradise, to the after life.

22   Q.   I'd like to direct your attention to Government's Exhibit

23   118-B, page 14.

24       Sir, can you see the exhibit in front of you?

25   A.   I can.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1    Q.    Again, this is the conversation between the Defendant and
 2    the undercover employee.  The third line down, the Defendant
 3    states, "The plane, some, they -- they fly some big ones.
 4    There was some Muslim Arabs, they made hijrah from Germany to
 5    Afghanistan.  One of the two brothers.  He was one of them
 6    released a statement, just a couple days ago."
 7          The term "hijrah" is used in that statement.  Are you able
 8    to determine how it was to be interpreted?
 9    A.    Yes.
10    Q.    How should we interpret that statement?
11    A.    In this case, it appears to be referring to making a
12    journey to a front line, to an Islamic front line.
13    Q.    Which is different than the two contexts that we just saw
14    before this?
15    A.    That's correct.
16    Q.    Sir, are you familiar with the individual identified as
17    Aafia Siddiqui?
18    A.    Yes.
19    Q.    Did I pronounce that correctly?
20    A.    You did.
21    Q.    Would you spell it for the Court?
22    A.    Sure.  Dr. Aafia Siddiqui, A-A-F-I-A  S-I-D-D-I-Q-U-I.
23    Q.    Sir, in your experience, who is Aafia Siddiqui?
24    A.    Dr. Aafia Siddiqui is a former Boston residence, a neuro
25    scientist, who has been convicted of providing material support
```

```
 1   to terrorist organizations, namely Al-Qaeda.

 2   Q.    In your review of the discovery in this case, do you

 3   recall whether or not that person is identified.

 4   A.    I recall, yes.  I recall at least one if not multiple

 5   instances of Dr. Aafia Siddiqui's name being referenced.

 6   Q.    Sir, in your discovery -- review of the discovery in this

 7   case, did you come across a reference to German brothers?

 8   A.    Yes.

 9   Q.    Are you familiar with who those German brothers are?

10   A.    I believe I am, yes.

11   Q.    Would you identify them for us?

12   A.    Yes.  German nationals, Yassin and Mounir Choucka.  Yassin

13   is Y-A-S-S-I-N and Mounir is M-O-U-N-I-R and Choucka is

14   C-H-O-U-C-K-A.

15   Q.    Are you indicating that those two brothers are known by

16   two names each?

17   A.    Actually, those are their real names.  They are also known

18   by Cunyas or pseudonyms.  The pseudonyms are Abu Ibrahim and

19   Abu Adam.  Abu Adam is written just like Adam, so it's like Abu

20   Ibrahim, Abu Adam.

21   Q.    How are you familiar with these individuals?

22   A.    These individuals are fairly well known in the context of

23   contemporary violent extremist groups.  They recorded a number

24   of videos in Afghanistan or in Pakistan with a group called the

25   German Taliban Mujahideen, which is a sub unit of another
```

1    organization known as the Islamic Movement of Uzbekistan, which

2    is an Al-Qaeda and Taliban ally in the northwest reaches of

3    Pakistan.

4         They recorded a number of video recordings that were

5    actually recorded in German, which include statements, video

6    statements and audio statements in German which were directed

7    both at the enemies of Al-Qaeda and the IMU, as well as those

8    who might support Al-Qaeda and the IMU.

9    Q.   How many videos that were produced were released by these

10   individuals are you aware of?

11   A.   I'm aware of at least two to three different videos and at

12   least one audio recording.

13   Q.   Sir, I'd like to direct your attention to Government's

14   Exhibit 118-B, pages 15 and 16.

15        Sir, at the bottom of the page, a conversation begins

16   which carries over to the next page.  At the bottom, Sami

17   Osmakac states, "Far away from the battlefield, nowhere near

18   the battlefield, there's two types of terrorism, really.  One

19   they do cowardly, terrorism from planes."  The UCE remarks,

20   "Uh-huh."  Sami Osmakac continues, "And one praise worthy.  The

21   one to terrorize the enemies of Allah, like one Shaykh says, do

22   the planes fly in the sky" --

23             THE COURT:  Requote that.

24             MR. MCGOVERN:  I'm sorry?

25             THE COURT:  That's not what it says.

1   BY MR. MCGOVERN:

2   Q.   I'm sorry.  "Like one Shaykh said, do the planes in the

3   sky, they fly above the thrown of Allah, or below the thrown

4   Allah."

5        Are you familiar with the quoted remarks stated by the

6   Defendant?

7   A.   Yes.

8   Q.   Have you ever seen them before?

9   A.   Yes.

10  Q.   Where have you seen them?

11  A.   They were stated by Mounir Choucka in an audio recording

12  released by the IMU titled -- it was in German, but the English

13  translation of the title is "*On to Success*."

14  Q.   Have you reviewed "*On To Success*?"

15  A.   Yes.

16  Q.   Is that an audio or video recording?

17  A.   It is an audio recording.  It was later rereleased on

18  YouTube as a video, but it was originally recorded as an audio.

19  Q.   So the specific quotation that we read about the planes,

20  in your experience, have you seen that particular quotation

21  attributed to any other person?

22  A.   I haven't seen this in any other piece of propaganda that

23  I've seen, no.

24  Q.   Have you ever seen it in materials that were released by

25  anybody?

1    A.   Not that I've seen, no.

2    Q.   I'd like to direct your attention to Government's Exhibit

3    118-B on 41 -- page 41.

4         Sir, on 118-B, page 41, the Defendant is speaking with the

5    undercover employee.  The Defendant specifically says, "Kuffar,

6    man, that's when, when the Sharia comes, we're gonna see how...

7    Yeah those, those Muslim brothers from Germany and Afghanistan,

8    they said, and right now Islam is merciful, but there's a time

9    have mercy, there's a time of war."

10        "They said, right now, we shouldn't have one drop of mercy

11   for them.  Not one drop, if you do, there's something wrong

12   with your" -- forgive me -- "aquida." "So there's no mercy,

13   it's like they -- they just shoot drone attacks after they kill

14   Shaykh Anwar al-Awlaki in Yemen."

15        Sir, are you familiar with that -- anything remarked by

16   the Defendant in that statement that I read?

17   A.   Yes.

18   Q.   What is it that you're familiar with?

19   A.   I believe they're actually almost verbatim quotes from the

20   Mounir Choucka audio recording on Success.  Specifically, I

21   look at when he says, "We shouldn't have one drop of mercy for

22   them" and talking about the time of war and there's something

23   wrong with your aquida, this is almost verbatim out of the

24   section of "*On to Success*."

25   Q.   So have you ever seen the quoted remarks in any other

1    resource distributed?

2    A.    Not just like this, no, no.

3    Q.    I'd like to direct your attention --

4              MR. MCGOVERN:  And Your Honor, this is the --

5              THE COURT:  I don't understand what that means, "not

6    like this."

7              THE WITNESS:  Your Honor, I've seen other people

8    questioning some of the aquida.  I've seen other people talking

9    about not having mercy.  But the specific order of how it was

10   said and the specific way it was said, it's very strongly

11   reminiscent to me, after watching almost every video released

12   by these squibs, is very strongly reminiscent to me of this

13   particular video.  I notice the parallel quite strongly.

14             THE COURT:  All right.

15   BY MR. MCGOVERN:

16   Q.    Following that conversation on page 41, the Defendant

17   remarks, "So they shot down" -- I'm sorry -- "So they shoot

18   drone attacks in Waziristan.  That's the most hot area in

19   Afghanistan Pakistan Border. Seven, they killed 17 of us.  Like

20   we had to gather the pieces, 50 of us..."

21        The undercover employee responds, "Uh-huh."

22        And the Defendant then responds, "And had to, 17 or 37, I

23   think, God knows.  So we had to dig all the graves and gather

24   all the pieces.  It took us a long time.  So, by then, there

25   was nothing but Aman.  'Cause all the pieces smelled so

1   beautiful, you know what I mean, right?  The musk?"

2        So are you familiar with that statement?

3   A.   I'm familiar with what's being described there, yes.

4   Q.   How are you familiar with that?

5   A.   Once again, this is almost verbatim retelling of what

6   happened or what was said by Mounir Choucka in the audio

7   recording "*On to Success*."  There are small differences in the

8   numbers, I think he may have gotten the 50 and the 17 wrong,

9   but Mounir Choucka describes exactly this, having recovered

10  bodies of approximately 50 individuals --

11             MR. PETER TRAGOS:  Object, Your Honor, speculation.

12             THE COURT:  Overruled.

13             THE WITNESS:  -- describing how they were recovering

14  the bodies of approximately 50 individuals who were killed in a

15  drone strike in Waziristan, how the bodies were in pieces and

16  we had to dig all the pieces up, and it took a long time.  It's

17  almost a verbatim mimicking of exactly what is in that audio

18  recording.

19  BY MR. MCGOVERN:

20  Q.   Sir, in your experience, have you seen this particular

21  description of events released in any other market?

22  A.   The only description I've seen that even comes close to

23  this would be what Mounir Chouka said in "*On To Success*".

24  Q.   And lastly, I'd like to direct your attention to

25  Government's Exhibit 124-B, page two.

1      Sir, in front of you is 124-B, page two.  In the middle of

2   the page that's before you, it starts out, "Allah, Allah."

3           MR. MCGOVERN:  Were you able to determine who's

4   talking at this point?

5           MS. SWEENEY:  It's the Defendant.

6           MR. MCGOVERN:  Your Honor, indicating that this is a

7   statement of the Defendant before the page was enlarged to

8   accommodate this one paragraph.

9   BY MR. MCGOVERN:

10  Q.   The middle paragraph, "Allah, Allah.  This is not World

11  War I, World War II.  This is not World War III: this is not

12  World War IV.  This is jihad until the next day.  This is jihad

13  until the next day.  This is jihad until the next day, so wake

14  up.  Stop with this Kurdistan, Turkey, Albania, Kosovo, Bosnia,

15  Afghanistan thing."

16      Sir, are you familiar with that statement?

17  A.   Yes.

18  Q.   Have you ever seen it before?

19  A.   Yes.

20  Q.   Where have you seen it?

21  A.   Mounir Chouka said almost exactly the same thing in "*On to*

22  *Success*".  It's obviously speaking in German.  He said, "This

23  is not the First World War, this is not the Second World War,

24  this is not the Third World War."  This is a very unusual

25  statement.  I've never seen this statement before in any other

1    piece of propaganda other than the audio recording "_On to_

2    _Success_" recorded by Mounir Choucka.

3    Q.   Thank you.

4         Sir, I'd like to talk to you about a website called

5    unjustmedia.com.

6         In your review of the materials in this case, did you come

7    across that site?

8    A.   I did.

9    Q.   Could you give us a brief description of what that site

10   is?

11   A.   Yes.  The unjustmedia.com is an English language website

12   on the Internet.  It operates like a blog, and it provides

13   direct --

14            THE COURT:  I'm sorry, let's stop there and take the

15   afternoon break for about 15 minutes.

16            (Jury excused from the courtroom.)

17            Court stands in recess for 15 minutes.

18            (Brief recess.)

19            Are counsel ready to proceed?

20            MR. PETER TRAGOS:  Yes, Your Honor.

21            MR. MCGOVERN:  We are.

22            THE COURT:  Please recall the jury.

23            (Jury returned to the courtroom.)

24            Counsel, you may proceed.

25            MR. MCGOVERN:  Thank you, Your Honor.  I just have a

