```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         TAMPA DIVISION

 3   UNITED STATES OF AMERICA,      Case No. 8:12-CR-45-T-35AEP

 4          Plaintiff,

 5    VS.                            Tampa, Florida

 6   SAMI OSMAKAC,                   November 5, 2014

 7          Defendant.               9:00 a.m.

 8   _____/

 9                               REDACTED
                  TRANSCRIPT OF SENTENCING PROCEEDINGS
10             BEFORE THE HONORABLE MARY S. SCRIVEN
                   UNITED STATES DISTRICT JUDGE
11

12   Appearances:

13   For the Government:        MS. SARA SWEENEY
                                Assistant United States Attorney
14                              400 North Tampa Street
                                Suite 3200
15                              Tampa, FL   33602
                                (813)274-6000
16                              sara.sweeney@usdoj.gov

17

     For the Defendant:         GEORGE E. TRAGOS, ESQUIRE
18                              PETER L. TRAGOS, ESQUIRE
                                Tragos & Sartes, PL
19                              601 Cleveland St, Suite 800
                                Clearwater, FL   33755
20                              (727)441-9030
                                stephanie@greeklaw.com
21                              petertragos@greeklaw.com

22   Court Reporter:            CLAUDIA SPANGLER-FRY, RPR, RMR
                                Official Court Reporter
23                              801 North Florida Avenue
                                7th Floor
24                              Tampa, FL 33602
                                (813)301-5575
25                              cookiefry@aol.com
```

```
1                         I N D E X

2    WITNESSES:                                      PAGE

3

4    DR. VALERIE MCCLAIN

5    Direct Examination by Mr. George Tragos ................  38

6    Cross-Examination by Ms. Sweeney .......................  41

7

8    AVNI OSMAKAC

9    Direct Examination by Mr. George Tragos ................  43

10

11   SPECIAL AGENT TAYLOR REED

12   Examination by the Court ...............................  60

13   Cros-Examination by Mr. George Tragos .................  70

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                      November 5, 2014
 3                         *******
 4           THE COURT:  Good morning.  Please call the case.
 5           THE CLERK:  In the matter of United States of America
 6   versus Sami Osmakac, Case Number 8:12-CR-45.
 7               Counsel, please state your appearances starting with
 8   counsel for the Government.
 9               MS. SWEENEY:  Good morning, Your Honor.  Sara Sweeney
10   on behalf of the Government and with me is Special Agent Jacob
11   Collins from the FBI.
12               THE COURT:  Good morning.
13               MR. GEORGE TRAGOS:  Morning, Your Honor, George
14   Tragos and Peter Tragos on behalf of the Defendant.
15               THE COURT:  Good morning.
16               Please swear the Defendant.
17               THE CLERK:  Mr. Osmakac, please raise your right
18   hand.
19   Thereupon,
20                          SAMI OSMAKAC,
21   after having been duly sworn to tell the truth, the whole truth
22   and nothing but the truth, under penalty of perjury, was
23   examined and testified as follows:
24               THE DEFENDANT:  I do.
25               THE COURT:  Mr. Osmakac, you're now under oath, sir.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1   You must give truthful answers to any questions that are asked.
 2   If you give false answers, you face penalties of perjury, false
 3   statement and obstruction.
 4           Do you understand that?
 5           THE DEFENDANT:  Yes.
 6           THE COURT:  At the same time, it's not my purpose to
 7   induce you to give false answers or mislead you, so if you
 8   don't understand what I'm saying to you or if you need to speak
 9   with your lawyer at any time, please ask me to be more clear or
10   ask for a chance to speak with counsel.
11           Do you understand that?
12           THE DEFENDANT:  Yes.
13           THE COURT:  Sir, are you currently under the
14   influence of drugs or alcohol?
15           THE DEFENDANT:  When you say "drugs", what do you
16   mean?
17           THE COURT:  Have you taken more than your prescribed
18   dosage of medication?
19           THE DEFENDANT:  No.
20           THE COURT:  Have you consumed any alcohol in the last
21   24 hours?
22           THE DEFENDANT:  No.
23           THE COURT:  Do you know where you are?
24           THE DEFENDANT:  In the Federal building in Tampa.
25           THE COURT:  And do you know why you're here?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              THE DEFENDANT:  Today is my sentencing day.
 2              THE COURT:  All right.
 3              Are there any preliminary issues from the Government?
 4              MS. SWEENEY:  No, Your Honor.
 5              THE COURT:  From the defense?
 6              MR. GEORGE TRAGOS:  Yes, Your Honor.
 7              THE COURT:  Yes, sir.
 8              MR. GEORGE TRAGOS:  Your Honor, we have -- I have Dr.
 9   McClain present.  If I could, I'd like to go through a
10   chronology of the last couple days with the Court.
11              THE COURT:  I don't have a sentencing memo from you.
12   Do you have one that you'd like to file with the Court past the
13   deadline?
14              MR. GEORGE TRAGOS:  No, Your Honor, 'cause it is past
15   the deadline.
16              THE COURT:  So you don't have one even today?
17              MR. GEORGE TRAGOS:  Right.
18              THE COURT:  All right.
19              MR. GEORGE TRAGOS:  Okay.  On November --
20              THE COURT:  I read your motion for a continuance.
21   Are you just going to recite the facts that are in it?
22              MR. GEORGE TRAGOS:  No, Your Honor, these are more
23   detailed since I even filed that motion.
24              On November 3rd, I called the Defendant, spoke to him
25   after I called him.  Dr. McClain called me, and I'll have Dr.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1    McClain testify as to what occurred with regards to her 'cause

2    I had Dr. McClain or I requested that she go and speak to the

3    Defendant.  That at some point on that day, the Defendant's

4    clothes and materials were taken away from him.  He was placed

5    in a paper gown.

6                THE COURT:  That was day before yesterday?

7                MR. TRAGOS:  That was the 3rd, yes, Monday, Your

8    Honor.

9                THE COURT:  All right.

10               MR. GEORGE TRAGOS:  Now, on -- I called the

11   lieutenant on duty who told me that the documents were taken

12   away and that he would talk to the division director to see if

13   they could break policy and give him anything back.

14               THE COURT:  When were his documents given to him?

15   How long had he had the documents before Monday?

16               MR. GEORGE TRAGOS:  Some of them a very long time,

17   some of them I believe he got Friday morning.

18               THE COURT:  All right.

19               MR. GEORGE TRAGOS:  The Friday morning documents are

20   some specific transcripts and notes that he requested pursuant

21   to the sentencing.

22               THE COURT:  Had to do with what area?

23               MR. GEORGE TRAGOS:  Had to deal with citations that

24   were in the Pre-Sentence Report.

25               THE COURT:  Citations to transcripts?

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
1            MR. GEORGE TRAGOS:  Yes.

2            THE COURT:  All right.

3            MR. GEORGE TRAGOS:  Or factual allegations in the

4   report that dealt with information from transcripts.

5            THE COURT:  Having to do with the challenges that you

6   filed with the Probation Office to the PSR?

7            MR. GEORGE TRAGOS:  Yes, Your Honor, and additional

8   factual questions that the Defendant had that he wished me to

9   investigate or to present to the Court.

10           THE COURT:  Concerning what?

11           MR. GEORGE TRAGOS:  Well, we don't -- I don't

12  necessarily know, Your Honor, because in my discussions with

13  him, I think it was on Thursday, he makes allegations.  I told

14  him that I needed to know what he was referring to because I

15  need to -- well, a lot of this would reveal attorney/client

16  privileged communications, Your Honor, if I go into more

17  detail.

18           THE COURT:  Well, does it have to do with anything

19  having to do with this sentencing today?

20           MR. GEORGE TRAGOS:  Yes, Your Honor.

21           THE COURT:  What does it have to do with the

22  sentencing today?

23           MR. GEORGE TRAGOS:  Because there are facts in the

24  Pre-Sentence Report that he wished me to challenge.

25           THE COURT:  Which you had not previously challenged
```

 1    before the deadline for filing objections to the Pre-Sentence
 2    Report?
 3              MR. GEORGE TRAGOS:  Yes, Your Honor.
 4              THE COURT:  And which you have not challenged in a
 5    sentencing memo to the Court?
 6              MR. GEORGE TRAGOS:  Yes, Your Honor.
 7              THE COURT:  Which he has known about since the end of
 8    trial in May?
 9              MR. GEORGE TRAGOS:  Yes, Your Honor.
10              THE COURT:  All right.
11              MR. GEORGE TRAGOS:  And so on Thursday -- I mean on
12    Friday morning, we gave him the additional materials.
13              THE COURT:  When did he ask you for them?
14              MR. GEORGE TRAGOS:  Thursday.
15              THE COURT:  All right.
16              MR. GEORGE TRAGOS:  And I told him that, you know, I
17    would want to know what specifically what pages or -- that he
18    was referring to in order for us to be able to investigate what
19    he was telling us.  On --
20              THE COURT:  How many pages were there?
21              MR. GEORGE TRAGOS:  I can't -- I don't really know,
22    Your Honor.
23              THE COURT:  Like 50 or 10?
24              MR. GEORGE TRAGOS:  No, much more than 10.  There
25    might have been a hundred.

1          THE COURT:  All right.

2          MR. GEORGE TRAGOS:  So on Monday, they were taken

3    away from him, Monday later they did give him some material.

4    According to the sergeant I talked to on Tuesday, it was about

5    one or two percent of what they had seized from his cell they

6    had returned to him.

7          In speaking to the Defendant, he told me they had

8    only given him some matters that pertained to Mr. Fernandez who

9    was the counsel before me, and nothing having to do with what

10   he needed.

11         I spoke to him in order for, you know, preparation

12   for the sentencing and he was unprepared to speak to me because

13   he did not have these documents.  And he had not had a chance

14   to review the documents so that he couldn't speak to me about

15   items he wished me to raise at sentencing.

16         THE COURT:  How many times have you spoken to him

17   since May?

18         MR. GEORGE TRAGOS:  Your Honor, I don't have that

19   number right now; multiple times.

20         THE COURT:  And he's had every opportunity since May

21   before Monday to raise any issues he had with you concerning

22   sentencing?

23         MR. GEORGE TRAGOS:  Well, Your Honor, I have met with

24   him multiple times, plus other attorneys in our office have

25   also met with him.

1          THE COURT:  And he had the Pre-Sentence Report since
2     when?
3          MR. GEORGE TRAGOS:  Since the day the Court -- I
4     mean, it's on the report.  You talking about the revised or the
5     original?
6          THE COURT:  The original.
7          Does Probation know what day it was submitted?
8          THE PROBATION OFFICER:  The date of the original
9     report, Your Honor, is September 23rd, 2014.  I do not have a
10    printout of when it was filed in CM/ECF.
11         THE COURT:  What's the amended report -- the revised
12    report date?
13         THE PROBATION OFFICER:  The Pre-Sentence Report is
14    noted as October 20, 2014, Your Honor.
15         THE COURT:  All right.
16         MR. GEORGE TRAGOS:  So, he was unprepared last night
17    or yesterday to meet with us to discuss these items, again,
18    Your Honor, because it's -- as the Court knows from having
19    tried this case, that things cannot be taken out of context,
20    that you need to know where things are said, what day they were
21    said, those types of things, in order to properly fashion a
22    response.  And the Defendant was working on that.
23         The Defendant, as I said in the motion, was having
24    trouble concentrating and because of what devils were putting
25    in his head, he was pacing back and forth, not sleeping --

1          THE COURT:  Because of what he said devils were

2    putting in his head?

3          MR. GEORGE TRAGOS:  He did not --

4          THE COURT:  You're not testifying to what actual --

5          MR. GEORGE TRAGOS:  -- evil, this was testified to

6    during the trial as well, but he was unable to concentrate.

7          THE COURT:  He reported to you that he was unable to

8    concentrate?

9          MR. GEORGE TRAGOS:  Yes, Your Honor.

10         THE COURT:  All right.

11         MR. GEORGE TRAGOS:  And so we have not been able to

12   have an effective conversation with him with regards to this

13   preparation for sentencing in the last several days when he --

14   after he had received his additional transcripts that he had

15   requested.

16         These are transcripts that he had assembled

17   earlier --

18         THE COURT:  What does it have to do with, because if

19   he has something to say about sentencing or a challenge to the

20   Pre-Sentence Report, he should long ago have told you what that

21   was so that you could lodge a timely objection to the

22   Pre-Sentence Report and filed a timely sentencing memo?  So

23   anything that he came up with in his mind as of last Thursday

24   would have been too late anyway.

25         And so what areas is he concerned about as it relates

1    to sentencing that he contends this additional day with his

2    papers would have facilitated?

3            MR. GEORGE TRAGOS:  A moment, Your Honor, with my

4    client?

5            THE COURT:  Yes, sir.

6            (Brief pause.)

7            MR. GEORGE TRAGOS:  Your Honor, in order to -- my

8    client wishes to speak to the Court.  I would request that this

9    be done, ex-parte, in camera, because I believe that he may be

10   revealing attorney/client privileged material to the Court.

11           THE COURT:  Well, he can't rely on attorney/client

12   privileged information to the Court in order to obtain some

13   relief from the Court and still retain the privilege.  How can

14   he assert a privilege and then rely on privileged information

15   to obtain relief?