```
 1    few more moments.
 2    BY MR. MCGOVERN:
 3    Q.   Mr. Kohlmann, I'd like for you to take a look at what's
 4    been marked as Government's Exhibit 118, page 11, which should
 5    be on the screen before you.
 6         This is a transcript of a conversation between the
 7    Defendant and the undercover employee on January 1, 2012.
 8         Sir, at the top of the page, the Defendant states to the
 9    undercover employee, "If you go on the unjust, the
10    unjustmedia.com" -- for the record, that is spelled out.
11         The undercover employee responds, "Yeah."
12         The Defendant states, "And you scroll down, you'll find
13    it.  Have you ever heard of that website?"
14         The UC responds, "Uh-huh."
15         The Defendant states, "That's where, that's the Mujahideen
16    website."
17         The undercover employee responds, "Okay."
18         And the Defendant responds, "All the brothers from
19    Afghanistan saw that.  They post everything, their daily
20    actions.  Like how many kuffar, how many tanks and..."
21         Sir, are you familiar with that statement?
22    A.   Yes, I am.
23    Q.   At the bottom where the Defendant remarks, "They post
24    everything, their daily actions, like how many tanks."
25         Are you familiar with that statement, specifically?
```

1   A.    Yes.

2   Q.    How are you familiar with that?

3   A.    I'm familiar with the statement from having read the

4   transcript.  I'm familiar with the context because I've

5   reviewed the unjustmedia.com on a very frequent basis.

6   Q.    What is the context of that statement?

7   A.    This statement refers to the fact that the people that run

8   the unjustmedia.com have established a direct relationship with

9   the media wing of the Islamic Emirate of Afghanistan.

10          MR. PETER TRAGOS:  Object to speculation and

11  predicate.

12          THE COURT:  Overruled.

13          THE WITNESS:  The unjustmedia.com posted notice on

14  their website indicating that they had established a direct

15  relationship with the Islamic Emirate of Afghanistan, the

16  Taliban.  And the Taliban's official online correspondent, an

17  individual who goes by the name of Zabiullah Mujahid,

18  Z-A-B-I-U-L-L-A-H  M-U-J-A-H-I-D, sends each day to the

19  unjustmedia a tally of exactly how many operations the Taliban

20  have carried out targeting U. S. and coalition forces, how many

21  people they've killed, how many tanks they've destroyed, how

22  many helicopters they've shot down, and these are delivered in

23  the form of short communiques.

24          So there was a battle today in Kandahar and we did

25  this and we did that.  We killed this many occupiers or

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1   infidels.
 2            This information is sent directly to the unjustmedia
 3   by the Taliban and the unjustmedia publishes this information
 4   in English on their website?
 5   Q.   Sir, have you visited that website?
 6   A.   Yes.
 7   Q.   Is that a publicly available site?
 8   A.   Yes.
 9            MR. MCGOVERN:  With your permission, Your Honor, can
10   we switch to the overhead?
11            For the record, Your Honor, the Government is
12   displaying a transcript that has been marked 124-B, which is a
13   transcript of the Defendant's martyrdom video.
14   BY MR. MCGOVERN:
15   Q.   Mr. Kohlmann, can you see that exhibit in front of you?
16   A.   Yes, I can.
17   Q.   Identifying for the record, if you permit me to point at
18   it.
19            THE COURT:  Pull the microphone over to you.
20   BY MR. MCGOVERN:
21   Q.   Specifically in this document, I'm referring to the first
22   main paragraph where the Defendant is speaking.  It starts out,
23   "This is brother, Abdul Sami."  And at the end of that
24   paragraph, the Defendant states, "And this is payback for
25   Shaykh Osama Bin Laden, Rahimullah and Anwar al-Awlaki and his
```

1   son.  May God have mercy on them."

2        Sir, are you familiar with the term or the individual

3   identified as Anwar al-Awlaki?

4   A.   Yes.

5   Q.   Who -- very generally, very specifically, very succinctly,

6   would you tell us who Anwar al-Awlaki is?

7   A.   Shaykh Anwar al-Awlaki was an extremist Yemeni/American

8   cleric who joined Al-Qaeda in the Arabian Peninsula and

9   assisted in the production of Inspire Magazine, their English

10  language magazine on behalf of Al-Qaeda in the Arabian

11  Peninsula, and also recorded video -- audio recordings on their

12  behalf.

13  Q.   Thank you.

14       Are you familiar with his religious beliefs?

15  A.   Yes.

16  Q.   Very succinctly, can you describe his religious beliefs?

17  A.   Yes.  He is from the sect of Islam known as the Salafis

18  jihadiis, S-A-L-A-F-I-S.  This is a reference to individuals

19  who believe that you should revert back to the original

20  conditions of Islam as they were first laid down in the '600s,

21  including a specific focus on violent jihad as a key element of

22  demonstrating your Islamic faith.

23  Q.   And the last thing I'd like to talk to you about,

24  Mr. Kohlmann, is the second page -- strike that -- the third

25  page of the transcript for the martyrdom video.  This goes to a

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    topic we discussed earlier.  Indicating the second paragraph

2    from the bottom -- I'm sorry -- the last paragraph on that page

3    that begins "My beloved brothers in Afghan, Abu Adam and Abu

4    Ibrahim."

5        Are you familiar with those two individuals?

6    A.   Yes.

7    Q.   Have we spoken about them today?

8    A.   Yes.

9    Q.   Briefly, who are they?

10   A.   Abu Adam is Mounir Choucka, a German national, Mounir

11   Choucka, Abu Abrahim is Yassin Chouka, the two German nationals

12   who were featured in video recordings produced on behalf of the

13   German Taliban Mujahideen and the Islamic Movement of

14   Uzbekistan.

15            MR. MCGOVERN:  Your Honor, with your permission, can

16   we switch back?

17            THE COURT:  Yes, sir.

18   BY MR. MCGOVERN:

19   Q.   Mr. Kohlmann, I'd like to show you what's been marked as

20   Government's Exhibit 188, page 14.

21            MS. SWEENEY:  I'm sorry, Mr. McGovern, can you repeat

22   that.

23            MR. MCGOVERN:  188.  Page 14.

24            MS. SWEENEY:  Do you mean 118?

25

```
 1              MR. MCGOVERN:  My mistake, Your Honor, 118, not 188.
 2   BY MR. MCGOVERN:
 3   Q.   Just circling back and talking about the German brothers
 4   who we discussed earlier, Mr. Kohlmann, can you see the Exhibit
 5   118-B, page 44, in front of you?
 6   A.   Yes.
 7   Q.   One second please.  We're going to switch to 118-B, page
 8   14.  I apologize, I wrote that down incorrectly.
 9        Sir, do you see 118-B, page 14 in front of you?
10   A.   I do.
11   Q.   The Defendant, Sami Osmakac, talks about the planes, we
12   went over that.
13              MR. MCGOVERN:  One moment, Your Honor.
14              (Brief pause.)
15              Your Honor, I don't have the exhibit I'm looking for
16   at the tip of my fingers.
17              That concludes the examination of the witness at this
18   time.
19              THE COURT:  All right.
20              Counsel.
21                        CROSS-EXAMINATION
22   BY MR. PETER TRAGOS:
23   Q.   Afternoon, Mr. Kohlmann.
24   A.   Afternoon.
25   Q.   First thing I want to ask you about is some of the
```

```
 1    translations of the words.  One of the words that you

 2    translated today was hijrah, correct?

 3    A.    Correct.

 4    Q.    First, would you consider yourself fluent in Arabic?

 5    A.    I'm not fluent, but I did study Arabic or religious

 6    vocabularies as part of my degree in Islam.

 7              THE COURT:  Mr. Kohlmann, answer the questions that

 8    are asked.

 9              THE WITNESS:  Excuse me, Your Honor.

10              No, I don't consider myself fluent in Arabic.

11    BY MR. PETER TRAGOS:

12    Q.    And you're not an Arabic expert?

13    A.    No, no, I'm not.

14    Q.    Okay.  Do you remember you reviewed the transcripts in

15    this case?

16    A.    Correct.

17    Q.    You reviewed transcripts between Sami and the confidential

18    human source?

19    A.    Amongst other things, yes.

20    Q.    All of the references to hijrah that the Government asked

21    you to define were with the UCE; is that correct?

22    A.    You mean in the context of conversation with the UCE?

23    Q.    Yes.

24    A.    I believe so, yes.

25    Q.    Okay.  And the dates of those were post November 30th
```

```
 1   2011; is that correct?
 2   A.   I don't recall off the top of my head, but I would take
 3   your affirmation that that's the case.
 4   Q.   Okay.  On November 30th, the CHS and the Defendant had a
 5   meeting.  You remember that meeting?
 6   A.   I believe so, yes.
 7   Q.   Okay.  In that meeting, they spoke about hijrah and Mr.
 8   Osmakac's plan to make hijrah and get a family and children and
 9   learn about Islam.  Do you remember that?
10   A.   I'd have to look at the exact transcript.  If you have it
11   in front, I could --
12   Q.   Would it refresh your recollection to review the
13   transcript?
14   A.   Yes, please.
15            MR. PETER TRAGOS:  May I approach, Your Honor?
16            THE COURT:  Yes, sir.
17            MR. PETER TRAGOS:  This is Government's Exhibit
18   101.4-B.
19            THE COURT:   Just put it -- go ahead.
20            MR. PETER TRAGOS:  Okay.
21            THE WITNESS:  Yes.
22            MR. PETER TRAGOS:  May I retrieve, Your Honor?
23            THE COURT:  You have general leave to approach the
24   witness as necessary.
25            MR. PETER TRAGOS:  Thank you, Your Honor.
```

```
 1   BY MR. PETER TRAGOS:
 2   Q.    Do you remember that conversation, Mr. Kohlmann?
 3   A.    Yes, I do.
 4   Q.    What kind of hijrah is that?
 5   A.    In my estimation, that's making hijrah to go to an Islamic
 6   country.
 7   Q.    Okay.  So that would be one instance where the Defendant
 8   meant it that way?
 9   A.    Well, at least he meant it in the context that he was
10   going to go to an Islamic country.  I don't know the extent of
11   what he intended to do.  In that context, I think he's
12   referring to moving to an Islamic country.
13   Q.    To learn Islam?
14   A.    Among other things, yes, sure.
15   Q.    Does he say among other things?
16   A.    I think he also says he wants to get a wife and some other
17   things like that.
18   Q.    So what kind of hijrah would you say that is?
19   A.    Again, in the absence of other details that would --
20             THE COURT:  Based on the information in front of you,
21   what kind of hijrah would that be, Mr. Kohlmann?
22             THE WITNESS:  Based on that context, it sounds like
23   hijrah to move to an Islamic country.
24   BY MR. PETER TRAGOS:
25   Q.    Okay.  Let's talk a little bit about your experience.
```

1   Have you done any investigations on terrorist suspects?

2   A.   You'd have to be more specific than that.

3   Q.   Do you have any FBI agency training?

4   A.   No.

5   Q.   Are you an FBI agent?

6   A.   No.

7   Q.   Do you have any psychiatric or medical training?

8   A.   No.

9   Q.   So you've never firsthand been involved in one of these

10  investigations?