16           MR. GEORGE TRAGOS:  I think that that's been done

17   multiple times during the course of this case.

18           THE COURT:  He's not entitled to the protections of

19   the FISA privilege.  He's asserting an attorney/client

20   privilege, and I haven't any circumstance when someone has

21   sought to rely on the benefits of an attorney/client privilege

22   to give them some benefit in this case and have withheld the

23   privileged information that they sought to use from the

24   opposing side.

25           Are you aware of such a circumstance, Mr. Tragos?

```
 1            MR. GEORGE TRAGOS:  No, Your Honor, but I'm aware
 2    that Courts have, in order for a Defendant to reveal
 3    attorney/client privileged matters, done in camera, ex-parte
 4    hearings or taken testimony with regards to that in order to
 5    protect that privilege if the Court --
 6            THE COURT:  Does the Government object to stepping
 7    out to hear what it is Mr. Osmakac says he needed to see in the
 8    last couple of days that he could not have seen since May?
 9            MS. SWEENEY:  No, Your Honor.
10            THE COURT:  All right.
11            If the Government would step out, the Court would, on
12    stipulation of the Government, hear a limited ex-parte
13    presentation from the defense concerning the need for this
14    additional information.  So everyone needs to step out of the
15    courtroom other than counsel, Court staff and the Defendant.
16    Probation can remain.
17            Any objection to Probation remaining to hear whatever
18    the privileged information is?
19            MR. GEORGE TRAGOS:  As long as the Court believes
20    that Probation is not a third party that would result in a
21    waiver.
22            THE COURT:  The Court would not find Probation's
23    presence to constitute a waiver of the privileged
24    communication.
25            (Thereupon, an in camera, ex parte proceeding was had
```

1    and not included in this transcript.)

2              All right.  Thank you.

3              Please recall the Court.  The sealed portion of this

4    record is closed.  If the Court Reporter would please set it

5    aside and not allow it to be viewed by the public under the

6    Court's determination that it should be sealed as it disclosed

7    attorney/client communications.  On stipulation of the

8    Government, it will not be released.

9              On consideration of the statement made by the

10   Defendant in the closed session of these proceedings, the Court

11   does not find any reason for delay of the proceedings because

12   the Defendant did not have paper -- certain of his papers

13   available to him in the last couple of days.  Anything else?

14             MR. GEORGE TRAGOS: Yes, Your Honor.  The defense

15   would call Dr. McClain.

16             THE COURT:  For what purpose?

17             MR. GEORGE TRAGOS:  To testify to the fact that I

18   asked Dr. McClain --

19             THE COURT:  I don't want to know what her testimony

20   is going to be, I want to know what it's concerning.

21             MR. GEORGE TRAGOS:  Yes, Your Honor.  That's what I'm

22   doing.

23             I asked Dr. McClain to speak to the Defendant, Your

24   Honor, before sentencing in order to see whether or not Dr.

25   McClain had any additional items that would be beneficial

1   toward the sentencing and toward the sentencing Court with

2   regards to the Defendant's mental illness.

3         THE COURT:  Having to do with his competence to sit

4   here today and be sentenced, or having to do with what sort of

5   sentencing mitigation should be considered?

6         MR. GEORGE TRAGOS:  Sentencing mitigation, Your

7   Honor.

8         THE COURT:  All right.

9         Then we're not at that point in the proceedings.

10        MR. GEORGE TRAGOS:  But Your Honor, the point is, she

11  couldn't see him.  That's what happened.

12        THE COURT:  When did you ask her to do that?

13        MR. GEORGE TRAGOS:  I asked her -- I don't remember

14  the date, Your Honor.  I asked her to do it, she --

15        THE COURT:  Dr. McClain, when were you asked to go

16  see the Defendant?

17        DR. MCCLAIN:  Your Honor, I was asked last week to

18  see the Defendant and my plan was to see him Wednesday, which

19  didn't work out because there was a hearing.  I, however,

20  attempted to see him --

21        THE COURT:  A hearing with whom?

22        DR. MCCLAIN:  A hearing regarding the continuation of

23  this sentencing.

24        THE COURT:  All right.

25        DR. MCCLAIN:  So what I did, Your Honor, was I

```
 1    then --
 2              THE COURT:  Come to the microphone.
 3              Swear the witness so the record is clean, Ms. Vizza.
 4    Thereupon,
 5                        DR. VALERIE R. MCCLAIN,
 6    after having been duly sworn to tell the truth, the whole truth
 7    and nothing but the truth, under penalty of perjury, was
 8    examined and testified as follows:
 9              THE WITNESS:  I do.  Dr. Valerie R. McClain,
10    M-C-C-L-A-I-N.
11              THE COURT:  All right.
12              You gave a couple of statements before you were under
13    oath.  Are those true as well?
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  And then so what happened after
16    Wednesday?
17              THE WITNESS:  What happened, Your Honor, was I went
18    out Monday, November 3rd, 2014, to Pinellas County Jail to try
19    to attempt to talk to the Defendant in preparation for
20    sentencing --
21              THE COURT:  Monday, day before yesterday?
22              THE WITNESS:  That's correct, Your Honor.
23              THE COURT:  All right.
24              THE WITNESS:  And when I --
25              THE COURT:  What happened to you Thursday and Friday?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              THE WITNESS:  Pardon?
 2              THE COURT:  Why not Thursday or Friday?
 3              THE WITNESS:  Your Honor, I wanted to see him prior
 4    to, meaning that the closer to when he was going to be
 5    sentenced, I would know his mental status and be able to
 6    basically talk with him and make sure that he was able to
 7    mentally be stable as well as be prepared.
 8              THE COURT:  So your attempt to see him on Monday had
 9    to do with whether he would be mentally stable to appear at
10    sentencing today?
11              THE WITNESS:  That's correct, Your Honor.
12              THE COURT:  Your information concerning his mental
13    capacity and his emotional state that would reflect on issues
14    related to sentencing and his level of culpability in this
15    wouldn't have anything to do with your having seen him on
16    Monday?
17              THE WITNESS:  That's correct, Your Honor.
18              THE COURT:  All right.  Thank you.
19              THE WITNESS:  You're welcome, Your Honor.
20              MR. GEORGE TRAGOS:  May I inquire, Your Honor?
21              THE COURT:  No, sir.  We can -- I'll hear Dr. McClain
22    on her view of the Defendant's level of culpability based upon
23    his mental state during the course of sentencing, if you wish
24    to call her, but I won't hear her on any question of competence
25    because there's no issue with respect to the Defendant's
```

1    competence at this stage in the proceedings.

2          Mr. Osmakac, on June 10, 2014, a jury found you

3    guilty of Counts One and Two of the Indictment.  Count One

4    charged you with attempted use of weapons of mass destruction,

5    in violation of 18 United States Code, Section 2332 (A)(A)(2).

6    Count Two charged you with possession of unregistered -- an

7    unregistered firearm in violation of 26 United States Code,

8    Section 5861(d).

9          The Court has already -- well, the Court will, if it

10   has not already, adjudicates you guilty of those offenses,

11   based upon the finding of that jury, having heard all the

12   post-trial motions.

13         It is now the stage in the proceedings where it is my

14   duty to address several questions to you, to your lawyer and to

15   counsel for the Government concerning the matter of your

16   sentencing.

17         Has the Government had an opportunity to read and

18   discuss the Pre-Sentence Report?

19         MS. SWEENEY:  Yes, Your Honor.

20         THE COURT:  Any objection to the factual accuracy of

21   the report?

22         MS. SWEENEY:  No, Your Honor.

23         THE COURT:  Any objection to the calculation of the

24   guidelines?

25         MS. SWEENEY:  No, Your Honor.

1          THE COURT:  Has the defense had an opportunity to

2    review the Pre-Sentence Report?

3          MR. GEORGE TRAGOS:  Yes, Your Honor.

4          THE COURT:  Any objection to the calculation of the

5    guidelines?

6          MR. GEORGE TRAGOS:  Yes, Your Honor.

7          THE COURT:  Any objection to the factual accuracy of

8    the report?

9          MR. GEORGE TRAGOS:  Yes, Your Honor.

10          (Brief pause.)

11          THE COURT:  There are a number of objections lodged

12    in the Pre-Sentence Report that were submitted by the defense

13    in writing.  The one initial was page three, the country of

14    birth was to be Kosovo, not Yugoslavia.

15          Was that corrected in the amended report?

16          MR. GEORGE TRAGOS:  Yes, Your Honor.

17          THE COURT:  The reference to the Al-Qaeda flag was

18    requested to be stricken.  Was that corrected?

19          MR. GEORGE TRAGOS:  No, Your Honor.

20          THE COURT:  Was there reference in the communications

21    as the Government recalled them to the word "Al-Qaeda" or was

22    it black flag or flag?

23          MS. SWEENEY:  In the communication that the Defendant

24    had with -- via telephone in December of 2010, it was solely to

25    black flag, Your Honor.  The words "Al-Qaeda" were not used in

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
1    that call.  The CHS later reported this information and it's
2    the Government's contention that that information is
3    corroborated by the Defendant's prior interest in black flags
4    which the Court heard testimony on.
5              THE COURT:  The Pre-Sentence Report should eliminate
6    the reference to the use of Al-Qaeda as requested by the
7    defense.
8              Page five, paragraph eight; was it stricken or did it
9    remain?
10             MS. SWEENEY:  It remained, Your Honor.
11             THE COURT:  Ms. Vizza, would you print the PSR?  I
12   can't look at it in two places.
13             No, the PSR itself.  I'm on the first five pages
14   anyway.  All right.
15             (Brief pause.)
16             The next challenge is to -- what is it now, page
17   five, paragraph -- is it eight?
18             MS. SWEENEY:  Yes, Your Honor.
19             THE COURT:  And this is a reference to the
20   confidential human source who did not testify according to the
21   defense?
22             MS. SWEENEY:  And that is correct, Your Honor.  A
23   portion of that meeting, or a recording from it, was played at
24   trial, and the Government believes there are portions of that
25   recording that corroborate this information as well as later
```

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
 1    statements of the Defendant.

 2              THE COURT:  That were played during trial?

 3              MS. SWEENEY:  Yes, Your Honor.

 4              THE COURT:  What portions -- what part are you

 5    talking about?

 6              MS. SWEENEY:  Specifically from that meeting, from

 7    the November 30, 2011 meeting with --

 8              MR. GEORGE TRAGOS:  I'm sorry, could we have an

 9    exhibit number so we can pull it up?

10              MS. SWEENEY:  Sure.  Right now, I'm speaking about

11    Exhibit 101.2 -- I'm sorry -- 101.8, I apologize.

12              THE COURT:  I'm asking you what are you talking about

13    in this paragraph that came from 101.8?

14              MS. SWEENEY:  Yes, Your Honor.  In that -- in that

15    recording, the Defendant says, "I'm going to put the belt on,

16    there's nobody stopping me, nothing now."  He references that

17    "If the other brother doesn't want to, I'll just hold one on me

18    until they both make bigger, big, unintelligible, don't worry

19    about, unintelligible, I'll put them together, I'll put one on

20    my leg if I have to, I don't care.  You know why, 'cause when

21    Allah says be as it is, I'm going to come back to like this on

22    the day of judgment."

23              THE COURT:  All right.

24              So that, in your mind, ties to what language in this

25    paragraph?
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              MS. SWEENEY:  It ties to the language, Your Honor,
 2    that the Defendant had asked the CHS to help him procure
 3    firearms and a belt containing explosives for use in the
 4    attack.
 5              THE COURT:  You disagree, Mr. Tragos?
 6              MR. GEORGE TRAGOS:  Yes, Your Honor.  The wording in
 7    the paragraph in the Pre-Sentence Report says, "During this
 8    meeting, the Defendant asked the CS to help him procure
 9    firearms and a belt containing explosives for use in the
10    attack."  The transcript -- at least the transcript I have
11    says -- does not say that, it talks about the belt --
12              THE COURT:  What does it say?
13              MR. GEORGE TRAGOS:  The CHS says, "If you -- if you
14    want a belt, we'll get you a belt.  Now you need two of them.
15    And you have everything after that.  You don't see me, I don't
16    see you."  That's the CHS talking.  There is no request on
17    there with the Defendant speaking asking the CHS for a belt.
18    The CHS saying, "I'll get you a belt."
19              THE COURT:  May I see the exhibit?
20              MS. SWEENEY:  Yes, Your Honor.
21              Your Honor, may I just present this?  Would you like
22    me to pull the specific one out of here for you?
23              THE COURT:  You can give me the notebook, it's
24    marked.
25              (Brief pause.)
```

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
1              101.8?
2              MS. SWEENEY:  101.8-B, Your Honor.
3              MR. GEORGE TRAGOS:  You have a page number for this?
4              MS. SWEENEY:  The first reference to the belt is on
5    page one, close to the -- it's in the top quarter to half of
6    the page.
7              The next reference to the belt is on page three.  The
8    CHS begins, "You want a belt, we'll get you the belt.  Now you
9    need two of them.  Fine, fine."  And it continues on from there
10   with the passage that I previously read about the Defendant
11   saying he would put them on his leg if he didn't have another
12   person.
13             On page 10, the Defendant states that it's -- I'm
14   sorry -- "What you might want to do is on the same day, 'cause
15   once I get it, it's going to be the same day, the same hour."
16   And then he says, "It would be better to me on a Friday.  Do
17   you know why?  Because of the mosque.  It's a reason for me to
18   be in Tampa because I used to go to the mosque in Tampa every
19   Friday."  And then conversation continues on with the CHS
20   saying, "If the thing is ready, you're going to take them and
21   do what you have to do without even looking."  And the
22   Defendant replies, "Yeah."  And it continues on to the next
23   page.  "You're not going to even look if there are people over
24   there or not."  The Defendant says, "Where?"  The CHS says,
25   "You're going to do it at random."  And the Defendant says,
```

```
 1   "I'm not going to do this till they come for me.  I'm going to
 2   do this."
 3           And the conversation continues on and the CHS says,
 4   "You promise me not to go to a mall."  And the Defendant then
 5   whispers the word "recruiting" which is the information that
 6   the CHS had provided was that at this time, the Defendant's
 7   target was a recruiting center.
 8           And the Defendant -- on page 12, the confidential
 9   source says, "All I know is, you know, you don't hurt anybody
10   as we agreed, civilians."  Then it continues on the next page
11   and the Defendant says, "I do what's more beneficial."
12           THE COURT:  All right.
13           The Court will make a modification to paragraph eight
14   to say in the second sentence, "During this meeting, the
15   Defendant and the CS discussed the Defendant's use of a belt
16   containing explosives for use in an attack."
17           And the rest seems to be consistent with the language
18   in the communications related to that issue.
19           Any objection from the Government?
20           MS. SWEENEY:  No, Your Honor.
21           THE COURT:  Any objection from the defense?
22           MR. GEORGE TRAGOS:  No, Your Honor.
23           THE COURT:  To be clear, the sentence beginning with
24   "during" will read, "During this meeting, the Defendant and the
25   CS discussed the Defendant's use of a belt containing
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1    explosives for use in an attack."