11  A.   That's not correct.

12  Q.   Okay.  That's what I was asking, so...

13  A.   No, no, no, I mean what you just said is not correct.  I

14  have been involved in investigations, but not as an FBI agent.

15  Q.   Can you explain your involvement in an ongoing

16  investigation.

17  A.   I can explain it without getting into sensitive details,

18  yes.  I'm asked to review hard drives and other evidence that's

19  been seized from Defendants or that has been collected from

20  Defendants.  I'm asked to review transcripts of covertly

21  recorded materials.  I'm asked to simply provide information

22  about a particular organization.  The limit of what I can do --

23  there is a limit to what I can do because I don't have a

24  security clearance, so I can review materials that are

25  sensitive, but I cannot review materials that are classified.

1    Q.    So that's everything you've done in this case, too?

2    A.    Not in the -- not in the way I did it in this case.  In

3    some cases I work on cases in the investigative phase as well

4    as the judicial phase.  In this case, as far as I'm aware, I

5    was only involved in the judicial phase.

6    Q.    What work that you do is different than the work you did

7    in this case; reviewing the transcripts, getting the

8    information about certain groups and people?

9    A.    Well, if you explain it that generically, it's the same

10   thing, but it varies in different cases, depending on the

11   groups, depending on the people, level of specificity.  It's a

12   wide description, but yeah, that's correct.

13   Q.    Isn't that how you just described it?

14   A.    Like I said, it's a generic description, but it differs

15   from case to case.  And there are differences between the

16   judicial phase in the investigation and the investigative phase

17   in an investigation.

18   Q.    Okay.  In this case, you didn't interview any of the

19   witnesses?

20   A.    Correct, I did not.

21   Q.    Including the Defendant?

22   A.    Correct.

23   Q.    Or the UCE?

24   A.    Correct.

25   Q.    Or the CHS?

```
 1    A.    Correct.

 2    Q.    And you didn't test any of Defendant's computers?

 3    A.    Testing them for what?

 4    Q.    You didn't pull the material off the hard drives?

 5    A.    No, no, no, not me personally, no.

 6    Q.    Okay.  And you didn't test any of the cell phones?

 7    A.    No, no, I don't have training in that.

 8    Q.    Okay.  Did you hear any of these conversations firsthand?

 9    A.    No.  I would have heard them on recordings, but not

10    firsthand.

11    Q.    So you reviewed the audiotapes?

12    A.    Yes.

13    Q.    And you reviewed the transcripts?

14    A.    Correct.

15    Q.    Do you remember what the date was that you reviewed the

16    transcripts?

17    A.    Not offhand.  It was over a period of time within the last

18    year.

19    Q.    When was the last time you reviewed a transcript; how many

20    months ago?

21    A.    Well, I reviewed a transcript yesterday, so yesterday.

22    Q.    Okay.  And was that transcript different than the one you

23    had previously reviewed?

24    A.    There were small differences in the extent that -- where

25    there was a symbol marked phonetic, it would be replaced with
```

1    the Arabic word that actually fits there.  So obviously in the

2    first transcripts, someone didn't know what Rahimullah meant,

3    which means peace be upon him, right, or may Allah have mercy

4    on him.  And that was replaced with -- Rahimullah was replaced

5    with PHs.  I also noticed that Abu Adam, the spelling had been

6    corrected.

7    Q.   Okay.  And do you know if the other transcripts you

8    reviewed previously to yesterday, those were months ago?

9    A.   Within the last few months, yeah.

10   Q.   Okay.  And do you know if those have been revised before

11   trial -- before they've been entered as exhibits?

12   A.   Other than the ones we've spoken of today, I wouldn't have

13   any way of knowing that.

14   Q.   Okay.  The Government asked you on direct if you're paid

15   for your work in this case.  How much have you been paid

16   specifically for this case?

17   A.   Well, so far I haven't been paid anything, but that's

18   because I haven't submitted an invoice yet.

19   Q.   Okay.

20   A.   My hourly rate in this case I believe is $400 an hour.  I

21   have spent a significant number of hours already in terms of

22   drafting my expert report and Pretrial hearings and whatnot.  I

23   haven't done an exact tally of hours, but what I have completed

24   is I've completed an expert report, I've reviewed all the

25   evidence and I'm obviously testifying here, so that would be

```
1    what I would be charging for.
2    Q.    Would it be fair to say it's more than $30,000?
3    A.    No, I would say it's probably less than that.
4    Q.    Okay.  Is it fair to say you've been paid over $1 million
5    over the last 12 years for your work in the FBI and the DOJ and
6    other Government organizations?
7    A.    Well, me and my company, but yes, that's correct, my
8    company, yes.
9    Q.    Okay.  And would it also be fair to say that you've been
10   getting Government grants to do your research and other things
11   that involve terrorism?
12   A.    Yeah, that's true, although not the U. S. Government.
13   Q.    Other Governments, any Government?
14   A.    Yeah, that's true, yes.
15   Q.    Mr. Kohlmann, I believe you said on direct that you've
16   testified in 40 plus trials.
17   A.    I've testified -- this I believe is number 31 in U. S.
18   Federal Court, and I've testified an additional 10 times
19   outside the United States.
20   Q.    Okay.  So that's over 40 trials you've testified for?
21   A.    Correct, yes.
22   Q.    And how many have been for the Government in that case,
23   the prosecution, whatever case?
24   A.    In terms of my work in criminal courts, they have all been
25   for the Government.
```

1  Q.    And how many times have you testified for the defense?

2  A.    Zero.

3  Q.    Okay.  Have you been called a hired hand for the

4  Government before?

5  A.    Have I been called by who?

6  Q.    Have you been called that before to any scholars or

7  Islamic scholars, to your --

8  A.    To my face?

9  Q.    No.  Have you heard of anybody calling you a hired hand

10  for the Government?

11  A.    I've read in magazine articles someone referred to me as

12  that, yeah.

13  Q.    Have you ever been referred to as the Doogie Howser of

14  terrorism that is in the guilty verdict business?

15  A.    Well, I don't know about the guilty verdict business part,

16  but the first part when I was 23 years old and I had started

17  doing this, yes, there was -- I was young, and as a result, FBI

18  agents dubbed me the Doogie Howser of terrorism.

19  Q.    And some scholars have called you more vile names for the

20  work that you do?

21  A.    I don't pay attention to people calling me vile names.

22  Q.    Okay.  But you have been aware that people do call you --

23  A.    It's not significant into my work.  I do attend

24  conferences and I certainly count other scholars' opinions and

25  I take them very --

```
1              THE COURT:  The question is, have you ever heard
2    anybody call you vile names, Mr. Kohlmann?
3              THE WITNESS:  Your Honor, I have heard plenty of
4    people call me vile names, both in a personal level as well as
5    a professional level, but yes.
6    BY MR. PETER TRAGOS:
7    Q.   Thank you.
8         The Inspire Magazine; is it possible to just pull articles
9    from that magazine?
10   A.   It's exceptionally difficult.
11   Q.   But on the transcript, didn't it seem to you that
12   Mr. Dennison had just pulled an article from that?
13   A.   He also described how difficult it was for him to pull the
14   article out, yeah.  The reason is because of the fact that --
15             THE COURT:  Mr. Kohlmann.
16             THE WITNESS:  Excuse me, Your Honor, sorry.
17             THE COURT:  If it's a yes or no question, just answer
18   yes or no.  If the Government wishes for you toto expound or
19   the defense does, they'll ask you to do so.
20             THE WITNESS:  Understood.
21             THE COURT:  So in the context of the transcript, did
22   it appear that Mr. Dennison had pulled an article from Inspire
23   Magazine?
24             THE WITNESS:  Yes, he did.
25             MR. PETER TRAGOS:  Thank you.
```

```
 1              One moment, Your Honor.
 2              (Brief pause.)
 3   BY MR. PETER TRAGOS:
 4   Q.   All right.
 5        Mr. Kohlmann, I've been corrected now on what you
 6   submitted so far before your trial testimony today.  Does
 7   $22,800 sound more reasonable of what you have billed up to
 8   this point?
 9   A.   That sounds more reasonable, yeah.  I would imagine the
10   total would be somewhere less than 30.  It would be edging up
11   toward --
12   Q.   In that range?
13   A.   It would be less than that, but it wouldn't be too far
14   away from that.
15   Q.   Okay.  Next, let's talk about the black flag.  Now,
16   throughout the transcripts, do you remember the first time the
17   black flag was mentioned between the UCE and Mr. Osmakac?
18   A.   Offhand, I couldn't tell you the exact date, no.
19   Q.   Okay.  Do you remember the conversation about Mr. Osmakac
20   asking the UCE what the black flag was for?
21   A.   Yes, I do.
22   Q.   And the UCE said it is for a video?
23   A.   I don't remember exactly how the UCE responded.  You can
24   bring up the transcript, though.
25   Q.   Okay.  We'll come back to that question, Mr. Kohlmann.
```

1          Did you review the martyrdom video in this case?

2    A.   I did.

3    Q.   And was the black flag used in that martyrdom video?

4    A.   I believe there was a black flag in the video, yes.

5    Q.   You also spoke about a black flag with white letters on

6    it, the shahada flag?