2              The Court will sustain the objection to paragraph

3    nine, and the word "work" will be the last word in that

4    paragraph.  And then in paragraph five -- I'm sorry -- page

5    five, paragraph 11, objection number five, the defense says

6    that the Defendant did not say "maybe can figure out how to use

7    an AK-47."

8              You deny that that statement was made?

9              MR. GEORGE TRAGOS:  No, Your Honor, the word "maybe"

10   wasn't in the original Pre-Sentence Report.

11             THE COURT:  So that has been resolved?

12             MR. GEORGE TRAGOS:  Yes, that has been resolved.

13   They added the word "maybe."

14             THE COURT:  All right.

15             Page six, paragraph 12; has that objection been

16   resolved?

17             MR. GEORGE TRAGOS:  No, Your Honor.

18             THE COURT:  What is the objection?

19             You can just remain seated during this portion so you

20   have the documents in front of you and we can move more

21   quickly.

22             MR. GEORGE TRAGOS:  Your Honor, is the issue of the

23   $500.  I'm sure the Court remembers that issue during the

24   course of the trial, the 500 being provided by the Government

25   to the Defendant through the CHS so the Defendant could then

```
 1    pay for explosives or ammunition or weapons.  The Government is
 2    maintaining or the Government's argument here is that this was
 3    part of the Defendant's salary, that they did not --
 4              THE COURT:  So if we change the words "provided to
 5    hand it", is that sufficient to resolve your concern concerning
 6    the accuracy of this statement?
 7              MR. GEORGE TRAGOS:  Excuse me, Your Honor, if I might
 8    have a moment.
 9              Okay.  Your Honor, I'm not sure what -- we would ask
10    for the last sentence to be stricken in 12.  I don't know what
11    the Court is --
12              THE COURT:  Any objection to striking the last
13    sentence?
14              MS. SWEENEY:  Yes, Your Honor.  I don't believe it's
15    factually accurate if that sentence is removed.  The money was
16    the Defendant's money and he chose what to do with it.  I don't
17    have -- the money did initially come from the FBI.  The FBI
18    gave it to the CHS, but the CHS gave it to the Defendant as his
19    salary and that's what the Defendant believed and the Defendant
20    talked on other occasions about the CHS owing him money as
21    salary.
22              MR. GEORGE TRAGOS:  If the Court will remember in the
23    overhears, it was specifically stated, they spoke about giving
24    him the 500 and they were worried he might walk with the 500.
25    They wanted to make sure he used that 500 to buy the explosives
```

```
 1    so he wouldn't walk away with it.
 2              MS. SWEENEY:  I think that is precisely the point,
 3    Your Honor, he could have used the money for whatever he wanted
 4    and he chose to use it to pay the undercover a down payment for
 5    weapons, firearms and explosives.
 6              THE COURT:  Why is it relevant to sentencing?
 7              MS. SWEENEY:  It does not affect the guidelines
 8    calculation, Your Honor.  I'm not saying that it does, but I do
 9    think it's an important point --
10              THE COURT:  This isn't an appellate brief.  If the
11    parties want to argue about what was proven at trial by use of
12    the transcript, they can do so.  The sentence will be stricken.
13    It doesn't mean it wasn't argued, it doesn't mean the testimony
14    didn't come in, it just means it's not pertinent to the PSR, it
15    is not pertinent to housing of the Defendant and it's not
16    pertinent to the Court's sentencing decision.
17              So the Court would delete the last sentence from the
18    statement.  This is not a ruling that the Government did not
19    establish evidence that it gave money to the Defendant as
20    ostensible salary for working in the confidential source's
21    business and that the Defendant used that money to purchase the
22    explosives.  It's -- that's the Government's contention, the
23    jury heard evidence, the jury made a finding of guilt based
24    upon all of the evidence it heard.  We don't know what they
25    believed and didn't believe of that evidence.
```

1            Page nine, paragraph 25.  Did that get corrected or

2   is that still at issue?

3            MR. GEORGE TRAGOS:  I don't have that in my --

4            MS. SWEENEY:  I believe it is corrected, Your Honor.

5   I believe the Defendant's objection was to the word "valuable"

6   being used rather than "sacred" as to the -- and I think it's

7   corrected.

8            THE COURT:  All right.

9            MR. GEORGE TRAGOS:  Excuse me, Your Honor.

10           (Brief pause.)

11           Your Honor, can we check for a second, 'cause we need

12   to check the transcript because the way that the transcript may

13   read is that it was sacred, more sacred than the Caba in the

14   site of Allah, as opposed to the people who do not believe in

15   Islam, though I know it's not in quotes, but we're -- give us a

16   second to check that.  Actually, the way the transcript reads,

17   "More sacred than tearing down the Caba brick by brick".  This

18   is 10-D(40).

19           THE COURT:  Is this on the record or are you having a

20   conversation with Ms. Sweeney?

21           MR. GEORGE TRAGOS:  Your Honor, I'm actually

22   announcing it on the record that the 10-D(40), that also

23   probably helps Ms. Sweeney find it.

24           MS. SWEENEY:  Your Honor, this should be Government's

25   Exhibit -- I'm sorry, Your Honor, just a moment.  I'm having

1    difficulty finding it for some reason.

2              THE COURT:  What is it that the Defendant wishes the

3    language to say in paragraph 25?

4              MR. GEORGE TRAGOS:  "More sacred than tearing down

5    the Caba brick by brick".

6              THE COURT:  That is in lieu of "more sacred than the

7    people who do not believe in Islam"?

8              MR. GEORGE TRAGOS:  Yes, Your Honor.

9              THE COURT:  So what's the Exhibit Number?

10             MS. SWEENEY:  124-B, Your Honor, which is not in that

11   binder that you have there.  I'll provide another one.

12             MR. GEORGE TRAGOS:  B like boy?

13             MS. SWEENEY:  Yes.  Your Honor, what the --

14             THE COURT:  One second.

15             MS. SWEENEY:  Yes.

16             THE COURT:  124-B, what page?

17             MS. SWEENEY:  The first page, Your Honor, and it's

18   the third -- kind of -- well, the second paragraph from the

19   bottom, it begins, "The blood of one Muslim," and in fact,

20   that's the sentence the Defendant is talking about.

21             THE COURT:  What is the sentence that the Government

22   is talking about?

23             MS. SWEENEY:  Your Honor, the PSR is --

24             THE COURT:  What sentence is the Government quoting

25   here?

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1          MS. SWEENEY:  Your Honor, it's not a quote, it's the

2     interpretation of what the Defendant means there.  I believe

3     the PSR is accurate in what it says.  It's not a direct quote,

4     but instead, it explains what is meant by this reference to

5     "tearing down the Caba brick by brick".

6          (Brief pause.)

7          THE COURT:  Well, rather than translating or being

8     descriptive, we will just insert the quote in its entirety of

9     this third paragraph, third full paragraph on page one of three

10    of Exhibit 124, in lieu of -- we'll start with "In the video,

11    the Defendant stated:" and then we'll just insert this entire

12    third full paragraph and then we will go to "and lastly," and

13    so that we don't need any translation or interpretation, we'll

14    just use the Defendant's words.

15          Any objection from the Government?

16          MS. SWEENEY:  No, Your Honor.

17          THE COURT:  Any objection from the defense?

18          MR. GEORGE TRAGOS:  No, Your Honor.

19          THE COURT:  And does the Probation Office have the

20    document?

21          THE PROBATION OFFICER:  No, we do not, Your Honor.

22          THE COURT:  All right.

23          Let me give it to you now so that we don't lose sight

24    of it.  Is this a Court copy or the Government's original?

25          MS. SWEENEY:  It's a Court copy, Your Honor.

1          THE COURT:  Thank you.

2          Page 13, paragraph nine.  Was that corrected?

3          MR. GEORGE TRAGOS:  I believe it was, Your Honor.

4          THE COURT:  All right.

5          And page 17, paragraph 18.

6          MR. GEORGE TRAGOS:  Actually, it's paragraph 81, Your

7    Honor, it was inverted.

8          THE COURT:  I'm sorry.

9          MR. GEORGE TRAGOS:  I'm sorry.

10          THE COURT:  Was that corrected?

11          MR. GEORGE TRAGOS:  No, Your Honor.

12          THE COURT:  Must be a new paragraph now.  What

13    paragraph is it now?

14          THE PROBATION OFFICER:  82, Your Honor.

15          THE COURT:  Well, there's a straight quote mark that

16    should be removed, first of all, because it's not a quote, and

17    I think that it's not inaccurate.  And so the Court would

18    overrule the objection.  But the quote mark should be removed

19    because there's no quotation there.

20          The Defendant also asserts -- are there any other

21    factual issues that the Court needs to address?

22          MR. GEORGE TRAGOS:  No, Your Honor.

23          THE COURT:  With respect to the calculation of the

24    guidelines, there is an assertion that there's a sentencing

25    entrapment departure that should apply in the case.  The

1   Government cites legal authority that the Eleventh Circuit

2   doesn't recognize such a departure.

3            Does the defense have any contrary legal authority?

4            MR. GEORGE TRAGOS:  If the Court will indulge me.  I

5   recognize that the Eleventh Circuit in the *Sanchez* case has

6   stated that as a matter of law has rejected sentencing

7   entrapment, and it also goes on to speak about sentencing

8   factor manipulation.  And it has some -- I think this case may

9   have some factual distinctions that may apply, but I recognize

10  that the Eleventh Circuit's opinion right now is that there is

11  no such thing.

12           THE COURT:  Well, then you preserve your objection?

13           MR. GEORGE TRAGOS:  That's what I want to do.

14           THE COURT:  It is so noted, but the Eleventh Circuit

15  doesn't recognize it and if you would like to argue for a

16  change in the law in that regard, you're free to assert that on

17  appeal.

18           MR. GEORGE TRAGOS:  Thank you, Your Honor.

19           THE COURT:  Is there a specific factual distinction

20  that you think you need to put on the record so it's preserved?

21           MR. GEORGE TRAGOS:  Well, Your Honor, in this case,

22  our position is that all the Defendant wished to procure on his

23  own were guns, according to the statements that -- on the

24  transcripts, that he went down to St. Petersburg to buy some

25  guns, and that the Government introduced weapons of mass

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1   destruction, and therefore, this matter should only be with

 2   regards to the count with regards to the unlawful possession of

 3   the guns and that the weapons of mass destruction was a

 4   sentencing entrapment by the Government in order to increase

 5   the Defendant's sentence.

 6               THE COURT:  All right.  Thank you.

 7               There's an objection to an increase of 12 levels for

 8   terrorism.  Do you wish to be heard on that objection?

 9               MR. GEORGE TRAGOS:  Your Honor, we would rely on the

10   matters raised in the Pre-Sentence Report that we've raised in

11   writing on that.  No oral argument.

12               THE COURT:  All right.  It's overruled.

13               Objection 30 to paragraph 31 for base offense level

14   of 28.  Anything further you'd like to add than what is in the

15   Pre-Sentence Report objection?

16               MR. GEORGE TRAGOS:  No, Your Honor, we continue just

17   to maintain that objection with no oral argument.

18               THE COURT:  The Court would overrule that objection

19   on the basis stated by the Office of Probation and response and

20   on the Court's independent review of the guidelines.

21               (Brief pause.)