7    A.   Yes.

8    Q.   And was there a -- were you able to review the physical

9    evidence in this case?

10   A.   I wasn't given direct access to the physical evidence, no.

11   Q.   Do you know if a black flag with white letters ever came

12   up again in this case?

13   A.   I'm not sure.

14   Q.   Okay.  You testified that one of your specialties was the

15   financial components of extreme organizations.

16   A.   That's correct, yes.

17   Q.   Okay.  And you also talked about how you interviewed

18   Muslim leaders and terrorists overseas.

19   A.   Correct.

20   Q.   Of all those Muslim organizations that you've studied the

21   financial components to, was there any evidence that any of

22   them ever provided financial support to the Defendant in this

23   case?

24   A.   To the Defendant?

25   Q.   Yes.

1    A.    I'm not aware of any, no.

2    Q.    Well, that's one of your specialties, right?

3    A.    That kind of information I'm not usually privy to.  When I

4    say a specialty, I'm aware of organizations when they're

5    engaged in money laundering or they're engaged in funding

6    illicit causes, but very rarely can we tie that down to

7    providing money to a single individual.  It's exceptionally to

8    difficult.  That being said, I don't have any evidence that the

9    organizations I've studied provided money to the Defendant.

10   Q.    So had they, you wouldn't even be able to connect it on a

11   case where you are an expert?

12   A.    It would be very challenging to do so.

13   Q.    Okay.  You also explained about some Muslim figures such

14   as Siddiqui and Anwar al-Awlaki and the German brothers; is

15   that correct?

16   A.    Correct.

17   Q.    Is there any evidence that any of them provided aid or any

18   of their followers provided aid to Mr. Osmakac in this case?

19   A.    Not that I'm aware of.

20   Q.    Well, you did review the transcripts, correct?

21   A.    Yes.  And the evidence that I reviewed, there was no --

22   there didn't appear to be direct support from these individuals

23   to Mr. Osmakac.

24   Q.    Is there any evidence that any terrorist organizations

25   provided him with guns?

```
 1    A.    Not that I'm aware of.

 2    Q.    With telephones?

 3    A.    Not that I'm aware of.

 4    Q.    With rental vans?

 5    A.    Not that I'm aware of.

 6    Q.    With a hotel room?

 7    A.    Not that I'm aware of.

 8    Q.    With any food or gas?

 9    A.    Not that I'm aware of.

10          MR. PETER TRAGOS:  Okay.  One moment, Your Honor.

11          (Brief pause.)

12          I'm sorry, Your Honor, the exhibit is Government's

13    Exhibit 111-B, page nine -- I'm sorry, it's page five of 22 on

14    the Government's Exhibit.

15    BY MR. PETER TRAGOS:

16    Q.    Then also at page six where Mr. Osmakac says, "And the

17    black flag."

18          And the UCE says, "You like."

19          And Mr. Osmakac says, "Yeah, I like."

20          The UCE says, "That was hard."

21          Osmakac says, "Yeah, but what is it for?"

22          The UCE said, "That is hard."

23          Osmakac says, "What is it for?"

24          The UCE says, "I thought, see, first in the beginning."

25          Osmakac says, "Yeah."
```

```
 1        The UCE says, "When the first I heard, I thought it was
 2   for making a video."
 3        Correct?
 4   A.    I'm sorry, what's the question?
 5   Q.    The UCE said that the black flag was for making a video.
 6   A.    He does say that, yes.
 7   Q.    Mr. Osmakac -- that's because Mr. Osmakac asked him what
 8   it was for, correct?
 9   A.    That's correct, yes.
10             MR. PETER TRAGOS:  I have nothing further, Your
11   Honor.
12             (Brief pause.)
13             Your Honor, the defense would request any Jencks
14   material on this witness.
15             MR. MCGOVERN:  Your Honor, for the record, the
16   Government has provided all discovery, including Jencks to the
17   defense in this matter.
18             THE COURT:  All right.
19             Any redirect of this witness?
20             MR. MCGOVERN:  Just briefly, Your Honor.
21                      REDIRECT EXAMINATION
22   BY MR. MCGOVERN:
23   Q.    Mr. Kohlmann, I'd like to direct your attention to
24   Government's Exhibit 124-A.
25             MS. SWEENEY:  I'm sorry, Mr. McGovern, what did you
```

1    say?

2              MR. MCGOVERN:   124-A.

3    BY MR. MCGOVERN:

4    Q.   Sir, do you see what has been marked as 124-A,

5    Government's Exhibit?

6    A.   Yes.

7    Q.   That's already been identified as a picture of the

8    Defendant when the martyrdom video was filmed.  Sir, do you see

9    anywhere in that photograph a black flag?

10   A.   No, you're correct, it's not in this image.

11   Q.   Were you mistaken about that earlier?

12   A.   I was --

13             MR. GEORGE TRAGOS:   Objection.  I'm sorry.

14             MR. PETER TRAGOS:   Objection, Your Honor.

15             THE COURT:   Overruled.

16             THE WITNESS:   I was mistaken, that's correct, sir, I

17   thought the black flag was behind him, but it's not.

18   BY MR. MCGOVERN:

19   Q.   Thank you.

20        Sir, you were asked about grant monies.

21   A.   Yes.

22   Q.   You were asked about grant monies for research and/or

23   work?

24   A.   That's correct.

25   Q.   And you indicated that that came from foreign countries?

```
 1   A.    That's correct.
 2   Q.    What foreign countries offered you grant money?
 3   A.    My company was given a joint grant from the Government of
 4   Canada.   It's a grant known as the Kanishka Grant, K-A-N-I --
 5             THE COURT:  The question was what countries?
 6             THE WITNESS:  Excuse me, Your Honor, Canada.
 7   BY MR. MCGOVERN:
 8   Q.    And for what purpose did Canada provide a grant to you?
 9   A.    To understand the process by which home grown extremists
10   can radicalize primarily using the Internet, violent home grown
11   extremists, otherwise known as Lone Wolves.
12   Q.    And the last thing that the defense cross-examined you on
13   was a reference by the UCE regarding a video.  From your review
14   of the discovery, are you able to determine whether or not the
15   reference to a video meant a YouTube video or a martyrdom
16   video?
17             MR. PETER TRAGOS:  Objection, leading.
18             THE COURT:  Overruled as to leading.
19             THE WITNESS:  I can't.
20             MR. MCGOVERN:  Thank you.
21             THE COURT:  You can remove the image.
22             MR. MCGOVERN:  Nothing further, Your Honor.
23             THE COURT:  Thank you, sir.  You may step down.
24             THE WITNESS:  Thank you, Your Honor.
25             (Witness excused.)
```

```
 1              THE COURT:  Please call your next witness.

 2              MS. SWEENEY:  Your Honor, may I have just a moment to

 3   consult with Mr. Tragos?

 4              THE COURT:  You may.

 5              MS. SWEENEY:  Thank you.

 6              (Brief pause.)

 7              Your Honor, at this time, the Government moves to

 8   admit Government's Exhibit 50-B.

 9              THE COURT:  Is this based on a conversation you had

10   with Mr. Tragos?

11              MS. SWEENEY:  Yes, Your Honor.

12              THE COURT:  I need the jury to step out.

13              (Jury excused.)

14              Yes, ma'am.

15              MS. SWEENEY:  Your Honor, I understand that the

16   defense does not object to stipulating to three pieces of

17   evidence that eliminates the need for a witness.  It's

18   Government's Exhibit 50-B, which is a picture of the hotel room

19   after essentially just showing the items present there after

20   the Defendant's arrest.  Government's Exhibit 14 and

21   Government's Exhibit 19-A, 14 and 19-A are respectively a note

22   with two phone numbers written on it and a cellular telephone.

23              THE COURT:  And the two numbers are what numbers?

24              MS. SWEENEY:  Well, Your Honor, we will call a

25   witness to testify to the analysis of the cell phone in 19-A.
```

```
 1    Actually, I apologize, Your Honor.  The cell phone in 18-A, the
 2    one that the UC gave to the Defendant on the night of his
 3    arrest, these two numbers are programmed into that phone.  One
 4    of them is under the letter A and one of them is under the word
 5    "Cuzz", C-U-Z-Z.  And as to both of these items, the Defendant
 6    makes statements in the UC recordings that he threw them over
 7    the wall from the -- when he was meeting with the UC.
 8              THE COURT:  So Exhibit 50-B is the hotel room,
 9    Exhibit 14 is the phone or is it the piece of paper?
10              MS. SWEENEY:  It is the note, the piece of paper.
11              THE COURT:  And then Exhibit 18-A is the phone?
12              MS. SWEENEY:  No, I'm sorry, Your Honor.  19-A is the
13    phone.  The note relates to Exhibit 18-A.
14              THE COURT:  And 19-A is just a phone?
15              MS. SWEENEY:  Yes, Your Honor.  The Government will
16    offer evidence of phone numbers that were on the phone to show
17    that it was the Defendant's, essentially.
18              THE COURT:  And is the Defendant stipulating to the
19    Government's ability to do that or just to the admission of the
20    phone?
21              MS. SWEENEY:  Just to the admission of the phone.
22              THE COURT:  And so someone else, some forensic person
23    is going to testify as to the content?
24              MS. SWEENEY:  That's correct, Your Honor.
25              THE COURT:  Mr. Tragos?
```

```
 1              MR. GEORGE TRAGOS:  That's correct, Your Honor.  It
 2    eliminates a witness that was just coming in just to say the
 3    agent found the phone in the bushes, and we're going to be
 4    questioning, they found the phone in the bushes.  And this
 5    photo is accurate and so -- and the piece of paper was also
 6    found in the bushes, so they're going to connect it up with
 7    another witness, but the mere finding of them, we don't
 8    question.
 9              THE COURT:  And the photos of the hotel room?
10              MS. SWEENEY:  Yes, we don't question the accuracy of
11    that.
12              THE COURT:  All right.
13              And you have discussed that with the Defendant?
14              MS. SWEENEY:  Yes, I have.
15              THE COURT:  Mr. Osmakac, is that true?
16              THE DEFENDANT:  Yes.
17              THE COURT:  And do you have any objection to the
18    admission of those pieces of evidence?
19              THE DEFENDANT:  No.
20              THE COURT:  All right.
21              Please recall the jury.
22              Anyone promise you anything for that agreement,
23    Mr. Osmakac?
24              THE DEFENDANT:  No.
25              THE COURT:  Anyone threaten you to get you to make
```

1    that agreement?

2              THE DEFENDANT:  No.

3              (Jury returned to the courtroom.)