22               MR. GEORGE TRAGOS:  Your Honor, may I leave the Court

23   to go excuse a witness?

24               THE COURT:  You may.  Somebody who wants to testify

25   on the Defendant's behalf and is running late or what?
```

1            MR. GEORGE TRAGOS:  No, Your Honor, we subpoenaed

2    some probation records from State Probation 'cause we thought

3    they may contain some information that would be relevant.  They

4    do not have the information we were looking for, so I'm going

5    to excuse the Probation Officer who brought the file.

6            THE COURT:  All right.

7            MR. GEORGE TRAGOS:  Thank you, Your Honor.

8            THE COURT:  Having addressed the factual disputes and

9    resolved them in accordance with the Court's statements on this

10   record, the Court adopts the factual statements as indicated by

11   the Office of Probation, except as modified on the record.  The

12   Court having overruled the guideline challenges for the reasons

13   stated finds that the Probation Officer's guideline

14   calculations are accurate.

15            Therefore, the Court determines the advisory

16   guideline range in this case to be a total offense level of 43,

17   the Defendant has a criminal history category of VI, the

18   guideline calculation would calculate a total of life

19   imprisonment, and there's a term of supervised release of any

20   term to -- any term of years to life as to Count One, and a one

21   to three-year period of supervised release as to Count Two.

22   Restitution would not be applicable.  The fine in this case

23   would be between $25,000 and $250,000 and there's a 200-dollar

24   mandatory special assessment that's statutorily set forth.

25            Does the Defendant wish to present any argument in

1    mitigation and does the Defendant wish to make a statement in

2    allocution, keeping in mind I received yesterday evening at

3    about 4:30 this 54-page document of a composite exhibit of

4    statements of persons offering mitigating information on the

5    Defendant's behalf, which the Court read in its entirety,

6    albeit much later than it should have been submitted for the

7    Court's consideration?

8              So do you wish to make any other statement in

9    allocution or mitigation?

10             MR. GEORGE TRAGOS:  Yes, Your Honor.

11             Does the Court understand that that was submitted to

12   Probation much earlier than yesterday?

13             THE COURT:  The Court understands that someone

14   attempted, allegedly, to submit it to Probation and that it was

15   returned on an unspecified date to your office and that it was

16   not then returned back to Probation until day before yesterday.

17             MR. GEORGE TRAGOS:  All right.

18             THE COURT:  So I don't know how it would have been

19   returned or who returned it.  Is it a postal undeliverable

20   return?  What happened to it?

21             MR. GEORGE TRAGOS:  Your Honor, the address on the

22   web -- Probation's website apparently was inaccurate or

23   something, but we got it back after we sent it to that and we

24   forwarded it on.

25             THE COURT:  When did you get it back, though?

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
 1              MR. GEORGE TRAGOS:  I don't remember.

 2              THE COURT:  Well, I'm sure it didn't take the Postal

 3    Service a month to get it back to you.  And you know where

 4    Probation is.  But in any event, I got it, I read it, I know

 5    what all of the people have said in support of Mr. Osmakac who

 6    have taken the time to write letters, many of which apparently

 7    were in the possession of the defense back in the summer.

 8              So I've read them and I understand what they all say.

 9    Do you wish to offer any additional argument or mitigation and

10    does the Defendant wish to allocute?

11              MR. GEORGE TRAGOS:  Your Honor, first, I guess, yes,

12    if we could speak to mental health as a possible departure or

13    deviation from the guideline recommendation that the Court

14    heard several mental health experts.

15              THE COURT:  This is the 3553 factor to consider in

16    the Defendant's sentencing?

17              MR. GEORGE TRAGOS:  Yes, Your Honor.

18              THE COURT:  All right.

19              MR. GEORGE TRAGOS:  That we believe that the mental

20    health issues in this case are extraordinary, atypical and

21    severe enough to justify a downward 3553 type departure, that

22    the Defendant has and it was testified to the borderline

23    intelligence and that he has lost weight, he's extremely

24    emaciated from his time in prison or in the county jail, that

25    his mental health disorders are spoken to, although in
```

1    different forms and maybe different titles, but everyone who

2    testified at the trial talked about what -- that he is

3    suffering from mental health issues.

4            We have a schizophrenic disorder, deferred

5    hypothyroidism, moderate.  Even the experts that the Court

6    hired that weren't hired by the State or the defense said that

7    the Defendant suffers from depressive disorders, psychotic

8    disorder, PTSD, the schizophrenia disorder, depression,

9    isolation, suicidal, homicidal ideation, paranoia, auditory and

10   visual hallucinations.  And then -- that's Dr. Goldsmith in

11   February 12, 2013.  When Dr. Goldsmith went back on May 17th,

12   2014, to evaluate the Defendant, she again came up with a

13   similar diagnosis with similar observations.

14           And the adequate treatment, he has not improved,

15   he's, in fact, gotten worse, and so he was not receiving, while

16   he was incarcerated, adequate treatment.

17           Dr. Taylor, who the Court appointed to go see him as

18   a psychiatrist, diagnosed him with hyperthyroidism,

19   schizoaffective disorder, depressive type, Post Traumatic

20   Stress Disorder.  And although I'm mentioning these and quoting

21   out of the reports, most of this is also in the Pre-Sentence

22   Report, where the Probation Officer went through the

23   psychiatric reports and listed these items.

24           He also suffers from depression, lack of sleep and a

25   lack of eating.  That's Dr. Taylor who was appointed by the

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

 1 | Court.
 2 |         Dr. McClain diagnosed him with major depression,
 3 | recurrent, psychotic disorder, Post Traumatic Stress Disorder,
 4 | and hyperthyroidism, that he has adjusted poorly to
 5 | incarceration, that he has increased depression over time in
 6 | prison and suicidal thoughts.
 7 |         The Government hired Dr. Johnson and Dr. Montalbano
 8 | who evaluated him and stated basically that he's diagnosed with
 9 | a persistent depressive disorder, dysthymia.
10 |         They speak about his traumatic childhood which is
11 | also, we believe, to be considered under 3553, and that we've
12 | got some traumatic conditions, specifically the Arab plane that
13 | almost crashed, the change in countries, violence in his
14 | country, moving around, the instability and the fear that he
15 | grew up with from Kosovo.
16 |         Your Honor, I would like to call Dr. McClain to
17 | expound on these issues with regard to sentencing.
18 |             THE COURT:  Call your witness.
19 |             MR. GEORGE TRAGOS:  Okay.
20 |             THE COURT:  Dr. McClain, you remain under oath.
21 |             THE WITNESS:  Yes, Your Honor.
22 |             THE COURT:  Counsel.
23 |                         DIRECT EXAMINATION
24 | BY MR. GEORGE TRAGOS:
25 | Q.   Dr. McClain, can you tell this Court what you believe

```
1    Mr. Osmakac is suffering from?
2    A.   Certainly.  With respect to mental health diagnoses, based
3    upon my review of documentation, the other doctors' evaluations
4    and my multiple interviews with the Defendant, I think he
5    suffers from major depression, recurrent, psychotic disorder
6    and also from Post Traumatic Stress Disorder.
7    Q.   How is prison affecting that or jail?
8    A.   During the course of the time that I've seen Mr. Osmakac,
9    I've seen him approximately six times.  And during the times
10   that I've seen him, there has been a consistent depression with
11   regard to lack of appetite, weight loss, sleep problems,
12   excessive feelings of guilt, suicidal thoughts, again, at times
13   hearing voices, seeing demons.  Basically, it's been consistent
14   that he has been depressed, severely depressed, and in and out
15   of suicidal precautions.
16          MR. GEORGE TRAGOS:  Your Honor, I have, in the
17   interest of efficiency, not gone through her resume, and those
18   types of things.  I think the Court probably remembers those
19   from the trial.  Does the court believe it should have to
20   review those again?
21          THE COURT:  Does the Government object to Dr. McClain
22   being qualified to offer an opinion in this regard?
23          MR. SWEENEY:  No, Your Honor.
24          THE COURT:  All right.
25          She's so qualified.
```

```
 1              MR. GEORGE TRAGOS:  Okay.  The other is, Your Honor,
 2    since her report is fairly summarized in the Pre-Sentence
 3    Report, I'm not going to go through all the details of that, as
 4    well.  And I know that the Court has a copy of that.  Would the
 5    Court allow that also to become part of her report, become part
 6    of the sentencing in this case?
 7              THE COURT:  Any objection from the Government?
 8              MS. SWEENEY:  Your Honor, if --
 9              MR. GEORGE TRAGOS:  All the reports.
10              MS. SWEENEY:  Yes, all the reports would be my
11    request.
12              THE COURT:  All right.
13    BY MR. GEORGE TRAGOS:
14    Q.   Do you believe that his continued incarceration for life
15    would severely impact his mental health?
16    A.   I think that based upon my observations during the course
17    of his stay at the jail, that his condition will remain the
18    same.  He's been prescribed medication, but his condition
19    basically has remained the same.
20              MR. GEORGE TRAGOS:  That's all the questions I have,
21    Your Honor.
22              THE COURT:  Any inquiry of this witness?
23              MS. SWEENEY:  Just briefly, Your Honor.
24                        CROSS-EXAMINATION
25
```

1   BY MS. SWEENEY:

2   Q.   Good morning, Dr. McClain.

3   A.   Good morning.

4   Q.   Has anything significant changed since your testimony at

5   trial?  Is there anything that you said at trial that is

6   different now as to the Defendant?

7   A.   No.

8   Q.   Have you written any additional reports or done any other

9   written work since the time of trial in this matter?

10  A.   Only a two-sentence memo that was not based upon an

11  interview with the Defendant, but just to state I was unable to

12  see him.

13  Q.   You said that -- is it your position that the Defendant's

14  stay in jail currently has impacted his mental health since he

15  got into jail?

16  A.   It's my statement that his mental health condition has

17  remained very poor with regard to the severity of the

18  depression.  I did not evaluate him outside of the jail

19  context, so I would not have observations pre-jail or

20  pre-incarceration.

21  Q.   Okay.  Are you aware of the Defendant's misbehaviors while

22  he's been in jail?

23  A.   Yes.

24  Q.   And would you -- do you agree that incarceration for life

25  could very well impact absolutely anyone's mental health?

```
 1  A.    Yes.
 2            MS. SWEENEY:  Thank you, Dr. McClain.
 3            Nothing further, Your Honor.
 4            THE WITNESS:  Certainly.
 5            THE COURT:  You may step down.
 6            THE WITNESS:  Thank you, Your Honor.
 7            MR. GEORGE TRAGOS:  May she be excused, Your Honor.
 8            THE COURT:  Yes, you may be excused.  Thank you.
 9            THE WITNESS:  Thank you, Your Honor.
10            (Witness excused.)
11            THE COURT:  Yes, sir?
12            MR. GEORGE TRAGOS:  Your Honor, at this time, the
13  defense would call Avni Osmakac.
14            THE COURT:  Please come forward to be sworn.
15  Thereupon,
16                        AVNI OSMAKAC,
17  after having been duly sworn to tell the truth, the whole truth
18  and nothing but the truth, under penalty of perjury, was
19  examined and testified as follows:
20            THE WITNESS:  I do.
21            THE CLERK:  Please seated.
22            Please state your name for the record.
23            THE WITNESS:  Avni Osmakac.
24            THE COURT:  Spell your name.
25            THE WITNESS:  A-V-N-I, last name is O-S-M-A-K-A-C.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              THE COURT:  All right.
 2              You're under oath, sir.  You must give truthful
 3    answers to any questions that are asked.  Any statements that
 4    you give must be truthful.  If you give false statements, you
 5    face penalties of perjury, false statement and obstruction.
 6              Do you understand that?
 7              THE WITNESS:  Yes.
 8              THE COURT:  You submitted a letter to the Court on
 9    your brother's behalf that is dated September 29th, 2014.  Do
10    you recall that?
11              THE WITNESS:  Yes.
12              THE COURT:  I have read that letter a couple of
13    times, so I'm familiar with its contents.  So it's not
14    necessary for you to repeat that.
15              Counsel, if you have other questions you'd like to
16    ask of him, feel free to do so at this time.
17              MR. GEORGE TRAGOS:  Thank you, Your Honor.
18                        DIRECT EXAMINATION
19    BY MR. GEORGE TRAGOS:
20    Q.   Mr. Osmakac, I'd like you to go -- well, just to make
21    sure, you are the Defendant's brother, correct?
22    A.   Yes.
23    Q.   And have you lived with your brother your whole life?
24    A.   Yes.
25    Q.   If you can, explain the change that overcame your brother
```

1    to, I guess, radicalize him or make him more religious.  How

2    did that occur?

3    A.   Well, after trip to Europe for my older brother's wedding,

4    we came back, and from Washington, D.C. to Tampa, we had a

5    turbulence where the pilot said over the speaker to prepare for

6    an emergency landing.  And the lights went out and the plane

7    started dropping right away and we thought we going to die, so

8    that was the first time I ever seen him pray when I turned to

9    the side.

10        And ever since that when we landed safely, ever since

11   that, he's just started changing, he wasn't sleeping, like he

12   would just leave at night, and then we'd tell him like, what's

13   going on.  He wouldn't talk to us, he would just leave the

14   house, and he started going to the mosque, which he never did

15   before.  He started going around asking people for why am I

16   hearing voices, to multiple preachers, Muslim preachers, which

17   are scared to come to testify because then to be intimidated by

18   the Government.