4              THE COURT:  Is this your last witness, Ms. Sweeney?

5              MS. SWEENEY:  There is one more very short witness,

6    Your Honor, after the next -- I'm sorry, the next witness is

7    Keith Arndt who will testify to the analysis of the cell

8    phones.  The final witness is Jeff Fuller who will testify

9    about the location of the van that the Defendant drove away

10   from the Days Inn.

11             THE COURT:  All right.

12             (Jury in.)

13             Counsel, please call your next witness.

14             MS. SWEENEY:  Your Honor, at this time, the

15   Government moves into evidence exhibits -- Government's

16   Exhibits 50-B, 14 and 19-A.

17             THE COURT:  They'll be received.

18             (Thereupon, Government's Exhibit Numbers 50-B, 14 and

19   19-A were received and filed in evidence.)

20             MS. SWEENEY:  Your Honor, may I display these briefly

21   to the jury?

22             THE COURT:  You may.

23             MS. SWEENEY:  This is Government's Exhibit 50-B.  It

24   is a picture of the hotel room where the Defendant met with the

25   undercover and it shows what it looked like after their meeting

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    on January 7th of 2012.

2              This is Government's Exhibit 14.  It is a piece of

3    paper that was -- with two phone numbers written on it.  That

4    was found in the parking lot adjacent to the Days Inn Hotel on

5    January 8th of 2012.

6              Finally, Exhibit 19-A is a cell phone that was found

7    in the parking lot adjacent to the Days Inn on January 8th of

8    2012.

9              At this time, the Government calls Keith Arndt to the

10   stand.

11   Thereupon,

12                        KEITH ARNDT,

13   After having been duly sworn to tell the truth, the whole truth

14   and nothing but the truth, under penalty of perjury, was

15   examined and testified as follows:

16             THE WITNESS:  Yes, I do.

17             THE CLERK:  Thank you, please be seated.

18             Please state your name and spell your last for the

19   record.

20             THE WITNESS:  Keith Arndt, A-R-N-D-T.

21             THE COURT:  Mr. Arndt, you're under oath.  You must

22   give truthful answers to any questions that are asked.  If you

23   give false answers, you face penalties of perjury, false

24   statement and obstruction of justice.

25             Do you understand that?

```
 1                THE WITNESS:  Yes, Your Honor.

 2                THE COURT:  Wait until counsel completes their

 3    questions before you begin your answer so you're not speaking

 4    over them.  And if you see opposing counsel stand to object,

 5    wait until I rule on the objection before you begin your

 6    answer.

 7                Do you understand that?

 8                THE WITNESS:  Yes, Your Honor.

 9                THE COURT:  Your collar is not properly adjusted.  I

10    don't know if that is your intent, but you might want to

11    address it.  Thank you.

12                Counsel.

13                MS. SWEENEY:  Thank you, Your Honor.

14                         DIRECT EXAMINATION

15    BY MS. SWEENEY:

16    Q.   Sir, who do you work for?

17    A.   The Federal Bureau of Investigation.

18    Q.   And what is your position there?

19    A.   I'm a digital forensic analyst.

20    Q.   What was that last word?

21    A.   I analyze digital forensics.

22    Q.   And how long have you been in that position?

23    A.   I've been doing that for approximately 20 years.

24    Q.   And that whole time, were you with the FBI?

25    A.   Yes.
```

1   Q.   Have you received training in that area?

2   A.   Yes, I have.

3   Q.   In this case, what was your primary role with respect to

4   the evidence we're going to discuss today?

5   A.   I processed several cell phones.

6   Q.   And do you have training specifically on how to process

7   cell phones?

8   A.   Yes, I do.

9   Q.   Can you describe, generally, the process by which you

10  obtain evidence from cell phones?

11  A.   Sure.  The way the process works is a request will come in

12  to our squad that some digital evidence needs to be examined.

13  In this case, it was for several cell phones.  Our supervisor

14  assigns me the task of analyzing these cell phones.  So then

15  the first step, I would go to our evidence room where I check

16  out the cellular phones that need to be examined.  I take them

17  to our lab which is in the same building.  I conduct a physical

18  examination of them.  I label them with an identifying number

19  we use.  And then I will start the process of extracting data

20  from them.

21       For the main tool we use is a -- it's kind of like a

22  computer.  It's called a Cellebrite.  It's an electronic device

23  we attach to the cell phone which then extracts the data from

24  the cell phone.  Each cell phone, depending on the make and

25  model, there's certain data that this will or will not extract.

1          Some cell phones, the only thing it will extract would be

2    perhaps the contact list, maybe the call logs, other cell

3    phones.  It will extract a lot more data to include SMS

4    messages, email messages, things like that.  So each individual

5    phone can be different in what we're able to actually extract

6    from it.

7          So once the data is extracted, then I will burn that

8    information onto a CD or DVD, depending on how much it is.

9    Then also depending on what the investigators may be looking

10   for and what the Cellebrite device is able to extract, we may

11   view the cell phone, and if there's any items on that cell

12   phone that are of interest to the investigators, then we could

13   take pictures of the actual screen to capture that sort of

14   information.

15   Q.   And sir -- I'm sorry.

16   A.   And that finishes the way we do an examination.

17   Q.   The process you just described at the end, viewing it and

18   perhaps taking pictures, that's -- is that in addition to using

19   the Cellebrite equipment?

20   A.   On some phones, the Cellebrite gets some information, and

21   then we may need to take photographs.  But then there's other

22   phones that may not be supported at all, so the Cellebrite

23   isn't even used and everything would be pictures.

24   Q.   And so when you get a cell phone to conduct an exam of it,

25   do you know, factually, where that phone came from?

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

```
 1  A.    No, I don't.
 2  Q.    Sir, I just handed you what's been marked as Government's
 3  Exhibits 17-A and 17-B.  Let's start with 17-B.  What is that?
 4  A.    17-B, this is a portion of the report that the Cellebrite
 5  provides of the data that was extracted from the cell phone.
 6  Q.    And what is Government's Exhibit 17-A?
 7  A.    17-A is a cell phone.  It's a Kyocera cell phone.
 8            THE COURT:  Is that phone on?
 9            THE WITNESS:  No, Your Honor.
10            THE COURT:  You may proceed.
11            MS. SWEENEY:  Thank you, Your Honor.
12  BY MS. SWEENEY:
13  Q.    I'm sorry, Agent.  You were explaining what 17-A is.
14  A.    Yes, it's a Kyocera cell phone.
15  Q.    And is it the cell phone that you analyzed to get the
16  results in 17-B?
17  A.    Yes, it is.
18  Q.    And how can you tell that?
19  A.    On the back of the cell phone, I've placed a sticker that
20  has my initials and date as well as the number I assigned it
21  from my examination.
22  Q.    And did you do that at the time that you examined the
23  phone?
24  A.    Yes, I did.
25  Q.    And are the results in 17 -- is the document in 17-B the
```

```
 1   results of your analysis?

 2   A.   Yes, it is.

 3             MS. SWEENEY:  Your Honor, at this time, the

 4   Government moves Exhibit 17-B into evidence.

 5             MR. GEORGE TRAGOS:  A moment, Your Honor.  Could I

 6   see the exhibit?

 7             THE COURT:  You may.

 8             MR. GEORGE TRAGOS:  You said 17-B?

 9             MS. SWEENEY:  Yes.

10             MR. GEORGE TRAGOS:  May I voir dire on this, Your

11   Honor?

12             THE COURT:  Yes, sir.

13                       VOIR DIRE EXAMINATION

14   BY MR. GEORGE TRAGOS:

15   Q.   This is your report, 17-B, correct?

16   A.   That's correct.

17   Q.   And you've got some statuses here.  Does that mean that

18   the number was dialed?

19   A.   Is that under the -- does it say contact list?

20   Q.   It says text messages, status sent.

21   A.   Okay.  That means that that text message was sent in that

22   phone.

23             MR. GEORGE TRAGOS:  We would object to the entry of a

24   report as opposed to the testimony.

25             THE COURT:  Is the Government seeking to introduce
```

1    his report?
2              MS. SWEENEY:  Your Honor, it's -- we're seeking to
3    introduce the data extracted from the cellular phone.
4              THE COURT:  Let me see it.  Which exhibit is it?
5              MS. SWEENEY:  It's 17-B.
6              (Brief pause.)
7              THE COURT:  It will be received.
8              (Thereupon, Government's Exhibit Number 17-B
9    received and filed in evidence.)
10   BY MS. SWEENEY:
11   Q.    So, Agent, on the bottom of 17-B, there's an entry that
12   says phone contacts.  What does that indicate?
13   A.    This was extracted from the phone and it's from the area
14   of the phone called contacts.  And in this area, people will --
15   can enter in the phone numbers that tie in with a person's name
16   or whatever they want to call it for that phone number, and
17   some phones you may call it like an address book.
18   Q.    And then, Agent, on page 22, there's an entry that reads
19   phone AMS text messages.  What are these?
20   A.    Okay.  This is the section from the text messages that
21   were extracted from the phone.  If you look, for instance, to
22   column number, that's the number that the text message was
23   either sent to or from.  This name, that's taken from the
24   contact list.  If it sees a phone number that's in the contact
25   list, that's where the name comes from.  The date and time is

1    when it was sent.  The status, whether it was sent, which meant
2    the phone sent it or where it's read.  That usually means the
3    phone received it.  The folder, that's the folder on the phone
4    where this was stored.  In this case, it was either in the sent
5    folder or the in-box.  Storage, normally the two places it can
6    be found on a phone is on the phone itself, which is, in this
7    case, or there may be like a micro SD storage card on the phone
8    and sometimes they can store the messages there.  Type, again
9    whether it was outgoing, which meant it was sent from the phone
10   or incoming.  And then the text, that's the context of the
11   message that was sent or received.
12   Q.   Okay.  Agent, I've handed you a number of exhibits.  Let's
13   start with Government's Exhibit 18-A.
14        Is that a cell phone that you have analyzed?
15   A.   Yes, it is.
16   Q.   And how do you know that?
17   A.   In this case, I have my date and initials on the evidence
18   tape.
19   Q.   And did you examine it pursuant to the procedure that we
20   previously discussed?
21   A.   Yes, I did.
22   Q.   And what is Government's Exhibit 18-B?
23   A.   This is the report that the Cellebrite produced of the
24   extracted data from the phone which is Exhibit 18-A.
25        MS. SWEENEY:  Your Honor, at this time, the

```
 1   Government moves Exhibit 18-B into evidence.

 2             MR. GEORGE TRAGOS:  Same objection, Your Honor, the

 3   best evidence, the report, hearsay and testimony is the best

 4   evidence.

 5             THE COURT:  It will be received.

 6             (Thereupon, Government's Exhibit Number 18-B was

 7   received in evidence.)

 8   BY MS. SWEENEY:

 9   Q.   I'd like you to take a look at Exhibit 18-C.  What is that

10   item?

11   A.   This is a photo I took of the screen of the phone on one

12   of the settings.

13   Q.   And why did you have to -- why did you do that in this

14   instance?

15   A.   In this case, I was asked about any --

16             MR. GEORGE TRAGOS:  Objection, hearsay.

17             THE COURT:  Overruled.

18             THE WITNESS:  In this case, I was asked about any

19   information I could find on the phone as to why there may not

20   be any text messages on the phone.  And in the settings -- one

21   of the settings is the auto erase in-box, and what this is, is

22   if this is turned on and you read a message, a text message,

23   then it automatically deletes it as opposed to keeping it on

24   the phone.

25
```

1   BY MS. SWEENEY:

2   Q.   And how do you know that that's a picture that you took

3   from Government's Exhibit 18-A?