19   Q.   And did you ever advise your brother to go seek any type

20   of mental health treatment?

21   A.   Multiple times, the whole family did.

22   Q.   Why is that?

23   A.   Because we seen the changes in him.  Like he wasn't the

24   same person.  He was just constantly talk about death, I'm

25   going to die soon, I'm going to die soon.  His clothing

1    changed, his character changed, everything.

2    Q.   Before that happened, what was your brother like?

3    A.   Just a normal 22 year -- up to 22, almost 23, he was the

4    normal guy like anybody, playing soccer, dating, night life,

5    everything, the same like everybody else.  He was mostly around

6    us, my brothers, my friends.  My friends couldn't come here

7    because they intimidate by the Government, too.  I want to make

8    this clear, the Government is going around intimidating people.

9              THE COURT:  Who do they intimidate?

10             THE WITNESS:  My friends.  One of his friends right

11   now to be deported.

12             THE COURT:  Has the Government -- any person from the

13   Government approached you, personally?

14             THE WITNESS:  They approached me on the date of

15   arrest.  I've seen them around me, but I'm not scared of them.

16   I going to speak my mind.

17             THE COURT:  Counsel.

18             THE WITNESS:  And by the way, there's other

19   informants not being --

20             THE COURT:  Wait until you're asked a question.

21             Counsel.

22   BY MR. GEORGE TRAGOS:

23   Q.   When this happened with your brother, did it come as a

24   surprise to you when he got arrested?

25   A.   Yes, it did, but we seen people like following us around

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1  every day.  We've seen undercover agents around my house every

2  day, but they knew my brother was not dangerous and they knew

3  because they were watching him 24/7.

4  Q.   With regard to your brother's character, was there

5  anything you'd like to tell the Court about -- that would

6  exhibit what kind of character he has?

7  A.   Before he got sick to this day, he was working -- he was

8  training with the Secret Service, ex Secret Service guy.  He

9  was training for seven years with him.  Before that, he used to

10 give bread and everything, homeless people every day.  The

11 Secret Service Agent -- the ex Secret Service agent was working

12 with him for seven years.  And I believe you have a letter from

13 him, too, Amir.

14 Q.   He's the Karate instructor?

15 A.   Yes, he's a kickboxing instructor.

16 Q.   Okay.  I didn't mean to stop you.  Is there anything else

17 you want to reflect on his character or would like to --

18 A.   He goes out of his way, he's done so many things for other

19 people, it doesn't matter what religion --

20          THE COURT:  Slow down a little bit because you're

21 being recorded by the Court Reporter.  When you're speaking,

22 speak a little bit slower.

23          THE WITNESS:  I'm sorry.

24          Well, he goes out of his way, he went out of his way

25 to pick up people from different religion to help them out with

1    stuff, with moving, with everything and it doesn't matter what

2    religion they were, the ethnicity, that's how he was before he

3    got sick.  After he got sick, he just disappeared, he went in

4    his own box, he wouldn't talk to friends, family, nobody.

5    BY MR. GEORGE TRAGOS:

6    Q.    Did you feel at that time that he was being easily

7    influenced by other people?

8    A.    Very much.  There was some people around him we never seen

9    before who disappeared right after his arrest.

10   Q.    And how were they influencing him?

11   A.    Everything, by his clothing, by his talking, the way he

12   was acting towards his family.  They were telling him your

13   family is not Muslim because they don't practice like us.

14   These are people that disappeared the next day that he was

15   arrested, multiple people.

16   Q.    Is there anything you'd like to add that would be relevant

17   to the sentencing of your brother?

18   A.    I believe if my brother wasn't sick and the Government

19   being around him, he would never commit any crime.  And the

20   Government knows that.  This is all a show.  They trying to

21   intimidate and scare people.  This is all a show for them

22   'cause they knew exactly, he was sick, and he was never been

23   able to commit a crime.  The day that they said he went to St.

24   Pete to get weapons, he was already working with the informant

25   that month and a half before that.  That month and a half,

```
 1    there was no recording, no nothing.
 2            MR. GEORGE TRAGOS:  That's all I have for this
 3    witness, Your Honor.
 4            THE COURT:  Counsel?
 5            MS. SWEENEY:  I have no inquiry of this witness, Your
 6    Honor.
 7            THE COURT:  Thank you.  You may step down.
 8            MR. GEORGE TRAGOS:  Your Honor, would the Court allow
 9    him to stay near the podium in order to translate for his
10    mother or his father who are my next witnesses?
11            THE COURT:  Is there not an official translator who's
12    been requested for this proceeding?
13            MR. GEORGE TRAGOS:  No, Your Honor.
14            THE COURT:  Is he an official Court translator?
15            MR. GEORGE TRAGOS:  He is not.
16            THE COURT:  Why don't you have a translator here,
17    Mr. Tragos?
18            MR. GEORGE TRAGOS:  I think the Government doesn't
19    have any objection to him translating.
20            THE COURT:  Counsel?
21            MR. GEORGE TRAGOS:  Are you talking to me?
22            THE COURT:  No.
23            MS. SWEENEY:  Your Honor, I don't have an objection.
24    I agree that Mr. Avni Osmakac is not a Court certified
25    translator, but I believe if the Court explains to him that he
```

```
 1   has an obligation to translate accurately and truthfully, the
 2   Government wouldn't have an objection to the testimony of the
 3   Defendant's mother and father being on the record here.
 4              THE COURT:  Mr. Osmakac, do you speak -- what is the
 5   language of your parents?
 6              THE WITNESS:  Albanian.
 7              THE COURT:  And do you speak Albanian?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Fluently?
10              THE WITNESS:  Yes.
11              THE COURT:  Do you translate for them in other
12   contexts?
13              THE WITNESS:  Yes.
14              THE COURT:  In what other contexts?
15              THE WITNESS:  They go see doctors, anything, mail.
16              THE COURT:  Do you feel that you are competent to
17   translate precisely what they tell the Court from Albanian to
18   English without any embellishment or descriptiveness, just to
19   tell me exactly the words they're saying?
20              THE WITNESS:  Yes.
21              THE COURT:  Even if their words don't make sense to
22   you or they're not the right words to use, can you translate
23   what they're saying in English precisely as they have stated
24   it?
25              THE WITNESS:  Yes.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              THE COURT:  Without objection from the Government,
 2    the Court will hear the testimony of the Defendant's mother and
 3    father.
 4              Please call your witness.
 5              MR. GEORGE TRAGOS:  Thank you, Your Honor.
 6              THE COURT:  Please swear the witness as an
 7    Interpreter, Ms. Vizza.
 8              THE CLERK:  Do you solemnly swear or affirm that you
 9    will fairly, truly and impartially, under penalty of perjury,
10    translate as an Albanian Interpreter in the matter before the
11    Court?
12              MR. AVNI OSMAKAC:  I do.
13              THE CLERK:  Thank you.
14    Thereupon,
15                        MRS. OSMAKAC,
16    after having been duly sworn to tell the truth, the whole truth
17    and nothing but the truth, under penalty of perjury, was
18    examined and testified as follows:
19              THE COURT:  You need to translate as she's speaking.
20              Stop.
21              Translate.
22              Continue.
23              Stop.  This witness is not competent to translate,
24    so...
25              MR. GEORGE TRAGOS:  If the Court please, I think he
```

1    may not have understood.  If the Court will give him --

2         THE COURT:  Well, what you have to do, Mr. Osmakac,

3    is every word that is said, you have to translate to the

4    witness as it's being said or we can stop in between words that

5    are being spoken and you can translate.  And then anything that

6    she says, whether she says good morning, good night, oops, I

7    didn't understand that, you have to translate that for the

8    Court.

9         Do you understand that?

10        MR. AVNI OSMAKAC:  I'm not able to do that.

11        THE COURT:  All right.

12        The Court has statements from the mother, I know.  Do

13   we have one from -- and I have a statement from the Defendant's

14   father.  Are they going to say something different than they

15   have said in their written statements?  I have an extensive

16   statement from the Defendant's mother, which is the first

17   statement that was submitted, and it's two and a half pages

18   long, single spaced.

19        MR. GEORGE TRAGOS:  Your Honor, I asked them to

20   provide me on Friday the additional items that they wished to

21   say.  I didn't receive anything from them, so I don't know what

22   additional statements they were going to make.

23        THE COURT:  Can you ask your mother what additional

24   statements she wanted to make other than what she already said

25   in her written letter?

1        Okay, stop.  What is she saying?

2        MR. AVNI OSMAKAC:  My mother is saying the day he was

3    arrested, the CHS called him to come to work and provided him

4    for $10 for gas to go to work.  And then when my brother went

5    there, he told them to go back 'cause I don't have any work for

6    you right now, come back when I call you again.  My mom told

7    him to stay away from him because something -- he's doing

8    something, now you doing something, you stay away.

9        THE COURT:  This is not trial testimony, this is

10   testimony concerning the Defendant's character, and I have a

11   very extensive letter from this witness that I will not allow

12   to be augmented cumulatively.  So you may step down, ma'am.

13       Would you tell her that I have her statement and I've

14   read it in its entirety.  Thank you.

15       (Witness excused.)

16       Now, does the father wish to add anything that he

17   hasn't put in his letter already which I have also read.

18       MR. GEORGE TRAGOS:  Does he have anything to add?

19       The family is indicating he has nothing to add, Your

20   Honor.

21       THE COURT:  All right.

22       They should be told that I have read everything that

23   they have submitted to me and all the letters of their other

24   family and friends, and I'm familiar with their view of their

25   son, brother, cousins' perspective in this case.

```
 1              MR. GEORGE TRAGOS:  Would the Court allow me to
 2     instruct the brother to tell them that?
 3              THE COURT:  Please.
 4              MR. GEORGE TRAGOS:  Excuse me, Your Honor, he stated
 5     to me he has just told them that.
 6              THE COURT:  All right.
 7              MR. GEORGE TRAGOS:  Your Honor, at this time, I think
 8     the Court should inquire about whether or not the Defendant has
 9     any statement the Defendant wishes to make to the Court.
10              THE COURT:  Mr. Osmakac, under our rules in regard to
11     sentencing, you have the right to make a statement in your own
12     behalf, the statement of allocution, setting forth any
13     information you would like for the Court to consider in
14     mitigation or reduction or any kind of consideration of what
15     sentence would be appropriate to impose against you in this
16     case.  You're not required to make a statement in allocution,
17     but you're entitled to make a statement.
18              Do you understand that?
19              THE DEFENDANT:  Yes.
20              THE COURT:  Would you like to make a statement in
21     your own behalf.
22              THE DEFENDANT:  No.
23              THE COURT:  Anything further from the Defendant?
24              MR. GEORGE TRAGOS:  No, Your Honor.
25              THE COURT:  Has anyone threatened you to keep you
```

```
 1    from giving a statement?

 2              THE DEFENDANT:  No.

 3              THE COURT:  Has anyone promised you anything would

 4    happen if you did or didn't give a statement?

 5              THE DEFENDANT:  No.

 6              THE COURT:  Does the Government wish to add anything

 7    to the record?

 8              MS. SWEENEY:  Yes, Your Honor, thank you.

 9              Your Honor, as the Court knows, the Government's

10    recommendation in this case is a term of imprisonment of 40

11    years and I won't repeat --

12              THE COURT:  Pull the microphone down.

13              MS. SWEENEY:  Yes, Your Honor.  Is that better?

14              THE COURT:  Yes.

15              MS. SWEENEY:  Okay.  I won't repeat the statements

16    that are made in the Government's sentencing memo that sets

17    forth why that's appropriate in this case, but I do want to

18    respond to some of the arguments the defense counsel has made

19    as well as make an argument on why a 40-year sentence is

20    appropriate, both under the guidelines and under 3553.

21              First as to this Defendant's mental health, there's

22    been a consistent threat in this case to try to portray the

23    Defendant as severely mentally ill.  I do not think that the

24    evidence at trial bore that out in any way.

25              I think that the doctors who spent the most
```

```
 1    significant amount of time with the Defendant, who would have
 2    been with him and able to see if he had psychotic episodes or
 3    if he suffered from PTSD, that is, the Government's doctors who
 4    both spent multiple days with the Defendant.  Neither one of
 5    them found that he had any of those significant disorders that
 6    other evaluators diagnosed him with, I would maintain, without
 7    a proper basis to do so.  And I think, in particular, Dr.
 8    Montalbano, who testified at trial, explained why those
 9    evaluators did not have the proper basis to do that.
10          The Defendant relies on a number of the
11    Court-appointed psychologists or psychiatrists and their
12    diagnoses of the Defendant.  I think the problem with that,
13    Your Honor, is that those individuals were appointed for the
14    purposes of competency.
15          So while they did perhaps reach a diagnosis with
16    respect to the Defendant's mental health, I believe that all of
17    them also stated in their reports that they spent very little
18    in-person time with the Defendant.  And that's not a slight on
19    those evaluators.  They were able to accomplish a competency
20    determination in that small amount of time.  I don't think
21    there's any question about that.  But those evaluators'
22    opinions were of his overall mental health.  I don't think they
23    can be held up as comparable to the evaluations of
24    psychologists and psychiatrists who spent a significant amount
25    of time with him, and in the case of Dr. Montalbano, conducted
```

1    psychological testing of the Defendant.