4   A.   I have my initials on the back of the photo.

5            MS. SWEENEY:  Okay.  Your Honor, at this time, the

6   Government moves 18-C into evidence.

7            THE COURT:  It will be received.

8            (Thereupon, Government's Exhibit Number 18-C was

9   received and filed in evidence.)

10  BY MS. SWEENEY:

11  Q.   So Agent, in looking at 18-B, starting on the first page,

12  there's the phone contacts entry.  Does this have the same

13  meaning as it did on Government's Exhibit 17-B?

14  A.   Yes, it does.  A user of the phone entered in this phone

15  number here and they also chose what they wanted to call it.

16  In this case, it's the HAQQ.

17  Q.   Does this phone also have additional entries in it,

18  additional phone contact entries?

19  A.   Yes, it does.

20  Q.   Is that what is shown on the screen right now?

21  A.   Yeah, the top three entries onto this page are from the

22  contact list.

23  Q.   Agent, I've handed you Government's Exhibit 14.  Please

24  read the two numbers that appear on that piece of paper.

25  A.   The first number is (727)871-5549 and the second one is

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1   (727)768-2046.

2   Q.    Thank you.

3         Back on 18-B on page two, did you locate any text messages

4   on the phone?

5   A.    Cellebrite extracted one text message and that was this

6   one.

7   Q.    What's the date onto that one, Agent?

8   A.    The date is 6/22/06.

9   Q.    Were any text messages from a later time extracted?

10  A.    No, there weren't.

11  Q.    And Agent, is this a picture of the phone itself?

12  A.    Yes, it's a picture of the screen of the phone.

13  Q.    And when you powered up the phone, was this option, auto

14  erase in-box, on at the time you powered up the phone and took

15  this picture?

16  A.    Yes.  You had to go into the settings and click onto this

17  option and this is the way it appeared once I clicked on it.

18  Q.    Agent, I've handed you Government's Exhibits 19-A and

19  19-C.  In looking at Government's Exhibit 19-A, is this the

20  phone that you examined?

21  A.    Yes, it is.

22  Q.    And how can you tell?

23  A.    I have my initial and dates on a sticker on the back.

24  Q.    I'd like to ask you now to look at Government's Exhibit

25  19-C.

```
 1   A.    All right.

 2   Q.    What is that?

 3   A.    This is the Cellebrite report for the phone in 19-A.

 4            MS. SWEENEY:  Your Honor, the Government moves 19-C

 5   into evidence.

 6            MR. GEORGE TRAGOS:  Same objections, Your Honor, as

 7   17-B.

 8            THE COURT:  Be received.

 9            (Thereupon, Government's Exhibit Number 19-C was

10   received and filed in evidence.)

11   BY MS. SWEENEY:

12   Q.    So, on this phone, starting on page one, we're going to go

13   over on to the second page.  Does the report indicate that this

14   phone had numbers programmed into it?

15   A.    Yes, it does.

16   Q.    And are these on the second page is that some of the

17   numbers that are programmed into the phone?

18   A.    Yes, they are.

19            MS. SWEENEY:  Your Honor, I have nothing further for

20   this witness.

21            THE COURT:  Counsel.

22                       CROSS-EXAMINATION

23   BY MR. GEORGE TRAGOS:

24   Q.    Agent, you analyzed three phones, correct; 19-A, 17-A and

25   18-A?
```

```
 1   A.    That's correct.
 2   Q.    And do you know who purchased these phones?
 3   A.    No, I do not.
 4   Q.    Do you know who activated these phones?
 5   A.    No, I do not.
 6   Q.    Do you know -- you say that on one of these phones you had
 7   a setting, deleting text message setting?
 8   A.    Auto -- I can look.
 9   Q.    Auto erase in-box, right?  That's 18-C?
10   A.    That's correct.
11   Q.    Do you know who did that?
12   A.    No, I do not.
13   Q.    Do you know what the default is on that?
14   A.    No, I do not.
15   Q.    So this "on" could be the default setting?
16   A.    It's possible.
17   Q.    So actually, it's possible that nobody had to do anything
18   and the default setting "on" would be on?
19   A.    That's correct.
20   Q.    And on one of these you found, I guess, a partial text
21   message or evidence of a text message on the 22nd of June?
22   A.    Was that the last --
23   Q.    I think that is 18-B.
24   A.    Yes, this was extracted from the phone.
25   Q.    The status of unread; what does that mean?
```

```
1   A.   That means that as far as the phone is concerned that the

2   message hasn't been read by a user as it was clicked on to see.

3   This is kind of unusual in that the date is back in 2006.  It's

4   entirely possible that if a user --

5              THE COURT:  The question is, what did that mean?

6              THE WITNESS:  I'm sorry.  It means it has not been

7   read by a user.

8   BY MR. GEORGE TRAGOS:

9   Q.   And this is in the in-box, so that would mean this is an

10  incoming text, correct?

11  A.   That's correct.

12  Q.   And in 2006, that's when this text was sent, according to

13  the --

14  A.   According to this, yes.

15  Q.   Okay.  Do you know who any of these phone numbers are

16  registered to?

17  A.   No, I do not.

18  Q.   You did an examination and some of these things look kind

19  of curious about, selected manufacturer Kyocera CDMA.  What is

20  that, K-Y-O-C-E-R-A?

21  A.   That's the name of the manufacturer of the phone, Kyocera.

22  Q.   Okay.  So, regardless if it was a Samsung, actually

23  somebody else manufactured it or is this a Kyocera phone?

24  A.   Which exhibit are you looking at?

25  Q.   17-B.
```

1  A.    In this case, the manufacturer is Kyocera.  One of the
2  other phones was a Samsung.
3  Q.    So what does CDMA mean?
4  A.    That's the type of network the phone operates on.  It
5  stands for code division multiple access.
6  Q.    And you have some text messages on -- let me find it --
7  17-B?
8  A.    17-B, yes.
9  Q.    And these are text messages that were saved on the phone,
10 correct?
11 A.    Yes, they are present on the phone.
12 Q.    They weren't deleted, I guess, you didn't retrieve --
13 A.    Right, these weren't recovered or deleted, these were
14 actual files.
15 Q.    And there's four of them?
16 A.    Correct.
17 Q.    And all four show a sent -- three show a sent status?
18 A.    Correct, three sent, one read.
19 Q.    What is the difference between sent and read?
20 A.    If you look over a couple more columns under type, the
21 sent means they were outgoing and that phone sent them.  And
22 then the read means it was incoming, someone sent that to this
23 phone.
24 Q.    Okay.  And the incoming, it says here, date and time,
25 January 7th 2012 at 6:04; is that a.m. or p.m.?

```
 1    A.    P.m.

 2    Q.    Does the phone only record the time that's there or is

 3    there an automatic setting on the phone that tells you what the

 4    date and time is?

 5    A.    For most phones, whenever the phone is turned on, it

 6    automatically corrects its date and time with the cell towers.

 7    Q.    This phone, 17-A, did it do that?

 8    A.    I wouldn't know.  You can't really tell.  The only thing I

 9    can tell is when I process it if the date and time is correct

10    at that time.  Like a week ago, it could have been different

11    depending on issues, but for the most part, cell phones, the

12    date and time is correct 'cause it's constantly updating

13    itself.

14    Q.    So on this phone, the total number of text messages are

15    four, three sent and one read, correct?

16    A.    That were present on the phone, yes.

17    Q.    Can you tell when the phone was activated?

18    A.    No, I can't.

19              MR. GEORGE TRAGOS:  That's all I have, Your Honor.

20              THE COURT:  Redirect.

21                      REDIRECT EXAMINATION

22    BY MS. SWEENEY:

23    Q.    I have one brief matter.

24          Agent, do you have 17-B in front of you still?

25    A.    Yes I do.
```

1  Q.   Mr. Tragos asked you about the text messages and the date

2  and time settings.  What is the -- what is the identification

3  number for that phone; the one you give it?

4  A.   Oh, the one I give it.  That would be QTB007.

5  Q.   Do you know if when you reviewed that phone, initially, if

6  the date and time settings were correct?

7  A.   Yes, they were.

8           MS. SWEENEY:  I have nothing further, Your Honor.

9           THE COURT:  You may step down, sir.  Thank you.

10           (Witness excused.)

11           How long is the inquiry for your last witness?

12           MS. SWEENEY:  He's probably less than 10 minutes,

13  Your Honor, but I'm not -- I don't know about cross.  He will

14  be here tomorrow so we can certainly take him up first thing

15  tomorrow morning.

16           THE COURT:  Can the jury indulge me 10 or 15 minutes

17  to get this last witness on?

18           Please call your witness.

19           MS. SWEENEY:  The United States calls Jeffrey Fuller.

20  Thereupon,

21                    JEFFREY ALLEN FULLER,

22  after having been duly sworn to tell the truth, the whole truth

23  and nothing but the truth, under penalty of perjury, was

24  examined and testified as follows:

25           THE WITNESS:  I do.

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1              THE CLERK:  Thank you.  Please be seated.  Please
 2    state your name and spell your last for the record.
 3              THE WITNESS:  Jeffrey Allen Fuller, F-U-L-L-E-R.
 4              THE COURT:  Mr. Fuller, you're under oath.  You must
 5    give truthful answers to the questions that are asked.  If you
 6    give false answers, you face penalties of perjury, false
 7    statement and obstruction of justice.
 8              Do you understand that?
 9              THE WITNESS:  Yes, Your Honor.
10              THE COURT:  Also, listen carefully to the question.
11    Wait until counsel finishes the question before you start to
12    answer so you're not talking over her.  And if you see opposing
13    counsel stand to object, wait until I rule on the objection
14    before you answer.
15              Do you understand that?
16              THE WITNESS:  Yes, Your Honor.
17              THE COURT:  Counsel.
18              MS. SWEENEY:  Thank you, Your Honor.
19                          DIRECT EXAMINATION
20    BY MS. SWEENEY:
21    Q.   Sir, who do you work for?
22    A.   The FBI.
23    Q.   And how long have you worked for the FBI?
24    A.   Nine and a half years.
25    Q.   What is your current position?
```

```
 1   A.    I'm a -- with a mobile surveillance team as a special

 2   agent.