2              This Defendant, we know that he knows at least three

3    languages, Your Honor.  He spoke them in the martyrdom video.

4    He spoke English, he spoke German and he spoke Albanian.  And

5    you also know that he's learning Arabic or at least knows some

6    phrases of Arabic.

7              I don't think that this Defendant truly is borderline

8    in terms of his I.Q.  He tested as low average which is

9    different than borderline.  And as Dr. Montalbano testified,

10   intelligence can be affected by cultural factors such as

11   someone being raised in a different culture with a different

12   language than English as their first language.

13             But in any event, I think that what's been presented

14   as to this Defendant that he's losing weight in jail, that he's

15   depressed in jail, those are not factors that are relevant to

16   the Court's consideration here.  All Defendants, any person,

17   not anyone, anyone at all would not want to be in jail for any

18   significant period of time, and certainly, not to be facing a

19   life sentence in front of this Court.

20             But I would also point out that the PSR notes that

21   the Defendant, in terms of his emaciation, the Defendant has

22   acknowledged trying to go on hunger strikes.  So I just don't

23   think that the mental health issues in this case rise to the

24   level of a 3553 factor.  I think that this Defendant has mental

25   issues that are on par with the sort of mental issues that this

1    Court might see every day.

2              The other thing that struck me from the letters from

3    the family members is they did all tell a similar story.  They

4    all told about a sudden and significant change in the

5    Defendant's behavior and personality.  The problem with that is

6    what the friends and family might have interpreted as mental

7    illness was, in fact, radicalization of the Defendant as an

8    Islamic extremist.

9              The Defendant, as Dr. Montalbano testified, appears

10   to have viewed materials related to Islamic extremism for quite

11   some time, and Dr. Montalbano opined that no one could induce

12   the Defendant to do anything that was not in line with his

13   Islamic beliefs or what he saw as his Islamic beliefs.

14             If someone had gone to the Defendant and said drink

15   alcohol or eat pork, the Defendant never would have agreed to

16   do those things under any circumstances.

17             So the idea that -- this idea that the Defendant was

18   unusually susceptible to inducement is not borne out in the

19   evidence and I think it was certainly rejected by the jury in

20   this case.

21             I did just want to address briefly Mr. Avni Osmakac's

22   testimony that he feels that witnesses have been approached by

23   the Government and perhaps intimidated.  I'm aware of nothing

24   like that.  I don't believe anyone from the Government has

25   spoken to any of those potential witnesses, whoever they are,

```
 1   and has told -- has told them --
 2            UNIDENTIFIED VOICE:   (Unintelligible.)
 3            THE COURT:  Excuse me, don't speak out in the
 4   proceedings.  If you want to remain in the courtroom, you'll
 5   have to be quiet, and if you do it again, the Court is going to
 6   ask you to leave.
 7            Do you understand that?
 8            MR. AVNI OSMAKAC:  She's lying.
 9            (Mr. Avni Osmakac left the courtroom.)
10            MS. SWEENEY:  Thank you, Your Honor.
11            May I continue?
12            THE COURT:  Yes.
13            MS. SWEENEY:  No one from the Government has
14   approached anyone and said don't come and testify in this case.
15   That -- that's simply not something that we would do or have
16   done in this matter.
17            THE COURT:  Has the Government instituted deportation
18   proceedings against someone the Government knew was an
19   associate of the Defendant?
20            MS. SWEENEY:  I don't know if it's deportation
21   proceedings yet, Your Honor.  I do know that an individual
22   associated with the Defendant has pending documents before
23   Immigration.
24            THE COURT:  How did they come to be before
25   Immigration?
```

1          MS. SWEENEY:  The individual submitted them in an

2    attempt to gain citizenship, Your Honor.

3          THE COURT:  So this is not a circumstance in which

4    the Government located this person, found him to be illegally

5    or potentially without authorization, and suggested or

6    otherwise encouraged any proceedings to be commenced?

7          MS. SWEENEY:  May I just confirm with the agent just

8    to be sure I'm a hundred percent accurate, but I believe the

9    answer to that is absolutely not.

10          THE COURT:  Well, let me speak with the agent.

11          MS. SWEENEY:  Would Agent Reed be the best person to

12    testify to that?

13          I call Special Agent Taylor Reed, Your Honor.

14    Thereupon,

15                         TAYLOR REED,

16    after having been duly sworn to tell the truth, the whole truth

17    and nothing but the truth, under penalty of perjury, was

18    examined and testified as follows:

19          THE WITNESS:  I do.

20          THE CLERK:  Please state your name and spell your

21    last for the record.

22          THE WITNESS:  Taylor Reed.

23          THE COURT:  Sir, you're under oath.  You must give

24    truthful answers to any questions that are asked.  Any

25    statement you give must be truthful.  If you give false

```
 1   statements or false answers, you face penalties of perjury,
 2   false statement and obstruction.
 3              Do you understand that?
 4              THE WITNESS:  Yes, Your Honor.
 5              THE COURT:  You heard Mr. Avni Osmakac say that
 6   witnesses who might have come forward and rabbis who might have
 7   come forward to testify on behalf of the Defendant at the
 8   sentencing hearing have felt intimidated because of Government
 9   actions or observations of them in connection with the
10   prosecution of the Defendant.  Did you hear that?
11              THE WITNESS:  Yes, Your Honor.
12              THE COURT:  Are you, sir, aware of any contact that
13   any law enforcement officer has made with anyone known or
14   believed to be a potential witness for the Defendant in this
15   case?
16              THE WITNESS:  Yes.
17              THE COURT:  Who is it?
18              THE WITNESS:  Jasmin Hodzic.
19              MR. GEORGE TRAGOS:  Can I have that spelled, Your
20   Honor?
21              THE COURT:  Spell it.
22              THE WITNESS:  J-A-S-M-I-N  H-O-D-Z-I-C.
23              THE COURT:  H-O what?
24              THE WITNESS:  H-O-D-Z-I-C.
25              THE COURT:  Who else?
```

```
 1              MS. SWEENEY:  Your Honor -- oh, I'm sorry, go ahead.
 2     Anyone else?
 3              THE WITNESS:  I think there are other -- and what I'm
 4     referring to --
 5              THE COURT:  I'm asking you their names first, then
 6     we'll get to what happened.
 7              MS. SWEENEY:  Your Honor.
 8              THE COURT:  I don't want you to interfere.
 9              MS. SWEENEY:  I'm sorry, Your Honor, I won't --
10              THE COURT:  I want the names and I don't want the
11     Government to say another word.
12              MS. SWEENEY:  Your Honor, I have to say something,
13     I'm sorry.
14              THE COURT:  Well, I'll hear you at sidebar outside
15     the presence of the witness.
16              (Thereupon, the following discussion was had at
17     sidebar:)
18              MS. SWEENEY:  Your Honor, I apologize, I think that
19     --
20              THE COURT:  I need you to speak quietly.
21              MS. SWEENEY:  I'm sorry, Your Honor.
22              THE COURT:  Sir, if you'll step down off the stand
23     and go back into your area.
24              THE WITNESS:  Yes, Your Honor.
25              THE COURT:  And don't speak to anyone during this
```

```
 1   break.

 2            MS. SWEENEY:  Your Honor, I think that the Court's

 3   question to the witness was of anyone had been spoken to about

 4   this investigation, which --

 5            THE COURT:  He heard my question.

 6            MS. SWEENEY:  Your Honor, my point was only that no

 7   one had spoken to a witness --

 8            THE COURT:  I'll let him answer the question.

 9            MS. SWEENEY:  Yeah, I think that it --

10            THE COURT:  If you want to redirect, if you want to

11   rehabilitate, you're free to do that.

12            MS. SWEENEY:  Can I withdraw the argument?

13            THE COURT:  You may not, you may not.  Overruled.

14            (Thereupon, the sidebar discussion was concluded and

15   the proceedings resumed as follows:)

16            Please retake the stand.

17            THE COURT:  Yes, sir.  Who else?

18            THE WITNESS:  Would you repeat your question one more

19   time for me?

20            THE COURT:  Just answer the question.

21            THE WITNESS:  If you could repeat the question, I

22   want to be sure I'm answering it --

23            THE COURT:  Are you, sir, aware of any contact that

24   any law enforcement officer has made with anyone known or

25   believed to be a potential witness for the Defendant in this
```

```
 1   case?
 2              THE WITNESS:  Yes.
 3              THE COURT:  And who are they?
 4              THE WITNESS:  Jasmin Hodzic and Russell Dennison.
 5              THE COURT:  And when was the contact made with Jasmin
 6   Hodzic?
 7              THE WITNESS:  The morning after Mr. Osmakac was
 8   arrested.
 9              THE COURT:  And what other contact has been made with
10   him?
11              THE WITNESS:  None that I'm aware of.
12              THE COURT:  And Mr. Dennison?
13              THE WITNESS:  The same morning, and I believe several
14   days later, a second contact.
15              THE COURT:  And is Mr. Jasmin Hodzic under
16   deportation proceedings?
17              THE WITNESS:  Not that I'm aware of.
18              THE COURT:  And Mr. Dennison, what's his status.
19              THE WITNESS:  He is no longer within the United
20   States.
21              THE COURT:  Where is he?
22              MS. SWEENEY:  Your Honor, the agent cannot answer
23   that question.
24              THE COURT:  You're asserting a privilege?
25              MS. SWEENEY:  Yes, Your Honor.
```

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
1              THE COURT:  What type of privilege?
2              MS. SWEENEY:  Your Honor, this is a -- the
3    information known is --
4              THE COURT:  This is a FISA privilege?
5              MS. SWEENEY:  Yes, Your Honor.
6              MR. GEORGE TRAGOS:  Can I just be clear, the FISA
7    privilege is as to the location of Russell Dennison?
8              MS. SWEENEY:  Yes.
9              THE COURT:  Are you aware of any contact anyone has
10   made with a person who was expected to come here to offer
11   mitigation testimony for Mr. Osmakac at this hearing.
12             THE WITNESS:  No, Your Honor.
13             THE COURT:  Are you aware of this person that Ms.
14   Sweeney has said has submitted some documents and is being
15   evaluated for their status in the country?
16             THE WITNESS:  I believe that's Mr. Hodzic.
17             THE COURT:  So I thought he wasn't under any sort of
18   deportation proceedings?
19             THE WITNESS:  As far as I know, there are no
20   proceedings.  Information was submitted as Ms --
21             THE COURT:  After the arrest of the Defendant or the
22   day after that information was submitted?
23             THE WITNESS:  Sometime subsequent to that.
24             THE COURT:  Well, I thought no contact had been made
25   since the day of the arrest?
```

```
 1              THE WITNESS:  As far as I'm aware, no one -- no law
 2    enforcement officers for the United States have had any contact
 3    with Mr. Hodzic since the morning after Mr. Osmakac's arrest.
 4              THE COURT:  Okay.  So who did have contact with him?
 5    What Government officer did have contact with him?
 6              THE WITNESS:  None, Your Honor.  If I could clarify.
 7    Subsequent to his arrest, agents with Immigration have had
 8    interactions with my office.  We've submitted information
 9    regarding Mr. Hodzic's association with Mr. Osmakac to them for
10    consideration in his citizenship application.
11              MS. SWEENEY:  Your Honor, may I inquire?
12              THE COURT:  No.
13              Have you heard of a catspaw?
14              THE WITNESS:  I'm sorry?
15              THE COURT:  Have you heard of a catspaw, where
16    someone reaches into a proceeding and they, themselves, don't
17    have to undertake the actions, but someone else does?  How is
18    it that agents with Immigration came to have contact with
19    Mr. Hodzic?
20              THE WITNESS:  I don't believe they had, Your Honor.
21    They became aware, his application was pending --
22              THE COURT:  He filed his own application?
23              THE WITNESS:  Yes, ma'am.
24              THE COURT:  And it was pending?
25              THE WITNESS:  Yes, Your Honor.
```

```
 1                    THE COURT:  And how did you come to learn of it?
 2                    THE WITNESS:  Immigration made us aware that he had
 3       that application pending.
 4                    THE COURT:  Why would Immigration call you to tell
 5       you about that?
 6                    MS. SWEENEY:  Your Honor, the agent cannot answer
 7       that question.
 8                    THE COURT:  So the agents of Immigration did make
 9       contact with you?
10                    THE WITNESS:  Yes, Your Honor.
11                    THE COURT:  And in response to that contact, you
12       provided the agents with information concerning this individual
13       to assist the agents in their determination about what to do
14       with his immigration status?
15                    THE WITNESS:  Yes, Your Honor.
16                    THE COURT:  And what was that information that you
17       gave to them?
18                    THE WITNESS:  Your Honor, it was primarily -- in
19       fact, I think it was exclusively information that was turned
20       over in discovery to the defense in this matter, surveillance
21       logs, interview reports.
22                    THE COURT:  What is his affiliation with the
23       Defendant?
24                    THE WITNESS:  They were close friends.
25                    THE COURT:  Did you provide any information to any
```

```
 1    other Immigration official concerning anyone else who was a
 2    close friend of the Defendant?
 3              THE WITNESS:  No, Your Honor.
 4              THE COURT:  An acquaintance of the Defendant?
 5              THE WITNESS:  No, Your Honor.
 6              THE COURT:  Known to associate with the Defendant?
 7              THE WITNESS:  No, Your Honor.
 8              THE COURT:  Have any of the rabbis that the Defendant
 9    was affiliated with or associated with been followed?
10              MR. GEORGE TRAGOS:  I think Iman is the word the
11    Court was looking for.
12              THE WITNESS:  None that I'm aware of, Your Honor.
13              THE COURT:  The Court needs to go into ex-parte
14    session with the Government.
15              MR. GEORGE TRAGOS:  Your Honor, before the Court does
16    that, can I raise something else because I know another Court
17    is going to want to take this up ex-parte as well.
18              THE COURT:  Yes, please.
19              MR. GEORGE TRAGOS:  Your Honor, during the course of
20    these proceedings, we've repeatedly requested from the
21    Government and the Government has filed documents with the
22    Court with regards to Russell Dennison not being an agent of
23    the Government.  And because, if you remember, Russell Dennison
24    had some recordings played during the course of the trial,
25    being that he was unavailable and not a Government agent.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1          I now hear that the Government knows where he is.