 3   Q.    I'd ask you to pull just a little bit closer to the mic,

 4   just a teeny bit.  There you go.

 5   A.    I'm a special agent with the mobile surveillance team.

 6   Q.    And how long have you held that position?

 7   A.    Three years.

 8   Q.    Prior to that, what did you do?

 9   A.    Investigating counterterrorism.

10   Q.    Were you involved in surveillance of the Defendant on

11   January 7, 2012?

12   A.    Yes.

13   Q.    What was your task that day?

14   A.    That day, we were essentially in a standby mode in the

15   event that we were needed to help out with surveillance.

16   Q.    Did you come to be asked to locate a car related to this

17   investigation?

18   A.    Yes.

19   Q.    I'm going to ask you to take a look at Government's

20   Exhibit 51 that's sitting in front of you.

21   A.    Okay.

22   Q.    Do you recognize that?

23   A.    Yes.

24   Q.    What is it?

25   A.    That is the vehicle that was parked by the Defendant to be
```

1   used as a get-away vehicle.

2   Q.   And did you --

3           MR. GEORGE TRAGOS:   Objection to the

4   characterization, Your Honor.

5           THE COURT:   Sustained.

6   BY MS. SWEENEY:

7   Q.   Agent, did you locate this vehicle during the course of

8   this investigation on January 7 of 2012?

9   A.   Yes.

10  Q.   And is this a picture of where you located it?

11  A.   Yes, it is.

12  Q.   And although this isn't very zoomed out, do you know the

13  location where this was?

14  A.   Yes.

15  Q.   And can you briefly describe that?

16  A.   It's a parking lot behind a small row of restaurants and

17  shops.   There's a Starbucks there and it's near the

18  intersection of South Howard Street and Swann.

19  Q.   Is this picture -- does it accurately reflect what you saw

20  that evening?

21  A.   Yes.

22          MS. SWEENEY:   Your Honor, the Government moves

23  Exhibit 51 into evidence.

24          MR. GEORGE TRAGOS:   No objection.

25          THE COURT:   It will be received.

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1              (Thereupon, Government's Exhibit Number 51 was

2    received and filed in evidence.)

3    BY MS. SWEENEY:

4    Q.    Agent, I first want to show you an exhibit that's already

5    been admitted, Government's Exhibit 21.  Have you seen this

6    before?

7    A.    It's a map of the Tampa region.

8    Q.    And do you see the indication on there for a Starbucks?

9    A.    Yes.

10   Q.    Is that -- is that where -- does that accurately indicate

11   where the van was that evening when you saw it?

12   A.    Yes.

13   Q.    Agent, can you -- on this picture, Government's Exhibit

14   51, can you read the license plate on that exhibit?

15   A.    Yes.

16   Q.    What is it?

17   A.    896 XSA, Florida license plate.

18   Q.    I'd like to ask you now to look at Government's Exhibit 13

19   which has already been admitted and is in front of you.

20         Do you see that?

21   A.    Is it the key?

22   Q.    Yes, I think -- do you see it?

23   A.    Yes.

24   Q.    And so you said that's a key, right?

25   A.    Yes.

1   Q.   I'd like you to look at the plastic tag attached to it.

2   Do you see on that tag the notation 896 XSA?

3   A.   Yes.

4            MS. SWEENEY:  No further questions, Your Honor.

5                       CROSS-EXAMINATION

6   BY MR. GEORGE TRAGOS:

7   Q.   When you followed the Defendant, you followed this car,

8   this Dodge?

9   A.   No, I did not follow it myself.

10  Q.   Have you seen this Dodge before?

11  A.   Not until I found it that evening.

12  Q.   You told the prosecutor that this is what the Defendant

13  was going to use for -- use later on, right?

14  A.   Yes.

15  Q.   But you, yourself, did not talk to the Defendant?

16  A.   No.

17  Q.   You didn't see the van -- I'm sorry?

18  A.   I did not say that he was going to use it later on, I said

19  that he had dropped it off there.

20  Q.   Did you see him drop it off there?

21  A.   No.

22  Q.   Did you follow him there?

23  A.   No, I did not.

24  Q.   Did you ever see him in it?

25  A.   I did not.

```
 1   Q.   Do you know who owns it?

 2   A.   No, not off the top of my head.  I don't know who owns it.

 3              MR. GEORGE TRAGOS:  Your Honor, can we have a

 4   sidebar?

 5              THE COURT:  Yes, sir.

 6              (Thereupon, the following discussion was had at

 7   sidebar:)

 8              MR. GEORGE TRAGOS:  Your Honor, I thought he

 9   testified that he identified this car as the car the Defendant

10   was going to use.  You know, he can't put this stuff in

11   evidence.  He never even knew the car had anything to do with

12   this case.

13              THE COURT:  Counsel.

14              MS. SWEENEY:  Your Honor, all he testified to was

15   that he found this vehicle in this location as depicted in this

16   picture and that vehicle has a license plate that has been

17   reflected on the rental car key that the UC gave to the

18   Defendant.  That's really the only -- his only testimony is he

19   found this.

20              THE COURT:  How is this tied into the case?  Did the

21   UCE testify that was the rental car key?

22              MS. SWEENEY:  Yes, Your Honor, and it was admitted in

23   evidence through him.  He had provided it to the Defendant and

24   then they -- nobody did see the Defendant -- he was -- had very

25   loose surveillance that night, nobody saw him.  They found this
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

1    van parked behind the Starbucks which is this witness' only

2    testimony.

3            THE COURT:  Well, it's not his only testimony, but it

4    was objected to, and the Court sustained the objection, but he

5    said he found the car in the Starbucks and that's the key that

6    matches the car and that's the tag that matches the car, and

7    he -- the UCE testified that that's the key he gave the

8    Defendant.  That's the sole content of his testimony.  He did

9    not say he surveilled the Defendant to this location.

10            MR. GEORGE TRAGOS:  I would ask -- I would make a

11   motion in Court that we strike this witness' testimony as being

12   irrelevant, and if not, then I'll strike it as his testimony is

13   irrelevant.

14            THE COURT:  Overruled.  You can continue to cross him

15   if you like.

16            (Thereupon, the sidebar discussion was concluded and

17   the proceedings resumed as follows:)

18   BY MR. GEORGE TRAGOS:

19   Q.   So from your personal knowledge, you know nothing other

20   than you went -- you went to this location and saw this van,

21   that's it?  That's all you personally know, right?

22   A.   Well, I certainly didn't see the Defendant in the van.

23            THE COURT:  You can't talk about what anybody told

24   you.  You can just talk about what you observed personally.

25            THE WITNESS:  Okay.  Fair enough.  Yes.

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

```
 1   BY MR. GEORGE TRAGOS:

 2   Q.   That's a yes?

 3   A.   Yes.

 4           MR. GEORGE TRAGOS:  That's all the questions I have.

 5           THE COURT:  All right.

 6           You can step down, sir.

 7           I'm sorry.  You have redirect of this witness?

 8           MS. SWEENEY:  No, Your Honor, thank you.

 9           THE COURT:  All right.

10           You may step down.

11           (Witness excused.)

12           And for the record, the jury is to disregard any

13   statement by this witness who just left that this is a car the

14   Defendant placed there as a get-away car.  He has no personal

15   knowledge of that fact.  It was objected to and that objection

16   was sustained.

17           Anything further from the Government?

18           MS. SWEENEY:  Your Honor, I would like to have the

19   evening -- and no further witnesses at this time.  I would like

20   to rest in the morning, if possible.

21           THE COURT:  That's fine.

22           MR. GEORGE TRAGOS:  Can we have a sidebar for a

23   moment?

24           THE COURT:  Yes.

25           (Thereupon, the following discussion was had at
```

```
 1   sidebar:)

 2           MR. GEORGE TRAGOS:  I know what's going to be the

 3   answer to this.  We start at 8:30, but we have our doctors

 4   coming tomorrow morning.  I think we will be done by noon or

 5   maybe 1:00 or 2:00 o'clock.

 6           THE COURT:  Is the intent to call the Defendant or

 7   not to call the Defendant?

 8           MR. GEORGE TRAGOS:  I will tell you the intent is not

 9   to call the Defendant.

10           THE COURT:  What's your question?

11           MR. GEORGE TRAGOS:  What I'm suggesting to the Court,

12   I'm sure that both -- we both want to take a look also and make

13   sure what evidence is in evidence and make sure everything is

14   all straight.  We have a short audio and DV argument.  We have

15   jury instructions at some point we have to go through that we

16   can do that tomorrow afternoon.  Again, I don't know, early

17   afternoon is probably when we will be done.  The Government I

18   know has two psychiatrists at great expense to them.

19           THE COURT:  What is the question?

20           MR. GEORGE TRAGOS:  Can we -- last thing, may we have

21   the jury come in at 9:30 tomorrow so we can get all of these

22   things done?

23           THE COURT:  I'm not sure what the things are.

24           MR. GEORGE TRAGOS:  Go through all the exhibits and

25   do our audio and video.
```

```
 1              THE COURT:  Is the Government intending to call
 2    rebuttal witnesses as to psychiatric issues?
 3              MS. SWEENEY:  Yes, Your Honor.
 4              THE COURT:  At what time do you think you'll be done
 5    with your direct of your witness?
 6              MR. GEORGE TRAGOS:  I don't know.  I was suggesting
 7    they put theirs on on Monday.
 8              MS. SWEENEY:  Our witnesses will be here to observe
 9    the Defendant's -- the testimony of the defense experts.
10              THE COURT:  Why Monday?
11              MR. GEORGE TRAGOS:  Well, I thought if they weren't
12    here.  I'm sorry.
13              MS. SWEENEY:  They are here, so if it does go into
14    tomorrow afternoon, we could put on our first rebuttal witness
15    tomorrow afternoon.
16              THE COURT:  How many do you have?
17              MS. SWEENEY:  Two, Your Honor, one psychologist and
18    one psychiatrist, just like the defense has.
19              THE COURT:  Why only one; you going to have somebody
20    testify for four or three hours?
21              MS. SWEENEY:  We'll have them both prepared in here
22    and so, yes, they could potentially both go on Thursday or
23    tomorrow afternoon.
24              THE COURT:  So I still don't understand your --
25              MR. GEORGE TRAGOS:  We don't have any problem
```

CLAUDIA SPANGLER-FRY  OFFICIAL U. S. COURT REPORTER

1    starting at 9:30 though.