2     That's fine, but it disturbs me that if he's not a Government

3     agent, why is it national security where he is.  And Russell

4     Dennison could have been a very relevant person to the case, as

5     the Court knows again, we have these recordings.

6          So, my guess is that since the Russell Dennison

7     location is FISA or FISA, that it may be something the Court

8     wants to look into as to the reasons why the Government said he

9     wasn't a Government agent or working for the Government.

10         THE COURT:  All right.

11         Anything else?  If you'll step out for a moment,

12    we'll secure the Defendant outside the courtroom, and I'll

13    inquire of the Government.

14         (Thereupon, an ex-parte, in camera classified

15    proceeding was had and not included in this transcript.)

16         The Court has considered the objections of the

17    Government to the inquiry of the witness on the stand beyond

18    what was disclosed and the Court sustains the objections

19    asserted by the Defendant to any other inquiry into those two

20    areas and also does not find there's any basis to believe that

21    any witnesses were intimidated or tampered with to preclude

22    them from testifying at the sentencing hearing or on behalf of

23    the Defendant at all.

24         Anything further from the Government with respect to

25    the matter of sentencing?

```
 1              MS. SWEENEY:  Your Honor, yes, may I continue with my
 2   presentation?
 3              THE COURT:  If you must.  I've read your sentencing
 4   memo, I've heard what you had to say.  Do you have anything new
 5   to add?
 6              MS. SWEENEY:  I will be very brief, Your Honor, but
 7   just for the record, I think there are some things I have to
 8   say with respect to the 3553 factors.
 9              MR. GEORGE TRAGOS:  Your Honor?
10              THE COURT:  Yes, sir?
11              MR. GEORGE TRAGOS:  If I might, there is an
12   additional question I wish to ask Agent Taylor with regards
13   to --
14              THE COURT:  Agent Reed?
15              MR. GEORGE TRAGOS:  I mean, Agent Reed, I'm sorry.  I
16   do have an additional question I would like to ask him.
17              THE COURT:  What's the question?
18              MR. GEORGE TRAGOS:  I want to ask him about an Allen
19   Sahmavoic, S-A-H-M-A-V-O-I-C, who is married to the cousin of
20   the Defendant, and to whether or not the FBI interviewed him,
21   and whether or not there were any discussions with regards to
22   the immigration status of the Defendant's cousin who had
23   married Allen Sahmavoic.
24              THE COURT:  Any objection to those inquiries?
25              MS. SWEENEY:  No.
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1              THE COURT:  All right.

 2              You may retake the stand, Mr. Taylor -- I'm sorry,

 3    Mr. Reed.

 4                        CROSS EXAMINATION

 5    BY MR. GEORGE TRAGOS:

 6    Q.    It is Taylor Reed?

 7    A.    Yes, it is.

 8    Q.    Okay.  Are you familiar with Allen Sahmavoic,

 9    S-A-H-M-A-V-O-I-C, being interviewed by the FBI?

10    A.    Yes, I am.

11    Q.    And during the course of -- do you know when these

12    interviews were?

13    A.    I know he was interviewed the morning after Mr. Osmakac

14    was arrested, and I believe there were followup interviews

15    with him subsequent to that, but I don't know the exact time

16    frame.

17    Q.    Are you aware that he was, at that time, I think engaged,

18    I think now married, to the Defendant's cousin?

19    A.    I was not aware of that.

20    Q.    Are you aware of any discussions that occurred with

21    regards to the immigration status of the Defendant's cousin who

22    is married to Al Sahmavoic?

23    A.    I am not.

24              MR. GEORGE TRAGOS:  That's all the questions I have,

25    Your Honor.
```

1           THE COURT:  Thank you.

2           Any follow-up?

3           MS. SWEENEY:  No, Your Honor.

4           THE COURT:  You may step down.

5           (Witness excuse.)

6           MS. SWEENEY:  Your Honor, I will be as brief as I can

7    in completing the rest of my argument.  I won't say anything

8    else about the nature of the offense which has been discussed

9    at great length in the Government's sentencing memo.

10           As to the history and characteristics of the

11    Defendant, to the extent that there is even a wisp of the idea

12    of entrapment left in this case, I think that the evidence at

13    trial completely obliterated that.  Whether the Eleventh

14    Circuit recognizes it as a sentencing doctrine or not, the

15    Defendant here had clear --

16           THE COURT:  The Court has already addressed it and it

17    does not intend to apply an entrapment in sentencing variance

18    in the case.

19           MS. SWEENEY:  Understood, Your Honor, but I think the

20    point I'm trying to make, and I'm sorry if I wasn't making it

21    clearly, is that the Defendant's intent here was so strong and

22    so corroborated by all the things that he had engaged in before

23    and after ever having contact with Government agents, including

24    as we --

25           THE COURT:  So why are you still arguing entrapment?

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

1           MS. SWEENEY:  I'm not, I'm arguing the Defendant's

2    strong intent in committing these acts.

3           THE COURT:  All right.

4           He's already been found guilty beyond a reasonable

5    doubt.

6           Do you have anything new to add?

7           MS. SWEENEY:  Yes, Your Honor, so I'll move on.

8           But I do want to point out the Defendant is and will

9    continue to be a danger to the community.  There is case law

10   that the Government cited that says that individuals who engage

11   in terroristic crimes are to be viewed as being more dangerous

12   than the typical criminal.

13          And I want to point out that even with a 40-year

14   sentence, this Defendant will be in his 60s when he gets out of

15   prison, which is still quite -- is young enough to continue to

16   engage in crimes if the Defendant were so inclined to do that.

17          And here, we have no indication that he wouldn't

18   continue to engage in these same types of activities.  He has

19   never expressed remorse for any of his behavior in this case.

20   He never expressed the slightest hesitation to engage in the

21   acts that he wanted to carry out in this case and in other

22   illegal behavior that he engaged in, including traveling

23   overseas to attempt to join Jihad in Iraq or Afghanistan

24   against American soldiers.

25          And Dr. McClain testified at trial that the Defendant

1    continued to have delusions of martyrdom when she spoke to him.

2    All of these factors combine to make this Defendant

3    particularly dangerous to the community and there's no

4    indication that that danger will ever abate at this point on

5    record, it just does not exist.

6              So in addition to the 40-year sentence, the

7    Government would ask for a lifetime of supervised release to

8    follow the Defendant's release from prison.

9              The only other thing I just want to raise is

10   deterrence is a key goal in these types of cases and a serious

11   sentence here would promote deterrence and promote respect for

12   the law.

13             For all the reasons I stated and for the reasons in

14   the Government's sentencing memo, the Government seeks a

15   40-year period of incarceration followed by a lifetime of

16   supervised release.

17             Thank you.

18             THE COURT:  Thank you.

19             MR. GEORGE TRAGOS:  Your Honor, I would first inform

20   the Court that the Defendant wishes to address the Court again

21   in camera, ex-parte.  He has new information that he states

22   that he has not revealed to me or anyone else with regards to

23   advice given to him by his former attorney.  I have no idea

24   what it is, but he says it could change the entire complexion

25   of what we're doing here.

```
 1              THE COURT:  What attorney?
 2              MR. GEORGE TRAGOS:  What's the name of the attorney?
 3              THE DEFENDANT:  Charles B. Vaughn.
 4              THE COURT:  Any objection from the Government?
 5              MS. SWEENEY:  Your Honor, based on what Mr. Tragos
 6    said, at this point, I do think I have to object, it has
 7    nothing to with the sentencing proceeding.  It sounds like it's
 8    about substantive evidence in the case, and as we noted, the
 9    time for that has passed.
10              THE COURT:  Well, I don't know what it's about, so I
11    don't have any idea, so we'll hear him and I'll determine
12    whether the time has passed.
13              Clear the courtroom again for all but Court staff and
14    I'd ask Probation to step out as well.
15              (Thereupon, the following is an ex-parte, in camera
16    proceeding.)
17              THE COURT:  Yes, sir?
18              THE DEFENDANT:  Okay.  One thing I told Charles P.
19    Vaughn is about the night of arrest.
20              THE COURT:  This is Charles Vaughn?
21              THE DEFENDANT:  Yeah.
22              THE COURT:  Yes, sir?
23              THE DEFENDANT:  I told him about something that
24    happened at the night of arrest, and this is something I did
25    want to talk to Dr. McClain about, but she wasn't allowed, on
```

```
1    top of other reason I wrote down, and I think it has a lot to
2    do with the whole case and even sentencing and the whole case
3    altogether.  And my inquiry of her to see me was at least since
4    two months to see.  It wasn't --
5              THE COURT:  What was it Mr. Vaughn told you or what
6    happened on the night of the arrest?
7              THE DEFENDANT:  Can I consult with him real quick?
8    He doesn't know about this.
9              THE COURT:  Yes.
10             (Brief pause.)
11             Yes, sir?
12             THE DEFENDANT:  George Tragos does not know what Dr.
13   McClain would know about the information I specifically wrote
14   down because every time the doctors came, including her, they
15   would ask the questions and interfere with what I had to say.
16   I specifically request George Tragos to -- that I want to speak
17   to her about things and I wrote down things.
18             THE COURT:  What happened to you on the day of the
19   arrest that had to do with Mr. Vaughn or has to do with these
20   proceedings?
21             THE DEFENDANT:  Well, George Tragos is not sure if I
22   should say without speaking to Dr. McClain.
23             MR. GEORGE TRAGOS:  Your Honor, he's asked me for
24   advice and he's told me for the first time this information and
25   what I have told him was in this context right now, I don't
```

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1   know how to advise him.  He said he wanted to tell the Court

2   about something that he told his prior lawyer that his prior

3   lawyer told him not to mention before.  He's mentioning it to

4   me for the first time and I don't know if it would change any

5   opinions of any mental health experts or not because I'm not a

6   mental health expert.

7           THE COURT:  All right.

8           Well, if I don't know what it is, I can't do anything

9   about it, and if he hasn't raised it before today, it's too

10  late to raise it.  And he has had an immeasurable number of

11  opportunities to speak with mental health care providers

12  concerning whatever it is he wanted to talk to them about and

13  if he hasn't mentioned it till now --

14          THE DEFENDANT:  May I?

15          THE COURT:  You may do so understanding that you're

16  doing so against the advice of your lawyer if you wish to do

17  so.  Do you understand that your lawyer has advised you not to

18  disclose it?

19          THE DEFENDANT:  I understand, no, I'm saying that he,

20  George Tragos, and Dr. McClain, Dr. McClain I don't recall her

21  saying she received a call from him to come see me about a week

22  prior.  This is something I've been requesting at least two

23  months.  So there's something with the defense, specifically,

24  especially with the reports.  There's a lot of things which

25  came from the UCE that were told to me or from the CHS, and

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

1    those things I tell the UCE.  And these things we didn't get to

2    prepare because the attorney has not done his job.

3              THE COURT:  Okay.  Let's recall the Government.

4              (Thereupon, the in camera, ex-parte proceedings

5    concluded.)

6              Despite the fact that the Defendant requested an

7    ex-parte hearing with the Court to describe something that had

8    gone on with a different attorney, Mr. Vaughn, the Defendant

9    declined to disclose what that was in the hearing and in any

10   event, it apparently is something he's known about since the

11   day of his arrest.  He has had numbers of opportunities to

12   present this information to lawyers and to his interviewers who

13   were mental health providers.  He was given an opportunity to

14   testify in his own behalf at trial, which he declined to do,

15   and he was given an opportunity to allocute here or to make a

16   statement here, which he has, within his right, declined to do,

17   and so the Court is not able to address anything about which it

18   has not been informed.  And in any event, it would appear to be

19   far past all deadlines for asserting any evidentiary challenges

20   or any -- or introducing evidence as to guilt, innocence or

21   questions of sentencing.