2              (Thereupon, the sidebar conference was concluded.)

3              THE COURT:  Court will resume tomorrow morning at

4    9:30.  Just plan to be here by tomorrow at 9:30 and we will

5    continue the presentation of the evidence.  And so that we

6    don't have to have a sort of truncated day, the Court will plan

7    to order lunch tomorrow.  And so we'll probably take only about

8    an hour for lunch tomorrow so we can sort of power through the

9    rest of the day.  So I will order lunch tomorrow and we will

10   start at 9:30.

11             Again, thank you for your attention and your

12   professionalism and your timeliness.  We will continue to keep

13   you apprized of where we are.

14             The Government has indicated that it thinks it's

15   about done subject to review, so we may be done with the

16   Government's case in chief, in which case, we are substantially

17   ahead of schedule as we indicated and we'll just kind of keep

18   you posted as we move through.

19             Thank you for your attention.  We are dismissed.  We

20   will take that break, Mr. Millian, if you still need it for

21   tomorrow.

22             JUROR MILLIAN:  Thank you, Your Honor.

23             (Jury excused.)

24             THE COURT:  Ms. Sweeney, what is it that the

25   Government needs to evaluate before you rest, whether you put

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER

| | |
|---|---|
| 1 | in all the documentary evidence you intend to introduce? |
| 2 | MS. SWEENEY:  Yes, Your Honor.  I just wanted to be |
| 3 | sure that all the evidence that was necessary had been |
| 4 | introduced, and just confirm that overnight, just to be sure, |
| 5 | Your Honor. |
| 6 | THE COURT:  But it's not anticipated there will be |
| 7 | any testifying witnesses tomorrow from the Government in its |
| 8 | case in chief? |
| 9 | MS. SWEENEY:  I do not anticipate that at this time, |
| 10 | Your Honor. |
| 11 | THE COURT:  All right. |
| 12 | Assuming then that the Government rests, the |
| 13 | Defendant intends to make a DV argument; is that right? |
| 14 | MR. GEORGE TRAGOS:  Yes, Your Honor. |
| 15 | THE COURT:  And how long do you think that will |
| 16 | require to argue? |
| 17 | MR. GEORGE TRAGOS:  Ten, 15 minutes at the most. |
| 18 | THE COURT:  All right. |
| 19 | And then you would intend to call two witnesses? |
| 20 | MR. GEORGE TRAGOS:  Yes, Your Honor. |
| 21 | Your Honor, they're both experts.  I was wondering if |
| 22 | one of the experts could sit in while my other expert |
| 23 | testifies? |
| 24 | THE COURT:  Any objection from the Government? |
| 25 | MS. SWEENEY:  No objection, Your Honor.  We would ask |

```
 1   for the -- you know, our experts asked for the same permission
 2   to view the --
 3              THE COURT:  Well, the rule hasn't been invoked, so it
 4   doesn't matter.  They can sit in.
 5              Does the Defendant intend to testify?
 6              MR. GEORGE TRAGOS:  He does not, Your Honor.
 7              Does the Court want to do a colloquy today or
 8   tomorrow after the Government rests?
 9              THE COURT:  Let's inquire of the Defendant.
10              Please swear Mr. Osmakac.
11   Thereupon,
12                        SAMI OSMAKAC,
13   after having been duly sworn to tell the truth, the whole truth
14   and nothing but the truth, under penalty of perjury, was
15   examined and testified as follows:
16              THE DEFENDANT:  I do.
17              THE COURT:  Mr. Osmakac, sir, you're under oath.
18              Do you understand that?
19              THE DEFENDANT:  Yes.
20              THE COURT:  If you give me false answers, you face
21   penalties of perjury, false statement and obstruction.
22              Do you understand that?
23              THE DEFENDANT:  Yes.
24              THE COURT:  Mr. Tragos has advised the Court that it
25   is your intent at this time not to testify in this case.
```

1          Did you hear that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Is that accurate?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Has anyone threatened you to get you to

6   give up the right to testify?

7          THE DEFENDANT:  No.

8          THE COURT:  Has anyone promised you anything to get

9   you to give up the right to testify on your own behalf?

10         THE DEFENDANT:  No.

11         THE COURT:  Under our Constitution, sir, you're

12  entitled to present a full defense.  In that regard, you're

13  entitled to have counsel represent you in that defense and

14  you're entitled to testify on your own behalf if you want to

15  testify.

16         You are also entitled, as you know, not to testify so

17  as not to incriminate yourself.  By making this decision not to

18  testify, you're giving up your right to defend yourself by your

19  own testimony.

20         Do you understand that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Without your testimony, the jury will be

23  left to consider your guilt or innocence based solely upon the

24  evidence the Government has introduced, its testimony and

25  evidence, and any evidence your lawyer may offer on your behalf

```
 1    as well as your lawyer's cross-examination of the witnesses
 2    presented by the Government.
 3              Do you understand that?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  What do you understand that you are doing
 6    in regard to what we're discussing now, in your own words, Mr.
 7    Osmakac?
 8              THE DEFENDANT:  I'm giving up my right to testify.
 9              THE COURT:  Has anyone threatened you to get you to
10    give up your right to testify?
11              THE DEFENDANT:  No.
12              THE COURT:  Has anyone promised you anything to
13    induce you to give up your right to testify?
14              THE DEFENDANT:  No.
15              THE COURT:  Has anyone promised you a specific
16    outcome if you choose not to testify?
17              THE DEFENDANT:  No.
18              THE COURT:  Have you had a full opportunity to
19    discuss this decision with your lawyers before you made the
20    decision not to testify?
21              THE DEFENDANT:  Yes.
22              THE COURT:  Are you satisfied with the representation
23    your lawyers have provided for you in regard to this issue?
24              THE DEFENDANT:  Yes.
25              THE COURT:  You have any questions about this issue
```

 1    for the Court?

 2              THE DEFENDANT:  No.

 3              THE COURT:  Are there any additional questions the

 4    Government wishes for the Court to put to this Defendant on

 5    this issue?

 6              MS. SWEENEY:  No, Your Honor.

 7              THE COURT:  Anything the Defendant wishes for the

 8    Court -- the defense wishes for the Court to put to the

 9    Defendant on this issue, Mr. Tragos?

10              MR. GEORGE TRAGOS:  No, Your Honor.

11              THE COURT:  Mr. Tragos, have you fully disclosed the

12    risks and benefits to your client in regard to his decision not

13    to testify?

14              MR. GEORGE TRAGOS:  Yes, Your Honor.

15              THE COURT:  And are you satisfied that the Defendant

16    fully understands the decision he's making?

17              MR. GEORGE TRAGOS:  Yes, Your Honor.

18              THE COURT:  All right.

19              MS. SWEENEY:  Your Honor, I'm sorry.  Mr. McGovern

20    just reminded me of something.

21              May we step up to sidebar for just a moment?

22              THE COURT:  No.  What?

23              MS. SWEENEY:  Your Honor, I think that it may make

24    sense to just inquire of Mr. Osmakac if he is currently under

25    the influence of any medications that may impact his decision.

```
 1              THE COURT:  Mr. Osmakac, the Court understands that
 2    you take medicine from time to time; is that correct?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Are you taking medication currently?
 5              THE DEFENDANT:  Risperdal, Synthroid and
 6    multivitamin.
 7              THE COURT:  Are you taking those medications in the
 8    dosages prescribed?
 9              THE DEFENDANT:  Yes.
10              THE COURT:  Have you exceeded the dosages prescribed?
11              THE DEFENDANT:  No.
12              THE COURT:  Have you -- do you understand time, place
13    and orientation?
14              THE DEFENDANT:  Where we at?
15              THE COURT:  Yes.
16              Where are we?
17              THE DEFENDANT:  We're in Federal building in Tampa
18    Bay.
19              THE COURT:  And what is today?
20              THE DEFENDANT:  It's Wednesday.  I don't know what
21    date.
22              THE COURT:  June 4th?
23              THE DEFENDANT:  It could be.
24              THE COURT:  And are those medications affecting in
25    any way your ability to understand what the Court is inquiring
```

```
 1    of you?
 2              THE DEFENDANT:  I believe no.
 3              THE COURT:  What?
 4              THE DEFENDANT:  I believe not.
 5              THE COURT:  All right.
 6              Anything further from the Government or the defense?
 7              MS. SWEENEY:  No, thank you, Your Honor.
 8              MR. GEORGE TRAGOS:  No, Your Honor.
 9              THE COURT:  All right.
10              We stand in recess until tomorrow at 9:30.  And be
11    prepared to go a full day tomorrow.  We'll take a break for
12    lunch as indicated and we will potentially finish the
13    presentation of the evidence tomorrow.  And how long will
14    closing take?
15              MS. SWEENEY:  I'd say -- I'd like to ask for up to
16    three hours, Your Honor.
17              THE COURT:  And you will lock the Court when you
18    leave?  Half that, max, or your jury will be sideways over in
19    their chairs.  I can't imagine anybody listening to you talk
20    about this case for three hours.
21              How long will the defense require?
22              MR. GEORGE TRAGOS:  Same amount, Your Honor, that the
23    Government gets.
24              THE COURT:  Hour and a half.
25              MS. SWEENEY:  Does that include rebuttal, Your Honor?
```

1          THE COURT:  Yes.

2          Thank you.  We're in recess.

3          (Thereupon, the proceedings concluded.)

4                          ******

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF HILLSBOROUGH     )

 5

 6        I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

 7   the United States District Court, Middle District, Tampa

 8   Division,

 9        DO HEREBY CERTIFY, that I was authorized to and

10   did, through use of Computer Aided Transcription, report

11   in shorthand the proceedings and evidence in the

12   above-styled cause, as stated in the caption hereto, and

13   that the foregoing pages numbered 1 to 234, inclusive,

14   constitute a true and correct transcription of my

15   shorthand report of said proceedings and evidence.

16        IN WITNESS WHEREOF I have hereunto set my hand

17   in the City of Tampa, County of Hillsborough, State of

18   Florida, this 15th day of June, 2015.

19

20             /s/CLAUDIA SPANGLER-FRY
               _____
21             CLAUDIA SPANGLER-FRY, Official Court Reporter

22

23

24

25
```

CLAUDIA SPANGLER-FRY   OFFICIAL U. S. COURT REPORTER