22             Yes, sir?

23             MR. GEORGE TRAGOS:  Your Honor, with regards to the

24   sentence that the Court is going to hand out today, the

25   Government has talked about dangerousness and the Defendant's

1    propensity in this case.  When we look at dangerousness, I

2    think we have to look at how really dangerous would this

3    Defendant really have been had it not been for the FBI.  And

4    what chances would this Defendant have of repeating this if it

5    hadn't been for the FBI.  What chances of success would this

6    Defendant have had if it hadn't been for the FBI.

7            The FBI created this crime.  They orchestrated the

8    activity.  They provided the money on one end for him to buy

9    explosives.  They provided the explosives on the other end, and

10   without any of that, he had no ability, no means, no money, no

11   intent here to blow up anything here in the United States until

12   the Government initiated their activity.

13           I don't believe it is appropriate to sentence him the

14   same way we would someone who created the activity, someone who

15   bought the weapons, someone who paid for the weapons with his

16   own money or any of the like.  So we should look at this

17   Defendant differently.

18           I believe that the appropriate sentence in this case

19   would be no more than 20 years.  It satisfies all of the

20   requirements of sentencing.  It certainly is a deterrent.  It

21   certainly is punishment.  But it also is appropriate for the

22   crime and appropriate for the facts and the activities which

23   the Court heard about during the course of the sentencing.

24           So I would ask this Court to not sentence this

25   Defendant to any more than 20 years, and perhaps less, because

```
 1    I believe the facts in this particular case justify it.
 2              THE COURT:  Mr. Osmakac, would you like to make a
 3    statement on your own behalf?
 4              THE DEFENDANT:  I haven't prepared anything.  All I
 5    do is pace all day and I got thoughts in my head, so...
 6              THE COURT:  So the answer is no?
 7              THE DEFENDANT:  Yes.
 8              THE COURT:  Yes, the answer is no?
 9              THE DEFENDANT:  Yes, the answer is no.
10              THE COURT:  All right.
11              Would you please stand, sir.
12              The Court has considered all of the information that
13    has been submitted to it on behalf of the parties, sentencing
14    memos, letters on behalf of the Defendant, I have considered
15    the arguments made here, I have sat through and considered all
16    the evidence introduced in the course of the trial, and I have
17    considered the Pre-Sentence Report as modified.
18              In accordance therewith and pursuant to Title 18,
19    United States Code, Sections 3551 and 3553, it is the judgment
20    of this Court that this Defendant, Sami Osmakac, is hereby
21    committed to the custody of the Bureau of Prisons to be
22    incarcerated for a term of 40 years.  This consists of a term
23    of 40 years as to Count One, a term of 120 months as to Count
24    Two, such terms to run concurrently.  And upon release, he will
25    serve a term of incarceration of life -- I'm sorry -- a term of
```

1    supervised release of life.

2              You may be seated.

3              This is life as to Count One and three years as to

4    Count Two, all such terms to run concurrently.  While on

5    supervised release, you will comply with standard conditions

6    adopted by the Middle District.  You will participate in mental

7    health treatment.  You will submit to a search of your person,

8    residence, place of business and storage units and vehicles to

9    insure compliance.  You are a felon.  You will cooperate in

10   the collection of DNA as directed.

11             The mandatory drug testing requirements of the VCCA

12   are waived.  However, you will be required to submit up to 104

13   tests per year.  The Court waives the imposition of a fine.

14   The Court orders the Defendant to pay a special assessment of

15   $200 which is due immediately.

16             Having considered the advisory sentencing guidelines

17   and all of the factors identified therein, the Court finds that

18   the sentence imposed is sufficient but not greater than

19   necessary to comply with the statutory purposes of sentencing.

20             The Court having pronounced sentence, does counsel

21   for the Government object to the sentence or manner in which it

22   was pronounced?

23             MS. SWEENEY:  No, Your Honor, but I think -- did you

24   mention forfeiture?

25             THE COURT:  I haven't done forfeiture.

```
 1              MS. SWEENEY:  Thank you, Your Honor.

 2              THE COURT:  Is there a forfeiture order in this case

 3   or there's not one in the sentencing statement?

 4              MS. SWEENEY:  I do believe the Court entered a

 5   forfeiture order.

 6              THE COURT:  Yes, I entered a preliminary order of

 7   forfeiture in this case in October.  That forfeiture included

 8   $500 in currency, $2,500 in firearms, an AK-47 assault rifle,

 9   magazine, ammunition, a pistol, ammunition for the pistol, a

10   duffel bag, firearm components, a magazine, ammunition can, and

11   other items as identified in that order of forfeiture through

12   to a vehicle and cell phones and associated items.  The Court

13   will impose that as a final order of forfeiture in this case.

14              Does the defense object to the sentence or the manner

15   in which it was pronounced?

16              MR. GEORGE TRAGOS:  No, Your Honor.  I do have two

17   items I'd like to raise with the Court.

18              THE COURT:  Yes, sir.

19              MR. GEORGE TRAGOS:  And they are probably items that

20   should be raised after the Court has finalized the sentence.

21   They do not deal with the actual sentence.

22              THE COURT:  Does the defense request special

23   placement?

24              MR. GEORGE TRAGOS:  No, Your Honor.  I don't think

25   that's -- I think they're going to place him where they think
```

1    they want to put him.

2              THE COURT:  All right.

3              The Defendant is hereby remanded to the custody of

4    the United States Marshal to await designation by the Bureau of

5    Prisons.

6              You have the right, Mr. Osmakac, within 14 days of

7    today's date to appeal your sentence.  If you fail to appeal

8    within 14 days, it will be a permanent waiver of your right to

9    appeal.

10             The Government may file an appeal if it chooses and

11   if it does so, you will have the right, obviously, to defend

12   that appeal and to file a cross appeal.

13             You're advised that you are entitled to have a lawyer

14   represent you in the taking of that appeal.  If you cannot

15   afford an attorney, the Court will appoint one for you.  If you

16   cannot pay the filing fee, the Court already directs the Clerk

17   of the Court to accept the notice of appeal without a fee

18   because I find, based upon the Pre-Sentence Report, that the

19   Defendant is not able to afford counsel in the taking or

20   defense of an appeal.

21             That is the judgment of this Court imposed this day,

22   November 5th, 2014.

23             Yes, sir?

24             MR. GEORGE TRAGOS:  Your Honor, two issues.  One is

25   that there's been -- we've been attempting to get an Iman,

1    Hassan Shibly, in to see the Defendant and we would ask that

2    the Court order that he be allowed to see Hassan Shibly.

3    Hassan Shibly has special Iman qualifications to perform

4    certain procedures with the Defendant.

5              THE COURT:  Any objection from the Government?

6              MS. SWEENEY:  Your Honor, I don't know, because I

7    think the issue is if Mr. Shibly wants to see the Defendant

8    through the standard video link that's available at the

9    Pinellas County Jail, I don't know that any special order is

10   required for that.

11             I'm assuming based on the special request that the

12   request is that he be able to have direct face-to-face contact

13   with the Defendant and I would need to consult with the

14   Marshals and with the Pinellas County Jail.

15             THE COURT:  He's going to be remanded to the custody

16   of the Marshal Service to await designation by the BOP and so

17   he will be subject to whatever their protocol is in regard to

18   seeing Iman Shibly or any other Iman associated with his

19   special requests.

20             Yes, sir?

21             MR. GEORGE TRAGOS:  Secondly, Your Honor, I have

22   filed a motion to withdraw in this case and which has been

23   served upon the Defendant.  I would ask the Court to, at this

24   time, grant that motion.

25             THE COURT:  Are you not prepared to represent the

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

1      Defendant in the appeal of this case?

2               MR. GEORGE TRAGOS:  No, Your Honor, I have not been

3      contracted to do so.

4               THE COURT:  All right.

5               Any objection from the Defendant for Mr. Tragos to

6      withdraw?

7               THE DEFENDANT:  No.

8               THE COURT:  All right.

9               The Court would grant the defense counsel's motion to

10     withdraw as counsel for the Defendant in this case.  Just as

11     soon as I resolve the pending motion to unseal certain

12     material, the Government has conceded that certain material

13     should be unsealed, the Court would grant the unsealing of that

14     material.  The Government has also requested that certain

15     material would remain sealed, that is, material that it has

16     identified as material that relates to its facilities for

17     conducting investigations, its deliberative process in the

18     course of an investigation and information that reveals

19     confidential information concerning essential bystanders or

20     peoples whose names might have been revealed in the course of

21     inquiry.  And finally, the names of and information concerning

22     ongoing investigations.

23               The Court has reviewed the material that has been

24     highlighted as falling within those categories and the Court

25     would sustain the Government's request to keep that information

```
 1    confidential and under seal, and the remaining portions would
 2    then be released for review and consideration outside of a
 3    sealed status.
 4              And I'll give -- have the Government prepare a
 5    redacted set of materials based upon the information it has
 6    provided and it will provide that information to Mr. Osmakac
 7    and his current counsel of record, Mr. Tragos.
 8              MS. SWEENEY:  Yes, Your Honor.  And I provided Ms.
 9    Vizza this morning with a set of those redacted materials.  The
10    Court is not --
11              THE COURT:  I saw them.
12              MS. SWEENEY:  Say that again.
13              THE COURT:  I saw them.
14              MS. SWEENEY:  Yes, Your Honor, thank you.
15              MR. GEORGE TRAGOS:  Your Honor, does the Court give
16    me permission to provide all of the materials in whatever form
17    that I have received in discovery to new counsel because there
18    are some issues --
19              THE COURT:  You were not given a clearance of any
20    type, were you?
21              MR. GEORGE TRAGOS:  No, I was not given any
22    clearance.
23              THE COURT:  Then I don't know that anything you have
24    would not be subject to communication to new counsel.
25              Is the Government aware of any basis to preclude new
```

CLAUDIA SPANGLER-FRY  OFFICIAL U.S. COURT REPORTER

```
 1    counsel from receiving that material?
 2              MS. SWEENEY:  No, Your Honor.  The only thing that
 3    the Government would ask is that there is a protective order
 4    entered -- that was entered in this case way back at the
 5    beginning and revised slightly, and we would -- we'll speak
 6    with appellate counsel and make sure that that protective
 7    order -- they understand that that protective order remains in
 8    place.
 9              THE COURT:  The Court would place a protective order
10    in place to cover not only current counsel but any future
11    counsel that would undertake the representation of Mr. Osmakac
12    on appeal.
13              MR. GEORGE TRAGOS:  And Your Honor, the Court, I
14    know, declared him indigent for filing of the notice of appeal.
15    Is the Court declaring him indigent for appointed counsel?
16              THE COURT:  Yes, based upon the information in the
17    PSR, I don't believe the Defendant has the means to retain
18    counsel and I assume, absent the largesse of his family, he
19    wouldn't have been able to retain you; is that right?
20              MR. GEORGE TRAGOS:  Yes, Your Honor.
21              THE COURT:  All right.
22              MR. GEORGE TRAGOS:  Thank you, Your Honor.
23              THE COURT:  The Court has conferred with Mr. Stephen
24    Leal who is the next person up on the list in the Middle
25    District who is most familiar with appeals emanating from the
```

1    Tampa Division as the lawyer who would handle the appeal of Mr.
2    Osmakac as first designee.  He's available to take the case.
3            Is there any objection or reason that the Court is
4    not aware of that Mr. Leal would not be suitable in this case?
5            MR. GEORGE TRAGOS:  Can the Court spell that last
6    name?
7            THE COURT:  L-E-A-L, Stephen Leal.
8            MS. SWEENEY:  No, Your Honor, not from the
9    Government.
10           MR. GEORGE TRAGOS:  The defendant doesn't know him,
11   so I guess he has no opinion.
12           THE COURT:  All right.
13           The Court would appoint Mr. Stephen Leal to represent
14   the Defendant in the appeal of this matter.  And he is aware
15   that this appointment is forthcoming and he will be prepared to
16   address it to file any motions necessary to assist in the
17   efficient processing of any such appeal if one is warranted.
18           Anything further in this matter from the Government?
19           MS. SWEENEY:  No, Your Honor, thank you.
20           THE COURT:  From the defense?
21           MR. GEORGE TRAGOS:  No, Your Honor.
22           THE COURT:  We are dismissed.
23           (Thereupon, the proceedings concluded.)
24                         ******
25

CLAUDIA SPANGLER-FRY   OFFICIAL U.S. COURT REPORTER

```
 1                          CERTIFICATE

 2

 3   STATE OF FLORIDA          )

 4   COUNTY OF HILLSBOROUGH     )

 5

 6          I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

 7   the United States District Court, Middle District, Tampa

 8   Division,

 9          DO HEREBY CERTIFY, that I was authorized to and

10   did, through use of Computer Aided Transcription, report

11   in shorthand the proceedings and evidence in the

12   above-styled cause, as stated in the caption hereto, and

13   that the foregoing pages numbered 1 to 88, inclusive,

14   constitute a true and correct transcription of my

15   shorthand report of said proceedings and evidence.

16          IN WITNESS WHEREOF I have hereunto set my hand

17   in the City of Tampa, County of Hillsborough, State of

18   Florida, this 15th day of June, 2015.

19

20          /s/CLAUDIA SPANGLER-FRY
            _____
21          CLAUDIA SPANGLER-FRY, Official Court Reporter

22

23

24

25
```